IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **JOHN DOE,** | ) | |
| Address Withheld, | ) | |
| | ) | |
| **Plaintiff,** | ) | Civil Action No. _____ |
| | ) | |
| **v.** | ) | |
| | ) | **COMPLAINT** |
| **THE GEORGE WASHINGTON** | ) | |
| **UNIVERSITY,** | ) | |
| 2121 I Street, NW | ) | |
| Washington, DC 20052 | ) | |
| | ) | |
| Serve: Mary Lynn Reed | ) | |
| Registered Agent | ) | |
| 2100 Pennsylvania Ave., NW | ) | |
| Suite 250 | ) | |
| Washington, DC 20052 | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

## NATURE OF THE ACTION

John Doe[1], by and through his attorneys, Justin Dillon and Christopher C. Muha, files this

complaint for gender-based discrimination in violation of 20 U.S.C. § 1681 (commonly known

as Title IX) and the D.C. Human Rights Act (D.C. Code § 2-1402.41), as well as breach of

contract and negligence.  In support of this complaint, John Doe states as follows:

## PARTIES

1.      Plaintiff John Doe is, and at all times relevant to this Complaint has been, a

resident of the State of Washington.  John Doe matriculated as a freshman at The George

Washington University ("GW" or "University") in August 2014 and completed all of his

---

[1] Due to the nature of the allegations in this lawsuit, Mr. Doe is proceeding under the pseudonym
"John Doe" and identifies his accuser as "Jane Roe."  He identifies other current and former
University students by their initials.

coursework by December 2017.  He was scheduled to have his degree conferred on January 19, 2018, and to walk at graduation in May.  His degree conferral was held in abeyance pending the disciplinary proceeding at issue in this suit and he was suspended from the University for one year on January 23, 2018.

2.      Defendant The George Washington University is a federally chartered university and a non-profit corporation incorporated in the District of Columbia.  Its principal place of business is in the District of Columbia.

## JURISDICTION AND VENUE

3.      The Court has federal question jurisdiction under 28 U.S.C. § 1331 because Doe's claims arise under federal law, namely Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681-88.  This Court also has diversity jurisdiction under 28 U.S.C. § 1332 because John Doe and the University are residents of different states.

4.      The Court has supplemental jurisdiction over John Doe's state law claims under 28 U.S.C. § 1367 because those claims are so closely related to his federal law claim as to form the same case or controversy under Article III of the United States Constitution.

5.      Venue properly lies in this Court under 28 U.S.C. § 1391(b)(2) because a substantial part of the events and omissions giving rise to the claims occurred in this district.

## STATEMENT OF FACTS

6.      On September 12, 2015, John Doe—a sophomore at GW, a member of its club rugby team, and a nondrinker of alcohol due to his religious beliefs—lost his virginity to Jane Roe, a freshman at the time, after Ms. Roe asked if they could have sex in his dorm room, called an Uber to take them there, made out with him there after they arrived, initiated oral sex upon him, held his head as he reciprocated, guided his penis into her vagina, and ultimately climbed

on top of him and thrust down upon him until he ejaculated.  On October 30, 2017—more than two years later and just three months before Mr. Doe would graduate early—Ms. Roe would file a Title IX complaint with GW against him, claiming she was too intoxicated to have consented to any sexual activity that night and that John Doe should have known it.  She demanded that John Doe not be permitted to graduate before she did.  And she got her wish: Mr. Doe was found responsible for having assaulted her and told that, despite having finished all of his course work, he would not be permitted to graduate until the following year.

7.      In one sense—the most important sense—that result is shocking.  Ms. Roe's testimony on critical points changed throughout the investigation, and the story she ultimately told was fantastic on its face.  She claimed to have consumed a ridiculous amount of alcohol—at least 4 shots of vodka, five Solo cups of beer, and at least one Solo cup of a very strong mixed drink—in just two hours, an amount that, on its face, would have put an average-sized woman like herself in the hospital, would have prevented her from having any memory of the night, and would have made it impossible for her to physically control herself.  Yet not a single person at the party saw her slurring her words, stumbling, or speaking incoherently.  Ms. Roe also claimed to have at least 26 distinct memories of her time with Mr. Doe and to have lost consciousness only once—at the very time, coincidentally, that they entered his apartment and began their sexual interaction.  She then claimed that, just *minutes* after regaining consciousness, when Mr. Doe got off the bed and went into the bathroom, she was able to dress herself quickly, *run* down *eight flights of stairs*, *run* home to her dorm, and coherently explain to her roommate—whom she never called as a witness at the hearing—what allegedly had just happened.  As an expert toxicologist would later confirm, Ms. Roe quite possibly would have been *on the brink of death* had she consumed as much alcohol as she says, and she would not have been able to do any of

3

the things she says she did that night. Ms. Roe lacked all credibility as to what happened that night.

8.       In another sense, however, Mr. Doe's suspension was no shock at all. For years, GW has been under relentless pressure to appear tough at all costs on sexual assault claims brought by women against men, and it has responded to that pressure by infusing its Title IX enforcement regime with gender bias and touting to the campus its ***100% conviction rate*** of respondents put through its formal sexual misconduct process, all of whom are believed to be male.

9.       That pressure reached a peak at the very time Jane Roe filed her complaint against John Doe. GW was one of the first universities targeted for investigation by the Education Department's Office for Civil Rights (OCR) in early 2011, when it began telling schools to implement a gender-biased enforcement of Title IX or risk the loss of all federal funding. It revamped its Title IX regime as a result and agree to two years' worth of monitoring by OCR. But in August 2017, OCR opened a new formal investigation into GW in response to a student's complaint, putting its Title IX enforcement regime under renewed scrutiny at the time Ms. Roe filed her complaint.

10.       That is not all. In late 2015, a female student dissatisfied with the University's handling of her sexual assault claims against a male student sued the University in a high-profile case in federal court. That case remains active and was in the thick of discovery when Jane Roe filed her complaint, making it especially necessary for the school to appear tough on sexual assault then.

11.       But most tellingly of all, GW was still dealing with the incredible public fallout stemming from yet another female student's complaints about its Title IX enforcement, in a case

that mirrored Ms. Roe's in striking ways.  That student, Aniqa Raihan, (who has publicly

identified herself in connection with the incident) started a change.org petition to protest the

deferred suspension of a student found responsible for sexually assaulting her more than two

years earlier.  Her alleged attacker, like Ms. Roe's, was a member of the club rugby team with

whom she had had sex more than two years before bringing her complaint and who was about to

graduate.  Her petition seeking his expulsion—and mandatory suspensions, at least, for anyone

found responsible for sexual assault—got more than 2,000 signatures and led to her being given

a sit-down meeting, outside the Title IX process, with GW administrators.  It also led GW to

issue a formal statement of response to the petition, which defended GW's handling of such

claims by expressly touting its 100% conviction rate in cases that had proceeded through its

formal process in the past two years.  Not satisfied with that response, Ms. Raihan interrupted

commencement ceremonies that year in dramatic fashion, as explained below, and in September

she filed her own Title IX complaint against GW, raising the specter that GW could have two

active investigations into its practices if it failed to appear tough on sexual assault in cases like

Ms. Raihan's—which is exactly what Ms. Roe's case was.

12.     The finding and sanction against John Doe are the direct result of the pressure

upon GW, from multiple sources, to appear tough at all costs on sexual assault.  The finding and

sanction violate Mr. Doe's rights under Title IX and the DC Human Rights Act, as well as his

common law rights.

## COLLEGE POLICIES AND PROCEDURES

13.     In the fall of 2014, John Doe matriculated as a freshman at the University.  Upon

his enrollment, Doe received a copy of the Sexual Harassment and Sexual Violence Policy (the

"Policy"), and the Code of Student Conduct (the "Code").  The Policy and the Code established

the University's standards for acceptable conduct, and also described the procedures by which the University would investigate and adjudicate alleged violations of its standards.

14.    In consideration for his tuition and attendance at the University, John Doe received and was given assurances by the University that it would follow and comply with numerous policies and procedures adopted and put forth by the school, including the Policy and the Code.

15.    Under the law of the District of Columbia, the Policy, the Code, and other statements by the University about the matters contained therein are terms in a contractual relationship between the University and John Doe.

16.    The University owes its students a duty of care when creating and enforcing standards of conduct.

17.    At the time Jane Roe made her allegations against John Doe, the Policy and the Code prohibited certain conduct by students at the University including sexual assault. *See* Ex. 1 (Policy); Ex. 2 (Code).  The Policy prohibits "[a]ctual or attempted rape, sexual assault, sexual battery or molestation, without consent or against another's will, whether achieved through force, coercion, threat or intimidation, or advantage gained by the aggrieved party's mental or physical incapacity or impairment." Policy at 3.  The Code likewise prohibits "Sexual Violence," which it defines as "Any physical sexual act against any person . . . against that person's will, or without that person's consent, or when that person is incapable of giving consent due to . . . use of alcohol or other drugs." Code at 2.  "The lack of verbal or physical resistance or participation in any act due to coercion, intimidation or incapacity does not by itself constitute consent." *Id.*

18.     The website of GW's Title IX Office further elaborates on what it means for sex to be consensual under the Policy and the Code. "Consent does not have to be verbal, but it does have to be clear, unambiguous, and voluntary. It must also be given by someone who is capable of doing so and not 'incapacitated' by sleep, unconsciousness, or intoxication."[2] "Someone who is incapacitated due to alcohol (unable to give a verbal, enthusiastic, and consistent "yes") is not able to consent to sexual activity." *Id.* "If the person you are with is impaired in a way you can or should be able to recognize (stumbling, slurring words, not making sense), you must assume they are too impaired to give consent." *Id.*

19.     In addition to proscribing certain forms of conduct, the Policy and the Code also prescribe the procedures the University must follow when investigating and adjudicating claims of misconduct.

20.     The Policy and the Code establish a tiered system of resolution for claims of sexual assault. The process typically begins, as it did here, when a complainant makes a formal complaint. The Policy requires the complainant to draft and sign "a factual account of the alleged harassment." Policy at 15. Complaints of sexual harassment "should be filed as soon as possible after the alleged harassment occurs." *Id.*

21.     Once a statement of complaint is signed, the Office of Student Rights and Responsibilities ("SRR"), the Title IX Coordinator, or their designee, "will conduct an adequate, reliable and impartial investigation of the alleged harassment, typically within 30 days." *Id.* The investigator "will provide the Complainant and the Respondent with similar and timely opportunities to identify witnesses and provide evidence relevant to the complaint." *Id.*

---

[2] *See* https://haven.gwu.edu/consent (last visited February 20, 2018).

7

22.    When the investigation is complete, the SRR, Title IX Coordinator or designee determines "whether an acceptable resolution of the matter may be achieved informally."  Policy at 16.  Informal resolution can involve "corrective action and/or sanctions against the Respondent, or it could involve no further action."  *Id.*

23.    When the matter "is not resolved informally, the SRR or Responsible University Official shall decide whether to initiate a formal hearing against the Respondent as set forth in Appendix C."  *Id.*  When both of the parties are students, the procedures in Section 1 of Appendix C are used.

24.    The first step in that process is for the SRR to "determine . . . whether to charge the Respondent."  *Id.* at 18.  If the SRR hands down charges, then "disciplinary proceedings will be commenced . . . according to the procedures outlined in the Code and in this Section of the Sexual Harassment and Sexual Violence Policy and Procedures."  *Id.* at 19.  In the event of a conflict between the two, the latter source governs.  *Id.*

25.    When the SRR decides to charge a Respondent the parties to the proceeding may elect to proceed either through a Disciplinary Conference (an informal sit-down between the Respondent and a University administrator) or a University Hearing Board (an adversarial hearing).  Code at 6.  Both parties, however, must agree to the use of a Disciplinary Conference; should one of them reject that option, the matter must proceed to a formal, adversarial hearing before an Ad Hoc Board.  *Id.*

26.    "An Ad Hoc Board may be appointed to hear any case which the Director of the Office of Student Rights & Responsibilities or designee determines in their discretion warrants resolution in this manner."  Code at 5.  Ad Hoc Boards "shall be composed of between one and five administrators, faculty members, students, or any combination thereof."  *Id.*

8

27.    The University trains its hearing officers to pursue different objectives in sexual misconduct investigations and hearings than in investigations and hearings for non-sexual misconduct claims.  While the training designed for the adjudication of claims of non-sexual misconduct "address[es] [the] roles and responsibilities of panel members, hearing procedures, applicable policies, and other techniques and standards pertinent to the formal complaint and hearing process," *id.* at 22, the "annual training" provided "to university personnel responsible for the administration of" the Policy concerns "how to conduct investigations and hearings in a manner that ***protects the safety of victims and promotes accountability***," *id.* at 11 (emphasis added).

28.    GW students are subjected to disciplinary action if they are untruthful in a disciplinary hearing.  "Any student who knowingly provides false information during a disciplinary hearing will be charged under Article 11, section i of this 'Code.'"  Code at 6.

29.    Parties to formal disciplinary hearings are given an opportunity to challenge the members of their hearing panels for bias.  "Any party may challenge a Board member on the grounds of personal bias before the hearing commences."  Code at 7.

30.    All factual issues in a hearing, including the question whether a student is responsible for the charges against him or her, are resolved based on a preponderance of the evidence standard.  Code at 7 ("On disputed points, a preponderance of the evidence introduced at the hearing will decide the facts.").

31.    In cases involving sexual violence, "neither the Complainant nor the Respondent will be permitted to question the other directly." *Policy* at 19.

32.     Sanctions are determined by the SRR.  *Id.*  But "[i]n cases involving suspension

or expulsion, the Vice Provost and Dean of Student Affairs, in concurrence with the Provost and

Executive Vice President for Academic Affairs, will impose sanctions."  *Id.*

33.     Parties are permitted "to appeal the outcome of the disciplinary hearing or

conference, . . . although not the sanction imposed, if any."  *Id.* at 20.  "Appeals must be based

on new information that is relevant to the case, that was not previously presented at the hearing

or conference, and that significantly alters the finding of fact."  Code at 8.  They must be

submitted in writing "within five business days after receipt of the outcome letter."  *Id.*

34.     Appeals are reviewed by a University administrator (the Executive Director of

Planning and Outreach) to determine their "viability"—*i.e.*, whether they fit the criteria

permitted in an appeal.  Code at 8.  If the appeal is found to be viable, it is forwarded to the Chair

of the Committee on the Judicial System, who selects a panel of three persons from the

Committee—one student, one administrator, and one faculty member—for a decision on its

merits.  *Id.*  The decision of the appeal panel "shall be final and conclusive and no further

appeals will be permitted."  *Id.*

35.     The appeal panel may do one of three things: (1) affirm the finding of the original

hearing board, (2) remand the case to the original hearing board for a new hearing, or (3) request

that a new hearing board hear the case.  *Id.*

**TITLE IX AT THE UNIVERSITY**

36.     In April 2011, the Education Department's Office for Civil Rights issued a "Dear

Colleague Letter" that dramatically rewrote the landscape of Title IX enforcement at colleges

and universities.  It was accompanied by a tsunami of publicly known investigations conducted

by OCR nationwide into how colleges and universities handle allegations of sexual assault, as

well as innumerable reports in the national media that suggested the pervasive nature of sexual

assault committed by male students on college campuses throughout the nation.  And it was no

secret that the view of sexual violence OCR was enforcing was a gendered view that saw men as

the paradigmatic perpetrators of that violence and heterosexual women as its paradigmatic

targets.

37.    The then-head of OCR, Catherine Lhamon, made that clear on numerous

occasions after 2011.  As one national media outlet reported in October 2016, in a story on

OCR's Title IX campaign:

> Lhamon says she is frustrated.  As she sat in her Washington, D.C.
> office during an interview with SI.com, she said she couldn't help
> but to think about the women who are suffering every day.[3]

Similarly, an OCR press release notified the public that, on May 1, 2014, Ms. Lhamon would be

speaking at the culmination of an event titled, "Walk a Mile in Her Shoes," "an event that will

raise awareness about sexual assault and highlight men's roles in preventing sexual violence."[4]

And in August 2015 she would tell a different national media publication, "'We don't treat rape

and sexual assault as seriously as we should,'" citing a statistic about the rate of unwanted sexual

activity experienced specifically by college women.[5]

---

[3] Scooby Axson, "Explaining Title IX and how sexual assaults are prosecuted on college campuses," SI.com (October 21, 2016) (available at https://www.si.com/college-football/2016/10/20/title-ix-sexual-assault-explained, last visited February 20, 2018).

[4] "U.S. Assistant Secretary for Civil Rights Catherine E. Lhamon to Visit Two California Universities to Highlight Successes in Addressing Community Responses to Sexual Assault" (available at https://www.ed.gov/news/media-advisories/us-assistant-secretary-civil-rights-catherine-e-lhamon-visit-two-california-universities-highlight-successes-addressing-community-responses-sexual-assault, last visited February 20, 2018).

[5] David G. Savage and Timothy M. Phelps, "How a little known education office has forced far-reaching changes to campus sexual assault investigations," LOS ANGELES TIMES (August 17, 2015) (available at http://www.latimes.com/nation/la-na-campus-sexual-assault-20150817-story.html, last visited February 20, 2018).

38.     Ms. Lhamon also left no doubt about the consequences schools faced if they

failed adequately to heed OCR's mandates: They would lose all of their federal funding. "Do

not think it's an empty threat," she told a group of university administrators in July 2014.[6]

"There is 'a need to push the country forward,'" she said in August 2015, echoing the same

sentiment.[7] "It's nice when you carry the big stick of the federal government," she would say

again in October 2016, leaving no doubt that the threat of having one's federal funding yanked

remained very real.[8]

39.     The impact of OCR's new movement was felt immediately by GW in 2011. And

since then, it has continuously been subjected to extraordinary pressure—by OCR complaints, by

lawsuits, by media coverage, and by its own students—to appear tough on allegations of sexual

assault made by women against men, no matter their merit. Those sources of pressure coalesced

right around the time Jane Roe reported her allegations to the University.

40.     On March 4, 2011, a female GW student filed a complaint with the Education

Department's Office for Civil Rights (OCR) alleging "that the University discriminated against

---

[6] *See, e.g.*, Rachel Axon, *Feds Press Colleges on Handling of Sex Assault Complaints*, USA
TODAY (July 14, 2014), http://www.usatoday.com/story/sports/ncaaf/2014/07/14/college-
sexual-assaults-dartmouth-summit/12654521/ (last visited February 20, 2018); Robin Wilson,
*2014 List: Enforcer*, THE CHRON. OF HIGHER EDUCATION (Dec. 15, 2014),
http://www.chronicle.com/article/Enforcer-Catherine-E-Lhamon/150837/ (last visited February
20, 2018); Tyler Kingkade, *Colleges Warned They Will Lose Federal Funding For Botching
Campus Rape Cases*, THE HUFFINGTON POST (July 14, 2014),
http://www.huffingtonpost.com/2014/07/14/funding-campus-rape-dartmouth-
summit_n_5585654.html (last visited February 20, 2018).

[7] David G. Savage and Timothy M. Phelps, "How a little known education office has forced far-
reaching changes to campus sexual assault investigations," LOS ANGELES TIMES (August 17,
2015) (available at http://www.latimes.com/nation/la-na-campus-sexual-assault-20150817-
story.html, last visited February 20, 2018).

[8] Scooby Axson, "Explaining Title IX and how sexual assaults are prosecuted on college
campuses," SI.com (October 21, 2016) (available at https://www.si.com/college-
football/2016/10/20/title-ix-sexual-assault-explained, last visited February 20, 2018).

[her] based on sex when it failed to respond in an adequate manner to her complaint that she was sexually assaulted by another undergraduate student." OCR opened an investigation into GW's handling of sexual assault claims on March 21.

41.    On August 31, 2011, GW entered into a sweeping resolution agreement with OCR to resolve the complaint that had been filed against it in March. As part of that agreement, GW agreed to "provide OCR with a description of all complaints of sexual violence filed with the University" within 60 days of the end of the 2012-13 and 2013-14 academic years, thereby applying extended pressure upon GW to implement OCR's gendered view of Title IX enforcement.

42.    The year after that monitoring ended, GW came under added pressure to appear tough on sexual assault claims brought by women against men. On October 21, 2015, GW was sued in federal court by a former female student alleging that the school had failed to stop years of stalking and sexual violence against her by another student, that it grossly mishandled its belated investigation of her allegations, and that the sanction it ultimately imposed on her attacker was too lenient. *See Prasad v. George Washington University*, No. 1:15-cv-01779-ABJ-GMH (D.D.C. Oct. 21, 2015). That lawsuit received national media attention at the time it was filed,[9] and GW's motion to dismiss the suit was largely denied on June 10, 2016, opening GW to extensive discovery into its handling of allegations of sexual harassment and sexual assault. The plaintiff propounded broad requests for documents reflecting GW's handling of such claims and deposed multiple GW administrators on those same topics in April 2017. Discovery was ongoing when Jane Roe's claims were investigated and adjudicated the following semester, and the case remains active as of the date of this filing.

---

[9] *See* http://www.slate.com/blogs/xx_factor/2015/10/24/lawsuit_alleges_george_washington_ university_violated_title_ix.html (last visited February 20, 2018).

43.     April 2017 saw another very public airing of a female student's claim that GW had utterly failed adequately to address her sexual assault.  In a case with striking similarities to Mr. Doe's, Aniqa Raihan waited more than two years to report an alleged assault by a member of the GW club rugby team until just before he was scheduled to graduate.  In March 2017, GW found him responsible for assault and gave him a deferred suspension that would let him graduate provided he committed no other disciplinary infractions before then.  He also was barred indefinitely from all University-controlled residential properties.

44.     Dissatisfied with that sanction, Ms. Raihan started a change.org petition on April 2, demanding that her assailant be expelled and that GW "[i]mplement mandatory suspensions for students who are found responsible for acts of sexual violence UNTIL THE SURVIVOR GRADUATES, with the possibility of higher sanctions INCLUDING EXPLUSION[.]"[10]  The petition received more than 2,000 signatures and led to a face to face meeting between Ms. Raihan and Peter Konwerski, GW's Vice Provost Dean of Student Affairs.

45.     The petition also provoked a remarkable direct response to the university at large by Caroline Laguerre-Brown (Vice Provost for Diversity, Equity and Community Engagement), Mr. Konwerski, and Roray Muhammad (Title IX Coordinator) on April 21.  Titled "Message from University Administrators," it stated that GW "take[s] the issue of sexual misconduct and sexual violence seriously, and we appreciate and laud the courage necessary for survivors to come forward."[11]  It stated that sexual misconduct cases are difficult to resolve, then noted that "[t]he narrative emerging from the petition and related activities suggests that GW has been reluctant or even unwilling to hold individuals accountable for acts of sexual violence."  The

---

[10] *Available at* https://www.change.org/p/gw-justice-for-survivors-of-sexual-violence-at-the-george-washington-university (capitalized letters in original).

[11] *Available at* https://gwtoday.gwu.edu/message-university-administrators (last visited February 20, 2018).

administrators were eager to disprove that narrative, which they insisted "is not borne out by our record." They recounted that in the last two academic years, a total of 16 formal complaints of sexual misconduct had been made, ten of which "went before a hearing board and are concluded." *All ten of those, they said, resulted in a finding of "responsible."* Four of those respondents were expelled, five were suspended, and one received a deferred suspension.

46.     In touting its conviction rate as a direct response to a claim that it failed to take sexual assault seriously, GW demonstrated a concrete link between public criticism of its Title IX enforcement regime and the results of individual Title IX cases.

47.     Ms. Raihan was satisfied neither by her meeting with Mr. Konwerski nor the Message from University Administrators. On May 20, at GW's commencement, Ms. Raihan, with the help of two friends, unfurled a 5'x12' sign over from a row of elevated stadium seating that read, "#GWProtectsRapists." They did so at the moment her assailant walked across the stage to receive his degree, with Ms. Raihan yelling at him. The entire graduating class from the women's gender and sexuality studies department held a banner with "IX" on it, to represent Title IX, while Ms. Raihan stood with her unfurled sign. Multiple people told her that she was ruining graduation. A police officer instructed her to remove the sign but she refused to do so for several minutes, complying only after the officer called his sergeant and the sergeant arrived. The incident was reported in national, local and campus media outlets.[12]

---

[12] *See, e.g.*, Grace Carr, "'Rapist' Banner Causes Scene at GW Commencement," *dailycaller.com* (May 23, 2017), *available at* http://dailycaller.com/2017/05/23/rapist-banner-causes-scene-at-gw-commencement/ (last visited February 20, 2018); Christina Sturdivant, " 'GW Protects Rapists': Students Protest at Graduation Ceremony," *dcist.com* (May 22, 2017), *available at* http://dcist.com/2017/05/gw_student_protests_at_graduation_o.php (last visited February 20, 2018); Leah Potter, "Students protest graduation of sexual assault assailant at CCAS ceremony," *The Hatchet* (May 20, 2017), *available at* https://www.gwhatchet.com/2017/05/20/students-protest-graduation-of-sexual-assault-assailant-at-ccas-ceremony/ (last visited February 20, 2018).

48.     In the wake of Ms. Raihan's protest and its media coverage, GW took steps intended to show that it was responsive to this pressure.  In July it announced that it had hired the law firm Cozen O'Connor to conduct a comprehensive review of its Title IX enforcement regime.  That same month it also hired Kiera Bloore, who had spent almost her entire professional career representing sexual assault claimants in courts and in university Title IX proceedings—and continues to serve as a legal fellow at one such organization—to serve as its full-time Title IX investigator, a role meant to be decidedly neutral.[13]  Ms. Bloore would be tasked with "conducting investigations of *all* allegations or violations of GW's Sexual Harassment and Sexual Violence Policy.[14]

49.     On August 8, 2017, however, the Education Department's Office for Civil Rights opened an investigation into GW's handling of sexual misconduct claims after a student filed a Title IX complaint with that office.  Upon information and belief that, that investigation will involve a systemic review of GW's handling of sexual misconduct claims over a three-year period.  The investigation was the subject of media attention at GW at the time it was opened,[15] and it remains active.

50.     In September, Ms. Raihan also filed a Title IX complaint with OCR against GW. OCR has yet to announce whether it will open a separate investigation based on that complaint, meaning that, for the entire pendency of Mr. Doe's investigation and hearing process, GW was in an especially precarious situation with regard to OCR.

---

[13] *See* https://www.linkedin.com/in/kiera-bloore-a3889963/ (last visited February 20, 2018).

[14] *Id.* (emphasis added).

[15] *See* Leah Potter, "GW under federal investigation for possible Title IX violations," *The Hatchet* (August 9, 2017), *available at* https://www.gwhatchet.com/2017/08/09/gw-under-federal-investigation-for-possible-title-ix-violations/ (last visited February 20, 2018).

51.     The pressure upon GW continued in the weeks before Ms. Doe filed her complaint.  On October 20, just 10 days before she filed her formal complaint, *The Hatchet* reported that "[m]ore than 150 people gathered in front of" the Education Department to protest the Department's decision "to rescind Obama-era guidelines on Title IX enforcement."[16]  It specifically noted that "many GW students and alumni" were among those who "spoke to the crowd about their personal experiences with sexual violence," and it recounted how two of the GW-affiliated speakers "were also speaking on behalf of Aniqa Raihan, an alumna and sexual assault survivor who petitioned the University to expel her assailant last spring."  One of those speakers specifically "'call[ed] on GW and the Department of Education to stand against misogyny, against rape culture, against rapists and with survivors."  The article then quoted Ariella Neckritz, "a 2016 alumni and former co-president of SASA [Students Against Sexual Assault]," as stating, "'I watched, as a student, GW fail survivors time and time again."

52.     Jane Roe herself has also placed public pressure on the University to be tough on Title IX enforcement.[17]

53.     Consistent with these sources of pressure, GW's Title IX office betrays a gendered view of Title IX enforcement.  GW requires incoming students to participate in mandatory sexual assault prevention training.  The training, which is conducted by its Title IX office, has two components: an online portion and an in-person session.  Among the topics

---

[16] *Available at* https://www.gwhatchet.com/2017/10/20/outside-education-dept-survivors-advocates-hold-vigil-in-support-of-title-ix/ (last visited February 20, 2018).

[17] Providing more detail about this allegation here risks revealing the identities of Jane Roe and John Doe.  Counsel for the University is aware of the "public pressure" to which John Doe refers here.

available to students to choose from for their in-person sessions is "how male students can prevent sexual violence."[18]

54.     The Title IX office also hosts workshops for interested students and student groups.  According to its website, one of its "frequently requested" one-on-one workshops is titled, "Foundations of Sexual Assault and Relationship Violence: Rape Culture and Other Factors."[19]

55.     The Title IX office's webpage also refers students to the work of Laci Green, "a sex educator and internet personality," for "information about consent."  A number of Ms. Green's videos are dedicated to explaining why it's wrong to think that women lie about being sexually assaulted.  In a video titled, "Do Girls Lie About Rape?" she argues that "distrust of rape survivors" is due to a wider "distrust of women" in general.[20]  She elaborates on the connection in another video, "False Rape Accusations??":

> One of the sneakiest and I think most pervasive reasons why people don't believe survivors is that most survivors are women. There are many subconscious sexist beliefs that we learn all throughout our lives that come in and inform our opinions that women lie a lot, we're not trustworthy, we're manipulative . . . ."[21]

"Sexual assault accounts," she concludes there, "are nearly always true."[22]

---

[18] *See* https://gwtoday.gwu.edu/title-ix-office-expands-three-new-staffers (last visited February 20, 2018).

[19] *See* https://haven.gwu.edu/workshops (last visited February 20, 2018).

[20] *See* https://www.youtube.com/watch?time_continue=1&v=wMZyljber8I at 2:22-2:26 ("So our distrust of women is deeply engrained, and I think that it fuels distrust of rape survivors.").

[21] *Id.* at 3:00-3:21.

[22] *Id.* at 3:44-3:48.

**THE INCIDENT**

56.     On September 12, 2015, Mr. Doe attended a party at an off-campus house known colloquially around campus as the rugby house.  Mr. Doe was a sophomore and had played on the GW club rugby team the previous semester.  At that time in his life, Mr. Doe did not drink alcohol, in keeping with his religious beliefs.  Mr. Doe was also a virgin.

57.     Ms. Roe, then a freshman, attended the same party.  According to her Uber receipts, she arrived at the party at 10:46 p.m.  Before arriving, starting at approximately 9:30 p.m., she pre-gamed with other students on her dorm floor.  She was witnessed to have consumed at least four shots of vodka in that time.

58.     At the party, at approximately 11:15 p.m., Mr. Doe ran into his friend, Q.W.  They had known each other since high school and were excited to see each other.  Q.W. was planning to leave the party, but Mr. Doe convinced him to stay to hang out with him.  They took a few pictures together at 11:16 p.m. before Q.W. said he was going into the house to get a beer.  Mr. Doe waited for him outside.

59.     While Q.W. was in the house, Mr. Doe heard a woman near him say to her friend, "I want to have sex with someone right now."  He turned and approached the women and introduced himself.  The woman who had made the statement was Ms. Roe.  She showed no obvious outwards signs of intoxication—she did not slur her words, she did not have trouble standing, and she was responding to him coherently.  She was not holding a drink, either.

60.     Within a few minutes of their introduction, Q.W. returned from inside the house with his beer.  He saw Mr. Doe talking with Ms. Roe and introduced himself to her and her friends.  Q.W. remembers talking and joking with Ms. Roe and having what was, by all

19

appearances, "a normal, lucid conversation" with her.  After talking with her he turned to talk to Ms. Roe's friends.  When he turned back a little while later, Doe and Ms. Roe were kissing.  Q.W. remembers being slightly annoyed with Mr. Doe because Mr. Doe was the reason he had stayed at the party and it now seemed they would not be hanging out together there.  Q.W. left shortly thereafter.

61.     Doe and Ms. Roe talked outside the rugby house for about 20 to 30 minutes.  Despite how the conversation had started, Doe and Ms. Roe had a real conversation, about personal and even intellectual topics.  Ms. Roe told Mr. Doe that she was from outside of Philadelphia and they talked about their majors, which led them to topics on religion and politics, subjects they were both interested in.  It was an impassioned conversation, and Ms. Roe was very engaged in it.  She talked to Doe about an Islam course she was taking that Doe had taken the year before, something he could not have known about her unless she had told him.  They had a sustained conversation about complicated topics that Ms. Roe followed perfectly and contributed to.  She again showed no signs of severe intoxication during that conversation.

62.     After they had talked for a while, Ms. Roe said to Doe that she had been texting her roommate to see their room was available for Ms. Roe and Doe to return to but that it would not be.  Ms. Roe asked Doe, almost out of the blue, "Can we fuck in your room?"  They entered his address into her Uber app and waited for their ride to get there.  Ms. Roe's Uber receipts indicate that the Uber arrived at 11:56 p.m.

63.     As they were preparing to leave, another student, S.A., asked if he could ride with them since he lived close to their destination.  They agreed to let him do so.  He sat in the front, with Mr. Doe in the seat behind him and Ms. Roe behind the driver.  The Uber dropped them off at 12:21 a.m.

64.     Ms. Roe and Doe did not speak to each other on the ride to his dorm room. Ms. Roe was calmly doing things on her phone for almost the entire ride. Doe, on the other hand, as a virgin who was about to have sex for the first time—with a third wheel in the front seat, no less—was nervous and self-conscious and a bit dazed at how fast things were moving. He took his lead from the much more confident-seeming Ms. Roe.

65.     When the three students exited the Uber, S.A. went up the street towards his dorm and Ms. Roe and Doe went into Doe's building. Doe lived on the eighth floor, so they took the elevator.

66.     Once they confirmed that Doe's roommates were not there they began kissing standing up next to his bed. They undressed themselves down to their underwear, and after about five minutes Ms. Roe pulled down Doe's underwear and performed oral sex on him. She then took off her own underwear and Doe performed oral sex on her while she held his head. She then put her hand on his penis and helped him insert it into her vagina and they had missionary-style sex for a few minutes. When Doe asked her to turn over she got on hands and knees, and they had sex with Doe behind her. Ms. Roe then said, "Let me get on top of you." Doe lay down on his back and Ms. Roe squatted over top of him and thrust up and down on him until he pulled out and ejaculated. Ms. Roe then rubbed his penis for a few seconds and said, "Wow, that was exhausting." Doe responded that it was.

67.     Doe got up to put his pants on. Ms. Roe then said to him, "We should fuck again." Doe, however, said that the was too tired and wanted to go to bed. He offered Ms. Roe to stay the night, but she said she would rather go home. Doe offered to walk her home but she turned down the offer. They said goodbye to each other and she left.

## THE INCIDENT IS REPORTED AND INVESTIGATED

68.     On October 30, 2017, more than two years after the incident, Jane Roe made a

formal complaint to the University claiming that on the night of the incident she had been too

intoxicated to consent—indeed, that she had been virtually catatonic.  She stated there that she

"had been drinking before [she] left [her] residence hall" but did remember (or at least did not

report) the amount of alcohol she consumed before leaving.  She said she recalled having

"several drinks" at the party and that her roommate and her roommate's boyfriend "had left

shortly after I arrived."

69.     Ms. Roe went on to state that she "remember[ed], though unclearly," speaking

with Mr. Doe outside at the party.  She stated, however, "I do not remember calling or getting

into a Uber [sic] with the respondent, and I believe I fell asleep or was groggy during the ride

back."

70.     Ms. Roe continued that she "did not know [John Doe's] name" but remembers

seeing on his door "the names of those who lived there and took note of his name."  She did not

explain how she knew which name was his (there were four of them).

71.     Ms. Roe then said that she remembered nothing between "seeing his name on the

door" until she "woke up on a bed in the dorm, facedown while the respondent was penetrating

me."  She alleged that she tried to push him away, then verbalized a "no" and tried to pull herself

away, but could not because he was on top of her and penetrating her from behind.  Ms. Roe says

that Mr. Doe then ejaculated on her and got up to use the shower.

72.     Ms. Roe next says that she "quickly got out of bed and dressed, and went down

the stairs to exit the building."  She never explained how she could have climbed down eight

flights of stairs at all, let alone without injury, just minutes after being unconscious due to

incapacitation.  She went on to say that she "walked . . . straight home," approximately one block, "where my roommate and her boyfriend were in our room."  She says she went to the bathroom and that her roommate followed her there, where Ms. Roe "explained to her the details of what had happened."  **Ms. Roe, however, would never seek any testimony from either her roommate or her boyfriend in the investigation or at the hearing.**

73.    Ms. Roe would later claim that she told several of her friends about the alleged assault in the days and weeks that followed.  And she also would say that she discussed it extensively with a counselor several months before she filed her complaint.  Whatever recall of details that might naturally happen as a person first thinks back on an event would have happened long before October 30.  Accordingly, Ms. Roe stated, at the end of her October 30 complaint statement, "The information I have provided in this report is true and correct to the best of my knowledge.  *The information report contains everything I can recall.*"  (Emphasis added.)

74.    Just three days later, however, Ms. Roe submitted a "Supplemental Statement" that exceeded in length her original complaint statement.  She stated there that she now remembered several things she did not include in her Oct. 30 statement.

75.    Ms. Roe affirmed that she couldn't recall how much she had to drink before leaving for the rugby party, but she estimated that she "consumed 5 Solo cups of beer" at the rugby party.

76.    Ms. Roe stated that she now remembered that she sat in the back seat of the Uber behind the driver.  She also stated that S.A. must have sat in the front.

77.    She also remembered someone shouting something like, "'Why are you leaving?'" as she left the party.

78.     As to the car ride, Ms. Roe specifically stated, "I can't recall any conversation or interactions taking place in the car." As to interactions with Mr. Doe specifically, she separately said later in the supplement, "I don't remember the interactions that I had with [Doe] during the Uber ride or once we arrived."

79.     Ms. Roe said she now remembered "wanting to tell the Uber driver that I wanted to get out of the car" and also that she "felt like [she] couldn't speak."

80.     As to seeing Mr. Doe's name on his door, Ms. Roe again stated, "I remember seeing his name on a door decoration on the door," along with "three other door decorations." She said she didn't "recall recognizing the names of any of his roommates," again failing to explain how she knew which name was Mr. Doe's and which were those of his roommates.

81.     Ms. Roe went on to add details between the time she saw the door decorations and the time she allegedly woke up on the bed, a period in which she claimed no memory in her Oct. 30 statement. She stated that she remembered "where his bed was in the room" and that she thinks "the lights in his room were on when we arrived."

82.     As to memories she had about what happened after sex, Ms. Roe again stated that she "grabbed [her] things quickly," put clothes on, and left. And she again stated that she took the stairs. This time, however, she added a detail that it is impossible to believe she only just remembered: that she "remember[s] falling down the stairs as [she] exited." She failed to explain how it was possible that she fell down only once in that state.

83.     Four days later, on November 6, Ms. Roe submitted yet another "Supplemental Statement." She claimed to "remember[] more details about the incident" after "speaking with some other parties," even though she had been speaking about the incident with friends and a counselor over the course of two years.

84.     Of note, Jane Roe said that she "now remember[s] drinking more than beer at the party." She said she "also drank 'jungle juice,' which is a mixed drink of Everclear and punch or lemonade. It has a high alcohol content." She also said she remembered that she drank it after, not before, she drank the beer.

85.     Despite claiming in her statements to have had six cups of alcohol—not shots, *cups*—in the one hour that she was at the rugby party, *after* having consumed some additional quantity of alcohol at the pregame, Ms. Roe never testified to using the bathroom at the rugby party, at Mr. Doe's place, or after she got home. Indeed, if she had truly fallen unconscious in the Uber, or on Doe's bed, she almost surely would have suffered incontinence immediately.

86.     Ms. Roe also claimed, in evidence she submitted to the investigators, that after the night of the incident, "I did not attend another party [there] because I thought the respondent might be there.

87.     By November 20, the investigation had turned up the following relevant evidence, all of which tended to undermine Ms. Roe's story:

   a. Text messages between Ms. Roe and a friend of hers before the rugby party in which Ms. Roe's friend says to her, "But like if one of us doesn't get laid tonight it's a failure."

   b. Ms. Roe's Uber receipts confirming the times she and Mr. Doe departed and arrived at various places that night.

   c. The statements of three witnesses (all friends of Ms. Roe) who saw her at the party yet did not testify that she looked intoxicated, let alone incapacitated— including one who saw her walking across the street yet did not say she had trouble doing so.

   d. The statement of one of her witnesses confirming that she had attended a party at the rugby house with him just two months after the night of the incident.

88.     Ms. Roe also submitted on November 16 a highly prejudicial letter from Mary Dolby McDonald, the counselor with whom she'd been meeting since March 6, 2017. Ms.

25

McDonald is a Licensed Clinical Social Worker with a Master's degree in social work but no degree in psychology or psychiatry. It stated as *fact*—not simply as something reported by Ms. Roe—that she had actually been assaulted:

- "[T]he sexual assault she experienced greatly contributed to the severity of her mental health concerns."

- "There is no question that the sexual assault she endured contributed to the necessity of the intensive treatment course."

And it expressly called for the University to sanction Mr. Doe as a result:

- "I certainly hope that you as university officials will take into account very seriously the toll this terrible event has taken on [Ms. Roe] and act accordingly in sanctioning the assailant."

It did so, furthermore, despite revealing that Ms. McDonald was treating Ms. Roe for *multiple* "current diagnoses" that predated the alleged assault, though the nature of those diagnoses were redacted.

89.     The investigation acquired one more piece of evidence by November 20: a statement emailed that day by E.E., a friend of Ms. Roe's and a former student at GW (the only former student to offer evidence in the proceeding). Upon information and belief, E.E. submitted testimony for the investigation because Ms. Roe identified her as a potential witness. E.E. testified there to what was easily the most dramatic piece of testimony in the case, the only testimony that—if true—would show that Ms. Roe was severely intoxicated that night and that Doe should have known it. E.E. testified that after losing track of Ms. Roe at the rugby party for some time, "*we*"—she and their friends—

> "called [Ms. Roe] and she said she was in an Uber with the suspected assailant but she was slurring her worlds [sic] and speaking incoherently and we couldn't understand anything else over the phone. She was obviously not in a conscious state of mind, definitely too drunk/maybe even drugged to consent. *We all*

went to go look for her but that point it was too late and that is all I
can remember."

E.E. concluded by hoping that "justice is served against her alleged attacker.  Not just for her

sake but for all of the victims of sexual violence at GW."

90.     E.E. and Ms. Roe both failed to identify who the other individuals were who

joined her in making this phone call and searching for Ms. Roe.

91.     Upon information and belief, no one from GW involved in the investigation asked

E.E. or Ms. Roe to identify who these other individuals were either.

92.     Upon information and belief, no one from GW ever asked her or E.E. to produce

phone records that might corroborate the existence of this call.

93.     Ms. Roe never explained why she failed, in three separate complaint statements,

to mention this phone call.

94.     There is a simple reason that explains all of that:  The phone call never happened.

95.     E.E., and no other witness for Ms. Roe, offered this fabricated testimony because

she alone is a *former* GW student who cannot be disciplined by GW for testifying untruthfully in

its disciplinary proceedings.

96.     On November 20—before seeing any of the evidence besides Ms. Roe's

statements—Mr. Doe submitted a statement responding to Ms. Roe's complaint statements.  He

testified there to what is recounted above in paragraphs 55-66: that he approached Ms. Roe after

hearing her say, "I want to have sex with someone right now," that they talked about their majors

and an Islam course she was taking, that she asked, "Can we fuck in your room?", that they did

not talk on the ride to his dorm, that she initiated and led most of their sexual encounter, and that

through the entire thing she neither slurred her words nor stumbled nor lacked mental coherence

nor exhibited any other outward sign of severe intoxication.

97.     Despite the lack of any testimony that Ms. Roe appeared incapacitated—or even intoxicated—at the rugby party; the contradictions between Ms. Roe's complaint statements, filed mere days apart; the addition of new details after October 30 despite her statement that the Oct. 30 statement contained all she could remember; and the obvious problems surrounding E.E.'s belated disclosure of the most damning evidence in the case, GW informed Mr. Doe on December 5 that the administrative review of Ms. Roe's complaint was complete and that he would be charged with having violated Article 11, Section (a)(1) of the Code of Conduct: Sexual Violence.

98.     On December 8, Mr. Doe was informed that an Ad Hoc Board would be convened to preside over his hearing and that the hearing would occur on December 14.  He was also told the identities of three individuals who would testify on behalf of Jane Roe: E.E., J.E. (a GW student with whom Ms. Roe pregamed before the party), and R.M. (a GW student who was at the party and with whom she had been romantically involved).

99.     The investigation conducted by the University before the hearing was wholly inadequate.  Upon information and belief, the University did little more than invite Mr. Doe and Ms. Roe to submit statements and to identify others whom it might solicit to submit a statement. Upon information and belief, the University interviewed no one nor took any affirmative steps to identify or contact witnesses who were not identified by the parties, even when the parties' testimony indicated the existence of such witnesses with relevant testimony.

### THE HEARING

100.     On December 14, a hearing was held on Jane Roe's allegations.

101.     Despite the Policy's promise that students will be permitted to challenge Board members based on personal bias, Mr. Doe was given no meaningful chance to object to the

Board members selected to preside over his case.  Rather, Mr. Doe was told their identities when he arrived for the hearing and was given no opportunity to review their backgrounds or otherwise acquire a meaningful basis on which to decide whether to object.

102.    Mr. Doe's Board consisted of an undergraduate student, C.R.; a student at GW's law school, D.H.; and an administrator, Christina Witkowicki.  Ms. Witkowicki is the Director of Greek Life at GW, a job that makes her "responsible for risk management and liability of all 30 chapters."[23]  Ms. Witkowicki is also pursuing a Doctorate in Education at GW, and the dissertation she is writing is titled, "The Influence of Gender Role Norms on Leadership Style Development in College Male Leaders."  Had Mr. Doe been able to learn these things about her before the hearing, he would have objected to her inclusion on the panel.

103.    Ms. Roe testified at the hearing, as she had in her complaint statements, that she was too intoxicated to consent to any sexual activity that night.  She believed that she was unconscious from the time she saw Mr. Doe's name on his door to the time she woke up in his bed, in the middle of sexual activity.

104.    Ms. Roe's testimony at the hearing added numerous details to the testimony she had already provided in her three complaint statements.

   a.  For the first time, Ms. Roe added detail to the level of alcohol she believed she consumed at the pregame, stating that she consumed "above four shots, maybe five."  She testified that she had "over ten drinks" between 9:30 p.m. and 11:56 p.m.

   b.  For the first time, Ms. Roe testified to remembering that she felt "scared" in the Uber.

   c.  For the first time, Ms. Roe testified that she specifically remembered thinking that she "did not wanna be having sex with this person" while Mr. Doe was allegedly assaulting her.

---

[23] *See* "Introducing Christina Witkowicki," *GWToday* (Oct. 25, 2010), *available at* https://gwtoday.gwu.edu/introducing-christina-witkowicki (last visited February 20, 2018).

     d.   For the first time, Ms. Roe claimed that she specifically recalled "not understanding how I got there."

     e.   For the first time, she testified that she "*scrambled* out of the room and building as quickly as I could."

     f.   For the first time, she claimed that she "*ran* down the stairs as fast as I could," not bothering to explain how she could have done so just 10 minutes after being unconscious due to intoxication.

105.    Beyond simply providing new details she claims to have remembered, Ms. Roe's hearing testimony also contradicted her investigation testimony in numerous respects.

     a.   Ms. Roe testified at the hearing that she "remembered spending a lot of the night with my roommate at the time, [A.C.], and her boyfriend, [R.B.]," but testified in her October 30 complaint statement that A.C. and R.B. "left shortly after I arrived."

     b.   Despite having claimed on November 2 that she "can't recall any conversation or interactions taking place in the car," Ms. Roe testified at the hearing that she remembered being on a phone call in the Uber. She stated that she wasn't aware who was on the other end, but that E.E. told her it was her. Ms. Roe never explained why she failed to report this phone call in any of her three complaint statements.

     c.   Ms. Roe testified at the hearing, "I don't remember gathering my clothes or my bag" before leaving Doe's dorm room, in an effort to depict her alleged intoxication, yet she testified in her November 2 statement that she remembered having "grabbed my things quickly" before leaving.

     d.   Ms. Roe testified at the hearing that she "*ran* back to [her] residence hall" after the alleged assault, in an effort to depict her alleged distress, but she testified on October 30 that she had "*walked* . . . straight home" from Doe's place (emphasis added).

     e.   Realizing that her claim to have learned Doe's name by seeing four unknown names on his door didn't make sense, Ms. Roe gave a new explanation at the hearing of how she learned Doe's name. She claimed that his name was the *only* one from the door that she remembered, because of its unusual spelling, and that she looked up that name on Facebook sometime later and recognized his face.

106.    After Ms. Roe finished giving her opening statement, one of the panelists stated, "I just want to recognize for all parties involved today that this can be an extremely traumatic

30

experience reliving things, and I appreciate everyone's involvement." But reliving a consensual sexual encounter was not at all traumatic for Mr. Doe, nor would anyone reasonably expect it to be. The panelist's statement, made immediately after she had finished testifying, was directed at Ms. Roe and suggested that the panelist had prejudged the case, its fig leaf of neutrality notwithstanding.

107.    The first witness to speak on Ms. Roe's behalf was her dorm neighbor at the time of the incident, J.E. He testified that Ms. Roe had "at least four . . . minimum four" drinks at the pregame that he hosted before the rugby party. He further testified that the girls at the pregame were stumbling and slurring their words a bit as they left for the rugby party. He did not testify that he observed them doing so at the party.

108.    The second witness to speak on Ms. Roe's behalf was R.M., a GW student who was at the party and with whom she'd had a romantic relationship between the time of the rugby party and the time she brought her complaint. He testified that there were approximately 100 people at the party. He was the *only* person to testify, either before or during the hearing, that Ms. Roe looked intoxicated at the rugby party. And he *refused* to say that she was severely intoxicated. When asked to estimate her level of intoxication, he expressly declined. "I don't want to go in depth and be like, I know exactly what the . . . I can say she was intoxicated." When he was then asked if anything about the interaction stood out to him, he did not say that she was slurring, stumbling, or exhibiting any other specific marker of intoxication; he simply answered, "You know how it is with parties. You know when someone's drunk, so . . . ."

109.    The hearing panel refused to let Mr. Doe ask R.M. questions to establish his potential bias as a witness. When Mr. Doe asked R.M. whether he had previously been "romantically or sexually involved with" Ms. Roe, one of the hearing board members

immediately interjected, "That's not a relevant question, so I'm not going to allow that to be answered."

110.    Ms. Roe's third witness was E.E.  She testified, as she had in writing on November 20, that Ms. Roe was incoherent on the phone.  "[S]he was extremely intoxicated, over the phone, and like barely conscious."  She allegedly kept repeating the phrase, "I'm in an Uber with a guy."

111.    E.E's testimony about the phone call contradicted the testimony she had given in writing less than a month earlier.  Despite having testified in writing to a dramatic unfolding of events—that she had feared for her friend's safety that night, called her on the phone for that reason, learned she was in fact in danger, searched for her with others, then discovered later that she had in fact been raped—E.E. testified *twice* at the hearing that *Ms. Roe* called *her* from the car that night ("Ms. Roe] called me and she told me she was in an Uber").  She also testified that Ms. Roe had told her "they were going to his apartment," even though Ms. Roe had testified that she did not know they were going there, but on the contrary was *confused* as to why the Uber had stopped there and not at her dorm.

112.    E.E. further testified that, after her phone call with Ms. Roe, Ms. Roe's roommate, A.C., who was still at the party, searched for her.  Ms. Roe, however, had testified on October 30 that A.C. left the party shortly after she arrived there.

113.    E.E. additionally testified that she learned of the alleged assault "probably a couple weeks after [it] happened," leaving little doubt that she would have discussed any alleged phone call in the Uber with Ms. Roe long before Ms. Roe filed her formal complaint.

114.   Neither Ms. Roe nor E.E. ever explained how Ms. Roe could have managed to get out her phone and successfully call E.E. if she were groggy and falling asleep (in the words of Ms. Roe on October 30) or "barely conscious" (in the words of E.E. at the hearing).

115.   Despite the fact that E.E. had said she and a group of Ms. Roe's friends had called her on the phone and searched for her that night, Ms. Roe produced no other witness to testify about this phone call, and neither she nor E.E. even identified by name the other people allegedly involved with this call.  Thus the only witness to testify about the phone call, either before or during the hearing, was someone who stood no risk of being disciplined by GW for providing untruthful testimony at a disciplinary hearing.

116.   Mr. Doe provided testimony at the hearing consistent with what he had said in writing on November 20.  And he expressly denied that Ms. Roe on any kind of phone call while they were in the Uber.

117.   Mr. Doe presented no witnesses of his own, and that fact was irrationally held against him by one the panelists, who stated, "So [Ms. Roe] has presented a couple witnesses, . . . . Is there any reason why you haven't presented any witnesses to us today?"  Mr. Doe responded that no one witnessed their sexual encounter and that the only person he knew who had witnessed their interactions—Q.W.—was abroad that semester, but had told Mr. Doe that he had observed nothing out of the ordinary when interacting with Ms. Roe.  The question evinced a bias against Mr. Doe and a desire to look for any reason at all to doubt his testimony.

### THE DECISION

118.   On January 23, 2018, GW informed Mr. Doe that the Hearing Board had found him responsible for sexually assaulting Ms. Roe and that he would be suspended for one year.

119.    The Board concluded that Ms. Roe's "level of intoxication reached the point of incapacitation" that night.  They based that conclusion on five things: (1) Ms. Roe's own testimony about her level of intoxication and her lack of memory, (2) E.E.'s testimony that Ms. Roe was incoherent and barely conscious on the phone, (3) the fact that Doe and Ms. Roe were quiet in the Uber, and (4) "the behavior of the collective club sports team," *i.e.* the rugby team, "that night, of which the Respondent was a member," in "encourag[ing]" women "to drink heavily," and (5) Mr. Doe's disclosure that he had approached Ms. Roe after hearing her say, "I want to have sex with someone right now," something they labeled "an example of predatory behavior."

120.    The Board "acknowledge[d] the statements made by [Mr. Doe] regarding [Ms. Roe's] actions that indicated to him that he had consent: [Ms. Roe] asked him to make arrangements to find a place to have sex, requested the Uber, removed his clothing, initiated oral sex on him, agreed to change positions when asked, and requested that they change positions."  It nevertheless concluded that Mr. Doe should have known that Ms. Roe was not just intoxicated that night, but was so intoxicated as to be incapacitated, for two reasons: (1) "the statements of the witnesses, indicating that they observed [Ms. Roe] acting in an intoxicated manner, in stumbling and slurring her words," and (2) "[Mr. Doe's] statements that the Complainant ceased conversation with him after leaving the party."

121.    The Board never explained how Mr. Doe could have known that Ms. Roe had been stumbling, given that the only testimony by anyone about that was J.E.'s testimony that she had stumbled as she was leaving the pregame.  The Board heard literally no testimony, ***from anyone***, that Ms. Roe had been observed stumbling or slurring at the party, including from three people who testified in writing that they saw her there—one of whom even saw her crossing the

street as she left. The only testimony that indicated Mr. Doe could have observed her slurring

her speech was E.E.'s testimony about the alleged phone call in the Uber, which Mr. Doe denied

ever happened and which had so many red flags as to be inherently unreliable.

122.    The Board also never explained why Mr. Doe, who abstained from alcohol for

religious reasons, could be held responsible for his teammates allegedly encouraging women to

drink. The Board heard no evidence—because there was none—that Mr. Doe had helped to plan

the party, had encouraged anyone to drink, or had given anyone a drink. And by Ms. Roe's own

testimony, she did all of her drinking before talking to Mr. Doe. Neither she nor anyone else

testified that *anyone* at the party, let alone Mr. Doe, had encouraged her to drink.

123.    The Board furthermore failed to explain why it would credit "[Mr. Doe's]

statements that the Complainant ceased conversation with him" in the Uber but not the rest of his

statement as to why—that she was busy doing things on her phone the entire ride. The Board

additionally never explained why an alleged change in Ms. Roe's demeanor in the Uber could be

tied to her alcohol consumption, given that Ms. Roe herself testified that her memory blackouts

began occurring long before she got in the Uber.

## THE APPEAL

124.    On January 30 Mr. Doe appealed the hearing board's finding based on two new

pieces of evidence: a report by an expert toxicologist who analyzed what Ms. Roe's level of

intoxication would have been had she consumed as much alcohol as she said she did, and a

statement from another student, Q.W., about his interaction with Ms. Roe at the rugby party.

125.    Based purely on the testimony of Ms. Roe and her witnesses about her level of

alcohol consumption and the time within which she consumed it, the toxicologist concluded that

Ms. Roe would have had a BAC of at least 0.26 (if she had consumed 10 drinks), and possibly as

high as 0.37 (if she had consumed 13), with 0.32 being the BAC that fell in the middle of that

range.  That, as he explained, is an *extraordinarily* high level of intoxication.  At an estimated

BAC level of 0.32, "Ms. [Ms. Roe] *would have required immediate medical attention because*

*she potentially could have been on the brink of death from alcohol intoxication*."  Even at a

BAC of 0.26, "the low end of the range," it is "unlikely . . . that she would have had *any* memory

of the car ride" or "*any* memory of anything that had occurred thereafter."  (Emphasis added.)

And it is "*extremely* unlikely" that she could have "dressed herself, run down eight flights of

stairs, run one block to her home," and been "coherent enough to be able to explain to her

roommate" what had supposedly happened.  (Emphasis added.)  And by Ms. Roe's own

testimony, she would not have been at the "low end of the range," because she said at the hearing

that she consumed "over ten drinks" that night.

      126.    Q.W. testified in his statement that he had a "normal, lucid conversation" with

Ms. Roe at the party.  He explained that he and Mr. Doe took a picture at 11:16 p.m., that he

went to get a beer, and that when he returned a few minutes later Mr. Doe and Ms. Roe were

talking.  Q.W. then talked with Ms. Roe, talked with her friends who were standing in that same

group, then saw Doe and Ms. Roe kissing.

      127.    Q.W.'s testimony established that Ms. Roe and Doe had no short conversation

before leaving in the Uber at 11:56 p.m., but instead had talked from approximately 11:25 p.m.

until the time they departed together.  He testified that she seemed perfectly lucid and was with

friends.  His testimony disproved any suggestion that Mr. Doe's interaction with Ms. Roe was

predatory in any way.

      128.    Mr. Doe's appeal also explained all of the reasons that E.E.'s claim to have

spoken with Ms. Roe on the phone in the Uber could not be believed.  He explained:

a. That E.E.'s change from saying she called Ms. Roe for a very specific reason—
fear for her safety, which was dramatically confirmed—to saying *Ms. Roe* called
*her* was not credible.

b. That Ms. Roe's level of intoxication, as confirmed by the expert toxicologist,
would have made it impossible for her to call E.E., let alone coherently say,
several times, "I'm in an Uber with a guy."

c. That neither Ms. Roe nor E.E. ever identified the *others* who, with E.E., allegedly
both called Ms. Roe and then searched for Ms. Roe that night.

d. That if this call had actually happened, E.E.—or one of the others allegedly
involved in it—would have told Ms. Roe about it long before November 20 and it
would have appeared in one of Ms. Roe's three complaint statements.

e. That E.E. could not have heard Ms. Roe say on that call that she was going to a
guy's apartment because Ms. Roe herself says she did not know that information
while in the Uber.

129.   Mr. Doe also explained in his appeal that he was quiet in the Uber not because

Ms. Roe had suddenly somehow become catatonic, but because he was nervous about having sex

for the first time, felt awkward that a third person whom he didn't know well was in the front

seat, and Ms. Roe was calmly buried in her phone the entire time.  He noted that the Board gave

no explanation why it would credit his testimony that they didn't talk yet fail to also credit his

testimony that she was busy with her phone the entire ride.

130.   On February 15 the University summarily rejected Mr. Doe's appeal, not on its

merits, but because it purportedly failed to satisfy the threshold criteria required of appeals.

Article 33 of the Code sets forth those criteria:

> Appeals must be based on new information that is relevant to the
> case, that was not previously presented at the hearing or
> conference, and that significantly alters the finding of fact.

Appeals that meet those criteria are sent to the Chair of the Committee on the Judicial System,

who selects a panel to decide the merits of the appeal.

131.    In a one-page letter from Robert Snyder, the University's Executive Director of Planning & Outreach, the University rejected Mr. Doe's appeal without explanation. Mr. Snyder simply repeated the threshold requirements of an appeal identified in Article 33, then stated, with no elaboration, "[I]t is my determination that you have not met the requirements for an appeal."

132.    Mr. Doe's appeal indisputably met those criteria. Neither the report of the expert toxicologist nor the statement of Q.W. were "presented at the hearing." Nor could they have been: It wasn't until the hearing that Ms. Roe specified the amount she drank at the pregame, and Q.W. was studying abroad at the time of the hearing. But even if that evidence had been available at the time of the hearing, that could not disqualify its use in an appeal, because appeals are not required to be based on information unavailable at the time of the hearing.

133.    The information undoubtedly was relevant—the toxicologist concluded that Ms. Roe's reported actions could not be reconciled with her reported alcohol intake, and Q.W.'s statement was evidence that Ms. Roe was not severely intoxicated at the rugby party.

134.    The new evidence also dramatically altered the findings of fact: They completely undermined Ms. Roe's credibility, on which the hearing board relied in its decision; directly supported everything Mr. Doe had said from the beginning about Ms. Roe's presentation that night; and, as to the toxicologist report, proved that, if Ms. Roe had truly consumed as much alcohol as she said, it would have been so obvious to those at the party that many of them would have testified to it. Yet none did.

## CAUSES OF ACTION

### COUNT I – VIOLATION OF TITLE IX (20 U.S.C. § 1681)

135.    Plaintiff incorporates by reference all of the preceding paragraphs of this Complaint as though fully set forth herein.

38

136.    The University receives federal funding, including in the form of federal student loans given to students.

137.    Because it receives federal funding, the University is subject to the requirements of Title IX.

138.    Title IX prohibits gender discrimination in the educational setting.

139.    Ms. Roe's complete lack of credibility; the frequent changes in her testimony; her impossible story about the actions she supposedly took after drinking so much alcohol; the lack of any credible evidence that Ms. Roe exhibited any signs of incapacitation to Mr. Doe or to anyone else at the party; and the lack of any evidence showing that she was incapacitated at all at the time they had sex; cast serious doubt on the University's finding of responsibility and show that the decision against him was based on his gender and the gender of his accuser.

140.    At the time Ms. Roe's claims were reported, investigated and adjudicated, the University was under tremendous pressure, from multiple sources, to appear tough on sexual assault, especially in cases that mirrored Jane Roe's.  It initiated its investigation and adjudication of the allegations against Mr. Doe fewer than three months after it came under active OCR investigation, and fewer than two months after a second OCR complaint was filed against it.

141.    As a reaction to these sources of pressure and scrutiny, the University was motivated to be perceived as aggressively addressing women's claims of sexual assault on its campus.  It has therefore treated male students accused of sexual misconduct by female students, including Mr. Doe, more aggressively than it otherwise would, and more aggressively than it would treat similar complaints made by male students against female students.

142.    GW's own Title IX office betrays the fact that gender bias pervades the process by which the University investigates and adjudicates sexual misconduct claims.  It offers incoming students a course on how "male students," specifically, "can prevent sexual violence." It offers a workshop that analyzes "rape culture," a term that typically denotes the 'normalization' of mistreatment of women by men, as one of the chief "foundations" of sexual violence.  And it refers students for information about consent to Laci Green, an internet personality whose materials exhibit overt gender bias with respect to the credibility of women who allege sexual assault.

143.    Consistent with those beliefs, every single respondent put through the University's formal hearing resolution process in academic years 2015-16 and 2016-17 was found responsible.  And the University itself touted that fact, in direct response to campus-wide criticism of its handling of a female complainant's case, proving that it views the results in individuals cases as a foil to the public criticism it has received for years, and continues to receive, regarding it handling of such claims.

144.    Upon information and belief, all of the respondents in those two academic years were men, and all or the vast majority of their accusers were women.

145.    Also upon information and belief, that same 100% conviction rate continued into the 2017-18 academic year.

146.    The gender bias with which the University investigates and adjudicates such claims also manifested itself in Mr. Doe's hearing.  At the conclusion of Ms. Roe's opening statement, one of the panelists stated that he wanted to acknowledge "that this can be an extremely traumatic experience reliving things, and I appreciate everyone's involvement," betraying the fact that he had already credited Ms. Roe's claim to have experienced something

traumatic.  Conversely, Mr. Doe's truthfulness was called into question by a panelist simply

because he had no relevant witnesses to bring to the hearing.  And the hearing board refused to

allow Mr. Doe to explore the potential bias of one of Ms. Roe's witnesses, whom he knew to

have had a romantic relationship with Ms. Roe in the past.  That witness was the only one to

testify that Ms. Roe appeared intoxicated, to any degree, at the party.

147.    The University has engaged in a pattern of unfair investigations and adjudications

resulting in serious sanctions being imposed on male students.  Upon information and belief, the

University has not acted comparably with respect to allegations of sexual misconduct made

against female students.

148.    As a direct result of the University's violation of Title IX, and as a direct and

proximate cause thereof, John Doe has been seriously and irreparably damaged in the following

ways, among others: he has endured extreme emotional and psychological suffering as a result of

the University's one-sided treatment of the false sexual assault charges against him; he has lost

the ability to graduate in the 2017-18 academic year, thereby delaying the time at which he can

begin a career and shortening the length of that career; his academic records from the University

and the gap between the completion of his coursework and his eventual date of graduation will

reflect his suspension, handicapping his ability to be accepted to graduate school or to secure his

desired employment; and he will suffer a permanent reduction in lifetime earnings.

149.    Accordingly, Defendant the University is liable to Mr. Doe for violations of Title

IX and for all damages arising out of that violation.

### COUNT II – VIOLATION OF THE D.C. HUMAN RIGHTS ACT
### (D.C. Code § 2-1402.41)

150.    Doe incorporates by reference all of the preceding paragraphs of this Complaint

as though fully set forth herein.

151.    Section 2-1402.41 of the D.C. Human Rights Act states:

It is an unlawful discriminatory practice, subject to the exemptions in § 2-1401.03(b), for an educational institution:

(1) To deny, restrict, or to abridge or condition the use of, or access to, any of its facilities, services, programs, or benefits of any program or activity to any person otherwise qualified, wholly or partially, for a discriminatory reason, based upon the actual or perceived: race, color, religion, national origin, sex, age, marital status, personal appearance, sexual orientation, gender identity or expression, familial status, family responsibilities, political affiliation, source of income, or disability of any individual[.]

152.    That provision bars acts of intentional discrimination and acts that merely have the effect of burdening a protected class.

**A. Disparate Treatment**

153.    For all of the reasons stated in Count I, Mr. Doe's finding of responsibility and the sanction against him are the product of intentional gender discrimination and therefore violate his rights under the D.C. Human Rights Act.

154.    The disparate impact of the University's Title IX enforcement regime, as explained below, is additional evidence that the University engaged in intentional gender discrimination in finding Mr. Doe responsible and suspending him.

**B. Disparate Impact**

155.    Upon information and belief, the vast majority of respondents in the University's Title IX proceedings over the past three years, and all of those put through its formal hearing process during that time, have been male.

156.    All of the respondents put through the University's formal hearing process in academic years 2015-16 and 2016-17 were found responsible.

157.    Upon information and belief, all of the respondents in academic year 2017-18 whose cases have been concluded have also been found responsible.

42

158.    The University uses training designed specifically for the investigation and adjudication of claims of sexual misconduct and sexual assault for the purpose of training individuals to handle such claims. It does not employ that same training for the purpose of training individuals to handle claims of non-sexual misconduct.

159.    The University employs as its Title IX investigator an individual who spent almost her entire professional career representing sexual assault claimants in court cases and university Title IX proceedings, who continues to serve as a legal fellow at one such organization, and who brings a bias in favor of complainants into every case she investigates.

160.    The process by which the University trains the individuals involved in sexual misconduct proceedings, conducts investigations of such claims, and adjudicates or otherwise resolve such claims has the effect of producing false findings of responsibility.

161.    The false findings of responsibility for claims of sexual misconduct exceed those for claims of non-sexual misconduct.

162.    Upon information and belief, the University does not convict 100% of its students accused of non-sexual misconduct or put through its formal hearing process on such claims.

163.    The University's Title IX enforcement regime has the effect of disproportionately burdening male students based upon their sex.

164.    No business necessity justifies the disparate impact of the University's Title IX enforcement regime upon male students.  A less discriminatory process, such as the regime the University uses to resolve claims of non-sexual misconduct, would suffice for claims of sexual misconduct as well.

165.    As a direct result of the University's violation of the D.C. Human Rights Act, and as a direct and proximate cause thereof, John Doe has been seriously and irreparably damaged in

the following ways, among others: he has endured extreme emotional and psychological

suffering as a result of the University's one-sided treatment of the false sexual assault charges

against him; he has lost the ability to graduate in the 2017-18 academic year, thereby delaying

the time at which he can begin a career and shortening the length of that career; his academic

records from the University and the gap between the completion of his coursework and his

eventual date of graduation will reflect his suspension, handicapping his ability to be accepted to

graduate school or to secure his desired employment; and he will suffer a permanent reduction in

lifetime earnings.

166.    Accordingly, the University is liable to Mr. Doe for violations of the D.C. Human

Rights Act and for all damages arising out of that violation.

## COUNT III – BREACH OF CONTRACT

167.    Doe incorporates by reference all of the preceding paragraphs of this Complaint

as though fully set forth herein.

168.    At all times relevant hereto, a contractual relationship existed between the

University and John Doe.

169.    The University's Policy and Code, and its public explanations of the meaning of

those Policy in places like its Title IX website, were a part of that contract.  Under that contract,

the University was required to act in accordance with these publications in resolving complaints

of misconduct, in the investigation of those complaints, in the process of adjudicating those

complaints, and in resolving appeals.

170.    Inherent in the University's contract with Mr. Doe was an implied covenant of

good faith and fair dealing.  That covenant required the University to execute the contract in a

way that did not have the effect of destroying or injuring Mr. Doe's right to receive the fruits of the contract.

171.     The covenant required the University to implement the contractual provisions identified below in ways that were not arbitrary, capricious or without reasoned basis, that did not ignore evidence to the contrary, and that did not steer Mr. Doe's disciplinary proceeding to a predetermined conclusion.

172.     The University breached this contract with John Doe, and the covenant of good faith inherent in it, by failing to comply with the Policy in at least the following ways:

**A. Impairment by Incapacity**

173.     The University failed to apply the Policy's requirement, as supplemented by statements on its Title IX website, that incapacity be present in order for alcohol intoxication to render sexual activity nonconsensual.  The University defines "incapacitate[ion] due to alcohol" as being "unable to give a verbal, enthusiastic, and consistent 'yes'" and as something that may be associated with "stumbling, slurring words, [and] not making sense."

174.     There was no credible evidence presented at Mr. Doe's hearing tending to show that Ms. Roe was incapacitated at the rugby party on the night of September 12, 2015, or that Mr. Doe had any way of knowing it.  Approximately 100 people were at the party, yet no one testified before or during the hearing that Ms. Roe slurred her words, stumbled, or otherwise appeared severely intoxicated there.  And the testimony of E.E. that she talked to Ms. Roe on the phone in the Uber is inherently lacking in credibility.   The only credible evidence tended to show that Ms. Roe was intoxicated to some degree but not that she was incapacitated.

175.    In finding Mr. Doe responsible for sexual assault, the University failed to apply the Policy requirement that required evidence of incapacity, not merely intoxication, to find sexual activity non-consensual, and thereby breached its contract with Mr. Doe.

**B. Application of the Preponderance Standard**

176.    The University also failed to apply the preponderance of the evidence standard in concluding that the evidence tending to show Ms. Roe was incapacitated, and that Mr. Doe should have known it, outweighed the evidence to the contrary.

177.    As explained immediately above, the hearing panel heard evidence tending to show only that Ms. Roe was intoxicated, not that she was incapacitated. Likewise, it heard evidence showing that Mr. Doe, or a reasonable person in his shoes, could have known only that Ms. Roe was intoxicated, not that she was allegedly incapacitated, if in fact she had been.

178.    The University, through its hearing board and in its appeal process, heard a large amount of evidence that called Ms. Roe's credibility into question and therefore undermined her claims. Among other things:

- Her testimony on points both large and small changed repeatedly during the course of her disciplinary proceeding.

- Ms. Roe claimed to have had enough alcohol to have almost killed her.

- Ms. Roe claimed to have performed actions she could not have performed had she consumed as much alcohol as she says she did.

- Ms. Roe told an inherently implausible story about falling unconscious at the precise moment sexual activity commenced.

- Ms. Roe refused to call her roommate as a witness.

- Ms. Roe failed to identify the other individuals who allegedly participated in E.E.'s phone call with Ms. Roe.

179.    The hearing on Ms. Roe's allegations also was biased against Mr. Doe.  The chair implicitly affirmed Ms. Roe's truthfulness before hearing any other witness testimony, then refused to let Mr. Doe challenge the potential bias of one of her witnesses, the only one to have claimed she seemed intoxicated at the party.

180.    In finding that Ms. Roe was incapacitated, and that John Doe should have known that, despite the fact that the evidence showed (1) only that she was intoxicated, (2) that Jane Roe simply was not credible, the hearing panel found John Doe responsible for sexual assault based on less than a preponderance of the evidence.  Its decision was arbitrary and capricious, was without reasoned basis, ignored contrary evidence, and was the product of the hearing board's pre-determined bias in favor of Ms. Roe.

### C. Viability of Mr. Doe's Appeal

181.    Appeals are viable if they are "based on new information that is relevant to the case, that was not previously presented at the hearing or conference, and that significantly alters the finding of fact."

182.    The new evidence on which John Doe's appeal was based is indisputably relevant, as it is the same kind of evidence that both the investigation and the hearing focused on: evidence of Ms. Roe's level of intoxication and her presentation to others at the party.

183.    The new evidence indisputably was not presented at the hearing.

184.    If true, the new evidence also significantly alters the hearing board's findings of fact, including its ultimate finding of responsibility.

185.    If Mr. Snyder concluded that it was this third criterion that had not been met by Mr. Doe, he could have reached that result only by concluding that the new evidence either was not true or that, if true, it did not in fact alter any finding of fact.

186.    Yet under the Policy and the Code, it is not the job of the Executive Director of Planning and Outreach to weigh the merits of the new evidence as it relates to the original findings of fact; that is a job entrusted to the Committee on the Judicial System.

187.    In committing only a determination of "viability" to the Executive Director of Planning and Outreach, Articles 33 and 34 of the Code can only mean that the Executive Director of Planning and Outreach is to determine whether the new information is the kind of information that, if true, *could* alter the finding of fact.

188.    If Mr. Snyder rejected Mr. Doe's appeal based on this third criterion, he breached the University's contract with Mr. Doe and violated the covenant of good faith and fair dealing in doing so by adopting an interpretation of those articles that gave him authority to weigh the merits of the new evidence presented in Mr. Doe's appeal.

189.    If Mr. Snyder rejected Mr. Doe's appeal based on either of the other two criteria, he breached the University's contract with Mr. Doe in doing so.

**D. Challenging Board Members for Bias**

190.    The Code states that "[a]ny party may challenge a Board member on the grounds of personal bias before the hearing commences."

191.    The University violated the covenant by failing to provide Mr. Doe with a meaningful opportunity to challenge the members of his Ad Hoc Board based on personal bias.

192.    One of Mr. Does' board members, Ms. Witkowicki, has exhibited the kind of gender-biased thinking that, in conjunction with the other evidence of gender bias in GW's Title IX process, called her objectivity reasonably into question.

193.    Had Mr. Doe been given a meaningful opportunity to challenge her inclusion on his hearing board, he would have done so.

194.    As a direct result of the University's breaches of its contract with Mr. Doe, and as a direct and proximate cause thereof, John Doe has been seriously and irreparably damaged in the following ways, among others: he has endured extreme emotional and psychological suffering as a result of the University's one-sided treatment of the false sexual assault charges against him; he has lost the ability to graduate in the 2017-18 academic year, thereby delaying the time at which he can begin a career and shortening the length of that career; his academic records from the University and the gap between the completion of his coursework and his eventual date of graduation will reflect his suspension, handicapping his ability to be accepted to graduate school or to secure his desired employment; and he will suffer a permanent reduction in lifetime earnings.

195.    Accordingly, the University is liable to Mr. Doe for breach of contract and for all damages arising out of that violation.

## COUNT IV – BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING

196.    Plaintiff incorporates by reference all of the preceding paragraphs of this Complaint as though fully set forth herein.

197.    Inherent in the University's contract with Mr. Doe was an implied covenant of good faith and fair dealing.  That covenant required the University to execute the contract in a way that did not have the effect of destroying or injuring Mr. Doe's right to receive the fruits of the contract.

198.    The covenant required the University to implement the contract in ways that were not arbitrary, capricious or without reasoned basis, that did not ignore evidence to the contrary, and that did not steer Mr. Doe's disciplinary proceeding to a predetermined conclusion.

199.    For all of the reasons stated above in paragraphs 173-193, and furthermore by conducting an inadequate investigation of Ms. Roe's claims, the University breached the covenant of good faith and fair dealing.

200.    As a direct result of the University's violation of the covenant of good faith and fair dealing, and as a direct and proximate cause thereof, John Doe has been seriously and irreparably damaged in the following ways, among others: he has endured extreme emotional and psychological suffering as a result of the University's one-sided treatment of the false sexual assault charges against him; he has lost the ability to graduate in the 2017-18 academic year, thereby delaying the time at which he can begin a career and shortening the length of that career; his academic records from the University and the gap between the completion of his coursework and his eventual date of graduation will reflect his suspension, handicapping his ability to be accepted to graduate school or to secure his desired employment; and he will suffer a permanent reduction in lifetime earnings.

201.    Accordingly, the University is liable to Mr. Doe for violation of the covenant of good faith and fair dealing and for all damages arising out of that violation.

## COUNT V - NEGLIGENCE

202.    Plaintiff incorporates by reference all of the preceding paragraphs of this Complaint as though fully set forth herein.

203.    In conducting its investigation and adjudication of Jane Roe's complaint against John Doe, the University owed a common law duty to John Doe to exercise reasonable care, with due regard for the truth, an evenhanded application of procedure, and the important and irreversible consequences of its actions, as well John Doe's various liberty and property rights and interests generally.

204.    Through the acts set forth above, the University, acting through its agents, servants and/or employees, breached that duty by carelessly, improperly, and negligently performing its assigned duties and facilitating a process that violated the rights and interests of John Doe.

205.    In particular, the University has negligently trained and supervised the individuals it employs to investigate claims of sexual misconduct, adjudicate those claims, or otherwise implement the Policy and the Code.

206.    Upon information and belief, those individuals are trained (1) to implement the goal of combating "rape culture," a chief element of which is to express any doubt about the veracity of sexual assault claimants; (2) to believe that only 2-8% of campus sexual assault claimants, or some similar number, make false accusations, even though that statistic was derived in the criminal context, where deterrents against false reports are far greater; and (3) to otherwise credit the testimony of sexual assault claimants unless there is clear and convincing evidence, or something akin to that, of its falsity, in contravention of the requirement that all facts be determined by a preponderance of the evidence.

207.    The University furthermore employs as its Title IX investigator an individual who spent almost her entire professional career representing sexual assault claimants in court cases and university Title IX proceedings, who continues to serve as a legal fellow at one such organization, and who brings a bias in favor of complainants into every case she investigates.

208.    The University also negligently trained the members of John Doe's hearing panel in the Policy's definitions of "consent" and "incapacitation," in applying the preponderance of the evidence standard, and in the need to allow parties to challenge potential witness bias.

51

209.    As a direct result of the University's negligence, and as a direct and proximate cause thereof, John Doe has been seriously and irreparably damaged in the following ways, among others: he has endured extreme emotional and psychological suffering as a result of the University's one-sided treatment of the false sexual assault charges against him; he has lost the ability to graduate in the 2017-18 academic year, thereby delaying the time at which he can begin a career and shortening the length of that career; his academic records from the University and the gap between the completion of his coursework and his eventual date of graduation will reflect his suspension, handicapping his ability to be accepted to graduate school or to secure his desired employment; and he will suffer a permanent reduction in lifetime earnings.

210.    Accordingly, the University is liable to John Doe for negligence and for all damages arising out of that violation.

## PRAYER FOR RELIEF

Wherefore, Plaintiff respectfully prays that this Court enter judgment on behalf of Plaintiff and against the University, and order relief against Defendant as follows:

a. That this Court issue preliminary and permanent injunctive relief, restraining The University from (1) reflecting, in any manner whatsoever, in Doe's records or elsewhere, the findings or sanctions imposed upon John Doe based on its adjudication of Ms. Roe's complaint; and (2) maintaining any records related to that sanction, as it was the product of the University's erroneous finding that he violated the Policy, which was itself the product of a flawed disciplinary process; and

b. That the University be ordered to pay compensatory damages as appropriate to compensate John Doe for his losses caused by the its misconduct; and

c.  That the University be ordered to pay punitive damages; and

d.  That this Court award John Doe his costs and expenses incurred in this action, as

well as such other and further relief as the Court deems just and proper.

Respectfully submitted,

DATED:  March 7, 2018

_____

Justin Dillon (D.C. Bar No. 502322)
Christopher C. Muha (D.C. Bar No. 987116)
KAISERDILLON PLLC
1401 K Street NW, Suite 600
Washington, DC 20005
T: (202) 640-2850
F: (202) 280-1034
jdillon@kaiserdillon.com
cmuha@kaiserdillon.com

*Attorneys for Plaintiff John Doe*