## IN THE UNITED STATES DISTRICT COURT FOR THE
## DISTRICT OF COLUMBIA

| | |
|---|---|
| **JOHN DOE**, | ) |
| | ) |
| **Plaintiff,** | )    Civil Action No.  1:18-cv-553-RMC |
| | ) |
| **v.** | ) |
| | ) |
| **THE GEORGE WASHINGTON** | ) |
| **UNIVERSITY,** | ) |
| | ) |
| **Defendant.** | ) |
| _____ | ) |

## MEMORANDUM IN SUPPORT OF JOHN DOE'S
## MOTION FOR A PRELIMINARY INJUNCTION

Justin Dillon (D.C. Bar No. 502322)
Christopher C. Muha (D.C. Bar No. 987116)
KAISERDILLON PLLC
1401 K Street NW, Suite 600
Washington, DC 20005
T: (202) 640-2850
F: (202) 280-1034
jdillon@kaiserdillon.com
cmuha@kaiserdillon.com

DATED:  March 13, 2018

*Attorneys for Plaintiff John Doe*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................................................ii

INTRODUCTION ............................................................................................................. 1

FACTUAL BACKGROUND ............................................................................................ 2

LEGAL STANDARD ...................................................................................................... 17

ARGUMENT .................................................................................................................. 19

I.   John Doe is Likely to Succeed on the Merits of His Claims. .................................... 19

   A.   Breach of Contract and the Implied Covenant of Good Faith ........................... 19

      1.   GW Was Required to Adhere to Its Contract with John Doe by
         Applying Its Disciplinary Policies in Good Faith. ...................................... 19

      2.   GW's Performance on Its Contract with Mr. Doe Was Arbitrary,
         Capricious, and Without a Reasoned Basis. ............................................... 21

   B.   Title IX ............................................................................................................ 30

   C.   D.C. Human Rights Act .................................................................................... 34

II.   John Doe Will Suffer Irreparable Harm Without Preliminary Relief. ..................... 37

   A.   Mr. Doe's Suspension Has Already Caused Him Serious Reputational
      Injury and Emotional Distress and Will Result in Lost Opportunities
      Without Preliminary Relief ................................................................................ 38

   B.   These Harms Will Be Magnified and Perpetuated Without Preliminary
      Relief, Even If Mr. Doe Succeeds at Trial. ....................................................... 40

III.   The Balance of Equities Overwhelmingly Favors Preliminary Relief. ................... 43

IV.   The Public Interest Favors Relief ......................................................................... 45

CONCLUSION ............................................................................................................... 45

## TABLE OF AUTHORITIES

**Cases**

*Albert v. Carovano*, 824 F.2d 1333 (2d Cir. 1987) ...................................................... 38

*Alden v. Georgetown Univ.*, 734 A.2d 1103 (D.C. 1999) ............................................. 19

*Alf v. Donley*, 666 F. Supp. 2d 60 (D.D.C. 2009), *vacated upon joint motion of the parties after settlement*, No. 1:09-cv-802 (D.D.C. Dec. 13, 2010) ................................................................... 37, 38

*Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127 (9th Cir. 2011) .................................. 18

*Allworth v. Howard Univ.*, 890 A.2d 194 (D.C. 2006) .............................................. 20

*Basch v. George Washington Univ.*, 370 A.2d 1364 (D.C. 1977) ................................. 9

*Caspar v. Snyder*, 77 F. Supp. 3d 616 (E.D. Mich. 2015) ........................................... 39

*Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290 (D.C. Cir. 2006) ........................................................ 37

*Chenari v. George Washington Univ.*, 847 F.3d 740 (D.C. Cir. 2017) ....................................... 20

*Citigroup Global Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd.*, 598 F.3d 30 (2d Cir. 2010) ............................................... 18

*Chipman v. Grant Cnty. School Dist.*, 30 F. Supp. 2d 975 (E.D. Ky. 1998) ........................ 39, 44

*CSX Transp., Inc. v. Williams*, 406 F.3d 667 (D.C. Cir. 2005) ................................................ 37

*Davenport v. Int'l Bhd. of Teamsters,* 166 F.3d 356 (D.C. Cir.1999) ...................................... 17

*Davis v. District of Columbia*, 949 F. Supp. 2d 1 (D.D.C. 2013) ................................. 35

*Davis v. Pension Ben. Guar. Corp.*, 571 F.3d 1288 (D.C. Cir. 2009) ..................................... 17

*Doe v. Amherst College*, 238 F. Supp. 3d 195 (D. Mass. 2017) ...................................... 32

*Doe v. Brandeis Univ.*, 177 F. Supp. 3d 561 (D. Mass. 2016) ....................................... 40

*Doe v. Case Western Reserve Univ.*, No. 1:17-cv-414, 2017 WL 3840418 (N.D. Oh. Sept. 1, 2017) ..................................... 31

*Doe v. Columbia Univ.*, 831 F.3d 46 (2d Cir. 2016) ................................... 30, 31, 32, 33

*Doe v. Cummins*, 662 Fed. App'x 437 (6th Cir. 2016)............................................... 33

*Doe v. Lynn Univ., Inc.*, 235 F. Supp. 3d 1336 (S.D. Fla. 2017) ............................... 33

*Doe v. Miami Univ.*, 882 F.3d 579 (6th Cir. 2018) ................................... 30, 31, 32, 33

*Doe v. Middlebury Coll.*, No. 1:15-CV-192-JGM, 2015 WL 5488109
    (D. Vt. Sept. 16, 2015) ....................................... 2, 38, 40, 41, 42, 43, 44, 45

*Doe v. The Ohio State Univ.*, 239 F. Supp. 3d 1048 (S.D. Ohio 2017)....................... 33

*Doe v. The Rector and Visitors of George Mason Univ.*, 149 F. Supp. 3d 602
    (E.D. Va. 2016)................................................................................................ 39

*Doe v. The Rector and Visitors of George Mason Univ.*, 179 F. Supp. 3d 583
    (E.D. Va. 2016)........................................................................................... 41, 45

*Doe v. The Trustees of the University of Pennsylvania*, 270 F. Supp. 3d 799
    (E.D. Pa. 2017) ................................................................................................ 33

*Doe v. Univ. of Cincinnati*, 223 F. Supp. 3d 704 (S.D. Oh. 2016)................... 38, 39, 42, 43, 44

*Doe v. Univ. of Notre Dame*, No. 3:17-cv-298, 2017 WL 1836939
    (N.D. Ind. May 8, 2017), *vacated by request of the parties*
    *after settlement*, No. 3:17-cv298, 2017 WL 7661416
    (N.D. Ind. Dec. 27, 2017)...........................................................30, 38, 40, 41

*Dyer v. Bilaal*, 983 A.2d 349 (D.C. 2009)....................................................... 28

*Estenos v. PAHO/WHO Federal Credit Union*, 952 A.2d 878 (D.C. 2008) ............................ 35

*Gay Rights Coal. of Georgetown Univ. Law Ctr. v. Georgetown Univ.*,
    536 A.2d 1 (D.C. 1987)..................................................................................... 35

*George Washington Univ. v. D.C. Bd. of Zoning Adjustment*, 831 A.2d 921
    (D.C. 2003) ....................................................................................................... 35

*Hajjar-Nejad v. George Washington Univ.*, 37 F. Supp. 3d 90 (D.D.C. 2014)........................ 19

*Hoosier Energy Rural Elec. Coop. v. John Hancock Life Ins. Co.*,
    582 F.3d 721 (7th Cir. 2009) ........................................................................... 18

*Jones v. Bd. of Governors of Univ. of North Carolina*, 704 F.2d 713
    (4th Cir. 1983) ................................................................................1, 38, 40, 44

*Kakaes v. George Washington Univ.*, 683 A.2d 128 (D.C. 1996) .............................................. 27

*King v. DePauw Univ.*, No. 2:14-cv-70, 2014 WL 4197507
(N.D. Ind. Aug. 22, 2014) ...................................................... 1, 21, 22, 24, 38, 41, 43, 45

*Kroupa v. Nielsen*, 731 F.3d 813 (8th Cir. 2013) ....................................................... 38

*Kumar v. George Washington Univ.*, 174 F. Supp. 3d 172 (D.D.C. 2016) ........................ 20, 30

*League of Women Voters of United States v. Newby*, 838 F.3d 1
(D.C. Cir. 2016) ........................................................................ 17, 18, 37

*Mitchell v. DCX, Inc.*, 274 F. Supp. 3d 33 (D.D.C. 2003) .................................... 35, 37

*Natural Motion by Sandra v. D.C. Comm'n on Human Rights,*
687 A.2d 215 (D.C. 1997) .............................................................. 35

*Nken v. Holder*, 556 U.S. 418 (2009) ...................................................... 18

*Paul v. Howard Univ.,* 754 A.2d 297 (D.C. 2000)........................................... 19

*Paulin v. George Washington School of Medicine and Health Sciences,*
878 F. Supp. 2d 241 (D.D.C. 2012) ..................................................... 20

*Prasad v. The George Washington Univ.*, No. 1:15-cv-1779
(D.D.C. Oct. 21, 2015) ..................................................................... 5

*Pride v. Howard Univ.*, 384 A.2d 31 (D.C. 1978) ........................................... 19

*Pursuing Am.'s Greatness v. FEC*, 831 F.3d 500 (D.C. Cir. 2016) ........................... 17

*Real Truth About Obama, Inc. v. FEC,* 575 F.3d 342 (4th Cir. 2009) ....................... 18

*Ritter v. Oklahoma*, No. 1:16-cv-438, 2016 WL 2659620
(W.D. Okla. May 6, 2016)........................................................... 38, 42, 44, 45

*Sherley v. Sebelius*, 644 F.3d 388 (D.C. Cir. 2011) .................................... 17

*Singh v. Carter*, 185 F. Supp. 3d 11, 17 (D.D.C. 2016) ................................. 44

*Starishevsky v. Hosftra Univ.* 612 N.Y.S.2d 794 (1994) .............................. 39, 41

*Trump v. Int'l Refugee Assistance Project*, 137 S. Ct. 2080 (2017)...................... 18

*Tully v. Orr*, 608 F. Supp. 1222 (E.D.N.Y. 1985)....................................... 39

*Valley v. Rapides Parish Sch. Bd.*, 118 F.3d 1047 (5th Cir. 1997) ...................................... 38, 39

*United States v. Bobo*, 419 F.3d 1264 (11th Cir. 2005)............................................................ 28

*United States v. Matusoff Rental Co.*, 493 F. Supp. 2d 740 (S.D. Ohio 2007) ........................... 39

*University of Tex. v. Camenisch,* 451 U.S. 390 (1981) ............................................................... 18

*Wells v. Xavier*, 7 F. Supp. 3d 746 (S.D. Oh. 2014).................................................................. 33

*WMATC v. Holiday Tours,* 559 F.2d 841 (D.C. Cir.1977) ......................................................... 17

*Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7 (2008) .................................... 17

*Wright v. Howard Univ.*, 60 A.3d 749 (D.C. 2013) .................................................................. 20

**Yusuf v. Vassar College*, 35 F.3d 709 (2d Cir. 1994) ....................................................... 30, 31

## Statutes

20 U.S.C. § 1681 ....................................................................................................................... 2

D.C. Code § 2-1401.03 ......................................................................................................... 34, 35

D.C. Code § 2-1402.41 .............................................................................................................. 34

D.C. Code § 2-1402.68 .............................................................................................................. 34

## Other Authorities

11A Charles Alan Wright et al., *Federal Practice and Procedure* § 2948.1
    (3d ed. 1998)........................................................................................................................ 38

Black's Law Dictionary (10th ed. 2014) .................................................................................. 28

## INTRODUCTION

John Doe seeks a preliminary injunction that will spare him from imminent and unavoidable lifelong harm, and which will impose upon the defendant, The George Washington University ("GW" or the "University") almost nothing.  GW suspended Mr. Doe for one year on January 23, 2018, four days after he was to have received his degree and left campus.  Ex. 1.  If he is not permitted to obtain his degree and graduate by May 20, 2018 (the University's commencement this year), he will immediately acquire a permanent "gap in [his] education which [he] will be forced to explain *through [his] professional life*."  *Jones v. Bd. of Governors of Univ. of North Carolina*, 704 F.2d 713, 716 (4th Cir. 1983) (emphasis added).  And what the gap will "force[]" him to explain is not that he was disciplined for some run of the mill conduct violation, but for sexual assault.  That threat is not speculative; it is "unavoidable," *King v. DePauw Univ.*, No. 2:14-cv-70, 2014 WL 4197507 at *14 (N.D. Ind. Aug. 22, 2014), and it cannot be remedied by his success at trial, because that gap will always exist and it will always require explanation.  The injury to his future educational and professional prospects, not to mention his reputation and his emotional well-being, cannot be understated.

The exact opposite is true for the University, and for his accuser, Ms. Roe—life will go on exactly the same whether the injunction is granted or not.  **Mr. Doe does not ask permission to return to campus this semester, to walk at his graduation in May, or to return the following academic year either (Ms. Roe's senior year).**  He has no desire to do those things and would affirmatively agree not to do them.  The lives of Ms. Roe and everyone else at GW will go on exactly the same as they would under the terms of his suspension, with the tiny exception that GW will have to confer upon him the degree he has already earned and mark him as having graduated in May.  It would require the University to do little more than flip some

switches and print a few pieces of paper.  And the University, unlike Mr. Doe, has an effective

remedy if it succeeds on the merits after an injunction is granted: It can revoke Mr. Doe's degree.

*Doe v. Middlebury Coll.*, No. 1:15-CV-192, 2015 WL 5488109 at *4 (D. Vt. Sept. 16, 2015).

Mr. Doe, by contrast, can do nothing to erase an education gap once it comes to be.

 Mr. Doe can already show that he is likely to succeed on four of his claims.  As explained

below and in Mr. Doe's Complaint, the hearing board that found him responsible for sexual

assault heard an incredible amount of evidence that undermined Ms. Roe's credibility and proved

that, even if she were in fact incapacitated that night (which she plainly was not), Mr. Doe had

no way of knowing it.  Ms. Roe repeatedly changed her testimony during the investigation and at

the hearing and ultimately told a story so fantastic that it should have put her in the hospital or on

the brink of death—and that directly contradicted the evidence of how she appeared at the party.

And if that weren't enough, Mr. Doe submitted an appeal based on an expert toxicology report

that concluded that Ms. Roe's testimony could not be scientifically reconciled with the amount

she had to drink that night.  Those actions of the University breached its contract with Mr. Doe

and the implied covenant of good faith inherent in it.  They also evinced a gross gender bias that

violated Title IX (20 U.S.C. § 1681) and the D.C. Human Rights Act.

 In the light of his likelihood of succeeding on the merits, the lifelong harm he will suffer

without an injunction, and the negligible burden that an injunction will impose on the University,

Mr. Doe respectfully requests that his Motion for a Preliminary Injunction be granted.

## FACTUAL BACKGROUND

### A. Title IX Enforcement at GW

 The University's Sexual Harassment and Sexual Violence Policy (the "Policy") and its

Code of Student Conduct (the "Code") prohibit certain conduct, including sexual assault, which

the Policy defines as sexual activity committed "without consent or against another's will, whether achieved through force, coercion, threat or intimidation, or advantage gained by the aggrieved party's mental or physical incapacity or impairment."  ECF No. 3-1 at 3.  The Code reiterates that "[t]he lack of verbal or physical resistance or participation in any act due to coercion, intimidation or incapacity does not by itself constitute consent."  ECF No. 3-2 at 2. Neither source elaborates on what it means to be incapacitated due to alcohol, but the website of the University's Title IX Coordinator, whom the Policy obligates to "oversee dissemination of this policy and these procedures to the university community," ECF No. 3-1 at 11, defines it as being "unable to give a verbal, enthusiastic, and consistent 'yes'" to sexual activity.  Ex. 2.  In then identifies outward markers of likely incapacitation: "If the person you are with is impaired in a way you can or should be able to recognize (stumbling, slurring words, not making sense), you must assume they are too impaired to give consent." *Id.*

Claims of sexual misconduct are investigated and adjudicated by a separate apparatus than claims for other forms of student misconduct at the University.  The Title IX office employs a full-time investigator, Kiera Bloore, to investigate alleged violations of the Policy.  The Policy also identifies procedures that apply only to claims of sexual misconduct, and it specifies that whenever there is a conflict between the provisions in the Policy and the provisions in the Code, the former governs.  ECF No. 3-1 at 19, 21.  **Notably, while the training designed for the adjudication of claims of *non-sexual* misconduct "address[es] [the] roles and responsibilities of panel members, hearing procedures, applicable policies, and other techniques and standards pertinent to the formal complaint and hearing process," *id.* at 22, the "annual training" provided "to university personnel responsible for the administration**

of" the Policy concerns **"how to conduct investigations and hearings in a manner *that protects the safety of victims and promotes accountability*," *id.* at 11.**

The Title IX office also offers training to GW students.  Among the topics available to students to satisfy their mandatory training is a session about "how male students can prevent sexual violence."  Ex. 3.  The office additionally hosts workshops for interested students and advertises that one of its "frequently requested" one-on-one workshops is titled, "Foundations of Sexual Assault and Relationship Violence: Rape Culture and Other Factors."  Ex. 4.  The office's webpage also refers students to the work of Laci Green, "a sex educator and internet personality," for "information about consent."  Ex. 2.  A number of Ms. Green's videos are dedicated to explaining why sexual assault claimants—but women in particular—should be believed when they allege sexual assault.  She teaches in one video that "distrust of rape survivors" is fueled by a deeply engrained "distrust of women."[1]  She explains in another that "[o]ne of the sneakiest and I think most pervasive reasons why people don't believe survivors is that most survivors are women."[2]  "Sexual assault accounts," she says, "are nearly always true."[3]

The language of the Policy, and its implementation, are the product of years' worth of pressure upon the University to appear tough at all costs on sexual assault claims brought by women against men, including the kind brought by Ms. Roe against Mr. Doe.  GW was among the first schools in the country to come under scrutiny in 2011 by the Education Department's Office for Civil Rights for its mishandling of sexual misconduct claims, *see* Compl. ¶ 9, and it came under that same scrutiny again in August 2017, just two months before Ms. Roe filed her

---

[1] *See* https://www.youtube.com/watch?time_continue=1&v=wMZyljber8I at 2:22-2:26 ("So our distrust of women is deeply engrained, and I think that it fuels distrust of rape survivors.").

[2] *Id.* at 3:00-3:21.

[3] *Id.* at 3:44-3:48.

complaint.  Ex. 5.  The University also was in the midst of discovery in a heavily publicized

lawsuit brought by a former female student alleging the mishandling of her claims.  *See Prasad*

*v. The George Washington Univ.*, No. 1:15-cv-1779 (D.D.C. Oct. 21, 2015).

Most critically of all, GW for months had been dealing with the massive public fallout

stemming from the actions of Aniqa Raihan, who had claimed that a member of the rugby team

who was about to graduate had assaulted her more than two years earlier, during her freshman

year—exactly as Ms. Roe would claim in October.  Ex. 6.  In response to Ms. Raihan's

Change.org petition demanding his expulsion (he had been given a deferred suspension) and

mandatory minimum punishments for those convicted of sexual assault, GW granted Ms. Raihan

a special sit-down with a high-level university administrator, *id.*, and issued a statement rebutting

"[t]he narrative emerging from the petition . . . that GW has been reluctant or even unwilling to

hold individuals accountable for acts of sexual violence" by **expressly touting the fact that**

**100% of the students put through its formal sexual misconduct hearing process in the past**

**two academic years had found responsible, and nine of those ten were suspended or**

**expelled**.  Ex. 7.  Then in July, after national and local media had covered Ms. Raihan's

unfurling of a large banner at commencement reading, "#GWProtectsRapists," *see, e.g.*, Ex. 8-9,

the University responded by hiring as its full-time Title IX Investigator someone who had

"[r]epresented crime victims" and "student-survivors" in courts and "Title IX administrative

hearings" and who had "[d]eveloped Survivor Toolkits" for sexual assault claimants at "the eight

universities in DC."  Ex. 10.  The University also commissioned a law firm to comprehensively

review its Title IX enforcement regime.  Ex. 11.  Yet advocacy on behalf of Ms. Raihan

continued through October 20, when GW students "speaking on [her] behalf" at an event outside

of the Education Department claimed that GW "fail[ed] survivors time and time again."  Ex. 12.

**B.      The Investigation of Ms. Roe's Allegations**

**1.      Ms. Roe's Investigation Testimony**

Just ten days after that very public protest, Ms. Roe filed a complaint that looked a lot like Ms. Raihan's.  She claimed that, more than two years earlier, John Doe—a member of the club rugby team who was about to graduate—had sexually assaulted her as she lay unconscious on his bed.  Ex. 13 at 4.  She claimed on October 30 that she drank an unspecified amount of alcohol at a pre-game party on the night of September 12, 2015, then arrived at a party at an off-campus house known as the rugby house at 10:46 p.m.  *Id.*  She claimed that she had "several drinks" at the party and that her roommate and her roommate's boyfriend "left shortly after I arrived."  *Id.*  She stated that she "remember[ed], though unclearly," meeting Mr. Doe at the party, but that she "d[id] not remember calling or getting into a [sic] Uber" with him.  *Id.*  She believed that she "fell asleep or was groggy" in the Uber but could remember nothing more.  *Id.*  According to her Uber records, they left the party at 11:56 p.m. and arrived at 12:21 a.m.  *Id.*  When they arrived at Mr. Doe's dorm room, she "did not know [John Doe's] name" but nevertheless said she saw on the door "the names of those who lived there and took note of his name."  *Id.*  She claimed to remember nothing until she "woke up on a bed in the dorm, facedown while the respondent was penetrating me."  *Id.*  She alleged that she tried to push him away, then verbalized a "no" and tried to pull herself away, but that Mr. Doe ignored her and continued having sex with her until he ejaculated on her.  *Id.* According to Ms. Roe she then "quickly got out of bed and dressed, and went down the stairs to exit the building."  *Id.*  She never explained how she could have climbed down eight flights of stairs just minutes after being unconscious due to incapacitation.  She says she then "walked" home where she found her

"roommate and her boyfriend." *Id.* Her roommate followed her into the bathroom and Ms. Roe "explained to her the details of what had happened." *Id.*

Ms. Roe stated, at the end of her complaint, "The information I have provided in this report is true and correct to the best of my knowledge. The information report contains everything I can recall." *Id.* at 5.

Three days later, on November 2, Ms. Roe submitted a "supplement" to her complaint that exceeded it in length and contradicted it in numerous respects. *Id.* at 6-7. Her memory had suddenly improved dramatically. She specified that she had consumed "5 Solo cups of beer" at the rugby party. *Id.* at 6. She remembered where she sat in the Uber. *Id.* She remembered someone asking her why she was leaving the party. *Id.* She couldn't "recall any conversation or interactions taking place in the car," didn't remember any interactions "with [Mr. Doe]" there, and "felt like [she] couldn't speak." *Id.* She did, however, now claim to remember wanting to tell the Uber driver that she wanted to get out. *Id.* at 6-7. She also claimed to have two memories between the time she saw the names on the door and the time she woke up on his bed (specifically, "where his bed was in the room" and that "the lights in his room were on when we arrived"). *Id.* at 7. She also claimed to have remembered "falling down the stairs as [she] exited," a fact that it is impossible to believe she could have forgotten before then. *Id.* She failed to explain how she could have fallen only once given her claimed level of intoxication.

Four days later, on November 6, Ms. Roe submitted yet another supplement to her complaint. *Id.* at 8. Again, she added yet more details. She claimed to "remember[] more details about the incident" after "speaking with some other parties," even though she would later reveal that she had been speaking about the incident with friends and a counselor over the course of two years. *Id.* She claimed to remember drinking a Solo cup of "jungle juice," a strong mixed

drink, after drinking the five cups of beer.  *Id.*  Despite claiming to have had six Solo cups of liquid in just over an hour, Ms. Roe would never testify that she used the bathroom at any point or that she suffered incontinence when she allegedly passed out.  *Id.*

Ms. Roe also submitted documentary evidence in the investigation.  She annotated part of it with the statement claiming that she "did not attend another party" at the rugby house after that night "because I thought the respondent might be there."  *Id.* at 16.

### 2.     Third Party Evidence

By November 19, five people had submitted witness statements for the investigation. **Three of those witnesses testified to having seen Ms. Roe at the rugby party that night, but *none* of them testified that she even looked *intoxicated*, let alone *incapacitated*.**  The first testified only to "seeing [Mr. Doe and Ms. Roe] talking" and did not say that she looked drunk, that she had trouble standing, that she was acting odd, or that she was showing any other obvious signs of intoxication. *Id.* at 24.  The second—a friend of Ms. Roe—testified that Ms. Roe "mostly hung out in a group in the back corner of the yard" but said nothing about her appearing intoxicated while she did so.  *Id.* at 25.  On the contrary, he said that he "vaguely remember[ed] seeing her cross the street," *id.*, an act that would have made any severe intoxication apparent, yet he did not say that she stumbled or had trouble doing so.  The third witness likewise said nothing about Ms. Roe's appearing intoxicated at the party; he testified only to "seeing [Ms. Roe] in the backyard with a few of her friends."  *Id.* at 26.

The investigation acquired one more witness statement on November 20: a statement from E.E., a friend of Ms. Roe's and a former student at GW (the only former student to offer evidence in the proceeding).  *Id.* at 28.  E.E. gave what was easily the most dramatic piece of testimony in the case and the only testimony by anyone that Ms. Roe appeared severely

intoxicated at the party.  E.E. testified that after losing track of Ms. Roe at the rugby party for

some time, "*we*"—she and their friends—

> called [Ms. Roe] and she said she was in an Uber with the suspected assailant but
> she was slurring her worlds [sic] and speaking incoherently and we couldn't
> understand anything else over the phone.  She was obviously not in a conscious
> state of mind, definitely too drunk/maybe even drugged to consent.  *We all* went
> to go look for her but that point it was too late and that is all I can remember.

*Id.*  E.E. failed to identify who the other individuals were who joined her in making this phone

call and searching for Ms. Roe.

### 3.    Mr. Doe's Investigation Testimony

On November 20, before seeing any of the evidence besides Ms. Roe's statements, Mr.

Doe submitted a statement responding to Ms. Roe's complaint and supplements.  He testified

that he heard a woman near him say to her friend, "I want to have sex with someone right now."

*Id.* at 29.  He turned and approached the women and introduced himself.  *Id.*  The woman who

had made the statement was Ms. Roe.  She showed no obvious outwards signs of intoxication—

she did not slur her words, she did not have trouble standing, and she was responding to him

coherently.  *Id.*  She was not holding a drink, either.  *Id.*  They talked about their majors and an

Islam course she was taking.

Ms. Roe, who had been texting her roommate about the availability of their room, then

asked him, "Can we fuck in your room?"  *Id.*  About ten minutes later, she asked him if he

wanted to leave and called an Uber to take them to his dorm.  *Id.*  A third student who lived near

Mr. Doe asked to ride with them and sat in the front.  *Id.*  Ms. Roe played with her phone for

most of the car ride.  *Id.*

After they arrived, they went up to Mr. Doe's room and began making out.  *Id.*  They

undressed themselves down to their underwear, and after about five minutes Ms. Roe pulled

down Mr. Doe's underwear and performed oral sex on him. *Id.* She then took off her own underwear, and Mr. Doe performed oral sex on her while she held his head. *Id.* She then put her hand on his penis and helped him insert it into her vagina, and they had missionary-style sex for a few minutes. *Id.* When Mr. Doe asked her to turn over, she got on her hands and knees, and they had sex with Mr. Doe behind her. *Id.* Ms. Roe then said, "Let me get on top of you." *Id.* Mr. Doe lay down on his back and Ms. Roe squatted over top of him and thrust up and down on him until he pulled out and ejaculated. *Id.* Ms. Roe then rubbed his penis for a few seconds and said, "Wow, that was exhausting." *Id.* Mr. Doe responded that it was. *Id.*

Mr. Doe got up to put his pants on. *Id.* Ms. Roe then said to him, "We should fuck again." *Id.* Mr. Doe, however, said that the was too tired and wanted to go to bed. *Id.* He offered her to stay the night but she said she would rather go home. *Id.* Mr. Doe offered to walk her home, but she turned down the offer. *Id.* They said goodbye to each other, and she left. *Id.*

## C.     The Hearing

The hearing on Jane Roe's allegations was held on December 14. Ms. Roe's testimony continued to evolve and contradict itself:

- Ms. Roe testified at the hearing that at the party, she "remember[ed] spending a lot of the night with my roommate at the time, [A.C.], and her boyfriend, [R.B.]," Ex. 14 (Hearing Transcript) at 7, despite having written on October 30 that A.C. and R.B. "left shortly after I arrived," Ex. 13 at 4.

- Ms. Roe testified at the hearing that she remembered talking with E.E. on the phone in the Uber, Ex. 14 at 12, despite having written on November 2 that she "can't recall any conversation or interactions taking place in the car" and "*felt like [she] couldn't speak,*" Ex. 13 at 7. She failed to explain, and was not even asked, why she did not mention this phone call in any of her three complaint statements.

- Ms. Roe testified at the hearing, "I don't remember gathering my clothes or my bag" before leaving Mr. Doe's room, Ex. 14 at 9, despite having written on November 2 that she "grabbed [her] things quickly" before leaving, Ex. 13 at 7.

- Ms. Roe testified at the hearing that she "ran back to [her] residence hall" after the alleged assault, Ex. 14 at 9, in an effort to depict her alleged distress, despite having written on October 30 that she had "walked" there, Ex. 13 at 4.

- Realizing that her claim to have learned Mr. Doe's name by seeing four unknown names on his door didn't make sense, Ms. Roe gave a new explanation at the hearing for how she learned Mr. Doe's name.  She claimed that his name was the *only* one from the door that she remembered, because of its unusual spelling, Ex. 14 at 6, and that she looked up the name on Facebook sometime later and recognized his face, *id.* at 10.

- Ms. Roe admitted to attending a subsequent party at the rugby house, *id.* at 15, even though she claimed in the investigation that she never did, Ex. 13 at 16.

Ms. Roe's testimony at the hearing also added crucial allegations she had not disclosed in any of her three complaint statements.  Among them:

- *For the first time*, Ms. Roe specified the amount of alcohol she drank at the pregame party, stating that she consumed "above four shots, maybe five."  *Id.* at 13.

- *For the first time*, she testified that she had a total of "over ten drinks" between 9:30 p.m. and 11:56 p.m.  *Id.* at 62.

- *For the first time*, she testified that she "*ran* down the stairs as fast as I could" after she "scrambl[ed]" out of Mr. Doe's apartment, not bothering to explain how she could have done that just 10 minutes after being catatonic on his bed.  *Id.* at 9.

After Ms. Roe finished giving her opening statement, the chair of the panel stated, "I just want to recognize for all parties involved today that this can be an extremely traumatic experience reliving things, and I appreciate everyone's involvement."  *Id.* at 11.  Reliving a consensual sexual encounter was not traumatic for Mr. Doe, nor would anyone reasonably expect it to be.  The timing and content of the statement showed it to be directed at Ms. Roe.

The first witness to speak on Ms. Roe's behalf was her dorm neighbor at the time of the incident, J.E.  He testified that Ms. Roe had "at least four . . . minimum four" drinks at the pregame, *id.* at 24, and that the women there were stumbling and slurring their words a bit as they left, *id.* at 25.  He gave no testimony about how they appeared at the party.

11

The second witness to speak on Ms. Roe's behalf was R.M., a GW student with whom she'd had a romantic relationship. He testified that there were "easily 100 people" at the party. *Id.* at 33. He was the *only* person to testify, either before or during the hearing, that Ms. Roe looked intoxicated at the rugby party, but he could point to no specific outward signs telling him that. *Id.* at 31 ("You know how it is with parties. You know when someone's drunk, so . . . ."). He expressly refused to speculate to what degree she was intoxicated and pointed to no specific outward signs revealing her intoxication. *Id.* Despite being the *only* person to testify that Ms. Roe looked intoxicated *at the party*, the chair refused to let Mr. Doe establish R.M.'s potential bias as someone who had been romantically involved with Ms. Roe. *Id.* at 35 ("That's not a relevant question, so I'm not going to allow that to be answered.").

Ms. Roe's third and final witness at the hearing was E.E. E.E.'s testimony about the alleged phone call in the Uber contradicted her own prior testimony and Ms. Roe's:

- E.E. testified *twice* at the hearing that *Ms. Roe called her* from the car that night. *Id.* at 38 ("Ms. [Roe] called me and she told me she was in an Uber"); *id.* at 41. But she had testified in writing just three weeks earlier that *she and her friends* had called *Roe* for a very specific and dramatic reason: They hadn't seen her in a while, feared for her safety, and called her. Ex. 13 at 28.

- E.E. testified that after the phone call, Ms. Roe's roommate, A.C., went to look for Ms. Roe. Ex. 14 at 38. But Ms. Roe testified on October 30 that L.C. went home soon after they arrived at the party. Ex. 13 at 4.

- E.E. testified that Ms. Roe had told her "they were going to his apartment," Ex. 14 at 40, but Ms. Roe had testified on November 2 that she did not know where they were going in the Uber, Ex. 13 at 6.

Neither Ms. Roe nor E.E. ever explained, nor were they asked, how Ms. Roe could have managed to get out her phone and successfully call E.E. if she "fell asleep or was groggy" (in the words of Ms. Roe on October 30, *see id.* at 4) or "barely conscious" (in the words of E.E. at the hearing, *see* Ex. 14 at 40). And neither E.E. nor Ms. Roe identified, or were asked to identify,

the other people allegedly involved with this call.  Ms. Roe also never explained, nor was she

asked to explain, why she failed, in three separate complaint statements, to mention this call.

Mr. Doe provided testimony at the hearing consistent with what he had said in writing on

November 20.  He testified that he and Ms. Roe talked outside the party for some time after he

introduced himself.  *Id.* at 44-45.  They talked about their majors and she identified the specific

school she was in.  *Id.* at 44.  She talked to Mr. Doe about an Islam course she was taking, *id.*,

something he could not have known about her unless she had told him.  He expressly denied that

Ms. Roe made any kind of phone call while they were in the Uber.  *Id.* at 45.  As to the sexual

activity itself, he testified consistently with his November 20 statement.  *Id.* at 46.

The panel grasped for reasons to doubt Mr. Doe.  The chair asked him why Ms. Roe had

presented witnesses but he had not.  *Id.* at 55 ("So [Ms. Roe] has presented a couple witnesses, .

. .  Is there any reason why you haven't presented any witnesses to us today?").  Another panelist

suggested his testimony should be doubted because he was able to remember so much.  *Id.* at 52

("You remember some very specific details from something that happened two and a half years

ago. . . .  Can you help me understand how . . . ?").  They never asked Ms. Roe or any of her

witnesses that question or anything like it.

### D.    The Decision

On January 23, 2018, GW informed Mr. Doe that the Hearing Board had found him

responsible for sexually assaulting Ms. Roe and that he would be suspended for one year.  Ex. 1.

The Board "acknowledge[d] the statements made by [Mr. Doe] regarding [Ms. Roe's] actions

that indicated to him that he had consent: [Ms. Roe] asked him to make arrangements to find a

place to have sex, requested the Uber, removed his clothing, initiated oral sex on him, agreed to

change positions when asked, and requested that they change positions."  *Id.* at 6.  It nevertheless

concluded that Ms. Roe's "level of intoxication reached the point of incapacitation," *id.* at 5, primarily on the basis of Ms. Roe's own testimony, *id.* ("The Board considers the Complainant's statements regarding her lack of memory . . . ."). It also concluded that Mr. Doe should have known she was incapacitated for two reasons: (1) "the statements of the witnesses, indicating that they observed [Ms. Roe] acting in an intoxicated manner, in stumbling and slurring her words," and (2) "[Mr. Doe's] statements that the Complainant ceased conversation with him after leaving the party." *Id.* at 6.

### E.    The Appeal

Mr. Doe appealed the hearing board's finding on January 30. The Code allows parties to appeal adverse findings "based on new information that is relevant to the case, that was not previously presented at the hearing or conference, and that significantly alters the finding of fact." ECF No. 3-2 at 8. Appeals proceed through a two-step process. First, the University's Executive Director of Planning & Outreach makes a determination of "viability." *Id.* Then the appeal is forwarded to three members of the Committee on the Judicial System who "review and decide the appeal" on its merits. *Id.*

Mr. Doe based his appeal on two new pieces of evidence: a report by an expert toxicologist who analyzed Ms. Roe's level of intoxication based on her reported consumption, and a statement from another student, Q.W., about his interaction with Ms. Roe at the rugby party. *See* Exs. 15 (Appeal), 16 (Report of Dr. Harry Milman), 17 (CV of Dr. Harry Milman), 18 (Statement of Q.W.). He could not have presented that report earlier, because the hearing was the first time that anyone testified to the number of drinks Ms. Roe had at the pregame. The toxicologist concluded, based purely on the testimony of Ms. Roe and her witnesses about how much she drank and when, that Ms. Roe would have had a BAC of at least 0.26 (if she had

14

consumed only 10 drinks), at which level it would be (1) "unlikely . . . that she would have had *any* memory of the car ride" or "*any* memory of anything that had occurred thereafter," and (2) "*extremely* unlikely" that she could have "dressed herself, run down eight flights of stairs, run one block to her home," and been "coherent enough to be able to explain to her roommate" what had supposedly happened.  Ex. 16 at 5 (emphasis added).  Ms. Roe herself testified at the hearing that she had consumed not just ten drinks, but "over ten drinks."  Ex. 14 at 62.

As for Q.W., he attached to his statement a picture of himself and Mr. Doe taken at the party at 11:16 p.m., Ext. 15 at 1, and testified that he and Mr. Doe met Ms. Roe shortly after they took that picture, Ex. 18.  He also testified that he had a "normal, lucid conversation" with Ms. Roe at that time.  *Id.*  His testimony confirmed that Mr. Doe and Ms. Roe would have spoken for around 30 minutes before leaving the party at 11:56 p.m., consistent with Mr. Doe's testimony.

Mr. Doe's appeal explained how this new evidence undermined the facts relied upon by the board to conclude that Ms. Roe was incapacitated and that Mr. Doe should have known it.  As to the former, he argued that the toxicology report showed either that Ms. Roe had grossly exaggerated the amount of alcohol she had consumed or that she was untruthful about the memories she claimed to have and the actions she claimed to have performed, both of which undermined her credibility.  Ex. 15 at 2.  He further noted that if Ms. Roe had consumed as much alcohol as she s aid she had, her extreme level of intoxication would have been obvious to everyone who saw her, especially the witness who saw her walk across the street, *id.* at 7; yet no one testified to seeing her stumble, slur her words, or act severely drunk at the party.  Instead, Q.W. reported having a "normal, lucid conversation" with her.  *Id.* at 8.

Mr. Doe also explained why the new evidence undermined the finding that he could have known Ms. Roe was incapacitated, if in fact she was.  He explained that not a single "witness[]"

had "observed [Ms. Roe] acting in an intoxicated manner, in stumbling and slurring her words" *at the actual party*; three witnesses who saw her there said nothing about her looking intoxicated, *id.* t 6-7, a fourth (R.M.) would say only that she looked "intoxicated," *id.* at 7, and now a fifth— Q.W.—testified that he had a "normal, lucid conversation" with her, *id.* at 8. The only witness to have testified that Ms. Roe stumbled or slurred after she met Mr. Doe was E.E., who twice said that Ms. Roe had called her and was slurring on the phone. But the toxicology report, Mr. Doe argued, proved that Ms. Roe would have been too intoxicated to have gotten her phone out, made that call, spoken an intelligible sentence ("I'm in an Uber with a guy") and remembered any of it if she had actually consumed as much alcohol as she said she had. *Id.* at 9. The appeal also offered several more reasons to doubt that the phone call ever occurred, reasons that took on new significance in the light of the toxicology report, including:

- That E.E. changed from saying that *she* had called *Ms. Roe*, as part of a dramatic chain of events prompted by fears for Ms. Roe's safety—to saying that *Ms. Roe* had called *her*.

- That neither Ms. Roe nor E.E. ever identified the others who, with E.E., allegedly both called Ms. Roe and then searched for Ms. Roe that night.

- That if this call had actually happened, E.E would have discussed it with Ms. Roe long ago and it would have appeared in one of Ms. Roe's three complaint statements.

*Id.* at 9-10.

Mr. Doe's appeal also explained that he was quiet in the Uber because he was nervous about having sex for the first time, felt awkward that a third person whom he didn't know well was in the front seat, and Ms. Roe was calmly buried in her phone the entire time. *Id.* at 10. He noted that the board gave no explanation why it would credit his testimony that they didn't talk in the Uber—he was the only source of that testimony—yet fail to also credit his testimony that Ms. Roe was busy with her phone the entire ride, not lying there catatonic, as she would later claim. *Id.* at 11.

On February 15, Robert Snyder, the University's Executive Director of Planning &

Outreach, rejected Mr. Doe's appeal as not viable without explanation.  Ex. 19.  Mr. Snyder

simply repeated the threshold requirements of an appeal identified in Article 33, then stated, with

no elaboration, "[I]t is my determination that you have not met the requirements for an appeal."

*Id.*  In other words, it refused to even consider the merits of his appeal.

## LEGAL STANDARD

"A party seeking a preliminary injunction must make 'a clear showing that four factors,

taken together, warrant relief: likely success on the merits, likely irreparable harm in the absence

of preliminary relief, a balance of the equities in its favor, and accord with the public interest.'"

*League of Women Voters of United States v. Newby*, 838 F.3d 1, 6 (D.C. Cir. 2016) (citing

*Pursuing Am.'s Greatness v. FEC*, 831 F.3d 500, 505 (D.C. Cir. 2016)).  In this Circuit, "[t]he

four factors have typically been evaluated on a 'sliding scale,'" meaning that "[i]f the movant

makes an unusually strong showing on one of the factors, then it does not necessarily have to

make as strong a showing on another factor."  *Davis v. Pension Ben. Guar. Corp.*, 571 F.3d

1288, 1291–92 (D.C. Cir. 2009) (citing *Davenport v. Int'l Bhd. of Teamsters,* 166 F.3d 356, 361

(D.C. Cir.1999)).  "For example, if the movant makes a very strong showing of irreparable harm

and there is no substantial harm to the non-movant, then a correspondingly lower standard can be

applied for likelihood of success."  *Id.* (citing *WMATC v. Holiday Tours,* 559 F.2d 841, 843

(D.C. Cir.1977)).  "It is in this sense that all four factors 'must be balanced against each other.'"

*Davis v. Pension Ben. Guar. Corp.*, 571 F.3d at 1292 (citing *Davenport,* 166 F.3d at 361).

In the wake of *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 24 (2008),

the circuit courts have split on the question whether "sliding scale" tests of this nature remain

viable, or whether instead a movant must always show that he or she is mathematically likely to

succeed on the merits.[4]  Panels of the D.C. Circuit have suggested that they might side with the

Fourth Circuit, *see, e.g.*, *Sherley v. Sebelius*, 644 F.3d 388, 393 (D.C. Cir. 2011), but to date this

Circuit "has not yet needed to decide this issue," *Newby*, 838 F.3d at 7.

Here, too, the Court need not decide the issue, because under either approach John Doe is

entitled to preliminary relief.  But should it take a position, it should apply this Circuit's

longstanding precedent, which has not been disavowed, and stand with the circuits that have held

that sliding scales survive *Winter*.[5]

---

[4] *Compare Alliance for the Wild Rockies v. Cottrell,* 632 F.3d 1127, 1130–35 (9th Cir. 2011) (sliding scales survive *Winter*); *Citigroup Global Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd.,* 598 F.3d 30, 35–38 (2d Cir. 2010) (same); and *Hoosier Energy Rural Elec. Coop. v. John Hancock Life Ins. Co.,* 582 F.3d 721, 725 (7th Cir. 2009) (same); *with Real Truth About Obama, Inc. v. FEC,* 575 F.3d 342, 347 (4th Cir. 2009) (reading *Winter* to require that movants always establish they are likely to succeed on the merits).

[5] *Winter* simply rejected the Ninth Circuit's incredibly lenient standard that allowed for the grant of an injunction based only on the "possibility" of irreparable harm. 555 U.S. at 21-22. Justice Ginsburg noted in dissent that the majority opinion did not, in fact, overturn courts' longstanding practice of applying sliding scales, a contention that the majority never refuted.  *See Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. at 51 (Ginsburg, J., dissenting) ("Consistent with equity's character, courts have evaluated claims for equitable relief on a 'sliding scale,' sometimes awarding relief based on a lower likelihood of harm when the likelihood of success is very high. . . . This Court has never rejected that formulation, and I do not believe it does so today.").  The majority never refuted that contention, and recent developments suggest she was right.  The standard governing stays pending appeal is the same as the standard governing preliminary injunctions articulated in *Winter*.  *See Nken v. Holder*, 556 U.S. 418, 434 (2009) (articulating four factors governing stays pending appeal and citing *Winter*); *id.* at 443 (Kennedy, J., dissenting) ("it is revealing that the standard that the Court adopts for determining whether a stay should be ordered is the standard that is used in weighing an application for a preliminary injunction").  In *Trump v. Int'l Refugee Assistance Project*, 137 S. Ct. 2080 (2017), the Supreme Court granted a stay pending *certiorari* based entirely on an analysis of the balance of the equities, with no discussion at all of the movant's chances of succeeding on the merits.  *Id.* at 2087.  It noted there that "[t]he purpose of such interim equitable relief is not to conclusively determine the rights of the parties, *University of Tex. v. Camenisch,* 451 U.S. 390, 395 (1981), but to balance the equities as the litigation moves forward."  *Id.  Winter* simply stands for the proposition that there must be more than a mere "possibility" of each of the four factors required for injunctive relief.

## ARGUMENT

The factors identified above weigh heavily in favor of granting the injunction.  Mr. Doe is likely to succeed on the merits of several claims, and the harm he will suffer without relief is a kind that courts across the country recognize as serious and irreparable.  The harm to the University, on the other hand, is negligible.  Its life will go on virtually the same whether or not the injunction is granted.  The balance of equities weighs overwhelmingly in Mr. Doe's favor, and the public has an interest in seeing that cases like his are handled properly.

## I.    JOHN DOE IS LIKELY TO SUCCEED ON THE MERITS OF HIS CLAIMS.

John Doe's Complaint raises five claims.  He can demonstrate now that he is likely to succeed on four of those claims.

### A.    Breach of Contract and the Implied Covenant of Good Faith

#### 1.    GW Was Required to Adhere to Its Contract with John Doe by Applying Its Disciplinary Policies in Good Faith.

It is well-settled in the District of Columbia that a student's relationship with his university "is contractual in nature," *Basch v. George Washington Univ.*, 370 A.2d 1364, 1366 (D.C. 1977), and that the terms of the contract include, among other things, disciplinary codes, *Pride v. Howard Univ.*, 384 A.2d 31, 34 (D.C. 1978), and other communications distributed to students, *Alden v. Georgetown Univ.*, 734 A.2d 1103, 1110 (D.C. 1999).  "[T]he usual practices surrounding a contractual relationship" can likewise "be raised to the level of a contractual obligation."  *Pride v. Howard Univ.*, 384 A.2d at 35.

Contracts between a university and its students, like all contracts, "contain an implied covenant of good faith and fair dealing."  *Hajjar-Nejad v. George Washington Univ.*, 37 F. Supp. 3d 90, 116 (D.D.C. 2014) (citing *Paul v. Howard Univ.,* 754 A.2d 297, 310 (D.C. 2000)).  The covenant "means that neither party shall do anything which will have the effect of destroying or

injuring the right of the other party to receive the fruits of the contract." *Kumar v. George Washington Univ.*, 174 F. Supp. 3d 172, 189–90 (D.D.C. 2016) (citing *Allworth v. Howard Univ.*, 890 A.2d 194, 201 (D.C. 2006)). "A party breaches this duty by evading the spirit of the contract, willfully rendering imperfect performance, or interfering with performance by the other party." *Id.* (citing *Paulin v. George Washington School of Medicine and Health Sciences*, 878 F. Supp. 2d 241, 247-48 (D.D.C. 2012)).

"[T]o show that a university breached the implied covenant of good faith and fair dealing," a plaintiff must show "'either bad faith conduct or conduct that is arbitrary and capricious.'" *Chenari v. George Washington Univ.*, 847 F.3d 740, 745 (D.C. Cir. 2017) (quoting *Wright v. Howard Univ.*, 60 A.3d 749, 754-55 (D.C. 2013)).[6]  In the context of university discipline, performance on a contract is arbitrary and capricious when it "steer[s] [an] investigation" towards "preconceived conclusions regarding [] misconduct," *Kumar*, 174 F. Supp. 3d at 189, when it "effectively disregard[s] evidence," *id.*, or when "there was no rational basis for the decision" or "it was motivated by bad faith or ill will," *Paulin*, 878 F. Supp. 2d at 247.  The test "is a reasonableness inquiry." *Kumar*, 174 F. Supp. 3d at 189-90 (citing *Paulin*, 878 F. Supp. 2d at 248, and *Allworth*, 890 A.2d at 202)).

---

[6] The standard for establishing a violation of the covenant based on *non-academic* misconduct should actually be lower than this, because the "arbitrary and capricious" standard has been developed in the context of claims of *academic* misconduct, a realm where schools are owed special deference.  *See Chenari*, 847 F.3d at 745 (basing standard on principle that "courts must not 'substitut[e] their judgment improperly for the academic judgment of the school'") (citing *Wright*, 60 A.3d at 754-55); *see also id.* ("True, all these cases involve decisions about academic performance, not honor code violations, but Chenari does not argue—nor do we decide—that a different standard should apply here.").  That is especially true in a case like this, where the panel consisted of two students and one low-level administrator, none of whom can be said to have brought "the academic judgment of the school" to bear.  The Court, in any event, need not decide what standard should apply, because Mr. Doe easily satisfies this "arbitrary and capricious" standard, as explained below.

### 2.     GW's Performance on Its Contract with Mr. Doe Was Arbitrary, Capricious, and Without a Reasoned Basis.

The University breached its contract with Mr. Doe, and the covenant inherent in it, when a biased hearing panel found him responsible on the basis of no credible evidence whatsoever, ignored a host of evidence to the contrary, and refused to let him fully defend himself.  It then further breached its contract with him when it negated his right to appeal that decision based on new evidence.

### a.     The Finding of Responsibility Violated the Covenant.

### i.     The Panel's Decision Lacked Any Rational Basis.

The panel's two reasons for concluding that Mr. Doe should have known Ms. Roe was incapacitated have no credible support in the hearing record.

<u>First</u>, "the statements of the witnesses, indicating that they observed [Ms. Roe] acting in an intoxicated manner, in stumbling and slurring her words," Ex. 1 at 6, do not indicate what Mr. Doe observed because ***none* of those witnesses saw her "stumbling and slurring her words" *at the party*.**  *See King v. DePauw Univ.*, 2014 WL 4197507 at *12 (testimony that complainant appeared incapacitated earlier in evening to others was not sufficient basis for concluding that she appeared incapacitated to plaintiff later that night).  J.E. was the only witness to testify that he observed Ms. Roe "stumbling and slurring her words," and he observed that only in his dorm room—before Ms. Roe arrived at the party.  Ex. 14 at 22.  Four other witnesses—all friends of Ms. Roe—*did* observe her at the party, and *none* of them testified that she appeared severely intoxicated there.  Three of them did not even say that she looked *intoxicated* at all—including one who saw her *walking across the street as she was leaving*.  Ex. 13 at 24-26.  And the fourth, R.M., expressly refused to say how intoxicated she appeared.  Ex. 14 at 31.  If she did not appear severely intoxicated to *four* of her friends, she would not have appeared that way to Mr. Doe,

either.  *Cf. King v. DePauw Univ.*, 2014 WL 4197507 at *12 (plaintiff, who "did not know [the complainant] well," would have less ability to detect her intoxication level than her friends).

The only person besides J.E. to testify that Ms. Roe stumbled or slurred (or exhibited any other marker of incapacitation) was E.E., who said Ms. Roe was slurring and incoherent in the Uber.  Ex. 14 at 40-41.  And her testimony is flatly unreliable.  Ms. Roe failed to mention this call—by far her most dramatic and important piece of evidence in the case—in *three* separate complaint statements.  That is just not believable.  E.E. herself testified that she "learned of the assault probably a couple weeks after this happened."  *Id.* at 41. It is impossible to believe that she would not have discussed the call with Ms. Roe or that Ms. Roe would then forget to include it in three separate complaint statements.  **It is telling that E.E. did not submit her written statement disclosing the phone call until November 20, after four out of four witnesses identified by Ms. Roe failed to say that she appeared intoxicated at the party.**

And those were just the reasons to doubt E.E.'s testimony before the hearing.  E.E. put a stake through the heart of her story at the hearing (just three weeks after she submitted her statement) when she testified twice that Ms. Roe had called *her, id.* at 38, 41—not that she *and a group of friends* had called Ms. Roe because they had been unable to locate her and feared for her safety, *see* Ex. 13 at 28.  She then said that Ms. Roe's roommate, A.C., "went to go find her" and "then we went home," Ex. 14 at 38, which can't be true, because Ms. Roe said in her original complaint statement that A.C. left the party soon after they all arrived, Ex. 13 at 4.  E.E.'s testimony is especially suspicious in the light of her written claim that she *and their other friends* collectively called Ms. Roe from the party.  *Id.* at 28.  If that were so, Ms. Roe would have followed up on it—this call was obviously the most important evidence in the entire case.  Ms. Roe would have presented these other friends as witnesses at the hearing or at the very least

sought to learn their identities.  Yet neither she nor the University did anything to identify these other bombshell witnesses—which only makes sense if she knew these "others" did not exist.

Second, "[Mr. Doe's] statements that the Complainant ceased conversation with him after leaving the party" are no evidence that he knew or should have known Ms. Roe was intoxicated to the point of incapacitation.  The idea that a drop in conversation level must be due to a person's sudden incapacitation due to alcohol is absurd on its face.  Worse still, the board based this finding on Mr. Doe's own testimony about their silence in the Uber ,yet failed to explain why it did not credit the rest of his testimony on that point—that she was busy doing things on her phone the entire ride, not sitting there comatose.  It also makes no sense, in anyone's version of events, to tie a change in conversation level to Ms. Roe's alcohol consumption.  In Ms. Roe's story, her memory blackout occurred well before she left with Mr. Doe, not when she got in the Uber.  Mr. Doe, on the other hand, testified that he and Ms. Roe had an "impassioned" conversation for 20-30 minutes before they got in the Uber.  That kind of conversation simply is not consistent with Ms. Roe's claimed level of intoxication at that time.  Yet that is the kind of conversation the panel's finding *presumes* was taking place.  To view Ms. Roe's silence as some dramatic change in her demeanor, you have to believe that she was actually carrying on a substantial conversation before she got in the car.  If the conversation were insubstantial or incoherent, silence would indicate no significant change.  **That is the great irony of this finding:  It presumes the truthfulness of Mr. Doe's characterization of their conversation— a kind of conversation they could not have in Ms. Roe's story—and then expressly credits**

**his testimony that they were silent in the Uber, yet inexplicably chooses not to credit his testimony about what Ms. Roe was doing while she was silent.**[7] It lacks any reasoned basis.[8]

The only remotely reliable evidence before the hearing board was evidence that Ms. Roe appeared intoxicated to some, but not all, of the *friends* who saw her at the party and that the only signs of potential incapacitation that any of them observed that night were observed before she got there.  Concluding that Mr. Doe should have known Ms. Roe was incapacitated on that basis, when the evidence available *to him* showed at most that she was intoxicated, is arbitrary and capricious.  The court in *King v. DePauw Univ.*, granted the plaintiff there a preliminary injunction on precisely that basis.  The question there, as here, was whether the plaintiff "is likely to succeed in demonstrating at trial that" it was "illegal, arbitrary or capricious" to conclude that he should have known the complainant was incapacitated when the evidence available *to him* indicated only that she was intoxicated.  *Id.* at *11.  The court concluded that the board's decision finding him responsible was indeed "arbitrary"—even though it was "not unreasonable" to think that she had in fact been incapacitated, unlike here—because there was no testimony that the outward signs of her incapacity occurred in the plaintiff's presence.  *Id.* at *12.

---

[7] Consider, too, that the finding requires that Ms. Roe almost *instantaneously* went from having a sustained conversation (as explained above) and walking across the street without difficulty (as reported by one of her witnesses) to being outright incapacitated.  Alcohol intoxication simply does not work that way.

[8] The real question is why the board bothered to rely on Mr. Doe's testimony about the lack of conversation at all, given that Ms. Roe testified she was falling asleep and unconscious in the car—a far stronger indication of incapacitation than a drop in conversation.  The reason undoubtedly is that if Ms. Roe had been *that* drunk in the car, it would have been impossible for her to have called E.E.  Which is absolutely right.

Not only is the same true here, but multiple witnesses who observed Ms. Roe at the party—including right before she left—noticed no signs of incapacity.  It was arbitrary and capricious for the hearing board to conclude that a preponderance of evidence showed otherwise.

### ii.      The Board Ignored a Host of Evidence to the Contrary.

The board also ignored an incredible amount of evidence contrary to its findings.  Among other things:

- Ms. Roe's testimony on points both large and small changed repeatedly during the disciplinary proceeding and often contradicted itself.

- Ms. Roe claimed on October 30 that her roommate, A.C., left the party very early, Ex. 13 at 4, but after Mr. Doe wrote that Ms. Roe had sent text messages to A.C. to see if the room was open for sex, *id.* at 29, Ms. Roe changed her story and testified that she "remembered spending a lot of the night with my roommate at the time, [A.C.], and her boyfriend, [R.B.]," Ex. 14 at 7, and that "[m]y roommate was at the party and so I wouldn't have texted her," *id.* at 62.

- Four friends saw Ms. Roe at the party, and *none* of them said she looked severely intoxicated, even though her incapacitation would have been screamingly obvious were she telling the truth about her alcohol consumption.

- Ms. Roe claimed to have consumed *six Solo cups* of alcohol in an hour yet never went to the bathroom or suffered incontinence—even when allegedly falling asleep in the car or falling unconscious.

- Ms. Roe claimed on November 2 that no conversations took place in the Uber and that she "felt like [she] couldn't speak," Ex. 13 at 7, but after E.E. submitted her statement on November 20, Ms. Roe suddenly remembered "having the phone up to my ear and speaking," Ex. 14 at 12, and E.E. testified that Ms. Roe *placed the call* and said "multiple times," "I'm in an Uber with a guy," *id.* at 40, 42.

- Ms. Roe told a ridiculous story about how she learned Mr. Doe's name that night.

- Ms. Roe told an inherently implausible story about falling unconscious at the precise moment sexual activity commenced.  Ex. 13 at 7.

- Ms. Roe claimed that she ran down eight flights of stairs, and ran home, just minutes after being unconscious and barely able to move. Ex. 13 at 7; Ex. 14 at 9 ("Right after he ejaculated he rolled off the bed and went into the bathroom.  I thought I heard the shower start, and I wanted to get out as fast as I could.").

That evidence cried out for an explanation, yet the hearing board addressed none of it.  Its decision to find Ms. Roe credible despite it was arbitrary and capricious.

### iii.     The Panel Steered the Hearing Towards Its Preconceived Conclusion.

The panel also showed itself to be biased against Mr. Doe and refused to let him fully defend himself.  As soon as Ms. Roe concluded her opening statement, the chair stated his belief that it was "traumatic" for her to "reliv[e]" what had happened, Ex. 14 at 11, showing that he had prejudged, at a minimum, Ms. Roe's honesty in claiming to have experienced a traumatic event—precisely the kind of unwavering belief in the truthfulness of sexual assault claims that the University has been pressured for years to accept and that its Title IX office teaches.  Its actions thereafter flowed from this preconceived conclusion and denied Mr. Doe a fair chance to defend himself.  When Mr. Doe tried to demonstrate the bias of one of her witnesses—*the only one who actually claimed to have seen Ms. Roe intoxicated at the party*—he was immediately shut down by the chair, with no dissent from the rest of the board.  *Id.* at 35.  And not surprisingly, no statement implicitly affirming Mr. Doe's honesty was made by the panel after he finished his opening statement.[9]  Instead, as noted above, the panel grasped for reasons to discredit his consistent and detailed testimony, including that it was *too detailed*, *id.* at 52, and that it was supported by fewer witnesses than Ms. Roe's, *id.* at 55.[10]  The board's one-sided

---

[9] Imagine if one had been—if one of the panelists had said, "We want to recognize for all involved how traumatic it is to be falsely accused," or some other statement implicitly affirming Mr. Doe's honesty.  Is there any doubt that Ms. Roe would have been outraged—and rightly so?

[10] The latter is especially ironic given the chair's refusal to let Mr. Doe actually test the bias of one of Ms. Roe's witnesses.  Again, imagine a hearing panelist telling a sexual assault claimant that her testimony looked suspicious because the respondent had brought friends in to testify for him and she had come alone—is there any doubt as to how that panelist would be viewed?

treatment of the parties denied Mr. Doe his contractual right to be found responsible by a

preponderance of the reasonably obtainable evidence and violates the covenant of good faith.

*    *    *

The hearing board's conclusion that Ms. Roe was incapacitated, and that Mr. Doe should

have known it, denied Mr. Doe the fruits of the University's contractual promises to him.  Its

reasons for concluding that a preponderance of evidence showed that he should have known Ms.

Roe was allegedly incapacitated are without a reasoned basis, ignored a host of damning contrary

evidence, and were the product of an evidence pool that Mr. Doe was not allowed to fairly

develop.  The University breached its contractual promises to Mr. Doe, and the covenant

inherent in them, when it found him responsible.

### b. GW Breached Its Contract with Mr. Doe in Rejecting His Appeal.

The University further breached its contract with Mr. Doe, and the covenant inherent in

it, when it rejected his appeal.  Appeals are permitted "based on new information that is relevant

to the case, that was not previously presented at the hearing or conference, and that significantly

alters the finding of fact."  ECF No. 3-2 at 8.  Mr. Doe's appeal was based on evidence that was

indisputably relevant and indisputably new; Mr. Snyder could conceivably have rejected it only

by determining that it did not "significantly alter[] the finding of fact."  But Mr. Snyder was

limited to determining the appeal's "viability," *id.*, and that role gave him very little authority to

weigh the actual merits of the appeal, as both the plain meaning of the term and the tiered

structure of appeals at GW make clear.  *See Kakaes v. George Washington Univ.*, 683 A.2d 128,

132 (D.C. 1996) (contractual terms "are to be given their common meaning").  The common

meaning of "viable" denotes something that has the *potential* to succeed, not something that

necessarily will.  *See, e.g.*, Merriam-Webster Dictionary (defining "viable" as "capable of

working" or "having a reasonable chance of succeeding")[11]; Oxford English Dictionary (defining "viable" as "capable of working successfully; feasible")[12]; *see also* Black's Law Dictionary (10th ed. 2014) (defining "viable" as "capable of succeeding"). When the "viability" of an appeal is determined separately from its merits, "viability" review necessarily consists in only a limited review of the merits. That is a structure common in the law, too. *See, e.g.*, *U.S. v. Bobo*, 419 F.3d 1264, 1267 (11th Cir. 2005) (double jeopardy claims are "viable candidates for interlocutory review" if the merits are "colorable"). Whether an appeal *in fact* succeeds is the question for merits review, and the Code clearly assigns that task to a different body. It would be wasteful and redundant to read the policy to commit a full merits review first to Mr. Snyder and then to the Committee. No one in the parties' shoes would interpret the Code that way, and "any ambiguity" in that regard must "be construed strongly against the drafter," GW. *Dyer v. Bilaal*, 983 A.2d 349, 355 (D.C. 2009). Mr. Snyder could reject the appeal only if it were not "capable" of succeeding, had no "reasonable chance of success" or presented no "colorable" argument.

Mr. Doe's appeal quite obviously did all three of those things. Not only was it viable, but it would also have succeeded in "significantly alter[ing] the finding of fact" had it been fairly considered by the Committee. The new evidence on which it was based completely undermined Ms. Roe's credibility, to whatever extent that had not already happened. The toxicology report showed just how incapacitated Ms. Roe would have been had she consumed as much alcohol as she said she did and just how incapable she would have been of performing the actions she says she performed or having the memories she says she had. Ex. 16. And Q.W. testified in his statement that he had a "normal, lucid conversation" with Ms. Roe soon after Mr. Doe met her, Ex. 18, making him the fifth person out of five to witness her *at the party* and notice no signs of

---

[11] *Available at* https://www.merriam-webster.com/dictionary/viable (last visited March 5, 2018).

[12] *Available at* https://en.oxforddictionaries.com/definition/viable (last visited March 5, 2018).

incapacitation.  Ms. Roe's testimony was the only evidence (apart from E.E.'s testimony) supporting the idea that she was incapacitated at the party.  It goes without saying that no finding against Mr. Doe can stand when his accuser is so lacking in credibility.

The toxicology report also destroyed whatever possibility there still was to believe that Ms. Roe had actually called E.E. from the Uber, the primary fact on which the board relied in concluding that Mr. Doe should have known she was incapacitated.  The report makes clear that Ms. Roe would have been far too intoxicated to have physically handled her phone, dialed E.E., and spoken an intelligible sentence to her had she actually drunk as much as she says she did.  That would have taken far more coherence and coordination than Dr. Milman says she would have had—and more, in fact, than *Ms. Roe herself* originally says she had in the car.  Ex. 13 at 6.

The toxicology report also lays bare just how damning the testimony was of one of Ms. Roe's investigation witnesses, who said that he saw her walking across the street as she was leaving but gave *no* testimony whatsoever that she looked intoxicated or had any trouble in doing so.  *Id.* at 25.  If Ms. Roe has consumed as much as she claimed, she could not have made that walk unassisted, or without extremely obvious signs of her severe intoxication.  Yet this witness noticed nothing like that.  And this would have happened just *minutes* before the alleged phone call with E.E. took place and Ms. Roe allegedly fell asleep or passed out in the car.  At a minimum it shows that, if Ms. Roe did in fact talk to E.E. on the phone—Mr. Doe believes that no such call occurred—it was at a time when she did not appear incapacitated.

What is true for this witness is true for all of the approximately 100 people at the party. There is testimony from *none* of them, including Ms. Roe's friends, that she exhibited a single sign of incapacitation there.  It is impossible to believe that a normal-sized 18- or 19-year old woman who had consumed "over ten drinks" of alcohol in two hours and had a BAC of at least

0.26 would appear severely intoxicated to no one.  It is even less possible to believe that she simultaneously *should have* appeared incapacitated to Mr. Doe.  The lack of witness evidence is absolutely damning.  Or at least it should have been.  The University breached its contract with Mr. Doe, and the covenant inherent in it, in rejecting his appeal.  *Doe v. Univ. of Notre Dame*, No. 3:17-cv-298, 2017 WL 1836939, at *11 (N.D. Ind. May 8, 2017), *vacated by request of the parties after settlement*, No. 3:17-cv-298, 2017 WL 7661416 (N.D. Ind. Dec. 27, 2017) ("conclusory and dismissive denial" of "very substantive request to appeal" suspension "contribute[d] to an ultimate finding that Notre Dame's process was arbitrary and capricious").

*     *     *

By the end of its disciplinary process, the University had ignored a legion of "evidence . . . contrary" to its finding, *Kumar*, 174 F. Supp. 3d at 190: the many contradictions in Jane Roe's testimony; the fact that *no one* at the party observed her looking or acting severely intoxicated; the fact that Q.W. observed her behaving just the opposite a few minutes after Mr. Doe began speaking with her; the inherently unreliable testimony about the phone call in the Uber; and the absolutely impossible things she says she did after drinking enough alcohol to put her in a coma. Mr. Doe is likely to succeed on these claims.

### B.   Title IX

Mr. Doe is also likely to succeed on his Title IX claim.  Federal courts around the country have recognized the "erroneous outcome" theory of Title IX liability set out by the Second Circuit in *Yusuf v. Vassar College*, 35 F.3d 709 (2d Cir. 1994).  *See, e.g.*, *Doe v. Miami Univ.*, 882 F.3d 579, 589 (6th Cir. 2018); *Doe v. Columbia Univ.*, 831 F.3d 46, 58 (2d Cir. 2016) (adjusting pleading standard for such claims in light of developments in Title VII case law). Under this theory, a student may recover upon a showing that, as a result of gender bias, "he was

innocent and wrongfully found to have committed an offense." *Yusuf*, at 35 F.3d at 715.  A

student-plaintiff succeeds on such a claim if he can show (1) "particular facts sufficient to cast

some articulable doubt on the outcome of the disciplinary proceeding," and (2) circumstances

showing "that gender bias was a motivating factor behind the erroneous finding." *Id.*

John Doe will succeed in showing both elements.  As to the first element, there is far

more than "some articulable doubt" about the outcome of the hearing, for all of the reasons

explained above.  As to the second element, he presents a number of facts showing that gender

bias affected the process.  Facts that show such bias include: (1) "statements by pertinent

university officials," *Yusuf*, 35 F.3d at 715; (2) "patterns of decisionmaking that . . . tend to show

the influence of gender," *id*.; and (3) "external pressure from the federal government," *Miami*

*Univ.*, 882 F.3d at 594, the media or the public, *Columbia Univ.*, 831 F.3d at 58.  John Doe has

evidence of all three.

<u>First</u>, "statements by university officials" make clear that gender plays a role in GW's

adjudication of these cases.  Its Title IX office, which implements the Policy, offers training to

male students in particular on how to prevent sexual assaults.  Ex. 3.  Implementing the policy

under the assumption that men are the sexual aggressors and women the ones enduring the risk

of their aggression is evidence of impermissible gender bias.  *Doe v. Case Western Reserve*

*Univ.*, No. 1:17-cv-414, 2017 WL 3840418 (N.D. Oh. Sept. 1, 2017) at *6 (administrator's

statements that college students, and "in particular women" were engaging in sexual risk taking

was evidence of gender bias).  Worse still, that same office refers GW students to the work of

Laci Green to further understand the Policy's meaning of consent, Ex. 2, and Ms. Green teaches

that one of the "most pervasive reasons why people don't believe survivors is that most survivors

are women" and that "[s]exual assault accounts are nearly always true."[13]   The office's gendered

enforcement of Title IX may be well-intended, but it is gender bias all the same.[14]

Second, there is "statistical evidence that ostensibly shows a pattern of gender-based

decision-making," [cite], and it comes from GW itself.   GW admits that 100% of the respondents

put through its formal process in the two most recent academic years were found responsible.

That necessarily means that 100% of the men put through that process were found responsible,

and upon information and belief, all ten of those respondents were in fact male.   That is

independent evidence of gender bias.   *See Miami Univ.*, 882 F.3d at 593 (allegations that 100%

of males in the academic year in which plaintiff was accused of misconduct were found

responsible, and that 90% of students found responsible in a three-year period were male,

showed pattern of decision-making informed by gender bias).

Third, there has been a tremendous amount of "external pressure" upon GW to appear

tough on claims of sexual assault brought by men against women—from the federal government,

the student body, and proceedings in the courts. *See* pp. 5-7, *supra.*   Even in the absence of an

active OCR investigation, courts are beginning to acknowledge the federal government's

pressure upon all schools to get tough on claims of sexual assault as a source of gender bias.   *See*

*Miami Univ.*, 882 F.3d at 594.   But when a school comes under targeted pressure from the

government in the form of an active OCR investigation, the influence of gender bias is especially

---

[13] *See* nn. 1-3, *supra.*

[14] *See Columbia Univ.*, 831 F.3d at 58 n. 11 ("A defendant is not excused from liability for discrimination because the discriminatory motivation does not result from a discriminatory heart . . . .   A covered university that adopts, even temporarily, a policy of bias favoring one sex over the other in a disciplinary dispute . . . has practiced sex discrimination[.]").

clear.[15]   The same is true when targeted pressure comes from other sources, such as student

movements,[16] local media coverage,[17] and lawsuits by female students.[18]

GW, as detailed above, was experiencing pressure from *all* of those sources

simultaneously at the time Ms. Roe filed her complaint.  It had come under active OCR

investigation fewer than three months before she filed; it was in the midst of defending itself

against a highly publicized lawsuit by a former female student; its Title IX enforcement had been

a repeated source of media attention, typically negative; and most importantly of all, it was

dealing with the fallout of a student movement pushing "to change the way it handled sexual

assault allegations," *Amherst College*, 238 F. Supp. 3d at 223, led by a student whose case

mirrored Ms. Roe's in remarkable ways.  The pressure upon it to suspend Mr. Doe was great.

But what makes GW unique, besides the sheer volume of the pressure it was under, is

that the link between this pressure and GW's Title IX adjudications need not be left to

speculation here nor await further proof, because GW itself has affirmed it.  As described above,

in direct response to Ms. Raihan's protest, **the University touted the fact that it convicted**

_____

[15] *See, e.g.*, *Doe v. Cummins*, 662 Fed. App'x 437, 453 (6th Cir. 201 (distinguishing targeted OCR investigation from generic pressure); *Wells v. Xavier*, 7 F. Supp. 3d 746, 747, 751 (S.D. Oh. 2014) (fact that school was brought under OCR investigation six months before plaintiff was charged supported inference of gender bias).

[16] *Doe v. Amherst College*, 238 F. Supp. 3d 195, 223 (D. Mass. 2017) (allegation that school punished plaintiff to appease student movement pushing "to change the way it handled sexual assault allegations" sufficient to establish inference of gender bias")

[17] *Columbia Univ.*, 831 F.3d at 58 (local pressure supported inference of gender bias); *Doe v. The Trustees of the University of Pennsylvania*, No. 2:16-cv-05088-JP, 2017 WL 4049033 at *16 (E.D. Pa. Sept. 13, 2017) (two newspaper articles highlighting school's handling of assault allegations supported inference of gender bias); *Doe v. Lynn Univ., Inc.*, 235 F. Supp. 3d 1336, 1340-41 (S.D. Fla. 2017) (media attention from school security's decision not to charge different student with misconduct in February 2015 supported inference of gender bias against plaintiff seven months later)

[18] *Doe v. Miami Univ.*, 882 F.3d at 594; *Doe v. Ohio State Univ.*, 239 F. Supp. 3d 1048, 1073 (S.D. Ohio 2017) (pressure and publicity from lawsuit filed two months before investigation supported inference of gender bias).

**100% of the respondents who went through its formal process in recent years, then hired a professional complainants' advocate as its full-time Title IX investigator**.

Before a single deposition has been taken, or a single Title IX training material from GW produced, there is substantial evidence of gender bias from multiple sources. John Doe is likely to succeed on the merits of his Title IX claim.

### C.    D.C. Human Rights Act

John Doe also is likely to succeed in establishing violations of the D.C. Human Rights Act. Section 2-1402.41 makes it "an unlawful discriminatory practice, subject to the exemptions in § 2-1401.03(b), for an educational institution" to "deny, restrict, or to abridge or condition the use of, or access to, any of its facilities, services, programs, or benefits of any program or activity to any person otherwise qualified, *wholly or partially*, for a discriminatory reason," including "based upon the actual or perceived . . . sex . . . of any individual." (Emphasis added.) John Doe will succeed in showing both disparate treatment and disparate impact under the Act.

### 1.    Disparate Treatment

For the same reasons stated in Section I.B., Mr. Doe will succeed in showing disparate treatment under the Act. That is especially true given that the Act is violated when denial of an educational benefit is based "wholly *or partially*" on a discriminatory motivation.

### 2.    Disparate Impact

Mr. Doe will also succeed in showing disparate impact under the Act. The Act contains an "effects clause" which states that "[a]ny practice which has the effect or consequence of violating any of the provisions of this chapter shall be deemed to be an unlawful discriminatory practice." D.C. Code § 2-1402.68. "Under that section, despite the absence of any intention to discriminate, practices are unlawful if they bear disproportionately on a protected class and are

not independently justified for some nondiscriminatory reason." *Gay Rights Coal. of Georgetown Univ. Law Ctr. v. Georgetown Univ.*, 536 A.2d 1, 29 (D.C. 1987); *Davis v. District of Columbia*, 949 F. Supp. 2d 1, 11 (D.D.C. 2013).  The Act is "a broad remedial statute and it is to be generously construed," *George Washington Univ. v. D.C. Bd. of Zoning Adjustment,* 831 A.2d 921, 939 (D.C. 2003), meaning that courts "must read the words of the DCHRA liberally consistent with the Act's sweeping statement of intent." *Estenos v. PAHO/WHO Federal Credit Union*, 952 A.2d 878, 887 (D.C. 2008).

The Act permits practices that have a disparate impact based on sex in just one circumstance: when required by "business necessity":

> Any practice which has a discriminatory effect . . . shall not be deemed unlawful if it can be established that such practice is not intentionally devised or operated to contravene the prohibitions of this chapter *and* can be justified by business necessity. Under this chapter, a "business necessity" exception is applicable only in each individual case where it can be proved by a respondent that, without such exception, such business *cannot be conducted*; a "business necessity" exception cannot be justified by the facts of increased cost to business, business efficiency, the comparative characteristics of one group as opposed to another, the stereotyped characterization of one group as opposed to another, and the preferences of co-workers, employers, customers or any other person.  (Emphasis added.)

D.C. Code § 2-1401.03.  That is the *only* permissible justification for unintentional discrimination, *Estenos*, 952 A.2d at 888, and that exception "should be interpreted narrowly and with the greatest of caution," *id.*, which is precisely what the courts do.[19]  The Act "places the burden of proving the exception of 'business necessity' squarely on the employer, who must meet that burden "'in each individual case.'" *Estenos*, 952 A.2d at 888 (quoting § 2-1401.03).

---

[19] *See, e.g.*, *Mitchell v. DCX, Inc.*, 274 F. Supp. 3d 33, (D.D.C. 2003) ("A defendant must show that without the business necessity exception, the defendant's business could not be conducted."); *Natural Motion by Sandra v. D.C. Comm'n on Human Rights,* 687 A.2d 215, 218 (D.C. 1997) (absences due to employee's physical handicap that "caused an unspecified increase in inefficiency in the operation of [a] salon" did not satisfy business necessity exception) (quotation marks and citation omitted).

John Doe is likely to succeed on a disparate impact claim under the D.C. Human Rights Act because the University's Title IX enforcement regime has a disparate impact on its male students.  The University resolves sexual misconduct claims through a regime separate from its standard disciplinary process.  *See* ECF No. 3-1.  It "provide[s] annual training to university personnel responsible for the administration of" its Sexual Harassment and Sexual Violence Policy "on issues relating to sexual harassment and *how to conduct investigations and hearings in a manner that protects the safety of victims and promotes accountability.*"  *Id.* at 11.  Consistent with that policy, investigations are overseen by a Title IX investigator who has spent her entire professional career advocating for sexual assault claimants and who remains affiliated the Network for Victim Recovery of DC.  Also consistent with that policy, the chair of Mr. Doe's hearing immediately acknowledged the "trauma" Ms. Doe was experiencing in "reliving" the encounter before hearing from any witnesses.  Not surprisingly, this system designed separately to "protect[] the safety of victims" and "promot[e] accountability" produced a 100% conviction rate over the last two completed academic years, as the University readily touted when it came under attack for its handling of sexual assault claims by women against men.  GW, in short, effectively teaches its judicial officers to view sexual misconduct complainants as victims before the actual hearing takes place, and the results have come out accordingly.  The Code, by contrast, does not state that GW trains judicial officers to conduct hearings on non-sexual misconduct claims so as to "protect[] the safety of victims" and "promot[e] accountability," and upon information and belief the non-sexual disciplinary charges resolved through its standard process do not have a 100% conviction rate.

Men do not commit 100% of sexual assaults.  Nor is the undergraduate student body all, or even predominantly, male.  Yet all of the respondents in GW's formal hearing process for

sexual misconduct claims since the fall of 2015 are believed to have been male, and all of them

were found responsible for sexual misconduct.  GW's Title IX regime has a disparate impact on

its male students.  *See Mitchell*, 274 F. Supp. 2d at 48-49 (taxi company's pick-up rates had

disparate impact based on race because "pick-up rate" for a disproportionately African American

section of the District was lower than the rate in the rest of the District).

No "business necessity" can justify the University's use of a separate hearing process,

based on training designed to "protect[] the safety of victims" and "promot[e] accountability," to

resolve sexual misconduct claims but no others.  The regime it uses to resolve all other

disciplinary claims would suffice to fairly resolve sexual misconduct claims as well.  The

University will not carry its burden of justifying this disparate impact by "business necessity."

## II.     JOHN DOE WILL SUFFER IRREPARABLE HARM WITHOUT PRELIMINARY RELIEF.

A party seeking a preliminary injunction "must make two showings to demonstrate

irreparable harm."  *Newby*, 838 F.3d at 7.  "First, the harm must be 'certain and great, 'actual and

not theoretical,' and so 'imminen[t] that there is a clear and present need for equitable relief to

prevent irreparable harm.'"  *Id.* at 7-8 (quoting *Chaplaincy of Full Gospel Churches v. England*,

454 F.3d 290, 297 (D.C. Cir. 2006)).  "Second, the harm 'must be beyond remediation,'" *id.*

(quoting *Chaplaincy of Full Gospel Churches*, 454 F.3d at 297), which occurs "when monetary

damages are difficult to ascertain or inadequate," *CSX Transp., Inc. v. Williams*, 406 F.3d 667,

674 (D.C. Cir. 2005) (quotation marks omitted).

Mr. Doe's suspension based on a finding that he committed sexual assault readily

satisfies both showings.  GW has labeled him a sex offender, and the resulting damage to his

reputation, not to mention the emotional distress that it causes him, is itself irreparable.  *Alf v.

Donley*, 666 F. Supp. 2d 60, 70 (D.D.C. 2009), *vacated upon joint motion of the parties after*

*settlement*, No. 1:09-cv-802 (D.D.C. Dec. 13, 2010) (reputational harm was irreparable harm warranting injunctive relief); *Kroupa v. Nielsen*, 731 F.3d 813, 821 (8th Cir. 2013) (same).  And it is not damage that he can leave behind him, even if he wins at trial, because his suspension creates an immediate and permanent "gap in [his] education which [he] will be forced to explain through [his] professional life." *Jones*, 704 F.2d at 716 (affirming grant of preliminary injunction to student disciplined for cheating).  What he will be "forced to explain" is not just that he was disciplined for some run of the mill thing, but for the most stigmatizing thing for which schools can punish their students.  Courts therefore have repeatedly found that discipline for sexual misconduct is the kind of irreparable harm that warrants preliminary relief.[20]  The harm to Mr. Doe is imminent, it is great, and it cannot be remedied by his success at trial.

### A.  Mr. Doe's Suspension Has Already Caused Him Serious Reputational Injury and Emotional Distress and Will Result in Lost Opportunities Without Preliminary Relief.

Mr. Doe already suffers three forms of irreparable harm. The first and most obvious is the severe damage to his reputation in being labeled a sexual offender and suspended by his school. Reputational injury "is not easily measurable in monetary terms, and so often is viewed as irreparable."  11A Charles Alan Wright et al., *Federal Practice and Procedure* § 2948.1 (3d ed. 1998); *Alf*, 666 F. Supp. 2d at 70 (reputational harm stemming from "stigma" of debarment was irreparable).[21]  Suspension from college for almost *any* reason creates a "stigma," *see Albert v.*

---

[20] *See, e.g.*, *Doe v. Univ. of Notre Dame*, 2017 WL 1836939, at *12; *Doe v. Univ. of Cincinnati*, 223 F. Supp. 3d 704, 712 (S.D. Oh. 2016); *Ritter v. Oklahoma*, No. 1:16-cv-438, 2016 WL 2659620 at *3 (W.D. Okla. May 6, 2016); *Doe. v. Middlebury Coll.*, No 1:15-cv-192, 2015 WL 5488109 at *4 (D. Vt. Sept. 16, 2015); *King v. DePauw Univ.*, No. 2:14-cv-70, 2014 WL 419750 at *13 (S.D. Ind. Aug. 22, 2014).

[21] *See also Kroupa v. Nielsen*, 731 F.3d 813, 821 (8th Cir. 2013) (finding irreparable harm because discipline in educational program results in "reputational injury"); *Valley v. Rapides Parish Sch. Bd.*, 118 F.3d 1047, 1056 (5th Cir. 1997) ("biased finding of inefficiency and

*Carovano*, 824 F.2d 1333, 1338 n. 6 (2d Cir. 1987), an "indelible" one that "cannot help but have a deleterious effect on [a] plaintiff's future," *Tully v. Orr*, 608 F. Supp. 1222, 1225 (E.D.N.Y. 1985). That fact is "so clear as to almost be a truism." *Doe v. The Rector and Visitors of George Mason Univ.*, 149 F. Supp. 3d 602, 614 n. 9 (E.D. Va. 2016). But where, as here, the disenrollment is occasioned by something that is itself "stigmatizing," like a sexual misconduct "complaint," *Starishevsky v. Hosftra Univ.* 612 N.Y.S.2d 794, 801 (1994), the reputational harm is especially great. *George Mason Univ.*, 149 F. Supp. 3d at 613 (expulsion for sexual assault "plainly calls into question a plaintiff's good name, reputation, honor, or integrity"). The University has labeled Mr. Doe a sex offender, a uniquely stigmatic thing in our society that undoubtedly injures a person's reputation and good name. *Doe v. Univ. of Cincinnati*, 223 F. Supp. 3d 704, 712 (S.D. Oh. 2016) (acknowledging, in granting preliminary injunction, harm to student's "academic and professional reputation" from finding by school that he committed sexual misconduct). The reputational harm he suffers each day is irreparable.

Reputational injury is particularly irreparable when it is accompanied by emotional distress, which itself can support a finding of irreparable harm.[22] Mr. Doe testifies poignantly to the emotional turmoil that Ms. Roe's false charges, and the school's response to them, are putting him through. Ex. 20 (Declaration of John Doe) at ¶¶ 10-14. For at least three days in December he gave serious thought to suicide, and the prospect of "having to tell someone that

---

incompetence" irreparably harmed plaintiff by causing "severe injury to her professional reputation").

[22] *See, e.g.*, *Caspar v. Snyder*, 77 F. Supp. 3d 616, 640 (E.D. Mich. 2015) (finding irreparable harm because "loss of dignity and other emotional injury" are "not susceptible to quantitative calculation"), *U.S. v. Matusoff Rental Co.*, 493 F. Supp. 2d 740, 756 (S.D. Ohio 2007) ("emotional distress" is "difficult, if not impossible, to calculate with mathematical precision"); *Chipman v. Grant Cnty. School Dist.*, 30 F. Supp. 2d 975, 981 (E.D. Ky. 1998) (irreparable harm where plaintiffs suffered "emotional distress" from school discipline).

[his] school found [him] responsible for sexual assault continues to give [him] significant

anxiety." *Id.* ¶ 14.  He is "afraid to meet new people," and understandably so, "because they will

eventually ask what [his] future plans are." *Id.*  He is crippled personally and socially, a

phenomenon common among those convicted by their schools for sexual assault.  *Doe v.*

*Brandeis Univ.*, 177 F. Supp. 3d 561, 602 (D. Mass. 2016) ("a student who is found responsible

for sexual misconduct will likely face substantial social and personal repercussions").

Finally, John Doe's suspension has delayed and continues to delay his career, *see* Ex. 20

at ¶¶ 15-20, and it will rob him of certain once-in-a-lifetime opportunities, such as the chance to

graduate with his classmates and to enjoy a lifelong link with them as an alumnus of the Class of

2018, at class reunions and numerous other alumni events.  That, too, is irreparable harm.[23]

### B.    These Harms Will Be Magnified and Perpetuated Without Preliminary Relief, Even If Mr. Doe Succeeds at Trial.

John Doe already is suffering severe reputational and emotional injury, is delayed in

pursuing his career, and will be unable to graduate in the Class of 2018, even if he succeeds at

trial; those injuries constitute irreparable harm.  But that is not the worst of it.  If Mr. Doe does

not graduate in May, he will immediately acquire a permanent "gap in [his] education which [he]

will be forced to explain *through [his] professional life*." *Jones*, 704 F.2d at 716 (emphasis

added).  And what the gap will "force[]" him to explain is not that he was disciplined for an

alcohol violation, or disorderly conduct, or even for cheating; he will be forced to explain that he

was found to have committed sexual assault.  That is threat is not speculative; it is

---

[23] *See Jones*, 704 F.2d at 716 (identifying delayed entry into workforce and lost opportunity "to complete her education with her fellow classmates" as forms of irreparable harm); *Doe v. Middlebury Coll.*, No. 1:15-CV-192-JGM, 2015 WL 5488109, at *3 (D. Vt. Sept. 16, 2015) ("money damages cannot compensate for . . . the delay in the completion of his degree, or the opportunity to begin his career in July 2016 with this particular employment"); *Doe v. Univ. of Notre Dame*, 2017 WL 1836939 at *13 (plaintiff suspended for sexual misconduct "will be putting his life on hold" without preliminary relief).

"unavoidable." *King v. DePauw Univ.*, 2014 WL 4197507, at \*14. And "any explanation is

unlikely to fully erase the stigma associated with such a finding," *id.*, because "the mere

accusation of [sexual misconduct], if disclosed, can invite harassment and ridicule." *Doe v. The*

*Rector and Visitors of George Mason Univ.*, 179 F. Supp. 3d 583, 593 (E.D. Va. 2016);

*Starishevsky*, 612 N.Y.S.2d at 801 (acknowledging the "stigmatizing" nature of a sexual

misconduct "complaint"). An actual *finding* will do that far more than a "mere accusation."

Courts therefore regularly find that educational gaps caused by disenrollment for sexual

misconduct result in lost educational and professional opportunities and amount to irreparable

harm, including in those cases most similar to Mr. Doe's. In *Doe v. University of Notre Dame*, a

federal trial court concluded that the plaintiff, a second-semester senior who was suspended for

sexual misconduct, would suffer irreparable harm in the absence of preliminary relief:

> I am persuaded that this [10-month] gap constitutes irreparable harm to John's
> reputation and resumé for purposes of career prospects and possible further
> academic advancement. The questions the gap raises, and the explanation it
> requires, are potentially damaging to John in a manner not compensable by
> money damages and not repaired by permanent injunctive relief that might be
> granted after a decision on the merits in John's favor.

*Doe v. Univ. of Notre Dame*, 2017 WL 1836939 at \*12. The court in *King v. DePauw* reached

the same conclusion in a similar situation:

> If [plaintiff] is not permitted to complete this upcoming semester at DePauw . . .
> he will forever have a [10-month] gap or a senior-year transfer on his record. The
> Court finds it inevitable that he would be asked to explain either situation by
> future employers or graduate school admissions committees, which would require
> him to reveal that he was found guilty of sexual misconduct at DePauw.
> Successfully seeing this lawsuit to its conclusion could not erase the gap or the
> transfer; the question will still be raised, and any explanation is unlikely to fully
> erase the stigma associated with such a finding.

*King v. DePauw Univ.*, 2014 WL 419750 at \*13. So, too, did the court in *Doe. v. Middlebury*

*College*, with respect to a rising senior:

> Plaintiff would have to explain, for the remainder of his professional life, why his education either ceased prior to completion or contains a gap. . . .  Money damages cannot provide an adequate remedy for such imminent and non-speculative harm.

*Doe v. Middlebury Coll.*, 2015 WL 5488109 at *3.  Still other courts have acknowledged the irreparable harm that inevitably flows from suspension for sexual misconduct without expressly tying it to the educational gap.  *See, e.g.*, *Doe v. Univ. of Cincinnati*, 223 F. Supp. 3d at 712 (granting injunction because suspension for sexual misconduct "would damage [plaintiff's] academic and professional reputation"); *Ritter v. Oklahoma*, 2016 WL 2659620 at *3 (withholding injunction would result in "loss of educational and career opportunities").

Mr. Doe is especially susceptible to the harm caused by an educational gap.  His gap comes at the literal end of his education, when there is nothing left for him to do but graduate.  He can do nothing to create the impression that the gap was intentional, such as obtain an internship or volunteer.  Neither of those things can explain why he waited a full year to obtain his degree after having completed literally all of the requirements for doing so.

As Mr. Doe explains in his declaration attached to this Motion, his wrongful suspension has already cost him the chance to be admitted to his first-choice master's degree program,[24] to which he submitted the first parts of an application but which he must now abandon because he will not have a degree. Ex. 20 at ¶ 16.  It is safe to say that no graduate school will accept him until he has obtained his undergraduate degree.  The two other programs to which he intended to apply, however, have June application deadlines.  *Id.* ¶ 17.  Granting preliminary relief in time for him to graduate on May 20 has the power not only to erase the gap in his undergraduate education but also to erase any delay in the pursuit of his career.

---

[24] Mr. Doe's declaration does not identify the programs to which he applied because of the possibility he may still attend one of them.

Mr. Doe is currently doing a three-month internship that is extendable up to six months. *Id.* ¶ 19.  Any educational or employment opportunity he seeks after that time will require, at a minimum, a copy of his resume, which will indicate that he has delayed in obtaining his degree and will inevitably require the disclosure of his discipline and its basis.  And this lawsuit is highly unlikely to fully resolve on the merits before next March, meaning that Mr. Doe will not be able to apply for graduate programs beginning in 2019 either.  His lost educational and professional opportunities, the damage to his reputation, and the emotional distress that comes with it, are "imminent," *Doe v. Middlebury Coll.*, 2015 WL 5488109 at *3, "unavoidable," *King v. DePauw Univ.*, 2014 WL 4197507, at *14., and great in the absence of preliminary relief.

## III.   THE BALANCE OF EQUITIES OVERWHELMINGLY FAVORS PRELIMINARY RELIEF.

In stark contrast with the serious lifelong harm that Mr. Doe stands to suffer, the University will suffer almost no harm at all from the preliminary relief Mr. Doe seeks.  Mr. Doe has completed all of his degree requirements at the University; he has no need ever to set foot on campus again and would affirmatively agree not to do so.  He has no other disciplinary history at GW, Ex. 20 at ¶ 21, and is no threat whatsoever to Jane Roe or to anyone else.  *See Doe v. Univ. of Cincinnati*, 223 F. Supp. 2d at 712 (finding that an injunction "will not harm third parties or UC" because there was no evidence that the plaintiff "pose[d] a risk to other students").

It costs the University nothing to confer upon Mr. Doe a degree that he has already earned.  Mr. Doe is willing to forgo walking at his graduation, sparing the University even the minimal administrative burden of allotting him a space there (which would not, in any event, merit the denial of an injunction).  Apart from the negligible administrative burden of giving him the degree he has earned, life will go on at GW the same as it would without the injunction.

43

The University may argue that its interest in enforcing standards of conduct and maintaining confidence in its disciplinary system will be harmed by the grant of an injunction. *See Jones*, 704 F.2d at 716 (courts have "recognize[d] [a] University's institutional interest in quickly resolving disciplinary charges and maintaining confidence in the integrity of its processes"). But that generalized interest readily gives way where, as here, a disciplined student will suffer "far more substantial, concrete injury" if an injunction is wrongly withheld "than will [the University] if the injunction" is wrongly granted. *Id.* (affirming grant of injunction). Some courts weighing requests for injunctions ignore that interest of schools altogether. *See, e.g.*, *Doe v. Univ. of Cincinnati*, 223 F. Supp. 2d at 712. Not only is it generalized, it is predicated on the assumption that the school in fact ruled correctly—which is in serious doubt here—because the University has no legitimate interest in maintaining confidence in a faulty resolution of a student complaint. No university suffers from being reminded that it must apply discipline fairly and even-handedly. The University's institutional interest, furthermore, is one that it largely can vindicate should it succeed on the merits, by revoking Mr. Doe's degree until he completes the terms of a suspension. *See Doe v. Middlebury Coll.*, 2015 WL 5488109, at *4 ("[I]f Middlebury prevails on the merits, it can refuse to award, or revoke, Plaintiff's diploma and maintain Plaintiff's disciplinary record in its files"); *Chipman*, 30 F. Supp. 2d at 980 (balance of equities favored injunction because "the defendants are free to dismiss [the plaintiffs] from [an honor society] if this court ultimately determines that the defendants acted within their rights").[25]

Courts therefore consistently find that the balance of harms in cases like Mr. Doe's weigh heavily in favor of the plaintiff, even where the burden on the school exceeds anything the University will suffer here. *See Ritter*, 2016 WL 2659620 at *3 (harm to school in letting

---

[25] Any claim that an injunction would give Mr. Doe "essentially the full relief he seeks on the merits," *see Singh v. Carter*, 185 F. Supp. 3d 11, 17 (D.D.C. 2016), is therefore without merit.

expelled student complete "all remaining graduation requirements" was "inconsiderable in comparison to the threatened injury to plaintiff"); *Doe. v. Middlebury Coll.*, 2015 WL 5488109 at *4 (balance favored readmitting expelled student for senior year and letting school revoke degree if he lost on the merits); *King v. DePauw Univ.*, 2014 WL 4197507 at *14 (balance weighed "firmly" in favor of letting suspended student return for senior year).

The only harm that the University stands to suffer from the wrongful grant of an injunction turns on the legitimacy of a highly problematic decision and largely can be vindicated after trial.  The harm to John Doe from the wrongful withholding of an injunction will have lifelong consequences for him, beginning now.  The balance of the equities weighs overwhelmingly in John Doe's favor.

## IV.     THE PUBLIC INTEREST FAVORS PRELIMINARY RELIEF.

Finally, the public interest also favors preliminary relief.  "[I]t is always in the public's interest that a student be treated fairly before being disciplined."  *Ritter*, 2016 WL 2659620 at *3; *see also King*, 2014 WL 419750 at *14 (the public and the university community "ha[ve] an interest in seeing DePauw's policies applied fairly to both complainants and respondents in disciplinary actions").  "Leaving in place a wrongfully imposed sanction and the record of such is plainly contrary to the public interest."  *Doe v. George Mason Univ.*, 179 F. Supp. 3d at 588.

## CONCLUSION

For the foregoing reasons, John Doe respectfully requests that his Motion for a Preliminary Injunction be granted.

Respectfully submitted,

DATED:  March 13, 2018

/s/ Justin Dillon
Justin Dillon (D.C. Bar No. 502322)
Christopher C. Muha (D.C. Bar No. 987116)
KAISERDILLON PLLC
1401 K Street NW, Suite 600
Washington, DC 20005
T: (202) 640-2850
F: (202) 280-1034
jdillon@kaiserdillon.com
cmuha@kaiserdillon.com

*Attorneys for Plaintiff John Doe*