**IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| JOHN DOE, | : | |
| *Plaintiff*, | : | |
| | : | |
| v. | : | |
| | : | Civil Action No. 1:18-CV-553-RMC |
| THE GEORGE WASHINGTON | : | |
| UNIVERSITY, | : | |
| | : | |
| *Defendant*. | : | |

**MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S
<u>MOTION FOR A PRELIMINARY INJUNCTION</u>**

Dated: <u>March 30, 2018</u>

/s/ *Joshua W. B. Richards*_____
James A. Keller, Esq. (D.C. Bar No. 1049037)
Joshua W. B. Richards, Esq. (D.C. Bar No. 1002821)
**SAUL EWING ARNSTEIN & LEHR LLP**
Centre Square West
1500 Market Street, 38th Floor
Philadelphia, PA 19102
James.Keller@saul.com
Joshua.Richards@saul.com
*Admitted pro hac vice*

Jason A. Ross, Esq. (D.C. Fed. Bar No. 1047909)
**SAUL EWING ARNSTEIN & LEHR LLP**
1919 Pennsylvania Avenue, N.W., Suite 550
Washington, DC 20006
Jason.Ross@saul.com

*Counsel for Defendant*

## TABLE OF CONTENTS

INTRODUCTION...................................................................................................................1

RELEVANT FACTUAL BACKGROUND..........................................................................2

LEGAL STANDARD .............................................................................................................5

ARGUMENT............................................................................................................................8

I.    PLAINTIFF'S MOTION SHOULD BE DENIED BECAUSE THE RELIEF HE SEEKS
      WOULD BREAK NEW LEGAL GROUND AND SEEKS A REMEDY PLAINTIFF COULD
      NOT OBTAIN AT FINAL JUDGMENT. ................................................................................8

II.   PLAINTIFF CANNOT DEMONSTRATE A LIKELIHOOD OF SUCCESS ON THE
      MERITS. ...........................................................................................................................11

      a.    Plaintiff's Breach of Contract Claim Is Not Likely to Succeed......................11

            i.    Plaintiff's Contract Claim Fails Because He Assumes, Without
                  Showing, the Enforceability of the Code or Policy as a
                  Contract..............................................................................................11

            ii.   Even if the Code or Policy Constituted a Contract, Plaintiff's
                  Claim Fails Because He Received All Promised Procedural
                  Protections...........................................................................................13

                  1.    Procedures Set Forth in the Code and Policy...........................14

                  2.    Plaintiff Received All Review Procedures Set forth in
                        the Code and Policy. ...............................................................14

                        i.     The University Appropriately Weighed and
                               Considered the Evidence at Plaintiff's
                               Disciplinary Hearing.....................................................15

                        ii.    There Was Significant Support in the Record for
                               the Board's Decision, and Plaintiff's After-the-
                               Fact Attacks on the Credibility of Witnesses
                               Have No Merit. ...........................................................16

                        iii.   Plaintiff's Arguments Related to Alleged Bias of
                               the University Are Not Persuasive or Apposite..........19

                        iv.    Plaintiff's Appeal was Properly Rejected. ..................20

            iii.  Plaintiff's Contract Claim Is Not Likely to Succeed Because his
                  Requested Relief is Extraordinary and Unwarranted..........................22

      b.    Plaintiff's Breach of the Implied Covenant of Good Faith and Fair
            Dealing Is Not Likely to Succeed on the Merits..............................................22

i.      Plaintiff's Good Faith and Fair Dealing Claim Is Not Likely to Succeed Because the Basis for the Claim and the Relief Sought Are Duplicative of his Purported Breach of Contract Claim. ...............23

ii.     An Implied Covenant of Good Faith and Fair Dealing Claim Cannot Expand the Express Terms of an Alleged Contract. ...............23

iii.    The Arbitrary and Capricious Standard Requires A Showing of Bad Faith or Arbitrary Decision Making. ............................................24

c.     Plaintiff's Title IX Claim is Not Likely to Succeed on the Merits. .................25

d.     Plaintiff Is Not Likely to Succeed on his Claims under the D.C. Human Rights Act. ....................................................................................................31

i.      Disparate Treatment ...........................................................................31

ii.     Disparate Impact ................................................................................31

1.    This Court Should Not Recognize a Disparate Impact Claim Under Section 2-1402.41 of the D.C. Human Rights Act. ....................................................................32

i.     Title IX Does Not Permit a Disparate Impact Claim, and this Court Should Interpret the D.C. Human Rights Act in Accord........................................32

ii.    If the Court Permits a Disparate Impact Claim Under the D.C. Human Rights Act, it will Create a Conflict with Federal Law. ......................................33

2.    Plaintiff Otherwise Cannot Demonstrate a Likelihood of Success on the Merits of His Disparate Impact Claim. ...........35

i.     Plaintiff Confuses Purported Instances of Facial Discrimination with his Disparate Impact Claim.........35

ii.    The University is Exempt Under the Business Necessity Exemption to the D.C. Human Rights Act.............................................................................36

iii.   Plaintiff's Argument Related to the 100% Conviction Rate Argument is Misguided. ...................37

III.    PLAINTIFF CANNOT DEMONSTRATE THAT ABSENT INJUNCTIVE RELIEF HE WILL SUFFER IRREPARABLE HARM. ......................................................................................38

a.     Plaintiff's Claims of Reputational Harm Are Speculative and Insufficient. ......................................................................................................38

b.     Plaintiff's Injury, if Any, is Economic in Nature..............................................39

c.     If Plaintiff Prevails on the Merits, His Academic Record will not Reflect any Gap..............................................................................40

d.     Plaintiff Fails to Raise Any Other Cognizable Irreparable Harm....................42

e.     Plaintiff's Injury is Not Immediate. ................................................................42

IV.    THE BALANCE OF EQUITIES DOES NOT FAVOR PRELIMINARY INJUNCTIVE RELIEF. ............................................................................................................42

V.    THE PUBLIC INTEREST DOES NOT FAVOR PRELIMINARY INJUNCTIVE RELIEF. .............44

**CONCLUSION ..........................................................................................................45**

## <u>TABLE OF AUTHORITIES</u>

<small>CASES</small>

*Aamer v. Obama,*
    742 F.3d 1023 (D.C. Cir. 2014) ................................................................. 7

*ABA, Inc. v. District of Columbia,*
    40 F. Supp. 3d 153 (D.D.C. 2014) ........................................................ 7, 8

*Achagzai v. Broad. Bd. of Governors,*
    No. 14-768, 2016 WL 471274 (D.D.C. Feb. 8, 2016) ............................... 6

*Advance America v. FDIC,*
    257 F. Supp. 3d 56 (D.D.C. 2017) ...................................................... 6, 25

*AFGE, AFL-CIO v. Vilsack,*
    118 F. Supp. 3d 292 (D.D.C. 2015) .......................................................... 6

*Alexander v. Sandoval,*
    532 U.S. 275 (2001) ................................................................................ 32

*Amelunxen v. Univ. of Puerto Rico,*
    637 F.Supp. 426 (D.P.R. 1986) .............................................................. 44

*Armenian Assembly of Am., Inc. v. Cafesjian,*
    758 F.3d 265 (D.C. Cir. 2014) ................................................................. 6

*Ass'n of Flight Attendants-CWA, AFL-CIO v. Pension Ben. Guar. Corp.,*
    372 F. Supp. 2d 91 (D.D.C. 2005) ..................................................... 6, 28

*Bain v. Howard Univ.,*
    968 F. Supp. 2d 294 (D.D.C. 2013), *aff'd sub nom.* No. 13-7174, 2014 WL
    1378308 (D.C. Cir. Mar. 25, 2014) ................................................... 15, 24

*Barrett v. W. Chester Univ. of Penn. of State Sys. of Higher Educ.,*
    No. 03-4978, 2003 WL 22803477 (E.D. Pa. Nov. 12, 2003) ................... 32

*Bean LLC v. John Doe Bank,*
    No. 17-2187, 2018 WL 297125 (D.D.C. Jan. 4, 2018) ............................. 5

*Benefits Commc'n Corp. v. Klieforth,*
    642 A.2d 1299 (D.C. 1994) ..................................................................... 32

*Bestor v. C.I.A.,*
    No. 04-2049, 2005 WL 486148 (D.D.C. Mar. 2, 2005) ............................ 6

*Billups v. Lab Corp. of Am.,*
    233 F. Supp. 3d 20 (D.D.C. 2017) .......................................................... 23

*Borum v. Brentwood Village, LLC,*
    218 F. Supp. 3d 1 (D.D.C. 2016) .............................................................. 7

*Brodie v. U.S. Dep't of Health & Human Servs.*,
715 F. Supp. 2d 74 (D.D.C. 2010) ............................................................... 38, 39

*Camarda v. Certified Fin. Planner Bd. of Standards, Inc.*,
No. 13-00871, 2015 WL 13159050 (D.D.C. July 6, 2015) ............................. 24

*Cannon v. Univ. of Chicago*,
441 U.S. 677 (1979) ....................................................................................... 32

*Carr v. St. John's Univ., New York*,
17 A.D. 2d 632, 231 N.Y.S. 2d 410 (1962) ................................................... 10

*Carroll v. Fremont Inv. & Loan*,
636 F. Supp. 2d 41 (D.D.C. 2009) ................................................................. 13

*Chenari v. George Washington Univ.*,
847 F.3d 740 (D.C. Cir. 2017) ....................................................................... 24

*Clark v. Route*,
951 A.2d 757 (D.C. 2008) .............................................................................. 22

*ClearOne Commc'ns, Inc. v. Bowers*,
651 F.3d 1200 (10th Cir. 2011) ....................................................................... 9

*Commissions Imp. Exp. S.A. v. Republic of the Congo*,
757 F.3d 321 (D.C. Cir. 2014) ....................................................................... 34

*Crook v. Baker*,
813 F.2d 88 (6th Cir. 1987) ........................................................................... 10

*Davis v. Pension Ben. Guar. Corp.*,
571 F.3d 1288 (D.C. Cir. 2009) ....................................................................... 7

*De Beers Consol. Mines v. United States*,
325 U.S. 212 (1945) ......................................................................................... 9

*Dinu v. President & Fellows of Harvard Coll.*,
56 F. Supp. 2d 129 (D. Mass. 1999) ............................................................. 10

*Doe v. Middlebury College*,
No. 15-192, 2015 WL 5488109 (D. Vt. Sept. 16, 2015) ................................ 41

*Doe v. Regents of the Univ. of Cal.*,
--- F. Supp. 3d ----, No. 15-02478, 2016 WL 5515711 (C.D. Cal. July 25,
2016) ......................................................................................................... 25, 26

*Doe v. Trustees of Boston College*
No. 15-10790, 2016 WL 5799297 (D. Mass. Oct. 4, 2017) ..................... 29, 30

*Doe v. Univ. of Cincinnati*,
223 F. Supp 3d 704 (S.D. Ohio 2016) .......................................................... 41

*Doe v. Univ. of Cincinnati*,
    173 F. Supp. 3d 586 (S.D. Ohio 2016) ........................................................... 30

*Doe v. Univ. of Cincinnati*,
    No. 16-987, 2018 WL 1521631 (S.D. Ohio, Mar. 28, 2018)............................ 29

*Doe v. Univ. of Notre Dame*,
    No. 17-298, 2017 WL 1836939 (N.D. Ind. May 8, 2017) .................................... 10, 40, 41

*Dorfmann v. Boozer*,
    414 F.2d 1168, 1173 (D.C. Cir. 1969) ............................................................. 6

*Duke v. N. Texas State Univ.*,
    469 F.2d 829 (5th Cir. 1972) ..................................................................... 19, 29

*E.L. ex rel. Bachman v. Penn Harris Madison Sch. Sys.*,
    No. 05-717, 2006 WL 2512077 (N.D. Ind. Aug. 28, 2006) ............................... 32

*Eley v. District of Columbia*,
    47 F. Supp. 3d 1 (D.D.C. 2014) ..................................................................... 8

*Estenos v. PAHO/WHO Fed. Credit Union*,
    952 A.2d 878 (D.C. 2008) ........................................................................... 32

*Fanning v. High Mountain Inspection Servs., Inc.*,
    520 F. Supp. 2d 55 (D.D.C. 2007) ............................................................... 39

*Gorman v. Univ. of Rhode Island*,
    837 F.2d 7 (1st Cir. 1988) ..................................................................... 19, 29

*Goss v. Lopez*,
    419 U.S. 565 (1975).................................................................................. 43

*Habte v. George Washington Univ.*,
    No. 05-0962, 2005 WL 1204882 (D.D.C. May 19, 2005)................................. 45

*Hajjar-Nejad v. George Washington Univ.*,
    37 F. Supp. 3d 90 (D.D.C. 2014) ....................................................... 15, 24, 44

*Haley v. Virginia Commonwealth Univ.*
    948 F. Supp. 573 (E.D. Va. 1996) ............................................................... 30

*Hardin v. Dadlani*,
    221 F. Supp. 3d 87 (D.D.C. 2016) ............................................................... 19

*Harwood v. Johns Hopkins Univ.*,
    747 A.2d 205 (Md. Ct. Spec. App. 2000) ..................................................... 10

*In re M.A.C.*,
    761 A.2d 32 (D.C. 2000) ........................................................................... 19

*In re Navy Chaplaincy*,
   738 F.3d 425 (D.C. Cir. 2013) ........................................................................ 7

*Int'l Bhd. of Teamsters v. United States*,
   431 U.S. 324 (1977).......................................................................... 34, 35, 36

*Jackson v. Birmingham Board of Educ.*,
   544 U.S. 167 (2005) ...................................................................................... 32

*Jacobson v. Hofgard*,
   168 F. Supp. 3d 187 (D.D.C. 2016) ............................................................. 23

*Jaksa v. Regents of Univ. of Michigan*,
   597 F. Supp. 1245 (E.D. Mich. 1984), *aff'd,* 787 F.2d 590 (6th Cir. 1986) ..................... 15

*John Doe Co. v. Consumer Fin. Prot. Bureau*,
   849 F.3d 1129 (D.C. Cir. 2017) ...................................................................... 5

*Johnson v. Holway*,
   329 F. Supp. 2d 12 (D.D.C. 2004) .................................................................. 6

*Jones v. D.C.*,
   177 F. Supp. 3d 542 (D.D.C. 2016) ............................................................. 38

*Kahane v. Sec'y of State*,
   700 F. Supp.1162 (D.D.C. 1988) ................................................................... 6

*King v. DePauw Univ.*,
   No. 14-70, 2014 WL 4197507 (S.D. Ind. Aug. 22, 2014) ............................. 30

*Kirwa v. U.S. Dep't of Defense*,
   -- F. Supp. 3d --, 2017 WL 4862763 (D.D.C. 2017) ...................................... 9

*Kumar v. George Washington University*,
   174 F. Supp. 3d 172 (D.D.C. 2016) ............................................................. 24

*Langevine v. D.C.*,
   106 F.3d 1018 (D.C. Cir. 1997) .................................................................... 19

*League of Women Voters of the United States v. Newby*,
   838 F.3d 1 (D.C. Cir. 2016) ............................................................................ 7

*Manago v. D.C.*,
   934 A.2d 925 (D.C. 2007) ............................................................................ 12

*Mazurek v. Armstrong*,
   520 U.S. 968 (1997) ....................................................................................... 5

*Mosby-Nickens v. Howard Univ.*,
   864 F. Supp. 2d 93 (D.D.C. 2012) ......................................................... 12, 13

*Nash v. Auburn Univ.*,
    812 F.2d 655 (11th Cir. 1987) .................................................................. 15, 20

*Nat'l Ass'n for Fixed Annuities v. Perez*,
    219 F. Supp. 3d 10 (D.C. Cir. 2016) ................................................................ 7

*Nio v. United States Dep't of Homeland Sec.*,
    270 F. Supp. 3d 49 (D.D.C. 2017) .................................................................. 9

*Osei v. Temple Univ. of Commonwealth Sys. of Higher Educ.*,
    No. 10-2042, 2011 WL 4549609 (E.D. Pa. Sept. 30, 2011), *aff'd sub nom.*
    518 F. App'x 86 (3d Cir. 2013) ....................................................... 19, 29, 30

*Pac. Radiation Oncology, LLC. v. Queen's Med. Ctr.*,
    810 F.3d 631 (9th Cir. 2015) ........................................................................ 9

*Paulin v. George Washington Univ. Sch. of Med. & Health Scis.*,
    878 F. Supp. 2d 241 (D.D.C. 2012) .............................................................. 15

*People ex rel. O'Sullivan v. New York Law Sch.*,
    22 N.Y.S. 663 (N.Y. Sup. Ct. 1893) ............................................................ 10

*Riccio v. New Haven Bd. of Educ.*,
    467 F. Supp. 2d 219 (D. Conn. 2006) ........................................................... 33

*Robertson v. McCloskey*,
    676 F. Supp. 351 (D.D.C. 1988) .................................................................. 21

*Sai v. Transp. Sec. Admin.*,
    54 F. Supp. 3d 5 (D.D.C. 2014) ..................................................................... 9

*Salau v. Denton*,
    139 F. Supp. 3d 989 (W.D. Mo. 2015) ......................................................... 41

*Sampson v. Murray*,
    415 U.S. 61 (1974) ...................................................................................... 39

*Save Jobs USA v. U.S. Dep't of Homeland Sec.*,
    105 F. Supp. 3d 108 (D.D.C. 2015) .............................................................. 42

*Sherley v. Sebelius*,
    644 F.3d 388 (D.C. Cir. 2011) ...................................................................... 8

*Shinabargar v. Bd. of Trustees of Univ. of D.C.*,
    164 F. Supp. 3d 1 (D.D.C. 2016) ................................................................. 12

*Singh v. Carter*,
    185 F. Supp. 3d 11 (D.D.C. 2016) ...................................................... 5, 6, 7, 8

*Smith v. Harvey*,
    No. 06-1117, 2006 WL 2025026 (D.D.C. July 17, 2006) ................................. 6

*Stop This Insanity, Inc. Emp. Leadership Fund* v. *F.E.C.*,
  902 F. Supp. 2d 23 (D.D.C. 2012) ..................................................................................... 8

*Students v. United States Dep't of Educ.*,
  No. 16-4945, 2016 WL 6134121 (N.D. Ill. Oct. 18, 2016), *report and recommendation adopted sub nom.* No. 16-4945, 2017 WL 6629520 (N.D. Ill. Dec. 29, 2017) .................................................................................................. 33

*Sundberg v. TTR Realty, LLC*,
  109 A.3d 1123 (D.C. 2015) .......................................................................................... 22

*Television Capital Corp. of Mobile v. Paxson Commc'ns Corp.*,
  894 A.2d 461 (D.C. 2006) ............................................................................................ 23

*Toxco Inc. v. Chu*,
  724 F. Supp. 2d 16 (D.D.C. 2010) ............................................................................... 38

*Tsuruta v. Augustana Univ.*,
  No. 15-4150, 2015 WL 5838602 (D.S.D. Oct. 7 2015) .............................................. 43, 44

*Weser v. Glen*,
  190 F. Supp. 2d 384 (E.D.N.Y. 2002), *aff'd,* 41 Fed. Appx. 521 (2d Cir. 2002) ...................................................................................................................... 32

*Whole Foods Mkt. Grp., Inc. v. Wical Ltd. P'ship*,
  No. 17-01079, 2018 WL 525486 (D.D.C. Jan. 23, 2018) ........................................ 23, 24

*Winter v. Nat. Res. Def. Council, Inc.*,
  555 U.S. 7 (2008) ................................................................................................... 5, 7, 8

*Wisconsin Gas Co. v. F.E.R.C.*,
  758 F.2d 669 (D.C. Cir. 1985) .................................................................................... 42

*WMATA v. Quik Serve Foods, Inc.*,
  No. 04-687, 2006 WL 1147933 (D.D.C. Apr. 28, 2006) ............................................ 23

*Wright v. Howard Univ.*,
  60 A.3d 749, 754 (D.C. 2013) ..................................................................................... 24

*Xereas v. Heiss*,
  933 F. Supp. 2d 1 (D.D.C. 2013) ................................................................................ 23

*Xiaolu Peter Yu v. Vassar Coll.*,
  97 F. Supp. 3d 448 (S.D.N.Y. 2015) ........................................................................... 32

*Yusuf v. Vassar College*,
  35 F.3d 709 (2d Cir. 1994) .......................................................................................... 26

*Zuccaro v. Martinez Unified Sch. Dist.*,
  No. 16-02709, 2016 WL 10807692 (N.D. Cal. Sept. 27, 2016) ................................. 32

**STATUTES**

D.C. Human Rights Act Section 2-1401.03................................................................36

D.C. Human Rights Act Section 2-1402.41................................................31, 33, 35

D.C. Human Rights Act Section 2-1402.68......................................................34, 35

**UNITED STATES CONSITUTION**

U.S. Const. Art. VI, cl. 2..........................................................................................34

**OTHER AUTHORITIES**

Federal Rule of Civil Procedure 12(f) ........................................................................4

## **INTRODUCTION**

Plaintiff John Doe ("plaintiff") is a student at George Washington University (the "university").  He was suspended in January 2018 for one year following the university's investigation and adjudication of a complaint by another student – Jane Roe ("Roe") – that plaintiff had sexually assaulted her.

The following facts are not in dispute: A sexual assault complaint was lodged against plaintiff, and the university had an obligation to investigate and adjudicate it.  The university did investigate the complaint, and held a hearing at which three panel members heard testimony from plaintiff, Roe, and several witnesses.  The hearing panel decided by a preponderance of the evidence that plaintiff had sex with Roe while she was incapacitated and unable to consent.  An appeal officer affirmed.  Plaintiff was disciplined with a one-year suspension from the university.

In this lawsuit plaintiff challenges that discipline.  In this motion, however, plaintiff asserts he cannot, like ordinary litigants, wait until his claims have been tested against the evidence and heard by the Court.  Instead, plaintiff contends he is entitled to relief right now.  As demonstrated below, plaintiff makes this demand on a record devoid of any concrete evidence of discrimination based on his sex and in the absence of any evidence that the university breached any duty owed to him.  Moreover, plaintiff makes this demand without showing that waiting until judgment will result in any immediate or irreparable harm.  Most remarkably, plaintiff asks for a drastic remedy – the immediate conferral of an academic degree for which he has not satisfied the requirements.  He cites no authority, and the university is aware of none, that has ever required an institution of higher education to affirmatively confer a degree under similar circumstances.

In short, the injunctive relief that plaintiff seeks in his motion is not, as with an ordinary injunction, just a disfavored, extraordinary remedy to be granted only upon a

similarly extraordinary showing.  What plaintiff asks for here is an affirmative injunction that is without precedent, and for good reason.  Courts do not lightly involve themselves in the internal affairs of colleges and universities, and the request to compel the granting of a degree both cuts to the heart of the most important academic function of a university and has the strong potential to result in irreparable harm to the university.  The Court should not break new ground by ordering the university to confer a degree on plaintiff without requiring him to first prove his claims.

## RELEVANT FACTUAL BACKGROUND

The relevant facts on this motion are few.  On September 12, 2015, plaintiff and Roe, both of whom were university students, had sex in plaintiff's dorm room.  (Hearing Transcript ("H.T."), attached as Exhibit "A", at 3.  Just over two years later, Roe filed a complaint with the university.  She alleged that the encounter was not consensual because: (a) her intoxication level that night rendered her unable to consent, and (b) she had clearly indicated to plaintiff that she did not consent.  (University Hearing Board Adjudication Report, "Hearing Report" or "H. Rep.", attached as Exhibit "B", at 3).  The university conducted an investigation of the complaint.  Plaintiff disputed Roe's account.

The investigation culminated in a hearing at which a three-member hearing board was tasked with determining whether plaintiff had violated university policy.  Roe called three student witnesses – J.E., R.M., and E.E. – each of whom testified that Roe had been inebriated the evening of the alleged assault.  (H.T. at 22, 31, and 38-39).  Roe likewise testified at the hearing that she had been intoxicated and unable to consent.  (H.T. at 5-6).  Plaintiff testified at the hearing that Roe had provided enthusiastic consent during their sexual encounter.  (H.T. at 45-6).  Plaintiff called no additional witnesses.  Although plaintiff conceded that Roe had been drinking, he testified that "there was *not enough intoxication* that

I witnessed that would constitute *a large enough disparity* for it to be unconsensual [sic]." (H.T. at 56) (emphasis added).

Faced with conflicting testimony from the witnesses at the hearing, the hearing board was nevertheless required to resolve whose version of events was more credible based on the information presented to them.  The board found plaintiff responsible for sexual misconduct, (H. Rep. at 3-7).  It suspended plaintiff for one year, delaying his graduation from May 2018, when plaintiff had expected to graduate, to January 2019.[1]  That sanction was affirmed when plaintiff's appeal was denied.

In his motion, plaintiff provides extensive detail about the university's proceedings, but that detail does not, in any material way, conflict with the short narrative provided above. It is plain that plaintiff disagrees with how the university's hearing board weighed the evidence, but the content of the evidence presented to the university is not subject to dispute. (*See generally* Hearing Transcript).  As such, the university does not believe it will aid the Court on this motion to present every detail of the proceedings.  Nevertheless, the university does note that in plaintiff's attempt to provide exhaustive (and self-serving) detail, he misstates and mischaracterizes the record in a number of material respects, which the university feels compelled to address at least briefly.

*First*, plaintiff argues that "Ms. Roe repeatedly changed her testimony during the investigation and at the hearing," (Pl. Br. at 2), and that her supplement to her complaint "contradicted it in numerous respects." (Pl. Br. at 7).  This is not accurate.  Roe's testimony grew more detailed, but those new details introduced no material inconsistencies.   The same was true with plaintiff's testimony.  The fundamental challenge of these cases is for a hearing

---

[1]       Declaration of Meghan Arias, attached as <u>Exhibit "C"</u>, at ¶¶ 5, 10.

board to listen to evidence from two compelling witnesses and resolve an often fundamental and irreconcilable conflict in their testimony.  That is what the hearing board did in this case.

*Second*, plaintiff asserts that "[t]he second witness to speak on Ms. Roe's behalf was R.M., a GW student with whom she'd had a romantic relationship."  (Pl. Br. at 12).  This statement has no evidentiary support in the record, is uncited in plaintiff's brief, and should be disregarded.  It also in all likelihood runs afoul of Federal Rule of Civil Procedure 12(f).

*Third*, plaintiff asserts that R.M. "was the *only* person to testify, either before or during the hearing, that Roe looked intoxicated at the rugby party, but he could point to no specific outward signs telling him that."  (Pl. Br. at 12).  This is true as far as it goes, but bears clarification.  For one thing, R.M. did not testify that Roe "looked intoxicated."  He testified that he could "definitely say that [she] was drunk," and that she "<u>was</u> intoxicated." (H.T. at 31) (emphasis added).  Moreover, three other witnesses testified that Roe had five drinks *before* even arriving at the party.  (H.T. at 6).  The time between when Roe started drinking and when she left the party was only 2.5 hours.  (H.T. at 7-8).  That R.M. was the only witness to testify that Roe was drunk *at* the party misses the forest for the trees.

*Fourth*, plaintiff argues that "[d]espite claiming to have had six Solo cups of liquid in just over an hour, Roe would never testify that she used the bathroom at any point or that she suffered incontinence when she allegedly passed out."  (Pl. Br. at 8).  Plaintiff implies here that Roe had no good explanation for some specific question he must have asked her about her use of the restroom.  But the fact is plaintiff did not cross examine Roe about this information in the hearing, and Roe, apparently not understanding this information to be important, did not include anything about it in her statement.  The record on this issue is silent.

*Fifth*, plaintiff argues that Roe "never explained how she could have climbed down eight flights of stairs just minutes after being unconscious due to incapacitation."  (Pl. Br. at

6).   This statement is false.   On page 6 of the Hearing Transcript, Roe describes exactly how she scrambled down the stairs, and that she fell while doing so.

*Sixth*, plaintiff argues that unlike Roe's witnesses, his witness Q.W. "testified that he had a 'normal, lucid conversation' with Roe" at the rugby party.   There are two important details plaintiff omits here.   One, Q.W. *did not* testify at the hearing, so the hearing panel never heard or saw his testimony.   His emailed statement was submitted by plaintiff *after* the hearing, with no reason given as to why it was not presented prior to hearing.   Less important, plaintiff selectively quotes from the email.   The quotation in its entirety is less definitive, and reads, "I remember talking to her for a few minutes in the group and we had what seemed to me to be a normal, lucid conversation."   (Pl. Br. Ex. 18).

*Seventh*, plaintiff contends in conclusory fashion that "[t]he panel grasped for reasons to doubt Mr. Doe.   The chair asked him why Ms. Roe had presented witnesses but he had not."   (Pl. Br. at 13).   It is true that the panel asked plaintiff why he had presented no witnesses.   (H.T. at 55).   That is a perfectly normal question to ask.   What plaintiff omits, however, is that the hearing panel was explicitly instructed, on the record, not to consider the number of witnesses on each side.   (H.T. at 56).

## LEGAL STANDARD

A preliminary injunction "is an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion."   *Singh v. Carter*, 185 F. Supp. 3d 11, 16 (D.D.C. 2016) (quoting *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997)) (emphasis in original); *Bean LLC v. John Doe Bank*, No. 17-2187, 2018 WL 297125, at *4 (D.D.C. Jan. 4, 2018) (same); *see also John Doe Co. v. Consumer Fin. Prot. Bureau*, 849 F.3d 1129, 1131 (D.C. Cir. 2017) (preliminary injunction "may only be awarded upon a clear showing that the [movant] is entitled to such relief") (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008)).

The D.C. Circuit has cautioned that this power should be "sparingly exercised." *Singh*, 185 F. Supp. 3d at 17 (quoting *Dorfmann v. Boozer*, 414 F.2d 1168, 1173 (D.C. Cir. 1969)).  The moving party must establish his right to a preliminary injunction by clear and convincing evidence.  *Ass'n of Flight Attendants-CWA, AFL-CIO v. Pension Ben. Guar. Corp.*, 372 F. Supp. 2d 91, 98 (D.D.C. 2005) ("A preliminary injunction is an extraordinary form of relief that should not be granted absent a clear and convincing showing.") (citing *Kahane v. Sec'y of State*, 700 F. Supp. 1162, 1165 (D.D.C. 1988)); *see also*, *e.g.*, *Smith v. Harvey*, No. 06-1117, 2006 WL 2025026, at *2 (D.D.C. July 17, 2006) (same); *Bestor v. C.I.A.*, No. 04-2049, 2005 WL 486148, at *1 (D.D.C. Mar. 2, 2005); *Johnson v. Holway*, 329 F. Supp. 2d 12, 15 (D.D.C. 2004) (same).

Allegations in the pleadings are not evidence for purposes of a preliminary injunction. *Achagzai v. Broad. Bd. of Governors*, No. 14-768, 2016 WL 471274, at *4 (D.D.C. Feb. 8, 2016) (finding that amended complaint was not "competent evidence" to support injunction"); *see also Armenian Assembly of Am., Inc. v. Cafesjian*, 758 F.3d 265, 284 n.14 (D.C. Cir. 2014) ("the only form of 'evidence' Appellants presented to support this theory consisted of allegations in Waters' unverified complaint, which, of course, are not evidence at all.").

It follows that the required showing for a preliminary injunction is substantially more burdensome than that necessary to survive a motion to dismiss.  *See Advance America v. FDIC*, 257 F. Supp. 3d 56, 64 (D.D.C. 2017); *AFGE, AFL-CIO v. Vilsack*, 118 F. Supp. 3d 292, 298 (D.D.C. 2015).  To survive a motion to dismiss, a plaintiff must only plead plausible facts that, accepted as true, state a claim; for a preliminary injunction, however, a plaintiff must show with evidence of record – not merely plead – a likelihood of success on the merits. *Advance America*, 257 F. Supp. 3d at 64 ("different standards [are] employed when reviewing a motion for preliminary injunction- 'likelihood of success on the merits'- and

when reviewing a motion to dismiss- 'plausibility'"); *Borum v. Brentwood Village, LLC*, 218 F. Supp. 3d 1, 5 n.1 (D.D.C. 2016) ("the Court considers different information when analyzing a motion to dismiss than it does with a motion for a preliminary injunction").

A plaintiff seeking the extraordinary remedy of a preliminary injunction must accordingly show by clear and convincing evidence: (1) a likelihood of success on the merits; (2) that he is likely to suffer irreparable harm in the absence of preliminary relief; (3) that the balance of the equities tips in his favor; and (4) that the injunction is in the public interest. *Aamer v. Obama*, 742 F.3d 1023, 1038 (D.C. Cir. 2014).

Many courts have held that the Supreme Court's decision in *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7 (2008) rejected the traditional "sliding-scale" standard for preliminary injunctions, which allowed a strong showing on one of the four injunction factors to overcome a weaker showing in another. *See*, *e.g.*, *Singh*, 185 F. Supp. 3d at 16-17. Although the D.C. Circuit has not definitively settled the question,[2] numerous courts in this Circuit have concluded that *Winter* is binding and that a party moving for the extraordinary remedy of preliminary injunctive relief must make a strong showing on all four factors separately. *In re Navy Chaplaincy*, 738 F.3d 425, 428 (D.C. Cir. 2013) (requiring all four prongs of the preliminary injunction met before granting injunctive relief); *Davis v. Pension Ben. Guar. Corp.*, 571 F.3d 1288, 1296 (D.C. Cir. 2009) (Kavanaugh, J., concurring) (noting that after *Winter* "the old sliding-scale approach to preliminary injunctions . . . is no longer controlling, or even viable"); *ABA, Inc. v. District of Columbia*, 40 F. Supp. 3d 153, 164-65

---

[2]     *League of Women Voters of the United States v. Newby*, 838 F.3d 1, 7 (D.C. Cir. 2016) ("Because appellants satisfy each of the four preliminary injunction factors, this case presents no occasion for the court to decide whether the 'sliding scale' approach remains valid after *Winter*."); *see also Nat'l Ass'n for Fixed Annuities v. Perez*, 219 F. Supp. 3d 10, 13 (D.C. Cir. 2016) (observing that the D.C. Circuit has not yet decided whether *Winter* destroys the sliding scale analysis for preliminary injunctions).

(D.D.C. 2014) (Collyer, J.) ("The D.C. Circuit has interpreted *Winter* to require a positive showing on all four preliminary injunction factors.").[3]

Even if the Court were to apply the sliding-scale test, a movant still has a burden to demonstrate a basis for relief each of the four factors: "It is particularly important for the movant to demonstrate a likelihood of success on the merits" because "absent a substantial indication of probable success [on the merits], there would be no justification for the court's intrusion" into the ordinary judicial process. *Stop This Insanity, Inc. Emp. Leadership Fund* v. *F.E.C.*, 902 F. Supp. 2d 23, 30 (D.D.C. 2012). Irrespective of whether the Court applies the *Winter* standard or a sliding-scale, plaintiff cannot satisfy his burden and his motion for a preliminary injunction must be denied.

## ARGUMENT

**I.**     **Plaintiff's Motion Should be Denied Because the Relief He Seeks Would Break New Legal Ground and Seeks a Remedy Plaintiff Could not Obtain at Final Judgment.**

As demonstrated below, plaintiff has not carried his burden to show he is entitled to *any* preliminary injunctive relief. Plaintiff's motion should also be rejected out of hand because the specific relief he seeks is not just inappropriate at this stage – it would be inappropriate and unavailable even if he prevailed fully on the merits at final judgment.

"A preliminary injunction may not issue when it is not of the same character as that which may be granted finally." 11A C. Wright, A. Miller, & M. Kane, *Federal Practice &*

---

[3]     *See also Singh*, 185 F. Supp. 3d. at 17 ("[T]he plaintiff bears the burden of persuasion on all four preliminary injunction factors in order to secure such an 'extraordinary remedy'"); *Eley v. District of Columbia*, 47 F. Supp. 3d 1, 20-21 (D.D.C. 2014) (in light of *Winter*, "assertion that, in this case, the likelihood of success on the merits prong may be given less weight than the other factors is simply incorrect as a matter of law"); *Sherley v. Sebelius*, 644 F.3d 388, 393 (D.C. Cir. 2011) (interpreting *Winter* as requiring each of the four factors be met as "an independent, free-standing requirement").

*Procedure*: *Civil* § 2947 (3d ed.); *see also De Beers Consol. Mines v. United States*, 325 U.S. 212, 220 (1945) (a preliminary injunction is inappropriate when it would provide relief that "in no circumstance" could be provided "in any final injunction that may be entered"); *Kirwa v. U.S. Dep't of Defense*, -- F. Supp. 3d --, 2017 WL 4862763 *10, (D.D.C. 2017) (a preliminary injunction grants "intermediate relief of the same character as that which may be granted finally.").[4]

Plaintiff's claims are all some version of one theory: during the disciplinary process, the university breached a duty owed to him. Irrespective of whether the alleged duty is grounded in contract, tort, or statute, the issue in this case is whether the university provided plaintiff with the process that he was due, and whether that process was free of bias based on sex. What is *not* at issue in this case is whether plaintiff actually sexually assaulted Roe.

If the university prevails in this case, plaintiff will be awarded his degree at the end of his suspension in January 2019. If plaintiff prevails, his remedy will not be a preclusive judgment that he did not assault a classmate – it will be a judgment that the university's process was defective in some way. As a result, the university would be required to repeat or reopen the proceedings on Roe's complaint to address the flaw, the result of which could either be a finding that plaintiff did not violate university policy or another finding that he did. In either event, plaintiff would not be entitled to an immediate award of his undergraduate degree.

Yet that is precisely the remedy plaintiff seeks in his motion – he asks the Court to act as university-super-administrator and direct the university to award him a degree that he has

---

[4]     *See also Nio v. United States Dep't of Homeland Sec.*, 270 F. Supp. 3d 49, 61 (D.D.C. 2017) (same); *Sai v. Transp. Sec. Admin.*, 54 F. Supp. 3d 5, 8 (D.D.C. 2014) (same); *Pac. Radiation Oncology, LLC. v. Queen's Med. Ctr.*, 810 F.3d 631, 636 (9th Cir. 2015); *ClearOne Commc'ns, Inc. v. Bowers*, 651 F.3d 1200, 1214 (10th Cir. 2011).

not earned.  To be proper, plaintiff's requested order would have to be predicated on a determination that plaintiff was not only discriminated against or denied the process he was due, but that he was *actually innocent*, so no new process is warranted.  Since that fact will *not* be adjudicated in this action, that remedy would be wholly inappropriate, even at final judgment.  *See, e.g., Doe v. Univ. of Notre Dame*, No. 17-298, 2017 WL 1836939, at *14 (N.D. Ind. May 8, 2017) (refusing to award degree while awarding other injunctive relief).

The lack of precedent to support plaintiff's extraordinary injunctive demand is due in no small measure to courts' tremendous deference to educational institutions' core academic functions, the most sacred of which is the conferral of a degree.  Plaintiff cites no case for the proposition that a plaintiff may obtain, by *affirmative* preliminary injunction, an order compelling a university to award a degree that the institution, applying its own policies, would say is unearned.  Consistent contrary authority stretches back over more than one hundred years of jurisprudence.  *See*, *e.g.*, *Harwood v. Johns Hopkins Univ.*, 747 A.2d 205 (Md. Ct. Spec. App. 2000) (upholding refusal to confer degree for student who had completed degree requirements but pled guilty to felony); *Dinu v. President & Fellows of Harvard Coll.*, 56 F. Supp. 2d 129 (D. Mass. 1999) (upholding refusal to confer degree on two students found responsible for stealing money from student organization after completion of all coursework); *see also Carr v. St. John's Univ., New York*, 17 A.D. 2d 632, 634, 231 N.Y.S.2d 410, 414 (1962) ("When a university, in expelling a student, acts within its jurisdiction, not arbitrarily but in the exercise of an honest discretion based on facts within its knowledge that justify the exercise of discretion, a court may not review the exercise of its discretion") (citing *People ex rel. O'Sullivan v. New York Law Sch.*, 22 N.Y.S. 663, 665 (N.Y. Sup. Ct. 1893); *accord Crook v. Baker*, 813 F.2d 88 (6th Cir. 1987) (finding that the University of Michigan was empowered to revoke a degree under state law).

Plaintiff's request for a preliminary injunction is unreasonable and fails at the outset.

**II.**     **Plaintiff Cannot Demonstrate A Likelihood Of Success On The Merits.**

     **a.**     **Plaintiff's Breach of Contract Claim Is Not Likely to Succeed.**

Plaintiff is not likely to prevail on his breach of contract claim for three principal reasons.  *First*, plaintiff falls well short of demonstrating that the university's published procedures meet the standard for enforceable contracts under District of Columbia law.  *Second*, plaintiff's argument can be reduced to the contention that since he disagrees with the ultimate outcome, the process was necessarily flawed.  But plaintiff was at most entitled to only the procedures set forth in the university's policies, not to any particular result.  Plaintiff has not shown that the university departed from those policies.  *Third*, the preliminary remedy plaintiff seeks in connection with his breach of contract claim – specific performance – is a disfavored and highly unusual contract remedy in its own right.  Plaintiff has not even argued – let alone demonstrated – that specific performance would be the appropriate remedy under a purported breach of contract claim at final judgment.

Plaintiff thus asks this Court to heap extraordinary remedy upon extraordinary remedy and award preliminary relief of specific performance under a contract that he has not even shown exists, let alone was violated.  The Court should decline plaintiff's invitation to rush judgment in this case.

     i.     <u>Plaintiff's Contract Claim Fails Because He Assumes, Without Showing, the Enforceability of the Code or Policy as a Contract.</u>

In his complaint plaintiff remarks, without support:

> The University's Policy and Code, and its public explanations of the meaning of those Policy in places like its Title IX website, were a part of that contract.  Under that contract, the University was required to act in accordance with these publications in resolving complaints of misconduct, in the investigation of those complaints, in the process of adjudicating those complaints, and in resolving appeals.

(Compl., at ¶ 165; *see also* ¶ 15 ("the Policy, the Code, and other statements by the University about matters contained therein are terms in a contractual relationship between the

University and John Doe.")).  Aside from these bare conclusions, plaintiff fails to specify where, how, or when the university expressed an intent to be contractually bound by the statements plaintiff references.

In his brief, plaintiff alleges that the disciplinary codes "and other communications distributed to students" form the basis of the contract.  (Pl. Br. at 19).  In other words, plaintiff assumes that any statement made by the university in any form at any time binds the university contractually, and any departure from the same is necessarily actionable in this Court.  This assumption is wrong.

"Although the relationship between a university and its students *can* be contractual in nature, a plaintiff must nevertheless '[show] sufficient facts to demonstrate the terms of the contract." *Mosby-Nickens v. Howard Univ.*, 864 F. Supp. 2d 93, 98 (D.D.C. 2012) (emphasis added) (dismissing breach of contract claim where Plaintiff failed to plead or prove that university intended to be bound by Graduate School Rules and Regulations).  "Whether 'a given section of a [student handbook] also becomes part of the contractual obligations between the students and the university depends upon general principles of contract construction.'" *Id.*; *see also Shinabargar v. Bd. of Trustees of Univ. of D.C.*, 164 F. Supp. 3d 1, 29 (D.D.C. 2016) (holding that university honor code lacked intent to be bound and mutuality of obligation, rendering it not enforceable); *Manago v. D.C.*, 934 A.2d 925, 927 (D.C. 2007) (finding that student failed to demonstrate terms of the contract or actual breach).  Plaintiff transforms the potential for a contractual relationship between himself and the university into a certainty without any factual or legal support.

This Court's opinion in *Mosby-Nickens* is instructive.  There the plaintiff alleged that she was dismissed from Howard University in breach of the school's student handbook.  864 F. Supp. 2d at 95.  The Court dismissed the breach of contract claim because the plaintiff did "not point to any language in the document that demonstrates Howard's intent to be bound by

its terms.  And she does not direct the Court to any other indication, such as signatures of the parties, that would demonstrate such intent." *Id.* at 99-100.

Here, like *Mosby-Nickens*, plaintiff explains what *he* subjectively believes the contract entails, but does not establish how the university intended to be bound by any such provisions.  *See Carroll v. Fremont Inv. & Loan*, 636 F. Supp. 2d 41, 49 (D.D.C. 2009) ("To determine whether the parties intended to be bound, the Court must examine the parties objective manifestations of intent.").  Moreover, the university reserved the unilateral right to modify the Code of Student Handbook without notice to, or the consent of, students, (*see* Code of Student Conduct, the "Code", attached as Exhibit "D", at 9, Sect. I) ("The University reserves the right to modify or change requirements, rules, and fees . . . The right is reserved by the University to make changes in programs without notice whenever circumstances warrant such changes."), evincing an express lack of intent to be contractually bound by the Code on the part of the university.

Plaintiff's claims also go well beyond the university's written procedures or the Code. For example, plaintiff derives his arguments related to incapacity due to intoxication from the university's Sexual Harassment and Sexual Violence Policy, "as supplemented by statements on [the University's] Title IX website . . . ."  (Compl. at ¶ 164).  Plaintiff assumes via a shotgun approach that every statement made by the university creates a contract with its students.  But absent facts showing that the university intended to be bound by the underlying documents and statements, plaintiff's claims must fail.

      ii.      <u>Even if the Code or Policy Constituted a Contract, Plaintiff's Claim Fails Because He Received All Promised Procedural Protections.</u>

Even if any of the terms identified by plaintiff were actionable, he does not show that any of those terms were actually breached by the university.  Plaintiff's brief argues that the hearing board's finding that Roe was incapacitated lacked credible support (Pl. Br. at 21-25), ignored evidence (*id.* at 25-26), steered towards a preconceived conclusion (*id.* at 26-27), and

that the university improperly rejected plaintiff's appeal from the board's decision (*id.* at 27-30).  None of these contentions are actionable or supported.

Although plaintiff purports to attack the review process set forth in the underlying documents, his real grievance is that he should be permitted to substitute his own judgment for that of the university.  While it is evident that plaintiff disagrees with the outcome of the proceedings, plaintiff's disagreement does not create a claim.

1.    Procedures Set Forth in the Code and Policy.

The Code sets forth the basic procedures available to every student subject to any manner of discipline.  *First*, the student receives written notice of a hearing and the charges against him.  (Ex. D at ¶ 27(a)).  *Second*, at the hearing, a student may introduce relevant evidence and present witnesses.  (*Id.* at ¶ 27(b)).  *Third*, hearings will be transcribed.  (*Id.* at ¶ 27(f)).  *Fourth*, a final decision will be made in a reasonable time period following the hearing.  (*Id.* at ¶ 27(p)).

A similar procedure is set forth related to formal hearings under the university's Sexual Harassment and Sexual Violence Policy.  ("Policy", attached as <u>Exhibit "E"</u>,  at Appendix C, which provides that "disciplinary proceedings will be commenced against that student according to the procedures outlines in the Code and in this Section . . . .").

2.    Plaintiff Received All Review Procedures Set forth in the Code and Policy.

Plaintiff does not contest that he was provided notice of a hearing, notice of the claims against him, the opportunity to present witnesses and evidence, a transcribed record, and a decision within a reasonable amount of time.  In other words, as outlined above, <u>plaintiff received exactly what the Code and Policy provide</u>.  Plaintiff was provided the opportunity to participate in the full and fair review process that the procedures offer.  Plaintiff's hearing resulted in a sixty-seven page transcript and spanned two and a half hours.  (*See generally* Hearing Transcript).  Although plaintiff disagrees with the findings of the hearing board,

14

there is no doubt on the record before the Court that he received the procedures set forth under the Code and the Policy.

> i.   The University Appropriately Weighed and Considered the Evidence at Plaintiff's Disciplinary Hearing.

The majority of plaintiff's brief is an attempt to establish that the board's decision was arbitrary based upon the evidence presented. (Pl. Br. at 6-17, 21-26, 27-30). Plaintiff's argument is undermined conclusively by the evidence.

The standard of review for the Court evaluating the university's decision is arbitrary and capricious, (Pl. Br. at 20 n.6),[5] so plaintiff must show that the university had "no rational basis for the decision or that it was motivated by bad faith or ill will unrelated to academic performance." *Paulin v. George Washington Univ. Sch. of Med. & Health Scis.*, 878 F. Supp. 2d 241, 247 (D.D.C. 2012); *see also Bain v. Howard Univ.*, 968 F. Supp. 2d 294, 299 (D.D.C. 2013), *aff'd sub nom.* No. 13-7174, 2014 WL 1378308 (D.C. Cir. Mar. 25, 2014) (same).

Courts have applied this high standard to claims involving non-academic misconduct, such as the sexual misconduct claims against plaintiff. *See also Hajjar-Nejad v. George Washington Univ.*, 37 F. Supp. 3d 90, 117 (D.D.C. 2014) (refusing to apply lesser standard of review for medical student dismissal related to lack of professional comportment, as opposed to purely academic issues). Moreover, a student's "rights in the academic disciplinary process are not co-extensive with the rights of litigants in a civil trial or with those of defendants in a criminal trial." *Nash v. Auburn Univ.*, 812 F.2d 655, 664 (11th Cir. 1987); *see also Jaksa v. Regents of Univ. of Michigan*, 597 F. Supp. 1245, 1250 (E.D. Mich. 1984), *aff'd,* 787 F.2d 590 (6th Cir. 1986).

---

[5]   While plaintiff mentions in passing that the standard might be something "lower" than arbitrary and capricious, he does not offer an actual alternative. (Pl. Br., at 20 n.6). In fact, plaintiff concludes that the Court "need not decide what standard should apply . . . ." (*Id.*).

An underlying and false assumption permeating plaintiff's brief is that he was entitled to the rights he subjectively views as proper, rather than those contemplated by the Code. The hearing panel reminded the parties up front that the hearing was not a formal civil or criminal judicial process. (H.T. at 4). Moreover, the Code grants the university broad discretion in the conduct of proceedings. (*See*, *e.g.*, Ex. D at ¶ 27(b) (school "may limit the presentation or number of witnesses in order to prevent repetition or delay or the presentation of irrelevant or immaterial information."); (*id.* at ¶ 27(e) ("The presiding officer will exercise control over the proceedings to maintain proper decorum, avoid needless consumption of time, and achieve an orderly completion of the hearing.")). Plaintiff has no legal support for his attempt to transform private, internal administrative university proceedings into a formal criminal trial with expanded evidentiary and procedural mechanisms.

> ii. *There Was Significant Support in the Record for the Board's Decision, and Plaintiff's After-the-Fact Attacks on the Credibility of Witnesses Have No Merit.*

Plaintiff does not dispute that the applicable burden of proof at his disciplinary hearing was a preponderance of the evidence. (Pl. Br. at 25, 27). The Code specifically states: "On disputed points, a preponderance of the evidence introduced at the hearing will decide the facts. A 'preponderance of the evidence' means that it is 'more likely than not' that a fact is true or an event occurred." (Ex. D at ¶ 27(j); *see also* H. Rep. at 5-6).

Plaintiff mistakenly argues that "[t]he University breached its contract with Mr. Doe . . . when a biased hearing panel found him responsible on the basis of no credible evidence whatsoever . . . ." (Pl. Br. at 21). This bare conclusion is unsupported by the evidence. It is not in dispute that four witnesses – Jane Roe, J.E., E.E., and R.M. – all testified at the hearing that Roe was intoxicated on the night in question. The university is tasked with assessing the evidence that is presented to it at the hearing, and the evidence presented at the hearing in support of the hearing board's finding was substantial.

To begin, Roe's testimony at the hearing was clear: "[plaintiff] . . . sexually assaulted me." (*See* H.T. at 5).  She also recounted that she:

- "Drank too much" following a "pregame" session, took "multiple shots of vodka", and had additional drinks throughout the night.  (H.T. at 6).

- Had few concrete memories as alcohol consumption continued.  (H.T. at 6).

- Left the subject rugby house party, and felt "trapped in the Uber" with plaintiff, but was "too drunk to do anything."  (H.T. at 6).

- "[C]ame to faced down on the bed with [plaintiff] having sex with [her] from behind."  (H.T. at 6).

- Could not recall any other sexual acts or preparations leading up to this point.  (H.T. at 16-17).

- Tried to "swat [plaintiff] off" of her during the encounter, an act clearly opposite of consent, but to no avail.  (H.T. at 6).

- "[W]as too drunk to respond" any further to plaintiff's continued and unwanted advances.  (H.T. at 6).

- "[S]crambled out of the room and building as quickly as I could, falling down the stairs because [she] was still so drunk."  (H.T. at 6; *see also* H.T. at 12 (Roe noting the bruise from the falls)).

- Had been hospitalized for a suicide attempt and suffered from post-traumatic stress disorder as a result of the incident with plaintiff.  (H.T. at 19-20, 58).

- Dropped classes to avoid plaintiff, and even had to disclose the assault to a federal polygraph administrator and investigators in order to obtain her security clearance for her career.  (H.T. at 60).

Plaintiff was without doubt entitled to challenge the veracity of these statements at the hearing, but he cannot now argue that there was no evidence in the record from which the board could conclude by a preponderance of the evidence that Roe was incapable of consent.

Moreover, Roe's account was bolstered by multiple witnesses, while plaintiff elected not to present any witnesses in support of his version of events.[6]   The first witness, J.E., confirmed that Roe consumed four to five shots of vodka at the pregame party and that she

---

[6]     The board was advised not to consider the quantity of witnesses for either side as an indication of the strength or weakness the case.  (H.T. at 56).

was "visibly drunk, to the point that she was slurring her words, and stumbling as she walked." (H.T. at 22, 25). Plaintiff declined an opportunity to cross-examine J.E. (H.T. at 28). Roe's second witness, R.M., a fraternity brother of plaintiff (a presumably friendly witness for plaintiff), also recalled that he saw Roe drinking alcohol at the rugby house party, and confirmed "definitively" that she was "drunk" and "intoxicated." (H.T. at 29, 31). A third witness, E.E., confirmed that Roe was "pretty intoxicated" on the way to the rugby house party. (H.T. at 37, 39). Roe testified that she spoke with E.E. while Roe was traveling by car to plaintiff's residence following the party, and E.E. testified that Roe "sounded extremely intoxicated," including slurred words. (H.T. at 38). Plaintiff chose not to cross-examine E.E. (H.T. at 43).

During the presentation of his own case, plaintiff conceded that Roe was at least partially intoxicated: "I mean, based on what I observed from her state of mind, there was *not enough intoxication* that I witnessed that would constitute *a large enough disparity* for it to be unconsensual [sic]." (H.T. at 56) (emphasis added). Plaintiff's own testimony was thus at least partially in accord with Roe and three witnesses on the principal issue in dispute – that Roe was inebriated at the time of the incident.

Plaintiff attempts to explain away this substantial evidence by labeling it "not credible." This "because I say so" argument carries throughout plaintiff's papers – any evidence that tends to show he was responsible is "not credible," while his own testimony should be credited *in toto*. It follows, plaintiff argues, that since he was not believed, the university did not adhere to the proper standard of proof. Plaintiff asks that the Court substitute his estimation of the witnesses' credibility for that of the hearing board, but that is not how the process works. There was evidence, presented by Roe and her witnesses, that Roe was intoxicated to the point of incapacitation. There was evidence, presented by plaintiff, that she was not. The hearing board reviewed the evidence before it, and resolved

that credibility determination against plaintiff.  That is not the outcome plaintiff hoped for.  But it is not a breach of contract.[7]

       *iii.*     *Plaintiff's Arguments Related to Alleged Bias of the University Are Not Persuasive or Apposite.*

"There is a presumption of fairness in [university] administrative proceedings which favors administrators and 'alleged prejudice of university hearing bodies must be based on more than mere speculation and tenuous inferences.'"  *Osei v. Temple Univ. of Commonwealth Sys. of Higher Educ.*, No. 10-2042, 2011 WL 4549609, at *11 (E.D. Pa. Sept. 30, 2011), *aff'd sub nom.* 518 F. App'x 86 (3d Cir. 2013); *see also Gorman v. Univ. of Rhode Island*, 837 F.2d 7, 15 (1st Cir. 1988) (same); *Duke v. N. Texas State Univ.*, 469 F.2d 829, 834 (5th Cir. 1972) (same).  This presumption is in accord with the deference that courts provide to the disciplinary schemes of higher education institutions, including the specific manner that institutions administer proceedings.

Plaintiff argues that the hearing panel had a "preconceived conclusion," but he bases this bald statement upon a single stray remark regarding the traumatic nature of the underlying events.  (Pl. Br. at 26-27).  Notwithstanding plaintiff's posturing, it is an uncontroversial notion that a set of hearings that necessarily involve either reliving a sexual

---

[7]     To the contrary, credibility determines are left solely to the discretion of the finder of fact, which in this case was the hearing panel.  *Accord Langevine v. D.C.*, 106 F.3d 1018, 1023 (D.C. Cir. 1997) ("The court emphasized that a trial judge's disagreement with the jury on the credibility of witnesses does not justify the granting of a new trial."); *Hardin v. Dadlani*, 221 F. Supp. 3d 87, 97 (D.D.C. 2016) (stating that the jury, the finder of fact, is responsible for credibility determinations, while the Court may not substitute its judgment); *In re M.A.C.*, 761 A.2d 32, 42 (D.C. 2000) ("Inconsistencies in witness' statements present questions of credibility, and issues of credibility are committed to the sole and sound discretion of the fact finder.").

assault or being forced to defend against a false accusation of sexual assault bring with them some emotional trauma for all involved.[8]

*iv.     Plaintiff's Appeal was Properly Rejected.*

The Code provides for an appeal based only upon "new information that is relevant to the case, that was not previously presented at the hearing or conference, and that significantly alters the finding of fact."  (Ex. D at ¶ 33).   Only if the appeal meets this standard and is determined to be "viable" will the issue proceed for further appellate review.  (*Id.* at ¶ 34). There is no dispute that plaintiff's appeal was received and reviewed by Robert Snyder, the university's Executive Director of Planning and Outreach.  (Pl. Br. Ex. 19).  Plaintiff now objects to the outcome of the appeal process, as opposed to the implementation of the process itself.

Plaintiff's appeal was not based upon any "new information" that was "relevant" to the dispute.  Plaintiff attempts to excuse the late submission of his purported expert report[9] based upon testimony at the hearing as to the precise number of drinks that Roe consumed on the night in question.  (*See* Appeal Letter, attached as <u>Exhibit "F"</u>, at 1).  However, there was never any ambiguity that Roe claimed she had consumed a significant amount of alcohol. Moreover, and critically, the evidence that plaintiff claimed was "new" – the precise number of drinks Roe contended she consumed – was gleaned from the hearing itself.  As a result, that information *had already been considered* by the hearing board when it came time to

---

[8]     Moreover, the board made accommodations in plaintiff's favor, which highlight the fairness and neutrality of the process.  For example, the board took recesses to permit plaintiff to "come up with some questions" for Roe's witnesses.  (*See* H.T. at 27, 35).

[9]     It is further notable that there is simply nothing in the Code that allows a student to submit expert testimony.  *See Nash*, 812 F.2d at 664 ("rights in the academic disciplinary process are not co-extensive with the rights of litigants in a civil trial or with those of defendants in a criminal trial.").

appeal.  It therefore did not meet the standard of "new information" necessary to support a viable appeal under the Code.[10]

Similarly, plaintiff tries to excuse his failure to introduce testimony from another student at the hearing because this student, Q.W, was studying abroad and the hearing was around the time of final examinations.  (*See* Ex. F at 1).  However, the Code specifically provides for notarized affidavits (or other accommodations) for unavailable witnesses.  (Ex. D at ¶ 26(e)).  An e-mail from Q.W. could easily have been submitted earlier, or plaintiff could have requested alternative accommodations to present witnesses at the hearing.  The evidence plaintiff later came forward with from Q.W. was not new, it was simply untimely.[11] Because plaintiff failed to submit evidence that was: (1) new; (2) could not have been previously submitted; and (3) would have significantly altered (or overturned) the board's decision, his appeal was appropriately rejected as not viable.

---

[10]    To the extent that plaintiff contends his experts opinions themselves about the facts are "new information," it is well-accepted that experts do not provide fact testimony, but instead *interpret* facts.  Here, the facts being interpreted are that ten or more drinks in the space of two hours would significantly impair a person.  Given that this is a matter of common understanding, the university submits that the Court may take judicial notice that the hearing board was more than aware of that interpretation of the facts at the time of hearing, and could appropriately weigh such facts without the need for expert testimony.  *Accord Robertson v. McCloskey*, 676 F. Supp. 351, 353 (D.D.C. 1988) ("a trial court has broad discretion to exclude expert testimony that, for example, relates to matters of common sense or everyday knowledge . . . .").

[11]    Even if plaintiff's appeal contained new and relevant information, it would not "significantly alter[]" the board's decision.  Q.W. stated, at most, that he spent "a few minutes" in a group with Roe approximately one-half hour to forty-five minutes before plaintiff and Roe departed the party.  (*See* Pl. Br. Ex. 18).  Q.W.'s passing and equivocal observance of Roe, especially considering that Q.W. himself was admittedly drinking, was not sufficient to significantly alter the record.  Moreover, Q.W.'s statement was less than certain: he could not remember when he arrived at the party; he was only "fairly sure" that he had a certain interaction with Roe; and was most concerned with being left alone at the party, not with any of the central issues in dispute.

iii.  Plaintiff's Contract Claim Is Not Likely to Succeed Because his Requested Relief is Extraordinary and Unwarranted.

Plaintiff's requested injunction includes three elements: (1) the university confer a degree upon plaintiff; (2) the university allow plaintiff to graduate in May 2018; and (3) the university treat plaintiff as if no misconduct or discipline occurred.  (Pl. Br. [Proposed] Order).  In other words, plaintiff is not attempting simply to enforce a contested contractual right – he is seeking a remedy at this early stage that is rare and disfavored even at final judgment.

Even if plaintiff could carry his burden to show that he is likely to succeed on the merits of his contract claim (which he cannot), he must also demonstrate that he is likely to obtain specific performance, itself an "extraordinary remedy." *Clark v. Route*, 951 A.2d 757, 759 (D.C. 2008) ("Specific performance is an extraordinary equitable remedy.").  He has not done so.  Instead, plaintiff asks the Court to award him two disfavored remedies at this preliminary and truncated stage of litigation before the parties (and the Court) are given a full opportunity to investigate, test, and ultimately determine the underlying facts.  The Court should reject plaintiff's request.

**b.  Plaintiff's Breach of the Implied Covenant of Good Faith and Fair Dealing Is Not Likely to Succeed on the Merits.**

Plaintiff's claim for breach of the implied covenant of good faith and fair dealing is unlikely to succeed on its merits because it is indistinguishable from his breach of contract claim.  Apparently conceding that his claims are largely indistinguishable, plaintiff combines his breach of contract and good faith and fair dealing claims into a single section in his brief.  It is therefore inappropriate for preliminary injunctive relief both because the claim fails on its own, and because relief is not warranted under plaintiff's breach of contract claim, as demonstrated above.  *See Sundberg v. TTR Realty, LLC*, 109 A.3d 1123, 1133 (D.C. 2015)

(explaining that the implied covenant requires action that has "the effect of destroying or injuring the right of the other party to receive the fruits of the contract.").

> i.   <u>Plaintiff's Good Faith and Fair Dealing Claim Is Not Likely to Succeed Because the Basis for the Claim and the Relief Sought Are Duplicative of his Purported Breach of Contract Claim.</u>

Courts have held that under D.C. law a "breach of the implied covenant is not an independent cause of action when the allegations are identical to other claims for relief under established cause of action, such as a breach of contract claim." *WMATA v. Quik Serve Foods, Inc.*, No. 04-687, 2006 WL 1147933, at *5 (D.D.C. Apr. 28, 2006); *see also Xereas v. Heiss*, 933 F. Supp. 2d 1, 8 (D.D.C. 2013) (same).[12]  Because the requested remedies are identical and the claims duplicative, the breach of the covenant of good faith and fair dealing claim is improper and cannot succeed.

> ii.   <u>An Implied Covenant of Good Faith and Fair Dealing Claim Cannot Expand the Express Terms of an Alleged Contract.</u>

Plaintiff's cause of action is based on the false premise that the implicit terms of his contract with the university (which he argues guarantee him a particular result from a disciplinary investigation and subsequent proceedings) provide him with greater rights than the express terms of the alleged contract with the university (which at most provide that the university will follow a certain set of procedures).  This theory directly contradicts the law and cannot succeed on the merits.

---

[12]   In *Jacobson v. Hofgard*, the Court reasoned that "[p]laintiffs are not required at the pleadings stage to choose between alternative remedies." 168 F. Supp. 3d 187, 208 (D.D.C. 2016).  There is no need to reconcile *Quik Serve* and *Xereas* with *Jacobson* on this motion, however, since the duplicative contract and good faith and fair dealing claims are not seeking alternative remedies, but the same remedy – a preliminary injunction. *C.f. Whole Foods Mkt. Grp., Inc. v. Wical Ltd. P'ship*, No. 17-01079, 2018 WL 525486, at *6 (D.D.C. Jan. 23, 2018) (allowing parallel claims to proceed because breach of contract claim sought injunctive relief and the breach of covenant of good faith and fair dealing claim sought damages).

"It is axiomatic that [t]he implied covenant of good faith and fair dealing cannot contradict, modify, negate, or override the express terms of a contract'" *Billups v. Lab Corp. of Am.,* 233 F. Supp. 3d 20, 26 (D.D.C. 2017) (quoting 17A C.J.S. Contracts §437 (2016)).  It is equally well-settled that the implied covenant cannot override express provisions of the contract. *Television Capital Corp. of Mobile v. Paxson Commc'ns Corp.,* 894 A.2d 461, 468 (D.C. 2006).  The alleged express terms of the purported contract here are a set of procedures for student conduct matters.  As plaintiff makes no showing that the university departed from those procedures, his claim fails.

> iii.  The Arbitrary and Capricious Standard Requires A Showing of Bad Faith or Arbitrary Decision Making.

To succeed on a claim of breach of implied duty of good faith and fair dealing, the moving party must allege "either bad faith or conduct that is arbitrary and capricious." *see Kumar v. George Washington University*, 174 F. Supp. 3d 172, 189 (D.D.C. 2016) (quoting *Wright v. Howard Univ.*, 60 A.3d 749, 754 (D.C. 2013)); *see also Chenari v. George Washington Univ.*, 847 F.3d 740, 745 (D.C. Cir. 2017); *Bain*, 968 F. Supp. 2d at 299 ("judicial review of academic decisions is limited to the question of whether they were made arbitrarily or in bad faith").

Such allegations may not simply parrot obligations already alleged to be imposed by express contractual terms.  *See Whole Foods Mkt. Grp., Inc.*, No. 17-01079, 2018 WL 525486, at *6.  In resolving these cases, "courts must not substitut[e] their judgments improperly for the academic judgment of the school." *Id.*  Student-plaintiffs must show evidence that a defendant-university was "motivated by bad faith or ill will toward them." *See Camarda v. Certified Fin. Planner Bd. of Standards, Inc.*, No. 13-00871, 2015 WL 13159050 *3 (D.D.C. July 6, 2015) (citing *Bain*, 968 F. Supp. 2d at 302).  Merely showing some deviation from established procedure or "procedural irregularities" is not sufficient to prove that a student disciplinary decision was arbitrary and capricious. *Hajjar-Nejad*, 37 F.

Supp. 3d at 119 ("the Court concludes that either there were no procedural irregularities here, or there were not the sort of procedural irregularities that would indicate an arbitrary decision.").

In short, to succeed on his claim plaintiff must show more than that the university made a questionable decision, a bad decision, or even the wrong decision.  Plaintiff must instead show that the decision against him was made with nefarious intent or that it was so unreasonable and unsupported as to prove arbitrary.  In light of the evidence of record, the likelihood that plaintiff will succeed on this claim approaches zero, and does not entitle him to extraordinary injunctive relief.

> **c.      Plaintiff's Title IX Claim is Not Likely to Succeed on the Merits.**

The crux of plaintiff's Title IX argument is that he is likely to succeed on the merits because the facts he asserts would, he contends, satisfy the pleading standard for a Title IX claim.  (Pl. Br. at 30-31) (citing exclusively cases at the 12(b)(6) stage)).  For this purpose, he relies on thin circumstantial evidence of: (1) training targeted to men regarding sexual assault; (2) statistical evidence that *does not even support* the conclusion that the university has a biased pattern of decision making; and (3) "external pressure" on the university.  None of these allegations are sufficient to prove his claim, let alone his request for extraordinary preliminary relief.

To resolve the pending motion for preliminary injunction, the appropriate legal standard is *not* whether plaintiff's claim would survive a 12(b) motion, but whether he has presented sufficient credible facts to show that a university decision-maker *intentionally* discriminated against him *in this case* because of his gender.  The answer to that question is a resounding "no" because the Court is not obligated to accept plaintiff's unsupported allegations as true, *see Advance America*, 257 F. Supp. 3d at 62, and plaintiff has presented

no evidence that demonstrates any intentional discrimination on the part of any decision maker in his case.

Plaintiff suggests that he can demonstrate a likelihood of success on the "erroneous outcome" theory.  To prove a claim under that Title IX theory, a plaintiff must show: (1) doubt about the accuracy of the disciplinary proceeding, and (2) that inaccuracy was motivated by intentional gender bias against the plaintiff.  *Doe v. Regents of the Univ. of Cal.*, --- F. Supp. 3d ----, No. 15-02478, 2016 WL 5515711, at *4 (C.D. Cal. July 25, 2016) (citing *Yusuf v. Vassar College*, 35 F.3d 709 (2d Cir. 1994)).  Assertions that fail to show a causal link between gender and a defendant's conduct are insufficient; a plaintiff must point to particular evidence that shows gender bias was the motivating factor.  *See Yusuf*, 35 F.3d at 715.

Plaintiff has not explained how there is a likelihood he will succeed on either prong of the erroneous outcome test by clear and convincing evidence.  At best, plaintiff has, with respect to the first prong, demonstrated that if he were on the hearing panel, he would have resolved questions of credibility differently.  It is, however, undisputed that four witnesses testified that Roe was intoxicated the evening of the sexual encounter. The fact that plaintiff now disagrees with the panel's resolution of credibility – or even that there was contrary evidence in the record that he finds more believable – does not establish by clear and convincing evidence that the outcome was inaccurate.

More importantly, plaintiff simply cannot demonstrate on the record before the Court that that outcome was motivated by gender.  By far the most convincing explanation is simply that the hearing board found Roe more believable.  Plaintiff has offered no evidence to the contrary, and the hearing board's plain reasoning in that regard is set forth in their written decision.  (H. Rep. at 6).  Moreover, while Roe offered evidence from three witnesses that she was inebriated that evening, plaintiff did not present any evidence apart from his own

self-interested testimony that Roe was sober.  (H.T. at 65).  We cannot know how the hearing board would have reacted to the evidence presented in Q.W.'s unsworn e-mail because plaintiff did not present Q.W.'s statement until *after* the hearing and outcome had been reached.

Next to this direct, concrete evidence, the circumstantial and generalized evidence of alleged "gender bias" that plaintiff presents does not move the needle.  *First*, the "statements by university officials" that plaintiff relies on is a news article reporting that "all GW undergraduates are required to participate in an online and in-person sexual assault prevention program."  (Pl. Br. Ex. 3, at 2).  The article explains that "students can choose" from one of several in-person sessions, *including* "preventing abuse in LGBTQAI communities," training directed at international students, or "how male students can prevent sexual assault."  (*Id.*).  Apart from the fact that this list is by its own terms not exhaustive, it strains credulity to conclude, based on the fact that the university trained its students about sexual assault awareness and prevention, that the university intentionally discriminated against plaintiff at his hearing.

*Second*, plaintiff cites "statistical evidence" in support of his (mistaken) contention that statistical evidence alone can *prove* intentional discrimination.  In truth, such evidence would be insufficient for purposes of the required showing even if plaintiff did not misrepresent it, which he does.

Plaintiff argues that because each of the ten respondents subject to a hearing from 2015-16 was found responsible, it follows that *he* was intentionally discriminated against.  This contention is wrong for at least two reasons.  One is that plaintiff has cherry-picked his facts.  The document upon which plaintiff relies actually states that sixteen reports of sexual assault were made during the two-year period discussed.  (*See* Pl. Br. Ex. 7, at 2).  The statement does not say what portion of the sixteen respondents were male.

Moreover, of those sixteen reports, only ten cases went to a formal process.  (*See id.*).
In about 40% of cases, a respondent was never subject to a hearing at all.  Even if there were
any evidence in the record about the gender of those students (there is not), it simply cannot
follow that a 60% rate of finding all accused respondents responsible can be the sole factual
predicate for intentional discrimination in plaintiff's case.  It is far more convincing to
conclude that the cases that made it far through the process were the strongest cases, and
resulted in a high rate of "responsible" findings.[13]

*Third*, plaintiff cites a number of cases that stand for the proposition that a plaintiff
may meet his pleading burden on a motion to dismiss by alleging that an institution was
subject to investigation by the Department of Education's Office for Civil Rights ("OCR").
(Pl. Br. at 32-33).  The problem with this argument is that plaintiff's burden when seeking
extraordinary injunctive relief is not to survive a motion to dismiss – it is to show, by clear
and convincing evidence, that he is likely to succeed on his claim that the university
intentionally discriminated against him on the basis of his sex at his hearing in this particular

---

[13]    Notwithstanding the fundamental differences in the university and criminal systems, it
is useful as a point of reference to recognize that the United States Attorney for the District of
Columbia, during the 2015 and 2016 fiscal years, brought charges in 432 cases, 384 of which
ended up with dispositions of guilt.  *See* UNITED STATES ATTORNEYS' ANNUAL STATISTICAL
REPORT,  FISCAL  YEAR  2016,  at  5  (*available  at*
https://www.justice.gov/usao/file/831856/download) (accessed Mar. 30, 2018); UNITED STATES
ATTORNEYS'  ANNUAL  STATISTICAL  REPORT,  FISCAL  YEAR  2015,  at  5  (*available  at*
https://www.justice.gov/usao/file/831856/download) (same)   The D.D.C. rate of nine (9) guilty
dispositions for every one (1) dismissal or not guilty disposition furthermore occurred under a
the "beyond a reasonable doubt standard," while the university's internal process occurs
under the "preponderance of the evidence" standard, where those accused are admittedly
more likely to be found responsible.  Plaintiff's implication that ten (10) of sixteen (16)
accusations of sexual assault resulting in findings of responsibility is so high as to imply
intentional (or disparate impact) discrimination is accordingly suspect from the start.
Plaintiff's argument must also incorporate an assumption that rates of false accusations of
sexual assault in the university's small sample size dramatically outpace false accusations of
in a much large sample of crimes pursued by the U.S. Attorney, a conclusion for which the
basis is not readily discernable.

case.  *Flight Attendants*, 372 F. Supp. 2d at 91  ("[a] preliminary injunction . . . should not be granted absent a clear and convincing showing by the moving party.").

The only evidence plaintiff offers of the generalized "pressure" the university faced comes in the form of student newspaper articles reporting that an OCR investigation had commenced at the university[14] and descriptions of protests at the prior year's graduation ceremony.  None of this speaks to the actions of the university in *this case*.  *See Doe v. Univ. of Cincinnati*, No. 16-987, 2018 WL 1521631, *5 (S.D. Ohio, Mar. 28, 2018) (public pressure unrelated to respondent's own case insufficient to show causal connection to gender discrimination even on motion to dismiss).

The theme characterizing all of plaintiff's arguments in this regard is substituting his own speculation for matters left to the deliberation of the university's hearing board, which is entitled to a presumption of neutrality that plaintiff must overcome: "[t]here is a presumption of fairness in [university] administrative proceedings which favors administrators and 'alleged prejudice of university hearing bodies must be based on more than mere speculation and tenuous inferences.'"  *Osei*, 2011 WL 4549609, at *11; *see also*, *Gorman*, 837 F.2d at 15 (same); *Duke*, 469 F.2d at 834 (same).

When placed side-by-side with the evidence presented to the hearing board by percipient witnesses, the evidence relied on by plaintiff does not approach the high burden necessary to award the extraordinary relief he seeks.  The *Doe v. Trustees of Boston College* case is instructive, and is particularly apposite since, rather than addressing a motion to

---

[14]    The Chronicle of Higher Education reports that OCR currently has over three-hundred (300) open investigations.  *See* "Tracking Sexual Assault Investigations," CHRONICLE OF HIGHER EDUCATION (available at https://projects.chronicle.com/titleix/) (accessed Mar. 29, 2018).

dismiss, *Boston College* analyzes whether the plaintiff had met his evidentiary burden. *See* No. 15-10790, 2016 WL 5799297 at *1 (D. Mass. Oct. 4, 2017).

In *Boston College*, the John Doe plaintiff argued, as plaintiff does here, that the university's policies were tough on respondents, labeling the participants as "victims" and "survivors" versus "perpetrators." *Id.* at *24. Yet the court observed, again, as here, that the materials presented by the plaintiff were gender neutral in their use of terms. (*Accord* Pl. Br., at 5) (referring to the rate at which respondents – not "men" – were found responsible at the university)). As the *Boston College* court observed, "Showing that a school favors alleged victims of sexual assault claims is not the equivalent of demonstrating bias against male students, even if accused students are generally male." *Id.* at *25 (citing *Univ. of Cincinnati*, 173 F. Supp. 3d 586, 602-03 (S.D. Ohio 2016); *King v. DePauw Univ.*, No. 14-70, 2014 WL 4197507, at *10 (S.D. Ind. Aug. 22, 2014); *Haley v. Virginia Commonwealth Univ.*, 948 F. Supp. 573, 579 (E.D. Va. 1996)).

Critically, the *Boston College* court then went on to explain:

> Doe also asserts that outside pressures with respect to sexual assault on campus instill bias in disciplinary proceedings. Doe's point that sexual assault on campuses is a subject of increasing public attention and controversy, with external pressures from a variety of sources, is well-taken. Doe, however, must do more than respond to Defendants' motion for summary judgment with bare assertions. Here, Doe provides no evidentiary support to show **how these outside pressures have influenced the disciplinary proceedings and review to which Doe was subjected**.

*Id.* at *25 (emphasis added) (citing cases for the proposition that "a plaintiff must be able to adduce substantial evidence to support his contentions; a mere iota of evidence, followed by conclusory allegations of discriminatory intent, will not suffice"). Finally, the court laid bare the problem with plaintiff's motion generally, *i.e.* the lack of any connection between alleged "patterns of decisionmaking" and actual, intentional discrimination:

Finally, Doe provides no evidentiary support for the claim that the "pattern of decision-making" in Doe's case is a result of gender bias. Doe points to a series of alleged procedural irregularities, to support this contention. ***However, in so arguing, Doe does not provide "statements by members of the disciplinary tribunal" or "statements by pertinent university officials" that demonstrate the improper influence of gender on the proceedings***. Providing no evidence explaining the causal relationship between the alleged procedural irregularities alleged and a pattern of decision-making based upon gender bias, Doe's claim under Count X cannot survive.

*Id.* at *25 (internal citations omitted) (emphasis added). Because, like the plaintiff in *Boston College*, plaintiff here has done nothing to connect his bare conclusions and circumstantial allegations to actual evidence of intentional discrimination, and because the record demonstrates convincingly that direct evidence provided a clear, nondiscriminatory basis for the university's decision, plaintiff has not carried his burden to show by clear and convincing evidence that he is likely to succeed on the merits of his Title IX claim.

### d. <u>Plaintiff Is Not Likely to Succeed on his Claims under the D.C. Human Rights Act.</u>

#### i. <u>Disparate Treatment</u>

Plaintiff's disparate treatment claim under the D.C. Human Rights Act is premised upon the same arguments he advances for his claim under Title IX. (Pl. Br. at 34). Therefore, for the same reasons that plaintiff has failed to demonstrate a likelihood of success under Title IX, he has likewise failed to demonstrate a likelihood of success on his disparate treatment claim under the D.C. Human Rights Act.

#### ii. <u>Disparate Impact</u>

Plaintiff also argues that "the University's Title IX enforcement regime has a disparate impact on its male students." (Pl. Br. at 36). Plaintiff bases this argument on a the university's statement that its sexual misconduct policy has produced a "100% conviction rate over the last two academic years." (*Id.*). This argument lacks merit. As explained above, at most what plaintiff *alleges*, rather than shows, is that slightly more than half of cases in

31

which a student was accused of sexual misconduct went to a hearing, and that cases that went to a hearing tended to result in a finding of misconduct.   This does not show anything approaching disparate impact discrimination.

      1.      This Court Should Not Recognize a Disparate Impact Claim Under Section 2-1402.41 of the D.C. Human Rights Act.

           i.      *Title IX Does Not Permit a Disparate Impact Claim, and this Court Should Interpret the D.C. Human Rights Act in Accord.*

Section 2-1402.41 of the D.C. Human Rights Act, which prohibits educational institutions from discriminating on the basis of sex, should be interpreted consistently with Title IX, which likewise prohibits institutions from such discrimination on the basis of sex, to avoid a direct conflict with federal law.   Title IX does not permit a disparate impact theory of liability.   Instead, only intentional discrimination is actionable under Title IX.   *See Xiaolu Peter Yu v. Vassar Coll.*, 97 F. Supp. 3d 448, 461 & n.6 (S.D.N.Y. 2015).[15]   Because Title IX prohibits a disparate impact claim under the federal statutory scheme, this Court should refuse to recognize such a claim under the D.C. statute.

---

[15]    The Supreme Court has held that "Title IX implies a private right of action to enforce its prohibition on intentional sex discrimination." *Jackson v. Birmingham Board of Educ.*, 544 U.S. 167, 173 (2005) (citing *Cannon v. Univ. of Chicago*, 441 U.S. 677, 690–93 (1979)). It has further noted that Title VI, on which Title IX was patterned, also "prohibits only intentional discrimination." *Alexander v. Sandoval*, 532 U.S. 275, 280 (2001).   Since Title IX is to be interpreted and applied in the same manner as Title VI, *see Cannon*, 441 U.S. at 696, it follows that Title IX also reaches only intentional discrimination.   While the Supreme Court has found that regulations implementing Title VI may reach activities that have a disparate impact, it has also held that there is no private right of action to enforce such regulations. *See Alexander*, 532 U.S. at 281, 293.   Accordingly, numerous courts have dismissed private actions to enforce Title IX itself or regulations implementing Title IX when the allegations were based on disparate impact.   *See, e.g.*, *Weser v. Glen*, 190 F. Supp. 2d 384, 395 (E.D.N.Y. 2002), *aff'd*, 41 Fed. Appx. 521 (2d Cir. 2002) (dismissing Title IX disparate impact claims); *Barrett v. W. Chester Univ. of Penn. of State Sys. of Higher Educ.*, No. 03-4978, 2003 WL 22803477, at *11 (E.D. Pa. Nov. 12, 2003) (plaintiffs "cannot pursue a private right of action to enforce disparate impact regulations under [Title IX]"); *E.L. ex rel. Bachman v. Penn Harris Madison Sch. Sys.*, No. 05-717, 2006 WL 2512077, at *1 (N.D. Ind. Aug. 28, 2006) (rejecting Title IX disparate impact claim).

The District of Columbia already "follow[s] cases construing Title VII in interpreting and applying the provisions of the DCHRA 'when appropriate.'" *Estenos v. PAHO/WHO Fed. Credit Union*, 952 A.2d 878, 886 (D.C. 2008) (emphasis added). The District has "also followed, when applicable, precedent from the federal courts involving claims under *other* civil rights statutes." *Benefits Commc'n Corp. v. Klieforth*, 642 A.2d 1299, 1302 (D.C. 1994) (emphasis added). Other states, such as California, construe their laws aimed at eradicating discrimination by educational institutions on the basis of sex or gender consistently with Title IX. *See*, *e.g.*, *Zuccaro v. Martinez Unified Sch. Dist.*, No. 16-02709, 2016 WL 10807692, at *13 (N.D. Cal. Sept. 27, 2016). This civil action and plaintiff's claim illustrate precisely why Section 2-1402.41 of the D.C. Human Rights Act also must be interpreted consistent with Title IX.

> ii.     *If the Court Permits a Disparate Impact Claim Under the D.C. Human Rights Act, it will Create a Conflict with Federal Law.*

The federal government generally requires all schools, colleges, universities, and other educational institutions that receive federal funds to establish fair processes to adjudicate claims of sexual misconduct in accordance with the guidance documents issued by the Department of Education's Office for Civil Rights.[16]

The Department of Education "maintain[s] and advance[s] its interpretation[s] as binding on schools in the United States" and uses its guidance documents, including those

---

[16]     *See*, *e.g.*, Office for Civil Rights, *Revised Sexual Harassment Guidance* (66 Fed. Reg. 5512, Jan. 19, 2001), *available at* https://www2.ed.gov/about/offices/list/ocr/docs/shguide.pdf; Office for Civil Rights, Dear Colleague Letter on Sexual Harassment (Jan. 25, 2006), *available at* https://www2.ed.gov/about/offices/list/ocr/letters/sexhar-2006.html; Office for Civil Rights, Q&A on Campus Sexual Misconduct (Sept. 2017), *available at* https://www.ed.gov/news/press-releases/department-education-issues-new-interim-guidance-campus-sexual-misconduct.

cited above, to "guide DOE's review of complaints and pursuit of enforcement actions." *Students v. United States Dep't of Educ.*, No. 16-4945, 2016 WL 6134121, at *11 (N.D. Ill. Oct. 18, 2016), *report and recommendation adopted sub nom.* No. 16-4945, 2017 WL 6629520 (N.D. Ill. Dec. 29, 2017); *see also Riccio v. New Haven Bd. of Educ.*, 467 F. Supp. 2d 219, 226 n.8 (D. Conn. 2006) ("The OCR has set forth administrative guidelines for its own use in determining whether an educational institution has violated the rules set forth in Title IX."). The Court need look no further than the pleadings in this case to illustrate this point. As plaintiff recounts in his pleadings, "GW was one of the first universities targeted for investigation by the Education Department's Office for Civil Rights (OCR) in 2011," (Compl. at ¶ 9), and "GW . . . had come under active OCR investigation fewer than three months before [Roe] filed [her complaint]." (Compl. at ¶ 33).

It is important to recognize that in pressing his disparate impact claim, plaintiff cannot simultaneously maintain that the university's Sexual Harassment and Sexual Violence Policy or its Code are facially discriminatory. To contend otherwise would be incompatible with the very essence of a disparate impact claim, which, by definition, applies only when policies or practices "that are facially neutral in their treatment of different groups . . . fall more harshly on one group than another." *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 335 n.15 (1977). In any event, it is clear that the Code and the Policy use gender-neutral terminology and thus plainly do not discriminate against one sex or another on their face. (*See* Exs. D, E).

According to plaintiff, however, if the outcome of the neutral processes established by the university pursuant to Title IX is that only men are found responsible for sexual misconduct, then the processes have a disparate impact on men and violate the D.C. Human Rights Act's "Effects Clause," which attempts to establish disparate impact liability for "[a]ny practice which has the effect or consequence of violating any of the provisions of" the Act. *See* D.C. Code §2-1402.68.

In other words, under plaintiff's theory, the university cannot comply with federal law under Title IX by instituting a facially neutral review procedure for sexual misconduct claims without simultaneously subjecting itself to claims of disparate impact under the D.C. Human Rights Act.  If plaintiff is correct, and compliance with Title IX results in a disparate impact on men in violation of the D.C. Human Rights Act, then there is an unavoidable conflict of state and federal law.  In this conflict scenario, the state law must give way to the federal law under the Supremacy Clause of the United States Constitution.  *See* U.S. Const. art. VI, cl. 2; *see also Commissions Imp. Exp. S.A. v. Republic of the Congo*, 757 F.3d 321, 326 (D.C. Cir. 2014) ("state laws are preempted when they conflict with federal law.").

This conflict can be avoided.  If Section 2-1402.41 of the D.C. Human Rights Act is construed consistently with Title IX, then the "Effects Clause" in Section 2-1402.68 of the Act does not apply to create disparate impact liability under Section 2-1402.41, and the state and federal laws will be in harmony and no conflict will arise.  This is the appropriate result.  Plaintiff cites to no case law to the contrary.

  2. Plaintiff Otherwise Cannot Demonstrate a Likelihood of Success on the Merits of His Disparate Impact Claim.

    *i.* *Plaintiff Confuses Purported Instances of Facial Discrimination with his Disparate Impact Claim.*

Even if plaintiff's disparate impact claim were legally cognizable, he cannot demonstrate a likelihood of success on the merits of this claim.  As explained above, plaintiff cannot maintain that the Policy or the Code are facially discriminatory in advancing a disparate impact claim.  *See Int'l Bhd. of Teamsters*, 431 U.S. at 335 n.15.  But that is precisely what plaintiff is attempting to assert.

Plaintiff asserts what he says is *actual bias* in "the University's Title IX enforcement regime."  (Pl. Br. at 36).  According to plaintiff, the university's purported bias appears in two features of its "Title IX enforcement regime": (1) the training the university provides to

personnel responsible for administering the Policy on issues related to sexual harassment, including "how to conduct investigations and hearings in a manner that protects the safety of victims and promotes accountability" (quoting the Policy, at 11), which plaintiff claims "effectively teaches its judicial officers to view sexual misconduct complainants as victims before the actual hearing takes place," (Pl. Br. at 36); and (2) the university's employment of a Title IX investigator "who spent almost her entire professional career representing sexual assault claimants in court cases and university Title IX proceedings, who continues to serve as a legal fellow at one such organization, and who brings a ***bias*** in favor of complainants into every case she investigates." (Compl. at ¶ 159).

These purported biases cannot form a foundation for a disparate impact claim because they are not "facially neutral" policies or practices that merely have the effect of "fall[ing] more harshly on one group than another." *See Int'l Bhd. of Teamsters*, 431 U.S. at 335 n.15. Rather, these alleged biases, if accepted, amount to *intentional* forms of discrimination (which is also false as explained above).

ii. The University is Exempt Under the Business Necessity
Exemption to the D.C. Human Rights Act.

Even if plaintiff could assert a viable disparate impact claim, that claim would also fail because the processes the university has established pursuant to Title IX are exempt under the business necessity exception in Section 2-1401.03 of the D.C. Human Rights Act.

The Act provides that "[a]ny practice which has a discriminatory effect . . . shall not be deemed unlawful if it can be established that such practice is not intentionally devised or operated to contravene the prohibitions of this chapter and can be justified by business necessity." D.C. Code §2-1401.03. A respondent claiming the business necessity exception must be able to prove that "without such exception," the respondent's "business cannot be conducted." *Id.* The university easily qualifies for the business necessity exception here. To conduct its business, the university must comply with federal law in the form of Title IX's

36

binding guidance by maintaining its federally-mandated processes for adjudicating claims of sexual misconduct, as explained above.  Therefore, plaintiff cannot demonstrate a likelihood of success on the merits of his disparate impact claim.

> iii.    *Plaintiff's Argument Related to the 100% Conviction Rate Argument is Misguided.*

Plaintiff's leading support for his disparate impact claim, that the university's system for the review of sexual misconduct claims led to a 100% conviction rate and, therefore, must be inherently biased, is not persuasive for a number of additions reasons.

*First*, plaintiff ignores confounding variables.  The Policy, for example, includes two steps before an allegation gets to a formal hearing.  Complainants are first offered a consultation with a university official.  (Ex. E at 8 and Appendix A).  Then, a complainant is also entitled to an administrative review level: "The allegations will receive an adequate, reliable, and impartial investigation and an effort will be made to resolve the complaint . . . ." (*Id.* at 9 and Appendix B).  These informal procedures attempt to first resolve complaints of sexual misconduct short of a hearing, and are often successful, including weeding out claims that are determined to be unsubstantiated.  Only if the "administrative review procedure fails to resolve a complaint," does the issue go to a formal hearing.  (*Id.*).  The Policy also includes sanctions, including expulsion, for false claims of misconduct.  (*Id.* at 11).  Therefore, the Policy takes steps to prevent false accusations, and also includes two preliminary levels of review before any formal hearing takes place.  The ultimate formal review hearing, and its resulting determinations upon which plaintiff relies, are only a small piece of the puzzle.

*Second*, although plaintiff exclaims that "[m]en do not commit 100% of sexual assaults" (Pl. Br. at 36), neither does plaintiff offer any evidence regarding in what numbers men are accused of sexual assault.  The university cannot control which gender files a misconduct charge or against which gender the charge is lodged.  Nor can it control whether

a male or female ultimately requests a formal hearing.  All that the university can do provide the neutral framework for such complaints.

    *Third*, although plaintiff casts the Policy as some sort of unique set of procedures separate from the Code designed to always convict the accused, this is simply not true.  As explained above, the university is required to have a policy for sexual misconduct claims in order to satisfy Title IX guidance.  However, both the Policy and the Code envision a similar, if not identical, formal hearing procedure: if "Respondent [is charged] with violating the prohibitions pertaining to sexual harassment, including sexual violence, *disciplinary proceedings will be commenced against that student according to the procedures outlined in the Code* and in this Section of the Sexual Harassment and Sexual Violence Policy and Procedures."  (Ex. E, Appendix C, Sect. 1, ¶ 4).  Plaintiff has not pointed to a single substantive difference between the hearing procedures under the Policy or the Code.  Instead, he received the same full and fair formal review procedure contemplated by both such frameworks.

## III.    Plaintiff Cannot Demonstrate That Absent Injunctive Relief He Will Suffer Irreparable Harm.

###     a.    Plaintiff's Claims of Reputational Harm Are Speculative and Insufficient.

    Plaintiff alleges that his reputation has suffered because "[t]he University has labeled Mr. Doe a sex offender . . . ."  (Pl. Br. at 39).  He further claims that he has suffered from emotional distress.  (*Id.* at 39-40).  These allegations are insufficient for two reasons.

    *First*, the disciplinary process administered at the university was confidential.  (*See*, *e.g.*, Ex. D at ¶ 25) (imposing confidentiality and sanctions for violations); (Ex. E at 10).  The university did not openly "label [plaintiff] a sex offender" or otherwise disclose the nature or result of the proceedings publicly.  *See Brodie v. U.S. Dep't of Health & Human Servs.*, 715 F. Supp. 2d 74, 84 (D.D.C. 2010) (lack of irreparable reputational harm where there was no

indication that third parties were likely to learn of decision, and generalized risk that someone *may* learn of decision was insufficient).

     *Second*, plaintiff's claimed reputational harm is speculative, which is insufficient to support an injunction: "As with all other forms of irreparable harm . . . the showing of reputational harm must be concrete and corroborated, not merely speculative." *Jones v. D.C.*, 177 F. Supp. 3d 542, 547–48 (D.D.C. 2016); *see also Toxco Inc. v. Chu*, 724 F. Supp. 2d 16, 31 (D.D.C. 2010) ("the court concludes that the plaintiff's claims of reputational harm are far too vague, speculative and uncorroborated to support a finding of irreparable harm."); *Brodie*, 715 F. Supp. 2d at 84  ("Merely conclusory allegations of stigma do not suffice to establish imminent injury.").

     **b.**      **Plaintiff's Injury, if Any, is Economic in Nature.**

     Plaintiff states plainly in his brief that his injuries are economic in nature: "John Doe's suspension has delayed and continues to delay his career . . . ." (Pl. Br. at 40).  At best plaintiff argues that he *might* obtain a job if permitted to graduate, *might* gain admission to graduate school if he receives his degree, or *might* receive some other monetary benefits from the immediate conferral of his degree.  He does not provide any concrete evidence in his affidavit or otherwise of *which* schools he has applied to, or *which* jobs he has sought.  Even so, all these potential benefits lead to one form of relief – some sort of monetary loss or decrease in earnings potential.  Plaintiff is primarily worried about the financial impact that the university's decision and discipline *could* have on his career.  If plaintiff proves such harm, money damages can compensate any harm.

     "[I]t is well settled that financial loss does *not* constitute irreparable injury because the financial loss can be remedied with money damages." *Fanning v. High Mountain Inspection Servs., Inc.*, 520 F. Supp. 2d 55, 59 (D.D.C. 2007) (emphasis original); *see also Sampson v. Murray*, 415 U.S. 61, 90 (1974) ("it seems clear that the temporary loss of

income, ultimately to be recovered, does not usually constitute irreparable injury.").  Here, plaintiff's claims, if he prevails, could be compensated by monetary damages.

> **c.**     **If Plaintiff Prevails on the Merits, His Academic Record will not Reflect any Gap.**

Plaintiff's leading argument on irreparable harm is that he will suffer a "gap" in his education which he will have to explain for the rest of his professional life.  (Pl. Br. at 40).  Some court have recognized a gap as indicative of irreparable harm.   However, as demonstrated below, this argument fails for two reasons: *First*, if plaintiff prevails in this action and on remand, the degree conferred on him will reflect no gap at all pursuant to the university's practice related to administrative holds on graduation.[17]   *Second*, **none** of the "gap" cases cited by plaintiff award anything approaching the extreme relief plaintiff seeks here.

 Plaintiff's argument regarding the gap is illusory.  The university does not believe that any part of its process breached any duty owed to plaintiff.  However, if this Court disagrees and enters a final judgment against the university, and upon remand the university finds plaintiff "not responsible" for assaulting Roe, plaintiff will be awarded a degree as if the underlying proceedings never happened, his diploma will be dated May 2018, and his academic transcript will indicate the degree was awarded as of May 2018 – the precise relief plaintiff seeks here.  (*See* Ex. C).

It also bears emphasis that all of the "gap" cases relied upon by plaintiff are fundamentally different from plaintiff's case.  Each involved something more than a mere gap in education – they involved either (a) potential to lose an actual job *already obtained* or were (b) litigated in the context of limited injunctive relief to guarantee completion of degree

---

[17]     *See* Declaration of Meghan Arias, attached hereto as Exhibit "C."

requirements pending final judgment so that *if* judgment were awarded, plaintiff would be in a position to graduate.  None of these cases involved a court compelling an institution to award a degree before the student proved his claim, nor an order compelling an institution to treat a student as if he had committed no misconduct, when the school had found just the opposite.

In *Doe v. University of Notre Dame*, for example, the court issued a narrow injunction to permit the plaintiff to take two examinations required for graduation.  No. 17-298, 2017 WL 1836939, at *13-14.  The court expressly refused to force the school to confer a degree on the plaintiff, and held any further financial harm could be compensated monetarily.  *Id.* And in *Doe v. University of Cincinnati*, the court determined that the "unique nature" of the plaintiff's graduate program could impact his ability to pursue his career field *at all* if the school's suspension was imposed.  223 F. Supp. 3d 704, 712-13 (S.D. Ohio 2016).  Plaintiff here, by contrast, offers nothing more than allegations that he intends to apply to schools (to which he offers no evidence of having applied).

Similarly, in *Doe v. Middlebury College*, the plaintiff met the "extraordinary circumstance" test because he had a concrete job offer contingent on the successful completion of his degree, which he would lose based upon the school's imposed discipline. No. 15-192, 2015 WL 5488109, at *2-3 (D. Vt. Sept. 16, 2015).  The *Middlebury College* court also noted that difficulty finding employment could be compensated by money under most circumstances.  *Id.* at *3 n.8; *see also Salau v. Denton*, 139 F. Supp. 3d 989, 1013 (W.D. Mo. 2015) (rejecting allegation of irreparable harm where "Plaintiff has not shown that he could not enroll in a different university to complete his degree program, or that he could not be employed elsewhere.").

Both because no gap will result and because even if it did, the relief sought by plaintiff would not be inappropriate, plaintiff has not demonstrated irreparable harm.

### d. Plaintiff Fails to Raise Any Other Cognizable Irreparable Harm.

Plaintiff also, in passing, alleges that he has been "rob[bed]" of the chance to graduate with his classmates and attend alumni events. (Pl. Br. at 40). This argument is directly contrary to plaintiff's previously expressed desire to otherwise disassociate himself with the university: "Mr. Doe does not ask permission to return to campus this semester, to walk at his graduation in May, or to return the following academic year either (Ms. Roe's senior year). He has no desire to do those things and would affirmatively agree not to do them." (*Id.* at 1). Irrespective of this conflict, plaintiff does not explain how being deprived of his degree for the duration of this litigation imposes irreparable harm. Plaintiff alleges, but does not offer evidence to show, that he has applied to any specific graduate programs, or more importantly that he has been rejected from any. As a result, he can hardly as the Court to presume that he has an immediate, articulable risk of harm.

### e. Plaintiff's Injury is Not Immediate.

Plaintiff concedes that his alleged harm is not immediate. He is currently involved with an internship extendable to at least late 2018. (Pl. Br. at 43). In order to succeed on his injunction, however plaintiff must provide "proof that [his] injury is *certain, great and actual*—not theoretical—and *imminent,* creating a clear and present need for extraordinary equitable relief to prevent harm." *Save Jobs USA v. U.S. Dep't of Homeland Sec.*, 105 F. Supp. 3d 108, 114 (D.D.C. 2015) (emphasis original); *see also Wisconsin Gas Co. v. F.E.R.C.*, 758 F.2d 669, 674 (D.C. Cir. 1985) ("Injunctive relief 'will not be granted against something merely feared as liable to occur at some indefinite time' . . . .").

### IV. The Balance Of Equities Does Not Favor Preliminary Injunctive Relief.

The balance of the equities tips strongly in favor of denying plaintiff's request for preliminary injunctive relief. What plaintiff asks in this motion is nothing less than to compel the university to misrepresent to the world that plaintiff has satisfied all of the university's

requirements to graduate.  That is not true, and accordingly amounts to a compelled misrepresentation.  Employers, institutions of higher education, and others will then rely on that misrepresentation because plaintiff will have something he did not earn: a degree from George Washington University.

Plaintiff glibly characterizes the equities here as involving only the "flip of a switch," but a university's degrees are the currency by which it establishes and maintains a reputation for excellence.  Ordering the university to compromise that standard would compel the university to act in a way that is completely anathema to its mission.  It would likewise put the university in a very poor position with third parties who might later find out no degree had actually been earned by plaintiff.  This construct also creates a windfall and a moral hazard for plaintiff, on whom the university would have to rely to inform third parties, in the event the degree were "revoked," as plaintiff suggests, that plaintiff was no longer a graduate.

Moreover, granting such relief will of course only serve to reinforce the notion that the federal courts are super-administrators for every student who is dissatisfied with the outcome of disciplinary proceedings.  If such relief is granted here, every time a disciplined student is unhappy with the outcome of an internal, administrative student conduct process, he or she will run to Court as plaintiff has here.  The university's ability to enforce discipline on its campus, and protect the safety of its students, particularly in the case of alleged sexual misconduct, will be diminished.

On the other hand, if injunctive relief is denied, this case will proceed quickly to test the sufficiency of the complaint, then through discovery and to resolution.  If plaintiff ultimately prevails in establishing that he is not responsible for sexually assaulting Roe,  the university has already committed to award plaintiff's degree as of the date he was otherwise qualified to graduate. (*See* Ex. C).  As such, the balance of the equities favors the university.

43

**V.**      **The Public Interest Does Not Favor Preliminary Injunctive Relief.**

Granting plaintiff injunctive relief is against the public's interest.  There is strong public interest in the university, a private institution of higher education, being able to independently investigate and, when appropriate, discipline its students for misconduct.

The Supreme Court has recognized the need for schools to maintain order and discipline in a manner that contributes to, and does not disrupt, the educational process.  *See*, *e.g.*, *Goss v. Lopez*, 419 U.S. 565, 590 (1975).  When a student reports an incident of alleged sexual misconduct, it is firmly within the public interest for the university to investigate the allegations and determine the appropriate punishments for anyone found responsible, in accordance with the university policy under the guidance of federal law.  *See*, *e.g.*, *Tsuruta v. Augustana Univ.*, No. 15-4150, 2015 WL 5838602, *10 (D.S.D. Oct. 7 2015) ("There is some public interest, however, in universities like Augustana adhering to the policies and procedures that they are required by law to adopt in order to adjudicate complaints of sexual assault among students.  The weight of this factor does not support [imposition of an injunction].").  Granting plaintiff's request, particularly with the extraordinary remedy of injunctive relief, cripples the university's ability to adjudicate student misconduct claims in an orderly, private, and efficient manner.

It is of even greater public interest to avoid superimposing federal court oversight onto a private university in the context of compelling the issuance of a collegiate degree.  *See Amelunxen v. Univ. of Puerto Rico*, 637 F.Supp. 426, 429-30 (D.P.R. 1986) ("At the outset, the court clarifies that it has no authority to order the University to award plaintiff a Master's Degree").  The public must be able to rely that when a member of society, whether as a job applicant or a professional, represents that they are a graduate of an accredited university, that the university has certified through its own processes that that individual has met all of the

standards required to obtain that degree and.  Allowing a court to order a university otherwise would destroy that public trust.  This court has explained:

> When a school issues a diploma to one of its students, it certifies to society that the student is well-versed in all of the knowledge and skills required by his or her chosen profession. Thus, to ensure society's confidence in the qualifications of individuals who have graduated from a particular educational institution, it is essential that the decisions surrounding the issuance of other credentials be left to the sound judgment of the professional educators who monitor the progress of their students on a regular basis.

*Hajjar-Nejad*, 37 F. Supp. 3d at 117 (internal quotations omitted).

What plaintiff asks in this case goes a step beyond: not only does he request the Court to order a private university to award his degree, certifying against its will to the world that a student it has not deemed qualified has met all requirements to graduate, but plaintiff further asks for this affirmative injunctive relief prior to a full adjudication on the merits.  Such a drastic remedy itself is against the public interest.  *See Habte v. George Washington Univ.*, No. 05-0962, 2005 WL 1204882, at *1 (D.D.C. May 19, 2005) ("the public interest supports denial of injunctive relief" where university would not certify plaintiff had met graduation requirements when he had failed to complete a required course).

## CONCLUSION

For all the foregoing reasons, plaintiff's motion for preliminary injunction should be denied.

/s/_Joshua W. B. Richards_____

Dated: March 30, 2018

James A. Keller, Esq. (D.C. Bar No. 1049037)
Joshua W. B. Richards, Esq. (D.C. Bar No. 1002821)
**SAUL EWING ARNSTEIN & LEHR LLP**
Centre Square West
1500 Market Street, 38th Floor
Philadelphia, PA 19102
James.Keller@saul.com
Joshua.Richards@saul.com
*Admitted pro hac vice*

Jason A. Ross, Esq. (D.C. Fed. Bar No. 1047909)
**SAUL EWING ARNSTEIN & LEHR LLP**
1919 Pennsylvania Avenue, N.W., Suite 550
Washington, DC 20006
Jason.Ross@saul.com

*Counsel for Defendant*

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document was served today via the Court's ECF filing system upon:

Justin Dillon, Esq.
Christopher C. Muha, Esq.
KAISERDILLON PLLC
1401 K Street NW, Suite 600
Washington, DC 20005
jdillon@kaiserdillon.com
cmuha@kaiserdillon.com
*Attorneys for Plaintiff John Doe*


Dated: March 30, 2018

/s/  *Joshua W. B. Richards*
James A. Keller, Esq. (D.C. Bar No. 1049037)
Joshua W. B. Richards, Esq. (D.C. Bar No. 1002821)
**SAUL EWING ARNSTEIN & LEHR LLP**
Centre Square West
1500 Market Street, 38th Floor
Philadelphia, PA 19102
James.Keller@saul.com
Joshua.Richards@saul.com
*Admitted pro hac vice*

Jason A. Ross, Esq. (D.C. Fed. Bar No. 1047909)
**SAUL EWING ARNSTEIN & LEHR LLP**
1919 Pennsylvania Avenue, N.W., Suite 550
Washington, DC 20006
Jason.Ross@saul.com

*Counsel for Defendant*