## IN THE UNITED STATES DISTRICT COURT FOR THE
## DISTRICT OF COLUMBIA

| | |
|---|---|
| **JOHN DOE,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | Civil Action No.  1:18-cv-553-RMC |
| ) | |
| **THE GEORGE WASHINGTON** ) | |
| **UNIVERSITY,** ) | |
| ) | |
| **Defendant.** ) | |
| ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯) | |

## REPLY IN SUPPORT OF JOHN DOE'S
## MOTION FOR A PRELIMINARY INJUNCTION

Justin Dillon (D.C. Bar No. 502322)
Christopher C. Muha (D.C. Bar No. 987116)
KAISERDILLON PLLC
1401 K Street NW, Suite 600
Washington, DC 20005
T: (202) 640-2850
F: (202) 280-1034
jdillon@kaiserdillon.com
cmuha@kaiserdillon.com

*Attorneys for Plaintiff John Doe*

DATED:  April 9, 2018

## TABLE OF CONTENTS

INTRODUCTION ...................................................................................................................... 1

ARGUMENT .............................................................................................................................. 2

I.  John Doe's Requested Remedy Is Available As Final—and Preliminary—Relief .................. 2

II. John Doe Is Likely to Succeed on the Merits of His Claims ..................................................... 6

    A.  Breach of Contract .............................................................................................................. 6

        1.  Contractual Obligation ................................................................................................. 7

        2.  Breach ............................................................................................................................ 9

            a.  Appeal ................................................................................................................... 9

            b.  Underlying Hearing ............................................................................................. 12

        3.  Appropriate Remedy .................................................................................................. 15

    B.  Breach of the Implied Covenant of Good Faith and Fair Dealing .................................. 15

    C.  Title IX ............................................................................................................................. 16

    D.  D.C. Human Rights Act .................................................................................................... 18

III. John Doe Will Suffer Irreparable Harm Without Preliminary Relief .................................... 22

IV. The Balance of Equities Overwhelmingly Favors Preliminary Relief .................................. 24

V.  The Public Interest Favors Preliminary Relief ....................................................................... 25

CONCLUSION .......................................................................................................................... 25

## INTRODUCTION

In its Opposition, George Washington University ("GW" or "the University'') sings a familiar tune: Granting Mr. Doe's request for a preliminary injunction, it says, would be an unprecedented act of judicial overreach that would do violence to the system that GW has set up to adjudicate allegations of sexual misconduct.  Moreover, it would turn this Court into a "university-super administrator" that would be called upon, time and again, to ignore the "tremendous deference" that courts should show to a school's "sacred" duties.  Opp'n at 8-10.

None of that is true.  All Mr. Doe asks is that this Court order the *temporary* conferral of a *revocable* degree in May of 2018—a degree that *GW itself* has admitted it will grant him "at the end of his suspension in January 2019," Opp'n at 9, if this Court does not order it to do so before then.  **In short, Mr. Doe isn't asking this Court to grant him something that GW isn't willing to give him; he is asking this Court to grant him something that GW isn't willing to give him *quite yet*.**  There is nothing radical about that.  Indeed, what Mr. Doe asks the Court to do here is less radical than what students *usually* request in these cases, which is to be returned to campus and allowed to continue their normal course of schooling—which can, of course, result in the (temporary) conferral of a (revocable) degree.  But Mr. Doe, who has already completed all of his graduation requirements, isn't even asking that.  He isn't asking to return to GW's campus, or to reenroll in classes that might lead him to cross paths with Ms. Roe—who, it bears repeating, waited *more than two years* to file her complaint against Mr. Doe.  Rather, he simply asks this Court to do one thing, should it find that he is likely to prevail on the merits of this case: to limit the harm that GW has done to him by ordering GW to *temporarily* grant him a *revocable* degree, which would in turn allow him to move on with his life as he would have been able to do absent GW's violation of his contractual rights and its own Title IX obligations.  It is not Mr.

Doe's request that is without precedent; rather, it is GW's suggestion that a student suspended (or even expelled) at the very end of his college career has only two choices: accept the punishment without complaint, or file a lawsuit and just… wait.  As courts across this country have shown time and again, and in this very context, while such a regime might be good for schools, it is not, in fact, the law.

Moreover, since Mr. Doe filed his Complaint, he has acquired new evidence, through a court-ordered phone-records subpoena, showing that **one of the most important pieces of testimony at his hearing—regarding a claimed phone call between Ms. Roe and E.E. allegedly proving that Ms. Roe was incapacitated—was fabricated**.  That evidence, which is discussed in footnote 2 at pages 13 and 14 below, casts even further doubt on the result in the flawed and biased process through which GW put Mr. Doe.

## ARGUMENT

### I.    JOHN DOE'S REQUESTED REMEDY IS AVAILABLE AS FINAL—AND PRELIMINARY—RELIEF.

GW asserts that giving Mr. Doe a diploma on his graduation date in May 2018 would be "extraordinary," "without precedent," and have "the strong potential to result in irreparable harm to the university."  Opp'n at 2.  GW's arguments on this score, when stripped of their hyperbole, appear to be twofold:  (1) that the Court may not issue an order as part of a *preliminary injunction*—even just to preserve the status quo—unless the plaintiff would be entitled to that same relief after a final decision on the merits; and (2) relatedly, that no court has ever issued a preliminary injunction permitting a plaintiff to obtain his or her diploma over a school's objection.  Opp'n at 8-10.  For at least the following four reasons, GW's arguments are incorrect.

First, GW is mistaken that the relief a court orders to effect a preliminary injunction must mirror the relief the plaintiff would obtain after prevailing at trial.  While the two kinds of relief

2

must indeed be of the same "character," Opp'n at 8, that does not mean "identical," as both common sense and the case law demonstrate.  Contrary to GW's argument, a court's power to issue a preliminary injunction includes the power to issue whatever ancillary relief is necessary to effect the injunction.  *See F.T.C. v. Elders Grain, Inc.*, 868 F.2d 901, 907 (7th Cir. 1989) (Posner, J.).  (recognizing that "the statutory grant of the power to issue a preliminary injunction carries with it the power to issue whatever ancillary relief is necessary to the effective exercise of the granted power"); *SEC v. American Institute Counselors, Inc.,* Fed. Sec. L. Rep. 95, 388 (D.D.C. 1975) ("It is a familiar tenet of equity that the remedy of a preliminary injunction, which has as its general purpose the preservation of the status quo, *pendente lite,* can be protective or restorative as well as preventive.  The maintenance of the status quo is intended to preserve a state of affairs such that final injunctive relief is both meaningful and effective.") (citing 7 Moore *Federal Practice*, at 1626 (2d ed. 1975)).  Here, GW's conferral of a diploma upon Mr. Doe pending a trial on the merits is necessary to prevent the lifelong harm of a substantial gap in Mr. Doe's scholastic or employment record.

Second, while GW apparently believes that requiring the *temporary* conferral of a *revocable* diploma is somehow different—and more intrusive—than the traditional remedy courts have ordered of temporarily enjoining a school's disciplinary action, in this case there is no practical difference.  The parties here agree that, but for the suspension, GW would be conferring a diploma upon Mr. Doe in May 2018, as Mr. Doe has satisfied all of the educational requirements to graduate.  Accordingly, the result of this Court's ordering GW to confer the diploma in May 2018 pending a final determination on the merits, on the one hand, or temporarily enjoining Mr. Doe's suspension, on the other, is precisely the same.  **Under either**

**scenario, Mr. Doe would receive a *revocable* diploma in May 2018, pending a final disposition of the case on the merits of this action.**

Ironically, GW's position appears to be that Mr. Doe *has not asked for enough*. Under GW's reasoning, Mr. Doe would be in far *less* controversial territory had he asked the Court to enjoin the school's disciplinary sanction in its entirety and return him to campus, instead of seeking the relatively modest relief that he is. Mr. Doe would then be requesting the same relief that the plaintiffs requested—*and that courts have ordered*—in the many cases granting preliminary injunctions in similar circumstances. *See, e.g., Doe v. Middlebury College*, No. 15-192, 2015 WL 5488109 (D. Vt. Sept. 16, 2015) (ordering that Middlebury "shall not expel Plaintiff and shall allow him to remain enrolled in his courses for the fall . . . semester"); *King v. DePauw Univ.*, No. 14-70, 2014 WL 4197507 (S.D. Ind. Aug. 22, 2014). Had Mr. Doe sought the kind of expansive relief that the plaintiffs successfully obtained in *Middlebury* and *King*, presumably GW would no longer be arguing—because it could not credibly do so—that the relief Mr. Doe seeks is "without precedent" and "would break new legal ground." Opp'n at 8-9.

Third, as the above discussion suggests, GW's argument that Mr. Doe has cited no case in which a school was required to confer a diploma pursuant to a preliminary injunction is misleading. Mr. Doe has, in fact, cited cases that required *much more* than that. The *Middlebury* court ordered the return of an *expelled* plaintiff to school—a much smaller school than GW—for his entire senior year, *expressly contemplating that it would include his graduation*. *See id.* at *4 (ordering the continued enrollment in the fall of 2015 of a plaintiff who "expected to graduate from Middlebury in 2016"). The school's remedy if it prevailed on the merits, the court held, was simply to withhold or revoke the diploma. *See id.* (noting that "if Middlebury prevails on the merits, it can refuse to award, or revoke, Plaintiff's diploma and maintain Plaintiff's

4

disciplinary record in its files"). The only reason the court did not directly order conferral of his degree was because the burden it imposed on the school was far greater and clearly encompassed the right to obtain his degree. The same is true in *King*. The court did not order the plaintiff re-admitted simply to complete his degree; he was ordered back to school for his senior year "without restriction." *King*, 2014 WL 4197507, at *15. Thus, because the school was barred from imposing discipline on the plaintiff during the lawsuit, it was required to give him his diploma as long as the litigation was continuing at the time of his graduation.

GW cites only one case in support of its argument that courts will not order relief implicating the conferral of a diploma at the preliminary injunction stage: *Doe v. Univ. of Notre Dame*, No. 17-298, 2017 WL1836939, at *14 (N.D. Ind. May 8, 2017). That is a surprising case for GW to cite, however, as the *Notre Dame* plaintiff *was expressly not seeking such relief*. As the court noted in the very first paragraph of its opinion, Mr. Doe was "not seeking the conferral of his degree at this time." *Id.* at *1. Given that the plaintiff was not asking the court to order the conferral of his diploma, GW's citation of *Notre Dame* as a case where a court "*refus[ed]* to award degree," Opp'n at 10 (emphasis added), or as one where the court held that an order requiring conferral of a degree was "wholly inappropriate," *id.*, is grossly misleading. **The reality is that GW cannot cite a single case holding that a court should *not* order the temporary conferral of a revocable diploma in order to prevent irreparable harm.**

Fourth, GW attaches significance to the fact that the Court here would "affirmatively" order the conferral of a revocable diploma, instead of returning a student to school so he could obtain the diploma in due course. *See* Opp'n at 10. But as GW well knows, there are numerous cases where courts have ordered the reinstatement of plaintiffs to the schools such that the plaintiffs would receive their diplomas in due course. Thus, it is only by injecting the word

"affirmatively" into its argument that GW's characterization of the relevant precedent is even *technically* accurate.  It is, in substance, simply a dodge.

Furthermore, insofar as GW is suggesting that by "affirmatively" ordering GW to confer a diploma upon Mr. Doe, the Court is improperly altering the status quo—as opposed to preserving it—that is also misleading.  The status quo in this case before the hearing board issued its decision was that GW intended to confer a diploma upon Mr. Doe in May 2018.  In ordering that GW continue to do what it would have done absent the hearing board's actions, the Court would be doing precisely what the law requires at this stage:  preserving the status quo pending a full determination the merits.

The relief that Mr. Doe requests—*temporary* conferral of a *revocable* diploma—is in fact *far less* burdensome for GW than the relief that numerous courts have ordered under nearly identical circumstances, *i.e.*, returning a student to campus to continue his or her education. Mr. Doe's request is neither dramatic nor groundbreaking; rather, it is required to prevent irreparable harm to Mr. Doe.  Mr. Doe therefore respectfully requests that the Court include this relief in its order entering a preliminary injunction.

## II.    JOHN DOE IS LIKELY TO SUCCEED ON THE MERITS OF HIS CLAIMS.

### A.    Breach of Contract.

Regarding Mr. Doe's likelihood of success on the merits of his breach of contract claim, GW offers three responses, each of which leaves apparent that Mr. Doe will prevail on his claim: (i) that GW is free to ignore its promised procedural protections in withholding a diploma, (ii) that, on this record, GW actually provided those protections, and (iii) that it continues to object to Doe's requested relief.  We address those contentions in turn.

1.  Contractual Obligation.  GW begins by suggesting that it was not bound to follow its published procedures (and particularly its Sexual Harassment and Sexual Violence Policy ("Policy") and Code of Student Conduct ("Code")) in withholding Mr. Doe's degree.  *See* Opp'n at 11-13.  The case law, Policy, and Code establish otherwise.

In *Basch v. George Washington Univ.*, 370 A.2d 1364 (D.C. 1977), the D.C. Court of Appeals considered a student challenge to GW conduct that was allegedly in violation of its published materials.  The Court had no trouble stating the "accepted" and "general rule": "that the relationship between a university and its students is contractual in nature" and "the terms set down in a university's bulletin become a part of that contract."  370 A.2d at 1366.  The Court later sided with the university, but only because the particular language at issue (regarding future tuition increases) had not guaranteed the students certain limits on those increases, as the students insisted.  *See id.* at 1365, 1367-68 (noting that the bulletin had referred only to "estimated" future tuition increases and had included this disclaimer noting that "it is not possible to project future economic data with certainty, and circumstances may require an adjustment in this estimate").

In *Pride v. Howard Univ.*, 384 A.2d 31, 34 (D.C. 1978), the D.C. Court of Appeals began with "the proposition established by *Basch* . . . that a contractual relationship exists between a university and its students."  The Court further observed that, "in *Basch*, provisions of the university's bulletin were deemed part of its contract with the students," and thus "accepted" that "the Code, which was contained in the manual given to each student, constituted a part of the contract between appellant and appellee."  384 A.2d at 34.  Indeed: "It has been established that the usual practices surrounding a contractual relationship [in the student-university context] can themselves be raised to the level of a contractual obligation."  *Id.* at 35 (citing *Greene v. Howard*

*Univ.*, 412 F.2d 1128, 1133 (D.C. Cir. 1969)).  With these points established as a matter of law, the *Pride* Court proceeded to do just what the *Basch* Court had done:  Consider whether the university met its contractual obligation by appropriately following the promises made in its published material.  *See id.* at 34-36 (considering whether the university abided by a statement that the disciplinary hearing panel would be constituted in particular manner); *see also, e.g.*, *Alden v. Georgetown Univ.*, 734 A.2d 1103, 1110, 1011 n.11 (D.C. 1999) (noting *Pride*'s holding that "provisions of the university's code of conduct, contained in a manual given to each student, constituted a part of the contract between [the] university and its students," and thus contractual "entitle[ment] to receive a degree" where the relevant requirements were met).

In the face of these decisions, GW relies primarily on *Mosby-Nickens v. Howard Univ.*, 864 F. Supp. 2d 93 (D.D.C. 2012).  In that case, the Court granted summary judgment in favor of a university where a student failed to "ple[a]d any facts describing and/or identifying either the terms of, or even the existence of, the contract" allegedly breached by a university.  854 F. Supp. 2d at 98.  That decision, in short, turned on a pleading failure.  Only in her summary judgment opposition did the student begin to respond, providing only limited parts of the handbook.  *See id.* at 99 nn.3 & 4.  The *Mosby-Nickens* Court considered whether "any language in the [provided parts of the handbook]" demonstrated the university's "intent to be bound."  *Id.* at 99.

Here, the Policy and the Code clearly state GW's intent to be bound.  On its first page, the Policy asks, "Who is Governed by This Policy?," and immediately answers:  "Faculty, staff, students, visitors to GW campuses, and participants in university programs and activities, both on campus and in other locations."  ECF No. 3-1 at 1.  The Policy uses mandatory language throughout.  *See, e.g.*, *id.* at 11 (GW "will further provide"); *id.* at Ex. C ("Formal Hearing Procedures") (particular GW office "will make," "will also provide," etc.).  The Code likewise

makes clear GW's intent to be bound: "The following procedural guidelines shall be applicable in all hearings . . . ."  ECF No. 3-2 at 6; *see also id.* at 9 (appeal procedures likewise expressed in mandatory language).[1]  In other words, GW's reliance on the *Mosby-Nickens* "intent to be bound" language serves only to highlight GW's unambiguous contractual commitment to its Policy and Code, and thus Doe's likelihood of success in his claim.

        2.  Breach.  GW next attempts the impossible:  Insisting that it complied with the procedural safeguards promised to Mr. Doe.  *See* Opp'n at 13-21.  Those safeguards included a right to a hearing, a right to present evidence at that hearing, and thus a right to a decision based on the credible evidence adduced at that hearing; they also included a right to appeal any adverse hearing determination.  *See* ECF 3-2 at 6-8; ECF 3-1 at App. C.  Yet GW did not provide those protections here:  There was a hearing, but it produced no result based on the credible evidence.  And GW refused to even consider Mr. Doe's timely appeal.

        Because GW cannot establish that it actually provided its promised procedural protections, it resorts to strawman mischaracterizations of Mr. Doe's argument, *e.g.*: "which he argues guarantee him a particular result from a disciplinary investigation and subsequent proceedings."  Opp'n at 23.  Mr. Doe argues no such thing; his likely-to-be-successful contract claim is based entirely on GW's own failure to provide its promised procedural protections.

        a.  Appeal.  Perhaps nowhere was GW's cynicism in disregarding its own policies more evident than in its treatment of Mr. Doe's appeal.  GW's Code provides:

> Parties have a right to appeal the outcome of a disciplinary hearing
> or conference but not the sanction.  Appeals must be based on new

---

[1]  That GW purported to reserve for itself the ability subsequently to modify its Code, *see* Opp'n at 13, does nothing to save GW from its contractual commitment.  The noted reservation does no more than allow the university to update its policies, with prospective application, from time to time.  Its contractual obligation is to adhere to those policies.  *See, e.g.*, *Alden*, 734 A.2d at 1110 (applying policies in place at relevant time).

information that is relevant to the case, that was not previously
presented at the hearing or conference, and that significantly alters
the finding of fact.

ECF 3-2 at 8.  Mr. Doe timely lodged an appeal; it contained "new" and "relevant" information

that was "not previously presented": (i) expert analysis of Ms. Roe's claimed alcohol

consumption (based on the brand-new, inflated claims of alcohol consumption she made at the

hearing), which analysis revealed that Ms. Roe's claims in that regard were necessarily fanciful

in light of the testimony of every other witness (and, indeed, her own testimony) regarding her

comportment on the relevant evening; and (ii) an eyewitness to Ms. Roe's behavior at the

relevant party (*i.e.*, when Mr. Doe would have also seen her and had an opportunity to evaluate

whether she was incapacitated).  *See* Mem. at 14-17.  This information, considered separately

and certainly collectively, could only "significantly alter[] the finding of fact."  ECF 3-2 at 8.

Yet GW—notwithstanding its contractual promise to do so—refused even to consider it; its

Executive Director of Planning & Outreach (Robert Snyder), authorized under the Code only

with performing a gatekeeping "viability" analysis, dismissed the appeal without forwarding it,

as required by the Code, to "the Chair of the Committee on the Judicial System, who shall select

a Panel of three persons from the Committee to review and decide the appeal."  *Id.*; *see also*

Mem. at 14-17.

     In defending its refusal to consider Mr. Doe's appeal, GW makes like an ostrich.

     First, GW labels the expert report "late," when it indisputably was not.  *Compare* Opp'n

at 20 ("late"), *with* ECF 3-2 at 8 ("Appeals must be submitted . . . within five business days

. . . ."), *and* ECF 6-16 (appeal filed January 30, 2018, five business days after decision).  And if

GW means that the report should have been submitted at the hearing itself, that is equally silly:

It was only at the hearing that Ms. Roe, or anyone else, quantified for the first time (and

implausibly, as the expert report revealed) the alcohol she allegedly had consumed; it was that, and only that, information that allowed preparation of the report. *See* Mem. at 11.

Second, GW makes the remarkable assertion that the expert report provides no new information because Ms. Roe, at the hearing, had already revealed her claimed amount of alcohol consumption. *See* Opp'n at 20. What is new about the report, however, is not the number of claimed drinks *but the expert analysis of that quantification*—and the consequent exposing of that testimony as fanciful. Ms. Roe provided false information about a material fact: She grossly exaggerated her alcohol consumption, presumably to increase the likelihood that the panel would determine her not just to have been drinking or intoxicated but to have been *incapacitated*, a prerequisite for a finding that Mr. Doe should have known of that incapacitation. While the panel members may have appreciated that Ms. Roe's claimed alcohol consumption would have impaired her (*i.e.*, an inference beneficial to Ms. Roe), *see* Opp'n at 21 n.10, they could not have calculated—because they did not have the benefit of expert analysis—the blood alcohol content ("BAC") that those claimed drinks would have produced, nor could they have appreciated that those claims were flatly incredible in light of the balance of the testimony.

And third, as to the new eyewitness testimony regarding Ms. Roe's conduct *at the critical time that Mr. Doe would have had an opportunity to evaluate her capacity*, GW argues that it could have been proffered earlier. *See* Opp'n at 21. But GW's appeal standard does not require that evidence not have been available earlier; in fact, it expressly requires only that the evidence be "new"—not "newly discovered." ECF 3-2 at 8. Further, Mr. Doe established good cause for not providing the evidence earlier: the given witness was studying outside the country, making it much harder to obtain his evidence.

11

b.  Underlying Hearing.  GW's refusal to provide its promised procedures is also plain as to the underlying hearing itself.  Yes, GW held a hearing.  But it then issued a decision entirely divorced from the credible evidence adduced at that hearing, thereby leaving compliance with the promised hearing procedures entirely illusory.  In its Opposition, GW strives to muddy those waters by pointing to the fact that hearing testimony revealed that Ms. Roe had been drinking that night.  *See* Opp'n at 16, 26.  But Mr. Doe never contested that fact. They met at a college party; of course he would assume she had been drinking.  **What matters is not whether Ms. Roe was *drinking* or *intoxicated*.  What matters is whether she was *incapacitated* (*i.e.*, too impaired to give consent), and whether Mr. Doe knew or had reason to know that.**  Only then could his having sex with her have constituted sexual assault.  *See* ECF 3-1 at 3; ECF 6-3; *see also* Mem. at 2-3.

In *DePauw*, the Court considered—just as this Court is now considering—a motion for preliminary injunction in which a student sought an order requiring reinstatement by his university after a suspension for alleged sexual misconduct.  In that case, there was substantial evidence that the complainant had been drinking heavily on the relevant evening and that she was acting unusually as a result, including by "dancing all over the place as if she did not have complete control over her limbs," falling, "screaming," "jumping up and down," rolling around in the snow, "standing on couches," and "pass[ing] out at some point."  2014 WL 4197507 at *3-6.  The Court acknowledged that this evidence would have provided the DePauw's disciplinary panel with credible evidence of incapacitation.  *See id.* at *12 ("It is clear that [the complainant] was intoxicated on the night in question.  Indeed, given all of the information the Board had before it, it was not unreasonable for it to conclude that [she] was intoxicated to the point of incapacitation.").  Nonetheless, the Court still granted the student's preliminary injunction.  *See*

*id.* at \*12-13, 15.  It did so because, as here, the record was devoid of evidence that the accused student knew or should have known that the complainant may have been incapacitated: He had not witnessed the complainant's consumption of significant alcohol, nor was there evidence that he had observed the above-described conduct that might have put him on notice of her alleged incapacitation.  *See id.* at \*12 ("But the evidence is essentially uncontroverted that [the accused] did not know *any* of these facts when he engaged in sexual activity with [the complainant].").

**So too here.  The record in this case contains not a single piece of credible evidence that Mr. Doe knew or should have known of Ms. Roe's alleged inability to consent. Nothing.**  *See, e.g.*, Mem. at 21-27 (three of Ms. Roe's four witnesses were unable to testify that she was at all intoxicated at the party where she met and propositioned Mr. Doe; the fourth indicated that Ms. Roe appeared intoxicated but was unable to say more; there was no evidence of Ms. Roe stumbling in Mr. Doe's presence; and indeed, Ms. Roe was observed crossing the street without difficulty).  GW returns repeatedly to Doe's statement at the hearing that "I mean, based on what I observed from her state of mind, there was not enough intoxication that I witnessed that would constitute a large enough disparity for it to be unconsensual."  *See* Opp'n at 2-3, 18 (adding a "[sic]" to end of quotation and emphasizing various words).  GW's effort to mock Doe's articulation is confounding; his statement, while perhaps uttered more like a college student than GW would have preferred, is both perfectly clear: Mr. Doe had no reason to think that Ms. Roe was too drunk to consent to sex.  GW's conclusion to the contrary, notwithstanding all the evidence from the hearing, deprived Mr. Doe of his contractual right to that hearing.[2]

---

[2]  What, though, of witness E.E.'s statement that she spoke by telephone with Ms. Roe while Ms. Roe travelled in an Uber with Mr. Doe (from the party to Mr. Doe's apartment), and that Ms. Roe, in that conversation, slurred her speech?  Could that be the thin reed that might have supported the idea that Mr. Doe could have been on notice of Ms. Roe's alleged incapacitation?

To all this, GW has little further response.  It argues that a deferential "arbitrary and capricious" standard should apply, even though this is not a case involving allegedly defective academic performance.  Opp'n at 15.  But the only authority GW cites for that assertion, *Hajjar-Nejad v. George Washington Univ.*, 37 F. Supp. 3d 90, 117 (D.D.C. 2014), *was* a case of allegedly defective academic performance, as the relevant court noted on the same page cited by GW, *see id.* at 117 (considering discipline imposed on medical student for "lack of professional comportment," and concluding "professional comportment issues fall under the umbrella of deference to academic decisions").  And, more fundamentally, for all the reasons noted above, GW failed to provide its promised procedural protections, even under GW's preferred, more deferential standard.

---

No—and there is quite a story there.  *First*, Ms. Roe and E.E.'s testimony on these points already was not credible, in that E.E. made the claim late (after it was clear that the record contained no evidence that Mr. Doe was on notice of any incapacitation—because he wasn't), and then contradicted herself regarding that call, first saying that she had telephoned Ms. Roe, and then claiming that Ms. Roe had called her.  *See* Mem. at 6-14.  Ms. Roe, for her part, never mentioned any such call in her first, second, or third statements to GW investigators—only claiming that it happened after realizing that E.E. belatedly had come forward with the story.  *See id.*

**More dramatically, it now appears that the call never happened: E.E. and Ms. Roe simply made it up, apparently in a desperate effort to manufacture some piece of evidence that might have put Mr. Doe on notice of Ms. Roe's claimed incapacitation.**

How do we know?  On March 16, 2018, this Court approved Mr. Doe's request for a subpoena for E.E.'s phone records.  *See* Minute Order (Mar. 16, 2018).  On March 26, 2018, the results arrived, and Mr. Doe will submit them as evidence at the hearing.  Those results reveal that, between 11:26 p.m. and 12:21 a.m. (the time during which Ms. Roe and Mr. Doe travelled in an Uber from the party to Mr. Doe's apartment), ***E.E. in fact neither made nor received a single telephone call***.

Two days later, on March 28, 2018, Mr. Doe made GW aware of these records and their import.  Still, on March 30, 2018, GW filed its Opposition, continuing to insist that Mr. Doe's suspension should stand—and remarkably, even *highlighting* Ms. Roe and E.E.'s fabricated testimony regarding the phone call and supposed slurred speech.  *See* Opp'n at 18.

3.  Appropriate Remedy.  GW's last response to Mr. Doe's likelihood of success

on his contract claim is simply a rehashing of its objections to his requested remedy.  *See* Opp'n

at 22.  We refuted those objections above.

**B.      Breach of the Implied Covenant of Good Faith and Fair Dealing.**

GW also offers three responses regarding Mr. Doe's likelihood of success on his claim

for breach of the implied covenant of good faith and fair dealing.  *See* Opp'n at 22-25.  These

responses, however, largely mirror its defective objections regarding Mr. Doe's breach of

contract claim and so fail for the same reasons.

GW first argues that, if Mr. Doe's implied covenant claim entirely duplicates his breach

of contract claim, then it is improper (or at least unnecessary).  *See* Opp'n at 23.  But the implied

covenant claim does not do that. Its premise is simple: Even if the Court were to agree (as it

should not) with GW's argument that the university-student contractual relationship does not

include the Policy and Code, GW nonetheless would be contractually obligated, via the implied

covenant, to provide the basic procedural protections promised therein.  *See* Compl. ¶¶ 196-201.

In other words, the claims arise from different premises; they are alternative, not duplicative.

GW next argues that Mr. Doe's implied covenant claim cannot provide contractual rights

greater than the express terms of the parties' contract (*i.e.*, greater than the terms of the Policy

and Code).  *See* Opp'n at 23-24.  But that argument is premised on the Policy's and the Code's

constituting express contractual terms, contrary to GW's insistence elsewhere—and, of course,

under that scenario, Mr. Doe simply succeeds under his breach of contract claim.

Finally, GW repeats its argument that this Court should apply only a deferential arbitrary-

and-capricious standard, notwithstanding that this matter does not deal with academic

misconduct.  *See* Opp'n at 24-25.  That argument remains defective, and irrelevant, for the

reasons stated above.  To the extent that GW argues that an implied covenant claim requires a special showing of ill will, Mr. Doe has established just that, including via the hearing panel chair's opining, immediately after Ms. Roe's opening statement, that Ms. Roe in fact had been mistreated—*which is what they were having a hearing to decide. See* ECF 6-14 at 11 (referencing "extremely traumatic experience reliving things"); *see also* Mem. at 21-30, 30-34.

### C.     Title IX.

Regarding Mr. Doe's likelihood of success on his Title IX claim, GW concedes that to prevail, Mr. Doe need only show (i) doubt about the accuracy of the result in the disciplinary proceeding against him, and (ii) that gender bias motivated that doubtful result.  *See* Opp'n at 26. On the first prong, Mr. Doe easily succeeds, for all the reasons discussed in his opening brief and above: He has established not only doubt about the result of that proceeding, but that it was rendered in absolute contempt of the evidence and the truth.  *See* Mem. at 21-30; *cf.* Opp'n at 25 (defending the proceeding only by noting that it included evidence of Ms. Roe's intoxication— an entirely uncontested issue in a case that was about *incapacitation*).

GW's defense of the Title IX claim, then, turns on the degree to which gender bias affected the adjudication in Mr. Doe's case.  There, GW insists that none of Mr. Doe's indicia of bias "are sufficient," standing alone, to establish that gender bias motivated the determination. Opp'n at 25.  But Mr. Doe is likely to succeed on this claim precisely because those indicia, *in context and in combination*, offer overwhelming evidence that GW's gender-biased approach to allegations of sexual assault motivated the outcome of Doe's proceeding.

GW's gendered approach to Mr. Doe's disciplinary proceeding is plain:

First, GW was under intense pressure to protect female sexual assault accusers, including in the context of both (i) a highly public, and oddly similar case involving a female student

16

accusing a male rugby player, who was about to graduate, of a sexual assault that allegedly occurred more than two years earlier and during the accuser's freshman year, and (ii) an ongoing, active investigation by the U.S. Department of Education's Office for Civil Rights.  *See* ECF 6-6; ECF 6-7; ECF 6-8; ECF 6-9; ECF 6-10; ECF 6-13; *see also* Mem. at 4-5.

Second, in response to that pressure, GW already publicly staked its defense to its ability to obtain disciplinary findings against respondents in sexual assault adjudications.  *See* ECF 6-8 (reassuring the campus community that 100% of the students put through its formal sexual misconduct hearing process over the past two academic years— all of whom were male, on information and belief (and not denied by GW in its Opposition)—had been found responsible).

Third, and also in response to that pressure, GW—rather than hire someone unbiased for the critical job of conducting sexual assault investigations—hired Kiera Bloore, whose previous experience was in aid of "student-survivors"; indeed, while serving as GW's Title IX Investigator, she has continued her work on behalf of accusers.  *See* ECF 6-11; Compl. ¶ 48.

Fourth, GW structured its trainings regarding sexual assault claims in a manner notably different than its trainings about any other type of alleged wrongdoing:  For alleged *non-sexual* misconduct, GW "address[ed] [the] roles and responsibilities of panel members, hearing procedures, applicable policies, and other techniques and standards pertinent to the formal complaint and hearing process," ECF 3-1 at 22, while, for alleged *sexual* misconduct, GW assumed complainants to be "victims" and instructed its staff "to conduct investigations and hearings in a  manner that protects the safety of victims and promotes accountability," *id.* at 11.

Fifth, GW further infused its relevant campus trainings with gender bias, including by entitling one course "[H]ow male students can prevent sexual assault," ECF 6-4, and even endorsing the teachings of "internet personality" Laci Green, who instructs that sexual assault

claimants should be believed because "distrust of rape survivors" is fueled by "distrust of women" and that "one of the sneakiest and . . . most pervasive reasons why people don't believe survivors is that most survivors are women," ECF 6-3; Mem. at 4.

And sixth, the chair of the disciplinary hearing panel in Mr. Doe's case, having apparently internalized these gendered biases, reflected them from the beginning of Mr. Doe's hearing; he announced, immediately following Ms. Roe's opening statement, his view that she had experienced something "extremely traumatic." ECF 6-14 at 11. Imagine if he had said, at the end of *Mr. Doe's* opening, that "Mr. Doe appears to have been falsely accused." Would GW would have tolerated that?

While GW can point to isolated cases finding that individual factors (*e.g.*, public pressure) may be insufficient to establish gender bias, Opp'n at 29-31, none of those cases involved the extraordinary number of factors present here. In other words, GW wants this Court to look at the evidence of gender bias stick-by-stick; what courts do in discrimination cases, however, is look at the bundle—and the bundle here shows overwhelming evidence of gender bias. *See, e.g.*, Mem. at 31-34 & nn.14-18 (citing a host of cases considering factors like those above to support gender bias).

**D.      D.C. Human Rights Act.**

Doe's D.C. Human Rights Act claim is likely to succeed under either of two theories: disparate treatment or disparate impact. *See* Mem. at 34-37; Compl. ¶¶ 150-166.

Regarding the first of those theories (disparate treatment), GW merely incorporates the arguments it made regarding Doe's likelihood of success on his Title IX claim, which responses are defective for all of the reasons stated above. *See* Opp'n at 31.

Regarding the second of those theories (disparate impact), GW argues that (1) the Court, contrary to the plain language of the D.C. Human Rights Act (and the case law), should construe it not to permit such a claim, and (2)(i) Doe's ability to demonstrate disparate impact somehow is hampered by GW's overt gender biases, (ii) GW has a business necessity to impose anti-respondent policies in the single area where respondents are overwhelmingly likely to be male, and (iii) GW's touted 100% rate of finding against respondents, in its formal sexual misconduct hearing process over the past two academic years, does not in fact suggest a disparate impact. *See* Opp'n at 31-38.  Each of these arguments is notably weak.

First, basic principles of statutory interpretation bar GW's "construction" of the D.C. Human Rights Act to bar disparate impact claims.  By its plain language, the Act bars "[a]ny practice which has *the effect or consequence* of violating any of the provisions of this chapter," D.C. Code § 2-1402.68 (emphasis added).  In other words, the Act bars any practice that has the effect or consequence of an educational institution's "deny[ing], restrict[ing], or . . . abridg[ing] or condition[ing] the use of, or access to, any of its facilities, services, programs, or benefits . . . for a discriminatory reason," including "based upon the actual or perceived . . . sex . . . of any individual."  D.C. Code § 2-1402.41.  Given this plain language, it is no surprise that this Court, in at least one case, already has held the D.C Human Rights Act to permit disparate impact claims.  *See Smith v. Henderson*, 982 F. Supp. 2d 32, 52 (D.D.C. 2013) (Boasberg, J.) (holding a disparate impact claim under D.C. Human Rights Act actionable where school closing procedures disproportionately affected a particular racial group).

Yet GW would have this Court read the disparate impact language out of the statute.  *See* Opp'n at 32-35.  GW so argues by insisting that because *Title IX* does not permit disparate impact claims, that somehow means that the D.C Human Rights Act shouldn't either.  *See id.*

GW never bridges that *non sequitur*, nor could it:  These are two entirely separate statutes; indeed, if they were identical, one of them would not need to exist.[3]

Nor, as GW curiously suggests, does the D.C. Human Rights Act's disparate impact language conflict with Title IX, thereby implicating the Supremacy Clause.  The language of Title IX says nothing on the question; it has just been construed by some courts to bar disparate impact claims only because its language resembles that of Title VI, which has similarly been construed by courts to bar disparate impact claims.  Disparate impact claims do nothing to frustrate Title IX's purpose of eradicating discrimination in the educational context, and nothing in Title IX requires, whether expressly or by implication, that such claims be barred.  And certainly, nothing in Title IX requires, or even authorizes, practices that impose a disparate impact on the basis of gender; certainly, Title IX does not require, or authorize, the use of a separate (and anti-respondent) adjudicatory process only for a class of cases (sexual assault claims) for which males are particularly likely to be named as respondents.  Indeed, GW's suggestion to the contrary reveals its own recognition that, in its perhaps well-intentioned zeal to appease the U.S. Department of Education, activists, and the public generally, it in fact has instituted policies that are not gender-neutral but, instead, disproportionately impact males.

Second, GW's arguments that Mr. Doe is unlikely to establish an actual disparate impact, *see* Opp'n at 35-38, are equally unavailing.  That GW has exhibited overt gender bias does nothing to undermine Doe's separate claim of disparate impact.  And that disparate impact claim is all but certain to prevail given GW's admission—indeed, *touting*—of its success in obtaining a

---

[3] GW's citation, *see* Opp'n at 33, to *Zuccaro v. Martinez Unified School District*, 2016 WL 10807692 (N.D. Cal. 2016), in which that court construed an entirely separate California statute in conformance with Title IX, is even further afield.  The relevant California statute, unlike the D.C. Human Rights Act, expressly included the following:  "It is the intent of the Legislature that this chapter shall be interpreted as consistent with . . . Title IX."  Cal. Educ. Code § 201(g)).

finding of responsibility as to every respondent put through its formal sexual misconduct hearing process over the past two academic years—all ten of whom, on information and belief (and not denied by GW), were males.  *See* ECF 6-7.[4]  Nor may GW escape Doe's likelihood of success by claiming a "business necessity" to impose such a gender-based disparate impact.  It is farcical, and deeply cynical, for GW to contend, as it does, that its "'business cannot be conducted,'" Opp'n at 36 (quoting D.C. Code § 2-1401.03), without employing a rigged discipline process in the context of sexual misconduct allegations.  *See, e.g.*, *Doe v. Brandeis*, 177 F. Supp. 3d 561, 573 (D. Mass. 2016) ("Whether someone is a 'victim' is a conclusion to be reached at the end of a fair process, not an assumption to be made at the beginning.").

Mr. Doe does not deny that GW must adjudicate claims of sexual misconduct.  Nor does he deny that most of the respondents in those proceedings are likely to be male.  What is not permissible under the D.C. Human Rights Act is to resolve those claims through a unique system where complainants are viewed as more likely to be victims.  If that were done in a category of claims with predominantly African-American respondents, for example, the process would rightly be characterized as having an impermissible disparate impact based on race.  GW's system just as clearly has an impermissible disparate impact based on sex.

---

[4] Here, GW also notes that not all claims make it to the formal hearing process—but it is that process that GW improperly wielded against Mr. Doe (and a host of other male students), and about which Mr. Doe complains.  It is that process—the formal sexual misconduct hearing process—that GW intentionally set up, in contrast to its system of adjudicating all other alleged violations, to target respondents, who are uniquely likely to be male.  **Most critically, GW ignores the fact that *it decides* which cases to send through its formal process.**  ECF No. 3-1 at 16-17.

**III.    JOHN DOE WILL SUFFER IRREPARABLE HARM WITHOUT PRELIMINARY RELIEF.**

GW makes two main arguments for why Mr. Doe will not suffer irreparable harm in the absence of a preliminary injunction: (1) that Mr. Doe's injury is economic in nature;  (2) that if Mr. Doe prevails in this action and on remand, the degree conferred on him will reflect no gap pursuant to GW's practice related to administrative holds on graduation, and Mr. Doe will therefore have suffered no harm.  *See* Opp'n at 38-42.

On the first point, and as Mr. Doe set forth in his initial motion, courts have repeatedly held that an erroneous finding of sexual misconduct is not remediable through money damages, due primarily to the creation of educational and/or vocational gaps in the student's record.  *See, e.g., Notre Dame*, 2017 WL 1836939, at *12 ("I am persuaded that this [10-month] gap constitutes irreparable harm to [the plaintiff's] reputation and possible further academic advancement.  The questions the gap raises, and the explanation it requires, are potentially damaging to [the plaintiff] in a manner not compensable by money damages and not repaired by permanent injunctive relief that might be granted after a decision on the merits in [plaintiff's] favor."); *Middlebury*, 2015 WL 5488109, at *3 ("While Plaintiff may recover money damages to compensate for lost wages, money damages cannot compensate for the . . . delay in completion of his degree, or the opportunity to begin his career . . . . Money damages cannot provide an adequate remedy for such imminent and non-speculative harm.").  GW provides no reason for this Court to reach a different conclusion.

On the second point, the irreparable harm to Mr. Doe that would result from the withholding of his degree is already apparent.  While GW has now stated its willingness to date Mr. Doe's diploma "May 2018" should Mr. Doe prevail at trial and on remand, a "May 2018" diploma conferred in the fall of 2018 or in 2019 cannot undo the irreparable harm that Mr. Doe

will suffer in the interim absent a preliminary injunction.  For example, Mr. Doe has now been

accepted into a graduate program that begins on September 24, 2018.  *See* ECF No. 19,

Attachment to Ex. A (acceptance letter, filed under seal).  A condition of his admission,

however, is that four weeks before the program starts, Mr. Doe must provide "formal notification

of the award of [Mr. Doe's] current degree with a cumulative GPA of 3.5 or higher."  *Id.*

(emphasis in original).[5]  The failure to issue the injunction will cause the immediate and

irreparable harm of forcing Mr. Doe to refuse his offer of acceptance to the graduate program.

　　　Beyond Mr. Doe's inability to accept the graduate-school offer absent a preliminary

injunction, failing to award Mr. Doe his diploma in a timely manner will have the debilitating

and permanent effect—regardless of which party ultimately prevails—of a gap in his

employment record.  Absent injunctive relief, Mr. Doe will be unable to take any job that

requires a college degree until he prevails on the merits or January 2019, whichever comes first,

and will be forced to explain that gap to educational institutions and potential employers for the

remainder of his life.  Just as in *Notre Dame*, Mr. Doe "will be putting his life on hold and will

have a lot of explaining to do to future employers and potential graduate schools."  *Id.* at * 13.

　　　GW's proposed remedy of a diploma dated May 2018, but conferred much later, does

nothing to erase that gap; it simply changes its nature.  Rather than having to explain a gap in his

undergraduate education, Mr. Doe will have to explain a gap between his current internship and

the next step in his career, whether that is graduate school or other appropriate employment.  As

numerous courts have recognized, the foregoing constitutes irreparable harm, such that a

preliminary injunction should issue.  *See Middlebury*, 2015 WL 5488109 at *3 ("While plaintiff

---

[5] The one-year deferral discussed on page 2 of the letter is not available unless Mr. Doe has received his diploma prior to requesting the deferral.  *See id.* at __ ("deferrals will not be accepted where academic conditions have not been met").

may recover money damages to compensate for lost wages, money damages cannot compensate

for . . . the delay in the completion of his degree or the opportunity to being his career. . . Further,

Plaintiff would have to explain, for the remainder of his professional life, why his education . . .

contains a gap."); *Notre Dame*, 2017 WL 1836939, at *12 ("I am persuaded that this gap

constitutes irreparable harm to [the plaintiff's] reputation and resume for purposes of career

prospects and possible further academic advancement.").

## IV.   THE BALANCE OF EQUITIES OVERWHELMINGLY FAVORS PRELIMINARY RELIEF.

GW does not dispute that, absent the hearing board's finding and its imposition of a one-

year suspension, it would be conferring a diploma upon Mr. Doe in May 2018.  GW also does

not dispute that it is going to give Mr. Doe his diploma in January of 2019.  What GW argues

instead is that, by conferring a *revocable* diploma on Mr. Doe *even temporarily*, the university

would be "misrepresent[ing] to the world that plaintiff has satisfied all of the university's

requirements to graduate."   Opp'n at 43.  GW then proceeds to trot out a parade of horribles

about how granting a potentially temporary diploma to this one student would undermine its

reputation for excellence and turn the federal courts into "super-administrators."  *Id.*

GW's concerns are vastly overblown.  As discussed above, a preliminary court order

*temporarily* conferring a *revocable* degree upon Mr. Doe is far less intrusive than Mr. Doe's

compelled return to campus to continue his education, which is what other courts have ordered

under similar circumstances.  *See*, e.g., *Middlebury,* 2015 WL 5488109, at *4; *King*, 2014 WL

4197507, at *15 ; *see also Notre Dame*, 2017 WL 1836939, at *12 ("An injunction requiring a

university to allow a student to return for an entire school year strikes me as a much greater

burden than what is being requested here---the taking of two final examinations.").  In those

cases, not only was the student obtaining a diploma in due course, but other students presumably

saw him on campus, thereby affecting in far more substantial ways the image concerns that GW proffers here.  In sum, given the minimally intrusive nature of the relief Mr. Doe requests, the balance of the equities overwhelmingly favors granting the preliminary injunction.

## V.     THE PUBLIC INTEREST FAVORS PRELIMINARY RELIEF.

GW suggests that an injunction would be against the public interest because it would detract from a university's ability to "independently investigate and, when appropriate, discipline its students for misconduct."  Opp'n at 44.  An injunction would do no such thing; to contrary, it would remind universities that when they make promises to students, they have to keep them, and that—no matter what kind of pressure they're under—gender bias in the disciplinary process is never excusable.  GW also suggests that issuing an injunction forcing it to *temporarily* confer a *revocable* degree would "destroy th[e] public trust" people have in what it takes to get a college degree.  It would do no such thing.  Indeed, "[l]eaving in place a wrongfully imposed sanction and the record of such is plainly contrary to the public interest."  *Doe v. George Mason Univ.*, 179 F. Supp. 3d at 588.  **Moreover, in light of the evidence showing that *the single most critical piece of evidence* against Mr. Doe was fabricated, preliminary relief is warranted now more than ever.**  Finally, GW's argument again proves too much: under its logic, no court should *ever* grant a student injunctive relief that would allow him to return to school and, in the normal course of things, earn his (revocable) degree while the lawsuit marches on. Yet, as we have detailed in our papers, that is something judges have done time and again in campus disciplinary cases when faced with abuses like the ones wrought by GW here.

## CONCLUSION

For the foregoing reasons, Mr. Doe respectfully requests that this Court grant his motion for a preliminary injunction.

Respectfully submitted,

DATED:  April 9, 2018

/s/ Justin Dillon
Justin Dillon (D.C. Bar No. 502322)
Christopher C. Muha (D.C. Bar No. 987116)
KAISERDILLON PLLC
1401 K Street NW, Suite 600
Washington, DC 20005
T: (202) 640-2850
F: (202) 280-1034
jdillon@kaiserdillon.com
cmuha@kaiserdillon.com

*Attorneys for Plaintiff John Doe*

**CERTIFICATE OF SERVICE**

I certify that on April 9, 2018, I filed via the Court's CM/ECF system the foregoing Reply in Support of John Doe's Motion for a Preliminary Injunction, and I understand that the system caused service of that document on counsel for all parties to this action.

*/s/ Justin Dillon*
Justin Dillon