**IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **JOHN DOE**, | ) | |
| | ) | |
| **Plaintiff,** | ) | Civil Action No.  1:18-cv-553-RMC |
| | ) | |
| **v.** | ) | |
| | ) | |
| **THE GEORGE WASHINGTON** | ) | |
| **UNIVERSITY,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| _____ | ) | |

**MEMORANDUM IN SUPPORT OF JOHN DOE'S
MOTION FOR PARTIAL SUMMARY JUDGMENT**

Justin Dillon (D.C. Bar No. 502322)
Christopher C. Muha (D.C. Bar No. 987116)
KAISERDILLON PLLC
1401 K Street NW, Suite 600
Washington, DC 20005
T: (202) 640-2850
F: (202) 280-1034
jdillon@kaiserdillon.com
cmuha@kaiserdillon.com

*Attorneys for Plaintiff John Doe*

DATED:  May 16, 2018

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ..................................................................................................ii

INTRODUCTION................................................................................................................. 1

FACTUAL BACKGROUND ............................................................................................... 3

LEGAL STANDARD .......................................................................................................... 18

ARGUMENT ....................................................................................................................... 20

I.  GW Breached Its Contract With Mr. Doe In Rejecting His Appeal. ..................................... 20

   A.  GW Was Required to Adhere to Its Contract with John Doe and to
       Apply Its Disciplinary Policies in Good Faith.................................................. 20

   B.  Mr. Doe Submitted a Viable Appeal .......................................................... 21

      1.  Mr. Doe's Appeal Was Based on Relevant Information........................... 22

      2.  Mr. Doe's Appeal Was Based on New Evidence. ................................... 23

      3.  The Information on Which Mr. Doe's Appeal Was Based Was Capable of,
          and In Fact Would Have Succeeded in, Significantly Altering
          the Findings of Fact.................................................................... 24

II.  E.E.'s Phone Records Also Satisfy the Three Criteria For Viable Appeals And
     Should Be Considered By Any Appeal Authority on Remand........................... 26

CONCLUSION .................................................................................................................... 26

## TABLE OF AUTHORITIES

<u>Cases</u>

*1901 Wyoming Ave. Coop. Ass'n v. Lee*, 345 A.2d 456 (D.C. 1975)..........................................19

*Akassy v. William Penn Apartments Ltd. P'ship*, 891 A.2d 291 (D.C. 2006)............................19

*Alden v. Georgetown Univ.*, 734 A.2d 1103 (D.C. 1999)............................................................20

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986)...............................................................18

*Angula v. Gochnauer*, 772 A.3d 830 (D.C. 2001).......................................................................19

*Basch v. George Washington Univ.*, 370 A.2d 1364 (D.C. 1977) ..............................................20

*Baylor v. Mitchell Rubenstein & Assocs., P.C.*,
857 F.3d 939 (D.C. Cir. 2017) ....................................................................................................18

*\*Capital City Mortg. Corp. v. Habana Vill. Art & Folklore, Inc.*,
747 A.2d 564 (D.C. 2000)......................................................................................................18, 19

*\*Chenari v. George Washington Univ.*, 847 F.3d 740 (D.C. Cir. 2017)...............................20, 21

*Clyburn v. 1411 K Street Ltd. P'ship*, 628 A.2d 1015 (D.C. 1993) ...........................................23

*\*Deutsche Bank Nat'l Tr. Co. v. FDIC*, 109 F. Supp. 3d 179 (D.D.C. 2015) ............................19

*Doe v. Univ. of Notre Dame*, No. 3:17-cv-298, 2017 WL 1836939
        (N.D. Ind. May 8, 2017), *vacated by request of the parties*
        *after settlement*, No. 3:17-cv298, 2017 WL 7661416
        (N.D. Ind. Dec. 27, 2017) ..................................................................................................26

*Dyer v. Bilaal*, 983 A.2d 349 (D.C. 2009)..................................................................................22

*\*Farmland Indus., Inc. v. Grain Bd. of Iraq*, 904 F.2d 732 (D.C. Cir. 1990) ................19, 20, 23

*Giles v. Howard Univ.*, 428 F. Supp. 603 (D.D.C. 1977)...........................................................23

*Hajjar-Nejad v. George Washington Univ.*, 37 F. Supp. 3d 90 (D.D.C. 2014).........................20

*Kakaes v. George Washington Univ.*, 683 A.2d 128 (D.C. 1996) ........................................18, 21

*Kumar v. George Washington Univ.*, 174 F. Supp. 3d 172 (D.D.C. 2016) ...........................20-21

*Minmar Builders, Inc. v. Beltway Excavators, Inc.,* 246 A.2d 784 (D.C.1968) ........................18

*NRM Corp. v. Hercules, Inc.*, 758 F.2d 676 (D.C. Cir. 1985) ..................................................... 19

*Paul v. Howard Univ.,* 754 A.2d 297 (D.C. 2000)...................................................................... 20

*Paulin v. George Washington School of Medicine and Health Sciences*,
    878 F. Supp. 2d 241 (D.D.C. 2012) ................................................................................ 21

*Pride v. Howard Univ.*, 384 A.2d 31 (D.C. 1978) ..................................................................... 20

*Raihan v. George Washington Univ.*, No. 1:18-cv-994-TNM
(D.D.C. April 27, 2018)...................................................................................................2, 3, 17

*Sacks v. Rothberg*, 569 A.2d 150 (D.C. 1990))........................................................................ 18

*United States v. Bobo*, 419 F.3d 1264 (11th Cir. 2005)............................................................. 22

*Wright v. Howard Univ.*, 60 A.3d 749 (D.C. 2013) ................................................................... 21

**Rules**

Fed. R. Civ. P. 56 ......................................................................................................................... 18

**Other Authorities**

Black's Law Dictionary (10th ed. 2014) ....................................................................................... 22

## INTRODUCTION

At some point, the truth has to matter.  Jane Roe and E.E. lied about the most important evidence in the entire disciplinary proceeding, and that fact is now out in the open.  They did so not in some incremental way, by exaggerating some minor detail in their testimony.  They did so spectacularly, fabricating from whole cloth an entire phone call that had Ms. Roe speaking incoherently just feet away from Mr. Doe *as* they were going to his place to have sex—evidence that, if true, would indisputably show that Mr. Doe knew Ms. Roe was incapacitated at the precise time they had sex.  A silver bullet of evidence that, by itself, established everything Ms. Roe needed to prevail at the hearing.

GW should care about that.  It should care that it was lied to.  It should care that dramatic false testimony was given against one of its students.  It should care that it may wrongly be suspending him and damaging his entire future.  It should care that on March 26—just hours before Mr. Doe obtained E.E.'s phone records—Ms. Roe publicly outed Mr. Doe as her alleged assailant in connection with this lawsuit.  Yet GW refused for weeks to act on the retaliation complaint Mr. Doe filed with GW against Ms. Roe on March 28th, right after she outed him, despite its knowing by then that she had fabricated the phone call testimony.  It did not reach out to him until April 6th to schedule a meeting to discuss his complaint.  Then, after that meeting took place on April 25th, Mr. Doe heard nothing from GW until this very morning—the same day that it knew his summary judgment motion would be filed, and two days after Mr. Doe emailed GW to ask them why, almost three weeks after that meeting, he had still heard nothing from them.  Only then did they say that they would refer his complaint to the Title IX office for investigation.  The timing, to put it mildly, seems a bit convenient. GW has also refused to

reopen Mr. Doe's appeal for reconsideration even though it now knows Ms. Roe and E.E. fabricated the key testimony in the case.

Mr. Doe has detailed in his complaint and in his Motion for a Preliminary Injunction the extreme pressure GW has been under to appear tough at all costs on sexual assault claims brought by women against men, and the effect of that pressure upon GW is now apparent. That pressure, in fact, has only gotten worse since Mr. Doe asked this Court for a preliminary injunction. Aniqa Raihan, whose story Ms. Roe's allegations track in remarkable detail, has now sued GW for violations of Title IX and common law negligence. *Raihan v. George Washington Univ.*, No. 1:18-cv-994-TNM (D.D.C. April 27, 2018). Now more than ever, GW cannot appear soft in a case that resembles Ms. Raihan's. It needs to be able to say to its students and alumni, "We did everything we could for Ms. Roe. Even when there was reason to doubt her, we pressed on. Even when the court ruled that John Doe was likely to succeed on his claim that his appeal was wrongly rejected, we refused to consider it. We fought until the very end, until we were ordered to do otherwise." GW can't say it, but it needs the cover of a court order for the truth to matter here.

John Doe respectfully moves for that order. John Doe is entitled to summary judgment on his claim that GW breached its contract with him when it rejected his appeal without considering it on the merits. The undisputed facts show that the expert toxicology report and the witness statement on which the appeal was based satisfy the three criteria of a viable appeal under the Code. Because E.E.'s phone records likewise satisfy the three criteria of a viable appeal under the Code, Mr. Doe respectfully requests that GW be ordered to consider Mr. Doe's appeal on its merits as supplemented by those records and a brief explanation of their relevance.

## FACTUAL BACKGROUND[1]

On September 12, 2015, John Doe and Jane Roe, both GW students, met at a party.  Ex. 1 at 4.  John Doe was a virgin and a non-drinker of alcohol for religious reasons.  Ex. 2 at 52.  A little before midnight, Mr. Doe and Ms. Roe took an Uber to Mr. Doe's dorm using Ms. Roe's Uber account.  Ex. 1 at 13.  Sometime after 12:21 a.m., Mr. Doe and Ms. Roe had sexual intercourse in Mr. Doe's dorm room.  *Id.* at 4, 29.  After they had intercourse, Ms. Roe went back to her dorm on foot unaided.  *Id.* at 4, 29.

Approximately one year later, on October 3, 2016, Aniqa Raihan, a student at GW, would file a complaint with GW alleging that she had been sexually assaulted more than two years earlier.  *Raihan v. George Washington Univ.*, No. 1:18-cv-994-TNM (D.D.C. April 27, 2018), ECF No. 1 at ¶ 44 (hereafter "Raihan Compl.").  Ms. Raihan said that she was assaulted in that student's dorm room when she was too intoxicated to consent to sexual activity.  *Id.* ¶ 34.  She claimed that she went "in and out of consciousness before blacking out" and remembered only a part of the unwanted sexual activity.  *Id.* ¶¶ 34-35.  On March 24, 2017, Ms. Raihan learned that her alleged assailant was found responsible by GW and given a deferred suspension.  *Id.* ¶ 55.  On April 2, 2017, she "went public with a Change.org petition" demanding that her alleged assailant "be expelled" and "be terminated from his employment."  *Id.* ¶ 59.  She also demanded that GW implement "[m]andatory suspensions for those found guilty of sexual violence."  *Id.*

The campus response to Ms. Raihan's petition was overwhelming.  Three GW administrators issued a statement on April 21 rebutting "[t]he narrative emerging from the petition . . . that GW has been reluctant or even unwilling to hold individuals accountable for acts

---

[1] With the exception of Section F., the Factual Background largely tracks the Factual Background section in John Doe's Motion for a Preliminary Injunction.

of sexual violence."[2]  That narrative, they said, "is not borne out by our record," because all ten complaints of sexual violence referred to a hearing board in academic years 2015-2016 and 2016-2017 resulted in findings of responsibility, and nine of those ten resulted in suspension or expulsion.[3]  On May 1, the GW Student Association Senate voted unanimously in support of Ms. Raihan's demands.[4]  Then, on May 20, at GW's commencement, Ms. Raihan unfurled a sign that read, "#GWProtectsRapists" and shouted at her alleged assailant, all of which was covered in multiple news outlets.  Exs. 5-6; Raihan Compl. ¶ 75.

GW's response to Ms. Raihan's petition continued after graduation.  On June 2, members of GW's general counsel's office, its Provost, and its Vice Provost for Diversity, Equity and Community Engagement met with Ms. Raihan to discuss her situation.  Raihan Compl. ¶ 77. Then in July, GW hired its full-time Title IX Investigator, someone who had "[r]epresented crime victims" and "student-survivors" in courts and "Title IX administrative hearings" and who had "[d]eveloped Survivor Toolkits" for sexual assault claimants at "the eight universities in DC."  Ex. 7.  The University also commissioned a law firm that month to comprehensively review its Title IX enforcement regime.  Ex. 8.

Ms. Raihan, and others with her, continued to speak out against GW.  On August 7, Ms. Raihan published an article about her Change.org petition and her graduation protest in *Ms.*

---

[2] *See* "Message from University Administrators," attached as Exhibit 3 and available at https://gwtoday.gwu.edu/message-university-administrators (last visited May 16, 2018).

[3] *Id.*

[4] *See* "SA Senate supports sexual assault survivor in campaign to expel her assailant," *GW Hatchet*, attached as Exhibit 4 and available at https://www.gwhatchet.com/2017/05/02/sa-senate-supports-sexual-assault-survivor-in-campaign-to-expel-her-assailant/ (last visited May 16, 2018).

*Magazine*.[5]  Then on September 10, she filed a Title IX complaint against GW with the

Education Department's Office for Civil Rights based on GW's handling of her complaint.[6]  The

following month, on October 20, GW students "speaking on [Ms. Raihan's] behalf" at an event

outside of the Education Department claimed that GW "fail[ed] survivors time and time again."

Ex. 11.

### A.    Ms. Roe's Complaint and Supplements

Ten days after that protest, on October 30, 2017, Ms. Roe filed a complaint with GW

alleging that John Doe had sexually assaulted her on the morning of September 13, 2015.  Ex. 1

at 4.  Like Ms. Raihan, Ms. Roe claimed she had been assaulted approximately two years earlier.

*Id.*  Like Ms. Raihan, Ms. Roe's alleged assailant would soon be graduating.  Ex. 2 at 61.  Like

Ms. Raihan, Ms. Roe alleged that she had been assaulted in her assailant's dorm room. Ex. 1 at 4.

And like Ms. Raihan, Ms. Roe alleged that she was in a blackout state due to alcohol intoxication

and remembered only a part of the alleged assault.  *Id.*

Ms. Roe claimed in her initial complaint that on October 30 that she drank an unspecified

amount of alcohol at a pre-game party on the night of September 12, 2015, then arrived at a party

at an off-campus house known as the rugby house at 10:46 p.m.  *Id.*  She claimed that she had

"several drinks" at the party and that her roommate and her roommate's boyfriend "left shortly

after I arrived."  *Id.*  She stated that she "remember[ed], though unclearly," meeting Mr. Doe at

the party, but that she "d[id] not remember calling or getting into a [sic] Uber" with him.  *Id.*

---

[5] *See* Aniqa Raihan, "I Fought Campus Rape Culture – With the Help of Title IX," *Ms. Magazine*
(Aug. 7, 2017), attached as Exhibit 9 and available at
http://msmagazine.com/blog/2017/08/07/fought-campus-rape-culture-help-title-ix/ (last visited
May 14, 2018).

[6] *See* "Alumna files federal Title IX complaint after leading high-profile protests," *GW Hatchet*,
attached as Exhibit 10 and available at https://www.gwhatchet.com/2017/09/25/alumna-files-
federal-title-ix-complaint-after-leading-high-profile-protests/ (last visited May 16, 2018).

She said that she believed that she "fell asleep or was groggy" in the Uber but could remember nothing more about the ride. *Id.*

According to Ms. Roe's Uber records, she and Mr. Doe left the party at 11:56 p.m. and arrived at Mr. Doe's building at 12:21 a.m. *Id.* Ms. Roe claimed on October 30 to remember nothing in Mr. Doe's dorm room until she "woke up on a bed in the dorm, facedown while the respondent was penetrating me." *Id.* She alleged that she tried to push him away, then verbalized a "no" and tried to pull herself away, but that Mr. Doe ignored her and continued having sex with her until he ejaculated on her. *Id.* According to Ms. Roe, she then "quickly got out of bed and dressed, and went down the stairs to exit the building." *Id.* She says she then "walked" home where she found her "roommate and her boyfriend." *Id.* Ms. Roe says her roommate followed her into the bathroom where Ms. Roe "explained to her the details of what had happened." *Id.* She stated, at the end of her complaint, that it "contains everything I can recall." *Id.* at 5.

Three days later, on November 2, Ms. Roe submitted a "supplement" to her complaint. *Id.* at 6-7. Ms. Roe now specified that she had consumed "5 Solo cups of beer" at the rugby party. *Id.* at 6. She now said that she remembered where she sat in the Uber. *Id.* She claimed to now remember someone asking her why she was leaving the party. *Id.* She said she couldn't "recall any conversation or interactions taking place in the car," didn't remember any interactions "with [Mr. Doe]" there, and "felt like [she] couldn't speak." *Id.* She claimed, however, to now remember wanting to tell the Uber driver that she wanted to get out. *Id.* at 6-7. She also claimed to have two memories between the time she saw the names on the door and the time she woke up on his bed (specifically, "where his bed was in the room" and that "the lights in his room were on when we arrived"). *Id.* at 7. She further claimed to have remembered

"falling down the stairs as [she] exited." *Id.* She failed to explain how she could have fallen only once given her claimed level of intoxication.

Four days later, on November 6, Ms. Roe submitted a second supplement to her complaint. *Id.* at 8. Ms. Roe there claimed to remember drinking a Solo cup of "jungle juice," a strong mixed drink, after drinking the five cups of beer. *Id.* Despite claiming to have consumed six cups Solo cups of alcohol in about an hour, Ms. Roe stated in none of her written statements that she used the bathroom at any point or that she suffered incontinence when she allegedly passed out. *Id.* at 4-8.

## B.    GW's Investigation

By November 19, five people had submitted witness statements as part of the investigation of Ms. Roe's allegations. *Id.* at 23-27.  Three of those witnesses testified to having seen Ms. Roe at the rugby party that night, but *none* of them testified that she looked intoxicated. *Id.*  The first witness testified to "seeing [Mr. Doe and Ms. Roe] talking" and did not say that she looked drunk, that she had trouble standing, that she was acting oddly, or that she was showing any other obvious signs of intoxication. *Id.* at 24. The second witness testified that Ms. Roe "mostly hung out in a group in the back corner of the yard" but said nothing about her appearing intoxicated while she did so. *Id.* at 25. He said that he "vaguely remember[ed] seeing her cross the street" and did not say that she stumbled or had trouble doing so. *Id.* The third witness testified to "seeing [Ms. Roe] in the backyard with a few of her friends." *Id.* at 26. He said nothing about Ms. Roe appearing intoxicated at the party. *Id.* at 26.

On November 20, after none of her witnesses claimed to have seen her intoxicated at the party, let alone incapacitated, a former GW student, E.E., submitted a witness statement. *Id.* at 28. Her statement said that after she lost track of Ms. Roe at the rugby party, "*we*" (she and their

friends) "called [Ms. Roe] and she said she was in an Uber with the suspected assailant but she was slurring her worlds [sic] and speaking incoherently and we couldn't understand anything else over the phone.  She was obviously not in a conscious state of mind, definitely too drunk/maybe even drugged to consent.  We all went to go look for her but that point it was too late and that is all I can remember."  *Id.*  E.E. did not identify the other people who joined her in making this phone call and searching for Ms. Roe.  *Id.*

On November 20, Mr. Doe submitted a statement responding to Ms. Roe's complaint and supplements.  *Id.* at 29.  He volunteered the fact that at the party he heard a woman near him say to her friend, "I want to have sex with someone right now," and that he then turned and approached the women and introduced himself.  *Id.*  The woman who had made the statement was Ms. Roe.  *Id.*  Mr. Doe testified that Ms. Roe showed no obvious outwards signs of intoxication—she did not slur her words, she did not have trouble standing, and she was responding to him coherently.  *Id.*  She was not holding a drink, either.  *Id.*  He said that they talked about their majors and a religion course she was taking.  *Id.*

Mr. Doe said that after they talked for a while, Ms. Roe, who had been texting her roommate about the availability of their room, suddenly asked him, "Can we fuck in your room?"  *Id.*  About ten minutes later, she asked him if he wanted to leave and called an Uber to take them to his dorm.  *Id.*  Mr. Doe testified that Ms. Roe was doing things on her phone for most of the car ride to his dorm.  *Id.*

Mr. Doe then testified that after they arrived, they went up to Mr. Doe's room and began making out.  *Id.*  They undressed themselves down to their underwear, and after about five minutes Ms. Roe pulled down Mr. Doe's underwear and performed oral sex on him.  *Id.*  She then took off her own underwear, and Mr. Doe performed oral sex on her while she held his

head.  *Id.*  Mr. Doe testified that she then put her hand on his penis and helped him insert it into

her vagina, and they had missionary-style sex for a few minutes.  *Id.*  When Mr. Doe asked her to

turn over, she got on her hands and knees, and they had sex with Mr. Doe behind her.  *Id.*  Mr.

Doe testified that Ms. Roe Ms. Roe then said, "Let me get on top of you."  *Id.*  Mr. Doe lay down

on his back and Ms. Roe squatted over top of him and thrust up and down on him until he pulled

out and ejaculated.  *Id.*  Ms. Roe then rubbed his penis for a few seconds and said, "Wow, that

was exhausting."  *Id.*  Mr. Doe responded that it was.  *Id.*

Mr. Doe testified that after he got up to put his pants on, Ms. Roe said to him, "We

should fuck again."  *Id.*  Mr. Doe, however, said that the was too tired and wanted to go to bed.

*Id.*  He testified that he offered Ms. Roe the opportunity to stay the night but that she said she

would rather go home.  *Id.*  Mr. Doe then offered to walk her home, but Ms. Roe turned down

the offer.  *Id.*  They said goodbye to each other, and she left.  *Id.*

### C.    The Hearing

On December 14, 2017, GW held a hearing on Ms. Roe's allegations.  Ex. 2 at 1.  Ms.

Roe testified there that at the party she "remember[ed] spending a lot of the night with my

roommate at the time, [A.C.], and her boyfriend, [R.B.]," Ex. 2 at 7, despite having written on

October 30 that A.C. and R.B. "left shortly after I arrived," Ex. 1 at 4.  Ms. Roe also testified at

the hearing that she remembered talking with E.E. on the phone in the Uber, Ex. 2 at 12, despite

having written on November 2 that she "can't recall any conversation or interactions taking place

in the car" and "felt like [she] couldn't speak," Ex. 1 at 7.  Ms. Roe did not explain why she

failed to mention this phone call earlier.  *Id.*

Ms. Roe contradicted her prior testimony in other ways as well.  She said at the hearing,

"I don't remember gathering my clothes or my bag" before leaving Mr. Doe's room, Ex. 2 at 9,

despite having written on November 2 that she "grabbed [her] things quickly" before leaving, Ex. 1 at 7.  She testified at the hearing that she "ran back to [her] residence hall" after the alleged assault, Ex. 2 at 9, despite having written on October 30 that she had "walked" there, Ex. 1 at 4. She also admitted to attending a subsequent party at the rugby house, Ex. 2 at 15, even though she claimed during the investigation that she never did out of fear, Ex. 1 at 16.

Ms. Roe's first witness at the hearing, J.E., testified that Ms. Roe had "at least four . . . minimum four" drinks at the pregame, Ex. 2 at 24, and that the women there were stumbling and slurring their words a bit as they left, *id.* at 25.  His testimony at the hearing was the first time anyone had quantified how much Ms. Roe allegedly drank at the pre-game party.  Ex. 1 at 1-29. J.E. gave no testimony, however, about how Ms. Roe appeared at the party.  Ex. 2 at 24-25.

Ms. Roe's second witness was R.M.  He testified that there were "easily 100 people" at the party.  *Id.* at 33.  He was the only person to testify, either before or during the hearing, that Ms. Roe looked intoxicated at the rugby party.  *Id.* at 31.  R.M., however, could point to no specific outward signs telling him that, and he expressly refused to speculate to what degree Ms. Roe was intoxicated.  *Id.*  The chair of the hearing panel refused to let Mr. Doe reveal R.M.'s potential bias by allowing him establish that R.M. had been romantically involved with Ms. Roe. *Id.* at 35.

Ms. Roe's third and final witness at the hearing was E.E.  *Id.* at 36.  E.E. testified twice at the hearing that Ms. Roe called her from the car that night, *id.* at 38, 41, despite having testified in writing approximately three weeks earlier that she and her friends had called Ms. Roe, Ex. 1 at 28.  She said that the call could not have lasted "more than 30 seconds."  Ex. 2 at 41.  She testified that after the phone call, Ms. Roe's roommate, A.C., went to look for Ms. Roe, *id.* at 38, even though Ms. Roe had testified on October 30 that A.C. went home soon after they arrived at

the party, Ex. 1 at 4.  E.E. also testified that Ms. Roe had told her "they were going to his apartment," Ex. 2 at 40, even though Ms. Roe had testified on November 2 that she did not know where they were going in the Uber, Ex. 1 at 6.

Mr. Doe testified at the hearing that he and Ms. Roe talked outside the party for some time after he introduced himself.  *Id.* at 44-45.  He testified that Ms. Roe told him about a religion course she was taking. *Id.*  As to the Uber ride, Mr. Doe expressly denied at the hearing that Ms. Roe made any kind of phone call there.  *Id.* at 45.  He testified that Ms. Roe was "looking at her phone for most of" the Uber ride, "texting or on social media or something." *Id.* He said that he and Ms. Roe "didn't really exchange very many words" in the Uber." *Id.*

As to the sexual activity itself, Mr. Doe testified consistently with his November 20 statement, describing a coherent Ms. Roe who directed much of the encounter.  *Id.* at 46; Ex. 1 at 29.

### D.    GW's Finding and Sanction Against Mr. Doe

On January 23, 2018, GW informed Mr. Doe that the Hearing Board had found him responsible for sexually assaulting Ms. Roe and that he would be suspended for one year.  *See* Ex. 12.  The Board's decision "acknowledge[d] the statements made by [Mr. Doe] regarding [Ms. Roe's] actions that indicated to him that he had consent: [Ms. Roe] asked him to make arrangements to find a place to have sex, requested the Uber, removed his clothing, initiated oral sex on him, agreed to change positions when asked, and requested that they change positions." *Id.* at 6.  The Board nevertheless concluded that Ms. Roe's "level of intoxication reached the point of incapacitation," and expressly relied on Ms. Roe's own testimony in so finding.  *Id.* at 5. The Board also concluded, for two reasons, that Mr. Doe should have known that Ms. Roe was incapacitated: (1) "the statements of the witnesses, indicating that they observed [Ms. Roe]

acting in an intoxicated manner, in stumbling and slurring her words," and (2) "[Mr. Doe's]

statements that the Complainant ceased conversation with him after leaving the party." *Id.* at 6.

      **E.**    **Mr. Doe's Appeal**

      Mr. Doe filed a timely appeal of the hearing board's finding on January 30, 2018. *See*

Ex. 13. GW's Code of Conduct allows parties to appeal adverse findings "based on new

information that is relevant to the case, that was not previously presented at the hearing or

conference, and that significantly alters the finding of fact." Ex. 14 at 8. Appeals proceed

through a two-step process. First, the University's Executive Director of Planning & Outreach

makes a determination of "viability." *Id.* Then the appeal is forwarded to three members of the

Committee on the Judicial System who "review and decide the appeal" on its merits. *Id.*

      Mr. Doe based his appeal on two pieces of evidence that had not been presented in the

investigation or at the hearing: a report by an expert toxicologist who analyzed Ms. Roe's level

of intoxication based on her reported consumption, and a statement from another student, Q.W.,

about his interaction with Ms. Roe at the rugby party. *See* Ex. 13 at 1; Ex. 15 (Report of Dr.

Harry Milman); Ex. 16 (CV of Dr. Harry Milman); Ex. 17 (Statement of Q.W.). Mr. Doe could

not have presented the toxicology report earlier, because the hearing was the first time that

anyone testified to the number of drinks Ms. Roe had consumed at the pregame. Ex. 1 at 1-29.

      The toxicologist concluded, based on the testimony of Ms. Roe and her witnesses about

how much she drank and when, that Ms. Roe would have had a BAC of at least 0.26 (if she had

consumed only 10 drinks), at which level it would be (1) "unlikely . . . that she would have had

*any* memory of the car ride" or "*any* memory of anything that had occurred thereafter," and (2)

"*extremely* unlikely" that she could have "dressed herself, run down eight flights of stairs, run

one block to her home," and been "coherent enough to be able to explain to her roommate" what

had supposedly happened.  Ex. 15 at 5 (emphasis added).  Ms. Roe herself testified at the hearing

that she had consumed not just ten drinks, but "over ten drinks."  Ex. 2 at 62.

Q.W. testified in his statement that he had a "normal, lucid conversation" with Ms. Roe

as he and Mr. Doe talked to her after they met her.  Ex. 17 at 1.  Q.W. attached to his statement a

picture of himself and Mr. Doe taken at the party at 11:16 p.m., *see* Ex. 13 at 1, and testified that

he and Mr. Doe met Ms. Roe shortly after they took that picture, Ex. 17 at 1.

Mr. Doe's appeal argued that this new evidence showed that Ms. Roe was not credible

and that, if she were in fact incapacitated, there was no way that Mr. Doe reasonably could have

known that.  Ex. 13 at 1-11.  As to the former, Mr. Doe's appeal argued that the toxicology

report showed either that Ms. Roe had grossly exaggerated the amount of alcohol she had

consumed or that she was untruthful about the memories she claimed to have and the actions she

claimed to have performed.  *Id.* at 2.  Mr. Doe's appeal further noted that if Ms. Roe had

consumed as much alcohol as she said she had, her extreme level of intoxication would have

been obvious to everyone who saw her, especially the witness who saw her walk across the

street, *id.* at 7.  Yet no one, Mr. Doe argued, testified to seeing her stumble, slur her words, or act

severely drunk at the party.  *See generally* Exs. 1-2.  Instead, Q.W. reported having a "normal,

lucid conversation" with her.  Ex. 13 at 8.  Mr. Doe's appeal also argued that not a single

"witness[]" had "observed [Ms. Roe] acting in an intoxicated manner, in stumbling and slurring

her words" at the actual party; three witnesses who saw her there said nothing about her looking

intoxicated, *id.* at 6-7, a fourth (R.M.) would say only that she looked "intoxicated," *id.* at 7, and

now a fifth—Q.W.—testified that he had a "normal, lucid conversation" with her, *id.* at 8.

Mr. Doe's appeal further argued that the toxicology report proved that Ms. Roe would

have been too intoxicated to have gotten her phone out, made a call, spoken an intelligible

sentence and remember any of it if she had consumed as much alcohol as she said she had. *Id.* at

9. The appeal furthermore offered several more reasons to doubt that the phone call ever

occurred, including:

- That E.E. changed from saying that *she* had called *Ms. Roe*, as part of a dramatic chain of events prompted by fears for Ms. Roe's safety—to saying that *Ms. Roe* had called *her*.

- That neither Ms. Roe nor E.E. ever identified the others who, with E.E., allegedly both called Ms. Roe and then searched for Ms. Roe that night.

- That if this call had actually happened, E.E would have discussed it with Ms. Roe long ago and it would have appeared in one of Ms. Roe's three complaint statements.

*Id.* at 9-10.

Mr. Doe also explained in his appeal that he was quiet in the Uber because he was

nervous about having sex for the first time, felt awkward that a third person whom he didn't

know well was in the front seat, and Ms. Roe was calmly buried in her phone the entire time. *Id.*

at 10. He noted that the board gave no explanation why it would credit his testimony that they

didn't talk in the Uber—he was the only source of that testimony—yet fail to also credit his

testimony that Ms. Roe was busy on her phone the entire ride, not lying there catatonic. *Id.* at

11.

On February 15, Robert Snyder, the University's Executive Director of Planning &

Outreach, rejected Mr. Doe's appeal as not viable without explanation. Ex. 18 (Appeal Decision

Letter) at 1. Mr. Snyder's decision letter simply repeated the threshold requirements of an

appeal identified in Article 33, then stated, with no elaboration, "[I]t is my determination that

you have not met the requirements for an appeal." *Id.*

### F.    Post-Litigation Developments

Since the time John Doe filed his complaint in this matter on March 8, 2018, there have

been four significant developments that relate to this motion.

### 1.    E.E.'s Phone Records

On March 26, pursuant to a subpoena authorized by this Court, *see* Minute Order, *Doe v. The George Washington Univ.*, No. 1:18-cv-553-RMC (D.D.C. March 16, 2018), John Doe received a production of documents from AT&T pertaining to E.E.'s phone records from September 12-13, 2015.  Ex. 19.  The call log data showed that E.E. made or received three phone calls between 11:00 p.m. on September 12, 2015 and 1:30 a.m. on September 13, 2015.  She received two calls from a 240- (Maryland) number, both before 11:30 p.m., and she made one call to a 203- (Connecticut) number at 11:47 p.m.  *Id.* at 18.  The call records show that E.E. neither made nor received a call from a Pennsylvania number (Ms. Roe's home state) or a D.C. number between 11:00 p.m. and 1:30 a.m. that night, and that she neither made nor received any calls at all between 11:56 p.m. (the time Ms. Roe called the Uber) and 12:21 a.m. (the time that the Uber arrived at Mr. Doe's dorm).  *Id.*

E.E.'s data usage logs also show that she did not speak with Ms. Roe through some non-traditional means such as Facebook.  E.E. testified at the hearing that her call with Ms. Roe lasted no more than 30 seconds.  Ex. 2 at 41.  The data usage logs show no such 30-second packet of usage.  Ex. 19 at 19.  They instead show two periods of extended data usage during the time Ms. Roe was in the Uber: a 13.5-minute data usage period starting at 12:04 a.m. and a 39-minute period window starting immediately after that at 12:18 a.m.  *Id.*  E.E. was using data for approximately 53 straight minutes beginning at 12:04 a.m., suggesting she may not even have been at the party by that time.

### 2.    Mr. Doe's Campus Complaint Against Ms. Roe

On the morning of March 26, just hours before Mr. Doe received E.E.'s phone records, Jane Roe, in a post on a social media page of hers, publicly identified John Doe by his true name

in connection with this lawsuit and called him a rapist.  Access to that post is not restricted by

Jane Roe in any way; it is available to anyone with a computer.  Muha Decl. ¶ 28.  On the

morning of March 28, Mr. Doe filed a complaint with GW via email against Ms. Roe for

retaliation and breach of confidentiality based on her disclosure of his identity and details of the

disciplinary process, and for providing false evidence at his disciplinary hearing based on the

fact that she never spoke with E.E. in the Uber.  Ex. 20 at 1.  He attached the social media post

and the phone records to that email.  *Id.* at 1-4.

Mr. Doe received no response from GW by the afternoon of March 29.  Ex. 21 at 1.  He

again emailed Mr. Muhammad, GW's Title IX Coordinator, about his complaint.  *Id.*  Mr.

Muhammad finally responded on April 2.  *Id.*  He stated that the Office of General Counsel

would be in touch regarding the inquiry since litigation was pending.  *Id.*

Four days later on April 6, Mr. Muhammad himself wrote to John Doe, stating that his

office had reviewed John Doe's complaint and asked to set up a time to discuss the complaint.

Ex. 22 at 1.  On April 25 John Doe and his advisor, Justin Dillon, met with Mr. Muhammad and

Toi Carter from GW's General Counsel's office to discuss his complaint against Jane Roe.

Muha Decl. ¶ 29.  Yet by May 14—almost three weeks after that meeting—John Doe had heard

nothing from GW regarding the status of his complaint. Ex. 23 at 1.  Mr. Doe emailed Mr.

Muhammad that day, noting that "[i]t has been over two weeks since I met with you to discuss

my initial complaint and over a month and a half since I sent my initial email with all of the

relevant evidence."  *Id.*  He asked Mr. Muhammad for an update and whether Mr. Muhammad

intended to do anything with his complaint.  *Id.*  This morning, May 16—the same day that John

Doe's Motion for Partial Summary Judgment is due to be filed—Mr. Muhammad responded, "I

will be forwarding your complaint to our Office of Students Rights and Responsibility (SRR) for consideration." *Id.*

### 3. Title IX Developments at GW

Finally, there have been two notable Title IX developments at GW. First, on April 27, 2018, Aniqa Raihan sued GW in this Court for violations of Title IX and for common law negligence based on its handling of her sexual assault complaint. *See Raihan v. George Washington Univ.*, No. 1:18-cv-994-TNM (D.D.C. April 27, 2018). That same day she held a press conference announcing that she had filed that lawsuit.[7] Her complaint, and her desire to publicize it, place more pressure than ever upon GW to appear tough at all costs on claims of sexual assault brought by women against men, especially in situations that resemble Ms. Raihan's.

Second, on or around May 14, 2018, Thomas J. LeBlanc, the President of GW, addressed the Faculty Senate regarding the adoption of a proposed new Title IX policy.[8] He encouraged them to vote in favor of it because the hearing panels and appellate decisionmakers in the current process are so woefully untrained:

> How do we handle cases next year? Do we take faculty before panels made up of students and staff? **Do we have essentially untrained or well-meaning individuals doing the investigation? Do we have no decent appeal rights to an outside entity who's actually trained in this?** I mean there's a lot of questions that our current policy raises. And it's a judgment call as to we're better off adopting a policy that has some warts to it, but they're not the kinds of

---

[7] Dani Grace and Leah Potter, "Alumna sues University, claims GW created 'hostile culture' for sexual assault survivors," *GW Hatchet* (April 30, 2018), attached as Exhibit 24 and available at https://www.gwhatchet.com/2018/04/30/alumna-sues-university-claims-gw-created-hostile-culture-for-sexual-assault-survivors/ (last visited May 14, 2018).

[8] *See* "Proposing new Title IX policies," *GW Hatchet* podcast (May 14, 2018), available at https://www.gwhatchet.com/2018/05/14/getting-to-the-bottom-of-it-proposing-new-title-ix-policies/) (last visited May 16, 2018).

warts that we have proven over time create horrible effects on our campus as is the case of the older policies like the one we have now."[9]

It is that same inadequate appeals process that John Doe challenges in this motion, and as to which he is entitled to summary judgment.

## LEGAL STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The evidence must be viewed in the light most favorable to the non-moving party.  *Baylor v. Mitchell Rubenstein & Assocs., P.C.*, 857 F.3d 939, 952 (D.C. Cir. 2017).  But "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original).

D.C. "'adhere[s] to the "objective law" of contracts, whereby the written language embodying the terms of an agreement will govern the rights and liabilities of the parties, . . . unless the written language is not susceptible of a clear and definite undertaking, or unless there is fraud, duress or mutual mistake.'" *Capital City Mortg. Corp. v. Habana Vill. Art & Folklore, Inc.*, 747 A.2d 564, 567 (D.C. 2000) (quoting *Minmar Builders, Inc. v. Beltway Excavators, Inc.,* 246 A.2d 784, 786 (D.C.1968)).  Whether a contract is susceptible of a "clear and definite undertaking" is determined by looking at "the 'face of the language itself, giving that language its plain meaning, without reference to any rules of construction.'"  *Id.* (quoting *Sacks v. Rothberg*, 569 A.2d 150, 154 (D.C. 1990)); *see also Kakaes v. George Washington Univ.*, 683 A.2d 128, 132 (D.C. 1996) (contractual terms must be given "their common meaning").  A court,

---

[9] *Id.* at 4:42-5:24 (emphasis added); see also Muha Decl. ¶ 27.

furthermore, must "construe the contract as a whole, giving effect to each of its provisions,

where possible." *Akassy v. William Penn Apartments Ltd. P'ship*, 891 A.2d 291, 303 (D.C.

2006).

Under D.C. contract law, a court may look to extrinsic evidence of contractual meaning

only if the plain meaning of the contract language is ambiguous. *Capital City Mortg. Corp.*, 747

A.2d at 568 ("the trial court erred in admitting extrinsic evidence, because none of the provisions

at issue is ambiguous"); *Farmland Indus., Inc. v. Grain Bd. of Iraq*, 904 F.2d 732, 736 (D.C. Cir.

1990) ("When the meaning of a contract provision is facially uncertain, a court may resort to an

examination of extrinsic evidence[.]").  The task of the court, if it admits extrinsic evidence, is to

"determine what a reasonable person in the position of the parties would have thought the

disputed language meant." *Capital City Mortg. Corp.*, 747 A.2d at 567 (citation omitted).  A

contracting parties unexpressed intentions as to contractual meaning may not be considered in

resolving facial ambiguity. *Deutsche Bank Nat'l Tr. Co. v. Fed. Deposit Ins. Corp.*, 109 F. Supp.

3d 179, 208 (D.D.C. 2015) (Collyer, J.)  ("Uncommunicated intentions do not carry any weight

in interpreting the intention of contracting parties.").  If consideration of the properly admitted

extrinsic evidence fails to yield "one definite meaning" of the contract, the ambiguities are then

"construed strongly against the drafter." *Capital City Mortg. Corp.*, 747 A.2d at 567 (citing

*1901 Wyoming Ave. Coop. Ass'n v. Lee*, 345 A.2d 456, 463 (D.C. 1975)).

Whether a contract is ambiguous "is a question of law for the court." *Deutsche Bank

Nat'l Trust Co. v. FDIC*, 109 F. Supp. 3d 179, 198 (D.D.C. 2015) (Collyer, J., citing *NRM Corp.

v. Hercules, Inc.*, 758 F.2d 676, 682 (D.C. Cir. 1985).  Summary judgment therefore "'is

appropriate where a contract is unambiguous[.]'" *Id.* (quoting *Angula v. Gochnauer*, 772 A.3d

830, 834 (D.C. 2001)).  Even when there is facial ambiguity, summary judgment is still

appropriate when there remains but one reasonable interpretation of the contract after

consideration of the extrinsic evidence. *Farmland Indus.*, 904 F.2d at 736.

## ARGUMENT

**I.    GW BREACHED ITS CONTRACT WITH MR. DOE IN REJECTING HIS APPEAL.**

**A.    GW Was Required to Adhere to Its Contract with John Doe and to Apply Its Disciplinary Policies in Good Faith.**

As this Court has already held, "both the D.C. Court of Appeals and the D.C. Circuit are

clear" that the relationship between a student and his or her school "is contractual in nature and

permits suit for its breach."  ECF No. 25 at 7 (citing *Chenari v. George Washington Univ.*, 847

F.3d 740, 744 (D.C. Cir. 2017); *Basch v. George Washington Univ.*, 370 A.2d 1364, 1367 (D.C.

1977)).  The terms of such contracts include, among other things, disciplinary codes, *Pride v.*

*Howard Univ.*, 384 A.2d 31, 34 (D.C. 1978), and other communications distributed to students,

*Alden v. Georgetown Univ.*, 734 A.2d 1103, 1110 (D.C. 1999).  GW, furthermore, clearly

intended to bind its students to the procedures in the Code.[10]

Contracts between a university and its students, like all contracts, "contain an implied

covenant of good faith and fair dealing."  *Hajjar-Nejad v. George Washington Univ.*, 37 F. Supp.

3d 90, 116 (D.D.C. 2014) (citing *Paul v. Howard Univ.,* 754 A.2d 297, 310 (D.C. 2000)).  The

covenant "means that neither party shall do anything which will have the effect of destroying or

injuring the right of the other party to receive the fruits of the contract."  "A party breaches this

duty by evading the spirit of the contract, willfully rendering imperfect performance, or

interfering with performance by the other party."  *Kumar v. George Washington Univ.*, 174 F.

---

[10] *See, e.g.*, Ex. 14 at 6 ("The following procedural guidelines shall be applicable in all hearings before University Hearing Boards, Ad Hoc Boards, and Board-Level Disciplinary Conferences[.]"); *id.* at 8 (couching appeal procedures in mandatory language).

Supp. 3d 172, 189–90 (D.D.C. 2016).  "[T]o show that a university breached the implied

covenant of good faith and fair dealing," a plaintiff must show "'either bad faith conduct or

conduct that is arbitrary and capricious.'"  *Chenari*, 847 F.3d at 745 (quoting *Wright v. Howard*

*Univ.*, 60 A.3d 749, 754-55 (D.C. 2013)).[11]  In the context of university discipline, performance

on a contract is arbitrary and capricious when "there was no rational basis for the decision."

*Paulin v. George Washington School of Medicine*, 878 F. Supp. 2d 241, 247 (D.D.C. 2012).

**B.      Mr. Doe Submitted a Viable Appeal.**

The University breached its contract with Mr. Doe, and the covenant inherent in it, when

it rejected his appeal.  Mr. Snyder was limited to determining the appeal's "viability," Ex. 14 at

8, and that role gave him very little authority to weigh the actual merits of the appeal, as both the

plain meaning of the term and the tiered structure of appeals at GW make clear.  *See Kakaes*, 683

A.2d at 132 (contractual terms "are to be given their common meaning").  The common meaning

of "viable" denotes something that has the *potential* to succeed, not something that necessarily

will.  *See, e.g.*, Merriam-Webster Dictionary (defining "viable" as "capable of working" or

"having a reasonable chance of succeeding")[12]; Oxford English Dictionary (defining "viable" as

---

[11] The standard for establishing a violation of the covenant based on *non-academic* misconduct
should actually be lower than this, because the "arbitrary and capricious" standard has been
developed in the context of claims of *academic* misconduct, a realm where schools are owed
special deference.  *See Chenari*, 847 F.3d at 745 (basing standard on principle that "courts must
not 'substitut[e] their judgment improperly for the academic judgment of the school'") (citing
*Wright*, 60 A.3d at 754-55); *see also id.* ("True, all these cases involve decisions about academic
performance, not honor code violations, but Chenari does not argue—nor do we decide—that a
different standard should apply here.").  That is especially true in a case like this, where the panel
consisted of two students and one low-level administrator, none of whom can be said to have
brought "the academic judgment of the school" to bear.  The Court, in any event, need not decide
what standard should apply, because Mr. Doe easily satisfies this "arbitrary and capricious"
standard, as explained below.

[12] *Available at* https://www.merriam-webster.com/dictionary/viable (last visited March 5, 2018).

"capable of working successfully; feasible")[13]; *see also* Black's Law Dictionary (10th ed. 2014) (defining "viable" as "capable of succeeding").  When the "viability" of an appeal is determined separately from its merits, "viability" review necessarily consists in only a limited review of the merits.  That is a structure common in the law, too.  *See, e.g.*, *U.S. v. Bobo*, 419 F.3d 1264, 1267 (11th Cir. 2005) (double jeopardy claims are "viable candidates for interlocutory review" if the merits are "colorable").  Whether an appeal *in fact* succeeds is the question for merits review, and the Code clearly assigns that task to a different body.  It would be wasteful and redundant to read the policy to commit a full merits review first to Mr. Snyder and then to the Committee.  No one in the parties' shoes would interpret the Code that way, and "any ambiguity" in that regard must "be construed strongly against the drafter," GW.  *Dyer v. Bilaal*, 983 A.2d 349, 355 (D.C. 2009).  Mr. Snyder could reject the appeal only if it were not "capable" of succeeding, had no "reasonable chance of success" or presented no "colorable" argument.

Mr. Doe's appeal readily met all three criteria required of a viable appeal.

### 1.    Mr. Doe's Appeal Was Based on Relevant Information.

First, the undisputed facts show that Mr. Doe's appeal was based on information that was "relevant to the case." Ex. 14 at 8.  The expert toxicology report addressed whether Ms. Roe told an internally consistent story about her level of intoxication and the actions she performed, going directly to her credibility. Q.W.'s statement addressed how intoxicated Ms. Roe outwardly appeared when Mr. Doe was talking to her.  The panel credited Ms. Roe's testimony about her level of intoxication, and it heard and relied on witness testimony about how Ms. Roe outwardly appeared in concluding that Mr. Doe should have known she was incapacitated.  Ex. 12 at 6. The evidence underlying Mr. Doe's appeal was obviously relevant to the case.

---

[13] *Available at* https://en.oxforddictionaries.com/definition/viable (last visited March 5, 2018).

## 2.      Mr. Doe's Appeal Was Based on New Evidence.

Second, it is undisputed that the toxicology report and the statement of Q.W. were "not previously presented at the hearing or the conference." Ex. 14 at 8. The toxicology report could not have been, as the Court has rightly recognized, because the hearing was the first place that Ms. Roe's alcohol consumption was precisely quantified. ECF No. 25 at 10 ("By any standard, this was 'new information' that could not have been presented *at* the hearing[.]"). But as the Court also held, the question under the plain meaning of the Code is not whether the information was "newly discovered" but simply whether it was "new." *Id.* at 9-10. The meaning of the provision is not "facially uncertain" such that extrinsic evidence of some non-obvious meaning is permitted. *Farmland Indus., Inc.*, 904 F.2d at 736. Not only is the meaning of the Code plain, but reading "new information" to mean "newly discovered or newly available information" would make the subsequent phrase "not previously presented at the hearing or conference" redundant, because *all* evidence discovered after a hearing, or made available after a hearing, will necessarily be evidence that was not presented at the hearing. *Clyburn v. 1411 K Street Ltd. P'ship*, 628 A.2d 1015, 1018 (D.C. 1993) ("A contract must be interpreted as a whole. No language therein should be viewed as redundant. Accordingly, the language limiting the guarantor's liability to a stated sum must be given some effect.") (internal citations omitted). As the Court additionally recognized, the Code was written for college students, not lawyers, and it must be read as college students would read it, without implied lawyerly qualifications. ECF No. 25 at 10; *see also Giles v. Howard Univ.*, 428 F. Supp. 603, 605 (D.D.C. 1977) ("the standard is that of reasonable expectation – what meaning the party making the manifestation, the University, should reasonably expect the other party," its students, to give it"). For all of these reasons, Mr. Doe's appeal satisfied this second prong of viability under the Code.

     **3.**     **The Information on Which Mr. Doe's Appeal Was Based Was Capable of, and In Fact Would Have Succeeded in, Significantly Altering the Findings of Fact.**

Third, the undisputed facts also show that the information contained in Mr. Doe's appeal was capable of significantly altering the hearing panel's findings that Ms. Roe was incapacitated and that Mr. Doe knew or should have known that she was.  The new evidence on which it was based severely undermined the credibility of Ms. Roe's testimony about how much she had to drink and how intoxicated she was.  *See* ECF No. 25 at 10 ("Thus, while the hearing panel interpreted the testimony concerning Ms. Roe's alcohol consumption, the expert's opinion might have affected the panel's evaluation of her testimony.").  The toxicology report showed just how incapacitated Ms. Roe would have been had she consumed as much alcohol as she said she did and just how incapable she would have been of performing the actions she says she performed or having the memories she says she had.  Ex. 16. For his part, Q.W. testified in his statement that he had a "normal, lucid conversation" with Ms. Roe soon after Mr. Doe met her, Ex. 18, making him the fifth person out of five to witness her *at the party* and notice no signs of incapacitation.  Ms. Roe's testimony was the only evidence (apart from E.E.'s testimony) supporting the idea that she was incapacitated at the party.  It goes without saying that no finding against Mr. Doe can stand when his accuser is so lacking in credibility.

The toxicology report also destroyed whatever possibility there still was to believe that Ms. Roe had actually called E.E. from the Uber, the primary fact on which the board relied in concluding that Mr. Doe should have known that she was incapacitated.  The report makes clear that Ms. Roe would have been far too intoxicated to have physically handled her phone, dialed E.E., and spoken an intelligible sentence to her had she actually drunk as much as she says she did.  That would have taken far more coherence and coordination than Dr. Milman says she

would have had—and more, in fact, than *Ms. Roe herself* originally says she had in the car.  Ex. 13 at 6.

The toxicology report also lays bare just how damning the testimony was of one of Ms. Roe's investigation witnesses, who said that he saw her walking across the street as she was leaving but gave *no* testimony whatsoever that she looked intoxicated or had any trouble in doing so.  *Id.* at 25.  If Ms. Roe had consumed as much as she claimed, she could not have made that walk unassisted, or without extremely obvious signs of her severe intoxication.  Yet this witness noticed nothing like that.  And this would have happened just *minutes* before the alleged phone call with E.E. took place and Ms. Roe allegedly fell asleep or passed out in the car.  At a minimum, it would have showed the hearing board that Ms. Roe did not appear incapacitated when she allegedly spoke with E.E. on the phone.  Of course, as we now know, that phone call never happened.  But even before that was known, Dr. Milman's report would have provided the hearing board with evidence that Ms. Roe's testimony about her level of intoxication could not be squared with how she was observed immediately before the alleged phone call happened.

What is true for this witness is true for all of the approximately 100 people at the party. There is testimony from *none* of them, including Ms. Roe's friends, that she exhibited a single sign of incapacitation there.  It is impossible to believe that a normal-sized 18- or 19-year old woman who had consumed "over ten drinks" of alcohol in two hours and had a BAC of at least 0.26 would appear severely intoxicated to no one.  It is even less possible to believe that she simultaneously *should have* appeared incapacitated to Mr. Doe.  The lack of witness evidence is absolutely damning.  Or at least it should have been.  The University breached its contract with Mr. Doe, and the covenant inherent in it, in rejecting his appeal.  *Doe v. Univ. of Notre Dame*, No. 3:17-cv-298, 2017 WL 1836939, at *11 (N.D. Ind. May 8, 2017), *vacated by request of the*

*parties after settlement*, No. 3:17-cv-298, 2017 WL 7661416 (N.D. Ind. Dec. 27, 2017)

("conclusory and dismissive denial" of "very substantive request to appeal" suspension

"contribute[d] to an ultimate finding that Notre Dame's process was arbitrary and capricious").

## II.    E.E.'S PHONE RECORDS ALSO SATISFY THE THREE CRITERIA FOR VIABLE APPEALS AND SHOULD BE CONSIDERED BY ANY APPEAL AUTHORITY ON REMAND.

Finally, the undisputed facts show that E.E.'s phone records can also support a viable

appeal.  They pertain to a key alleged event that night and therefore are relevant to the case.

They were obtained through this litigation and therefore were not, and could not have been,

presented to the hearing board.  And they unquestionably are capable of significantly altering the

findings of fact because the panel relied on alleging slurring observed by Mr. Doe as a basis for

finding him responsible, Ex. 12 at 6, and the only such alleged instance of that was Ms. Roe's

phone call with E.E.  The phone records do nothing less than eliminate the panel's primary basis

for concluding that Mr. Doe should have known Ms. Roe was incapacitated.

## CONCLUSION

For the foregoing reasons, John Doe respectfully requests that his Motion for Partial

Summary Judgment be granted and that this Court enter an order requiring GW to do the

following:

- Reach a decision on the merits of his appeal within 20 calendar days of its submission by John Doe;

- Include the phone records as evidence on which the appeal is based; and

- Let John Doe brief the appeal again to discuss the new phone record evidence.

Ms. Roe and E.E. fabricated evidence, the most critical evidence in the case.  GW and

Mr. Doe were both lied to, and both have the documents proving it.  Those lies, and the damage

to Mr. Doe's future, should not be allowed to stand simply because GW is under too much pressure to publicly acknowledge them as such.

Respectfully submitted,

DATED:  May 16, 2018

/s/ Christopher C. Muha
Justin Dillon (D.C. Bar No. 502322)
Christopher C. Muha (D.C. Bar No. 987116)
KAISERDILLON PLLC
1401 K Street NW, Suite 600
Washington, DC 20005
T: (202) 640-2850
F: (202) 280-1034
jdillon@kaiserdillon.com
cmuha@kaiserdillon.com

*Attorneys for Plaintiff John Doe*