IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF COLUMBIA

| | |
|---|---|
| **JOHN DOE**, ) | |
| ) | |
| Plaintiff, ) | Civil Action No. 1:18-cv-553-RMC |
| ) | |
| v. ) | |
| ) | |
| **THE GEORGE WASHINGTON** ) | |
| **UNIVERSITY**, ) | |
| ) | |
| Defendant. ) | |
| ) | |

**STATEMENT OF MATERIAL FACTS AS TO
WHICH THERE IS NO GENUINE DISPUTE**

Pursuant to Local Rule 7(h)(1), John Doe respectfully submits the following statement of materials facts as to which there is no genuine dispute in support of his Motion for Partial Summary Judgment.

**I.     BACKGROUND**

1. On September 12, 2015, John Doe and Jane Roe met at a party. Ex. 1 at 4.

2. At the time, they were students at The George Washington University ("GW" or the "university"). *Id.*

3. John Doe was a virgin and a non-drinker of alcohol for religious reasons. Ex. 2 at 52.

4. A little before midnight, Mr. Doe and Ms. Roe took an Uber to Mr. Doe's dorm using Ms. Roe's Uber account. Ex. 1 at 13.

5. Sometime after 12:21 a.m., Mr. Doe and Ms. Roe had sexual intercourse in Mr. Doe's dorm room. *Id.* at 4, 29.

6. After they had intercourse, Ms. Roe went back to her dorm on foot unaided. *Id.* at 4, 29.

7. On October 3, 2016, Aniqa Raihan, a student at GW, alleged she had been sexually assaulted more than two years earlier. *Raihan v. George Washington Univ.*, No. 1:18-cv-994-TNM (D.D.C. April 27, 2018), ECF No. 1 at ¶ 44 (hereafter "Raihan Compl.").

8. Ms. Raihan alleged that she was assaulted in that student's dorm room when she was too intoxicated to consent to sexual activity. *Id.* ¶ 34.

9. Ms. Raihan claimed that she went "in and out of consciousness before blacking out" and remembered only a part of the unwanted sexual activity. *Id.* ¶¶ 34-35.

10. Two years later, on October 3, 2016, Ms. Raihan filed a complaint with GW against her alleged assailant. *Id.* ¶ 44.

11. On March 24, 2017, Ms. Raihan learned that her alleged assailant was found responsible by GW and given a deferred suspension. *Id.* ¶ 55.

12. On April 2, 2017, Ms. Raihan "went public with a Change.org petition" demanding that her alleged assailant "be expelled" and "be terminated from his employment." *Id.* ¶ 59. She also demanded that GW implement "[m]andatory suspensions for those found guilty of sexual violence." *Id.*

13. In response to Ms. Raihan's petition, three GW administrators issued a statement on April 21 rebutting "[t]he narrative emerging from the petition . . . that GW has been reluctant or even unwilling to hold individuals accountable for acts of sexual

violence."[1] That narrative, they said, "is not borne out by our record," because all ten complaints of sexual violence referred to a hearing board in academic years 2015-2016 and 2016-2017 resulted in findings of responsibility, and nine of those ten resulted in suspension or expulsion.[2]

14. On May 1, the GW Student Association Senate voted unanimously in support of Ms. Raihan's demands.[3]

15. On May 20, at GW's commencement, Ms. Raihan unfurled a sign that read, "#GWProtectsRapists" and shouted at her alleged assailant. Exs. 5-6; Raihan Compl. ¶ 75.

16. On June 2, members of GW's general counsel's office, its Provost, and its Vice Provost for Diversity, Equity and Community Engagement met with Ms. Raihan. Raihan Compl. ¶ 77.

17. In July, GW hired its full-time Title IX Investigator, someone who had "[r]epresented crime victims" and "student-survivors" in courts and "Title IX administrative hearings" and who had "[d]eveloped Survivor Toolkits" for sexual assault claimants at "the eight universities in DC." Ex. 7. The University also commissioned a law firm to comprehensively review its Title IX enforcement regime. Ex. 8.

---

[1] *See* "Message from University Administrators," attached as Exhibit 3 and available at https://gwtoday.gwu.edu/message-university-administrators (last visited May 16, 2018).
[2] *Id.*
[3] *See* "SA Senate supports sexual assault survivor in campaign to expel her assailant," *GW Hatchet*, attached as Exhibit 4 and available at https://www.gwhatchet.com/2017/05/02/sa-senate-supports-sexual-assault-survivor-in-campaign-to-expel-her-assailant/ (last visited May 16, 2018).

18. On August 7, Ms. Raihan published an article about her Change.org petition and her graduation protest in *Ms. Magazine*.[4]

19. On September 10, Ms. Raihan filed a Title IX complaint against GW with the Education Department's Office for Civil Rights.[5]

20. On October 20, GW students "speaking on [Ms. Raihan's] behalf" at an event outside of the Education Department claimed that GW "fail[ed] survivors time and time again." Ex. 11.

## II. MS. ROE'S COMPLAINT AND SUPPLEMENTS

21. Ten days after that protest, on October 30, 2017, Ms. Roe filed a complaint with GW alleging that John Doe had sexually assaulted her on the morning of September 13, 2015. Ex. 1 at 4.

22. Like Ms. Raihan, Ms. Roe claimed she had been assaulted approximately two years earlier. *Id.*

23. Like Ms. Raihan, Ms. Roe's alleged assailant would soon be graduating. Ex. 2 at 61.

24. Like Ms. Raihan, Ms. Roe alleged that she had been assaulted in her assailant's dorm room. Ex. 1 at 4.

25. Like Ms. Raihan, Ms. Roe alleged that she was in a blackout state due to alcohol intoxication and remembered only a part of the alleged assault. *Id.*

---

[4] *See* Aniqa Raihan, "I Fought Campus Rape Culture – With the Help of Title IX," *Ms. Magazine* (Aug. 7, 2017), attached as Exhibit 9 and available at http://msmagazine.com/blog/2017/08/07/fought-campus-rape-culture-help-title-ix/ (last visited May 14, 2018).

[5] *See* "Alumna files federal Title IX complaint after leading high-profile protests," *GW Hatchet*, attached as Exhibit 10 and available at https://www.gwhatchet.com/2017/09/25/alumna-files-federal-title-ix-complaint-after-leading-high-profile-protests/ (last visited May 16, 2018).

26. Ms. Roe claimed in her initial complaint that on October 30 that she drank an unspecified amount of alcohol at a pre-game party on the night of September 12, 2015, then arrived at a party at an off-campus house known as the rugby house at 10:46 p.m. *Id.*

27. She claimed that she had "several drinks" at the party and that her roommate and her roommate's boyfriend "left shortly after I arrived." *Id.*

28. She stated that she "remember[ed], though unclearly," meeting Mr. Doe at the party, but that she "d[id] not remember calling or getting into a [sic] Uber" with him. *Id.*

29. She stated that she believed that she "fell asleep or was groggy" in the Uber but could remember nothing more about the ride. *Id.*

30. According to Ms. Roe's Uber records, she and Mr. Doe left the party at 11:56 p.m. and arrived at Mr. Doe's building at 12:21 a.m. *Id.*

31. Ms. Roe claimed to remember nothing in Mr. Doe's dorm room until she "woke up on a bed in the dorm, facedown while the respondent was penetrating me." *Id.* She alleged that she tried to push him away, then verbalized a "no" and tried to pull herself away, but that Mr. Doe ignored her and continued having sex with her until he ejaculated on her. *Id.*

32. According to Ms. Roe, she then "quickly got out of bed and dressed, and went down the stairs to exit the building." *Id.* She says she then "walked" home where she found her "roommate and her boyfriend." *Id.*

33. Ms. Roe says her roommate followed her into the bathroom and Ms. Roe "explained to her the details of what had happened." *Id.*

34. Ms. Roe stated, at the end of her complaint, that it "contains everything I can recall." *Id.* at 5.

35. Three days later, on November 2, Ms. Roe submitted a "supplement" to her complaint. *Id.* at 6-7.

36. Ms. Roe now specified that she had consumed "5 Solo cups of beer" at the rugby party. *Id.* at 6.

37. She now said that she remembered where she sat in the Uber. *Id.*

38. She now said that she remembered someone asking her why she was leaving the party. *Id.* She said she couldn't "recall any conversation or interactions taking place in the car," didn't remember any interactions "with [Mr. Doe]" there, and "felt like [she] couldn't speak." *Id.* She did, however, now claim to remember wanting to tell the Uber driver that she wanted to get out. *Id.* at 6-7. She also claimed to have two memories between the time she saw the names on the door and the time she woke up on his bed (specifically, "where his bed was in the room" and that "the lights in his room were on when we arrived"). *Id.* at 7. She also claimed to have remembered "falling down the stairs as [she] exited." *Id.* She failed to explain how she could have fallen only once given her claimed level of intoxication.

39. On November 6, Ms. Roe submitted a second supplement to her complaint. *Id.* at 8. Ms. Roe now claimed to remember drinking a Solo cup of "jungle juice," a strong mixed drink, after drinking the five cups of beer. *Id.*

40. In none of her written statements did Ms. Roe state that she used the bathroom at any point or that she suffered incontinence when she allegedly passed out. *Id.* at 4-8.

### III. GW'S INVESTIGATION

41. By November 19, five people had submitted witness statements for the investigation. *Id.* at 23-27. Three of those witnesses testified to having seen Ms. Roe at the rugby party that night, but *none* of them testified that she looked intoxicated. *Id.*

42. The first witness testified to "seeing [Mr. Doe and Ms. Roe] talking" and did not say that she looked drunk, that she had trouble standing, that she was acting oddly, or that she was showing any other obvious signs of intoxication. *Id.* at 24.

43. The second witness testified that Ms. Roe "mostly hung out in a group in the back corner of the yard" but said nothing about her appearing intoxicated while she did so. *Id.* at 25. He said that he "vaguely remember[ed] seeing her cross the street" and did not say that she stumbled or had trouble doing so. *Id.*

44. The third witness testified to "seeing [Ms. Roe] in the backyard with a few of her friends." *Id.* at 26. He said nothing about Ms. Roe appearing intoxicated at the party. *Id.* at 26.

45. On November 20, a former student at GW, E.E., submitted a witness statement. *Id.* at 28. Her statement said that after she lost track of Ms. Roe at the rugby party, "*we*" (she and their friends) "called [Ms. Roe] and she said she was in an Uber with the suspected assailant but she was slurring her worlds [sic] and speaking incoherently and we couldn't understand anything else over the phone.

7

> She was obviously not in a conscious state of mind, definitely too drunk/maybe even drugged to consent. We all went to go look for her but that point it was too late and that is all I can remember." *Id.*

46. E.E. did not identify the other people who joined her in making this phone call and searching for Ms. Roe. *Id.*

47. On November 20, Mr. Doe submitted a statement responding to Ms. Roe's complaint and supplements. *Id.* at 29.

48. He testified there that at the party he heard a woman near him say to her friend, "I want to have sex with someone right now." *Id.* He turned and approached the women and introduced himself. *Id.* The woman who had made the statement was Ms. Roe. *Id.*

49. Mr. Doe testified that Ms. Roe showed no obvious outwards signs of intoxication—she did not slur her words, she did not have trouble standing, and she was responding to him coherently. *Id.* She was not holding a drink, either. *Id.* He said that they talked about their majors and a religion course she was taking. *Id.*

50. Mr. Doe said that Ms. Roe, who had been texting her roommate about the availability of their room, then asked him, "Can we fuck in your room?" *Id.* About ten minutes later, she asked him if he wanted to leave and called an Uber to take them to his dorm. *Id.*

51. Mr. Doe testified that Ms. Roe was doing things on her phone for most of the car ride. *Id.*

52. Mr. Doe testified that after they arrived, they went up to Mr. Doe's room and began making out. *Id.* They undressed themselves down to their underwear, and after about five minutes Ms. Roe pulled down Mr. Doe's underwear and performed oral sex on him. *Id.* She then took off her own underwear, and Mr. Doe performed oral sex on her while she held his head. *Id.*

53. Mr. Doe testified that she then put her hand on his penis and helped him insert it into her vagina, and they had missionary-style sex for a few minutes. *Id.* When Mr. Doe asked her to turn over, she got on her hands and knees, and they had sex with Mr. Doe behind her. *Id.*

54. Mr. Doe testified that Ms. Roe Ms. Roe then said, "Let me get on top of you." *Id.* Mr. Doe lay down on his back and Ms. Roe squatted over top of him and thrust up and down on him until he pulled out and ejaculated. *Id.* Ms. Roe then rubbed his penis for a few seconds and said, "Wow, that was exhausting." *Id.* Mr. Doe responded that it was. *Id.*

55. Mr. Doe said in his response that he next got up to put his pants on. *Id.* Ms. Roe then said to him, "We should fuck again." *Id.* Mr. Doe, however, said that the was too tired and wanted to go to bed. *Id.*

56. Mr. Doe testified that he offered Ms. Roe the opportunity to stay the night but that she said she would rather go home. *Id.* Mr. Doe offered to walk her home, but she turned down the offer. *Id.* They said goodbye to each other, and she left. *Id.*

**IV.   THE HEARING**

57. On December 14, 2017, GW held a hearing on Ms. Roe's allegations. Ex. 2 at 1.

58. Ms. Roe testified at the hearing that at the party, she "remember[ed] spending a lot of the night with my roommate at the time, [A.C.], and her boyfriend, [R.B.]," Ex. 2 at 7, despite having written on October 30 that A.C. and R.B. "left shortly after I arrived," Ex. 1 at 4.

59. Ms. Roe testified at the hearing that she remembered talking with E.E. on the phone in the Uber, Ex. 2 at 12, despite having written on November 2 that she "can't recall any conversation or interactions taking place in the car" and "felt like [she] couldn't speak," Ex. 1 at 7. Ms. Roe did not explain why she failed to mention this phone call earlier. *Id.*

60. Ms. Roe testified at the hearing, "I don't remember gathering my clothes or my bag" before leaving Mr. Doe's room, Ex. 2 at 9, despite having written on November 2 that she "grabbed [her] things quickly" before leaving, Ex. 1 at 7.

61. Ms. Roe testified at the hearing that she "ran back to [her] residence hall" after the alleged assault, Ex. 2 at 9, despite having written on October 30 that she had "walked" there, Ex. 1 at 4.

62. Ms. Roe admitted to attending a subsequent party at the rugby house, Ex. 2 at 15, even though she claimed during the investigation that she never did, Ex. 1 at 16.

63. Ms. Roe's first witness at the hearing, J.E., testified that Ms. Roe had "at least four . . . minimum four" drinks at the pregame, Ex. 2 at 24, and that the women there were stumbling and slurring their words a bit as they left, *id.* at 25.

64. J.E.'s testimony at the hearing was the first time anyone had quantified how much Ms. Roe allegedly drank at the pre-game party. Ex. 1 at 1-29.

65. J.E. gave no testimony about how Ms. Roe appeared at the party. Ex. 2 at 24-25.

66. Ms. Roe's second witness was R.M. He testified that there were "easily 100 people" at the party. *Id.* at 33.

67. R.M. was the only person to testify, either before or during the hearing, that Ms. Roe looked intoxicated at the rugby party. *Id.* at 31. R.M. could point to no specific outward signs telling him that. *Id.*

68. R.M. expressly refused to speculate to what degree Ms. Roe was intoxicated. *Id.*

69. The chair of the hearing panel refused to let Mr. Doe reveal R.M.'s potential bias by letting him establish that R.M. had been romantically involved with Ms. Roe. *Id.* at 35.

70. Ms. Roe's third and final witness at the hearing was E.E. *Id.* at 36.

71. E.E. testified twice at the hearing that Ms. Roe called her from the car that night, *id.* at 38, 41, despite having testified in writing approximately three weeks earlier that she and her friends had called Ms. Roe, Ex. 1 at 28.

72. E.E. said that the call could not have lasted "more than 30 seconds." Ex. 2 at 41.

73. E.E. testified that after the phone call, Ms. Roe's roommate, A.C., went to look for Ms. Roe, *id.* at 38, even though Ms. Roe had testified on October 30 that A.C. went home soon after they arrived at the party, Ex. 1 at 4.

74. E.E. testified that Ms. Roe had told her "they were going to his apartment," Ex. 2 at 40, even though Ms. Roe had testified on November 2 that she did not know where they were going in the Uber, Ex. 1 at 6.

75. Ms. Roe also never explained, nor was she asked to explain, why she failed, in three separate complaint statements, to mention this call. Ex. 2 at 1-68.

76. Mr. Doe testified at the hearing that he and Ms. Roe talked outside the party for some time after he introduced himself. *Id.* at 44-45. He testified that Ms. Roe told him about an religion course she was taking. *Id.*

77. Mr. Doe expressly denied at the hearing that Ms. Roe made any kind of phone call while they were in the Uber. *Id.* at 45.

78. Mr. Doe testified that Ms. Roe was "looking at her phone for most of" the Uber ride, "texting or on social media or something." *Id.*

79. Mr. Doe said that he and Ms. Roe "didn't really exchange very many words" in the Uber." *Id.*

80. As to the sexual activity itself, Mr. Doe testified consistently with his November 20 statement. *Id.* at 46; Ex. 1 at 29.

V. **GW's Finding and Sanction Against Mr. Doe**

81. On January 23, 2018, GW informed Mr. Doe that the Hearing Board had found him responsible for sexually assaulting Ms. Roe and that he would be suspended for one year. *See* Ex. 12.

82. The Board's decision "acknowledge[d] the statements made by [Mr. Doe] regarding [Ms. Roe's] actions that indicated to him that he had consent: [Ms. Roe] asked him to make arrangements to find a place to have sex, requested the Uber, removed his clothing, initiated oral sex on him, agreed to change positions when asked, and requested that they change positions." *Id.* at 6.

83. The Board nevertheless concluded that Ms. Roe's "level of intoxication reached the point of incapacitation," and expressly relied on Ms. Roe's own testimony in so finding. *Id.* at 5.

84. The Board also concluded, for two reasons, that Mr. Doe should have known that Ms. Roe was incapacitated: (1) "the statements of the witnesses, indicating that they observed [Ms. Roe] acting in an intoxicated manner, in stumbling and slurring her words," and (2) "[Mr. Doe's] statements that the Complainant ceased conversation with him after leaving the party." *Id.* at 6.

## VI. Mr. Doe's Appeal

85. Mr. Doe filed a timely appeal of the hearing board's finding on January 30, 2018. *See* Ex. 13.

86. GW's Code of Conduct allows parties to appeal adverse findings "based on new information that is relevant to the case, that was not previously presented at the hearing or conference, and that significantly alters the finding of fact." Ex. 14 at 8.

87. Appeals proceed through a two-step process. First, the University's Executive Director of Planning & Outreach makes a determination of "viability." *Id.* Then the appeal is forwarded to three members of the Committee on the Judicial System who "review and decide the appeal" on its merits. *Id.*

88. Mr. Doe based his appeal on two pieces of evidence that had not been presented in the investigation or at the hearing: a report by an expert toxicologist who analyzed Ms. Roe's level of intoxication based on her reported consumption, and a statement from another student, Q.W., about his interaction with Ms. Roe at the rugby party. *See* Ex. 13 at 1; Ex. 15 (Report of Dr. Harry Milman); Ex. 16 (CV of Dr. Harry Milman); Ex. 17 (Statement of Q.W.).

89. Mr. Doe could not have presented the toxicology report earlier, because the hearing was the first time that anyone testified to the number of drinks Ms. Roe had consumed at the pregame. Ex. 1 at 1-29.

90. The toxicologist concluded, based on the testimony of Ms. Roe and her witnesses about how much she drank and when, that Ms. Roe would have had a BAC of at least 0.26 (if she had consumed only 10 drinks), at which level it would be (1) "unlikely . . . that she would have had *any* memory of the car ride" or "*any* memory of anything that had occurred thereafter," and (2) "*extremely* unlikely" that she could have "dressed herself, run down eight flights of stairs, run one block to her home," and been "coherent enough to be able to explain to her roommate" what had supposedly happened. Ex. 15 at 5 (emphasis added).

91. Ms. Roe herself testified at the hearing that she had consumed not just ten drinks, but "over ten drinks." Ex. 2 at 62.

92. Q.W. testified in his statement that he had a "normal, lucid conversation" with Ms. Roe as he and Mr. Doe talked to her after they met her. Ex. 17 at 1.

93. Q.W. attached to his statement a picture of himself and Mr. Doe taken at the party at 11:16 p.m., *see* Ex. 13 at 1, and testified that he and Mr. Doe met Ms. Roe shortly after they took that picture, Ex. 17 at 1.

94. Mr. Doe's appeal argued that this new evidence showed that Ms. Roe was not credible and that, if she were in fact incapacitated, there was no way that Mr. Doe reasonably could have known that. Ex. 13 at 1-11.

95. As to the former, Mr. Doe's appeal argued that the toxicology report showed either that Ms. Roe had grossly exaggerated the amount of alcohol she had

consumed or that she was untruthful about the memories she claimed to have and the actions she claimed to have performed. *Id.* at 2.

96. Mr. Doe's appeal further noted that if Ms. Roe had consumed as much alcohol as she said she had, her extreme level of intoxication would have been obvious to everyone who saw her, especially the witness who saw her walk across the street, *id.* at 7. Yet no one, Mr. Doe argued, testified to seeing her stumble, slur her words, or act severely drunk at the party. *See generally* Exs. 1-2. Instead, Q.W. reported having a "normal, lucid conversation" with her. Ex. 13 at 8.

97. Mr. Doe's appeal also argued that not a single "witness[]" had "observed [Ms. Roe] acting in an intoxicated manner, in stumbling and slurring her words" at the actual party; three witnesses who saw her there said nothing about her looking intoxicated, *id.* at 6-7, a fourth (R.M.) would say only that she looked "intoxicated," *id.* at 7, and now a fifth—Q.W.—testified that he had a "normal, lucid conversation" with her, *id.* at 8.

98. Mr. Doe's appeal further argued that the toxicology report proved that Ms. Roe would have been too intoxicated to have gotten her phone out, made a call, spoken an intelligible sentence and remember any of it if she had consumed as much alcohol as she said she had. *Id.* at 9.

99. The appeal also offered several more reasons to doubt that the phone call ever occurred, including:

    a. That E.E. changed from saying that *she* had called *Ms. Roe,* as part of a dramatic chain of events prompted by fears for Ms. Roe's safety—to saying that *Ms. Roe* had called *her*.

15

       b. That neither Ms. Roe nor E.E. ever identified the others who, with E.E., allegedly both called Ms. Roe and then searched for Ms. Roe that night.

       c. That if this call had actually happened, E.E would have discussed it with Ms. Roe long ago and it would have appeared in one of Ms. Roe's three complaint statements.

*Id.* at 9-10.

100. Mr. Doe's appeal also explained that he was quiet in the Uber because he was nervous about having sex for the first time, felt awkward that a third person whom he didn't know well was in the front seat, and Ms. Roe was calmly buried in her phone the entire time. *Id.* at 10.

101. Mr. Doe's appeal also noted that the board gave no explanation why it would credit his testimony that they didn't talk in the Uber—he was the only source of that testimony—yet fail to also credit his testimony that Ms. Roe was busy on her phone the entire ride, not lying there catatonic. *Id.* at 11.

102. On February 15, Robert Snyder, the University's Executive Director of Planning & Outreach, rejected Mr. Doe's appeal as not viable without explanation. Ex. 18 (Appeal Decision Letter) at 1. Mr. Snyder's decision letter simply repeated the threshold requirements of an appeal identified in Article 33, then stated, with no elaboration, "[I]t is my determination that you have not met the requirements for an appeal." *Id.*

## VII. Post-Litigation Developments

103. On March 8, 2018, Mr. Doe filed his complaint in this matter. *See* ECF No. 3.

104. On March 16, this Court granted John Doe permission to serve a subpoena on AT&T seeking E.E.'s phone from the night of September 12-13, 2015. *See* Minute Order, *Doe v. The George Washington Univ.*, No. 1:18-cv-553-RMC (D.D.C. March 16, 2018).

105. Mr. Doe received those records on the afternoon of March 26, 2018. Declaration of Christopher C. Muha ("Muha Decl.") ¶ 20.

106. According to those records, E.E. neither placed nor received a phone call between 11:56 p.m. on September 12 and 12:21 a.m. on September 13. Ex. 19 at 18-20.

107. On the morning of March 26, just hours before Mr. Doe received E.E.'s phone records, Jane Roe, in a post on a social media page of hers, publicly identified John Doe by his true name in connection with this lawsuit and called him a rapist. Access to that post is not restricted by Jane Roe in any way; it is available to anyone with a computer. Muha Decl. ¶ 28.

108. On the morning of March 28, Mr. Doe filed a complaint with GW via email against Ms. Roe for retaliation and breach of confidentiality based on her disclosure of his identity and details of the disciplinary process, and for providing false evidence at his disciplinary hearing based on the fact that she never spoke with E.E. in the Uber. Ex. 20 at 1. He attached the social media post and the phone records to that email. *Id.* at 1-4.

109. Mr. Doe received no response from GW by the afternoon of March 29. Ex. 21 at 1. He again emailed Mr. Muhammad, GW's Title IX Coordinator, about his complaint. *Id.*

110. Mr. Muhammad responded on April 2. *Id.* He stated that the Office of General Counsel would be in touch regarding the inquiry since litigation was pending. *Id.*

111. On April 6, Mr. Muhammad responded that his office had reviewed John Doe's complaint and asked to set up a time to discuss the complaint. Ex. 22 at 1.

112. On April 25 John Doe and his advisor, Justin Dillon, met with Mr. Muhammad and Toi Carter from GW's General Counsel's office to discuss his complaint against Jane Roe. Muha Decl. ¶ 29.

113. By May 14, more than two weeks later, John Doe had heard nothing from GW regarding the status of his complaint. Ex. 23 at 1. Mr. Doe emailed Mr. Muhammad that day, noting that "[i]t has been over two weeks since I met with you to discuss my initial complaint and over a month and a half since I sent my initial email with all of the relevant evidence." *Id.* He asked Mr. Muhammad for an update and whether Mr. Muhammad intended to do anything with his complaint. *Id.*

114. This morning, May 16—the same day that John Doe's Motion for Partial Summary Judgment is due to be filed—Mr. Muhammad responded, "I will be forwarding your complaint to our Office of Students Rights and Responsibility (SRR) for consideration." *Id.*

115. Meanwhile, on April 27, 2018, Aniqa Raihan sued GW in this Court for violations of Title IX and for common law negligence based on its handling of her sexual assault complaint. *See Raihan v. George Washington Univ.*, No. 1:18-cv-994-TNM (D.D.C. April 27, 2018).

116. That same day, Ms. Raihan held a press conference announcing that she had filed her lawsuit.[6]

117. On or around May 14, 2018, Thomas J. LeBlanc, the President of GW, addressed the Faculty Senate regarding adoption of a proposed new Title IX policy.[7] He said at that meeting, "How do we handle cases next year?  Do we take faculty before panels made up of students and staff?  **Do we have essentially untrained or well-meaning individuals doing the investigation?  Do we have no decent appeal rights to an outside entity who's actually trained in this?**  I mean there's a lot of questions that our current policy raises.  And it's a judgment call as to we're better off adopting a policy that has some warts to it, but they're not the kinds of warts that we have proven over time create horrible effects on our campus as is the case of the older policies like the one we have now."[8]

                                                                              /s/_____
                                                          Justin Dillon (D.C. Bar No. 502322)
                                                          Christopher C. Muha (D.C. Bar No. 987116)
                                                          KAISERDILLON PLLC
                                                          1401 K Street NW, Suite 600
                                                          Washington, DC 20005
                                                          T: (202) 640-2850
                                                          F: (202) 280-1034
                                                          jdillon@kaiserdillon.com
DATED:  May 16, 2018                        cmuha@kaiserdillon.com

                                                          *Attorneys for Plaintiff John Doe*

---

[6] Dani Grace and Leah Potter, "Alumna sues University, claims GW created 'hostile culture' for sexual assault survivors," *GW Hatchet* (April 30, 2018), attached as Exhibit 24 and available at https://www.gwhatchet.com/2018/04/30/alumna-sues-university-claims-gw-created-hostile-culture-for-sexual-assault-survivors/ (last visited May 14, 2018).

[7] *See* "Proposing new Title IX policies," *GW Hatchet* podcast (May 14, 2018), available at https://www.gwhatchet.com/2018/05/14/getting-to-the-bottom-of-it-proposing-new-title-ix-policies/) (last visited May 16, 2018).

[8] *Id.* at 4:42-5:24 (emphasis added); see also Muha Decl. ¶ 27.