IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

- - - - - - - - - - - - - - - - x

JOHN DOE,

                     CA No. 1:18-cv-00553-RMC

       Plaintiff,

                     Washington, D.C.
v.                 Thursday, April 12, 2018
                     2:00 p.m.


THE GEORGE WASHINGTON UNIVERSITY,

      Defendant.

- - - - - - - - - - - - - - - - x

_____

TRANSCRIPT OF PRELIMINARY INJUNCTION HEARING
HELD BEFORE THE HONORABLE ROSEMARY M. COLLYER
UNITED STATES DISTRICT JUDGE

_____

APPEARANCES:

For the Plaintiff:     Justin Dillon, Esq.
                          KAISER DILLON, PLLC
                          1401 K Street, NW
                          Suite 600
                          Washington, DC 20005
                          (202) 640-2850

For the Defendants:    Joshua W.B. Richards, Esq.
                          Jason A. Ross, Esq.
                          SAUL EWING ARNSTEIN & LEHR LLP
                          Centre Square West
                          1500 Market Street (38th Floor)
                          Philadelphia, PA 19102-2186
                          (215) 972-7737

Court Reporter:        Timothy R. Miller, RPR, CRR, NJ-CCR
                          Official Court Reporter
                          U.S. Courthouse, Room 6722
                          333 Constitution Avenue, NW
                          Washington, DC 20001
                          (202) 354-3111


Proceedings recorded by machine shorthand; transcript
produced by computer-aided transcription.

1              **P R O C E E D I N G S**

2                  THE DEPUTY CLERK:  Civil Action 18-553, John Doe

3      v. George Washington University.

4                  For the plaintiff, Justin Dillon; for the defense,

5      James -- excuse me, Jason Ross and Joshua Richards.

6                  THE COURT:  Good afternoon, everyone.

7                  MR. RICHARDS:  Good afternoon, Your Honor.

8                  MR. DILLON:  Good afternoon, Your Honor.

9                  MR. ROSS:  Good afternoon, Your Honor.

10                 THE COURT:  Thank you for coming.

11                 This is a hearing on the motion for preliminary

12     injunction.  It's not the permanent injunction that we're

13     talking about today.  I had some early questions, if you

14     will, for defense counsel.  I assume you're ready to --

15                 Oh, no, I actually meant you.

16                 MR. DILLON:  Oh, okay.  Sorry.

17                 THE COURT:  I said defense, but I actually meant

18     the plaintiff.  Anyway, I had some early questions for you

19     to -- before we begin argument, but let me ask if you had

20     any evidence that you wanted to present beyond argument.

21                 MR. DILLON:  The evidence, Your Honor, is the

22     declarations, and also, the plaintiff's Preliminary

23     Injunction-1 which I've passed up to the Deputy Clerk.

24                 THE COURT:  Yes.

25                 MR. DILLON:  And I think that's what GW filed a

```
 1    motion in limine to exclude last night.  So we're relying on

 2    the declarations --

 3              THE COURT:  Okay.

 4              MR. DILLON:  -- that evidence, but no live

 5    witnesses.

 6              THE COURT:  No live testimony?  That -- that's

 7    fine.  I just wanted to make sure that I didn't overlook

 8    that possibility.

 9              MR. DILLON:  Thank you, Your Honor.

10              THE COURT:  Does GW have any intention to present

11    live testimony?

12              MR. RICHARDS:  No, Your Honor.

13              THE COURT:  Okay.  Now, do me a favor and tell me

14    who's going to be speaking for GW.

15              MR. RICHARDS:  I am, Your Honor.  Josh Richards.

16              THE COURT:  Thank you, sir.

17              MR. RICHARDS:  You're welcome.  Thank you.

18              THE COURT:  And this is Justin Dillon; right?

19              MR. DILLON:  Yes, Your Honor.

20              THE COURT:  Right.  Okay.  Great.

21              Well, Mr. Dillon, maybe, you could come forward,

22    because my first question has to do with a question of

23    timing.  And so, maybe, you can -- you know the facts better

24    than I and, maybe, you can explain it to me.

25              It's my understanding that your client applied to
```

1    get his college diploma in January of 2018, but his

2    application was late.  And so the university denied the

3    application to graduate or get his diploma in January.  And

4    so the soonest he might get it is May which is what you

5    asked for in your initial papers --

6              MR. DILLON:  That's correct, Your Honor.

7              THE COURT:  -- right?  So the April deadline -- or

8    the April request that he get it before April 27th, I know

9    the reason for that, but I'm not sure that I understand --

10   and I understand the urgency that he feels about that, but

11   I'm not sure that I understand how I could effectuate that

12   since he filed late for an early graduation.

13             MR. DILLON:  I think all he has to do is certify

14   that he's going to accept admission and certify that he will

15   be getting his diploma.  He needs his diploma in order to

16   start the program.  So he can accept in April and then show

17   proof of the diploma after it comes in May and then jump off

18   to the program thereafter.

19             THE COURT:  Okay.  So what you need is an

20   agreement or an order or whatever comes out of this that

21   says that he will get a diploma -- Mr. Doe will get a

22   diploma in May of 2018.

23             MR. DILLON:  That needs to be the effect.  I

24   can -- if it would be helpful, I can, sort of -- I think

25   both parties --

```
1              THE COURT:  Oh, no, I think -- I think the way

2      that we would get there, if we do, is to find that there was

3      some problem with the underlying action and, therefore,

4      suspend the effects of that which turn him into an active

5      student.  He gets his diploma; then we decide whether there

6      really were problems, and if there were not, then -- and he

7      has to wait.

8              MR. DILLON:  That is exactly right.  I think both

9      parties did a terrible job of framing this.  All --

10              THE COURT:  No, no, I figured that out.  All --

11              MR. DILLON:  So did I.  I figured it out while

12      preparing for oral argument.

13              THE COURT:  No, see, I figured it out while

14      preparing for oral argument, but I did it, actually, while

15      figuring out what the facts were.

16              MR. DILLON:  Right.

17              THE COURT:  Okay.  So that's what we're talking

18      about.

19              MR. DILLON:  Yes, Your Honor.

20              THE COURT:  Now, let's go to each one of these.

21      Let's overlook Title 9 for the moment.

22              MR. DILLON:  Okay.

23              THE COURT:  The violation of the D.C. Human Rights

24      Act, disparate treatment/disparate impact, I understand the

25      thesis of it and I understand, let's say, the public noise
```

1     about it; that is, at the times in question and before the

2     pressure on universities to come up with a program to

3     address what I will use here -- what I would call here date

4     rape.  I'm not sure that you would like that expression.

5     But --

6               MR. DILLON:  It's a placeholder.

7               THE COURT:  -- is it okay to use it?

8               MR. DILLON:  Sure.  Of course.  Whatever.

9               THE COURT:  So universities were under pressure

10    from the Department of Education to develop programs with an

11    eye to the fact that young women who are most often the

12    victims or the targets -- I'll use "targets" instead of

13    "victims" -- didn't report such things immediately and they

14    needed to feel like they could and there's a process and DOE

15    was -- DO -- Department of Education was pressing all that,

16    but I don't see any evidence -- and I hear the argument, but

17    I don't see any evidence here that there was actually

18    disparate treatment or disparate impact.  I understand what

19    you're saying, but I don't --

20              MR. DILLON:  Okay.  Okay.  So let me try to answer

21    that.

22              THE COURT:  Okay.

23              MR. DILLON:  So I think, as an initial matter,

24    Your Honor, the pressure wasn't just what -- the pressure

25    that, I think, is true in every case which is -- in the last

 1    several years is that schools feel pressure from the Office

 2    for Civil Rights and the education department to do

 3    something about these cases, and that's true in most cases.

 4    And courts have said, you know, that can be enough if you

 5    combine that with other facts on the ground.

 6          Well, here, GW was under pressure that far

 7    out-strips the vast majority of what you have seen in just

 8    about any other published case here.  They had been sued by

 9    a complainant in 2015 who -- Ms. Personn [ph], whose case

10    has been pending now for two-and-a-half years, who said that

11    the school did not take the claim seriously enough.  There's

12    another woman who came forward, I believe, in 2016 and she

13    also was very public about how even though her acute -- her

14    rapist, as she put it, had been found responsible, but he

15    was only given a deferred suspension.  So she put on this

16    big protest; did a Change.org petition and which got, I

17    think, almost 2,000 signatures; and in the spring of 2016, I

18    believe, GW responded to that in April and it was remarkable

19    what they said.

20          So I mean, you've got, you know -- this woman,

21    the -- the second woman disrupted graduation; right?  There

22    were GW protects rapists.  I mean, it was a firestorm.  It

23    wasn't just generalized pressure in the air.  It was very GW

24    specific.  So what does GW do in response to that?  Well,

25    and, you know, again, we don't have discovery yet, but

1    here's what we do know.  They released a statement that we

2    attached to the declaration talking about how seriously they

3    take these issues.  And one of the things that they did is,

4    they published the numbers and they said, Since 2015, there

5    have been 16 accusations made of sexual misconduct.  Ten of

6    them went to a hearing.  And in all 10 cases, the students

7    were found responsible.  That's a 100 percent conviction

8    rate.  In 9 out of 10 of those cases, the student was

9    suspended or expelled, but that's not all they did.  They

10   also hired a career victims' rights advocate, Ms. Kiera

11   Bloore.  Now, Your Honor, this isn't in the record, per se,

12   but I do a lot of this work.  It is a -- you rarely see a

13   fox asked to guard a henhouse like this where you've got

14   someone whose entire -- we attached her LinkedIn bio.  Her

15   entire bio is victim rights advocacy from the -- I think

16   it's the Victim's Rights Center and a lot of work like that.

17   Now, that is -- hiring her to do sexual assault cases is

18   basically equivalent to hiring me to do them; right?  No one

19   could --

20        THE COURT:  Actually, I would expect you to be

21   able to be dispassionate.

22        MR. DILLON:  I would like to think I could, had I

23   -- if I had that role, Your Honor -- if I were hired to do

24   that role, but I will bet that the public perception would

25   not be such.  And I think here, not only has Ms. Bloore --

1    was she hired to do this work, she continues to do victim

2    advocacy.  And, again, she is an investigator.  That's not

3    right.  It's, you know -- you can't hire someone whose

4    entire background is on one side of the ledger as an

5    advocate, not even as a counselor or, you know, some

6    schools, for example, will hire former sex crimes

7    prosecutors.  Now, as a former prosecutor myself -- although

8    not a sex crimes one -- I don't think that's great, but, you

9    know, if you've been -- your role as a prosecutor when you

10   wield the power of the sovereign is different than your role

11   as a, you know -- when you work at a non-profit and you are

12   an, you know -- sort of, an ideological activist in that

13   way.  You have a different role in the system; right?

14              And so I think it's not just the general pressure

15   from the education department.  It's very specific pressure

16   on GW's campus around this time, and then it's the fact that

17   what GW said to its community amid this firestorm that was

18   about not being hard enough on these cases; that it says,

19   We're going to tell you, we have 100 percent conviction rate

20   and we're going to hire victim advocates to be in our Title

21   9 office.

22              Now, Your Honor, we may get more if, you know --

23   if we get to the discovery stage someway or another, but --

24              THE COURT:  Okay.  Let me --

25              MR. DILLON:  Sure.

1          THE COURT:  -- ask you another question.  What

2    was -- and I should know this, of course, from reading the

3    record, but that happened a couple of days ago.  So what was

4    the date of the incident at issue here?

5          MR. DILLON:  Yeah, August 25th of 2015.  Ms. Roe

6    took more than two years to file her complaint.

7          THE COURT:  Right.  Right.  Okay.  Is -- all

8    right.

9          MR. DILLON:  No, I'm sorry, it wasn't.  I think

10    I --

11          MR. RICHARDS:  September 12th, Your Honor.

12          MR. DILLON:  September 12th.  I'm sorry, Your

13    Honor.  Still more than two years.

14          THE COURT:  2015?

15          MR. DILLON:  Of 2015.  Yeah.  I'm sorry about

16    that.

17          THE COURT:  And she filed her complaint in 2017?

18          MR. DILLON:  In October of 2017.  And, you know --

19    and there's a -- again, we don't know what we don't know,

20    but here is a known unknown, if you will.  She waited more

21    than two years -- the woman I mentioned before who protested

22    GW protects rapists and all that, that woman waited more

23    than two years to file her complaint.  Her complaint was

24    also filed against a rugby player.  It's a weird similarity.

25    And it -- and that -- remember, the woman who protested, her

1    complaint got a tremendous amount of attention and it was

2    her protest that prompted GW to issue this statement.  So

3    then, sort of, after this firestorm, Ms. Roe has done

4    nothing for a year-and-a-half about this complaint.  All

5    this stuff happens at graduation.  It gets, you know -- and

6    I haven't even touched on GW -- the GW Hatchet, the school

7    newspaper which, you know, gave, sort of, blanket coverage

8    to this issue, as you might expect for a good college

9    newspaper.  And, you know, in response to all of this, this

10   was just, sort of -- this campus was soaked in this stuff.

11           Somehow, then, in the fall of 2017, more than two

12   years later, she files this complaint.  And it contains,

13   frankly, a, sort of, unbelievable amount of detail, and then

14   if you just -- if you -- when you actually dig into the

15   facts -- which I'll be frank, Your Honor, GW doesn't want

16   you to do that.  Their brief is all 30,000 feet.  And if I

17   had this case and I were them, I'd stay there, because when

18   you get down and you look at the trees, it's ugly.  And

19   that's what we've really tried to do in our papers, is show

20   how many times her story changed; how, for example, you

21   know, the -- what he was found responsible for was having

22   sex with her when she was incapacitated, and that's really

23   important.  The -- GW says again and again in its brief that

24   she was -- there was evidence that she was intoxicated.

25   Well, that's true and we grant that.  There's no dispute

1   about that.  But, of course, there's a big difference --

2        THE COURT:  Well, no, I got that part and I

3   understand why -- let me just ask you one of my other

4   beginning questions before we get away from the beginning.

5   I understand why the phone records would be potentially

6   material to arguing about whether or not the phone --

7   alleged phone call between Ms. Roe and Mr. Doe actually

8   occurred.  And so therefore, in your brief, you argue

9   without that, there's no evidence that Mr. Doe would have

10  had or did have -- maybe, not would have had, but did have

11  any reason to suspect that Ms. Roe was incapacitated.  I

12  understand that argument.  But what GW says is, Well, that

13  argument is one that really should have been -- could be --

14  they don't want to say could be, but I say could be --

15        MR. DILLON:  Right.  Right.

16        THE COURT:  -- presented to the panel of whoever

17  the decisionmakers are.  The panel, if I think that it was

18  insufficient, why, we can cure that, but that isn't the

19  basis for an injunction.  So tell me why -- assuming

20  arguendo everything you just said, tell me why they're not

21  right that, well, if this were insufficient and, most

22  particularly, if I could say, handling of his appeal with

23  new evidence that was discounted and not sent, apparently,

24  to the panel for reconsideration.  So why isn't that all

25  curable by a remand?  I use "remand" only because it's a

 1    good analogy, not because it really fits the situation

 2    exactly.

 3              MR. DILLON:  Of course.  Well, Your Honor, to be

 4    frank, right, if it's that or nothing, we'll take that, but

 5    I think why it's not sufficient is, I think we have shown

 6    enough evidence of the flawed nature of this process; the

 7    bias inherent in it, the gender bias; that, I think, to

 8    throw us back there right now, you're, sort of, throwing us

 9    right back in the briar patch.  And I think, given that GW

10    has two lawsuits pending against it right now, that it's not

11    taking these cases serious enough.  Given that, again, it

12    touts that 100 percent conviction rate, I don't know if it's

13    going to want to reverse that.  So I worry, frankly, that if

14    we go back there -- if we go back with that and that's the

15    only relief we get today, that we're, sort of, back in the

16    same place and then we'll be, frankly, probably back up

17    here.

18              I will say, too, about the phone records, GW takes

19    great pains, you know?  I think they're worried about the

20    phone records.  And they should be; right?  I mean, they've

21    had them for more than two weeks, yet they -- and they got

22    them before they filed their opposition, but they still

23    highlighted the phone call in the opposition.  And then they

24    filed a motion in limine at 5:01 p.m. yesterday; right?

25    Less than 24 hours before the hearing.  So they're worried.

1    And I think they're right to be.  But here's something they

2    say in the papers that just is not true.  And it's a

3    brilliant job of framing.  And I'll give them credit for

4    that.  They're -- it's -- they play with a level of

5    generality.  They say, Well, we never knew about these phone

6    records.  So we can't be responsible.

7            THE COURT:  And your client should have produced

8    them in time for the hearing.

9            MR. DILLON:  They weren't his, remember?  They

10   were E.E.'s and the -- they were E.E.'s phone records.

11           THE COURT:  Right.

12           MR. DILLON:  And so -- and this is the big thing.

13   And this is -- I want to make this very clear.  They -- GW

14   knew that the phone call was an issue during the

15   investigation and during the hearing.  Okay?  And GW was the

16   only entity that had any power to investigate that.  As you

17   doubtless know, Mr. Doe does not have subpoena power and did

18   not have it until he filed this lawsuit.

19           So what did GW know?  GW knew that four -- the

20   complainants -- four witnesses had not said anything that

21   would show evidence that she was incapacitated at the party

22   and that Mr. Doe had -- should have reasonably known that.

23   All right?  So they knew that.  They knew that very late in

24   the process, just three weeks before the hearing,

25   miraculously, in walks E.E. with her statement and it says

1    for the first time there was this phone call and it

2    characterizes it, Your Honor, in the most amazingly dramatic

3    terms.  We were worried about her.  We called her.  And, you

4    know, it talks about how she sounded incoherent and

5    everything like that.  It's very, very dramatic; and then

6    they knew what Mr. Doe was saying which was no -- nothing

7    about a phone call or anything like that; then they go to

8    the hearing.  And so right then; right?  Right then, there's

9    this blockbuster phone call out of nowhere last minute, you

10   know?  It's like the end of A Few Good Men and it's amazing.

11   What do they do with that?  They do nothing.  They didn't go

12   to E.E. and say, That's interesting that you've suddenly

13   come up with this after the complainant, in three different

14   statements given on three different dates, has never

15   mentioned a phone call.  Why don't you show us if you've got

16   anything to back that up?  E.E. could have gotten these;

17   right?  I mean, we got them from AT&T.  E.E. could have just

18   gone -- logged into her account and printed them out.  They

19   never did that.

20          So please don't let GW tell you with a straight

21   face that they didn't know about the specific issue that --

22   the specific records here.  That dog won't hunt, Your Honor.

23   They knew that the phone call was the only piece of evidence

24   that linked Mr. Doe to evidence of -- that he knew about her

25   incapacitation.  All right?  So they knew it, and then at

1      the hearing, it gets even more remarkable.  At -- remember,

2      E.E. gives this very dramatic story.  We were worried.  I

3      called her.  I get to the hearing three weeks later, all of

4      a sudden, it's switched.  No longer is it, E.E. called the

5      complainant.  It was, the complainant called E.E.

6            So the whole thing does this 180, you know?  And

7      GW wants to say, Well, they didn't ask any questions about

8      that.  You're right.  A 21-year-old kid, you know, in that

9      hearing -- and he did have a lawyer that he got a couple of

10     days before, but he didn't, in that moment, you know, try to

11     do anything with that because he had been -- and nor could

12     he have.  He wasn't really empowered to do that.  But the

13     obligation -- the promises made here are GW's promises to

14     what they're going to do.  And this evidence is -- I mean,

15     it is -- it's such a blockbuster because it shows, I think,

16     that E.E. lied; it shows that the complainant lied; and it

17     shows that even if you don't believe that; even if you want

18     to give them credit and say, Well, it had been two years;

19     their memories were fuzzy, it shows there was no call.  And

20     if it shows there was no call, then out drops the bottom of

21     the he-saw-signs-of-incapacitation argument.

22           THE COURT:  Well, except that there was testimony

23     that, at the party, she displayed significant drunkenness at

24     a minimum.

25           MR. DILLON:  At the pregame.  There was -- the

1    only time she stumbled or did anything like that was at the

2    pregame, if I may, which he wasn't at, remember?  He wasn't

3    there.  And who -- when people talked about what she was

4    like at the party, you know, they, kind of, gave fairly

5    short descriptions which isn't -- or in the record that's

6    just, kind of, average college drinking.  There was nothing

7    special about it.  And even one person said, I remember

8    seeing her cross the street, you know?  So there wasn't

9    anyone at the party who said she showed those signs.

10        And moreover, getting to, sort of, the appeal --

11   the frustrated appeal, what did you have there?  You finally

12   -- we have a witness who comes in and says, I talked to her.

13   We had a normal, lucid conversation that was about half an

14   hour before they got in an Uber.  And that was -- so the

15   only evidence they had, aside from the phone call, was

16   that -- that came up during the appeal because Q.W. was

17   away.  So you know, I understand that GW doesn't want to

18   reopen it.

19        And let me say one more thing, Your Honor.  If the

20   Court could have -- so GW got this -- got these records on

21   March 27th.  Okay?  If GW -- and we -- I think we had

22   scheduled this hearing, I think, by then.  If GW saw those

23   records, knew what they really meant and wanted to do the

24   right thing, you know what they would have said, Your Honor?

25   They would have said, Mr. Dillon, you know, I think we can,

1    sort of, have the power to work this out; right?  I think

2    they could have either reopened the appeal sua sponte.  They

3    certainly could do that on, you know -- they're not --

4    there's nothing that says they can't do that.  If they were

5    going to act in good faith and they recognized how

6    incredibly powerful these records are, I think they would

7    have done it in the last two weeks.  Instead, we are here.

8    And I'm happy to be here, but we're here.  But I think

9    that's something I'd ask the Court to keep in mind when you

10   think about sending us back for the appeal.  Again, if it's

11   that or nothing, I'll take that, but I do have concerns that

12   without the preliminary injunction; without moving forward

13   with the case, getting some discovery, we're not going to --

14   we're just -- we're going to be back here in two months.

15        THE COURT:  Okay.  So I've got the answer.  I

16   understand the arguments.

17        MR. DILLON:  Can I do one thing?  I feel like I'm

18   honor-bound to do one thing with respect to Mr. Richards.

19        THE COURT:  What's that?

20        MR. DILLON:  We had agreed on -- so what I have

21   been talking about with the phone records is what I believe

22   the reasonable inference is.  Mr. Richards was gracious

23   enough not to make me call someone from AT&T.  So he and I

24   agreed on a stipulation that I'd just like to read to the

25   Court.

1            THE COURT:  Yes.

2            MR. DILLON:  And I'll explain, sort of, how we're

3     arguing it and what I've been doing.  So we agree, number

4     one, the phone records are authentic, i.e., they are E.E.'s

5     phone records during the stated time period on 9/12/15 and

6     9/13/15.  And the stated time period means the Uber ride.

7            Number two, the phone records show that no phone

8     calls, as traditionally understood -- i.e., calls made using

9     the phone's phone function -- were made from or received on

10    E.E.'s phone between 11:56 p.m. on 9/12/15 and 12:21 a.m. on

11    9/13/15.

12            I think Mr. Richards may argue -- and we've talked

13    about this a little bit -- that, Well, everybody said call,

14    but there's other ways to call.  There's Facebook calling

15    and whatnot, you know?  I -- everybody said call.  We can

16    certainly argue that, if the Court would like us to.  I

17    think, given that everybody said call, you know, even in our

18    modern era, most people who say call mean phone call, but I

19    wanted to make sure that I am -- we've agreed to those

20    terms.  I am arguing what I think is the most obvious

21    inference.  Mr. Richards may try to undermine that.  But I

22    wanted to make sure that the Court was aware of what we

23    agree about and what we do not.

24            THE COURT:  Okay.  And then I -- you have a breach

25    of contract claim.  Now, there's also a breach of implied

1    covenant of good faith and fair dealing.  You can't have

2    that claim without a contract; right?

3            MR. DILLON:  Right.

4            THE COURT:  Okay.  And then you have a negligence

5    claim which is a lack of reasonable care in investigating

6    this all, but it's -- I think, under D.C. law, one would

7    really need an expert as to the duty of care to pursue that

8    claim.  I mean, you can pursue it, but for present

9    purposes --

10           MR. DILLON:  Sure.

11           THE COURT:  -- I don't think so.

12           So let me go to the breach of contract claim.  The

13   answer from GW, as I understand it -- and, of course,

14   they'll talk for themselves -- the answer from GW is, Well,

15   there is no contract.  These are just policies which are

16   totally in the control of the university.  We can change

17   them anytime.  We do change them.  We just publish revised

18   policies when we need to.  And so there's no contract to it.

19           MR. DILLON:  Right.  That's not D.C. law.  I know

20   he wishes it were, but it's not D.C. law.  It is, in fact,

21   Virginia law.  Mr. Richards and I had a case there and I

22   lost that claim against him, but it's not D.C. law.  D.C.

23   law has been very clear for the last, I mean, more than 30

24   years that it is a contract.  And what the cases do is, they

25   look at, what do you -- the cases that we've cited, they've

1    cited the Basch case; the Pride case; the Alden --

2              THE COURT REPORTER:  Can you slow down, please.

3              MR. DILLON:  I'm sorry.

4              The cases that we've cited, Basch, Pride and

5    Alden, they've showed this -- it's a very long line of cases

6    showing that it -- this is -- that these are construed as

7    contracts.  And what the Court is charged with doing is

8    figuring out, okay.  It -- was the -- did the parties intend

9    to be bound by the terms?

10             The case that they cite, the Mosby-Nichols case, I

11   believe, is the only -- it's a -- sort of, a strange outlier

12   from that that, I think, is, sort of -- is an example of bad

13   facts make bad law.  There -- that wasn't a case in which

14   the university said, as it did here, We will do this.  We

15   will do that.  It was all about the obligations of the

16   student in the graduate program.  And it said things like,

17   you know, You need to complete your degree within 12 years

18   or we're not going to give you credit.  But I think,

19   frankly, that's -- that case is all about obligations on the

20   student.  It is, to put it gently, in some tension with the

21   D.C. Court of Appeals's law in Basch.  And, obviously, of

22   course, that -- it's the D.C. Court of Appeals that defines

23   the scope of contract law here.

24             So to be Frank, Your Honor, it is just hornbook

25   law that in D.C. -- and there's so many -- I mean, Howard;

1    Georgetown; GW itself.  I mean, it's, kind of, hornbook law

2    that these discipline codes are contracts.  And it, you

3    know -- the -- GW relies, as all schools do, on the idea

4    that, Well, we can change it at any time.  That's true, but

5    that doesn't mean that you're not intending to be bound

6    under the current policy.  And, you know, it makes sense.  I

7    mean, this is -- this isn't some sort of, you know,

8    statement like, I think, in the Howard case which talked

9    about, Well, we hope not to raise tuition, you know?  We

10   expect tuition to be this, but you can't really count on it.

11   That's not what this is.

12          This is, essentially, a Bill of Rights or Criminal

13   Code or whatever you want to call it, but this is a

14   carefully thought out code of conduct; of procedure; and the

15   idea that -- and I'll tell you, I'm sure GW doesn't tell its

16   students that they can just, sort of, willy-nilly disregard

17   their obligations under that, and I don't think GW can

18   either.  So I think it is just hornbook law that -- in D.C.,

19   happily, for this case, it's a contract.  I think the

20   question is whether it was breached.

21          THE COURT:  Okay.  So I -- you -- we've covered

22   those and I think I understand what your arguments are.  For

23   purposes of an injunction, of course, there's likelihood of

24   success and then the emphasis on the syllable is,

25   apparently, equal at least insofar as the harm --

1    irreparable harm.  And it seemed to me that the introduction

2    of the acceptance at the London school, as long as your

3    client was able to say yea or nay by April 27th, would

4    create some demonstration of, arguably, irreparable harm.

5    And, certainly, GW's papers almost conceded that by their

6    saying, Well, there's nobody that's actually accepted him

7    into any school, and etcetera.

8              I'll let GW speak for itself.  I promise.

9              But I did note at the time that they wrote their

10   briefs, he didn't have that acceptance.  Well, I think that

11   acceptance, as I said in the beginning, doesn't actually

12   help us because -- or help any of us -- you, me or GW --

13   because your client can't graduate before May.  He can't.  I

14   can't force, by any force --

15             MR. DILLON:  Sure.

16             THE COURT:  I can't order GW to give him or to

17   award his diploma by April 27th.  But we've talked about

18   that.  And so you say, No, no, no.  You just have to get

19   them to agree that in May, they'll give it to him.

20             MR. DILLON:  Right.  No, it's a standard -- it --

21   I think, like lawyers everywhere, we're all probably

22   overcomplicating this.  It is a good old-fashioned, You get

23   into school in April and you go a few months later.  That's

24   all it is.  But we've got to have a deadline so we know how

25   many people to accept.

```
 1                THE COURT:  Okay.

 2                MR. DILLON:  So that's what it is.

 3                THE COURT:  Okay.  So the question is -- my

 4     question is irreparable harm, because the argument from GW

 5     is, it's really a question of career status movement,

 6     etcetera, and that all can be compensated later by a

 7     monetary award, should you win on the merits.  And so,

 8     therefore, it isn't irreparable harm.  So --

 9                MR. DILLON:  Sure.

10                THE COURT:  -- speak to that.

11                MR. DILLON:  Two responses.  Number one, courts

12     have repeatedly held in these cases that an erroneous

13     finding of sexual assault is not remedable [sic] --

14     remediable through money damages.  So that is -- that's --

15     there's a lot of law on that and we cite it.

16                Number two, it's the gap, Your Honor.  So here's

17     what happens.  If he -- if the -- if Your Honor does not

18     issue the injunction, for the rest of his life, when he is

19     sending in his résumé or -- to somebody, they'll look at it,

20     as I do, as somebody who looks at résumés, and they'll say,

21     Huh, I see you graduated in May of 2018, but I see that you

22     didn't really have any jobs or anything until the spring of

23     2019.  What happened with that?  What did you decide to do?

24     And there's always going to be that gap.  Now, what are his

25     choices at that point, Your Honor?  I think they're pretty
```

1    stark, and I hope they point up the issue.  He can tell the

2    truth.  I was found responsible for sexual misconduct by GW,

3    and then, maybe, I won my lawsuit and they undid it, but,

4    you know, somebody thought I was a rapist for a period of

5    time and I had to sue.  Please ignore that, you know?  I

6    hope you don't care that somebody thought I was a rapist.

7    So he can tell the truth and deal with -- I think the very

8    real consequences of that -- I mean, I think that's -- I

9    probably don't have to belabor the impact that could have on

10   jobs -- and courts have been very clear about that -- or he

11   can lie.  And I don't think -- he doesn't want to lie.  His

12   folks don't want him to lie.  He can't lie if it's a Federal

13   Government job.

14          THE COURT:  Let's assume that -- yeah, he doesn't

15   want to lie and that lying would be even more of a

16   complication, in one sense.  So he decides, Okay.  I'm going

17   to do something else.  I'm going to travel and I'm going to

18   tell people, Well, I decided to travel.

19          MR. DILLON:  That, to me, is --

20          THE COURT:  I'm going to -- no, whatever.  He's --

21   tell the university in London, I've been talking to GW about

22   getting my -- I've finished all my coursework.  And when can

23   I get my diploma?  I tried to get it in January.  They said

24   they couldn't get it in January.  I want to get it now.

25   They're equivocating on that.  I -- we're just having this

1    conversation that's going on and on and on.  I'd like to

2    come, but I can't tell you I can come this year.  Can I come

3    next year?  Can I defer?

4            MR. DILLON:  If a law clerk were applying to you,

5    Your Honor, and you asked that question and he gave that --

6    sort of, that answer where he, kind of, talks around it,

7    what would you think?  Would you think he's being honest?  I

8    mean --

9            THE COURT:  Well, if he were in the middle of this

10   litigation on the basis that he didn't get a fair shot the

11   first time around, then I would not think that was not an

12   appropriate response.  I don't, as an applicant, necessarily

13   -- if I win this lawsuit, why, then I can say, this happened

14   and I won.

15           MR. DILLON:  Right.

16           THE COURT:  He's got an issue no matter what.

17           MR. DILLON:  He does.  Absolutely.

18           THE COURT:  He does.

19           MR. DILLON:  But it -- he --

20           THE COURT:  So --

21           MR. DILLON:  But the hope is, if the PI issues,

22   then, you know -- then what he can do, he can avoid that

23   gap.  And I do think it's serious.  I mean, and I think --

24           THE COURT:  Well, then I --

25           MR. DILLON:  -- that that gap has been found --

1              THE COURT:  I -- okay.  I understand that.  I'm

2      not -- I just needed you to say on the record today what

3      your irreparable harm was.

4              MR. DILLON:  Can I articulate one more point about

5      it?  Is that the --

6              THE COURT:  Yes.

7              MR. DILLON:  -- kind of job that would be -- it's

8      hard to get a job that would -- that someone with his

9      background and grades would reasonably -- would look

10     reasonable on a résumé without a college degree.

11             THE COURT:  Without what?

12             MR. DILLON:  Without a college degree.  So it's,

13     you know -- it's -- if he goes and waits tables for 10

14     months, again, the -- and it's going to be -- it's going to

15     just look funny, and then just coincidentally, in Notre Dame

16     and in DePauw, there were also, sort of, 10 months, kind of,

17     left.  It was going to be a 10-month gap.  In those cases,

18     the PI issued.

19             THE COURT:  Okay.  It's after 3:00.  So I need to

20     let GW speak.

21             MR. DILLON:  Sure.

22             THE COURT:  Thank you, sir.

23             MR. DILLON:  Thank you, Your Honor.

24             MR. RICHARDS:  Good afternoon, Your Honor.

25             THE COURT:  Hi, there.  Mr. Richard; right?

1               MR. RICHARDS:  Mr. Richards.

2               THE COURT:  Richards.

3               MR. RICHARDS:  Yes.

4               THE COURT:  Forgive me, sir.

5               MR. RICHARDS:  No apologies necessary.

6               THE COURT:  Go right ahead.  I -- as I hope, I

7       don't need you to go from the beginning to the middle to the

8       end.  What I'd really like you to respond to with specifics

9       are the argument that plaintiff's counsel makes that the

10      system used by GW for this matter was infected, if I can use

11      that term advisedly, with the concern the university has

12      had -- so immediately before that -- about demonstrations on

13      the failure of the university to protect its women students.

14              MR. RICHARDS:  Sure.

15              So there's a lot of case law out there, Your

16      Honor, under Title 9 on these issues.  Title 9, as the Court

17      knows, doesn't have a disparate impact analysis.  And so

18      there isn't a lot to inform disparate impact in the context

19      of a college campus, but as to the D.C. --

20              THE COURT:  But we all know disparate -- well, we

21      don't all know disparate impact.  I know something about

22      disparate impact.

23              MR. RICHARDS:  The Court understands it, sure.

24      But in terms of talking about specific cases on the issue,

25      there aren't a lot on there, but what we do know from those

1    cases are that when a court looks at whether or not external

2    influences extraneous to that plaintiff's individual case

3    really had the effect of discrimination on a plaintiff, what

4    courts have said -- including the Boston College case which

5    we cited in our brief -- is that it's okay at the pleading

6    stage to say, There are these external factors that may have

7    influenced discrimination; may have influenced

8    decisionmakers in getting to that result, but when it comes

9    to meeting an evidentiary burden like at summary judgment or

10   like on a preliminary injunction, you need more.  You need

11   to actually have evidence that individual decisionmakers in

12   that case acted with animus on the basis of sex.  And that

13   comes straight out of the Yusuf case which is the seminal

14   case; lays all the bedrock principles for these sorts of

15   respondent claims.  So what Mr. Dillon has presented here

16   might be enough under those cases to survive a motion to

17   dismiss, but it's not enough under an evidentiary

18   standard -- particularly under a clear and convincing

19   evidentiary standard which is what we have on this motion --

20   to connect those external pressures with discrimination

21   against Mr. Doe.

22            I can go on, but I think that that, sort of,

23   covers --

24            THE COURT:  No, I think that --

25            MR. RICHARDS:  -- our perspective on that.

1          THE COURT:  -- that tells me what your response

2     is.

3          Let me tell you in all honesty that I have

4     concerns about the handling of the appeal by Mr. Doe within

5     the process.  The process has new evidence.  He presented

6     new evidence.  It doesn't say, New evidence that wasn't

7     available before.  I mean, your defenses to it are very

8     legal and they would apply in an administrative agency,

9     perhaps.  This is not that.  This is a process set up 100

10    percent by the university; peopled 100 percent by the

11    university.  All the personnel are for the university.  They

12    all have, presumably, a connection to the university and

13    desire for its success which incidents like this one can

14    affect.  I don't know whether Mr. Doe is guilty or innocent.

15    I know that your panel found him guilty.  I know -- and I

16    take that as the finding of the panel, but then when he

17    appealed, there -- I mean, it was totally ignored.  It was

18    new evidence that was totally ignored.  And I don't see how

19    you -- how the university -- forgive me, I don't mean you.

20    You understand.

21          MR. RICHARDS:  I understand, Your Honor.

22          THE COURT:  Thank you, sir.  Everybody has

23    clients.

24          MR. RICHARDS:  We sure do.

25          THE COURT:  I don't understand how the university

1     says, Oh, we did it right, when, as far as I can see, they

2     did not do it right.  They ignored his appeal and said, No,

3     that's it.  Too bad.  We don't think this is important.  You

4     could have done this before.  This is the answer to the AT&T

5     records.  I mean, I -- that one, I accept because, in fact,

6     he couldn't have produced these before.  I don't know that

7     it was the university's obligation to do so either.  But

8     they're here now and, in the meantime, the university paid

9     no attention to what he did say.  I -- tell me how I'm

10    supposed to say that that's okay.  I don't want to talk in

11    due process terms because it's not a judicial process, but

12    it is a question of fairness terms and allegiance to what

13    the university says it's going to do and it didn't do it.

14    It just said, No.  I don't understand that.

15              MR. RICHARDS:  So --

16              THE COURT:  Please.

17              MR. RICHARDS:  -- there's a lot in there and I'm

18    going to try and move through it.

19              It, you know -- a few things.  And just, sort of,

20    from the outset so I make sure I get this on the record, I

21    don't -- I respectfully don't agree that the university

22    didn't do what it was supposed to do under the policies, but

23    I want to get there in a minute.

24              THE COURT:  That's a perfect thing to get on the

25    record.  So go right ahead.

1          MR. RICHARDS:  So -- but first, I, you know -- I

2     think one of the tensions in a case like this is that there

3     is a temptation to make this case an appeal from the

4     university's process, but that's not how it works.

5          THE COURT:  Well, wait.  Hold on.  Before you

6     continue, in a sense, it is an appeal from the university's

7     process.  It is not -- and it can't be an appeal from the

8     university's panel conclusion because that's not my job,

9     unless treatment in some fashion in that process -- and I

10    don't actually see any -- would indicate that it was biased

11    in some way or something.

12         MR. RICHARDS:  That's a much better formulation

13    than mine.

14         THE COURT:  But it is -- it is an attack, and it's

15    an attack properly brought here on the process.

16         MR. RICHARDS:  I completely --

17         THE COURT:  Okay?

18         MR. RICHARDS:  -- agree, Your Honor.  And so --

19         THE COURT:  Okay.

20         MR. RICHARDS:  -- that -- the proper scope of this

21    case is much narrower than what was presented to the panel.

22    And there's, sort of, a -- there's a Russian doll effect

23    here where, you know, we all agree, you know, that the

24    largest doll is Title 9 and that there's no question that

25    under federal law and under D.C. state law, under the D.C.

1    statute, Plaintiff can sue and allege, if he is able to

2    allege sufficient facts, that he was discriminated on the

3    basis of his sex and there is a clear standard set forth in

4    the Yusuf case and others as to how he pleads that claim and

5    proves it.  So it's clear that that is one avenue for him to

6    get relief in this case.  What, I think, the Court was just

7    talking about was something different; right?  I mean, the

8    procedures that the university followed, I suppose they

9    could be evidence of bias, but really, what you're talking

10   about there is, did they adhere to their written policies?

11           THE COURT:  Well, it's -- it -- I'm -- I think

12   that it goes, perhaps, to the Title 9 issue, but it also

13   goes to the breach of contract issue, and exactly the

14   arguments that you've made against the contract, in my

15   opinion, are too general, generic.  I'm not -- I am not at

16   all in a position to say the extent to which the policies

17   and pronouncements of the university to its student body

18   constitute a contract between the school and the -- all the

19   students, but the issue of how they're going to handle a

20   specific kind of complaint that the complainant has these

21   rights; the defendant or the respondent -- whatever your

22   terminology is -- has these rights; we go to a hearing;

23   there's a -- three panels; they make a decision; you have a

24   right to appeal, those things seem to me to be very close.

25   I mean, that sounds contractual to me.  And it's the failure

1    there to abide by that that I find there's a set up --

2              MR. RICHARDS:  So let me --

3              THE COURT:  -- that it isn't fair.

4              MR. RICHARDS:  Maybe I can address that piece in

5    two ways.  One is that the -- one of the bedrock principles

6    of contract law is that in order to have an enforceable

7    contract, there has to be mutuality of obligation.  And if

8    there is not mutuality of obligation, then there is no

9    fairness exception to create a contract.  And so when the

10   university writes in its code that the university can

11   unilaterally, at any time, change the terms of the code, I

12   don't see how we can interpret that as imposing a mutuality

13   of obligation.  And with respect to Mr. Dillon's position,

14   the two cases that he cited with respect to contract law are

15   about 40 years old and other cases have happened since then,

16   including a case against the University of D.C. just a few

17   years ago in this court in which the court analyzed this

18   question and said, We need to look to the concrete terms of

19   the agreement -- and we cited this in our brief -- and if

20   the concrete terms of the agreement don't make clear an

21   intent to be bound by those terms, then we're not going to

22   find mutuality of obligation; we're not going to find an

23   agreement, and that's what we have here.

24              Now, I understand, taking a step back, that may be

25   unsatisfactory to the Court in its question about fairness.

1   And so I want to address that, too.

2          THE COURT:  No, no, no, no.  When I say fairness,

3   don't mistake me.  If we're talking contract, we're talking

4   breach or not.  I mean, "fairness" is a term that I have

5   used too loosely.  The question is whether there's a

6   contract and whether the specificity of this particular

7   process laid out by the university as to which the rights of

8   two students are to be adjudicated with finality.  The

9   concept is, we're going to do this within the university and

10  that is going to be our answer.

11         MR. RICHARDS:  That is the hope.

12         THE COURT:  That is the hope.  Now, the fact that

13  people sue, well, that is reality, but it's the specificity

14  of this, the necessity the student, whether it's the person

15  making the complaint or the person of whom -- about whom the

16  complaint is made, have no alternative except to go sue each

17  other in federal court or state court or wherever and the

18  university doesn't want that either.

19         MR. RICHARDS:  Agreed.

20         THE COURT:  Okay.

21         MR. RICHARDS:  And so --

22         THE COURT:  And so what we have is, if you will, a

23  mandatory process.  The university sets the terms.  The

24  university can change the terms, but it remains a mandatory

25  process by which a very important dispute between two

1       students gets finally resolved to the university's

2       satisfaction, win, lose or draw.  So it seems to me that in

3       those circumstances, you have a contract because the

4       university intended to be bound and it certainly intended

5       the student to be bound and the student has no alternative

6       but to be bound.  Certainly, the -- neither one.  So I, you

7       know -- I understand your more general argument.  And so I

8       don't want to have to go to generalities and say, anytime

9       the university speaks up, it's a contract.  I don't need to

10      do that.  This is a much more precise question and a set of

11      circumstances.

12              Anyway, so if I come to the conclusion -- and,

13      you, of course, would disagree, and that's your job -- that,

14      I think, there may be a legitimate argument here about the

15      nature of a contract, then the question becomes, well, was

16      the contract adhered to by both sides?  I don't hear any

17      complaint about Mr. Roe -- Mr. Doe's compliance with the

18      terms of the contract.  He complains about the university

19      ignoring his appeal.  I -- that seems to me to -- now, the

20      answer to that is to send him back to the university.  I

21      understand that.  The answer is -- well, I can't -- despite

22      the arguments from counsel, I can't say that it was a wrong

23      result.  All I can say is that the process was not properly

24      filed -- followed and the university needs to reconvene and

25      reconsider in light of new evidence and, in that fact, I

1    would say the evidence now presented as to the phone calls.

2    That just seems to me that time has passed.  There's now new

3    evidence in addition to what there was.  There wouldn't have

4    been had this been handled the first time around, but, you

5    know, here we are.  And so I think that -- I don't know how

6    to get around the idea and I'm not yet to PI.  Okay?  I'm

7    still on the merits of this thing.  So bear with me.

8             MR. RICHARDS:  I want to take one more run on the

9    contract claim before we get past, if that's okay.

10            THE COURT:  Okay.  Go ahead.  One more jump at the

11   contract claim.

12            MR. RICHARDS:  You know, I'm not going to -- I

13   won't belabor any further the question of whether it is a

14   contract.  I think we're clear on each other's views on

15   that.  But as to whether the contract was violated on the

16   appeal, these processes, like court proceedings, have a

17   beginning, a middle and an end.  And in the beginning,

18   there's a complaint made and there's an investigation done;

19   in the middle, there's a hearing and at that hearing, all of

20   the evidence available to the parties is presented; and at

21   the end, there's an appeal and then it's final.  The

22   university respectfully does not interpret its own contract,

23   if that's what it is, but it's certainly its own policy to

24   read new in a very narrow way that Mr. Dillon and the Court,

25   a moment ago, suggested which just means, I didn't present

1   this before.  In other words, it can't be right that on

2   appeal, a party could say, Well, I didn't say this at the

3   hearing, but, you know, I really wasn't there that night.

4           THE COURT:  Well, I -- you were -- you have a

5   sound argument.  I think that the policy doesn't quite meet

6   that argument because it doesn't define what new evidence

7   means.  Previously unavailable or something.  But beyond

8   that -- and it's only to students, not to lawyers.  If -- I

9   don't mean any insult to GW students, but it's not written

10  -- it's written by lawyers, perhaps, but not to lawyers.

11  But the real problem is that there was evidence that Mr. Doe

12  wished to present that would counter testimony at the

13  hearing so that he knew no need to counter that testimony

14  until after the hearing.

15          MR. RICHARDS:  Your Honor, I think that's a

16  fiction.  I mean, there was never any debate that this woman

17  had five drinks over the course of a short party.

18          THE COURT:  That was before she came to the party

19  in question, wasn't it?

20          MR. RICHARDS:  No.  No.  Actually, the complaint

21  here is that it was never known beforehand how many she had

22  had before the party, and so that the argument is, Well, we

23  didn't know that it was nine drinks.  We only knew it was at

24  least six.  And, respectfully, you know, a young woman who's

25  in college who is barely at the drinking age or, maybe, not

1    quite at the drinking age who's had six drinks in an hour is

2    heavily inebriated.  If you believed, as a person on that

3    panel, that she had six drinks over the course of an hour,

4    you believed she was very, very intoxicated.  And whether it

5    was 6 or 10 doesn't really make a difference because, at

6    that point, you've concluded that she's intoxicated beyond

7    the point of being able to consent.

8         If you didn't believe her -- all right.  If you

9    were disinclined to believe her testimony, then the number

10   of drinks also didn't matter because you would say, you

11   know, She's making this up, or, you know, there's -- she has

12   some motive for falsely accusing this man, but whether it's

13   6 or 10, the expert report, all it's telling the panel is

14   this woman would have been extremely intoxicated and,

15   perhaps, unable to walk.  The panel, looking at the size of

16   the complainant; looking at the age of the complainant; the

17   experience of the complainant was perfectly able to say,

18   This woman had 10 drinks in 2 hours?  I can evaluate, one,

19   what that would do to her; two, whether or not her memory on

20   this is accurate; three, whether or not the accuracy of the

21   number of drinks, whether it's 7 or 10 or 6, really matters

22   for our purposes today.  So they may have not believed her

23   that she had 10 drinks; thought that she was exaggerating

24   and only had 5, but found her testimony on lack of consent;

25   on swatting him away so compelling that they believed her

1    anyway.  So the idea that this expert testimony is new

2    evidence, I just don't think is, you know -- there's no

3    opportunity in the code for expert evidence to begin with.

4    There's no new factual evidence being added.  It's just

5    reliving what was already testified about and offering an

6    expert opinion on something that lay opinion does just fine.

7             THE COURT:  Well, the question, I thought, at the

8    hearing was whether or not the defendant -- I'm sorry,

9    excuse me, the plaintiff --

10            MR. RICHARDS:  The respondent.

11            THE COURT:  -- Mr. Doe --

12            MR. RICHARDS:  Yep.

13            THE COURT:  -- I should call him by his name -- by

14   his pseudonym because then it's more clear -- whether

15   Mr. Doe had reason to know that the complaining party was so

16   drunk that she was beyond the capacity to exceed.  And it's

17   there that I think that the expert may or may not influence

18   a panel as to if she had as many drinks as she said, would

19   she actually be able to stand up and walk around and have a

20   conversation?  Which every -- which there -- of which there

21   was testimony that she was able to stand up and walk around

22   and have a conversation which she may or may not remember.

23   I mean, there's a drunk and then there's semi-conscious

24   drunk, you know?  You don't even know what you're doing, but

25   you're still performing, acting.

```
 1              MR. RICHARDS:  Your Honor, so walk through this,

 2     though, for -- on the university's perspective.  So this

 3     means that when information comes up in a hearing through

 4     witness testimony that could be susceptible to any expert

 5     testimony, then as long as that evidence wasn't testified to

 6     before the hearing, we have to have a new hearing every

 7     time.

 8              THE COURT:  Well, you may have to have

 9     consideration by the panel without a hearing of whether this

10     new evidence has any impact on the conclusion they've

11     already drawn.  I mean, I, you know -- this is set up as if

12     it were a legal process, but it's truncated.  The head is

13     taken off it because, in fact, from this perspective, it

14     doesn't look like there really is any appeal because you

15     can't do anything beyond the hearing itself.

16              MR. RICHARDS:  Oh, you --

17              THE COURT:  And I -- it just -- again, I'm -- I

18     haven't gotten to the preliminary injunction question.  I'm

19     not sure that that issue, to the extent that it's a real

20     one -- and you make a good argument why I should not think

21     that way, except that it's set up to be like that.  It's set

22     up to be a final determination and there doesn't seem to be

23     a real appeal and that's very troublesome.  I'm just a

24     judge.

25              MR. RICHARDS:  Well, Your Honor --
```

```
1              THE COURT:  I get appealed from all the time.

2              MR. RICHARDS:  -- think about it in the context of

3     an at-will employment workplace.  We don't have contracts

4     with our employees.  We get a complaint about an employee.

5     We don't have a hearing.  We just have an HR officer.  The

6     HR officer hears the complaint and they make a decision;

7     they make a recommendation to the Manager; and the person is

8     fired.  There's no appeal from that.  It's an at-will

9     position.  It's not that different.

10             THE COURT:  Well, it is and it isn't.  They're not

11    employees.

12             MR. RICHARDS:  No.

13             THE COURT:  So they don't have the same Title 7

14    rights that one has as an employee.  The university, maybe,

15    under regulations set up by the Department of Education, has

16    an obligation to set up a process --

17             MR. RICHARDS:  Yes.

18             THE COURT:  -- whereby complaints of sexual

19    harassment or assault or whatever can be advanced; a hearing

20    can be held; a decision can be made --

21             MR. RICHARDS:  Yes.

22             THE COURT:  -- it can be resolved; right?

23             MR. RICHARDS:  Right.  And there's no obligation

24    to have an appeal process at all.

25             THE COURT:  There's no obligation what?
```

1          MR. RICHARDS:  To have an appeal process at all.

2          THE COURT:  There may not be an obligation in the

3     regulations, but GW, smartly in my opinion --

4          MR. RICHARDS:  I agree.

5          THE COURT:  I mean, I commend them for setting up

6     an appeal process, but an appeal process that isn't an

7     appeal is a promise that we'll do something that actually

8     we're not going to do.  Shhhhhh.  We don't have to do it.

9     We don't want to do it.  We don't do it to employees.  We're

10    not going to do it to you either.

11         MR. RICHARDS:  Well, but that's not how we

12    approach it.  I mean, in this situation --

13         THE COURT:  Well, I -- it just seems that way

14    because this is the only one I know.

15         MR. RICHARDS:  Well, understood, Your Honor,

16    but from our perspective, we read this as newly -- as

17    evidence that was not available at the hearing.  It's new

18    because it's evidence that could not have been presented at

19    the hearing.  And so from that perspective, our appellate

20    officer looked at this information and asked, with respect

21    to this information from the student who was studying

22    abroad, could this have been presented at the hearing?  Yes,

23    it could have.  And so it's not the basis for an appeal.

24    With respect to this expert testimony, is this -- does this

25    contain factual matter that wasn't presented at the hearing?

1     No, it doesn't.  And so we're not going to go -- I mean, the

2     Court can certainly disagree that if it were sitting in the

3     shoes of that appellate officer, it would have made a

4     different decision, but I would submit that it's not

5     appropriate for the Court in this posture to say, Well, not

6     only did they not do what I would have done, but they

7     breached the contract by not doing it, because I don't think

8     that's right.  I don't think that the contract says what the

9     Court is suggesting, if it is a contract at all.  I mean,

10    we're past that point in this --

11              THE COURT:  For purposes --

12              MR. RICHARDS:  -- arguing in a hypothetical.

13              THE COURT:  For purposes of this argument --

14              MR. RICHARDS:  Right.

15              THE COURT:  -- I think we're past that point.  I

16    understand why you read the language in the procedure the

17    way you do.  It seems to me that it's -- for purposes of the

18    audience to whom this code applies, it's a very legalistic

19    reading.  I'm not surprised.  You're a lawyer.  But, anyway,

20    I do have a problem with the appeal process, but whatever

21    one would want to call it.  And to that extent, I might find

22    that on a basis of a preliminary injunction without a full

23    record that it looks like there may have been a breach of

24    contract.  I'm not sure that that gets me to a preliminary

25    injunction.  It might get me to a remand, but it doesn't --

1    is "remand" the right word?

2          MR. RICHARDS:  I'm not sure what that injunction

3    would look like, Your Honor, but I agree that there's not

4    enough to get us to a preliminary injunction.

5          (Laughter.)

6          THE COURT:  Yes.  No, I -- you're very -- that's

7    very well done.  But let me ask you another question.  Is it

8    a remand?  What do I -- have you ever had this situation

9    where somebody said, "Oh, I don't think you quite followed

10   your own process.  I think you should reconsider"?

11         MR. RICHARDS:  I'm not aware of one, Your Honor.

12   And I -- Mr. Dillon practices in this area all the time.  I

13   do, as well.  He may be aware of a case where that has

14   happened.  I am not.  Typically, in the situations where

15   there's been a preliminary injunction in one of these cases,

16   it's because there's a concern that the student won't finish

17   school within four years if the matter drags on too long.

18   And so in the Middlebury case; in the Notre Dame case; in

19   the DePauw case, in each of those cases, the student was

20   allowed to return to class so that he could finish his

21   degree requirements and then, once he finished them, the

22   case would march forward and if -- in the event that he

23   prevailed, he'd get his degree as if he had finished on time

24   because his coursework was done; and if he didn't prevail,

25   well, then, it was as if, you know, he didn't -- he doesn't

1    prevail.  The sanction stays in place.  I'm not aware of a

2    case where a court has ordered an institution and a

3    plaintiff suing that institution to go back on a preliminary

4    basis for a do-over as -- on a remand.  And to what stage it

5    would be remanded, you know, I'm not sure.

6                THE COURT:  Well, I'm not -- if it's not -- if it

7    doesn't meet the standard for a preliminary injunction --

8    assuming for purposes of this discussion that there's a

9    contract and that there's a possible breach of that

10    contract, if it doesn't meet the standard for a preliminary

11    injunction, then it isn't subject to an injunction to

12    reconsider.  It's subject to a potential final judgment that

13    says reconsider only if there's an injunction.  So the

14    question here is that this student has finished his

15    coursework; right?

16                MR. RICHARDS:  Yes, Your Honor.

17                THE COURT:  And is, therefore -- and the

18    university recognizes that.  And so therefore, he wants to

19    get on with graduate school, but the university says, No,

20    you've been suspended and what that means is, we're not

21    giving you a diploma until December of 2012 -- I'm sorry,

22    December of --

23                MR. RICHARDS:  2019, Your Honor.

24                THE COURT:  -- 20 --

25                MR. RICHARDS:  January of 2019.

1          THE COURT:  January?

2          MR. RICHARDS:  Yes.

3          THE COURT:  I was trying to figure out whether it

4    was January -- December or January.

5          MR. RICHARDS:  And the way that it works -- the

6    way this, sort of -- it works under the hood is that a

7    student has to finish their academic requirements to

8    graduate, and also, has to be in good standing.

9          THE COURT:  Right.

10          MR. RICHARDS:  And good standing could mean -- not

11    being in good standing could mean you're not current on your

12    tuition payments.

13          THE COURT:  Right.

14          MR. RICHARDS:  It could mean a whole variety of

15    things.  But one of the ways that you are not in good

16    standing is when you have a pending disciplinary action,

17    either you're subject to a current suspension or there's an

18    action going on in real time.  When that happens, a hold is

19    placed on the student's account.

20          THE COURT:  Okay.  So your position is that even

21    if one were to think that there might be a breach of

22    contract, that that's insufficient for an injunction and so,

23    therefore, we should just proceed?

24          MR. RICHARDS:  Yes, Your Honor.  And I would note,

25    too, that it's really the preliminary nature of that relief

1    that troubles me, because where this case is going is

2    ultimately that either Mr. Doe will show that there was some

3    defect in the proceeding that's actionable -- and we can

4    disagree for a moment about what that is -- and if that

5    happens, then that would, I would assume, result in

6    something happening again.  What it wouldn't result in is a

7    finding that -- as Your Honor said a moment ago, that the

8    panel's finding was wrong; right?  All we can say is, there

9    was a defect.  We can't say they got to the right result; we

10   can't say they got to the wrong result.

11          THE COURT:  Well, we can -- we could say that the

12   panel result is interim, pending an appeal.  And it would

13   become final if an appeal were not taken or an appeal were

14   denied.  But in this case, an appeal was taken and ignored

15   or overruled or erroneously discarded on this, quote, new

16   evidence thesis.  And so, therefore, it's, you know --

17   the panel doesn't have to be redone.  The consideration of

18   additional evidence along with the panel result has to be

19   redone.

20          MR. RICHARDS:  And as a practical matter, what

21   would happen, then, is either the appeal -- so the appeal

22   officer under that hypothetical scenario would re-review the

23   record on appeal and make a determination, and then the

24   panel officer has a variety of options open to them.  They

25   can vacate; they can remand; or they can affirm.

1          THE COURT:  Right.

2          MR. RICHARDS:  And so I suppose that at final

3    judgment in that case, that's where we might end up.

4          THE COURT:  Right.

5          MR. RICHARDS:  But my view would be that

6    preliminary relief in that regard is not appropriate because

7    we haven't proven the claim yet.

8          THE COURT:  No, no, I follow you.  I follow you.

9    The real -- yes, I understand exactly what you're saying.  I

10   come to what I think is the same result.  I need to hear

11   from Mr. Dillon a little bit.  But I come to approximately

12   the same result, more from looking at the standards for

13   preliminary relief than from looking at whether or not this

14   is actually proofed -- a proved claim.  There has to be

15   sufficient evidence to support preliminary relief.  There

16   doesn't have to be final evidence for preliminary relief,

17   but assuming -- I mean, going through this all with you and

18   coming to the result that I'm troubled -- I'll say troubled

19   for the moment -- by the way the appeal was handled, it

20   seems to me that even if my being troubled is translated

21   into, there was an error in handling this appeal, that that

22   doesn't make enough -- there isn't enough there to show

23   satisfaction of the standards for preliminary relief.

24   That's where I'm, sort of, coming.

25          So why don't I hear from Mr. Dillon one more time.

```
 1              MR. RICHARDS:  Thank you, Your Honor, for the

 2     privilege.

 3              THE COURT:  Thank you.

 4              Mr. Dillon?

 5              MR. DILLON:  Okay.

 6              THE COURT:  Now, I am trying -- because we're

 7     doing this on a preliminary relief record, I am trying to be

 8     really forthcoming in my views to you gentlemen so that you

 9     know what I'm thinking and you can respond accordingly.  I

10     am not saying necessarily that this is where I would come

11     out if we had a full case and we were doing summary

12     judgments and all the evidence.  So I just want you to

13     realize why I'm saying, okay.  Well, I think there may be a

14     problem here, etcetera.  But come back to whether or not

15     preliminary relief -- whether or not there's likelihood of

16     success; irreparable harm; balance of the harms; public

17     interest; that sort of thing.

18              MR. DILLON:  Okay.  And let me -- what I'll do,

19     is, I'll start with the other things and then I'll come back

20     to likelihood of success --

21              THE COURT:  Okay.

22              MR. DILLON:  -- because we haven't talked that

23     much about them.

24              So we've talked about -- we have talked about the

25     irreparable harm.  And I will say, Your Honor, a finding
```

1    that -- an opinion from the Court that said, I'm troubled by

2    the appeal process, but not so troubled that I'll give

3    preliminary relief, is, sort of, a -- would be a -- sort of,

4    a Pyrrhic victory in the extreme, you know?  Your Honor's

5    well aware of how cases take -- how long they take.  The

6    Prasad case -- lawsuit against GW's been going on for

7    two-and-a-half years.  So to say that he can, maybe, at the

8    end of this case in two-and-a-half three years, get a

9    do-over -- I mean, I'd ask the Court to just, sort of, think

10   about that when you're a young man who's fulfilled all his

11   graduation requirements and you're trying to start his life.

12   That's one thing.

13          The second thing is, remember the snowball effect

14   of this.  This isn't a harm -- Mr. Richards wants it to be,

15   but it's not a harm that you can undo at the end of a case.

16   If he doesn't get the preliminary relief, it is

17   unquestionably going to harm him irreparably.  He is going

18   to have a gap forever and courts have found that time and

19   again.

20          THE COURT:  Well, the problem -- and I completely

21   understand the argument you make.  The problem is that if

22   the ultimate finding is that the -- Mr. Doe was properly

23   found to have violated the code and, therefore, been

24   suspended properly, that is because of his own conduct which

25   was if it's ultimately credited as it was initially which is

 1   his conduct.  I mean, I'm sorry for it.  I wish this young

 2   man didn't have this problem, but I wish he hadn't acted the

 3   way he's alleged to have acted.  So I agree with you about

 4   the effect of it, but I also understand the university's

 5   position that, you know, We did it the best we could and we

 6   concluded that we believed her more than we believed him and

 7   so, therefore, he was suspended and that's the -- I mean, he

 8   doesn't get his diploma until the end of the suspension.

 9   Otherwise, what is the suspension?  He's graduated; he has

10   his diploma; he doesn't care.  It's like putting somebody on

11   probation and letting them go to Chile.  They're not

12   actually on probation.  Anyway, go ahead.

13            MR. DILLON:  Well, I mean, I think -- I'm trying

14   to think how to approach that, Your Honor.  If he wins the

15   case, right, Mr. Richards wants to say, The only remedy is a

16   do-over.  That's not true.  This is a very new area of law,

17   frankly, and there's very little case law on what the proper

18   remedy is.  I happen to have litigated the first case that

19   dealt with remedy against -- it's the George Mason case, Doe

20   v. George Mason.  And in that case, Judge Ellis did not

21   allow the -- George Mason to retry my client.  There were --

22   there was suggestion that other -- that the complainant

23   might want to bring other complaints against him for conduct

24   that had not initially been raised.  He put a tight time

25   frame on that.  He said, She has to allege it.  You've got

1   to adjudicate it in 60 days.  If you don't do that, you

2   can't retry him.  And it turns out nothing ever happened and

3   he was never retried.  So I don't want to concede --

4           THE COURT:  And what was -- I'm sorry, I read

5   these things very quickly because I'm not -- I'm just coming

6   out of being ill.

7           MR. DILLON:  Sure.

8           THE COURT:  And I'm not ill anymore, but I don't

9   have any hair.  If I were a man --

10          MR. DILLON:  You and me both, Your Honor.

11          THE COURT:  Yeah.  If I were a man, I could show

12  up without any hair and you'd all think that was

13  interesting, but okay.  As a woman, it doesn't work so well.

14  But as a result, I have spent a fair amount of time on this,

15  but at intervals.  So tell me what the issue was in George

16  Mason that was done wrong.

17          MR. DILLON:  Well, so in George Mason, what -- it

18  was a due process case because --

19          THE COURT:  Right.

20          MR. DILLON:  -- it was a public school.  And,

21  basically, the short version of that case was, the student

22  was found not responsible for misconduct.  It was, then,

23  appealed.  It was, again, sort of, an appeal issue.  That

24  was one issue.  The appeals officer, very long story short,

25  didn't like him.  They had a bit of a history.  So he

1    assigned himself the appeal; later testified in his

2    deposition that he assumed Mr. Doe was guilty from the

3    beginning and that nothing Mr. Doe said during the appeal

4    process could have possibly made a difference.

5               THE COURT:  Okay.  Okay.  I've got that.  That's

6    all we need.

7               MR. DILLON:  All right.  So --

8               THE COURT:  Thank you.

9               MR. DILLON:  So that --

10              THE COURT:  So I'm -- I understand your reference

11   to George Mason.  I'm still having trouble with the

12   concreteness and immediacy of the harm.

13              MR. DILLON:  Sure.  Let me -- I'd love to address

14   that.

15              The two cases that are really great -- the Notre

16   Dame case, Your Honor, is terrific.  I think the judge did a

17   very good job.  It's a clearly written opinion and it, sort

18   of, walks through what a lot of the failures in that process

19   were.  And the DePauw judge does as well, but the Notre Dame

20   case is terrific.  And there -- a lot of these cases, they

21   really do talk about how irreparable the harm is.  And I

22   think that is -- it is something that is honestly not

23   intuitive in terms of most civil litigation; right?  We

24   usually think, Okay.  Well, if you don't get the PI, you win

25   the case.  You're fine.  But that's not true.  If he doesn't

1    -- if Your Honor does not grant him the PI, he is going to

2    have that gap for the rest of his life.  So again, he could

3    win the case in two-and-a-half years.  He could get $10

4    million from GW, whatever it is in some, you know, great

5    lawsuit and -- great result and, still, he will have to

6    answer the question when people look at him and say, That's

7    weird, you know?  You graduated May of '18.  What did you do

8    between Time A and Time B?  That is a problem that's going

9    to follow him around.

10             And also, please remember this.  It has a snowball

11   effect.  I don't have to tell Your Honor that, you know,

12   there is a certain path to dependency to one's career;

13   right?  You get Job A; that leads to Job B; to Job C; to Job

14   D.  And sometimes if you don't get Job B, you never get to C

15   to D.  So think about what you -- what's going to happen if

16   the -- if Your Honor, sort of, looks at this; believes

17   there's a likelihood of success on the merits -- and, again,

18   I'll end with that -- and doesn't grant him the injunction.

19   This is something he is not going to be able to go to the

20   school that he's accepted into.  He's going to not be able

21   to do anything between now and probably the mid to late

22   spring, maybe, even summer of 2019 that you have to have a

23   college degree for; right?  So it's not that in January, he

24   snaps his fingers and he has a job.  He has to apply for a

25   job, and he can't do that without a diploma.

1              And then so think, sort of, what the downstream

2      effects of that are.  And courts have been really good about

3      that.  Again, the Notre Dame court's great on it.  I believe

4      DePauw is good on it, too.  Middlebury is good on it.  In

5      Middlebury, in fact, the student -- sort of, like this --

6      had a job.  I think it paid him 85,000 a year; good bonus

7      and all that stuff.  And the Court enjoined Middlebury

8      from -- issued the preliminary injunction against Middlebury

9      in that case.  And what the court talked about was exactly

10     this.  He's not -- if he loses this job -- this great job,

11     he's not going to get that job again.  And what are the

12     downstream consequences of that?  And, again, I know this is

13     not intuitive.  This is, you know --

14              THE COURT:  No, I follow exactly what you're

15     saying.

16              MR. DILLON:  But it's not -- it is unusual; right?

17     Because we usually think that you can undo it, you know, if

18     it's --

19              THE COURT:  No, no, I -- there is an argument

20     about undoing because, you know, if he doesn't get the first

21     job, they can pay him money, and there is the argument that

22     that's not really undoing it.  No, I follow that.  So I've

23     got that one.

24              MR. DILLON:  Okay.  So that's --

25              THE COURT:  So go to the next one.

```
1              MR. DILLON:  So it's almost like compounding

2     interest.

3              THE COURT:  Right.

4              MR. DILLON:  Think of it like that; right?

5              THE COURT:  Right.  Okay.

6              MR. DILLON:  And we don't, you know -- I think

7     that's -- that's the harm.  And again, the courts --

8              THE COURT:  Okay.

9              MR. DILLON:  Notre Dame, Middlebury and DePauw are

10    really good on that.  So I, you know --

11             THE COURT:  Okay.

12             MR. DILLON:  And also, again -- and this is --

13    this feels, sort of, lawyerly, but -- I mean, courts have

14    said time and again that an erroneous finding of misconduct

15    is not remediable through money damages.  And if the Court

16    finds on any of our claims that there's a likelihood of

17    success on the merits and has doubts -- I mean, look, this

18    is not, you know -- this kid was a virgin, Your Honor;

19    right?  I mean, this was the first time he had ever had sex

20    and then, more than two years later, the complainant, out of

21    nowhere, comes and says, you know, I was incapacitated.  I

22    mean, that's a -- if -- I think the Court -- the Court may

23    not sit as a super appeals court on merits, but I think

24    facts matter.  And I think when you look at the facts of

25    this case and when you really -- you dig in -- and, again,
```

1     our brief digs in; theirs doesn't, because the digging is

2     good for us and bad for them.  There's a lot that should

3     trouble the Court about whether this kid actually did this.

4     And I think that's important.  And I think that goes -- you

5     can probably evaluate that under both the balance of

6     equities and the public interest.

7             When you look and you see what -- how many times

8     this complainant contradicted herself; how bad GW's

9     investigation was; how biased their process was; how, you

10    know -- bragging about your conviction rate in response to

11    public pressure that you're not hard enough, all of these

12    things, and you look at that and then you -- and you walk

13    through our evidence and our brief and you see that they --

14    what the panel did -- I mean, the panel, Your Honor, was a

15    joke.  The softball questions that she was asked; the idea

16    that they wouldn't question her about all the times her

17    story changed.  Just read her statements back to back, you

18    know?  It is -- in her first statement, she says, This is

19    everything I remember.  A few days later, Wait, there's

20    more.  A few days later, my favorite one is, After talking

21    to other people, I now remember a bunch of stuff; right?

22    This is more than two years after the event at that point.

23    That is ridiculous.  I mean, if, you know -- I'm a -- I came

24    up in a, you know -- in the -- as an AUSA and if you've got

25    a cop saying that, right, on the stand -- well, you know, I

1    remembered the defendant said he did it the third time, but

2    not the first two -- I mean, that would get laughed out of

3    court and probably sanctioned.

4           So I think that's important in the balance of

5    equities.  I mean, this is -- what -- this kid -- there is a

6    tremendous amount of evidence in this case that this kid did

7    not do this.  And this -- I mean, again, it's the first girl

8    he ever had sex with.  He was a non-drinker.  He was

9    stone-cold sober.  He remembers this.  He remembers what

10   happened.  And, again, we have evidence that the complainant

11   and E.E. lied about this call.  And they had reason to lie

12   because they didn't -- they knew that there was a gap in the

13   case.  No one can say that she was drunk on the scene.  And

14   I know, you know, Mr. Richards, I think, admirably tries to

15   say that all of our new evidence wasn't actually new.

16   That's just not true.  We couldn't have -- or not -- it

17   didn't add anything.  The expert, right -- I mean, that was

18   -- he needed to be able to say, This is the total amount of

19   alcohol she had consumed.  That's number one.  He didn't

20   have that.  Number two -- and this is so important -- if you

21   read Dr. Milman's report, you will see that the things --

22   that based on -- if you take the complainant at her word

23   about her consumption, the story she tells is scientifically

24   impossible.  She would have been incontinent and at the

25   brink of death.

1           And why does that matter?  Mr. -- Mr. Richards

2     wants to say, Well, everybody knew she had five or six

3     drinks and she was drunk at the party.  First of all, he

4     knows that's not true; that no one saw that at the party.

5     He knows that.  So no one said she showed signs of

6     incapacitation there.  And then, again, what does Dr. Milman

7     do?  It's, kind of, like the phone records.  It shows she's

8     not telling the truth.

9           Now, Your Honor, as you balance the equities; as

10    you think about the public interest in letting a finding of

11    this magnitude stay on someone's record for years if you

12    don't grant the injunction, you don't have to find that she

13    was lying.  People convince themselves all the time of

14    things that didn't happen and that aren't true.  And could

15    it be that a young woman, over the course of two years -- a

16    young woman who, as we, sort of, vaguely allege in our

17    complaint, had spoken out on these issues publicly in a way

18    that GW knew about -- and we were vague to protect her

19    identity -- that over that time, over two years, she comes

20    to turn this freshman year encounter into something that it

21    wasn't and she believes that, so by the time she shows up,

22    she's told the story so many times that it is true to her?

23    You don't have to find she lied.  You can just find that

24    there doesn't appear -- she may believe it, but when you

25    actually dig in and you look at what the evidence was,

1    there's not enough evidence to support it.  And, again,

2    phone call's a little hard to reconcile with not straight-up

3    lying, but I don't know.  But you can write an opinion that

4    that doesn't call her a liar while give us relief.  And what

5    does -- why does that matter?  Because it goes to both the

6    balance of equities between him and GW and it goes to the

7    public interest.  There is -- this is a strong case of

8    innocence.

9            You -- I get that you're here to review process,

10   but you -- you'd have, you know -- I think you're charged

11   looking at everything, right, as you decide what to do.

12   And, you know, courts have said that it is not in the public

13   interest to allow a finding like this to stay.  And it's

14   certainly not in the -- and it's not -- I think the equities

15   are far more in his favor.  Now, balance that.  What do you

16   have on the balance of equities?  There is no harm to GW.

17   GW likes to do what every single school in this country

18   likes to do and say that it is a holy and sacred place and

19   judges have -- I mean, I think Mr. Richards suggested at

20   some point that this Court can't really review the breach of

21   contract.  I mean, they like to say even to courts, You need

22   to, sort of, stay out of our business.  That's not true.

23   You can absolutely get in their business.  The Catholic

24   Church, of which I'm a proud member, said that for many,

25   many years and, eventually, courts got up in its business,

1    too.  No one is above the law.  This is the United States.

2    And they promised this guy procedures and they didn't give

3    it to him and they railroaded him and he is innocent.

4           So there is no harm to GW if you say -- you enter

5    an injunction that isn't just the do-over on the appeal, but

6    that is -- you find a likelihood of success -- and whichever

7    one, you know; I think any one of them will get us there --

8    and they're enjoined from enforcing the suspension or any

9    disciplinary action against him.  And I think, given -- I

10   heard some wiggle room from Mr. Richards acknowledging that

11   he's a student in good standing, because I think he is.  And

12   I don't want to play -- I don't want to be back here with a

13   contempt motion about game-playing.  So if you do that, that

14   lets him go to graduate school; that lets him avoid this

15   compounding interest effect.

16          And then what is it to GW?  GW just lost a -- they

17   lost a PI.  Okay.  And, maybe, they lose a suit.  But

18   there's no -- this -- the idea that we're -- you're

19   tampering with their sacred process and what a diploma

20   means, they've said they're going to give this guy a

21   diploma.  They're saying he is someone that can hold himself

22   out there as a GW graduate.  So there is -- like, the

23   balance of equities is overwhelmingly for him.  And I do

24   think it's okay to look at the -- at his innocence here.

25   And, again, that -- I think the same thing with the public

1    interest.  And that's especially true, Your Honor, given the

2    phone records.

3           THE COURT:  Okay.  Let's go to likelihood of

4    success.

5           MR. DILLON:  Okay.  Okay.

6           THE COURT:  I'm getting to the end of my day's

7    quotient of energy.  So you --

8           MR. DILLON:  I get it.

9           THE COURT:  You don't want me to keel over here.

10    That would be a very bad ending to this hearing.

11           MR. DILLON:  I don't want to start dodging

12    staplers, Your Honor.  I get it.

13           THE COURT:  Okay.

14           MR. DILLON:  I will move on.  Okay.

15           Breach of contract.  Three things.  The failure to

16    give him an adequate, reliable and impartial investigation.

17    They didn't do that.  The best evidence we have is the phone

18    records.  There are other arguments, but that's the best

19    evidence that they had.  This -- the magnitude of this

20    evidence was so overwhelmingly apparent to anyone and they

21    didn't go after it, and that was their job and they were the

22    only ones that could have done it.

23           Notre Dame, I'd ask you to look at -- for that

24    Notre Dame and Amherst.  Notre Dame talks about the same

25    principle in terms of text messages; makes all those

1      arguments.  And Amherst, the same thing.  That wasn't a PI,

2      but it talks about that.  And, again, why is that important?

3      Because that was the only evidence that showed that he knew

4      or had reason to know she was incapacitated.  And DePauw is

5      instructive there.  In DePauw, the judge says, basically, I

6      think she was probably incapacitated, but there was no

7      evidence he knew.  The only evidence before the panel were

8      the phone records.  And we now have shown that they were --

9      that testimony was a lie.  And I'll just say -- I mean, E.E.

10     is a liar.  Maybe the complainant has said something else,

11     but there is no way you come out of left field at the last

12     minute with a sincere memory of this when the complainant,

13     remember, did not mention a phone call in her three

14     statements and then, suddenly, after E.E.'s statement comes

15     in, miraculously remembers it.  So E.E. is a liar.  And I

16     don't know if, you know -- we'll see about the complainant.

17            The right to appeal, I think that's been beaten to

18     death.  It says, New.  It doesn't say, Not available.

19            To the -- Mr. Richards's point about, would

20     anyone, you know -- why can't people just bring up new

21     evidence on appeal?  Well, a couple things.  One, who is --

22     who on Earth is going to do that?  These are -- no one's

23     going to try to play a sandbagging game.  Two, there's no

24     incentive to do that.  And, two, you have to construe it

25     against the drafter.  So they may want it to mean newly

1    discovered, but they've got to write that if they could.

2    And, remember, they've made quite clear, they can write that

3    if they want to.  Most schools I deal with, it does say, Not

4    available at the time of the hearing.  GW doesn't.  They're

5    free to change it.

6            On whether it's a contract, I can hopefully

7    resolve this once and for all.  D.C. Circuit 2017 -- my case

8    is older than -- is newer than his case -- Chenari v. -- I

9    kid you not -- George Washington University, 847 F.3d 740

10   pincite 744.  And I quote, Under District of Columbia law

11   which governs here, the relationship between a university

12   and its students is contractual in nature.  The end.  So

13   it's a contract.

14           So in terms of the likelihood of success -- going

15   back to likelihood of success.  So I think we've beat the

16   appeal to death.  I think you probably don't want me to talk

17   about that anymore, and then he -- they violated the burden

18   of proof.  And, remember, you know, they're saying you can't

19   relitigate it.  That's not true.  You can.  They promised

20   him that, We will only find you responsible if there is

21   enough evidence to show by a preponderance that you are.

22   This is why they stayed at 30,000 feet, because they know

23   darn well that there was no preponderance when you look at

24   everything.  If this had been in front of a real court; a

25   real jury, they would have looked at it and they would have

1     seen that there was not enough evidence there to do that.

2          Again, it has to be -- it was an incapacitation

3     finding.  So it has to be that there was enough evidence to

4     find that she was incapacitated and there just wasn't.  I

5     mean, even if you -- the panel even credited that at the

6     party, they talked about their majors; they talked about

7     Islam; they talked about where she was from.  Can she really

8     do that if she had had 10 drinks and was in the state that

9     Dr. Milman said she was in?  So you can actually look and

10    say, I find that he's likely to succeed on the merits; that

11    they violated the burden of -- the promise -- the

12    contractual promise to apply the preponderance standard.

13          And of course you can do that; right?  Because if

14    you couldn't, then what could schools do?  They could set up

15    a super fancy process and the -- let's say -- you could put

16    forward a videotape of something that didn't happen --

17    showing that it never happened that way and the school could

18    say, Okay.  Irresponsible anyway; right?  And would that --

19    couldn't someone there say, "Well, gee, you told me

20    preponderance.  All the evidence was on my side"?  Of

21    course, someone could come in here and say that.  So this

22    idea that we cannot, you know -- you cannot review the holy

23    and sacred findings of a three GW panel is just nonsense.

24          Then -- that's breach of contract.  I think

25    I've -- D.C. Human Rights Act -- I, you know -- the Smith v.

1   Henderson case is a good case for us.  Judge Boasberg;

2   right?  That's this DCPS case.  And it's statistical

3   evidence.  And, at this point, we don't know, of course,

4   that all 10 of those people in their touted 100 percent

5   conviction rate were men, but we said it in our papers and

6   they never denied it.  And they even included a declaration

7   in their response to our -- in their opposition.  Don't you

8   think that declaration would have had a line about, Well,

9   they weren't all men, if they weren't all men?  I think they

10  were all men.  And that -- so I think the DCHRA case is

11  actually quite strong because it has what Title 9 has not

12  yet been interpreted by this circuit to have which is

13  disparate impact.  And, again, they bragged.  They bragged.

14  Read that press release, Your Honor.  It is in our papers.

15  It's in the -- one of the attachments.  They bragged.  I

16  know you guys think we don't take it seriously enough, but

17  we've convicted 10 out of 10 that go through the process.

18          And then, finally, Title 9, I'd ask you to just

19  look at the piece in our reply brief that talks about the --

20  sort of, the bundle and the sticks.  That's what this is.

21  Mr. Richards wants to get up here and say it's -- he wants

22  to look at the sticks and to fan out the sticks, but you've

23  got to look at the bundle, not the sticks.  This is an

24  unbelievably strong Title 9 case, because you have both OCR

25  pressure and active investigation.  Remember, there was a

1    new investigation brought in August of '17 right before she

2    brought her complaint.  So they had gotten hit with a new

3    one and, by God, it was from the Trump DOE.  They already

4    had one from Obama's.  Second investigation; massive campus

5    pressure; a statement about their 100 percent conviction

6    rate.  In response, they put out that statement.  They hire

7    a career victims' rights advocate.  They implement -- and I

8    even -- I'll touch on this very quickly --

9              THE COURT:  You're repeating yourself.

10             MR. DILLON:  Okay.

11             THE COURT:  I've got that.

12             MR. DILLON:  The two-tiered training system, and

13   that's it.  I mean --

14             THE COURT:  If go back to my first line --

15             MR. DILLON:  I'm sorry.

16             THE COURT:  -- and my first page, I got all that.

17             MR. DILLON:  And the last one is just the

18   two-tiered training system.  Remember what they say, for the

19   -- for non-sexual misconduct, we're going to just train you

20   in the policies and procedures.  Okay?  Here's what they say

21   about Title 9 cases.  We'll implement a system that promises

22   to, quote, protect the safety of victims and promote

23   accountability.  Are you kidding me?  I mean, how can that

24   be read as anything other than -- when you combine it with

25   the 100 percent touted conviction rate, anything other than,

1    We know what you want, angry people, and we're going to give

2    it to you.  We're going to hire the people to give it to

3    you; we're going to train people in the right way to give it

4    to you; and we're going to make darn sure that you get it.

5            So Your Honor, you know, I'd ask -- and the last

6    thing I will say -- and I always, you know -- like every

7    lawyer, you hate asking for things in the alternative.  I --

8    we want the PI.  We hope to God you believe we've shown that

9    he should get it so we don't have the compounding interest

10   problem.  If you don't, if all you find when you've thought

11   about it is that the only thing that really troubles you is

12   the appeal, then I'd ask you to do something like this.

13   Order the appeal to be reopened next month.  We can't --

14   waiting two-and-a-half months -- two-and-a-half years for an

15   appeal -- for -- to win this case and get a new appeal is

16   the ultimate Pyrrhic victory.  At least order -- which you

17   could absolutely do.  I mean, it's -- I know Mr. Richards

18   wants to say there's no cases that say that.  It's just

19   garden-variety injunctive relief.

20           THE COURT:  I mean, I can -- well, whether I do it

21   in an injunctive relief or I just do it in an order --

22           MR. RICHARDS:  Right.

23           THE COURT:  -- that we're going to expedite --

24           MR. DILLON:  Right.

25           THE COURT:  -- it -- that whether it's in the next

```
1    month or --
2              MR. DILLON:  So --
3              THE COURT:  -- July or something --
4              MR. DILLON:  Right.  But --
5              THE COURT:  And I understand --
6              MR. DILLON:  But can you give him a PI until then
7    so he can accept -- because, remember, the appeal's on the
8    papers.  So he could accept at the graduate school.  The
9    appeal's on the papers.  So he can put the phone records in;
10   they can consider Dr. Milman's report, right; and they can
11   put Q.W. in.  So you've got new witness who says, I saw her
12   at the party not drunk; phone records; all that --
13             THE COURT:  Right, Right, Right, right.
14             MR. DILLON:  -- but give him the PI, too, in the
15   meantime until that's resolved so he doesn't have the gap
16   and he at least has a shot.
17             THE COURT:  Okay.
18             MR. DILLON:  Thank you.
19             THE COURT:  Thank you.
20             Thank you.  Did you want to answer one more time?
21             MR. RICHARDS:  Would the Court like to hear from
22   me?
23             THE COURT:  No, not particularly, but I don't want
24   to make you go away if you really, really, really need to
25   speak.
```

1        MR. RICHARDS:  I want to just say one thing, Your

2    Honor.

3        THE COURT:  Okay.

4        MR. RICHARDS:  And that's -- Mr. Dillon is

5    advocating zealously for his client.  And I don't begrudge

6    him that.  The reason that the university hasn't engaged

7    heavily on the facts here -- and, you know, we can take this

8    at face value or not -- is that we really don't like

9    litigating with our students.  I don't want to make this

10   case about making Mr. Doe seem like a bad guy.  I don't want

11   to make it seem like anything.  I want to defend the

12   university against what I believe are claims that don't have

13   any merit about our process.  Our process played itself out

14   and we got to the result we got to by following that

15   process.  I wasn't sitting on the panel.  I don't know what

16   I would have said.  I don't know what the Court would have

17   said.  I do know what the panel said.  And a couple of

18   things that Mr. Dillon said, I just don't think are borne

19   out by the record.  And I want to bring the Court's

20   attention to that.  I don't know that they're going to

21   matter or not, but it's not true that nobody saw Ms. Roe

22   intoxicated at the party.  In fact, R.M. testified at the

23   hearing that she was definitely drunk and that she was

24   intoxicated.  So does that -- is that the thing that made

25   the panel believe her or not?  I don't know, but it was in

 1    the record.  And what was also in the record was Roe's own

 2    testimony about what happened that night.  And I don't want

 3    to go into the facts on that on the record in open court.

 4    But the Court can review the testimony and, at best, what

 5    Mr. Dillon can argue is that his client offered conflicting

 6    testimony.  So it isn't that we accept Mr. Doe's testimony

 7    and say, Aha, now that we know this is true, none of these

 8    other things are possible.  That's not how this works.

 9           So I will leave it at that, Your Honor.  And I

10    appreciate the Court's time.

11           THE COURT:  Well, I very much appreciate the

12    arguments because I love good lawyering and I don't always

13    see good lawyering.  And this afternoon, I've had some

14    splendid advocacy on both sides.  I think Mr. Richards has a

15    hard time because he has to be reserved and careful because

16    he represents the university and Mr. Dillon is allowed to be

17    excited and passionate because he represents the plaintiff,

18    but I will say that I think both of you have done a really

19    excellent job.

20           I had thought that I could rule right now.  That's

21    the way I normally would handle a PI.  I'd just rule.  I do

22    not want to do that today.  I want to think more deeply

23    about the arguments you've made.  I've made good notes about

24    them.  I want to go back and look at some of the evidence

25    and then either write something very short since it's a PI

1    or call you back in and do it orally in court.  It's just --

2    I say what I normally would do, but it's -- I won't -- I

3    think you deserve to have me spend a little more time on it.

4    Let me put it that way.  Okay?

5              MR. DILLON:  Okay.

6              MR. RICHARDS:  Thank you, Your Honor.

7              THE COURT:  So with respect to everybody -- and I

8    know the hurry that the plaintiff is in; I'm not ignoring

9    that -- I don't think I'm -- I don't think I should decide

10   it this afternoon.

11             MR. DILLON:  He's in no hurry until the 27th.

12             (Laughter.)

13             I'm just saying, between now and then --

14             THE COURT:  Lots of time; right?  Anyway, okay.

15   Thank you, everybody.  I very much appreciate it.

16             MR. DILLON:  Thank you, Your Honor.

17             MR. RICHARDS:  Thank you, Your Honor.

18             MR. ROSS:  Thank you, Your Honor.

19             THE DEPUTY CLERK:  All rise.  This Honorable Court

20   stands adjourned.

21             (Proceedings concluded at 4:09 p.m.)

22                  *  *  *  *  *  *  *  *  *  *  *

23             **CERTIFICATE OF OFFICIAL COURT REPORTER**

24   **I, TIMOTHY R. MILLER, RPR, CRR, NJ-CCR, do hereby certify**

25   **that the above and foregoing constitutes a true and accurate**

1    transcript of my stenographic notes and is a full, true and

2    complete transcript of the proceedings to the best of my

3    ability, dated this 30th day of May 2018.

4                              /s/Timothy R. Miller, RPR, CRR, NJ-CCR
                               Official Court Reporter
5                              United States Courthouse
                               Room 6722
6                              333 Constitution Avenue, NW
                               Washington, DC 20001
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25