## IN THE UNITED STATES DISTRICT COURT FOR THE
## DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **JOHN DOE**, | ) | |
| | ) | |
| **Plaintiff,** | ) | Civil Action No.  1:18-cv-553-RMC |
| | ) | |
| **v.** | ) | |
| | ) | |
| **THE GEORGE WASHINGTON** | ) | |
| **UNIVERSITY,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| _____ | ) | |

## REPLY IN SUPPORT OF JOHN DOE'S
## MOTION FOR PARTIAL SUMMARY JUDGMENT

Justin Dillon (D.C. Bar No. 502322)
Christopher C. Muha (D.C. Bar No. 987116)
KAISERDILLON PLLC
1401 K Street NW, Suite 600
Washington, DC 20005
T: (202) 640-2850
F: (202) 280-1034
jdillon@kaiserdillon.com
cmuha@kaiserdillon.com

*Attorneys for Plaintiff John Doe*

DATED:  June 6, 2018

## TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................................ii

INTRODUCTION ........................................................................................................... 1

SUPPLEMENTAL FACTUAL BACKGROUND ...................................................... 3

ARGUMENT .................................................................................................................. 7

I.  GW Breached Its Contract with Mr. Doe in Rejecting an Appeal That Was Based on New
    Evidence Capable of Significantly Altering the Findings of Fact............................ 7

    A.  The Code Plainly Requires That Appeals Be Based on New, Not Newly Discovered,
        Evidence ..................................................................................................... 7

    B.  Dr. Snyder Wrongly Failed to Review Mr. Doe's Appeal for Viability In Determining
        Whether It Significantly Altered the Findings of Fact....................................... 8

    C.  The Code and the Sexual Misconduct Policy Manifestly Supply the Terms of the
        Contract. ................................................................................................... 14

II.  Ms. Roe's Phone Records Also Satisfy the Three Criteria for Viable Appeals and
     Should Be Considered by Any Appeal Authority on Remand................................... 17

III. This Court Possesses Broad Equitable Powers to Craft an Appropriate Remedy................... 17

CONCLUSION ............................................................................................................ 19

# TABLE OF AUTHORITIES

**Cases**

*Basch v. George Washington Univ.*,
    370 A.2d 1364 (D.C. 1977)........................................................................... 14

*Chenari v. George Washington Univ.*,
    No. 1:14-cv-929 (D.D.C. May 30, 2014)...................................................... 16, 17

*Chenari v. George Washington Univ.*,
    172 F. Supp. 3d 38 (D.D.C. 2016)................................................................ 16

*Chenari v. George Washington Univ.*,
    847 F.3d 740 (D.C. Cir. 2017)...................................................................... 14

*Clyburn v. 1411 K Street Ltd. P'ship*,
    628 A.2d 1015 (D.C. 1993)........................................................................... 10

*Drazin v. Am. Oil Co.*,
    395 A.2d 32 (D.C. 1978)............................................................................... 18

*Hajjar-Nejad v. George Washington Univ.*,
    37 F. Supp. 3d 90 (D.D.C. 2014).................................................................. 14

*Howard Univ. v. Best*,
    484 A.2d 958 (D.C. 1984)............................................................................. 8

*Katz v. Georgetown Univ.*,
    246 F.3d 685 (D.C. Cir .2001)..................................................................... 8

*Kumar v. George Washington Univ.*,
    No. 1:15-cv-120, (D.D.C. April 2, 2015)...................................................... 16-17

*Kumar v. George Washington Univ.*,
    174 F. Supp. 3d 172 (D.D.C. 2016).............................................................. 16-17

*Lemon v. Kurtzman*,
    411 U.S. 192 (1973)..................................................................................... 18

*Manago v. D.C.*,
    934 A.2d 925 (D.C. 2007)............................................................................. 14, 15

*Mosby-Nickens v. Howard Univ.*,
    864 F. Supp. 2d 93 (D.D.C. 2012)................................................................ 14, 15, 16

*Shinabargar v. Bd. of Trustees of Univ. of D.C.*,
　164 F. Supp. 3d 1 (D.D.C. 2016) ................................................................................ 14, 15

*Ward v. Wells Fargo Bank, N.A.*,
　89 A.3d 115 (D.C. 2014) ................................................................................................ 18

## INTRODUCTION

Desperate times apparently call for desperate evidence.  Rather than simply grant Mr. Doe a second appeal after indisputable evidence of critical false testimony came to light, and after this Court indicated that GW wrongly rejected his first appeal, *see* ECF No. 25 at 8-11. GW has staked its opposition on two pieces of evidence that Mr. Doe himself would have leapt at the chance to offer had that been possible.  The first is a Declaration from GW's first-level appellate officer, Dr. Robert Snyder, that attempts, as we predicted during the last hearing, to backfill his rationale-free rejection of Mr. Doe's appeal with some sort of an explanation. What's most noteworthy about it, however, is that it's made of recycled material: its rationale mirrors, almost exactly, the legal arguments that counsel for GW made in opposing Mr. Doe's preliminary injunction motion.  What's even more noteworthy about it is that it concedes that every appeal Dr. Snyder has decided, for at least *six years*, including Mr. Doe's, has been legally defective, because Dr. Snyder has reviewed them only for *newly available* evidence and has weighed them *directly on their merits*—both in direct contravention of the Code.  One wonders what other GW students who have been put through the disciplinary process might do with that information.

But GW's second piece of evidence is even more momentous.  It is Ms. Roe's actual phone records from the night in question—records that, apparently, GW could have easily obtained before Mr. Doe's hearing, had it simply asked.  Those records would have been absolutely devastating to her case had they actually been obtained before the hearing.  They confirm, as we knew they would, that *no* call with E.E. occurred that night—the only evidence that unequivocally showed, if true, that Mr. Doe should have known Ms. Roe was incapacitated. But they also show that Ms. Roe was coherent enough to place *three* outgoing calls after she

ordered the Uber, *including a two-minute call with her roommate*, whose absence as a witness at the hearing is now more conspicuous than ever.[1]  GW, based on a spectacular misreading of Ms. Roe's Uber records, thinks that these three calls happened in the Uber and actually accuses Mr. Doe of having lied to this Court when he said that no phone conversations happened in the Uber. ECF No. 32 at 11 n. 4.  In actual fact, only the last of those three calls were placed from the Uber, and Ms. Roe's records are consistent with that last call having never been answered.  Ms. Roe's own phone records may, indeed, have supplanted E.E.'s as the most critical evidence in the case and the most damning evidence against her.[2]

GW's desperation here is palpable.  No school produces a declaration affirming that it has processed six years' worth of appeals contrary to a federal judge's reading of its Code, or goes hunting for phone records that undermine the accuser in the process it is defending, unless it has no other choice.  Neither piece of evidence, nor any of the legal arguments that GW recycles from its preliminary injunction briefing, do anything to suggest that Mr. Doe's Motion for Partial Summary Judgment should be denied.  They instead highlight all the more that an innocent man is being punished and that Mr. Doe is entitled to partial summary judgment in this case.

---

[1] Recall that A.C. was the first person to whom Ms. Roe disclosed the alleged assault, and that, according to Mr. Doe, she exchanged text messages with Ms. Roe about whether their room was available for sex.

[2] As reflected in the amended proposed order attached to this reply, John Doe respectfully requests that any order granting his Motion for Partial Summary Judgment direct GW to consider both E.E.'s *and* Ms. Roe's phone records on remand.

## SUPPLEMENTAL FACTUAL BACKGROUND[3]

### I.   MS. ROE'S PHONE RECORDS

In response to a request from GW—one it easily could have made in the proceedings against Mr. Doe—Ms. Roe has produced her phone records from the night of Sept. 12-13, 2015. Those records show that she placed three outgoing phone calls[4] between 11:56 p.m. (the first time that appears on her Uber receipt) and 12:21 a.m. (the time that the Uber arrived at Mr. Doe's dorm).  ECF No. 32-8 at 2.  The first call is a two-minute call to Ms. Roe's roommate, A.C., at 11:57 p.m.  *Id.*  And the third is a 12:06 a.m. call to A.C. again, this time lasting one minute.  *Id.*[5]

Based on these records, GW maintains that Ms. Roe had not one, but "in fact had *three* phone calls while in the Uber with John Doe" and that E.E.'s phone records "amount to far less than plaintiff would like" as a result.  ECF No. 32 at 11 n. 4.  GW also accuses Mr. Doe of lying to this Court, stating that these records "demonstrate that John Doe's affidavit submitted in connection with his motion for preliminary injunction," wherein he stated that he recalled no phone conversations happening in the car, "was accordingly not just self-serving, it was false," and that he therefore "provided false testimony" both in his Declaration "and at the university's hearing."  *Id.*  Ms. Roe's records, GW says, "do little more than further muddy the waters."  *Id.*

---

[3] Because GW will not have an opportunity to affirm or deny any of the factual allegations presented here, Mr. Doe does not view these facts as conceded in the way that a fact in a Statement of Facts is conceded when it is not addressed by an opposing party.

[4] Incoming calls are designated by the term "Incoming CL" in the "Destination" column of the records.  *See, e.g.*, the 1:18 a.m. call with A.D.

[5] In addition to these three calls, Ms. Roe's records show that she also made a one-minute call to A.D., one of the friends with whom she attended the pre-game party, at 12:59 a.m.  ECF No. 32-8 at 2.

Well, yes—if you grossly misread Ms. Roe's Uber records, as GW does, these phone records would muddy the waters a bit.  If Ms. Roe had gotten into the Uber at 11:56 p.m., as GW asserts, then it is true that she would have made "*three* phone calls while in the Uber."  And that would certainly undermine Mr. Doe's testimony.  Mind you, it would do nothing to salvage E.E.'s claim that Ms. Roe called her—Ms. Roe's records confirm that that never happened.  Nor would it explain how Ms. Roe could have placed not one, but "*three*" outgoing calls—one of which lasted for two minutes—during an Uber ride in which she allegedly was passing out.  ECF No. 27-5 at 40, 42.  But yes, the records in that case might muddy the waters a bit. They might make you view Mr. Doe skeptically.  They might even tempt you to accuse him of providing false sworn testimony to a court.

But here's the rub, which GW failed to realize: 11:56 p.m. isn't when the Uber left the party.  It's when the Uber was *called*.  Ms. Roe's receipt says (1) that they arrived at Mr. Doe's dorm at 12:21 a.m., and (2) that the trip time was 16 minutes and 31 seconds.  ECF No. 27-4 at 13.  That means they left the rugby party sometime between 12:04:29 (if the Uber dropped them at the dorm at exactly 12:21:00) and 12:05:28 (if it dropped them at the dorm at 12:21:59).  All of which is confirmed by the mystery "unknown" call Ms. Roe placed at 12:03 a.m.  A reverse phone search of the unknown number indicates that the number is not assigned to a fixed line, but instead is a non-fixed VoIP (Voice over Internet Protocol) number that can be "assigned" to any cell line, *see* Ex. 1, a service commonly used by rideshare services such as Uber and Lyft to anonymize their passengers' and drivers' contact information.[6]  Mr. Doe and Ms. Roe were not in the Uber yet because Ms. Roe in all likelihood was calling the Uber driver, through the Uber

---

[6] When that number is dialed directly, the caller hears a message saying, "The number you reached does not accept phone calls."  Declaration of Christopher C. Muha (hereafter "Muha Reply Decl.") at ¶ 3.

app, to tell the driver who and where they were outside the party (recall that there were over 100 people there, many of them outside).

Ms. Roe thus *was not in the car* for the 11:57 p.m. call.  She *was not in the car* for the 12:03 a.m. call.  The only call for which she was in the Uber was the 12:06 a.m. call to A.C., a 1-minute outgoing call.  And because it is a 1-minute outgoing call, it is impossible to tell from her phone records whether anyone actually answered that call.  When a Verizon subscriber's call goes unanswered for under a minute before hanging up, it is recorded on the subscriber's bill as a one-minute outgoing call.  Muha Reply Decl. at ¶¶ 4-5; Ex. 2.  The 12:06 a.m. call to A.C. would be recorded on Ms. Roe's records in exactly the same way whether or not A.C. ever answered, and therefore whether or not Ms. Roe ever said a word.  **Nothing in those records—literally nothing—contradicts Mr. Doe's testimony about what happened in the car.**

Just the opposite is true, in fact: Ms. Roe's phone records confirm in stunning detail everything that Mr. Doe has said from the beginning and erase whatever residual doubt there might be about whether Ms. Roe was incapacitated and whether she has told the truth about that night.

1.   The records confirm Mr. Doe's testimony about Ms. Roe's communications with A.C. before they left the party.  Mr. Doe testified in both the investigation and the hearing that before they ordered the Uber, Ms. Roe was texting A.C. *asking if their room was available for sex.  See* ECF No. 27-4 at 29.  Sure enough, Ms. Roe's first call, just one minute after the Uber was ordered, was to A.C., and lasted for two minutes.  ECF No. 32-8 at 2. Ms. Roe undoubtedly called A.C. to tell her how they had resolved the issue.

2.   The records further prove that Ms. Roe lied about A.C.'s whereabouts to make her seem less relevant as a source of evidence.  Ms. Roe testified in the investigation that A.C. went

home soon after arriving at the party.  ECF No. 27-5 at 4.  But when she was confronted with

Mr. Doe's claim that she was texting A.C. about the availability of their room, she then testified

that A.C. still "was at the party and so I wouldn't have texted her."  ECF No. 27-5  at 62. But if

that were true, then *she wouldn't have called her, either*.  Ms. Roe's refusal to call A.C. as a

witness is a silence that gets progressively more deafening.[7]

3.  If Ms. Roe had been incapacitated, it would have been blatantly obvious to A.C. in

their two-minute conversation.  If she had still been at the party, she would have looked for Ms.

Roe or at least called her back.  Yet 7-8 minutes elapsed from the beginning of their call to the

arrival of the Uber, and A.C. neither came looking for Ms. Roe nor called her back.  Nor did she

return Ms. Roe's 12:06 a.m. call.

4.  Even if it were assumed that A.C. and Ms. Roe talked in the car at 12:06 a.m.; even if

it were furthermore very charitably assumed that A.C. was still at the party then; and even if it

were also very charitably assumed that E.E. *just happened* to be with A.C. at 12:06 a.m., it is *still*

impossible for that 12:06 a.m. call to be the one that alerted A.C. and E.E. to Ms. Roe's alleged

incapacitation, as E.E. testified.  ECF No. 27-4 at 28.  That is because Ms. Roe had already just

spoken to A.C. for two minutes.  ECF No. 32-8 at 2.  If Ms. Roe had been incoherent, A.C.

would have learned it from that first phone call, not the second.

5.  The phone records show that Ms. Roe was completely mentally coherent.  She made

three outgoing calls in a span of nine minutes, two to her roommate and one to her Uber driver.

These were not random phone calls; they were phone calls that make perfect sense in the context

of what was happening.  And the first of those calls lasted two minutes.

---

[7] Recall that, in addition to having spoken and texted with Ms. Roe at the party, A.C. was also
the first person to whom Ms. Roe told of her alleged assault.

6.  The phone records further undermine Ms. Roe's claim that she "ran" home from Mr. Doe's place immediately afterwards.  At 12:59 a.m., she called her friend, A.D., with whom she'd earlier gone to the rugby party.  ECF No. 32-8 at 2.  That had to have been before she arrived home, because according to Ms. Roe she ran home, talked with her roommate, then went to bed.  ECF No. 27-4 at 4.  Yet it is impossible that Ms. Roe was (1) so intoxicated that she had recently passed out and fallen down the stairs, (2) was running home, and simultaneously was (3) calling a friend.  Which is another way of saying that the phone records disprove Ms. Roe's testimony about her level of intoxication and/or her actions after she left.

7.  Last but not least, the phone records confirm that, despite making three outgoing calls, Ms. Roe never called E.E., as they had both claimed at the hearing.  ECF No. 32-8 at 2.

## ARGUMENT

**I.     GW BREACHED ITS CONTRACT WITH MR. DOE IN REJECTING AN APPEAL THAT WAS BASED ON NEW EVIDENCE CAPABLE OF SIGNIFICANTLY ALTERING THE PANEL'S FINDINGS OF FACT.**

Successful appeals under the Code "must be based on new information that is relevant to the case, that was not previously presented at the hearing or conference, and that significantly alters the finding of fact."  ECF No. 27-17 at 8.  GW offers no reasons that create a genuine dispute about the meaning of those provisions or whether they were properly applied in Mr. Doe's case.

### A.     The Code Plainly Requires That Appeals Be Based on New, Not Newly Available, Evidence.

This Court has already held that the plain language of the Code requires that appeals be based only on new evidence, not newly discovered evidence, ECF No. 25 at 8-11, and John Doe presented a number of arguments in support of that position in his Motion, ECF No. 27-1 at 23. GW presents no direct arguments to the contrary; it seeks only to preserve its old arguments.

ECF No. 32 at 6 n.2.  Dr. Snyder's Declaration, however, affirms that "for over six (6) years" he

has been reviewing appeals not for whether they are based on new evidence, but on evidence

"that was not available during the adjudication."  Snyder Decl. ¶¶ 5-6.  Although university

practices can be relevant to determining a contract's meaning, they may do so only "in the

absence of an express term to the contrary," *Howard Univ. v. Best*, 484 A.2d 958, 967-68 (D.C.

1984), *i.e.*, when the language is ambiguous, *Katz v. Georgetown Univ.*, 246 F.3d 685, 690 (D.C.

Cir. 2001).  That is not the case here.[8]  Dr. Snyder's Declaration serves only to acknowledge that

he has sadly processed six years' worth of appeals in contravention of the plain language of the

Code.

**B.     Dr. Snyder Wrongly Failed to Review Mr. Doe's Appeal For Viability In Determining Whether It Significantly Altered the Findings of Fact.**

Dr. Snyder's job under the Code was to review Mr. Doe's appeal for "viability."  ECF

No. 27-17 at 8.  GW concedes that he did not do that—it claims that he only reviewed the appeal

directly on its merits.  That alone merits the grant of Mr. Doe's motion.  Mr. Doe's appeal, in any

event, easily passes any kind of viability analysis, and in fact serves to significantly alter the

panel's findings of fact.

**1.     The Code Plainly Required Dr. Snyder to Review Appeals for Viability, Not On Their Merits.**

Article 33 of the Code articulates the substantive standard governing appeals—that they

be based on new information that significantly affects the findings of fact.  ECF No. 27-17 at 8.

Article 34 determines the level of scrutiny that two different appellate bodies will to the question

whether a given appeal meets that substantive standard.  The "Executive Director of Planning

---

[8] Furthermore, as Mr. Doe argued in his Motion, *see* ECF No. 27-1 at 23, and as this Court has already found, *see* ECF No. 25 at 8-11, Dr. Milman's report clearly would have satisfied even a "newly available" standard, should that have been the standard the Code employed.

and Outreach," Dr. Snyder, is only "to determine its viability based on the criteria in Article 33,"
*id.*, meaning that he asks whether the appeal is "capable" or has a "reasonable chance" (*i.e.*,
viable) of "significantly alter[ing] the finding of fact" (*i.e.*, the criteria in Article 33). "*[I]f* an
appeal is found to be *viable*" by him, it is then "forwarded to the Chair of the Committee," the
second appellate body, for the Committee to actually "review and decide"—*i.e.*, to "grant or
deny" it. *Id.* (emphasis added). Twice, in plain English, the Code says the Executive Director is
to conduct a viability review.

GW's response, to the extent that Mr. Doe understands it, appears to be that because the
word "viable" does not appear in Article 33, it plays no part in appellate review. Its brief never
cleanly says that, but that seems to be the implication on page 7 (ECF No. 32), where it discusses
Dr. Snyder's "duties under Article 33" in the first full paragraph, and then immediately accuses
Mr. Doe of "trying to change the rules in midstream" by "openly, and without support,
modif[ying] the terms of the handbook and present[ing] the word 'viable' to the Court as a
modifier . . . in a place it does not actually appear in the Code."

If GW is actually arguing that the terms "viable" and "viability" have no bearing on the
appellate standard articulated in Article 33 because they appear in Article 34, then its argument is
completely frivolous and borders on the disingenuous. Article 34 plainly, in its very first
sentence, attaches "viability" review *to the Executive Director's duties under Article 33*. ECF
No. 27-17 at 8. It literally says that his role is "to determine [an appeal's] ***viability*** based on the
criteria in ***Article 33***." *Id.* It then expressly affirms that an appeal proceeds to the second stage if
the Executive Director finds it to be—not meritorious, or successful—but "viable." *Id.* That, in
fact, is the *only* place that his "duties" are anywhere discussed; Article 33 says absolutely

nothing about him or his role in the appellate process.  It simply lays out the substantive standard.

Tellingly, GW offers no alternative explanation as to what Article 34's "viability" review is doing in the Code.  It is a cardinal rule of contract interpretation that effect must be given to every term in a contract.  *Clyburn v. 1411 K Street Ltd. P'ship*, 628 A.2d 1015, 1018 (D.C. 1993).  GW's arguments reduce the terms "viable" and "viability" to surplusage.  For these and the other reasons Mr. Doe articulated in his Motion,[9] the Code clearly provides that Dr. Snyder's job was only to review Mr. Doe's appeal for viability.

### 2.     Remarkably, GW Concedes That Dr. Snyder Did Not Perform a Viability Analysis.

As suggested by its argument above, GW has taken the position—probably because Dr. Snyder's practice "for over six (6) years," Snyder Decl. 5, has backed them into it—that Dr. Snyder is not charged by the Code with performing viability analysis, but instead that he consistently reviews appeals directly on their merits, and that he did so here:

> Dr. Snyder does not determine whether a piece of evidence presented on appeal is 'capable' of succeeding, or has no 'reasonable chance of success.' (*See* Pl. Br. at 22.) Dr. Snyder instead makes the determination of whether the information in his discretion objectively ***significantly alters*** the findings of fact. (Snyder Decl. at ¶ 6) (emphasis added). ***That is precisely what he did***.

ECF No. 32-7 (second emphasis added).  Dr. Snyder confirms the same in his declaration.[10]

Should the Court conclude that the Code requires Dr. Snyder to perform a viability review, it

---

[9] *See, e.g.*, ECF No. 27-1 at 22 (arguing that the tiered structure of the appellate system suggests a limited role for Dr. Snyder).  GW asserts that this kind of limited role makes Dr. Snyder "merely a stepping stone bereft of any substantive obligation." ECF No. 32 at 7.  But that quite obviously is not true.  Tiered systems of review are commonly used to filter out frivolous appeals at the first stage, and that necessarily entails some level of scrutiny of the merits.

[10] The term "viable" appears nowhere in his declaration.  Instead it states that his normal practice is to forward an appeal to "the Committee on the Judicial System" only if he finds it "to have *merit*," and to reject it if it "lacks *merit*." Snyder Decl. ¶¶ 8-9 (emphasis added).  He then

could on this basis alone remand the appeal to him for a viability review, since he never performed one.

### 3.   Mr. Doe's Appeal Succeeds Under Any Analysis.

For the reasons explained in his Motion, Mr. Doe's appeal clearly sufficed to significantly alter the panel's findings regarding Ms. Roe's credibility (via Dr. Milman's report) and her apparent level of intoxication at the end of the night (via Q.W.'s statement).  ECF No. 27-1 at 24-26.  Because Dr. Snyder's reasons for rejecting Mr. Doe's appeal under a more stringent "merits review" standard do not withstand scrutiny, they necessarily would fail to justify rejection of his appeal under a viability review as well.  Given that Mr. Doe's appeal therefore clearly would survive a good faith viability review by Dr. Snyder, the Court should send Mr. Doe's appeal not to Dr. Snyder, but to the Committee, the second stage of GW's legacy appellate review system.

### a.   Dr. Milman's Report

Dr. Snyder gives two reasons for concluding that Dr. Milman's report would not significantly alter the finding of fact.  Both reasons are specious, and all the more galling coming from someone with a doctorate.  First, he says that "the Toxicology Report's conclusion—that Roe would have had "a high level of intoxication" if she had consumed as much alcohol as she reported—"was a fact that the hearing panel had sufficient knowledge and information about." ECF No. 32-7 at ¶ 14.  But that quite obviously was not the report's conclusion.  Rather, it concluded that Ms. Roe would have been *so* intoxicated that she could not have performed the actions or had the memories she claimed—that her reported consumption is inconsistent with her

---

proceeds in his declaration to explain why the evidence presented by Mr. Doe, in his view, *in fact* did not "significantly alter[] the findings of fact."  *Id.* at ¶¶ 12-15.

reported actions.  ECF No. 27-18 at 8-9.  This first reason fails to address that contradiction altogether and therefore provides no "reasoned" basis for rejecting the appeal.

Second, Dr. Snyder says that "the underlying facts" that the report was based on "were facts that were explicitly before the hearing panel," ECF No. 32-7 at ¶ 14, which is obviously true since Dr. Milman's data came from the hearing transcript.  Dr. Snyder never states the significance of that fact, but presumably he means that the panel was able to draw conclusions from the data just as Dr. Milman was.  That kind of reasoning is, to be frank, a bit crazy.  It is like saying that parents don't need to take their children to medical doctors for diagnoses because they (the parents) are aware of all of the same symptoms that would be reported to the doctor. Dr. Snyder cannot honestly believe that the panelists—two GW students and one low-level GW administrator—have anything close to an expert understanding of the physiology of alcohol intoxication.  Again, the report does not pretend to determine how Ms. Roe *in fact* appeared that night, but to show that Ms. Roe's reported consumption and her reported actions cannot *both* be true, and thereby to undermine her credibility.  ECF No. 27-18 at 8-9.  Dr. Snyder fails to engage with that conclusion altogether and thereby fails to give any reasoned basis for dismissing Dr. Milman's report.

Dr. Snyder's reasons for rejecting Dr. Milman's report lack any rational basis.  They would also necessarily lack a rational basis had Dr. Snyder performed a more lenient viability review as required instead of the merits review he conducted.  Dr. Milman's report provides a sufficient basis for sending Mr. Doe's appeal to the Committee.

### b.     Q.W.'s Statement

Dr. Snyder's reasons for dismissing Q.W.'s statement fare no better.  He first states that he dismissed Q.W.'s observation that Ms. Roe conversed normally when he met her (at

approximately 11:20 p.m.) by saying that this testimony "was not materially different from other testimony offered by" Mr. Doe.  ECF No. 32-7 at ¶ 13.  But that testimony of Mr. Doe's, unlike other testimony of his, was never credited by the panel.  ECF No. 27-15 at 5-6.  The panel's decision states very explicitly what testimony from the parties it chooses to credit.  Had the panel found that Ms. Roe appeared to converse normally toward the end of her time at the party, then it would be true that Q.W.'s statement could not change much, because it would simply support a fact that the panel had already found.  But the panel made no such finding, and in fact credited Ms. Roe's testimony about her state of intoxication there.  *Id.*  By definition, evidence that might *alter* a finding a fact must either support a fact that the panel did *not* find or undermine a fact that it *did*.  Dismissing Q.W.'s statement *because* it supported testimony that the panel did *not* credit lacks any rational basis.

Dr. Snyder's second reason for disregarding Q.W.'s statement is that, in his view, it was outweighed by the testimony of Ms. Roe and her witnesses.  ECF No. 32-7 at ¶ 13.  But if Dr. Milman's report is considered, as it must be, then Dr. Snyder's reliance on Ms. Roe's testimony is unfounded, or at a minimum greatly diminished.  That leaves the testimony of J.E. (who saw Ms. Roe stumble an hour before Q.W. talked to her) and R.M. (who said Ms. Roe looked "intoxicated" sometime before then but could not say more) as the evidence to weigh against Q.W.'s statement.  To any fair mind, Q.W.'s testimony ought to "significantly alter" any perception that Ms. Roe may have been incapacitated at that point.  Under a viability analysis, it undoubtedly is "capable" of significantly altering that finding, even assuming application of a

deferential standard of review is appropriate.[11]  Q.W.'s statement therefore also provides a basis for sending Mr. Doe's appeal to the Committee on any remand.

### C.     The Code and the Sexual Misconduct Policy Manifestly Supply the Terms of the Contract.

GW makes one final effort to avoid summary judgment, by restating its arguments from the preliminary injunction briefing that the Code simply is not a contract.  "[B]oth the D.C. Court of Appeals and the D.C. Circuit are clear," this Court held in resolving that motion, "that the relationship between a student and his or her school "is contractual in nature and permits suit for its breach."  ECF No. 25 at 7 (citing *Chenari v. George Washington Univ.*, 847 F.3d 740, 744 (D.C. Cir. 2017); *Basch v. George Washington Univ.*, 370 A.2d 1364, 1367 (D.C. 1977)).  GW asks the Court to reconsider for two reasons, neither of which holds any water.

First, GW cites three cases where courts concluded that various university statements did not supply terms of the university-student contract.  ECF No. 32 at 13 (citing *Mosby-Nickens v. Howard University*, 864 F. Supp. 2d 93, 99 (D.D.C. 2012); *Shinabargar v. Bd. of Trustees of University of D.C.*, 164 F. Supp. 3d 1, 29 (D.D.C. 2016); and *Manago v. D.C.*, 934 A.2d 925, 926-27 (D.C. 2007)).  But in all three, the statements manifestly did not identify actions the

---

[11] GW's reasons for insisting that non-academic breach of *contract* claims (as opposed to claims for breach of the covenant of good faith and fair dealing) are overturned only when "no rational basis" supports the decision, do not withstand scrutiny.  GW baldly asserts that "[c]ourts have applied this high standard to claims involving non-academic misconduct," but follows that with only a "*See also*" to *Hajjar-Nejad v. George Washington Univ.*, 37 F. Supp. 3d 90, 117 (D.D.C. 2014), which applied that standard to dismissal related to lack of professional comportment.  ECF No. 32 at 8.  What GW leaves out is that *Hajjar-Nejad* clearly, unambiguously, on the very same page of the opinion, held that "*particularly for medical students*," as was the case there, "professional comportment issues fall under the umbrella of academic decisions."  37 F. Supp. at 117.

        As Mr. Doe has stated repeatedly, the question here is academic because GW's rejection of his appeal fails under any standard.  But should it matter, the courts draw clear line between the standard of review applied to academic decisions vs. non-academic decisions.

*university* was expected to take; they stated instead what *students* were expected to do.  It goes without saying that if a statement does not purport to tell a university to do something, it cannot be a contract provision binding the university to do that thing.  That is all that these cases stand for.  *See, e.g.*, *Mosby-Nickens*, 864 F. Supp. at 99 (statements that "'[s]tudents are expected to complete a doctoral degree within a maximum of seven calendar years'" and "'[t]he responsibility for fulfilling these requirements on time is that of the student'" applied to students and therefore did not bind *university*); *Shinabargar*, 164 F. Supp. 3d at 29 (UDC Honor Code did not supply terms of the contract because it "is merely 'an acknowledgement and pledge' that a student 'will read and become familiar with'" the student handbook); *Manago*, 934 A.2d at 926-27 (D.C. 2007) (plaintiff failed to identify provisions that purported to bind the *university* to do the things she alleged it should have done).

The GW Code, including the specific provisions at issue here, are the exact opposite of the provisions in the cases above, as Mr. Doe noted in his Motion.  ECF No. 27-17 at 8.  They are repeatedly directed at the university and couched in mandatory language.  Article 34 states that "[a] timely appeal *will be* reviewed *by the Executive Director of Planning & Outreach* to determine its viability."  *Id*.  "If an appeal is found to be viable, the appeal *will be* forwarded to *the Chair of the Committee on the Judicial System*."  *Id.*  One member from each constituency of the Committee "*shall be* appointed" to the appeals panel.  *Id.*  "The decision to grant or deny the appeal *will be* based on information supplied in the written appeal and, when necessary, the record of the original proceedings."  *Id.*  And the appeals panel may resolve the appeal through one of three designated means.  *Id.* (Article 35).  The entire procedure is mandatory and concerns the actions that the university says *it* will take in response to misconduct.  Indeed, the entire

Code "go[es] into force whenever the proper authorities may determine" and presumably remains in force until the GW "make[s] changes." *Id.* at 9.

GW's second argument as to why the Code is not a contract is that it purportedly reserves the right to modify it at any time. ECF No. 32 at 14. GW quotes Section I. of the Code, on page 9, for that proposition—but conspicuously leaves out the middle sentence from that section (bolded below), which completely undercuts its argument:

> The University reserves the right to modify or change requirements, rules, and fees. **Such regulations shall go into force whenever the proper authorities may determine.** The right is reserved by the University to make changes in programs without notice whenever circumstances warrant such changes.

ECF No. 27-17 at 9. Far from "unambiguously expressing a lack of intent to be contractually bound by the Code on the part of the university," ECF No. 32 at 14, the Code shows that GW intends for all to be bound by the Code for as long as the Code is in effect. And when a new Code "go[es] into force," it likewise becomes binding until it is replaced. The University may "make changes in programs without notice whenever circumstances warrant," but until it does it has bound itself to the "regulations" that have "go[ne] into force." Consistent with its mandatory language, the Code sensibly expresses that it is binding for as long as it is in effect.

Not surprisingly, GW appears not to have argued in prior cases that any of its disciplinary policies fail to supply terms in its student-university contract. The district court in *Chenari*—the same judge, in fact, who decided *Mosby-Nickens*—spent no time analyzing whether GW's Honor Code provisions concerning cheating were part of the student-university contract, *see Chenari v. George Washington Univ.*, 172 F. Supp. 3d 38 (D.D.C. 2016), and GW in fact maintained in its summary judgment briefing that "[c]ourts in the District of Columbia recognize a contractual relationship between a student and a university." No. 1:14-cv-929, ECF No. 18 at 35 (D.D.C. Aug. 10, 2015). And in *Kumar v. George Washington Univ.*, GW did not dispute that the

university's "Research Misconduct Policy" supplied terms in the student-university contract,[12] even though that policy stated only that GW would "normally" follow it and that "circumstances in an individual case may dictate variation from the normal procedure,"[13] neither of which is true of the Code.

## II.      MS. ROE'S PHONE RECORDS ALSO SATISFY THE THREE CRITERIA FOR VIABLE APPEALS AND SHOULD BE CONSIDERED BY ANY APPEAL AUTHORITY ON REMAND.

Just as Mr. Doe asked that E.E.'s phone records be included in any remand to GW, he likewise requests that Ms. Roe's phone records be included as well.  Those records, like E.E.'s records, can also support a viable appeal.  They pertain to key alleged events that night and therefore are relevant to the case.  They were not requested until recently and therefore were not presented at or before the hearing.  And they unquestionably are capable of significantly altering the findings of fact, for the reasons explained above.  Like E.E.'s records, they do nothing less than eliminate the panel's primary basis for concluding that Mr. Doe should have known that Ms. Roe was incapacitated.

## III.     THIS COURT POSSESSES BROAD EQUITABLE POWERS TO CRAFT AN APPROPRIATE REMEDY.

GW contends that any reconsideration of Mr. Doe's appeal should be limited to consideration of the precise appeal he presented back in January, despite the undeniably critical evidence that this litigation has uncovered.  ECF No. 32 at 15-16.  That original appeal undoubtedly succeeds in "significantly altering the findings of fact," for the reasons explained

---

[12] *See Kumar v. George Washington Univ.*, 174 F. Supp. 3d 172, 184-85 (D.D.C. 2016); *see also Kumar v. George Washington Univ.*, No. 1:15-cv-120, ECF No. 8-1 (D.D.C. April 2, 2015) (GW refraining from arguing in motion to dismiss that Research Misconduct Policy was not part of contract).

[13] *See Chenari v. George Washington Univ.*, No. 1:15-cv-120, ECF No. 8-4 at 2 (D.D.C. April 2, 2015).

above, and therefore ought to be enough by itself to warrant removal of the finding against Mr.

Doe or, at a minimum, a new hearing.  It is very, very difficult to understand why GW would

fight so hard to avoid having to consider this new evidence even upon a court-ordered remand,

and GW offers no explanation for its position.

GW is wrong, in any event, that this Court lacks the power to order anything other than

order precise specific performance on remand.  Specific performance "is an equitable remedy,"

*Drazin v. Am. Oil Co.*, 395 A.2d 32, 34 (D.C. 1978), and "[i]n shaping equity decrees, the trial

court is vested with broad discretionary power."  *Lemon v. Kurtzman*, 411 U.S. 192, 200 (1973);

*see also Ward v. Wells Fargo Bank, N.A.*, 89 A.3d 115, 123 (D.C. 2014) ("[c]ourts have broad

powers to fashion equitable remedies").  As the Supreme Court has explained:

> Equitable remedies are a special blend of what is necessary, what is fair, and what
> is workable. . . .  The essence of equity jurisdiction has been the power of the
> Chancellor to do equity and to mould each decree to the necessities of the
> particular case. Flexibility rather than rigidity has distinguished it. The qualities of
> mercy and practicality have made equity the instrument for nice adjustment and
> reconciliation between the public interest and private needs as well as between
> competing private claims.

*Lemon*, 411 U.S. 192, 200–01 (1973) (citation and quotation marks omitted).  Those

considerations may "*[g]enerally*" militate in favor of specific performance of the contract "in

precise terms," *Drazin*, 395 A.2d at 34 (emphasis added), but here they decidedly do not.  GW's

purported remedy would force Mr. Doe and GW through an artificial process that has to pretend

that *the most critical evidence that anyone is aware of* simply doesn't exist—evidence that Mr.

Doe could not have obtained earlier, that he has sought diligently at an early stage of this

litigation, and that GW, at least initially, agreed not to oppose.  *See* ECF No. 9-1 at 2.

GW calls this evidence a "windfall."  ECF No. 32 at 16.  But the truth is not a windfall.

Being able to use undisputed evidence to defend yourself against a rape charge that will change,

and already *has* changed, the course of your life, is not a windfall. Nothing about this case or this situation is a windfall for Mr. Doe.

## CONCLUSION

As we said at the outset of this briefing, at some point the truth has to matter.  John Doe has a right to defend himself fully, with *all* of the available evidence, against what it is now clearer than ever is a false rape charge that relied on false testimony to convict him.  That false charge, and GW's biased and irresponsible actions in the face of it, have taken away almost five months of his life.  But he still has a chance to salvage the next stage of his life if this Court rules in his favor, grants him the relief he seeks, and GW resolves his favorably and quickly.  John Doe thus respectfully requests that his Motion for Partial Summary Judgment be granted.  A revised Proposed Order is attached.

Respectfully submitted,

DATED:  June 6, 2018

/s/ Christopher C. Muha
Justin Dillon (D.C. Bar No. 502322)
Christopher C. Muha (D.C. Bar No. 987116)
KAISERDILLON PLLC
1401 K Street NW, Suite 600
Washington, DC 20005
T: (202) 640-2850
F: (202) 280-1034
jdillon@kaiserdillon.com
cmuha@kaiserdillon.com

*Attorneys for Plaintiff John Doe*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 6th day of June, 2018, a copy of the foregoing Reply in

Support of John Doe's Motion for Partial Summary Judgment was served by ECF and by email

upon the following counsel who have been retained to represent The George Washington

University in this matter:


Joshua W. B. Richards               Jason A. Ross
James A. Keller                      Saul Ewing Arnstein & Lehr LLP
Saul Ewing Arnstein & Lehr LLP    1919 Pennsylvania Ave. NW
Centre Square West               Suite 550
1500 Market Street, 38th Floor     Washington, DC 20006
Philadelphia, PA 19102           (202) 295-6655
Joshua.Richards@saul.com       Jason.Ross@saul.com
James.Keller@saulcom



                                      /s/ Christopher C. Muha
                                      Christopher C. Muha