**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **JOHN DOE,**<br><br>**Plaintiff,**<br><br>**v.**<br><br>**THE GEORGE WASHINGTON UNIVERSITY,**<br><br>**Defendant.** | **Case No. 18-cv-553 (RMC)** |

## MEMORANDUM OPINION

As a college sophomore, John Doe encountered a young woman at a party who said that she wanted to have sex. They did. Two years later, Jane Roe complained to the university that she had been sexually assaulted because she had been obviously too drunk to consent. After a hearing before a panel of three, Mr. Doe was found responsible for sexual assault. He was suspended in January 2018 for one year, even though he had completed all coursework for his degree. Mr. Doe appealed the panel's finding but his appeal was found inadequate to present to an appellate panel. Mr. Doe sued and now moves for partial summary judgment, arguing that the handling of his appeal violated the terms of the university's contract with its students as defined in part by its Code of Student Conduct. The Court agrees and will order the university to provide the appellate review to which Mr. Doe was entitled.

## I. BACKGROUND

The events that prompted this lawsuit began on the night of September 12, 2015, when two undergraduate students at George Washington University (GW or the University), in the District of Columbia, met at a college party. *See* Pl.'s Sealed Ex. 1, GW Office of Student

Rights & Responsibilities Summary of Material Allegations (ORR Documents) [Dkt. 28-1] at 6 (providing the complainant's statement). John Doe was a virgin; he also did not drink any alcohol over the course of the night because he is a nondrinker for religious reasons. Pl.'s Sealed Ex. 2, Unredacted Hearing Transcript (Sealed Tr.) [Dkt. 28-2] at 54.[1] Ms. Roe was a freshman; she consumed a significant amount of alcohol over the course of the night, although the exact amount is in dispute. At the party, Mr. Doe heard Ms. Roe say she wanted to have sex; the two met and talked and at some point around midnight they left the party together, riding in an Uber taxi ordered by Ms. Roe and headed together to Mr. Doe's dorm room, where they had sexual intercourse. *See* ORR Documents at 6 (noting in the complainant's statement that the Uber ride took place from 11:56 p.m. until 12:21 a.m., when the two students got out of the car at Mr. Doe's building). Ms. Roe left afterwards and walked back to her room. *See id.* (describing her walk home). Mr. Doe now insists that the encounter was consensual and initiated by Ms. Roe, and that his reasonable perception was that she was able to consent; she would later formally allege that she had been too drunk to consent to sex.

On October 30, 2017, Ms. Roe filed a complaint with GW's Title IX enforcement office,[2] alleging that Mr. Doe had sexually assaulted her during the encounter two years prior. *See id.* at 6-7. In her initial complaint, Ms. Roe described the approximate timing of her alcohol consumption, and stated that she had been extremely intoxicated, but did not specify the full amount she consumed. *See id.* A week later, Ms. Roe supplemented her complaint stating she had consumed "5 solo [*sic*] cups of beer" at the party in question, in addition to alcohol

---

[1] When citing to the parties' exhibits, the Court cites to the page numbers generated by the Court's Electronic Case Filing (ECF) system.

[2] Title IX, which is codified at 20 U.S.C. §§ 1681-88, is a federal civil-rights law that prohibits discrimination on the basis of sex in educational programs that receive federal funds.

consumed before she went to the party. *Id.* at 8 (providing the complainant's supplemental statement dated November 2, 2017). A few days later she submitted another supplemental declaration, stating she had also had a large cup of a strong mixed drink after drinking beer at the party. *Id.* at 10 (providing the complainant's supplemental statement dated November 6, 2017). GW investigated Ms. Roe's complaint and on December 14, 2017 convened a hearing on her allegations. At the hearing, Ms. Roe presented witness testimony that she had drunk "at least four" mixed drinks before attending the party in question, and that she was "not . . . able to speak fluidly, stumbling over words, not having perfect motor skills, tripping," and otherwise appeared intoxicated immediately before going to the party. Sealed Tr. at 26-27.

Both Ms. Roe and Mr. Doe had the opportunity to present testimony, and a hearing panel consisting of "two students and one low-level administrator" presided and served as the fact-finder. Mem. in Support of John Doe's Mot. For Partial Summ. J. (Doe Mot.) [Dkt. 27-1] at 21 n.11. Ms. Roe testified as to her recollection of the evening, which included her recollection that she spoke with a friend, E.E., on the phone during the Uber ride with Mr. Doe. *See* Sealed Tr. at 8. E.E. also testified, stating that Ms. Roe had sounded incoherent and slurred her speech during the phone call. *Id.* at 43-44 (testifying that she recalled Ms. Roe "slurring [her] words" on the phone from the Uber). Another witness presented by Ms. Roe, J.E., testified that Ms. Roe had been drinking heavily and appeared drunk at a "pregame" party, although J.E. did not testify as to Ms. Roe's condition at the party at which she met Mr. Doe. *Id.* at 26-27. Ms. Roe's third witness, R.M., testified that Ms. Roe appeared intoxicated during the party while she was talking to Mr. Doe. *See id.* at 33. Mr. Doe testified on his own behalf that Ms. Roe did not appear drunk; he did not present any other witnesses at the hearing. *See id.* at 56 ("There was nothing that indicated to me that she was intoxicated. . . .").

On January 23, 2018, GW informed Mr. Doe that the panel had found him responsible for sexually assaulting Ms. Roe. As a result, he was suspended for one year, which delayed conferral of his undergraduate degree from spring 2018 until January 2019. *See* Pl.'s Ex. 12, GW Office of Student Rights & Responsibilities University Hearing Board Adjudication Report [Dkt. 27-15] at 7 (finding Mr. Doe "in violation of the charge" and recommending suspension); Def.'s Sealed Ex. C, Decision Letter (Jan. 23, 2018) [Dkt. 33-4] at 2-3.[3]

Mr. Doe timely appealed the hearing panel's finding of responsibility according to the procedures outlined in GW's Code of Student Conduct (the Code). *See* Pl.'s Sealed Ex. 13, Doe Appeal [Dkt. 28-14]; *see also* Pl.'s Ex. 14, GW Code of Student Conduct (GW Code) [Dkt. 27-17] § 33 (providing that parties have a right to appeal the outcome of a disciplinary proceeding, and setting forth the relevant deadlines and procedural requirements). His appeal included a statement from another student, Q.W., who stated that he had spoken with Ms. Roe at the party and that she appeared "normal" and "lucid," and that she did not appear to be blackout drunk. Pl.'s Sealed Ex. 17, Email from Q.W. (Jan. 30, 2018) [Dkt. 28-16] at 3. Mr. Doe's appeal also included a report by a professional toxicologist, Dr. Harry Milman, who reviewed Ms. Roe's testimony regarding her alcohol consumption on the night in question and opined that the amount of alcohol Ms. Roe claimed to have consumed was so high that, were she telling the truth, she likely would have been passed out and unable to stand, speak, remember anything from the entire evening, or dress herself and leave Mr. Doe's room on her own two feet; *i.e.*, the report called into question her testimony regarding the level of drunkenness she had displayed. *See* Pl.'s Sealed Ex. 15, Report of Harry A. Milman, Ph.D. (Dr. Milman Rpt.) [Dkt. 28-15] at 5.

---

[3] At the time of his suspension, Mr. Doe had already completed the coursework necessary to earn his degree.

In relevant part, the Code provides for process by which a student may appeal the outcome of a disciplinary proceeding:

> 33. Parties have a right to appeal the outcome of a disciplinary hearing or conference but not the sanction. Appeals must be based on new information that is relevant to the case, that was not previously presented at the hearing or conference, and that significantly alters the finding of fact. . . .
>
> 34. A timely *appeal will be reviewed* by the Executive Director of Planning & Outreach or designee *to determine its viability* based on the criteria in Article 33. . . . If an appeal is found to be viable, the appeal will be forwarded to the Chair of the Committee on the Judicial System, who shall select a Panel of three persons from the Committee to review and decide the appeal (the "Panel"). One member from each constituency—students, faculty and administrators—shall be appointed, but otherwise the selection of Panel members shall be within the discretion of the Chair. The decision to grant or deny the appeal will be based on information supplied in the written appeal and, when necessary, the record of the original proceedings. . . . The decision of the Panel, or the outcome and sanctions (if any) resulting from any new hearing or conference ordered by the Panel in connection with the appeal, shall be final and conclusive and no further appeals will be permitted.

GW Code §§ 33-34 (emphasis added).

Robert Snyder, GW's Executive Director of Planning and Outreach, is tasked with performing the gatekeeper function for all appeals of the University's non-academic disciplinary proceedings, a role he has performed for more than six years. *See* Def.'s Ex. E, Declaration of Robert Snyder (Snyder Decl.) [Dkt. 32-7] ¶ 5 (Mr. Snyder describing his role). In his declaration, Mr. Snyder describes his responsibility as "reviewing appeals from findings in disciplinary hearings to determine the viability of the appeal," as described in Articles 33 and 34. *Id.* ¶ 4. He then details his process for making this determination, which involves determining "the validity of the appeal," *id.* ¶ 6, and deciding whether the appeal has "merit" under Article 33 of the Code. *Id.* ¶¶ 8-11. Mr. Snyder rejected Mr. Doe's "new" evidence on the basis that both

the expert toxicology report and Q.W.'s affidavit "were not previously unavailable . . . as both could have been obtained prior to the hearing." *Id.* ¶ 11.[4]

Mr. Doe filed suit and initially moved for a preliminary injunction; specifically, he sought an order from the Court requiring the University to confer his degree in May 2018 and to clear his record. Mot. for Prelim. Injunction [Dkt. 6]. The Court denied the motion because Mr. Doe had failed to establish that he would suffer irreparable harm without a preliminary injunction. 4/25/2018 Order [Dkt. 26]; *Doe v. George Washington Univ.*, 305 F. Supp. 3d 126 (2018) (*Doe I*). However, the Court found that Mr. Doe's breach of contract claim was likely to succeed on the merits insofar as he argued that his appeal of the finding of responsibility was viable under the Code and should have been considered by an appellate panel. *See Doe I*, 305 F. Supp. 3d at 133. During this litigation, Mr. Doe subpoenaed telephone records from E.E.'s cellphone provider, which showed no incoming or outgoing phone calls during the time period when Ms. Roe and E.E. testified they spoke on the phone during the Uber ride. *See* Pl.'s Sealed Ex. 19 [Dkt. 28-18].

Because the central focus of Mr. Doe's complaint is his sanction, resulting in the University's delayed conferral of his degree for 12 months, the matter is time-sensitive. The parties agreed, with the Court's permission, to proceed directly to briefing on Mr. Doe's motion for partial summary judgment on whether Mr. Doe's appeal was denied improperly, and that Mr. Doe's other claims, including breach of contract on other grounds, can be addressed later, as needed. *See* 5/2/2018 Minute Order. Mr. Doe's motion for partial summary judgment on breach

[4] At the time of the hearing, Q.W. was studying abroad and physically unavailable.

of contract concerning his appeal is now fully briefed.[5] The Court held a hearing on the motion for partial summary judgment on June 13, 2018. *See* 6/13/2018 Minute Entry. The motion is ripe for decision.

## II. LEGAL STANDARDS

Summary judgment may be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material if it is capable of affecting the outcome of litigation. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). A dispute is genuine if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Id.*

The relationship between GW and Mr. Doe, insofar as that relationship is governed by University codes and policies, is contractual in nature and permits suit for its breach. *Chenari v. George Washington Univ.*, 847 F.3d 740, 744 (D.C. Cir. 2017) ("Under District of Columbia law, which governs here, the relationship between a university and its students is contractual in nature.") (quotation marks and citations omitted); *see also Alden v. Georgetown Univ.*, 734 A.2d 1103, 1111 n.11 (D.C. 1999); *Pride v. Howard Univ.*, 384 A.2d 31, 34 (D.C. 1978); *Basch v. George Washington Univ.*, 370 A.2d 1364, 1367 (D.C. 1977). To determine the material terms of a contract, courts look to whether the parties' intent to be bound. *See Carroll v. Fremont Inv. & Loan*, 636 F. Supp. 2d 41, 49 (D.D.C. 2009).

---

[5] *See* Mot. for Partial Summ. J. [Dkt. 27]; GW Mem. in Opp'n to Mot. for Partial Summ. J. (Opp'n) [Dkt. 32]; Reply to Opp'n to Mot. for Partial Summ. J. (Reply) [Dkt. 36]; Surreply to Reply to Opp'n to Mot. (Surreply) [Dkt. 40]. The parties provided evidence as exhibits attached to their briefs and in supplemental sealed filings. *See* Pl.'s Exs. [Dkts. 27-4 – 27-28]; Pl.'s Sealed Exs. [Dkts. 28-1 – 28-22]; Def.'s Exs. [Dkts. 32-3 – 32-9]; Def.'s Sealed Exs. [Dkts. 33-1 – 33-5]; Def.'s Sealed Exs. [Dkts. 37-1 – 37-3]; Pl.'s Notice of Filing of Redacted Document [Dkt. 38].

## III. ANALYSIS

Mr. Doe moves for summary judgment for alleged breach of a contract between him and the University. GW argues that there is no such contract and that it complied with the terms of the Code of Conduct.

### A. The Contract

Over GW's objections, this Court has followed precedent from the District of Columbia Court of Appeals and found that the Code forms a contract between the University and its students, despite the fact that the Code is written and can be changed unilaterally by the school. *See Doe I*, 305 F. Supp. 3d at 131-33 (citing *Alden*, 734 A.2d at 1111 n.11; *Pride*, 384 A.2d at 34; and *Basch*, 370 A.2d at 1367; and finding that the relationship between Mr. Doe and GW is contractual and that the Code provisions at issue in this case are contract terms). The University offers an education on certain terms—tuition, attendance, behavior under the Code, etc.—and a student accepts and performs his part of the contract accordingly. *See Basch*, 370 A.2d at 1366.

GW maintains its objection, arguing in brief that Mr. Doe has failed to show "sufficient facts to demonstrate the terms of the contract," Opp'n at 13 (quoting *Mosby-Nickens v. Howard Univ.*, 864 F. Supp. 2d 93, 98 (D.D.C. 2012))—in short, arguing that Mr. Doe has failed to demonstrate that the Code, in this case, is a contract. GW protests that the University did not intend to be bound by the Code and that there is no mutuality of obligation, so that the Code cannot be interpreted as a contract. Opp'n at 13-14 (citing *Shinabargar v. Bd. of Trustees of Univ. of D.C.*, 164 F. Supp. 3d 1, 29 (D.D.C. 2016)). GW's argument is based on the University's explicit reservation of a "unilateral right to modify the Code without notice to, or the consent of, students." Opp'n at 14; *see also id.* (quoting the Code at 9 § I, describing the

University's "right to modify or change requirements, rules, and fees . . . The right is reserved by the University to make changes in programs without notice").

Whether the cited language supports a unilateral right to change any and all policies, including those at issue here, need not be decided. Under D.C. law, the contract between a university and its students can include disciplinary codes and other communications from a university to its students. *See Pride*, 384 A.2d at 34; *Alden*, 734 A.2d at 1110. In *Pride v. Howard*, for example, the D.C. Court of Appeals found that provisions from Howard University's code of conduct, parts of which had been distributed to students in a manual, constituted contract terms. *Pride*, 384 A.2d at 34. The fact that a university reserves the right to modify "requirements, rules, and fees," as does GW, does not mean that no bargain exists. GW has agreed to provide its students with an education and, upon satisfactory completion, a degree. The Code of Conduct governs student behavior while studying at the University and its sections on appeals from panel decisions on non-academic discipline set forth clear procedures that impose requirements on the University, to which the University expressed a clear intent to be bound. By contrast, in *Basch*, the D.C. Court of Appeals found that code provisions containing words such as "estimated" and "approximate" suggested that there was no intent to be bound to an exact tuition rate; words conveying a more "definite" requirement would have suggested the opposite. *Basch*, 370 A.2d at 1367. The Court finds that the Code sections at issue here are binding on the University, and failure to follow them, as alleged, would constitute a breach of contract.

**B. The Appeal**

The question presently at bar is whether Mr. Snyder improperly denied Mr. Doe's appeal on what was supposed to be initial screening. The University states that "Article 33 of the

Code . . . governs appeals" and an appealing party "must present evidence that meets two requirements under the Code: [1] new information that is relevant to the case, that was not previously presented, which [2] *significantly alters the findings of fact*." Opp'n at 8; *see also* GW Code § 33 ("Appeals must be based on new information that is relevant to the case, that was not previously presented at the hearing or conference, and that significantly alters the finding of fact.")

In its focus on Article 33, the University fails to mention Article 34, which describes the procedures that must be followed in reviewing appeals. As relevant, Article 34 states:

> A timely appeal will be reviewed by the Executive Director of Planning & Outreach or designee to determine its viability based on the criteria in Article 33. . . . If an appeal is found to be viable, the appeal will be forwarded to the Chair of the Committee on the Judicial System, who shall select a Panel of three persons from the Committee to review and decide the appeal. . . . The decision to grant or deny the appeal will be based on information supplied in the written appeal and, when necessary, the record of the original proceedings. . . . The decision of the Panel, or the outcome and sanctions (if any) resulting from any new hearing or conference ordered by the Panel in connection with the appeal, shall be final and conclusive and no further appeals will be permitted.

GW Code § 34.

Mr. Snyder declares that he is "responsible for reviewing appeals from findings in disciplinary hearings to determine the *viability* of the appeal" but then explains the processes by which he "determine[d] the *validity* of the appeal" in Mr. Doe's case and others. Snyder Decl. ¶¶ 4, 6 (emphasis added). When deciding the "validity" of an appeal, Mr. Snyder states that he decides whether an appeal has "merit" under Article 33 of the Code. *Id.* ¶ 8 (stating he forwards an appeal to an appellate panel only if he finds it "to have merit under the provisions of the Code"); ¶ 9 (stating that if "an appeal lacks merit according to the provisions of the Code," he

notifies the appealing party that it is rejected); ¶ 11 (stating that he "found that Doe's appeal was without merit under the Code").

Mr. Snyder rejected Mr. Doe's "new" evidence on the basis that both the expert toxicology report and the affidavit from Q.W. "were not previously unavailable . . . as both could have been obtained prior to the hearing." *Id.* ¶ 11. This Court has already rejected the unspoken requirement that "new" evidence to support an appeal must have been previously unavailable prior to the panel hearing, because this limitation was not then stated in the Code. *See Doe I*, 305 F. Supp. 3d at 133 ("The Court cannot agree to add limitations that are not stated in the Code."). As to the toxicology report, Mr. Snyder missed the point that Ms. Roe had never quantified the full amount she drank on the night in question until the actual panel hearing so that a toxicologist could not have evaluated the impact of that amount of liquor on someone of her size and weight prior to that hearing. Thus, the toxicology report was "new" evidence by any definition.

Inasmuch as Mr. Snyder read the toxicology report to summarize only that Ms. Roe "would have had an extremely high level of intoxication," he concluded that it would not have altered the hearing panel's finding of fact because "the exact number of drinks Roe contended she consumed . . . [was] explicitly before the hearing panel." Snyder Decl. ¶ 14. However, Dr. Harry Milman, the toxicologist, opined that the amount of alcohol Ms. Roe reported was so high that, if she were telling the truth, she likely would have been passed out and unable to stand, speak, remember anything from the entire evening, or dress herself and leave Mr. Doe's room on her own two feet *i.e.*, the report called into question her testimony regarding her level of drunkenness and how she had acted. *See* Dr. Milman Rpt. at 5. Mr. Snyder did not appreciate or consider whether an appellate panel might have questioned the potential exaggerations in Ms. Roe's testimony once it reviewed Dr. Milman's expert opinion. Further,

Mr. Snyder discounted the value of Q.W.'s affidavit because his statement "was not materially different from other testimony offered by the respondent," Snyder Decl. ¶ 13, despite the fact that one of the hearing members specifically asked if Mr. Doe did not have other witnesses to corroborate his testimony. *See* Sealed Tr. at 57 ("Is there any particular reason why you haven't presented any witnesses to us today?").

Q.W.'s testimony, which provided support for Mr. Doe's testimony concerning Ms. Roe's appearance, speech, and behavior on the night in question, was not before the hearing panel. Nonetheless, Mr. Snyder decided that "weighing the evidence presented by the complainant and her witnesses, the facts presented in Q.W.'s statement were not significant enough to outweigh the evidence presented by the complainant and her witnesses." Snyder Decl. ¶ 13. This statement clearly weighed the evidence and decided credibility from a written record; it thereby failed to appreciate the separate roles of a fact-finder (a hearing or appellate panel in the GW system) and a gatekeeper. It thus compounds the error of ignoring the possible impact of the new toxicology report on Ms. Roe's credibility or the credibility of her other witnesses who supported her testimony. Mr. Snyder added a summary statement in his declaration that the combination of the Toxicology Report and the Q.W. statement "were not independently significant enough to alter the findings of fact." *Id.* ¶ 15. This summary adds no weight to his conclusions.

The details of Mr. Snyder's analysis are worth examining because Article 34 of the Code directs that, upon receiving an appeal, Mr. Snyder is "to determine its viability based on the criteria in Article 33." GW Code § 34. "If an appeal is found to be viable," it is then "forwarded to the Chair of the Committee" on the Judicial System for the Committee to "review and decide," *i.e.*, to "grant or deny." *Id.* Thus, the Code advises students that their appeals will

go forward to a second panel if they appear "viable" but Mr. Snyder acknowledges that he decided whether Mr. Doe's appeal had "validity" based on his assessment of its "merit." Mr. Snyder's declaration makes no differentiation between the terms or why he used "validity" when Article 33 set out a test of "viability." Not surprisingly, this comports with GW's argument, discussed below.

Contractual terms "are to be given their common meaning." *Basch*, 370 A.2d at 1367. In common parlance, viable means "having a reasonable chance of succeeding," Merriam-Webster.com; "able to be done or likely to succeed," Cambridge Business English Dictionary, dictionary.cambridge.org; or "possible," "within possibility," Thesaurus.com. *See also* Black's Law Dictionary (10th ed. 2014) (defining viable as "[c]apable of independent existence or standing," as in "a viable lawsuit," or "[c]apable of succeeding," as in "a viable option"). Thus, by the direction of Article 34, Mr. Snyder's role was to determine whether an appeal had "a reasonable chance of succeeding" or was "likely to succeed" based on the criteria in Article 33 (as relevant, whether the appeal had a reasonable chance of "significantly alter[ing] the finding of fact"). In contrast, "valid" means "logically correct," as in a "*valid* argument," Merriam-Webster.com; "based on truth or reason; able to be accepted," as in "The money was gone, and the only *valid* conclusion was that someone had stolen it."), Cambridge Academic Content Dictionary, dictionary.cambridge.org (providing the definition in "American English"); or "credible," "good," "well-founded," "solid," "accurate," "persuasive," "binding," "legal," "logical," "compelling," Thesaurus.com. *See also* Black's Law Dictionary (10th Ed. 2014)

(defining valid as "[l]egally sufficient; binding," as in "a valid contract," or "[m]eritorious," as in "that is a valid conclusion based on the facts presented in this case").[6]

Mr. Doe argues that the viability analysis for which Mr. Snyder was authorized in Article 34 did not give him authority to decide the merits of Mr. Doe's appeal or to decide whether his appeal would succeed. Instead, Mr. Doe contends, Mr. Snyder was tasked only with determining whether there were "new" evidence and whether there were a reasonable chance of success on appeal. GW does not recognize or address the viability standard in Article 34 that defines Mr. Snyder's review parameters, although it filed an opposition and a surreply. To the contrary, GW contends that Mr. Doe:

> attempts . . . to change the rules midstream – he openly, and *without support*, modifies the terms of the handbook and presents the word 'viable' to the Court as a modifier. . . . In adding this word in a place it does not actually appear in the Code, plaintiff asserts that Mr. Snyder's role is only to determine if something has the 'potential' to succeed, portraying his role as merely a stepping stone bereft of any substantive obligation. This formulation is wrong.

Opp'n at 7 (emphasis added).[7] Recognizing its error at oral argument, GW insisted that the definition for "viable," as used in Article 34, is found in Article 33, *i.e.*, "viable" means that an appeal must present new evidence that "significantly alters the finding of fact." GW insists that such a decision is properly made by Mr. Snyder. GW had no explanation for Mr. Snyder's use of the word "validity" in reviewing an appeal, but it discounted its importance since viable is, according to the argument, contractually defined. To be precise, GW does not argue that

---

[6] The Oxford Living Dictionaries define validity as "[t]he quality of being logically or factually sound; soundness or cogency" and include "viability" as a synonym. English Oxford Living Dictionaries, oxforddictionaries.com (providing both American and British English definitions). However, on the whole, American sources clearly distinguish between the two terms.

[7] GW's surreply was devoted to the issue of phone records, which are irrelevant to the breach of contract analysis. *See generally* Surreply.

"viability" and "validity" are the same thing. Rather, for purposes of its argument concerning the Code of Conduct, it defines viability as used in Article 34 to mean validity.

Contrary to the University's position, Mr. Doe does not modify the Code and argue for a standard of viability without support. Viability, not validity, is the word used by the contract between GW and its students at precisely the place that describes Mr. Snyder's role. To be sure, Article 33 comes first and identifies the ultimate analysis but the standard for the preliminary analysis by Mr. Snyder is guided by Article 34, which instructs him to evaluate the viability, or chance of success, of an appeal and not its validity, or correctness.

To ignore Article 34, as GW does, would render it surplusage, a result that is contrary to the rules of contract interpretation. *See, e.g.*, *New England Power Co. v. Fed. Energy Regulatory Comm'n*, 571 F.2d 1213, 1225 (D.C. Cir. 1977) ("Redundancy in the construction of contracts is to be avoided if any other reasonable interpretation is possible."). Ignoring Article 34 would also deprive students of a promised level of intermediate review, legitimately designed to weed out those appeals with no new evidence and no reasonable chance of changing the result, but allowing others to proceed to a second panel of review. Unlike federal circuit courts, GW has protected its appellate panel from hearing repeated arguments on which a decision was already reached but providing that those appeals which have new evidence and a "viable" chance of meeting the requirements of Article 33 to proceed. Such an approach does not deprive Mr. Snyder of a "substantive" role as GW fears, although such a substantive role is limited. Under the Code, as it was written at the relevant time, a person in Mr. Snyder's position was restricted to determining whether there was "new" evidence (there was) and whether that new evidence, combined with the record evidence, had a chance of success on appeal—without the substitution of his opinion on the merits for that of the appellate panel.

GW promulgates the Code and writes it unilaterally as is its right. The rules of evidence that control in court do not limit proceedings under the Code. Indeed, as a private institution, GW owes no strict constitutional due process to its students. *See, e.g.*, *Board of Curators of Univ. of Missouri v. Horowitz*, 435 U.S. 78, 88 (1978) ("A school is an academic institution, not a courtroom or administrative hearing room."); *Nash v. Auburn Univ.*, 812 F.2d 655, 664 (11th Cir. 1987) ("[Appellants'] rights in the academic disciplinary process are not co-extensive with the rights of litigants in a civil trial or with those of defendants in a criminal trial."); *see also Goss v. Lopez*, 419 U.S. 565, 581 (1975) (finding that a public school's disciplinary proceedings should include certain "rudimentary precautions against unfair or mistaken findings of misconduct and arbitrary exclusion from school," but clarifying that an informal rather than formal hearing would suffice). Nonetheless, having unilaterally issued the Code of Conduct that governed Mr. Doe and University obligations, GW was required to comply with its terms. Mr. Snyder's approach may have been more efficient, but it collapsed part of the appellate panel's decision process into his own and went beyond the scope of his authority under Article 34.

The Court concludes that GW violated the terms of the contract in the way it handled Mr. Doe's appeal.

**C. The Remedy**

Mr. Doe asks the Court to order GW to consider Mr. Doe's appeal on the merits (*i.e.*, bypassing Mr. Snyder's gatekeeper authority), and order GW in doing so to consider the additional new evidence of E.E.'s phone records. *See* Doe Mot. at 26. GW argues that such an order would constitute a "windfall in equity," arguing that only remand to Mr. Snyder would constitute specific performance on the University's contract with Mr. Doe. Opp'n at 16. GW

adds, however, the argument that any remand for Mr. Snyder to consider Mr. Doe's new evidence would be "illusory" because he already did so. Opp'n at 16. The Court is persuaded that a remand to Mr. Snyder, who appears to have long misinterpreted his function as described in Article 34 of the Code, would not effect a remedy. Therefore, it will order GW to submit Mr. Doe's appeal to an appellate panel, without reference to Mr. Snyder's opinion, and with submission of new evidence including Dr. Milman's report, Q.W.'s recollections, and the telephone records presented by both parties in this litigation.

The Court does not decide whether the initial panel decision was correct, nor does it decide that any party acted in bad faith. It merely decides that GW breached its contract with Mr. Doe and deprived him of rights assured by the Code, and that the effective remedy is to order GW to convene an appellate panel to hear Mr. Doe's appeal based on the full evidence available. To avoid a meaningless remedy, the appeal must be concluded no later than 28 days from the date of issuance of this Memorandum Opinion and its accompanying Order.

## IV. CONCLUSION

For the foregoing reasons, the Court will grant Mr. Doe's Motion for Partial Summary Judgment, Dkt. 27, and order GW to consider the merits of Mr. Doe's appeal, including review of his original appeal and accompanying exhibits as well as the E.E. phone records subpoenaed in this litigation and other relevant new evidence, according to the procedures for an appellate panel outlined in Article 34 of the Code. The Court will Order GW to ensure that the appeal panel convene and reach a decision no later than September 12, 2018.

Date: August 14, 2018

ROSEMARY M. COLLYER
United States District Judge