## IN THE UNITED STATES DISTRICT COURT FOR THE
### DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **JOHN DOE**, | ) | |
| Address Withheld, | ) | |
| | ) | |
| **Plaintiff,** | ) | Civil Action No. 1:18-cv-553-RMC |
| | ) | |
| **v.** | ) | |
| | ) | **AMENDED COMPLAINT** |
| **THE GEORGE WASHINGTON** | ) | |
| **UNIVERSITY,** | **)** | |
| 2121 I Street, NW | ) | |
| Washington, DC 20052 | ) | |
| | ) | |
| Serve:  Mary Lynn Reed | ) | |
| Registered Agent | ) | |
| 2100 Pennsylvania Ave., NW | ) | |
| Suite 250 | ) | |
| Washington, DC 20052 | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

## NATURE OF THE ACTION

John Doe[1], by and through his attorneys, Justin Dillon and Christopher C. Muha, files this

Amended Complaint for gender-based discrimination in violation of 20 U.S.C. § 1681

(commonly known as Title IX) and the D.C. Human Rights Act (D.C. Code § 2-1402.41), as

well as breach of contract and negligence.  In support of this Amended Complaint, John Doe

states as follows:

## PARTIES

1.      Plaintiff John Doe is, and at all times relevant to this Amended Complaint has

been, a citizen of the State of Washington.  John Doe matriculated as a freshman at The George

---

[1] Due to the nature of the allegations in this lawsuit, Mr. Doe is proceeding under the pseudonym
"John Doe" and identifies his accuser as "Jane Roe."  He identifies other current and former
University students by their initials.

Washington University ("GW" or "University") in August 2014 and completed all of his coursework by December 2017.  He was scheduled to have his degree conferred on January 19, 2018, and to walk at graduation in May.  His degree conferral was held in abeyance pending the disciplinary proceeding at issue in this suit and he was suspended from the University for one year on January 23, 2018.

2.      Defendant The George Washington University is a federally chartered university and a non-profit corporation incorporated in the District of Columbia.  Its principal place of business is in the District of Columbia.

## JURISDICTION AND VENUE

3.      The Court has federal question jurisdiction under 28 U.S.C. § 1331 because Doe's claims arise under federal law, namely Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681-88.  This Court also has diversity jurisdiction under 28 U.S.C. § 1332 because John Doe and the University are citizens of different states.

4.      The Court has supplemental jurisdiction over John Doe's state law claims under 28 U.S.C. § 1367 because those claims are so closely related to his federal law claim as to form the same case or controversy under Article III of the United States Constitution.

5.      Venue properly lies in this Court under 28 U.S.C. § 1391(b)(2) because a substantial part of the events and omissions giving rise to the claims occurred in this district.

## STATEMENT OF FACTS

6.      On September 12, 2015, John Doe—a sophomore at GW, a member of its club rugby team, and a nondrinker of alcohol due to his religious beliefs—lost his virginity to Jane Roe, a freshman at the time, after Ms. Roe asked if they could have sex in his dorm room, called an Uber to take them there, made out with him there after they arrived, initiated oral sex upon

him, held his head as he reciprocated, guided his penis into her vagina, and ultimately climbed on top of him and thrust down upon him until he ejaculated.

7.      On October 30, 2017—***more than two years later*** and just three months before Mr. Doe would graduate early—Ms. Roe would file a Title IX complaint with GW against him, claiming she was too intoxicated to have consented to any sexual activity that night and that John Doe should have known it.  She demanded that John Doe not be permitted to graduate before she did.  And she got her wish: Mr. Doe was found responsible for having assaulted her and was told that, despite having finished all of his course work, he would not be permitted to graduate until the following year, when Ms. Roe would.

8.      In one sense—the most important sense—that result is shocking.  Ms. Roe's testimony on critical points changed throughout the investigation, and the story she ultimately told was fantastic on its face.  She claimed to have consumed a ridiculous amount of alcohol—at least 4 shots of vodka, five Solo cups of beer, and at least one Solo cup of a very strong mixed drink—in just two hours, an amount that would have prevented her from having any memory of the night and would have made it impossible for her to physically control herself.

9.      Yet not a single person at the party saw her slurring her words, stumbling, or speaking incoherently.

10.     Moreover, Ms. Roe was coherent enough to call her roommate to check if her own room was available for sex, and, when she learned that it wasn't, was coherent enough to call an Uber to take them to Mr. Doe's room.

11.     Ms. Roe also claimed to have at least 26 distinct memories of her time with Mr. Doe and to have lost consciousness only once—at the very time, coincidentally, that they entered his apartment and began their sexual interaction.  She then claimed that, just ***minutes*** after

regaining consciousness, when Mr. Doe got off the bed and went into the bathroom, she was able to dress herself quickly, ***run*** down ***eight flights of stairs***, ***run*** home to her dorm, and coherently explain to her roommate what allegedly had just happened.  As an expert toxicologist would later confirm, Ms. Roe would not have been able to do any of the things she says she did that night had she consumed as much alcohol as she says.

12.     Finally, cell phone records that were discovered only after Mr. Doe filed his original Complaint showed that Ms. Roe and her star witness, E.E., had both lied about literally the only piece of evidence suggesting that, *even if* Ms. Roe had been incapacitated by alcohol that night, Mr. Doe had any reason to know that.  In short, Ms. Roe lacks all credibility as to what happened that night.

13.     In another sense, however, Mr. Doe's suspension was no shock at all.  For years, GW has been under relentless pressure to appear tough at all costs on sexual assault claims brought by women against men, and it has responded to that pressure by infusing its Title IX enforcement regime with gender bias and touting to the campus its ***100% conviction rate*** of respondents put through its formal sexual misconduct process, all of whom are believed to be male.

14.     That pressure reached a peak at the very time Jane Roe filed her complaint against John Doe.  GW was one of the first universities targeted for investigation by the Education Department's Office for Civil Rights (OCR) in early 2011, when it began telling schools to implement a gender-biased enforcement of Title IX or risk the loss of all federal funding.  It revamped its Title IX regime as a result and agreed to two years' worth of monitoring by OCR.  But in August 2017, OCR opened a new formal investigation into GW in response to a student's

complaint, putting its Title IX enforcement regime under renewed scrutiny at the time Ms. Roe

filed her complaint.

15.     That is not all.  In late 2015, a female student, dissatisfied with the University's

handling of her sexual assault claims against a male student, sued the University in a high-profile

case in federal court.  That case remains active and was in the thick of discovery when Jane Roe

filed her complaint, making it especially necessary for the school to appear tough on sexual

assault then.

16.     But most tellingly of all, GW was still dealing with the incredible public fallout

stemming from yet another female student's complaints about its Title IX enforcement, in a case

that mirrored Ms. Roe's in striking ways.  That student, Aniqa Raihan (who has publicly

identified herself in connection with the incident), started a change.org petition to protest the

deferred suspension of a student found responsible for sexually assaulting her more than two

years earlier.  Her alleged attacker, like Ms. Roe's, was a member of the club rugby team with

whom she had had sex more than two years before bringing her complaint and who was about to

graduate.  Her petition seeking his expulsion—and mandatory suspensions, at least, for anyone

found responsible for sexual assault—got more than 2,000 signatures and led to her being given

a sit-down meeting, outside the Title IX process, with GW administrators.  It also led GW to

issue a formal statement of response to the petition, which defended GW's handling of such

claims by expressly touting its 100% conviction rate in cases that had proceeded through its

formal process in the past two years.

17.     Not satisfied with that response, Ms. Raihan interrupted commencement

ceremonies that year in dramatic fashion, as explained below, and in September 2017 she filed

her own Title IX complaint against GW, raising the specter that GW could have two active

investigations into its practices if it failed to appear tough on sexual assault in cases like Ms. Raihan's—which is exactly what Ms. Roe's case was.

18.     Then, on April 27 of this year, Ms. Raihan sued GW in this court for how it handled her case.  The Honorable Trevor N. McFadden dismissed her lawsuit on August 28, 2018; on September 27, 2018, Ms. Raihan filed her notice of appeal.

19.     On August 14, 2018, this Court granted Mr. Doe's motion for partial summary judgment and ordered GW to hear his appeal, which it had originally failed to do in violation of the plain text of its own policies. Unfortunately, as Mr. Doe will discuss below, GW declined to hear his appeal in good faith.  Instead, it summarily rejected his appeal and denied him a new hearing in a decision that spanned less than a page and a half.  It also allowed Ms. Roe, during the appeals process and over Mr. Doe's express objections, to make yet more false allegations against Mr. Doe—this time, accusing him of stalking her on Facebook.

20.     The finding and sanction against Mr. Doe are the direct result of the pressure upon GW, from multiple sources, to appear tough at all costs on sexual assault.  The finding and sanction violate Mr. Doe's rights under Title IX and the DC Human Rights Act, as well as his common law rights.

## COLLEGE POLICIES AND PROCEDURES

21.     In the fall of 2014, John Doe matriculated as a freshman at the University.  Upon his enrollment, Mr. Doe received a copy of the Sexual Harassment and Sexual Violence Policy (the "Policy," attached as Exhibit 1), and the Code of Student Conduct (the "Code," attached as Exhibit 2).  The Policy and the Code established the University's standards for acceptable conduct, and also described the procedures by which the University would investigate and adjudicate alleged violations of its standards.

22.     In consideration for his tuition and attendance at the University, Mr. Doe received

and was given assurances by the University that it would follow and comply with numerous

policies and procedures adopted and put forth by the school, including the Policy and the Code.

23.     Under the law of the District of Columbia, the Policy, the Code, and other

statements by the University about the matters contained therein are terms in a contractual

relationship between the University and John Doe.

24.     The University owes its students a duty of care when creating and enforcing

standards of conduct.

25.     At the time Ms. Roe made her allegations against Mr. Doe, the Policy and the

Code prohibited certain conduct by students at the University, including sexual assault.  *See* Ex.

1 (Policy); Ex. 2 (Code).  The Policy prohibited "[a]ctual or attempted rape, sexual assault,

sexual battery or molestation, without consent or against another's will, whether achieved

through force, coercion, threat or intimidation, or advantage gained by the aggrieved party's

mental or physical incapacity or impairment."  Policy at 3.  The Code likewise prohibited

"Sexual Violence," which it defined as "Any physical sexual act against any person . . . against

that person's will, or without that person's consent, or when that person is incapable of giving

consent due to . . . use of alcohol or other drugs."  Code at 2.  "The lack of verbal or physical

resistance or participation in any act due to coercion, intimidation or incapacity does not by itself

constitute consent."  *Id.*

26.     The website of GW's Title IX Office further elaborated on what it means for sex

to be consensual under the Policy and the Code.  "Consent does not have to be verbal, but it does

have to be clear, unambiguous, and voluntary. It must also be given by someone who is capable

of doing so and not 'incapacitated' by sleep, unconsciousness, or intoxication."[2]  "Someone who is incapacitated due to alcohol (unable to give a verbal, enthusiastic, and consistent "yes") is not able to consent to sexual activity."  *Id.*  "If the person you are with is impaired in a way you can or should be able to recognize (stumbling, slurring words, not making sense), you must assume they are too impaired to give consent."  *Id.*

27.      In addition to proscribing certain forms of conduct, the Policy and the Code also prescribed the procedures the University was required to follow when investigating and adjudicating claims of misconduct.

28.      The Policy and the Code established a tiered system of resolution for claims of sexual assault.  The process typically began, as it did here, when a complainant made a formal complaint.  The Policy required the complainant to draft and sign "a factual account of the alleged harassment."  Policy at 15.  Complaints of sexual harassment "should be filed as soon as possible after the alleged harassment occurs."  *Id.*

29.      Once a statement of complaint is signed, the Office of Student Rights and Responsibilities ("SRR"), the Title IX Coordinator, or their designee, "will conduct an adequate, reliable and impartial investigation of the alleged harassment, typically within 30 days."  *Id.*  The investigator "will provide the Complainant and the Respondent with similar and timely opportunities to identify witnesses and provide evidence relevant to the complaint."  *Id.*

30.      When the investigation was complete, the SRR, Title IX Coordinator or designee determined "whether an acceptable resolution of the matter may be achieved informally."  Policy at 16.  Informal resolution could involve "corrective action and/or sanctions against the Respondent, or it could involve no further action."  Policy at 17.

---

[2] *See* https://haven.gwu.edu/consent (last visited February 20, 2018).

31.     When the matter "is not resolved informally, the SRR or Responsible University Official shall decide whether to initiate a formal hearing against the Respondent as set forth in Appendix C." *Id.*  When both of the parties are students, the procedures in Section 1 of Appendix C are used.

32.     The first step in that process was for the SRR to "determine . . . whether to charge the Respondent." *Id.* at 18.  If the SRR handed down charges, then "disciplinary proceedings will be commenced . . . according to the procedures outlined in the Code and in this Section of the Sexual Harassment and Sexual Violence Policy and Procedures." *Id.* at 19.  In the event of a conflict between the two, the latter source governed.  *Id.*

33.     When the SRR decided to charge a Respondent, the parties to the proceeding could elect to proceed either through a Disciplinary Conference (an informal sit-down between the Respondent and a University administrator) or a University Hearing Board (an adversarial hearing).  Code at 5.  Both parties, however, had to agree to the use of a Disciplinary Conference; should one of them reject that option, the matter must proceed to a formal, adversarial hearing before an Ad Hoc Board.  *Id.*

34.     "An Ad Hoc Board may be appointed to hear any case which the Director of the Office of Student Rights & Responsibilities or designee determines in their discretion warrants resolution in this manner."  Code at 5.  Ad Hoc Boards "shall be composed of between one and five administrators, faculty members, students, or any combination thereof."  *Id.*

35.     The University trained its hearing officers to pursue different objectives in sexual misconduct investigations and hearings than in investigations and hearings for non-sexual misconduct claims.  While the training designed for the adjudication of claims of non-sexual misconduct "address[ed] [the] roles and responsibilities of panel members, hearing procedures,

applicable policies, and other techniques and standards pertinent to the formal complaint and hearing process," Policy at 22, the "annual training" provided "to university personnel responsible for the administration of" the Policy concerned "how to conduct investigations and hearings in a manner that ***protects the safety of victims and promotes accountability***," *id.* at 11 (emphasis added).

36.     GW students were subjected to disciplinary action if they were untruthful in a disciplinary hearing.  "Any student who knowingly provides false information during a disciplinary hearing will be charged under Article 11, section j of this 'Code.'"  Code at 6.

37.     Parties to formal disciplinary hearings are given an opportunity to challenge the members of their hearing panels for bias.  "Any party may challenge a Board member on the grounds of personal bias before the hearing commences."  Code at 7.

38.     All factual issues in a hearing, including the question whether a student is responsible for the charges against him or her, are resolved based on a preponderance of the evidence standard.  Code at 7 ("On disputed points, a preponderance of the evidence introduced at the hearing will decide the facts.").

39.     In cases involving sexual violence, "neither the Complainant nor the Respondent will be permitted to question the other directly."  *Policy* at 19.

40.     Sanctions were determined by the SRR.  *Id.* at 20.  But "[i]n cases involving suspension or expulsion, the Vice Provost and Dean of Student Affairs, in concurrence with the Provost and Executive Vice President for Academic Affairs, will impose sanctions."  *Id.* at 27.

41.     Parties were permitted "to appeal the outcome of the disciplinary hearing or conference, . . . although not the sanction imposed, if any."  *Id.* at 20.  "Appeals must be based on new information that is relevant to the case, that was not previously presented at the hearing

or conference, and that significantly alters the finding of fact." Code at 8. They were to be submitted in writing "within five business days after receipt of the outcome letter." *Id.*

42.     Appeals were reviewed by a University administrator (the Executive Director of Planning and Outreach) to determine their "viability"—*i.e.*, whether they fit the criteria permitted in an appeal. Code at 8. If the appeal is found to be viable, it is forwarded to the Chair of the Committee on the Judicial System, who selects a panel of three persons from the Committee—one student, one administrator, and one faculty member—for a decision on its merits. *Id.* The decision of the appeal panel "shall be final and conclusive and no further appeals will be permitted." *Id.*

43.     The appeal panel was permitted to do one of three things: (1) affirm the finding of the original hearing board, (2) remand the case to the original hearing board for a new hearing, or (3) request that a new hearing board hear the case. *Id.*

## TITLE IX AT THE UNIVERSITY

44.     In April 2011, the Education Department's Office for Civil Rights issued a "Dear Colleague Letter" that dramatically rewrote the landscape of Title IX enforcement at colleges and universities. It was accompanied by a tsunami of publicly known investigations conducted by OCR nationwide into how colleges and universities handle allegations of sexual assault, as well as innumerable reports in the national media that suggested the pervasive nature of sexual assault committed by male students on college campuses throughout the nation. And it was no secret that the view of sexual violence OCR was enforcing was a gendered view that saw men as the paradigmatic perpetrators of that violence and heterosexual women as its paradigmatic targets.

45.     The then-head of OCR, Catherine Lhamon, made that clear on numerous occasions after 2011.  As one national media outlet reported in October 2016, in a story on OCR's Title IX campaign:

> Lhamon says she is frustrated.  As she sat in her Washington, D.C. office during an interview with SI.com, she said she couldn't help but to think about the women who are suffering every day.[3]

Similarly, an OCR press release notified the public that, on May 1, 2014, Ms. Lhamon would be speaking at the culmination of an event titled, "Walk a Mile in Her Shoes," "an event that will raise awareness about sexual assault and highlight men's roles in preventing sexual violence."[4] And in August 2015 she would tell a different national media publication, "'We don't treat rape and sexual assault as seriously as we should,'" citing a statistic about the rate of unwanted sexual activity experienced specifically by college women.[5]

46.     Ms. Lhamon also left no doubt about the consequences schools faced if they failed adequately to heed OCR's mandates: They would lose all of their federal funding.  "Do not think it's an empty threat," she told a group of university administrators in July 2014.[6]

---

[3] Scooby Axson, "Explaining Title IX and how sexual assaults are prosecuted on college campuses," SI.com (October 21, 2016) (available at https://www.si.com/college-football/2016/10/20/title-ix-sexual-assault-explained, last visited February 20, 2018).

[4] "U.S. Assistant Secretary for Civil Rights Catherine E. Lhamon to Visit Two California Universities to Highlight Successes in Addressing Community Responses to Sexual Assault" (available at https://www.ed.gov/news/media-advisories/us-assistant-secretary-civil-rights-catherine-e-lhamon-visit-two-california-universities-highlight-successes-addressing-community-responses-sexual-assault, last visited February 20, 2018).

[5] David G. Savage and Timothy M. Phelps, "How a little known education office has forced far-reaching changes to campus sexual assault investigations," LOS ANGELES TIMES (August 17, 2015) (available at http://www.latimes.com/nation/la-na-campus-sexual-assault-20150817-story.html, last visited February 20, 2018).

[6] *See, e.g.*, Rachel Axon, *Feds Press Colleges on Handling of Sex Assault Complaints*, USA TODAY (July 14, 2014), http://www.usatoday.com/story/sports/ncaaf/2014/07/14/college-sexual-assaults-dartmouth-summit/12654521/ (last visited February 20, 2018); Robin Wilson, *2014 List: Enforcer*, THE CHRON. OF HIGHER EDUCATION (Dec. 15, 2014),

"There is 'a need to push the country forward,'" she said in August 2015, echoing the same sentiment.[7]  "It's nice when you carry the big stick of the federal government," she would say again in October 2016, leaving no doubt that the threat of having one's federal funding yanked remained very real.[8]

47.    The impact of OCR's new movement was felt immediately by GW in 2011.  And since then, it has continuously been subjected to extraordinary pressure—by OCR complaints, by lawsuits, by media coverage, and by its own students—to appear tough on allegations of sexual assault made by women against men, no matter their merit.  Those sources of pressure coalesced right around the time Jane Roe reported her allegations to the University.

48.    On March 4, 2011, a female GW student filed a complaint with the Education Department's Office for Civil Rights (OCR) alleging "that the University discriminated against [her] based on sex when it failed to respond in an adequate manner to her complaint that she was sexually assaulted by another undergraduate student."  OCR opened an investigation into GW's handling of sexual assault claims on March 21.

49.    On August 31, 2011, GW entered into a sweeping resolution agreement with OCR to resolve the complaint that had been filed against it in March.  As part of that agreement, GW

---

http://www.chronicle.com/article/Enforcer-Catherine-E-Lhamon/150837/ (last visited February 20, 2018); Tyler Kingkade, *Colleges Warned They Will Lose Federal Funding For Botching Campus Rape Cases*, THE HUFFINGTON POST (July 14, 2014), http://www.huffingtonpost.com/2014/07/14/funding-campus-rape-dartmouth-summit_n_5585654.html (last visited February 20, 2018).

[7] David G. Savage and Timothy M. Phelps, "How a little known education office has forced far-reaching changes to campus sexual assault investigations," LOS ANGELES TIMES (August 17, 2015) (available at http://www.latimes.com/nation/la-na-campus-sexual-assault-20150817-story.html, last visited February 20, 2018).

[8] Scooby Axson, "Explaining Title IX and how sexual assaults are prosecuted on college campuses," SI.com (October 21, 2016) (available at https://www.si.com/college-football/2016/10/20/title-ix-sexual-assault-explained, last visited February 20, 2018).

agreed to "provide OCR with a description of all complaints of sexual violence filed with the University" within 60 days of the end of the 2012-13 and 2013-14 academic years, thereby applying extended pressure upon GW to implement OCR's gendered view of Title IX enforcement.

50.     The year after that monitoring ended, GW came under added pressure to appear tough on sexual assault claims brought by women against men.  On October 21, 2015, GW was sued in federal court by a former female student alleging that the school had failed to stop years of stalking and sexual violence against her by another student, that it grossly mishandled its belated investigation of her allegations, and that the sanction it ultimately imposed on her attacker was too lenient.  *See Prasad v. George Washington University*, No. 1:15-cv-01779-ABJ-GMH (D.D.C. Oct. 21, 2015).  That lawsuit received national media attention at the time it was filed,[9] and GW's motion to dismiss the suit was largely denied on June 10, 2016, opening GW to extensive discovery into its handling of allegations of sexual harassment and sexual assault.  The plaintiff propounded broad requests for documents reflecting GW's handling of such claims and deposed multiple GW administrators on those same topics in April 2017.  Discovery was ongoing when Jane Roe's claims were investigated and adjudicated the following semester, and the case remains active as of the date of this filing.

51.     April 2017 saw another very public airing of a female student's claim that GW had utterly failed adequately to address her sexual assault.  In a case with striking similarities to Mr. Doe's, Aniqa Raihan waited more than two years to report an alleged assault by a member of the GW club rugby team until just before he was scheduled to graduate.  In March 2017, GW found him responsible for assault and gave him a deferred suspension that would let him

---

[9] http://www.slate.com/blogs/xx_factor/2015/10/24/lawsuit_alleges_george_washington_university_violated_title_ix.html (last visited September 28, 2018).

graduate provided he committed no other disciplinary infractions before then.  He also was barred indefinitely from all University-controlled residential properties.

52.     Dissatisfied with that sanction, Ms. Raihan started a change.org petition on April 2, demanding that her assailant be expelled and that GW "[i]mplement mandatory suspensions for students who are found responsible for acts of sexual violence UNTIL THE SURVIVOR GRADUATES, with the possibility of higher sanctions INCLUDING EXPLUSION[.]"[10]  The petition received more than 2,000 signatures and led to a face to face meeting between Ms. Raihan and Peter Konwerski, GW's Vice Provost Dean of Student Affairs.

53.     The petition also provoked a remarkable direct response to the university community at large by Caroline Laguerre-Brown (Vice Provost for Diversity, Equity and Community Engagement), Mr. Konwerski, and Rory Muhammad (Title IX Coordinator) on April 21.  Titled "Message from University Administrators," it stated that GW "take[s] the issue of sexual misconduct and sexual violence seriously, and we appreciate and laud the courage necessary for survivors to come forward."[11]  It stated that sexual misconduct cases are difficult to resolve, then noted that "[t]he narrative emerging from the petition and related activities suggests that GW has been reluctant or even unwilling to hold individuals accountable for acts of sexual violence."  The administrators were eager to disprove that narrative, which they insisted "is not borne out by our record."  They recounted that in the last two academic years, a total of 16 formal complaints of sexual misconduct had been made, ten of which "went before a hearing board and are concluded."  ***All ten of those, they said, resulted in a finding of "responsible."***

---

[10] *Available at* https://www.change.org/p/gw-justice-for-survivors-of-sexual-violence-at-the-george-washington-university (capitalized letters in original).

[11] *Available at* https://gwtoday.gwu.edu/message-university-administrators (last visited February 20, 2018).

Four of those respondents were expelled, five were suspended, and one received a deferred suspension.

54.   **In touting its 100% conviction rate as a direct response to a claim that it failed to take sexual assault seriously, GW demonstrated a concrete link between public criticism of its Title IX enforcement regime and the results of individual Title IX cases.**

55.   Ms. Raihan was satisfied neither by her meeting with Mr. Konwerski nor the Message from University Administrators.  On May 20, at GW's commencement, Ms. Raihan, with the help of two friends, unfurled a 5'x12' sign over from a row of elevated stadium seating that read, "#GWProtectsRapists."  They did so at the moment her alleged assailant walked across the stage to receive his degree, with Ms. Raihan yelling at him.  The entire graduating class from the women's gender and sexuality studies department held a banner with "IX" on it, to represent Title IX, while Ms. Raihan stood with her unfurled sign.  Multiple people told her that she was ruining graduation.  A police officer instructed her to remove the sign but she refused to do so for several minutes, complying only after the officer called his sergeant and the sergeant arrived. The incident was reported in national, local, and campus media outlets.[12]

56.   In the wake of Ms. Raihan's protest and its media coverage, GW took steps intended to show that it was responsive to this pressure.  In July it announced that it had hired the

---

[12] *See, e.g.*, Grace Carr, "'Rapist' Banner Causes Scene at GW Commencement," *dailycaller.com* (May 23, 2017), *available at* http://dailycaller.com/2017/05/23/rapist-banner-causes-scene-at-gw-commencement/ (last visited February 20, 2018); Christina Sturdivant, " 'GW Protects Rapists': Students Protest at Graduation Ceremony," *dcist.com* (May 22, 2017), *available at* http://dcist.com/2017/05/gw_student_protests_at_graduation_o.php (last visited February 20, 2018); Leah Potter, "Students protest graduation of sexual assault assailant at CCAS ceremony," *The Hatchet* (May 20, 2017), *available at* https://www.gwhatchet.com/2017/05/20/students-protest-graduation-of-sexual-assault-assailant-at-ccas-ceremony/ (last visited February 20, 2018).

law firm Cozen O'Connor to conduct a comprehensive review of its Title IX enforcement regime.

57.    That same month, GW also hired Kiera Bloore, who had spent almost her entire professional career representing sexual assault claimants in courts and in university Title IX proceedings—and continues to serve as a legal fellow at one such organization—to serve as a full-time Title IX investigator, a role meant to be decidedly neutral.[13]  Ms. Bloore would be tasked with "conducting investigations of **all** allegations or violations of GW's Sexual Harassment and Sexual Violence Policy.[14]

58.    On August 8, 2017, however, the Education Department's Office for Civil Rights opened an investigation into GW's handling of sexual misconduct claims after a student filed a Title IX complaint with that office.  Upon information and belief that, that investigation will involve a systemic review of GW's handling of sexual misconduct claims over a three-year period.  The investigation was the subject of media attention at GW at the time it was opened,[15] and it remains active.

59.    In September, Ms. Raihan also filed a Title IX complaint with OCR against GW. OCR has yet to announce whether it will open a separate investigation based on that complaint— meaning that, for the entire pendency of Mr. Doe's investigation and hearing process, GW was in an especially precarious situation with regard to OCR.

60.    The pressure upon GW continued in the weeks before Ms. Doe filed her complaint.  On October 20, just 10 days before she filed her formal complaint, *The Hatchet*

---

[13] *See* https://www.linkedin.com/in/kiera-bloore-a3889963/ (last visited February 20, 2018).

[14] *Id.* (emphasis added).

[15] *See* Leah Potter, "GW under federal investigation for possible Title IX violations," *The Hatchet* (August 9, 2017), *available at* https://www.gwhatchet.com/2017/08/09/gw-under-federal-investigation-for-possible-title-ix-violations/ (last visited February 20, 2018).

reported that "[m]ore than 150 people gathered in front of" the Education Department to protest the Department's decision "to rescind Obama-era guidelines on Title IX enforcement."[16]  It specifically noted that "many GW students and alumni" were among those who "spoke to the crowd about their personal experiences with sexual violence," and it recounted how two of the GW-affiliated speakers "were also speaking on behalf of Aniqa Raihan, an alumna and sexual assault survivor who petitioned the University to expel her assailant last spring."  One of those speakers specifically "'call[ed] on GW and the Department of Education to stand against misogyny, against rape culture, against rapists and with survivors."  The article then quoted Ariella Neckritz, "a 2016 alumni and former co-president of SASA [Students Against Sexual Assault]," as stating, "'I watched, as a student, GW fail survivors time and time again.'"

61.     Jane Roe herself has also placed public pressure on the University to be tough on Title IX enforcement.[17]

62.     Consistent with these sources of pressure, GW's Title IX office betrays a gendered view of Title IX enforcement.  GW requires incoming students to participate in mandatory sexual assault prevention training.  The training, which is conducted by its Title IX office, has two components: an online portion and an in-person session.  Among the topics available to students to choose from for their in-person sessions is "how male students can prevent sexual violence."[18]

---

[16] *Available at* https://www.gwhatchet.com/2017/10/20/outside-education-dept-survivors-advocates-hold-vigil-in-support-of-title-ix/ (last visited February 20, 2018).

[17] Providing more detail about this allegation here risks revealing the identities of Jane Roe and John Doe.  Counsel for the University is aware of the "public pressure" to which John Doe refers here.

[18] *See* https://gwtoday.gwu.edu/title-ix-office-expands-three-new-staffers (last visited February 20, 2018).

63.     The Title IX office also hosts workshops for interested students and student groups.  According to its website, one of its "frequently requested" one-on-one workshops is titled, "Foundations of Sexual Assault and Relationship Violence: Rape Culture and Other Factors."[19]

64.     The Title IX office's webpage also refers students to the work of Laci Green, "a sex educator and internet personality," for "information about consent."  A number of Ms. Green's videos are dedicated to explaining why it's wrong to think that women lie about being sexually assaulted.  In a video titled, "Do Girls Lie About Rape?" she argues that "distrust of rape survivors" is due to a wider "distrust of women" in general.[20]  She elaborates on the connection in another video, "False Rape Accusations??":

> One of the sneakiest and I think most pervasive reasons why people don't believe survivors is that most survivors are women. There are many subconscious sexist beliefs that we learn all throughout our lives that come in and inform our opinions that women lie a lot, we're not trustworthy, we're manipulative . . . ."[21]

"Sexual assault accounts," she concludes there, "are nearly always true."[22]

### THE INCIDENT

65.     On September 12, 2015, Mr. Doe attended a party at an off-campus house known colloquially around campus as the rugby house.  Mr. Doe was a sophomore and had played on the GW club rugby team the previous semester.  At that time in his life, Mr. Doe did not drink alcohol, in keeping with his religious beliefs.  Mr. Doe was also a virgin.

---

[19] *See* https://haven.gwu.edu/workshops (last visited February 20, 2018).

[20] *See* https://www.youtube.com/watch?time_continue=1&v=wMZyljber8I at 2:22-2:26 ("So our distrust of women is deeply engrained, and I think that it fuels distrust of rape survivors.").

[21] *Id.* at 3:00-3:21.

[22] *Id.* at 3:44-3:48.

66.     Ms. Roe, then a freshman, attended the same party.   According to her Uber receipts, she arrived at the party at 10:46 p.m.   Before arriving, starting at approximately 9:30 p.m., she pre-gamed with other students on her dorm floor.   She was witnessed to have consumed at least four shots of vodka in that time.

67.     At the party, at approximately 11:15 p.m., Mr. Doe ran into his friend, Q.W. They had known each other since high school and were excited to see each other.   Q.W. was planning to leave the party, but Mr. Doe convinced him to stay to hang out with him.   They took a few pictures together at 11:16 p.m. before Q.W. said he was going into the house to get a beer. Mr. Doe waited for him outside.

68.     While Q.W. was in the house, Mr. Doe heard a woman near him say to her friend, "I want to have sex with someone right now."   He turned and approached the women and introduced himself.   The woman who had made the statement was Ms. Roe.   She showed no obvious outwards signs of intoxication—she did not slur her words, she did not have trouble standing, and she was responding to him coherently.   She was not holding a drink, either.

69.     Within a few minutes of their introduction, Q.W. returned from inside the house with his beer.   He saw Mr. Doe talking with Ms. Roe and introduced himself to her and her friends.   Q.W. remembers talking and joking with Ms. Roe and having what was, by all appearances, "a normal, lucid conversation" with her.   After talking with her, he turned to talk to Ms. Roe's friends.   When he turned back a little while later, Mr. Doe and Ms. Roe were kissing. Q.W. remembers being slightly annoyed with Mr. Doe because Mr. Doe was the reason he stayed at the party and it now seemed they would not be hanging out together there.   Q.W. left shortly thereafter.

70.     Mr. Doe and Ms. Roe talked outside the rugby house for about 20 to 30 minutes. Despite how the conversation had started, Mr. Doe and Ms. Roe had a real conversation, about personal and even intellectual topics.  Ms. Roe told Mr. Doe that she was from outside of Philadelphia and they talked about their majors, which led them to topics on religion and politics, subjects they were both interested in.  It was an impassioned conversation, and Ms. Roe was very engaged in it.  She talked to Mr. Doe about an Islam course she was taking that Doe had taken the year before, something he could not have known about her unless she had told him.  They had a sustained conversation about complicated topics that Ms. Roe followed perfectly and contributed to.  She again showed no signs of severe intoxication during that conversation.

71.     After they had talked for a while, Ms. Roe said to Mr. Doe that she had been texting her roommate to see if their room was available for Ms. Roe and Mr. Doe to return to but that it would not be.  Ms. Roe asked Mr. Doe, almost out of the blue, "Can we fuck in your room?"  She called an Uber (using the Uber app) and waited for their ride to get there.  Ms. Roe's Uber receipts indicate that the Uber was called at 11:56 p.m.

72.     As they were preparing to leave, another student, S.A., asked if he could ride with them since he lived close to their destination.  They agreed to let him do so.  He sat in the front, with Mr. Doe in the seat behind him and Ms. Roe behind the driver.  According to Ms. Roe's Uber receipt, the trip took 16 minutes and 31 seconds, and the Uber dropped them off at 12:21 a.m.

73.     Ms. Roe and Doe did not speak to each other on the ride to his dorm room.  Ms. Roe was calmly and quietly doing things on her phone for almost the entire ride.  At no time did she speak with anyone on the phone.  Mr. Doe, on the other hand, as a virgin who was about to have sex for the first time—with a third wheel in the front seat, no less—was nervous and self-

conscious and a bit dazed at how fast things were moving.  He took his lead from the much more confident-seeming Ms. Roe.

74.     When the three students exited the Uber, S.A. went up the street towards his dorm and Ms. Roe and Mr. Doe went into Mr. Doe's building.  Mr. Doe lived on the eighth floor, so they took the elevator.

75.     Once they confirmed that Mr. Doe's roommates were not there they began kissing standing up next to his bed.  They undressed themselves down to their underwear, and after about five minutes Ms. Roe pulled down Mr. Doe's underwear and performed oral sex on him. She then took off her own underwear and Mr. Doe performed oral sex on her while she held his head.  She then put her hand on his penis and helped him insert it into her vagina and they had missionary-style sex for a few minutes.  When Mr. Doe asked her to turn over she got on hands and knees, and they had sex with Mr. Doe behind her.  Ms. Roe then said, "Let me get on top of you."  Mr. Doe lay down on his back and Ms. Roe squatted over top of him and thrust up and down on him until he pulled out and ejaculated.  Ms. Roe then rubbed his penis for a few seconds and said, "Wow, that was exhausting."  Mr. Doe responded that it was.

76.     Mr. Doe got up to put his pants on.  Ms. Roe then said to him, "We should fuck again."  Mr. Doe, however, said that he was too tired and wanted to go to bed.  He offered to let Ms. Roe stay the night, but she said she would rather go home.  Mr. Doe offered to walk her home but she turned down the offer.  They said goodbye to each other, and she left.

## THE INCIDENT IS REPORTED AND INVESTIGATED

77.     On October 30, 2017, ***more than two years after the incident***, Jane Roe made a formal complaint to the University claiming that on the night of the incident she had been too intoxicated to consent—indeed, that she had been virtually catatonic.  It looked, for all the world,

like a copycat complaint made to track Ms. Raihan's, whose story had recently consumed the campus.  She stated there that she "had been drinking before [she] left [her] residence hall" but did not remember (or at least did not report) the amount of alcohol she consumed before leaving.  She said she recalled having "several drinks" at the party and that her roommate and her roommate's boyfriend "had left shortly after I arrived."

78.     Ms. Roe went on to state that she "remember[ed], though unclearly," speaking with Mr. Doe outside at the party.  She stated, however, "I do not remember calling or getting into a Uber [sic] with the respondent, and I believe I fell asleep or was groggy during the ride back."

79.     Ms. Roe continued that she "did not know [John Doe's] name" but remembers seeing on his door "the names of those who lived there and took note of his name."  She did not explain how she knew which name was his (there were four of them).

80.     Ms. Roe then said that she remembered nothing between "seeing his name on the door" until she "woke up on a bed in the dorm, facedown while the respondent was penetrating me."  She alleged that she tried to push him away, then verbalized a "no" and tried to pull herself away, but could not because he was on top of her and penetrating her from behind.  Ms. Roe says that Mr. Doe then ejaculated on her and got up to use the shower.

81.     Ms. Roe next says that she "quickly got out of bed and dressed, and went down the stairs to exit the building."  She never explained how she could have climbed down eight flights of stairs at all, let alone without injury, just minutes after being unconscious due to incapacitation.  She went on to say that she "walked . . . straight home," approximately one block, "where my roommate and her boyfriend were in our room."  She says she went to the bathroom and that her roommate followed her there, where Ms. Roe "explained to her the details

23

of what had happened." **Ms. Roe's roommate, however, would later refuse to testify on her behalf at the hearing.**

82.     Ms. Roe would later claim that she told several of her friends about the alleged assault in the days and weeks that followed.  And E.E. would later testify that she learned of the alleged assault within weeks of its occurrence (which her own text messages with Ms. Roe would later prove false).  Ms. Roe would further say that she discussed it extensively with a counselor several months before she filed her complaint.  Whatever recall of details that might naturally happen as a person first thinks back on an event would have happened long before October 30.  Accordingly, Ms. Roe stated, at the end of her October 30 complaint statement, "The information I have provided in this report is true and correct to the best of my knowledge. *The information report contains everything I can recall.*" (Emphasis added.)

83.     Just three days later, however, Ms. Roe submitted a "Supplemental Statement" that exceeded in length her original complaint statement.  She stated there that she now remembered several things she did not include in her Oct. 30 statement.

84.     Ms. Roe affirmed that she couldn't recall how much she had to drink before leaving for the rugby party, but she estimated that she "consumed 5 Solo cups of beer" at the rugby party.

85.     Ms. Roe stated that she now remembered that she sat in the back seat of the Uber behind the driver.  She also stated that S.A. must have sat in the front.

86.     She also remembered someone shouting something like, "'Why are you leaving?'" as she left the party.

87.     As to the car ride, **Ms. Roe specifically stated, "I can't recall any conversation or interactions taking place in the car."**

88.     As to interactions with Mr. Doe specifically, she separately said later in the supplement, "I don't remember the interactions that I had with [Doe] during the Uber ride or once we arrived."

89.     Ms. Roe said she now remembered "wanting to tell the Uber driver that I wanted to get out of the car" and also that she "felt like [she] couldn't speak."

90.     As to seeing Mr. Doe's name on his door, Ms. Roe again stated, "I remember seeing his name on a door decoration on the door," along with "three other door decorations." She said she didn't "recall recognizing the names of any of his roommates," again failing to explain how she knew which name was Mr. Doe's and which were those of his roommates.

91.     Ms. Roe went on to add details between the time she saw the door decorations and the time she allegedly woke up on the bed, a period in which she claimed no memory in her October 30 statement.  She stated that she remembered "where his bed was in the room" and that she thinks "the lights in his room were on when we arrived."

92.     As to memories she had about what happened after sex, Ms. Roe again stated that she "grabbed [her] things quickly," put clothes on, and left.  And she again stated that she took the stairs.  This time, however, she added a detail that it is impossible to believe she only just remembered: that she "remember[s] falling down the stairs as [she] exited."  She failed to explain how it was possible that she fell down only once in that state.

93.     Four days later, on November 6, Ms. Roe submitted yet another "Supplemental Statement."  She claimed to "remember[] more details about the incident" after "speaking with some other parties," even though she had been speaking about the incident with friends and a counselor over the course of two years.

94.     Of note, Ms. Roe said that she "now remember[s] drinking more than beer at the party."  She said she "also drank 'jungle juice,' which is a mixed drink of Everclear and punch or lemonade.  It has a high alcohol content."  She also said she remembered that she drank it after, not before, she drank the beer.

95.     Despite claiming in her statements to have had six cups of alcohol—not shots, *cups*—in the one hour that she was at the rugby party, *after* having consumed some additional quantity of alcohol at the pregame, Ms. Roe never testified to using the bathroom at the rugby party, at Mr. Doe's place, or after she got home.  Indeed, if she had truly fallen unconscious in the Uber, or on Doe's bed, she almost surely would have suffered incontinence immediately.

96.     Ms. Roe also claimed, in evidence she submitted to the investigators, that after the night of the incident, "I did not attend another party [there] because I thought the respondent might be there."

97.     By November 20, the investigation had turned up the following relevant evidence, all of which tended to *undermine* Ms. Roe's story:

   a.  Text messages between Ms. Roe and a friend of hers before the rugby party in which Ms. Roe's friend says to her, "But like if one of us doesn't get laid tonight it's a failure."

   b.  Ms. Roe's Uber receipts confirming the times she and Mr. Doe departed and arrived at various places that night.

   c.  The statements of three witnesses (all friends of Ms. Roe) who saw her at the party yet did not testify that she looked intoxicated, let alone incapacitated— including one who saw her walking across the street yet did not say she had trouble doing so.

   d.  The statement of one of her witnesses confirming that she had attended a party at the rugby house with him just two months after the night of the incident.

98.     Ms. Roe also submitted on November 16 a highly prejudicial letter from Mary Dolby McDonald, the counselor with whom she'd been meeting since March 6, 2017.  Ms.

McDonald is a Licensed Clinical Social Worker with a Master's degree in social work but no degree in psychology or psychiatry.  It stated as *fact*—not simply as something reported by Ms. Roe—that she had actually been assaulted:

- "[T]he sexual assault she experienced greatly contributed to the severity of her mental health concerns."

- "There is no question that the sexual assault she endured contributed to the necessity of the intensive treatment course."

And it expressly called for the University to sanction Mr. Doe as a result:

- "I certainly hope that you as university officials will take into account very seriously the toll this terrible event has taken on [Ms. Roe] and act accordingly in sanctioning the assailant."

It did so, furthermore, despite revealing that Ms. McDonald was treating Ms. Roe for *multiple* "current diagnoses" that predated the alleged assault, though the nature of those diagnoses was redacted.

99.     The investigation acquired one more piece of evidence by November 20: a statement emailed that day by E.E., a friend of Ms. Roe's and a former student at GW (the only former student to offer evidence in the proceeding). E.E. submitted testimony for the investigation because Ms. Roe identified her as a potential witness.  E.E. testified there to what was easily the most dramatic piece of testimony in the case, the only testimony that—if true— would show that Ms. Roe was severely intoxicated that night *and that Doe should have known it*. E.E. testified that after losing track of Ms. Roe at the rugby party for some time, "we"—she and their friends—

> "called [Ms. Roe] and she said she was in an Uber with the suspected assailant but she was slurring her worlds [sic] and speaking incoherently and we couldn't understand anything else over the phone.  She was obviously not in a conscious state of mind, definitely too drunk/maybe even drugged to consent.  We all

> went to go look for her but that point it was too late and that is all I
> can remember."

E.E. concluded by hoping that "justice is served against her alleged attacker.  Not just for her sake but for all of the victims of sexual violence at GW."

100.   E.E. and Ms. Roe both failed to identify the other people who joined her in making this phone call and searching for Ms. Roe.

101.   No one from GW involved in the investigation asked E.E. or Ms. Roe to identify who those other people were, either.

102.   No one from GW ever asked her or E.E. to produce phone records that might corroborate the existence of this call.

103.   Ms. Roe never explained why she failed, in three separate complaint statements, to mention this phone call.

104.   There is a simple reason that explains all of that:  The phone call never happened.

105.   E.E. knowingly offered this false testimony because, unlike any of Ms. Roe's other witnesses, she was a *former* GW student who could not be disciplined by GW for testifying untruthfully in its disciplinary proceedings.

106.   E.E.'s call records, which Mr. Doe received only during this litigation, show that she neither called nor received a call from Ms. Roe between 11:00 p.m. and 1:30 a.m. that night, and that she neither made nor received *any* calls at all between 11:56 p.m. (when Ms. Roe called the Uber) and 12:21 a.m. (when the Uber arrived at Mr. Doe's dorm).

107.   Ms. Roe's phone records, which Mr. Doe also received only during this litigation, are equally devastating to her credibility. They confirm that neither of E.E.'s stories—that Ms. Roe called E.E., or that a group of friends called Ms. Roe—were true.  As such, they fatally undermine the only witness testimony that arguably established Mr. Doe's knowledge of Ms.

Roe's alleged incapacitation.  They also show that Ms. Roe was coherent enough to place *three* outgoing calls after she ordered the Uber, *including a two-minute call with her roommate (A.C.),* the one who refused to testify for Ms. Roe at the hearing.

108.    Specifically, Ms. Roe's phone records from the night of Sept. 12-13, 2015, show that she placed three outgoing phone calls between 11:56 p.m. (when the Uber was called) and 12:21 a.m. (when the Uber arrived at Mr. Doe's dorm).

109.    Ms. Roe's Uber receipt says (1) that they arrived at Mr. Doe's dorm at 12:21 a.m., and (2) that the trip time lasted 16 minutes and 31 seconds.

110.    That means that they left the rugby party sometime between 12:04:29 (if the Uber dropped them at the dorm at *exactly* 12:21:00) and 12:05:28 (if it dropped them at the dorm at 12:21:59).

111.    Thus, any call with E.E. during the Uber ride would had to have happened between, at the most, 12:04:29 and 12:21 a.m.

112.    Moreover, E.E. has consistently claimed that she herself *was still at the party* when she spoke with Ms. Roe.  So for her to have spoken with Ms. Roe, Ms. Roe either must have (1) called E.E. directly, or (2) called someone else who *was still at the party* who could have handed his or her phone to E.E.

113.    **But the records show that didn't happen: Ms. Roe's records show that she did not call E.E. at any time that night and that she placed only one call during her ride in the Uber—to her roommate, A.C.,** *who had already left the party and refused to testify for Ms. Roe.*

114.    **There is thus no way that E.E. could have been involved in any way with that call.**

115.     The calls that Ms. Roe actually made between 11:56 p.m. and 12:21 a.m., in fact, serve only to undermine her claim to have been incapacitated at that time.  The first of Ms. Roe's three calls was a two-minute call to A.C. at 11:57 p.m.—*before* she got in the Uber.  That corroborates Mr. Doe's testimony in both the investigation and the hearing—well before he knew anything about the phone records—that before they ordered the Uber, Ms. Roe was texting A.C. asking if their room was available for sex.  The call lasted two minutes, betraying any notion that Ms. Roe was too intoxicated to speak coherently.  Nor did A.C. try to call Ms. Roe back after they hung up, suggesting she was not concerned for Ms. Roe's well-being.

116.     The second call was placed at 12:03 a.m., almost certainly to the Uber driver, to tell him where to pick them up.[23]

117.     The third call, placed at 12:06 a.m., was another call to A.C., this time lasting one minute.

118.     Because it was a one-minute outgoing call, it is impossible to tell from the phone records whether anyone actually answered that call.

119.     When a Verizon subscriber's call goes unanswered for under a minute before hanging up, it is recorded on the subscriber's bill as a one-minute outgoing call.  The 12:06 a.m. call to A.C. would thus be recorded on Ms. Roe's records in exactly the same way whether or not A.C. ever answered, and therefore whether or not Ms. Roe ever said a word.

120.     Thus, nothing in those records—literally nothing—contradicts Mr. Doe's testimony about what happened in the car.

_____

[23] A reverse phone search of the unknown number indicates that the number is not assigned to a fixed line, but instead is a non-fixed VoIP (Voice over Internet Protocol) number that can be "assigned" to any cell line, a service commonly used by rideshare services such as Uber and Lyft to anonymize their passengers' and drivers' contact information. Indeed, when that number is dialed directly, the caller hears a message saying, "The number you reached does not accept phone calls."

121.     **To sum up: Ms. Roe *was not in the car* for the 11:57 p.m. call.  She *was not in the car* for the 12:03 a.m. call.  The only call for which she *was* in the car was the 12:06 a.m. call to A.C., who was *nowhere near E.E. at the time* and may not have even answered the phone.**

122.     Ms. Roe's testimony about A.C.'s whereabouts changed during the course of the hearing.  She stated at the beginning of the hearing that A.C. left the party shortly after she (Ms. Roe) arrived.  But when she was confronted with Mr. Doe's claim that she was texting A.C. about the availability of their room, Ms. Roe changed her story and testified that A.C. still "was at the party and so I wouldn't have texted her."  But if that were true, then *she wouldn't have called her, either*.

123.     As it turns out, A.C. didn't remember anything about what happened that night.  On October 30th, 2017, Ms. Roe texted A.C. to ask her if she remembered "what happened when I came home" after she and Mr. Doe had sex that night. A.C responded, "Honestly no."

124.     It is simply impossible to believe that A.C., or anyone else, would forget being called by an incoherent roommate or told by that roommate, roughly an hour later, about that roommate's sexual assault.

125.     That proves that Ms. Roe lied when she told the hearing panel that she "ran back to [her] dorm and told my roommate" that she had just been sexually assaulted.  If that had happened, A.C. would have remembered it.

126.     A.C., in fact, told GW in June of this year that she "was asleep by the time [Ms. Roe] arrived home.  She went to the bathroom and didn't want me to enter." That directly contradicts Ms. Roe's claim at the hearing that she told A.C. about the alleged assault after A.C. followed her into the bathroom.

127.     **But none of this evidence—not E.E.'s phone records, not Ms. Roe's phone records, not testimony from A.C., and not any of Ms. Roe's many texts with E.E. and A.C. about the case—was provided at the time of the hearing.  GW never asked for it, and Ms. Roe never offered it.**  It would not come out until months later, and only after Mr. Doe filed a retaliation complaint against Ms. Roe.

128.     On November 20—before seeing any of the evidence besides Ms. Roe's statements—Mr. Doe submitted a statement responding to Ms. Roe's complaint statements.  He testified there to what is recounted above in Paragraphs 65-76: that he approached Ms. Roe after hearing her say, "I want to have sex with someone right now," that they talked about their majors and an Islam course she was taking, that she asked, "Can we fuck in your room?", that they did not talk on the ride to his dorm, that she initiated and led most of their sexual encounter, and that through the entire thing she neither slurred her words nor stumbled nor lacked mental coherence nor exhibited any other outward sign of severe intoxication.

129.     Despite the lack of any testimony that Ms. Roe appeared incapacitated—or even intoxicated—at the rugby party; the contradictions between Ms. Roe's complaint statements, filed mere days apart; the addition of new details after October 30 despite her statement that the Oct. 30 statement contained all she could remember; and the obvious problems surrounding E.E.'s belated disclosure of the most damning evidence in the case, GW informed Mr. Doe on December 5 that the administrative review of Ms. Roe's complaint was complete and that he would be charged with having violated Article 11, Section (a)(1) of the Code of Conduct: Sexual Violence.

130.     On December 8, Mr. Doe was informed that an Ad Hoc Board would be convened to preside over his hearing and that the hearing would occur on December 14.  He was also told

the identities of three individuals who would testify on behalf of Jane Roe: E.E., J.E. (a GW

student with whom Ms. Roe pregamed before the party), and R.M. (a GW student who was at the

party and with whom she had been romantically involved).

131.    The investigation conducted by the University before the hearing was wholly

inadequate.  Upon information and belief, the University did little more than invite Mr. Doe and

Ms. Roe to submit statements and to identify others whom it might solicit to submit a statement.

Upon information and belief, the University interviewed no one nor took any affirmative steps to

identify or contact witnesses who were not identified by the parties, even when the parties'

testimony indicated the existence of such witnesses with relevant testimony.

## THE HEARING

132.    On December 14, a hearing was held on Jane Roe's allegations.

133.    Despite the Policy's promise that students would be permitted to challenge Board

members based on personal bias, Mr. Doe was given no meaningful chance to object to the

Board members selected to preside over his case.  Rather, Mr. Doe was told their identities when

he arrived for the hearing and was given no opportunity to review their backgrounds or otherwise

acquire a meaningful basis on which to decide whether to object.

134.    Mr. Doe's Board consisted of an undergraduate student, C.R.; a student at GW's

law school, D.H.; and an administrator, Christina Witkowicki.  Ms. Witkowicki is the Director of

Greek Life at GW, a job that makes her "responsible for risk management and liability of all 30

chapters."[24]  Ms. Witkowicki is also pursuing a Doctorate in Education at GW, and the

dissertation she is writing is titled, "The Influence of Gender Role Norms on Leadership Style

---

[24] See "Introducing Christina Witkowicki," *GWToday* (Oct. 25, 2010), *available at*
https://gwtoday.gwu.edu/introducing-christina-witkowicki (last visited February 20, 2018).

Development in College Male Leaders."  Had Mr. Doe been able to learn these things about her before the hearing, he would have objected to her inclusion on the panel.

135.    Ms. Roe testified at the hearing, as she had in her complaint statements, that she was too intoxicated to consent to any sexual activity that night.  She believed that she was unconscious from the time she saw Mr. Doe's name on his door to the time she woke up in his bed, in the middle of sexual activity.

136.    Ms. Roe's testimony at the hearing added numerous details to the testimony she had already provided in her three complaint statements.

137.    For the first time, Ms. Roe added detail to the level of alcohol she believed she consumed at the pregame, stating that she consumed "above four shots, maybe five."  She testified that she had "over ten drinks" between 9:30 p.m. and 11:56 p.m.

138.    For the first time, Ms. Roe testified to remembering that she felt "scared" in the Uber.

139.    For the first time, Ms. Roe testified that she specifically remembered thinking that she "did not wanna be having sex with this person" while Mr. Doe was allegedly assaulting her.

140.     For the first time, Ms. Roe claimed that she specifically recalled "not understanding how I got there."

141.    For the first time, she testified that she "*scrambled* out of the room and building as quickly as I could."

142.    For the first time, she claimed that she "*ran* down the stairs as fast as I could," not bothering to explain how she could have done so just 10 minutes after being unconscious due to intoxication.

143.     Beyond simply providing new details she claims to have remembered, Ms. Roe's

hearing testimony also contradicted her investigation testimony in numerous respects.

   a.   Ms. Roe testified at the hearing that she "remembered spending a lot of the night
        with my roommate at the time, [A.C.], and her boyfriend, [R.B.]," but testified in
        her October 30 complaint statement that A.C. and R.B. "left shortly after I
        arrived."

   b.   Despite having claimed on November 2 that she "can't recall any conversation or
        interactions taking place in the car," Ms. Roe testified at the hearing that she
        remembered being on a phone call in the Uber.  She stated that she wasn't aware
        who was on the other end, but that E.E. told her it was her.  Ms. Roe never
        explained why she failed to report this phone call in any of her three complaint
        statements.

   c.   Ms. Roe testified at the hearing, "I don't remember gathering my clothes or my
        bag" before leaving Doe's dorm room, in an effort to depict her alleged
        intoxication, yet she testified in her November 2 statement that she remembered
        having "grabbed my things quickly" before leaving.

   d.   Ms. Roe testified at the hearing that she "*ran* back to [her] residence hall" after
        the alleged assault, in an effort to depict her alleged distress, but she testified on
        October 30 that she had "*walked* . . . straight home" from Doe's place (emphasis
        added).

   e.   Realizing that her claim to have learned Doe's name by seeing four unknown
        names on his door didn't make sense, Ms. Roe gave a new explanation at the
        hearing of how she learned Doe's name.  She claimed that his name was the *only*
        one from the door that she remembered, because of its unusual spelling, and that
        she looked up that name on Facebook sometime later and recognized his face.

144.     After Ms. Roe finished giving her opening statement, one of the panelists stated,

"I just want to recognize for all parties involved today that this can be an extremely traumatic

experience reliving things, and I appreciate everyone's involvement."  But reliving a consensual

sexual encounter was not at all traumatic for Mr. Doe, nor would anyone reasonably expect it to

be.  The panelist's statement, made immediately after she had finished testifying, was directed at

Ms. Roe and suggested that the panelist had prejudged the case, its fig leaf of neutrality

notwithstanding.

145.     The first witness to speak on Ms. Roe's behalf was her dorm neighbor at the time of the incident, J.E.  He testified that Ms. Roe had "at least four . . . minimum four" drinks at the pregame that he hosted before the rugby party.  He further testified that the girls at the pregame were stumbling and slurring their words a bit as they left for the rugby party.  He did not testify that he observed them doing so at the party.

146.     The second witness to speak on Ms. Roe's behalf was R.M., a GW student who was at the party and with whom she'd had a romantic relationship between the time of the rugby party and the time she brought her complaint.  He testified that there were approximately 100 people at the party.  He was the *only* person to testify, either before or during the hearing, that Ms. Roe looked intoxicated at the rugby party.   And he *refused* to say that she was severely intoxicated.  When asked to estimate her level of intoxication, he expressly declined.  "I don't want to go in depth and be like, I know exactly what the . . . I can say she was intoxicated." When he was then asked if anything about the interaction stood out to him, he did not say that she was slurring, stumbling, or exhibiting any other specific marker of intoxication; he simply answered, "You know how it is with parties.  You know when someone's drunk, so . . . ."

147.     The hearing panel refused to let Mr. Doe ask R.M. questions to establish his potential bias as a witness.  When Mr. Doe asked R.M. whether he had previously been "romantically or sexually involved with" Ms. Roe, one of the hearing board members immediately interjected, "That's not a relevant question, so I'm not going to allow that to be answered."

148.     Ms. Roe's third witness was E.E.  She testified, as she had in writing on November 20, that Ms. Roe was incoherent on the phone.  "[S]he was extremely intoxicated,

over the phone, and like barely conscious." She allegedly kept repeating the phrase, "I'm in an Uber with a guy."

149.     E.E.'s testimony about the phone call contradicted the testimony she had given in writing less than a month earlier. Despite having testified in writing to a dramatic unfolding of events—that she had feared for her friend's safety that night, called her on the phone for that reason, learned she was in fact in danger, searched for her with others, then discovered later that she had in fact been raped—E.E. testified *twice* at the hearing that *Ms. Roe* called *her* from the car that night ("[Ms. Roe] called me and she told me she was in an Uber"). She also testified that Ms. Roe had told her "they were going to his apartment," even though Ms. Roe had testified that she did not know they were going there, but on the contrary was *confused* as to why the Uber had stopped there and not at her dorm.

150.     E.E. further testified that, after her phone call with Ms. Roe, Ms. Roe's roommate, A.C., who was still at the party, searched for her. Ms. Roe, however, had testified on October 30 that A.C. left the party shortly after she arrived there.

151.     This testimony was a provable lie. Both E.E.'s and Ms. Roe's phone records show that they never spoke when Ms. Roe was in the Uber.

152.     The only person Ms. Roe even *tried* to call from the Uber—and likely did not even reach—was her roommate A.C., *who had already left the party and thus could not possibly have been with E.E.*

153.     Ms. Roe knew well before the hearing that A.C. had left the party by the time she got into the Uber—which is why she didn't want A.C. to testify. When Ms. Roe texted A.C. on October 30, 2017, to ask if A.C. was "at the rugby party September 12,2015," A.C. texted back, "I'm sorry but I don't think that I was and if I was I left really early because of" her boyfriend.

When Ms. Roe asked A.C. if she remembered what happened when Ms. Roe came home, A.C. replied simply, "Honestly no."

154.    E.E. additionally testified that she learned of the alleged assault "probably a couple weeks after [it] happened," leaving little doubt that she would have discussed any alleged phone call in the Uber with Ms. Roe long before Ms. Roe filed her formal complaint.

155.    This, too, was a lie.

156.    During GW's investigation of Mr. Doe's retaliation complaint against Ms. Roe, Ms. Roe finally produced her text messages with E.E.  They show that Ms. Roe did not tell E.E. "probably a couple of weeks after [it] happened."  Rather, she told E.E. for the first time on November 3, 2017—fewer than six weeks before the hearing.

157.    Here, in its entirety, is what Ms. Roe texted E.E. on November 3, 2017: "hey so do you remember a rugby party on September 12, 2015?  it was the third week of freshman year and we ubered together to the party.  I was raped by one of the rugby guys and GW is doing an investigation right now.  I need to know if you remember anything at all so I can get them the info they need[.]"

158.    That text makes clear that that was the first time Ms. Roe told E.E. that Mr. Doe had sexually assaulted her.  If it weren't, Ms. Roe would have said something like, "do you remember *when I told you what happened* freshman year?", not "do you remember a rugby party" and "I was raped by one of the rugby guys."

159.    As if that alone weren't enough to prove that E.E. lied about Ms. Roe's having told her this "probably a couple of weeks after [it] happened," here is how E.E. began her response: "oh my god. i actually remember that night very clearly. i'm so sorry that happened."

160.    These are the words of someone who is being told something terrible for the first time—not someone who is being reminded of something that, if it has actually happened, would be unforgettable.

161.    As for what she remembered about that night, E.E. went on in her text message to say that "we [Ubered] together and then I didn't see you for a while and I think you said you were in an uber with him over the phone but I don't remember anything specific i just know one minute you were there and then the next you weren't and we didn't see you until the next day."

162.    By the time she got to the hearing fewer than six weeks later (a far shorter gap than the *26 months* between the night in question and the November 3rd text), E.E. would go from not "remember[ing] anything specific" about a phone call she "think[s]" Ms. Roe made from the Uber, to recalling vivid details about how incoherent Ms. Roe seemed and what she allegedly said.

163.    Moreover, neither Ms. Roe nor E.E. ever explained how Ms. Roe could have managed to get out her phone and successfully call E.E. if she were groggy and falling asleep (in the words of Ms. Roe on October 30) or "barely conscious" (in the words of E.E. at the hearing).

164.    Despite the fact that E.E. had said she and a group of Ms. Roe's friends had called her on the phone and searched for her that night, Ms. Roe produced no other witness to testify about this phone call, and neither she nor E.E. even identified by name the other people allegedly involved with this call.  Thus, the only witness to testify about the phone call, either before or during the hearing, was someone who stood no risk of being disciplined by GW for providing untruthful testimony at a disciplinary hearing.

165.     Mr. Doe provided testimony at the hearing consistent with what he had said in
writing on November 20.  And he expressly denied that Ms. Roe on any kind of phone call while
they were in the Uber.

166.     Mr. Doe presented no witnesses of his own, and that fact was irrationally held
against him by one the panelists, who stated, "So [Ms. Roe] has presented a couple witnesses, . .
. .  Is there any reason why you haven't presented any witnesses to us today?"  Mr. Doe
responded that no one witnessed their sexual encounter and that the only person he knew who
had witnessed their interactions—Q.W.—was abroad that semester, but had told Mr. Doe that he
had observed nothing out of the ordinary when interacting with Ms. Roe.  The question evinced a
bias against Mr. Doe and a desire to look for any reason at all to doubt his testimony.

**THE DECISION**

167.     On January 23, 2018, GW informed Mr. Doe that the Hearing Board had found
him responsible for sexually assaulting Ms. Roe and that he would be suspended for one year.

168.     The Board concluded that Ms. Roe's "level of intoxication reached the point of
incapacitation" that night.  They based that conclusion on five things: (1) Ms. Roe's own
testimony about her level of intoxication and her lack of memory, (2) E.E.'s testimony that Ms.
Roe was incoherent and barely conscious on the phone, (3) the fact that Doe and Ms. Roe were
quiet in the Uber, and (4) "the behavior of the collective club sports team," *i.e.*, the rugby team,
"that night, of which the Respondent was a member," in "encourag[ing]" women "to drink
heavily," and (5) Mr. Doe's disclosure that he had approached Ms. Roe after hearing her say, "I
want to have sex with someone right now," something they labeled "an example of predatory
behavior."

169.    The Board "acknowledge[d] the statements made by [Mr. Doe] regarding [Ms. Roe's] actions that indicated to him that he had consent: [Ms. Roe] asked him to make arrangements to find a place to have sex, requested the Uber, removed his clothing, initiated oral sex on him, agreed to change positions when asked, and requested that they change positions."  It nevertheless concluded that Mr. Doe should have known that Ms. Roe was not just intoxicated that night, but was so intoxicated as to be incapacitated, for two reasons: (1) "the statements of the witnesses, indicating that they observed [Ms. Roe] acting in an intoxicated manner, in stumbling and slurring her words," and (2) "[Mr. Doe's] statements that the Complainant ceased conversation with him after leaving the party."

170.    The Board never explained how Mr. Doe could have known that Ms. Roe had been stumbling, given that the only testimony by anyone about that was J.E.'s testimony that she had stumbled as she was leaving the pregame.  The Board heard literally no testimony, *from anyone*, that Ms. Roe had been observed stumbling or slurring at the party, including from three people who testified in writing that they saw her there—one of whom even saw her crossing the street as she left.  The only testimony that indicated Mr. Doe could have observed her slurring her speech was E.E.'s testimony about the alleged phone call in the Uber, which Mr. Doe denied ever happened and which had so many red flags as to be inherently unreliable.

171.    The Board also never explained why Mr. Doe, who abstained from alcohol for religious reasons, could be held responsible for his teammates' allegedly encouraging women to drink.  The Board heard no evidence—because there was none—that Mr. Doe had helped to plan the party, had encouraged anyone to drink, or had given anyone a drink.  And by Ms. Roe's own testimony, she did all of her drinking before talking to Mr. Doe.  Neither she nor anyone else testified that *anyone* at the party, let alone Mr. Doe, had encouraged her to drink.

172.     The Board furthermore failed to explain why it would credit "[Mr. Doe's]

statements that the Complainant ceased conversation with him" in the Uber but not the rest of his

statement as to why—that she was busy doing things on her phone the entire ride.  The Board

additionally never explained why an alleged change in Ms. Roe's demeanor in the Uber could be

tied to her alcohol consumption, given that Ms. Roe herself testified that her memory blackouts

began occurring long before she got in the Uber.

### THE FIRST APPEAL

173.     On January 30, Mr. Doe appealed the hearing board's finding based on two new

pieces of evidence: a report by an expert toxicologist who analyzed what Ms. Roe's level of

intoxication would have been had she consumed as much alcohol as she said she did, and a

statement from another student, Q.W., about his interaction with Ms. Roe at the rugby party.

174.     Based purely on the testimony of Ms. Roe and her witnesses about her level of

alcohol consumption and the time within which she consumed it, the toxicologist concluded that

Ms. Roe would have had a BAC of at least 0.26 (if she had consumed 10 drinks), and possibly as

high as 0.37 (if she had consumed 13), with 0.32 being the BAC that fell in the middle of that

range.  That, as he explained, is an extraordinarily high level of intoxication.  At an estimated

BAC level of 0.32, "Ms. [Ms. Roe] would have required immediate medical attention because

she potentially could have been on the brink of death from alcohol intoxication."  Even at a BAC

of 0.26, "the low end of the range," it is "unlikely . . . that she would have had *any* memory of

the car ride" or "*any* memory of anything that had occurred thereafter."  (Emphasis added.)  And

it is "*extremely* unlikely" that she could have "dressed herself, run down eight flights of stairs,

run one block to her home," and been "coherent enough to be able to explain to her roommate"

what had supposedly happened.  (Emphasis added.)  And by Ms. Roe's own testimony, she

would not have been at the "low end of the range," because she said at the hearing that she consumed "over ten drinks" that night.

175.   Q.W. testified in his statement that he had a "normal, lucid conversation" with Ms. Roe at the party.   He explained that he and Mr. Doe took a picture at 11:16 p.m., that he went to get a beer, and that when he returned a few minutes later Mr. Doe and Ms. Roe were talking.   Q.W. then talked with Ms. Roe, talked with her friends who were standing in that same group, then saw Doe and Ms. Roe kissing.

176.   Q.W.'s testimony established that Ms. Roe and Doe had no short conversation before leaving in the Uber at 11:56 p.m., but instead had talked from approximately 11:25 p.m. until the time they departed together.   He testified that she seemed perfectly lucid and was with friends.   His testimony disproved any suggestion that Mr. Doe's interaction with Ms. Roe was predatory in any way.

177.   Mr. Doe's appeal also explained all of the reasons that E.E.'s claim to have spoken with Ms. Roe on the phone in the Uber could not be believed.   He explained:

- That E.E.'s change from saying she called Ms. Roe for a very specific reason—fear for her safety, which was dramatically confirmed—to saying *Ms. Roe* called *her* was not credible.

- That Ms. Roe's level of intoxication, as confirmed by the expert toxicologist, would have made it impossible for her to call E.E., let alone coherently say, several times, "I'm in an Uber with a guy."

- That neither Ms. Roe nor E.E. ever identified the *others* who, with E.E., allegedly both called Ms. Roe and then searched for Ms. Roe that night.

- That if this call had actually happened, E.E.—or one of the others allegedly involved in it—would have told Ms. Roe about it long before November 20 and it would have appeared in one of Ms. Roe's three complaint statements.

- That E.E. could not have heard Ms. Roe say on that call that she was going to a guy's apartment because Ms. Roe herself says she did not know that information while in the Uber.

178.   Mr. Doe also explained in his appeal that he was quiet in the Uber not because Ms. Roe had suddenly somehow become catatonic, but because he was nervous about having sex for the first time, felt awkward that a third person whom he didn't know well was in the front seat, and Ms. Roe was calmly buried in her phone the entire time.  He noted that the Board gave no explanation why it would credit his testimony that they didn't talk yet fail to also credit his testimony that she was busy with her phone the entire ride.

179.   On February 15 the University summarily rejected Mr. Doe's appeal, not on its merits, but because it purportedly failed to satisfy the threshold criteria required of appeals.

180.   Article 33 of the Code sets forth those criteria: "Appeals must be based on new information that is relevant to the case, that was not previously presented at the hearing or conference, and that significantly alters the finding of fact."  Appeals that meet those criteria are sent to the Chair of the Committee on the Judicial System, who selects a panel to decide the merits of the appeal.

181.   In a one-page letter from Robert Snyder, the University's Executive Director of Planning & Outreach, the University rejected Mr. Doe's appeal without explanation.  Mr. Snyder simply repeated the threshold requirements of an appeal identified in Article 33, then stated, with no elaboration, "[I]t is my determination that you have not met the requirements for an appeal."

182.   Mr. Doe's appeal indisputably met those criteria.  Neither the report of the expert toxicologist nor the statement of Q.W. were "presented at the hearing."  Nor could they have been:  It wasn't until the hearing that Ms. Roe specified the amount she drank at the pregame, and Q.W. was studying abroad at the time of the hearing.  But even if that evidence had been available at the time of the hearing, that could not disqualify its use in an appeal, because appeals are not required to be based on information unavailable at the time of the hearing.

183.    The information undoubtedly was relevant—the toxicologist concluded that Ms. Roe's reported actions could not be reconciled with her reported alcohol intake, and Q.W.'s statement was evidence that Ms. Roe was not severely intoxicated at the rugby party.

184.    The new evidence also dramatically altered the findings of fact: They completely undermined Ms. Roe's credibility, on which the hearing board relied in its decision; directly supported everything Mr. Doe had said from the beginning about Ms. Roe's presentation that night; and, as to the toxicologist report, proved that, if Ms. Roe had truly consumed as much alcohol as she said, it would have been so obvious to those at the party that many of them would have testified to it.  Yet none did.

## THE SECOND APPEAL

185.    On August 14, 2018, this Court granted Mr. Doe's motion for partial summary judgment and ordered GW to review his appeal on the merits after concluding that its prior refusal to do so violated the plain text of the Code.  This Court also ordered that Mr. Doe be allowed to submit the phone records obtained during the litigation as part of his appeal.

186.    On August 28, 2018, Mr. Doe submitted his revised appeal, which contained all of his original arguments as well as new arguments based on Ms. Roe's and E.E.'s respective phone records.

187.    On August 29, as noted above, GW gave Mr. Doe access to the investigation report from the retaliation complaint he had filed against Ms. Roe (discussed below), which included information that further undermined Ms. Roe's credibility and put yet another nail in the "E.E. phone call" coffin.

188.    On August 30, Mr. Doe filed a supplement to his appeal focused on the newly provided evidence from the retaliation investigation.

189.    Although the Code did not give non-appealing parties the right to respond to an appeal, GW nevertheless allowed Ms. Roe to submit lengthy responses to Mr. Doe's appeal and his supplement to the appeal.

190.    On September 4, Ms. Roe responded to Mr. Doe's appeal.

191.    On September 5, Ms. Roe responded to Mr. Doe's supplement (hereinafter the "supplemental response").

192.    Not only did these extra-Code procedures give Ms. Roe the last word on Mr. Doe's appeal, it also allowed Ms. Roe to submit entirely new, and completely unsubstantiated, allegations of harassment against Mr. Doe, which he was not permitted to rebut to the panel.

193.    In her supplemental response, Ms. Roe accused Mr. Doe, *without any credible evidence*, of posting and then deleting three comments on her Facebook page related to her allegations against him.

194.    The first alleged comment was "a long-winded comparison of the case with the storyline of *To Kill a Mockingbird*."  Ms. Roe did not submit a copy of this comment, claiming that it was deleted before she could capture it.

195.    The second alleged comment was supposedly "a picture of [Mr. Doe] as a child." She did not describe the photo or explain how she had any way to know what Mr. Doe, whom she barely knew, looked like as a child. Once again, Ms. Roe did not submit a copy of this comment, claiming that it was deleted before she could capture it.

196.    The third alleged comment was a "painting of Salome holding John the Baptist's Head."  "Who else," she asked, "could have made these comments but a religion minor who knew that the person he was targeting was also studying religion?"  Ms. Roe did not explain why one has to minor in religion to know a story so familiar.

197.     On September 10 and September 13, Mr. Doe objected to the inclusion of the Facebook allegations, arguing that there was literally no evidence connecting them to him and that they were a transparent attempt to make him look like a stalker and prejudice the panel against him.  His objections were ignored, and these new accusations remained in Ms. Roe's response.  Mr. Doe was afforded no opportunity to refute them to the appeals panel.

198.     Mr. Doe's appeal hearing was scheduled for Monday, September 10. Mr. Doe was not told who would actually be on his panel.  Rather, he was given a list of potential panelists and told to let GW know if he objected to any of them.

199.     **One of the potential panelists was a GW undergraduate who holds a high-ranking position in an organization dedicated to "dismantl[ing] rape culture," touts its "belie[f] in survivors," and even sells clothing that says "Believe Survivors."**  The potential panelist also tweeted frequently about issues related to sexual assault, all consistent with the views promoted by that organization.

200.     Upon information and belief, GW was aware of that panelist's involvement in the organization prior to putting her on the list of potential panelists to hear Mr. Doe's appeal.

201.     When Mr. Doe objected to the panelist, GW agreed not to put her on the panel.  It did not, however, take a position as to whether it agreed with Mr. Doe's concerns about her potential bias.

202.     The problems with the potential student panelists did not end there, however.

203.     GW selected three members for the panel from the pool Mr. Doe had been given but did not tell him whom it had selected.  (In other words, they told him who was on his jury venire, but not on his petit jury.)

204.    One of the appointed panelists (like the "potential panelist" discussed above) was a GW undergraduate.

205.    On or about September 8 or 9—the weekend before the panel was scheduled to convene—the student panelist emailed Christine Anthony, the Director of GW's Office of Student Rights & Responsibilities, and copied the other co-panelists.

206.    In that email, the student panelist told Ms. Anthony that even though the student panelist had been "explicitly told not to do outside research for these cases," there were "certain things [the student panelist] came across while reading through the materials that [the student panelist] felt needed to be looked into further."

207.    The student panelist stated that "we, the members of this panel, need to know the University's position on this specific case before we come to a decision on the appeal.  I don't think we need much but since I have now learned that this has legal ramifications that could affect the University, I believe it imperative that we receive a brief word from you or GW's counsel on how our decision could affect any current or future standing of the University in court against the respondent."

208.    In sum, the student panelist—who had been vetted and approved by GW as authorized to hear appeals in student conduct cases, and presumably trained by GW for that task—wanted to make sure that nothing the panel decided might hurt GW in court and ignored a specific instruction not to conduct outside research about the case.

209.    The clear pro-victim bias exhibited by the potential panelist and the flagrant pro-GW bias exhibited by the student panelist demonstrated that GW failed adequately to select and train panelists to hear appeals in sexual misconduct cases.

210.    Consistent with that failure, GW's President, Thomas LeBlanc, exhorted GW's faculty to adopt a new sexual misconduct policy and procedures between the time of Mr. Doe's first and second appeals precisely because the appellate panelists in the legacy system were so woefully untrained:

> How do we handle cases next year?  Do we take faculty before panels made up of students and staff?  **Do we have essentially untrained or well-meaning individuals doing the investigation?  Do we have no decent appeal rights to an outside entity who's actually trained in this?**  I mean there's a lot of questions that our current policy raises.  And it's a judgment call as to we're better off adopting a policy that has some warts to it, but they're not the kinds of warts that we have proven over time create horrible effects on our campus as is the case of the older policies like the one we have now."[25]

211.    On September 10, GW shared the student-panelist's email with Mr. Doe and told him that the student-panelist would be removed from his panel. It also gave him a choice between, on the one hand, simply replacing the student-panelist and keeping the rest of the original panelists and, on the other hand, replacing the entire panel (given that all of them had received the offending email).  Mr. Doe chose to replace the entire panel.

212.    Although GW sent Mr. Doe the name of a new proposed panelist so that he could raise any bias objections (which he did not), it never told him who would actually be serving on his appeals panel.

213.    On September 18, Mr. Doe received a letter from GW notifying him that his appeal had been rejected and that he would not be granted a new hearing.

214.    Mr. Doe's combined appeal and supplemental appeal, without exhibits, had spanned 20 pages.  With exhibits, they spanned 198 pages.

---

[25] "Proposing new Title IX policies," *GW Hatchet* podcast (May 14, 2018) at 4:42-5:24 (available at https://www.gwhatchet.com/2018/05/14/getting-to-the-bottom-of-it-proposing-new-title-ix-policies/) (last visited May 16, 2018).

215.    **GW's letter rejecting Mr. Doe's appeal and denying him a hearing ran less than a page and a half.**

216.    The letter's analysis began with throat-clearing that was all but required by this Court's earlier grant of summary judgment, noting that the Roe/E.E. phone records, Roe/A.C. text messages, toxicology report, and Q.W. statement were all "new, relevant, and not presented during the hearing."

217.    Yet it found that "none of this evidence significantly altered the finding of fact."

218.    First, it reasoned that "the phone records did not significantly alter the finding of fact because the phone records supported the complainant's witness's statement that a phone call occurred in the Uber ride" and thus "would have corroborated her witness's account."

219.    Yet as the panel did not deny, the only person Ms. Roe called from the Uber was A.C., who had long since left the party *and thus could not possibly have been with E.E.* when the call was placed.  If A.C. was not with E.E., then E.E. could not have heard what she claims to have heard during the alleged call.

220.    The panel, in other words, reasoned that, because the phone records showed that Ms. Roe called **A.C.**, who was not at the party, the records corroborated E.E.'s testimony that Ms. Roe called **E.E.**, who was at the party.  That reasoning is so frivolous as to be disingenuous on its face.

221.    The panel also reasoned that because Ms. Roe's call records show that a call was placed to A.C. during the Uber ride, they "directly contradicted [Mr. Doe's] testimony that no phone call occurred during the Uber ride."

222.    But that is also not true.  Because that call was recorded in Ms. Roe's phone records as lasting for just one minute—which is how Verizon denotes *all* attempted calls of one

minute or less, even if no one picks up—it is just as likely that A.C. never answered the call as that she did.  Indeed, *A.C. herself* told GW in June of 2018 that she does not remember speaking by phone with Ms. Roe that night.

223.    In short, Mr. Doe said that Ms. Roe never spoke with anyone on the phone during the Uber ride.  A.C., the only person Ms. Roe could possibly have spoken with during the ride, has said repeatedly that she does not remember speaking with Ms. Roe by phone that night.  E.E. has never said A.C. was with her when the alleged call was made.  And Ms. Roe herself originally told the investigator and the hearing panel that she spoke to E.E., not to A.C., and believed (accurately) that A.C. had already left the party by the time she herself left with Mr. Doe.

*224.*    Yet the appeals panel nonetheless concluded that Ms. Roe's phone records support the proposition that she spoke with *E.E.* that night—when, again, **literally everyone agrees that E.E. could not possibly have been with A.C. when that call was made, because E.E. was still at the party and A.C. had already gone home.**

225.    Second, the appeals panel reasoned that "the toxicology report did not significantly alter the finding of fact because the complainant's response credibly indicates that the report's calculations regarding the complainant's BAC level were based on inaccurate information about the complainant's height and weight."  That was the sum total of the appeals panel's analysis on this point.

226.    Again, the appeal panel's failure to be specific speaks volumes.  It is true that Mr. Doe—who had not interacted with Ms. Roe in more than two years and never had access to her medical records—underestimated her height and weight when conveying it to the toxicologist.

Instead of the 65 inches and 140-150 pounds that he had estimated, Ms. Roe was actually 70 inches tall and weighed roughly 171 pounds the night they had sex.

227.    In her response to Mr. Doe's appeal, Ms. Roe used an online blood alcohol content (BAC) calculator to estimate her BAC at .24 or .25—not the .32 that Dr. Milman had allegedly estimated.  She argued that she was thus much less intoxicated than Dr. Milman had estimated she was.

228.    But both Ms. Roe and the appeals panel failed to mention the fact that Dr. Milman actually estimated a *range* for her intoxication—.26 to .37.  And here is how he said Ms. Roe would have been acting *even at the low end of that range* (which is almost exactly the number that Ms. Roe's online calculator estimated): "Moreover, it is unlikely, even at the low end of the range that she would have had any memory of the car ride to Mr. [Doe's] dorm room or any memory of anything that had occurred thereafter.  In addition, it is extremely unlikely that she could have dressed herself, run down eight flights of stairs, run one block to her home, and was coherent enough to be able to explain to her roommate that she had allegedly been assaulted."

229.    The appeals panel said nothing about that.  It simply said, "You got her height and weight wrong," without acknowledging that even *at* the correct height and weight, Dr. Milman's analysis still showed Ms. Roe's testimony to be internally inconsistent.

230.    Third, the appeals panel found that the statement from Q.W.—who said that he had a "a normal, lucid conversation" with Ms. Roe while she was speaking with Mr. Doe and was the only witness in the entire case, other than Mr. Doe, to have spoken with Ms. Roe at the party—"did not shift the weight of evidence in this case."

231.    The appeals panel reasoned that "the delay in providing this statement reduced its credibility and that the evidence it presented did not outweigh other evidence offered by the parties."

232.    The appeals panel discounted Q.W.'s testimony simply because it was not submitted until after the hearing—despite knowing that Q.W. had been studying abroad when the hearing took place.

233.    The appeals panel took a far more generous view of E.E.'s testimony, however. Despite the fact that E.E.'s phone records *flatly disproved* E.E.'s hearing testimony that Ms. Roe called her from the car, the panel generously chalked that up to a simple failure of memory, finding it "plausible that the complainant's witnesses [*sic*—there was only one alleged witness to the call besides Ms. Roe herself] forgot the detail of whose phone was actually called, and so that did not weigh negatively against their credibility."

234.    The appeals panel thus gave less weight, with less reason to do so, to the uncontested testimony of a male student (Q.W.) on behalf of a male respondent than it did to the provably false testimony of a female student (E.E.) on behalf of a female complainant.

235.    Fourth and finally, the appeals panel found that Ms. Roe's "texts with an associate of the complainant who did not appear in the hearing… did not significantly alter the finding of fact because the witness's formal statement generally corroborates the complainant's statement and [Mr. Doe's] description of the possibility of omitted texts did not provide a clear refutation of other information."

236.    Upon information and belief, the "associate of the complainant" to which the appeals panel referred is A.C., Ms. Roe's roommate.

237.    The contention that A.C.'s "formal statement generally corroborates the complainant's statement" is also provably false.

238.    Last fall, Ms. Roe originally told the investigators that she "walked from [redacted] straight home to [redacted] where my roommate and her boyfriend were in our room. I went to the bathroom so that I could be alone, and my roommate followed me in.  I explained to her the details of what had happened."  She then doubled down on that at the hearing: "I ran back to my dorm and told my roommate what had happened to me."

239.    But that's not what A.C.—whom Ms. Roe tellingly never called as a witness— said when she was formally interviewed on June 18, 2018.

240.    In her formal statement, A.C. said, "I know I was asleep by the time [Ms. Roe] arrived home.  She went to the bathroom *and didn't want me to enter*."  That directly contradicts Ms. Roe's version of events, in which A.C. "followed [her] in" to the bathroom and listened as she "explained the details of what had happened."

241.    A.C. did not say that Ms. Roe came home and said *anything* about Mr. Doe's having just assaulted her, much less that Ms. Roe "explained… the details of what had happened."

242.    A.C. also said that she didn't "remember calling or speaking with [Ms. Roe] over the phone" that night—which she surely would have if she'd spoken to a slurring and incoherent Ms. Roe, whom she would later learn was allegedly raped just minutes later.

243.    Finally, A.C. said that although she knew E.E., she didn't "remember specifically interacting with her that night"—which, of course, would include being on the phone with her.

244.    Moreover, Ms. Roe *knew* that's what A.C. would have said if she had been called to testify, because A.C. texted her on October 30 that she didn't remember what happened when

Ms. Roe came home that night. She gave this testimony at the hearing only because A.C. did not want to testify for her and would not be there to testify to the contrary.

245.     The appeals panel's assertion that A.C.'s "formal statement generally corroborates the complainant's statement" is thus, at best, wishful thinking. At worst, it is a bald-faced lie.

246.     Moreover, although the appeals panel found that "the delay in providing [Q.W.'s] statement reduced its credibility," it made no finding that A.C.'s delay in producing the formal statement (which it believed corroborated Ms. Roe's testimony) reduced its credibility—proving once again that it privileged the testimony of female witnesses it (wrongly) perceived as favoring the female complaint over male witnesses it (rightly) perceived as favoring the male respondent.

247.     The appeals panel's reasoning makes clear that it had no intention of giving Mr. Doe a fair hearing and did not, in fact, do so.

## MR. DOE'S COMPLAINTS AGAINST MS. ROE

248.     On March 26, 2018, Ms. Roe wrote a post on Facebook criticizing Mr. Doe's lawsuit, which he had filed on March 6, and using his real name—despite the fact that he had not named her in the lawsuit and had specifically removed details, at GW's request, that might identify her.

249.     In that post, Ms. Roe stated (among other things), "[Mr. Doe's real name] is a rapist and I will not let him be known solely as 'John Doe.'"

250.     On March 28, Mr. Doe sent the Facebook post to GW Title IX Coordinator Rory Muhammad and said that he wanted to file a complaint against Ms. Roe "for retaliation and for violation of the confidentiality provisions in the Title IX policy, as well as for any other relevant

violations of GW policy."  Mr. Doe also said that he wanted to file a complaint against her for

providing false information about the alleged call with E.E. during the investigation and the

hearing, as the newly discovered phone records showed.

251.    As of March 28, GW's Sexual Misconduct Policy prohibited both retaliation and

providing false information during a sexual misconduct investigation.  With respect to

confidentiality, it stated, "All persons involved in the proceedings will be advised of the need for

discretion and confidentiality.  Inappropriate breaches of confidentiality may result in

disciplinary action."

252.    On April 6, GW Title IX Coordinator Rory Muhammad informed Mr. Doe that

his complaint had been reviewed and asked him to come in for a meeting to discuss it.

253.    That meeting was held on April 25.  During the meeting, Mr. Muhammad asked

Mr. Doe to explain why he thought Ms. Roe's publication of his real name and the alleged

provision of false testimony would constitute a violation of GW policy.

254.    Upon information and belief, Mr. Muhammad does not typically ask complainants

to explain why they believe alleged conduct might violate GW policy.  Rather, he typically

gathers facts from complainants and makes his own determination about whether the alleged

facts, if true, would violate GW policy.

255.    On May 14, Mr. Doe emailed Mr. Muhammad to check in about the status of his

complaint, having heard nothing from GW for more than two weeks.

256.    On May 16, Mr. Muhammad responded that he would be forwarding Mr. Doe's

complaint to GW's Office of Student Rights and Responsibilities and that Mr. Doe would hear

from SRR "very shortly."

257.    But Mr. Doe would not hear anything from GW about his complaint for more than three months.

258.    On August 21, Jennifer Alexander-Smith from SRR emailed Mr. Doe to inform him that, with respect to his retaliation claim, "Ms. [Roe's] actions do not constitute a violation of university policy. Therefore, no action will be taken regarding these reported concerns."

259.    In that same email, Ms. Alexander-Smith told Mr. Doe that "it remains uncertain" whether Ms. Roe and E.E. spoke by phone that night, and therefore "no violation of university policy can be substantiated."

260.    Ms. Alexander-Smith did not explain how SRR reached that conclusion.

261.    Ms. Alexander-Smith did not tell Mr. Doe what SRR had done to investigate his complaint.

262.    Ms. Alexander-Smith did not tell Mr. Doe that GW had prepared an investigation report that included several text messages—from Ms. Roe, E.E., and A.C.—that seriously undermined the credibility of Ms. Roe's allegations.

263.    Ms. Alexander-Smith did not inform Mr. Doe that he had a right to appeal SRR's determination.

264.    When Mr. Doe emailed Ms. Alexander-Smith on August 22 asking if he had a right to appeal SRR's decision, neither Ms. Alexander-Smith nor anyone at GW ever responded to him.

265.    On August 29th—eight days after rejecting his complaint, one day after Mr. Doe filed his court-ordered second appeal, and presumably knowing that Mr. Doe would eventually receive the documents in discovery—GW informed Mr. Doe that an investigation report

regarding his retaliation complaint had been prepared and that it would share the report and its accompanying documents with him.

266.    Those records included the text messages discussed above at Paragraphs 153-163, showing, among other things, (1) that Ms. Roe didn't tell E.E. about the alleged assault until last October (not in the weeks after it happened, as E.E. had claimed); (2) that E.E. didn't "remember anything specific" about the alleged Uber call (as opposed to vividly remembering how drunk Ms. Roe seemed), and (3) that A.C. had left the party by the time Ms. Roe tried to contact her (meaning she could not possibly have been with E.E. at the relevant time).

267.    Yet GW still found insufficient evidence to prove that Ms. Roe had provided false testimony during the investigation into her claims against Mr. Doe.

## CAUSES OF ACTION

## COUNT I – VIOLATION OF TITLE IX (20 U.S.C. § 1681)

268.    Plaintiff incorporates by reference all of the preceding paragraphs of this Complaint as though fully set forth herein.

269.    The University receives federal funding, including in the form of federal student loans given to students.

270.    Because it receives federal funding, the University is subject to the requirements of Title IX.

271.    Title IX prohibits gender discrimination in the educational setting.

272.    Ms. Roe's complete lack of credibility; the frequent changes in her testimony; her impossible story about the actions she supposedly took after drinking so much alcohol; the lack of any credible evidence that Ms. Roe exhibited any signs of incapacitation to Mr. Doe or to anyone else at the party; the lack of any evidence showing that she was incapacitated at all at the

time they had sex; and GW's gross mishandling of Mr. Doe's second appeal cast serious doubt on the University's finding of responsibility and show that the decision against him was based on his gender and the gender of his accuser.

273.   At the time Ms. Roe's claims were reported, investigated and adjudicated, the University was under tremendous pressure, from multiple sources, to appear tough on sexual assault, especially in cases that mirrored Jane Roe's.  It initiated its investigation and adjudication of the allegations against Mr. Doe fewer than three months after it came under active OCR investigation, and fewer than two months after a second OCR complaint was filed against it.

274.   As a reaction to these sources of pressure and scrutiny, the University was motivated to be perceived as aggressively addressing women's claims of sexual assault on its campus.  It has therefore treated male students accused of sexual misconduct by female students, including Mr. Doe, more aggressively than it otherwise would, and more aggressively than it would treat similar complaints made by male students against female students.

275.   GW's own Title IX office betrays the fact that gender bias pervades the process by which the University investigates and adjudicates sexual misconduct claims.  It offers incoming students a course on how "male students," specifically, "can prevent sexual violence."  It offers a workshop that analyzes "rape culture," a term that typically denotes the 'normalization' of mistreatment of women by men, as one of the chief "foundations" of sexual violence.  And it refers students for information about consent to Laci Green, an internet personality whose materials exhibit overt gender bias with respect to the credibility of women who allege sexual assault.

276.   Consistent with those beliefs, **every single respondent put through the University's formal hearing resolution process in academic years 2015-16 and 2016-17 was found responsible**.  And the University itself touted that fact, in direct response to campus-wide criticism of its handling of a female complainant's case, proving that it views the results in individuals cases as a foil to the public criticism it has received for years, and continues to receive, regarding it handling of such claims.

277.   Upon information and belief, all of the respondents in those two academic years were men, and all or the vast majority of their accusers were women.

278.   Also upon information and belief, that same 100% conviction rate continued into the 2017-18 academic year.

279.   The gender bias with which the University investigates and adjudicates such claims also manifested itself in Mr. Doe's hearing.  At the conclusion of Ms. Roe's opening statement, one of the panelists stated that he wanted to acknowledge "that this can be an extremely traumatic experience reliving things, and I appreciate everyone's involvement," betraying the fact that he had already credited Ms. Roe's claim to have experienced something traumatic.  Conversely, Mr. Doe's truthfulness was called into question by a panelist simply because he had no relevant witnesses to bring to the hearing.  And the hearing board refused to allow Mr. Doe to explore the potential bias of one of Ms. Roe's witnesses, whom he knew to have had a romantic relationship with Ms. Roe in the past.  That witness was the only one to testify that Ms. Roe appeared intoxicated, to any degree, at the party.

280.   The panel that denied Mr. Doe's appeal on September 18, 2018, similarly exhibited gender bias when it misrepresented the evidence in the case; disregarded clearly exculpatory information; treated late-presented male testimony supporting Mr. Doe differently

than late-presented female testimony (purportedly) supporting Ms. Roe; and summarily refused to grant Mr. Doe a new hearing.

281.    The University has engaged in a pattern of unfair investigations and adjudications resulting in serious sanctions being imposed on male students.  Upon information and belief, the University has not acted comparably with respect to allegations of sexual misconduct made against female students.

282.    Indeed, the University's feeble response to Mr. Doe's retaliation complaint shows this very well.  Mr. Doe sought help from the University when Ms. Roe called him a rapist, *by name*, on Facebook, in a clear effort to punish him for his vigorous defense of his innocence in this case.  She did this despite the fact that Mr. Doe had taken pains not to identify Ms. Roe in his pleadings, had successfully sought for leave to identify both of them by pseudonyms, and—it should be noted—had not sued Ms. Roe personally, despite the clear evidence that she and E.E. had conspired to lie about what happened that night.

283.    Yet GW brushed off his complaint from the start.  It began by asking him to explain why he thought there was a violation.  It then dragged its feet on an investigation and told him, almost five months later, that it was rejecting his complaint.  It didn't bother to tell him why or even answer his email asking whether he could appeal that decision.  And if Mr. Doe had not been in active litigation against GW—thus putting GW on notice that he would eventually see the investigative report in discovery—GW never would have given him the report and the extraordinarily exculpatory text messages it contained.

284.    As a direct result of the University's violation of Title IX, and as a direct and proximate cause thereof, John Doe has been seriously and irreparably damaged in the following ways, among others: he has been falsely branded a rapist, which he will have to report to many

future schools and future employers; endured extreme emotional and psychological suffering as a result of the University's one-sided treatment of the false sexual assault charges against him; lost the ability to graduate in the 2017-18 academic year, thereby delaying the time at which he can begin a career and shortening the length of that career; been forced to withdraw graduate school applications due to his lack of a diploma, thus delaying his matriculation there and forcing him to explain why that happened; and he will suffer a permanent reduction in lifetime earnings.

285.    Accordingly, Defendant the University is liable to Mr. Doe for violations of Title IX and for all damages arising out of that violation.

### COUNT II – VIOLATION OF THE D.C. HUMAN RIGHTS ACT
### (D.C. Code § 2-1402.41)

286.    Doe incorporates by reference all of the preceding paragraphs of this Complaint as though fully set forth herein.

287.    Section 2-1402.41 of the D.C. Human Rights Act states:

It is an unlawful discriminatory practice, subject to the exemptions in § 2-1401.03(b), for an educational institution:

(1) To deny, restrict, or to abridge or condition the use of, or access to, any of its facilities, services, programs, or benefits of any program or activity to any person otherwise qualified, wholly or partially, for a discriminatory reason, based upon the actual or perceived: race, color, religion, national origin, sex, age, marital status, personal appearance, sexual orientation, gender identity or expression, familial status, family responsibilities, political affiliation, source of income, or disability of any individual[.]

288.    That provision bars acts of intentional discrimination and acts that merely have the effect of burdening a protected class.

**A. Disparate Treatment**

289.    For all of the reasons stated in Count I, Mr. Doe's finding of responsibility and the sanction against him are the product of intentional gender discrimination and therefore violate his rights under the D.C. Human Rights Act.

290.    The disparate impact of the University's Title IX enforcement regime, as explained below, is additional evidence that the University engaged in intentional gender discrimination in finding Mr. Doe responsible and suspending him.

**B. Disparate Impact**

291.    Upon information and belief, the vast majority of respondents in the University's Title IX proceedings over the past three years, and all of those put through its formal hearing process during that time, have been male.

292.    All of the respondents put through the University's formal hearing process in academic years 2015-16 and 2016-17 were found responsible.

293.    Upon information and belief, all of the respondents in academic year 2017-18 whose cases have been concluded have also been found responsible.

294.    The University uses training designed specifically for the investigation and adjudication of claims of sexual misconduct and sexual assault for the purpose of training individuals to handle such claims. It does not employ that same training for the purpose of training individuals to handle claims of non-sexual misconduct.

295.    The University employs as a Title IX investigator someone who spent almost her entire professional career representing sexual assault claimants in court cases and university Title IX proceedings, who continues to serve as a legal fellow at one such organization, and who brings a bias in favor of complainants into every case she investigates.

296.    The process by which the University trains the individuals involved in sexual misconduct proceedings, conducts investigations of such claims, and adjudicates or otherwise resolve such claims has the effect of producing false findings of responsibility.

297.    The false findings of responsibility for claims of sexual misconduct exceed those for claims of non-sexual misconduct.

298.    Upon information and belief, the University does not convict 100% of its students accused of non-sexual misconduct or put through its formal hearing process on such claims.

299.    The University's Title IX enforcement regime has the effect of disproportionately burdening male students based upon their sex.

300.    No business necessity justifies the disparate impact of the University's Title IX enforcement regime upon male students.  A less discriminatory process, such as the regime the University uses to resolve claims of non-sexual misconduct, would suffice for claims of sexual misconduct as well.

301.    As a direct result of the University's violation of the D.C. Human Rights Act, and as a direct and proximate cause thereof, John Doe has been seriously and irreparably damaged in the following ways, among others: he has been falsely branded a rapist, which he will have to report to many future schools and future employers; endured extreme emotional and psychological suffering as a result of the University's one-sided treatment of the false sexual assault charges against him; lost the ability to graduate in the 2017-18 academic year, thereby delaying the time at which he can begin a career and shortening the length of that career; been forced to withdraw graduate school applications due to his lack of a diploma, thus delaying his matriculation there and forcing him to explain why that happened; and he will suffer a permanent reduction in lifetime earnings.

302.     Accordingly, the University is liable to Mr. Doe for violations of the D.C. Human Rights Act and for all damages arising out of that violation.

## COUNT III – BREACH OF CONTRACT

303.     Doe incorporates by reference all of the preceding paragraphs of this Complaint as though fully set forth herein.

304.     At all times relevant hereto, a contractual relationship existed between the University and John Doe.

305.     The University's Policy and Code, and its public explanations of the meaning of those Policy in places like its Title IX website, were a part of that contract.  Under that contract, the University was required to act in accordance with these publications in resolving complaints of misconduct, in the investigation of those complaints, in the process of adjudicating those complaints, and in resolving appeals.

306.     Inherent in the University's contract with Mr. Doe was an implied covenant of good faith and fair dealing.  That covenant required the University to execute the contract in a way that did not have the effect of destroying or injuring Mr. Doe's right to receive the fruits of the contract.

307.     The covenant required the University to implement the contractual provisions identified below in ways that were not arbitrary, capricious or without reasoned basis, that did not ignore evidence to the contrary, and that did not steer Mr. Doe's disciplinary proceeding to a predetermined conclusion.

308.     The University breached this contract with John Doe, and the covenant of good faith inherent in it, by failing to comply with the Policy in at least the following ways:

### A. Impairment by Incapacity

309.     The University failed to apply the Policy's requirement, as supplemented by statements on its Title IX website, that incapacity be present in order for alcohol intoxication to render sexual activity nonconsensual.  The University defines "incapacitate[ion] due to alcohol" as being "unable to give a verbal, enthusiastic, and consistent 'yes'" and as something that may be associated with "stumbling, slurring words, [and] not making sense."

310.     There was no credible evidence presented at Mr. Doe's hearing tending to show that Ms. Roe was incapacitated at the rugby party on the night of September 12, 2015, or that Mr. Doe had any way of knowing it.  Approximately 100 people were at the party, yet no one testified before or during the hearing that Ms. Roe slurred her words, stumbled, or otherwise appeared severely intoxicated there.  Q.W. said that he spoke to Ms. Roe at the party and had "a normal, lucid conversation" with her.  And the testimony of E.E. that she talked to Ms. Roe on the phone in the Uber has been contradicted by both her own and Ms. Roe's phone records, which show that the only person whom Ms. Roe even *might* have called was A.C.—who had indisputably left the party (and thus could not have been with E.E.) by the time the call was placed.  The only credible evidence tended to show that Ms. Roe was *intoxicated* to some degree, but not that she was *incapacitated*.

311.     The report submitted by Dr. Harry Milman, and then disregarded by the appeals panel, also established that Ms. Roe could not *possibly* have been as intoxicated as she claimed to be.  Dr. Milman found that someone who claimed to have as much to drink as Ms. Roe claimed would be unlikely to "have had any memory of the car ride to Mr. [Doe's] dorm room or any memory of anything that had occurred thereafter.  In addition, it is extremely unlikely that she could have dressed herself, run down eight flights of stairs, run one block to her home, and

was coherent enough to be able to explain to her roommate that she had allegedly been assaulted."

312.    It also bears repeating that Ms. Roe did not file her complaint until *more than two years* after that party.  The idea that anyone could remember exactly how much she had to drink, and indeed what *specifically* she had to drink, at a party held that long ago is simply risible.

313.    In finding Mr. Doe responsible for sexual assault, the University failed to apply the Policy requirement that required evidence of incapacity, not merely intoxication, to find sexual activity non-consensual, and thereby breached its contract with Mr. Doe.

**B. Application of the Preponderance Standard**

314.    The University also failed to apply the preponderance of the evidence standard in concluding that the evidence tending to show Ms. Roe was incapacitated, and that Mr. Doe should have known it, outweighed the evidence to the contrary.

315.    As explained immediately above, the hearing panel heard evidence tending to show only that Ms. Roe was intoxicated, not that she was incapacitated.  Likewise, it heard evidence showing that Mr. Doe, or a reasonable person in his shoes, could have known only that Ms. Roe was intoxicated, not that she was allegedly incapacitated, if in fact she had been.

316.    The University, through its hearing board and in its appeal process, heard a large amount of evidence that called Ms. Roe's credibility into question and therefore undermined her claims.  Among other things:

- Her testimony on points both large and small changed repeatedly during the course of her disciplinary proceeding.

- Ms. Roe claimed to have performed actions she could not have performed had she consumed as much alcohol as she says she did.

- Ms. Roe told an inherently implausible story about falling unconscious at the precise moment sexual activity commenced.

- Ms. Roe refused to call her roommate, A.C., as a witness.

- Ms. Roe's testimony that she went home and immediately told A.C. what happened was contradicted by 1) A.C.'s June 2018 statement, in which A.C. said that Ms. Roe came home, went straight to the bathroom, and didn't want A.C. to come in, and 2) by A.C.'s text message to Ms. Roe on October 30, 2017, that she didn't remember what happened when Ms. Roe came home.

- Ms. Roe's and E.E.'s phone records show that she and E.E. could not possibly have spoken on the phone from the Uber that night, given that the only call Ms. Roe might have made was to A.C.—who had already left the party and thus could not possibly have been with E.E., and who also told GW that she did not remember speaking by phone with either Ms. Roe or E.E. that night.

317.    The hearing on Ms. Roe's allegations also was biased against Mr. Doe.  The chair implicitly affirmed Ms. Roe's truthfulness before hearing any other witness testimony, then refused to let Mr. Doe challenge the potential bias of one of her witnesses, the only one to have claimed she seemed intoxicated at the party.

318.    In finding that Ms. Roe was incapacitated, and that John Doe should have known that, despite the fact that the evidence showed (1) only that she was intoxicated, (2) that Jane Roe simply was not credible, the hearing panel found John Doe responsible for sexual assault based on less than a preponderance of the evidence.  Its decision was arbitrary and capricious, was without reasoned basis, ignored contrary evidence, and was the product of the hearing board's pre-determined bias in favor of Ms. Roe.

**C. Challenging Board Members for Bias**

319.    The Code states that "[a]ny party may challenge a Board member on the grounds of personal bias before the hearing commences."

320.    The University violated the covenant by failing to provide Mr. Doe with a meaningful opportunity to challenge the members of his Ad Hoc Board based on personal bias.

321.     One of Mr. Does' board members, Ms. Witkowicki, has exhibited the kind of gender-biased thinking that, in conjunction with the other evidence of gender bias in GW's Title IX process, called her objectivity reasonably into question.

322.     Had Mr. Doe been given a meaningful opportunity to challenge her inclusion on his hearing board, he would have done so.

### D. Failure to Provide an "adequate, reliable, and impartial investigation"

323.     GW's 2017-18 sexual misconduct policy "assures all members of the university community that each complaint of sexual harassment will receive an adequate, reliable, and impartial investigation."  For all of the reasons explained in detail above, GW breached that promise.

324.     It failed, for example, to adequately investigate his case the first time around, by (among other things) asking Ms. Roe or E.E. for their phone records, trying to interview A.C., or asking Ms. Roe to specify exactly how much she had had to drink that night.

325.     It failed, for example, to render a reliable decision on his appeal, such as by implying that E.E. could have been present when Ms. Roe called A.C., even though the undisputed evidence from Ms. Roe and A.C. themselves show that A.C. had long since left the party and thus could not possibly have been with E.E. when the alleged call occurred.

326.     It failed, for example, to be impartial, when it tossed aside Q.W.'s statement that he had a "normal, lucid conversation" with Ms. Roe at the party, simply because the statement was not submitted until after the hearing, but did not apply that same passage-of-time credibility discount to testimony given by A.C. or E.E. until June of this year.

### E.  Denial of Mr. Doe's Second Appeal

327.     As held by this Court, for at least six years GW has misapplied the appellate procedures in its Code at the first stage of its legacy appellate process, requiring that appeals be based on newly *available* (rather than newly *presented*) evidence and that the evidence in those appeals do more than show that the appeal is merely viable.

328.     That same Code requires that, at the second stage of an appeal, a duly appointed appeals panel order a new hearing when qualifying evidence presented on appeal significantly altered the finding of fact.

329.     That Code, and the covenant of good faith and fair dealing inherent within it, also required that appeals panels consist of panelists capable of, and adequately trained to, review and decide sexual misconduct appeals according to the requirements articulated in the Code.

330.     As explained above, GW, in violation of the Code, did not adequately select or train the pool of panelists from which it selected Mr. Doe's appeals panel.

331.     Also as explained above, the evidence provided by Mr. Doe in his appeal unquestionably served to significantly alter the hearing panel's finding of fact.  The appeals panel's rationale for rejecting that evidence was frivolous and without basis and in violation of the Code.

332.     As further explained above, GW created appellate procedures for Ms. Roe not present in its Code, which procedures gave her the last word on Mr. Doe's appeal and allowed her to present to the appeals panel new and unsubstantiated accusations of harassment by Mr. Doe that he had no opportunity to address before the panel.

### F. Handling of Mr. Doe's Complaints against Ms. Roe

333.    GW's 2017-2018 sexual misconduct policy (the "Policy") promises students that "[a]llegations of retaliation" against people who, among other things, "provide[] information" or "participates in a sexual harassment investigation or proceeding… will be investigated and may result in disciplinary action, up to and including expulsion or termination."

334.    GW broke this promise when it dragged out its investigation of Mr. Doe's claim for almost five months and failed to hold Ms. Roe responsible for publishing his name on Facebook, which constituted clear retaliation for his efforts to clear his name at GW and through this litigation.

335.    The Policy also promises students that "[a] person who knowingly makes false complaints of sexual harassment, or who knowingly provides false information in a sexual harassment investigation or proceeding, will be subject to disciplinary action, up to and including expulsion or termination."

336.    GW broke this promise when it ignored what all of the phone records plainly showed and failed to hold Ms. Roe responsible for making provably false statements about her alleged phone call with E.E. on the night of the alleged incident.

337.    As a direct result of the University's breaches of its contract with Mr. Doe, and as a direct and proximate cause thereof, John Doe has been seriously and irreparably damaged in the following ways, among others: he has been falsely branded a rapist, which he will have to report to many future schools and future employers; endured extreme emotional and psychological suffering as a result of the University's one-sided treatment of the false sexual assault charges against him; lost the ability to graduate in the 2017-18 academic year, thereby delaying the time at which he can begin a career and shortening the length of that career; been

forced to withdraw graduate school applications due to his lack of a diploma, thus delaying his matriculation there and forcing him to explain why that happened; and he will suffer a permanent reduction in lifetime earnings.

338.    Accordingly, the University is liable to Mr. Doe for breach of contract and for all damages arising out of that violation.

## COUNT IV – BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING

339.    Plaintiff incorporates by reference all of the preceding paragraphs of this Complaint as though fully set forth herein.

340.    Inherent in the University's contract with Mr. Doe was an implied covenant of good faith and fair dealing.  That covenant required the University to execute the contract in a way that did not have the effect of destroying or injuring Mr. Doe's right to receive the fruits of the contract.

341.    The covenant required the University to implement the contract in ways that were not arbitrary, capricious or without reasoned basis, that did not ignore evidence to the contrary, and that did not steer Mr. Doe's disciplinary proceeding to a predetermined conclusion.

342.    For all of the reasons stated above, including by conducting an inadequate investigation of Ms. Roe's claims, failing to provide him with a meaningfully selected and trained appeals panel, concluding through that panel that the threshold for a new hearing had not been met, and failing to properly adjudicate his complaints against Ms. Roe, the University breached the covenant of good faith and fair dealing.

343.    As a direct result of the University's violation of the covenant of good faith and fair dealing, and as a direct and proximate cause thereof, John Doe has been seriously and irreparably damaged in the following ways, among others: he has been falsely branded a rapist,

which he will have to report to many future schools and future employers; endured extreme emotional and psychological suffering as a result of the University's one-sided treatment of the false sexual assault charges against him; lost the ability to graduate in the 2017-18 academic year, thereby delaying the time at which he can begin a career and shortening the length of that career; been forced to withdraw graduate school applications due to his lack of a diploma, thus delaying his matriculation there and forcing him to explain why that happened; and he will suffer a permanent reduction in lifetime earnings.

344.    Accordingly, the University is liable to Mr. Doe for violation of the covenant of good faith and fair dealing and for all damages arising out of that violation.

## COUNT V - NEGLIGENCE

345.    Plaintiff incorporates by reference all of the preceding paragraphs of this Complaint as though fully set forth herein.

346.    In conducting its investigation and adjudication of Ms. Roe's complaint against John Doe, the University owed a common law duty to Mr. Doe to exercise reasonable care, with due regard for the truth, an evenhanded application of procedure, and the important and irreversible consequences of its actions, as well as Mr. Doe's various liberty and property rights and interests generally.

347.    Through the acts set forth above, the University, acting through its agents, servants and/or employees, breached that duty by carelessly, improperly, and negligently performing its assigned duties and facilitating a process that violated the rights and interests of Mr. Doe.

348.    In particular, the University has negligently trained and supervised the individuals it employs to investigate claims of sexual misconduct, adjudicate those claims, or otherwise implement the Policy and the Code.

349.    Upon information and belief, those individuals are trained (1) to implement the goal of combating "rape culture," a chief element of which is to express any doubt about the veracity of sexual assault claimants; (2) to believe that only 2-8% of campus sexual assault claimants, or some similar number, make false accusations, even though that statistic was derived in the criminal context, where deterrents against false reports are far greater; and (3) to otherwise credit the testimony of sexual assault claimants unless there is clear and convincing evidence, or something akin to that, of its falsity, in contravention of the requirement that all facts be determined by a preponderance of the evidence.

350.    The University furthermore employs as its Title IX investigator an individual who spent almost her entire professional career representing sexual assault claimants in court cases and university Title IX proceedings, who continues to serve as a legal fellow at one such organization, and who brings a bias in favor of complainants into every case she investigates.

351.    The University also negligently trained the members of Mr. Doe's hearing panel in the Policy's definitions of "consent" and "incapacitation," in applying the preponderance of the evidence standard, and in the need to allow parties to challenge potential witness bias.

352.    Further evidence of the University's negligent selection and training of its panel members is evident from what happened with the two students who were initially tapped to serve on Mr. Doe's appeal panel.  One of the students was an outspoken member of a pro-victims' group that literally sold t-shirts saying "Believe survivors," while the other conducted outside research on the case and wondered aloud if he needed to act in a way that would preserve GW's

reputation. A non-negligent school would have disqualified the former student on bias grounds and implemented a training program effective enough to assuage the latter student's concerns.

353. The University was also negligent in its investigation and adjudication of Mr. Doe's complaints against Ms. Roe for retaliation and submitting false evidence, for the reasons outlined in Paragraphs 248-267, 282-283, and 333-336 above.

354. As a direct result of the University's negligence, and as a direct and proximate cause thereof, John Doe has been seriously and irreparably damaged in the following ways, among others: he has been falsely branded a rapist, which he will have to report to many future schools and future employers; endured extreme emotional and psychological suffering as a result of the University's one-sided treatment of the false sexual assault charges against him; lost the ability to graduate in the 2017-18 academic year, thereby delaying the time at which he can begin a career and shortening the length of that career; been forced to withdraw graduate school applications due to his lack of a diploma, thus delaying his matriculation there and forcing him to explain why that happened; and he will suffer a permanent reduction in lifetime earnings.

355. Accordingly, the University is liable to John Doe for negligence and for all damages arising out of that violation.

## **PRAYER FOR RELIEF**

Wherefore, Plaintiff respectfully prays that this Court enter judgment on behalf of Plaintiff and against the University, and order relief against Defendant as follows:

a. That this Court issue preliminary and permanent injunctive relief, restraining The University from (1) reflecting, in any manner whatsoever, in Doe's records or elsewhere, the findings or sanctions imposed upon John Doe based on its adjudication of Ms. Roe's complaint; and (2) maintaining any records related to that sanction, as it was the product of the University's

erroneous finding that he violated the Policy, which was itself the product of a flawed disciplinary process; and

b.      That the University be ordered to pay compensatory damages as appropriate to compensate John Doe for his losses caused by the its misconduct; and

c.      That the University be ordered to pay punitive damages; and

d.      That this Court award John Doe his costs and expenses incurred in this action, as well as such other and further relief as the Court deems just and proper.


Respectfully submitted,


DATED:  September 28, 2018                    _____/s/_Justin Dillon_____
                                             Justin Dillon (D.C. Bar No. 502322)
                                             Christopher C. Muha (D.C. Bar No. 987116)
                                             KAISERDILLON PLLC
                                             1401 K Street NW, Suite 600
                                             Washington, DC 20005
                                             T: (202) 640-2850
                                             F: (202) 280-1034
                                             jdillon@kaiserdillon.com
                                             cmuha@kaiserdillon.com

                                             *Attorneys for Plaintiff John Doe*

## CERTIFICATE OF SERVICE

I hereby certify that on this 28th day of September, 2018, a copy of the foregoing

Amended Complaint was served upon counsel of record by the Court's electronic filing system,

and further that it was served by email to the following counsel for The George Washington

University:

| | |
|---|---|
| Joshua W. B. Richards | Jason A. Ross |
| Saul Ewing Arnstein & Lehr LLP | Saul Ewing Arnstein & Lehr LLP |
| Centre Square West | 1919 Pennsylvania Avenue, NW |
| 1500 Market Street, 38th Floor | Suite 550 |
| Philadelphia, PA 19102 | Washington, DC 20006 |
| Joshua.Richards@saul.com | Jason.Ross@saul.com |
| Admitted *pro hac vice* | |

/s/ Justin Dillon