## IN THE UNITED STATES DISTRICT COURT FOR THE
## DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **JOHN DOE**, | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | Civil Action No.  1:18-cv-553-RMC |
| **v.** | ) | |
| | ) | |
| **THE GEORGE WASHINGTON** | ) | |
| **UNIVERSITY,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| _____ | ) | |

## JOHN DOE'S OPPOSITION TO GEORGE WASHINGTON UNIVERSITY'S
## MOTION TO DISMISS AMENDED COMPLAINT

Justin Dillon (D.C. Bar No. 502322)
Christopher C. Muha (D.C. Bar No. 987116)
KAISERDILLON PLLC
1401 K Street NW, Suite 600
Washington, DC 20005
T: (202) 640-2850
F: (202) 280-1034
jdillon@kaiserdillon.com
cmuha@kaiserdillon.com

DATED:  November 2, 2018

*Attorneys for Plaintiff John Doe*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................... ii

INTRODUCTION .............................................................................................................. 1

FACTUAL ALLEGATIONS................................................................................................ 3

LEGAL STANDARD ........................................................................................................ 12

ARGUMENT .................................................................................................................. 13

I.  GW Repeatedly Breached Its Contract With Mr. Doe .......................................... 13

   A.  GW Has Not Moved to Dismiss Two of Mr. Doe's Breach of Contract Claims. ............. 14

   B.  The Hearing Panel Arbitrarily and Without Rational Basis Concluded That a Preponderance of Evidence Showed That Ms. Roe Was Incapacitated and Mr. Doe Should Have Known That. ............................................................................ 16

   C.  Biased Hearing Panels Do Not Comply With the Contract............................................. 19

   D.  Mr. Doe's Appeal Panel Handed Down a Patently Ridiculous Rationale and is Plausibly Alleged to Have Been Biased Against Him. .................................................... 20

II.  The Amended Complaint Overwhelmingly States a Title IX Claim. .................................... 23

III. Mr. Doe Plainly States Claims of Both Disparate Treatment and Disparate Impact Under the D.C. Human Rights Act.. ...................................................................... 33

IV.  GW's Administration of a Nakedly Biased Disciplinary Regime Constitutes Negligence... 41

CONCLUSION ............................................................................................................... 45

# TABLE OF AUTHORITIES

## <u>Cases</u>

*Alden v. Georgetown Univ.*, 734 A.2d 1103 (D.C. 1999)...........................................................17

*Allworth v. Howard Univ.*, 890 A.2d 194 (D.C. 2006)................................................................14

*Anderson v. Zubieta*, 180 F.3d 329 (D.C. Cir 1999) .............................................................39-40

*Arista Records LLC v. Doe 3,* 604 F.3d 110 (2d Cir.2010) ........................................................36

*Ashcroft v. Iqbal,* 556 U.S. 662 (2009)......................................................................................13

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ..........................................................13, 26, 32

*Ceco Corp. v. Coleman,* 441 A.2d 940, 944 (D.C. 1982).........................................................45

*Chenari v. George Washington Univ.,* 847 F.3d 740 (D.C. Cir. 2017).......................................14

*Choharis v. State Farm Fire & Cas. Co.,* 961 A.2d 1080 (D.C. 2008)................................. 43, 44

*Collick v. William Patterson Univ.*, 2016 WL 6824374 (D.N.J. Nov. 17, 2016) ................. 24, 31

*Davis v. District of Columbia,* 949 F. Supp. 2d 1 (D.D.C. 2013) ...............................................34

*Demery v. Montgomery C'nty, Md.,* 602 F. Supp. 2d 206 (D.D.C. 2009)............................. 16, 45

*District of Columbia v. Shannon,* 696 A.2d 1359 (D.C.1997)....................................................42

*Doe v. Amherst College,* 238 F. Supp. 3d 195 (D. Mass. 2017) ...............................24, 28, 31, 33

*\*Doe v. Baum,* 903 F.3d 575 (6th Cir. 2018)............................... 26, 27, 29, 30, 31, 33

*Doe v. Brown Univ.,* 166 F. Supp. 3d 177 (D.R.I. 2016)...........................................................26

*Doe v. Case Western Reserve Univ.*, No. 1:17-cv-414,
     2017 WL 3840418 (N.D. Ohio Sept. 1, 2017) .....................................................24, 29, 43

*\*Doe v. Columbia Univ.,* 831 F.3d 46 (2d Cir. 2016) ...............................................25, 27, 30, 31

*Doe v. Colorado,* 255 F. Supp. 3d 1064 (D. Colo. 2017 ...........................................................32

*Doe v. Cummins,* 662 Fed. App'x 437 (6th Cir. 2016)..............................................26, 27, 28, 32

*Doe v. Lynn Univ.,* 224 F. Supp. 3d 1288 (S.D. Fla. 2016) ...................................................... 32

*Doe v. Lynn Univ., Inc.,* 235 F. Supp. 3d 1336 (S.D. Fla. 2017) ....................................24, 28, 31

*Doe v. Marymount Univ.,* 297 F. Supp. 3d 573 (E.D. Va. 2018).............................. 24, 29-30

*\*Doe v. Miami Univ.,* 882 F.3d 579 (6th Cir. 2018) ......................................................... passim

*Doe v. Ohio State Univ.,* 239 F. Supp. 3d 1048 (S.D. Ohio 2017)............................24, 28, 31,33

*Doe v. Purdue Univ.,* 281 F. Supp. 3d 754 (N.D. Ind. 2017) ...................................... 32

*Doe v. St. Thomas Univ.,* 240 F. Supp. 3d 984 (D. Minn. 2017) ......................................... 32, 43

*Doe v. The Trustees of the University of Pennsylvania,*
No. 2:16-cv-05088-JP, 2017 WL 4049033 (E.D. Pa. Sept. 13, 2017) ............................24, 28, 31

*Doe v. Univ. of Cincinnati,* No. 16-987, 2018 WL 1521631 (S.D. Ohio Mar. 28, 2018) ........... 33

*Doe v. Univ. of Mississippi,* 2018 WL 3570229 (S.D. Miss. July 24, 2018).............................. 24

*Doe v. Univ. of Notre Dame,* No. 3:17-cv-298,
2017 WL 1836939 (N.D. Ind. May 8, 2017) ...................................................... 15, 18

*Doe v. Univ. of the South,* No. 4:09-cv-62, 2011,
WL 1258104 at \*21 (E.D. Tenn. March 31, 2011) ...................................................... 43

*Doe v. Washington & Lee Univ.,* No. 6:14-CV-00052,
2015 WL 4647996 (W.D. Va. Aug. 5, 2015)...................................................... 30

*Doherty v. S. Coll. of Optometry*, 862 F.2d 570 (6th Cir. 1988)................................................. 14

*EDCare Mgmt., Inc. v. DeLisi*, 50 A.3d 448 (D.C. 2012) ...................................................... 44

*Estenos v. PAHO/WHO Federal Credit Union*, 952 A.2d 878 (D.C. 2008) ........................ 35, 36

*Evangelou v. D.C.*, 901 F. Supp. 2d 159 (D.D.C. 2012) ............................................................ 36

*Gay Rights Coal. of Georgetown Univ. Law Ctr. v. Georgetown Univ.,*
536 A.2d 1 (D.C. 1987) ...................................................................................... 34, 35

*George Washington Univ. v. D.C. Bd. of Zoning Adjustment,*
831 A.2d 921 (D.C. 2003).................................................................................. 35

*Gischel v. Univ. of Cincinnati*, No. 1:17-cv-475,
2018 WL 705886 (S.D. Oh. February 5, 2018)...................................................... 24

*Grant v. U.S. Air Force*, 197 F.3d 539 (D.C. Cir. 1999) ..................................................... 16, 45

*Griggs v. Duke Power Co.*, 401 U.S. 424 (1971) ....................................................... 35

*Hajjar-Nejad v. George Washington Univ.,* 37 F. Supp. 3d 90 (D.D.C. 2014).................... 13, 14

*Haynesworth v. D.H. Stevens Co.*, 645 A.2d 1095 (D.C.1994) ................................................ 42

*Hedgepeth v. Whitman Walker Clinic,* 22 A.3d 789 (D.C. 2011) ............................................... 42

*King v. DePauw Univ.*, No. 2:14-cv-70,
2014 WL 419750 (S.D. Ind. Aug. 22, 2014) ............................................................... 18

*\*Kumar v. George Washington Univ.,*
174 F. Supp. 3d 172 (D.D.C. 2016)..............................................................2, 13, 14, 17, 21

*Mahavongsanan v. Hall,*
529 F.2d 448 (5th Cir. 1976)................................................................................ 14

*Mitchell v. DCX, Inc.,*
274 F. Supp. 3d 33 (D.D.C. 2003)...................................................................... 5, 37

*Natural Motion by Sandra v. D.C. Comm'n on Human Rights,*
687 A.2d 215 (D.C. 1997)............................................................................... 35-36

*Neal v. Colorado State Univ. Pueblo,* No. 1:16-cv-873,
2017 WL 633045 (D. Colo. Feb. 16, 2017) ......................................................... 24, 31

*Papelino v. Albany Coll. of Pharmacy of Union Univ.*, 633 F.3d 81 (2d Cir. 2011) ................. 43

*Paul v. Howard Univ.*, 754 A.2d 297 (D.C. 2000)....................................................... 13

*\*Paulin v. George Washington School of Medicine and Health Sciences,*
878 F. Supp. 2d 241 (D.D.C. 2012)......................................................... 13, 14, 16, 21

*Rollins v. Cardinal Strich Univ.*, 626 N.W.2d 464 (Minn. Ct. App. 1981)............................. 43

*Ruff v. Bd. of Regents of Univ. of New Mexico,*
272 F. Supp. 3d 1289 (D.N.M. 2017).................................................................... 32

*Schaumleffel v. Muskingum Univ.*, No. 2:17-cv-463,
2018 WL 1173043 (S.D. Ohio March 6, 2018) ....................................................... 24

*Smith v. Henderson*, 982 F. Supp. 2d 32 (D.D.C. 2013) ....................................................... 34

*Spar v. Obwoya*, 369 A.2d 173 (D.C. 1977) .............................................................. 45

*Starishevsky v. Hofstra Univ.*, 612 N.Y.S.2d 794 (Sup. Ct. 1994) ........................................ 42-43

*Tsuruta v. Augustana Univ.*, No. 4:16-cv-4107,
Docket No. 13 (D.S.D. June 16, 2016) .............................................................. 43, 44

*U.S. v. Wynn*, 20 F. Supp. 2d 7 (D.C. Cir. 1997) ........................................................ 39

*Wells v. Xavier,* 7 F. Supp. 3d 746 (S.D. Oh. 2014) ...................................................... 27, 31

*Wright v. Howard Univ.*, 60 A.3d 749 (D.C. 2013) .................................................... 14

*Yusuf v. Vassar College*, 35 F.3d 709 (2d Cir. 1994) ........................................................ 25, 26

*Zaidan v Trump*, 317 F. Supp. 3d 8 (D.D.C. 2018) ...................................................... 23, 24

*Zuccaro v. Martinez Unified Sch. Dist.*, No. 16-02709,
2016 WL 10807692 (N.D. Cal. Sept. 27, 2016) ........................................................ 37

**INTRODUCTION**

Every time Mr. Doe gets new evidence in this case, his innocence becomes even clearer, and GW's decision to defend its flawed decision becomes even more bizarre.  In March, it was E.E.'s phone records, which showed that she and Ms. Roe lied when they testified that they had spoken on the phone that night.  In May, it was Ms. Roe's own phone records, which—in addition to showing, again, that she and E.E. never spoke on the phone—proved that Ms. Roe was coherent enough to make three calls during the time she claimed to be incapacitated, none of them to E.E.  And then, just in time for his second appeal in August, it was the last piece of that puzzle—evidence from A.C., the person Ms. Roe *did* call that night, who confirmed (1) that she was at home, not at the party with E.E., when Ms. Roe called her, (2) that she remembers nothing about their call, proving it wasn't memorable, and (3) that, contrary to what Ms. Roe told the investigators and said at the hearing, Ms. Roe did not tell A.C. that night that Ms. Doe had sexually assaulted her.

This discovery-before-discovery has proven consistently bad for the disciplinary proceeding GW keeps striving to defend.  The Court's legal rulings—in particular, its conclusion that GW has consistently misapplied its own appellate procedures for more than six years—have not been any better for GW.

So GW has decided to throw a few Hail Marys.  It tries to convince the Court that it already sort of ruled against Mr. Doe's contract claims—even though the Court expressly said it was refusing to do so *"because the parties have yet to engage in discovery."*  ECF No. 25 at 8 (emphasis added).  It ignores the only three published federal appellate opinions on the gender bias prong of an "erroneous outcome" Title IX claim.  And it tries to dispose of Mr. Doe's state-

1

law disparate-impact claim by asserting that he alleges *facial* discrimination based on sex, which he doesn't.

Perhaps least surprisingly, it puts on repeat the mantra that Mr. Doe just wants a do-over; that he's merely upset at the outcome; and that he simply "is asking the Court to 'second-guess' the conclusion of the university's [sexual] misconduct investigation," *Kumar v. George Washington Univ.*, 174 F. Supp. 3d 172, 188 (D.D.C. 2016). That is a common refrain that courts recognize as such. "Deference to the university's judgment," another court in this District has previously informed GW, "does not require the Court to dismiss [an] otherwise valid complaint prior to discovery." *Id.* That is particularly true here, where its track record of "judgment" consists in (1) failing to collect the most probative documentary and testimonial evidence before the hearing, and then (2) misapplying its own appellate procedures, as it had been doing for more than six years.

Mr. Doe does not seek a do-over. He has seen how pointless those are at GW, which perhaps is the message GW wanted to send all along. What he seeks is a chance to vindicate himself in this Court, with the full array of evidence to which he is entitled. Every time Mr. Doe has received discovery, his case—and thus the plausibility of the claims he alleges—has become stronger. He thus asks this Court to deny GW's motion to dismiss and permit him to proceed to full discovery in this case, which he is confident will lead to his full and complete vindication.

**FACTUAL ALLEGATIONS**

The parties have extensively briefed most of the factual allegations in this matter.  *See* ECF No. 6-1 (Memorandum in Support of John Doe's Motion for a Preliminary Injunction) at 2-17; ECF No. 27-1 (Memorandum in Support of John Doe's Motion for Partial Summary Judgment) 3-18.  John Doe briefly recounts here those facts of which the Court has already been made aware and elaborates in more detail upon those facts that are new to the Amended Complaint.

A.      **Title IX Enforcement at GW**

The University's Sexual Harassment and Sexual Violence Policy (the "Policy") and its Code of Student Conduct (the "Code") prohibit certain conduct, including sexual assault, which the Policy defines as sexual activity committed "without consent or against another's will."  ECF No. 3-1 at 3.  The Code reiterates that "[t]he lack of verbal or physical resistance or participation in any act due to coercion, intimidation or incapacity does not by itself constitute consent."  ECF No. 3-2 at 2.  Neither source elaborates on what it means to be incapacitated due to alcohol, but the website of the University's Title IX Coordinator, whom the Policy obligates to "oversee dissemination of this policy and these procedures to the university community," ECF No. 3-1 at 11, defines it as being "unable to give a verbal, enthusiastic, and consistent 'yes'" to sexual activity."  Am. Comp. ¶ 26.  It then identifies outward markers of likely incapacitation: "If the person you are with is impaired in a way you can or should be able to recognize (stumbling, slurring words, not making sense), you must assume they are too impaired to give consent." *Id.*

Claims of sexual misconduct are investigated and adjudicated by a separate apparatus than claims for other forms of student misconduct at the University.  The Title IX office employs a full-time investigator, Kiera Bloore, to investigate alleged violations of the Policy.  Notably,

while the training designed for the adjudication of claims of *non-sexual* misconduct "address[es] [the] roles and responsibilities of panel members, hearing procedures, applicable policies, and other techniques and standards pertinent to the formal complaint and hearing process," *id.* ¶ 9, the "annual training" provided "to university personnel responsible for the administration of" the Policy concerns "how to conduct investigations and hearings in a manner *that protects the safety of victims and promotes accountability*," *id.* ¶ 10.

The Title IX office also offers training to GW students.  Among the topics available to them is a session about "how male students can prevent sexual violence."  *Id.* ¶ 62.  The office's webpage also refers students to the work of Laci Green, "a sex educator and internet personality," for "information about consent."  *Id.* ¶ 64.  Ms. Green teaches that "distrust of rape survivors" is fueled by a deeply engrained "distrust of women."[1]  She explains in another that "[o]ne of the sneakiest and I think most pervasive reasons why people don't believe survivors is that most survivors are women."[2]  "Sexual assault accounts," she says, "are nearly always true."[3]

The language of the Policy, and its implementation, are the product of years' worth of pressure upon the University to appear tough at all costs on sexual assault claims brought by women against men, including the kind brought by Ms. Roe against Mr. Doe.  GW was among the first schools in the country to come under scrutiny in 2011 by the Education Department's Office for Civil Rights for its mishandling of sexual misconduct claims, *see* Am. Compl. ¶ 14, and it came under that same scrutiny again in August 2017, just two months before Ms. Roe filed her complaint, *id.* ¶¶ 14-15.  The University also was in the midst of discovery in a heavily

---

[1] *See* https://www.youtube.com/watch?time_continue=1&v=wMZyljber8I at 2:22-2:26 ("So our distrust of women is deeply engrained, and I think that it fuels distrust of rape survivors.").

[2] *Id.* at 3:00-3:21.

[3] *Id.* at 3:44-3:48.

publicized lawsuit brought by a former female student alleging the mishandling of her claims. *See Prasad v. The George Washington Univ.*, No. 1:15-cv-1779 (D.D.C. Oct. 21, 2015).

Most critically of all, GW for months had been dealing with the massive public fallout stemming from the actions of Aniqa Raihan, who had claimed that a member of the rugby team who was about to graduate had assaulted her more than two years earlier, during her freshman year—exactly as Ms. Roe would claim in October. Am. Compl. ¶ 15. In response to Ms. Raihan's Change.org petition demanding mandatory minimum suspensions punishments for those convicted of sexual assault, GW granted Ms. Raihan a special sit-down with a high-level university administrator, *id.*, and issued a statement rebutting "[t]he narrative emerging from the petition . . . that GW has been reluctant or even unwilling to hold individuals accountable for acts of sexual violence" by **expressly touting the fact that 100% of the students put through its formal sexual misconduct hearing process in the past two academic years had found responsible, and nine of those ten were suspended or expelled**. *Id.* Then in July, after national and local media had covered Ms. Raihan's unfurling of a large banner at commencement reading, "#GWProtectsRapists," *see, id.* ¶ 55, the University responded by hiring as its full-time Title IX Investigator someone who had spent her career representing crime victims and student-survivors in courts and Title IX administrative hearings, *id.* ¶ 57. Yet advocacy on behalf of Ms. Raihan continued through October 20, when GW students "speaking on [her] behalf" at an event outside of the Education Department claimed that GW "fail[ed] survivors time and time again." *Id.* ¶ 60.

## B.    The Investigation

Just ten days after that very public protest, Ms. Roe filed a complaint that bore a curious resemblance to Ms. Raihan's. She claimed that she after pregaming in a dorm room, she met Mr.

Doe at a rugby party, went home with him while incapacitated, and was woke up to being sexually assaulted by him on his bed.  Ms. Roe testified that her roommate, A.C., left the party early.  As the Amended Complaint recounts in great detail, the story Ms. Roe would tell in three written submissions, and then in December at her hearing, would continue to change and contradict itself at every turn.  *See id.* ¶¶ 8, 122, 129, 143, 149, 272, 309, 316.  Critically, Ms. Roe produced Uber records showing that she ordered an Uber at 11:56 p.m. that night, arrived at Mr. Doe's dorm at 12:21 a.m., and that the ride took 16 minutes and 31 seconds, meaning that they left the rugby party between 12:04:29 (if the Uber dropped them at the dorm at *exactly* 12:21:00) and 12:05:28 (if it dropped them at the dorm at 12:21:59).  *Id.* ¶ 110.

By November 19, five people had submitted witness statements for the investigation. **Three of those witnesses testified to having seen Ms. Roe at the rugby party that night, but not one of them testified that she even looked *intoxicated*, let alone *incapacitated*.**  *Id.* ¶ 97. One of them remembered seeing her cross the street to leave, *id.*, an act that would have made any severe intoxication apparent, yet he did not say that she stumbled or had trouble doing so. Then on November 20, the investigation acquired one more witness statement, from E.E., a friend of Ms. Roe's and a former student at GW.  *Id.* ¶ 99.  E.E. dramatically stated that after losing track of Ms. Roe at the rugby party, she and some friends "called [Ms. Roe] and she said she was in an Uber with the suspected assailant but she was slurring her worlds [sic] and speaking incoherently. . . .  *We all* went to go look for her[.]"  *Id.*

On November 20, before seeing any of the evidence besides Ms. Roe's statements, Mr. Doe submitted a statement denying that he sexually assaulted Ms. Roe.  *Id.* ¶ 128.  At no point, he said, did Ms. Roe slur her words or stumble, and she was entirely coherent.  *Id.*  He described in great detail how Ms. Roe initiated and directed most of their sexual intercourse.  *Id.* ¶¶ 73-75.

It was his first time having sex. *Id.* ¶ 6. When they were done Ms. Roe asked him to have sex again but Mr. Doe declined. He offered to let Ms. Roe sleep there, but she left. *Id.* ¶ 76.

### C.     The Hearing

The hearing occurred on December 14. *Id.* ¶ 132. Only one witness testified that Ms. Roe even appeared intoxicated during the party, but he refused to say to what degree. *Id.* ¶ 146. No one testified to seeing any signs of incapacitation from Ms. Roe during the party. Ms. Roe testified, for the first time at the hearing, that she remembered being on the phone, as E.E. had written. E.E. also testified about the call, but said twice that Ms. Roe had called her, not that she—and her friends—had called Ms. Roe. *Id.* ¶ 149. She also testified that A.C. went to look for Ms. Roe after the call. *Id.* ¶ 150. Neither Ms. Roe nor E.E. ever explained how Ms. Roe could have gotten out her phone and called E.E. if she were as incapacitated as she had described.

### D.     The Decision

On January 23, 2018, GW informed Mr. Doe that the Hearing Board had found him responsible for sexually assaulting Ms. Roe and that he would be suspended for one year. *Id.* ¶ 167. The Board refused to credit much of Ms. Roe's testimony, including her most explosive allegation—that Mr. Doe had forcibly assaulted her as she physically resisted. It nevertheless concluded that Ms. Roe had been incapacitated that night and that Mr. Doe should have known that, for two reasons: (1) witnesses had observed Ms. Roe "stumbling and slurring her words," and (2) Ms. Roe was not talkative in the car, something that was only known because Mr. Doe testified to it. *Id.* ¶¶ 168-69. The only witness to testify that Ms. Roe showed any signs of incapacitation at the party was E.E., who said she did so on the phone in Mr. Doe's presence. *Id.* ¶ 170.

7

### E.        The First Appeal

Mr. Doe appealed the hearing board's finding on January 30. *Id.* ¶ 173. Appeals succeed if based on new information not presented at the hearing that significantly alters the finding of fact. They proceed through a two-step process. First, the University's Executive Director of Planning & Outreach makes a determination of "viability." ECF No. 3-2 at 8. Then the appeal is forwarded to three members of the Committee on the Judicial System who "review and decide the appeal" on its merits. *Id.* Mr. Doe's appeal was rejected as not viable. Am. Compl. ¶ 179.

### F.        Preliminary Injunction and Summary Judgment

Mr. Doe filed this lawsuit on March 8, 2018, and on March 13 he moved to preliminarily enjoin GW from enforcing his suspension pending resolution of his lawsuit. *See* ECF No. 6. While that motion was pending, the Court granted Mr. Doe leave to serve a subpoena on AT&T for E.E.'s phone records from the night of September 12-13, 2015. *See* ECF No. 9. Mr. Doe obtained those records on March 26. **They showed that E.E. had neither called nor received a call from Ms. Roe between 11:00 p.m. and 1:30 a.m. that night.**

On April 25, this Court denied Mr. Doe's preliminary injunction motion. ECF No. 25. The Court concluded that Mr. Doe had not established irreparable harm. *Id.* at 15. The Court held, however, that he was likely to succeed on that portion of his contract claim alleging that his appeal was wrongly rejected. *Id.* at 11. The Court expressly "d[id] not rule" on Mr. Doe's argument that the hearing panel's rationale was "so unreasonable" as to breach the contract, precisely "because the parties have yet to engage in discovery." *Id.* at 8. And it agreed that Mr. Doe had plausibly alleged facts that "may forestall dismissal" of his Title IX claim. *Id.* at 12.

After the motion was denied, the parties proposed, and the Court so ordered, that Mr. Doe would file a motion for partial summary judgment on that portion of his contract claim

concerning rejection of his appeal, and that the remainder of the case would be stayed pending resolution of that motion. *See* Minute Order (May 2, 2018). The parties spent 63 pages of briefing parsing the meaning and application of the four articles in GW's Code governing appeals.

### G.   Roe's Records and A.C.'s Testimony

During that briefing, GW produced to Mr. Doe Ms. Roe's phone records from the night of the party. GW had obtained them *simply by asking Ms. Roe to produce them*, as part of its investigation into a retaliation complaint Mr. Doe had filed against Ms. Roe. The records confirmed that no call with E.E. had occurred and provided substantial additional evidence showing that Ms. Roe was not incapacitated.

The records showed that Ms. Roe was coherent enough to place *three* outgoing calls between the time she ordered the Uber (11:56 p.m.) and the time she arrived at Mr. Doe's dorm (12:21 a.m.). Am Compl. ¶ 115. The first was to her roommate, A.C., at 11:57 p.m., 7-8 minutes before she got in the Uber. *Id.* It was a two-minute call, betraying any notion that Ms. Roe was too intoxicated to speak coherently. *Id.* The second call was placed at 12:03 a.m., 1-2 minutes before they got in the Uber, to a non-fixed VoIP (Voice over Internet Protocol) number commonly used by ride-sharing services, almost surely a call to the Uber driver. *Id.* ¶t 116. The third call (the only one placed from the Uber) was again to A.C., and it is recorded as lasting one minute. *Id.* ¶ 117. Because Verizon logs unanswered outgoing calls as one-minute calls, it is impossible to tell from the phone records whether anyone answered that call. *Id.* ¶¶ 118-19.

### H.   The Second Appeal

On August 14, this Court granted Mr. Doe's motion for partial summary judgment. *See* ECF No. 41. It concluded that for at least six years, GW had been misapplying its own appellate

procedures.  *Id.* at 1.  It ordered GW to consider the merits of Mr. Doe's appeal at the second

level of its process and furthermore ordered that the phone records of E.E. and Ms. Roe were

evidence that Mr. Doe could submit as part of his appeal.  *Id.* at 17.  Mr. Doe submitted his

revised appeal on August 28, which contained all of his original arguments as well as new

arguments based on Ms. Roe's and E.E.'s respective phone records.  Am. Compl. ¶ 186.

On August 29, GW gave Mr. Doe access to materials it had collected in its investigation

of his retaliation complaint against Ms. Roe.  *Id.* ¶ 187.  It included testimony and text messages

from A.C., confirming that A.C. would have given this information testified in Ms. Roe's

proceeding if she had simply been asked.

A.C.'s evidence was absolutely damning to Ms. Roe's credibility.  A.C. told Ms. Roe on

October 30, 2017, via text, that she did not remember what happened when Ms. Roe came home

the night of the party, *id.* ¶ 244, betraying any idea that Ms. Roe had disclosed a horrific sexual

assault to her that night as Ms. Roe had claimed at the hearing.  A.C. also said that she didn't

even remember a call with Ms. Roe that night, confirming that Ms. Roe was not in a memorably

drunken state.  *Id.* ¶ 242.  And A.C. told GW's investigator in June 2018 that she "was asleep by

the time [Ms. Roe] arrived home" and that Ms. Roe "didn't want me to enter" the bathroom, *id.* ¶

126, contradicting Ms. Roe's testimony that she disclosed the assault to A.C. in the bathroom

after she got home.  A.C.'s testimony further confirmed that she was home when Ms. Roe would

have called her from the party, *see, e.g.*, *id.,* meaning that she could not have been with E.E. or

helped look for Ms. Roe after the alleged Uber call, as E.E. had said.  On August 30, Mr. Doe

filed a supplement to his second appeal focused on this newly provided evidence.  *Id.* ¶ 189.

Although the Code provides non-appealing parties with no right to respond to appeals,

GW let Ms. Roe do just that, giving her the last word on Mr. Doe's appeal. *Id.* ¶ 189.  Ms. Roe

responded to Mr. Doe's second appeal on September 4 and to his supplement to it on September 5. *Id.* ¶¶ 190-191.   Ms. Roe used the response as an opportunity to submit entirely new, and completely unsubstantiated, allegations of online harassment against Mr. Doe, which he was not permitted to rebut to the panel. *Id.* ¶ 192.  Mr. Doe's objections were ignored. *Id.* ¶ 197.

After Mr. Doe was told the pool of individuals from which his appeals panel would be drawn, he quickly learned that one of the pool members **held a high-ranking position in an organization that is dedicated to "dismantl[ing] rape culture," that touts its "belie[f] in survivors," and that even sells clothing that says "Believe Survivors."** *Id.* ¶ 199.  Upon information and belief, GW was aware of these things prior to putting her in the pool.  *Id.* ¶ 200. Though she was removed from the pool, Mr. Doe would later learn that one of the panelists actually selected to hear his appeal violated an express direction "not to do outside research for these cases" and asked to learn how their decision could affect "any current or future standing of the University in court against the respondent." *Id.* ¶¶ 206-07. Consistent with those failures GW's president, Thomas LeBlanc, would exhort GW's faculty to vote to adopt a new Sexual Misconduct Policy precisely because they currently had "no decent appeal rights to an outside entity who's actually trained in this." *Id.* ¶ 210.

GW denied Mr. Doe's second appeal on September 18. *Id.* ¶ 213.  Its rationale, squeezed into a one and a half page letter, was ridiculous on its face. *Id.* ¶ 215.  Ms. Roe and E.E. had testified to talking to each other, *and no one else*, while Ms. Roe was in the Uber.  But Ms. Roe's phone records, in turn, had shown that she spoke only with A.C. (not E.E.) that night—once before she got in the Uber, and *possibly* a second time from inside the Uber.  A.C. herself told GW (and her texts confirmed) that she was at home at the time Ms. Roe made those calls.  But E.E. consistently testified to being at the party during that call.  It is therefore indisputable that

E.E. could not have been with A.C. during those calls—which meant that she indisputably couldn't have been with E.E. during the phone call E.E. said she had with Ms. Roe. Indisputable, at least, to anyone but the appeals panel, which actually concluded that Ms. Roe's call to *A.C.*, at *home*, bolstered the testimony that she called *E.E.*, at the *party*. Am. Compl. ¶¶ 218-24.  Mr. Doe is not making that up—that was, in fact, their reasoning.

The rest of the panel's reasoning was equally irrational.  An expert toxicologist had concluded that Ms. Roe's BAC that night was between 0.26 and 0.37.  Even at a BAC of 0.26, he said, Ms. Roe's actions and her purported alcohol consumption could not be reconciled.  Ms. Roe's appeal response argued that, based on her actual weight at the time (which was different than what Dr. Milman used), her BAC would have been almost identical to that—0.24 or 0.25. *Id*. ¶¶ 227-228.  Yet the appeals panel used the weight discrepancy as a pretext to discard the toxicologist's report, even though it resulted in no BAC discrepancy.  *Id.* ¶¶ 225.

Finally, the appeals panel discounted the testimony of Q.W., Mr. Doe's friend who had a lucid conversation with Ms. Roe near the end of the party, because it was offered subsequent to the hearing.  Yet it credited testimony by A.C. that it (wrongly) deemed helpful to Ms. Roe, even though it, too, was first offered long after the hearing.  Am. Compl. ¶¶ 230-32, 246.

## LEGAL STANDARD

To survive dismissal under Federal Rule of Civil Procedure 12(b)(6), a complaint "must contain sufficient factual matter to state a claim for relief that is 'plausible on its face.'" *Zaidan v. Trump*, 317 F. Supp. 3d 8, 16–17 (D.D.C. 2018) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)) (Collyer, J.).  "The facts alleged 'must be enough to raise a right to relief above the speculative level.'"  *Id.* (quoting *Twombly*, 550 U.S. at 570).  The plausibility standard "asks for more than a sheer possibility that a defendant has acted unlawfully," but it is "not akin to a

probability requirement." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  "When a plaintiff pleads

factual content that allows the court to draw the reasonable inference that the defendant is liable

for the misconduct alleged, then the claim has facial plausibility." *Zaidan*, 317 F. Supp. 3d at 17.

This standard does not "require a plaintiff to allege the *most* plausible set of facts, but

merely *a* plausible set of facts. *Id.* at 20 (emphasis in original).

## ARGUMENT

## I.  GW REPEATEDLY BREACHED ITS CONTRACT WITH MR. DOE.

GW has remained steadfast in its determination to go through the motions of its

disciplinary procedures without actually doing what it promised Mr. Doe it would do.  This

Court has held that GW's Policy and Code constitutes a contract between John Doe and GW,

ECF No. 25 at 7, and contracts between a university and its students, like all contracts, "contain

an implied covenant of good faith and fair dealing." *Hajjar-Nejad v. George Washington Univ.*,

37 F. Supp. 3d 90, 116 (D.D.C. 2014) (citing *Paul v. Howard Univ.,* 754 A.2d 297, 310 (D.C.

2000)).  "A party breaches this duty by evading the spirit of the contract, willfully rendering

imperfect performance, or interfering with performance by the other party." *Kumar v. George

Washington Univ.*, 174 F. Supp. 3d 172, 189–90 (D.D.C. 2016) (citing *Paulin v. George

Washington School of Medicine and Health Sciences*, 878 F. Supp. 2d 241, 247-48 (D.D.C.

2012)).

"[T]o show that a university breached the implied covenant of good faith and fair

dealing," a plaintiff must show "'either bad faith conduct or conduct that is arbitrary and

capricious.'" *Chenari v. George Washington Univ.*, 847 F.3d 740, 745 (D.C. Cir. 2017) (quoting

*Wright v. Howard Univ.*, 60 A.3d 749, 754-55 (D.C. 2013)).  In the context of university

discipline, performance on a contract is arbitrary and capricious when it "steer[s] [an]

investigation" towards "preconceived conclusions regarding [] misconduct," *Kumar*, 174 F. Supp. 3d at 189, when it "effectively disregard[s] evidence," *id.*, or when "there was no rational basis for the decision" or "it was motivated by bad faith or ill will," *Paulin*, 878 F. Supp. 2d at 247.  The test "is a reasonableness inquiry."  *Kumar*, 174 F. Supp. 3d at 189-90 (citing *Paulin*, 878 F. Supp. 2d at 248, and *Allworth v. Howard Univ.*, 890 A.2d 194, 202 (D.C. 2006)).

There is uncertainty among the courts in this district regarding the showing a plaintiff must make to succeed on a breach of contract claim against a university based on *academic* misconduct.[4]  Because this case involves *non-academic* misconduct, no heightened standard should apply.[5]  But no matter the standard, John Doe succeeds in stating several breach of contract claims, as explained below.

### A.  GW Has Not Moved to Dismiss Two of Mr. Doe's Breach of Contract Claims.

As a preliminary matter, GW has not moved to dismiss two of Mr. Doe's breach of contract claims: his claim that GW denied him an "adequate, reliable and impartial investigation" of Ms. Roe's claims, *see* Am. Compl. ¶¶ 324-27, and his claim that GW mishandled his own complaint against Ms. Roe, *see id.* ¶¶ 334-39.

---

[4] *See Kumar*, 174 F. Supp. 3d 172, 188 (D.D.C. 2016) (noting, but not adopting, the *Paulin* court's decision to require a showing of arbitrary and capricious conduct to succeed on a breach of contract claim against a university based on academic misconduct).  *Hajjar-Nejad*, 37 F. Supp. 3d at 117, which GW says applied a heightened standard to non-academic misconduct, *see* ECF No. 46-1 at 14, expressly stated that it concerned "professional comportment issues," which "fall under the umbrella of deference to *academic* decisions") (emphasis added).

[5] *See Doherty v. S. Coll. of Optometry*, 862 F.2d 570, 577 (6th Cir. 1988) ("courts have adopted different standards of review when educators' decisions are based upon disciplinary versus academic criteria—applying a more intrusive analysis of the former and a far more deferential examination of the latter."); *cf. Mahavongsanan v. Hall*, 529 F.2d 448, 449–50 (5th Cir. 1976) ("Misconduct and failure to attain a standard of scholarship cannot be equated. . . .  There is a clear dichotomy between a student's due process rights in disciplinary dismissals and in academic dismissals.").

Mr. Doe's claim that GW failed to conduct "an adequate, reliable and impartial investigation" was described in paragraphs 324-327 of the Amended Complaint and even denoted with a separate section heading (III.D). Those paragraphs are mentioned nowhere in the motion to dismiss, and GW nowhere argued that it provided Mr. Doe an adequate, reliable or impartial investigation of Ms. Roe's claims. On the contrary, in (wrongly) asserting that it provided Mr. Doe "all review procedures set forth in the policy," it left this promise completely out of the equation, leaving it no room to claim that it kept this promise to Mr. Doe. *See* ECF No. 46-1 at 8-9 (identifying (1) "written notice of a hearing and the charges," (2) "at the hearing, . . . introduc[ing] relevant evidence and present[ing] witnesses," (3) having the hearing "recorded," and (4) receiving a final decision "in a reasonable time period" as the procedures promised to students). And for good reason: This litigation revealed how easy it would have been for GW to collect Ms. Roe's phone records before the hearing, and GW's investigation of Mr. Doe's complaint against Ms. Roe revealed how willing A.C. would have been to talk to investigators about Ms. Roe's claims had they simply contacted her. *See Doe v. Univ. of Notre Dame*, No. 3:17-cv-298, 2017 WL 1836939, at *9 (N.D. Ind. May 8, 2017) (text message evidence obtained during litigation showed that school's investigation "might have been arbitrary and capricious" and thus breached promise to conduct "prompt, fair and impartial investigation and resolution"). The Amended Complaint readily states a claim that GW denied Mr. Doe an "adequate, reliable and impartial investigation," and GW does not here dispute that.

GW also has not moved to dismiss Mr. Doe's claim that GW breached its contract with him in its handling of his complaint against Ms. Roe for retaliation and for providing false testimony in her proceeding against him—which, again, was denoted by a separate section

heading (III.F) and can be found at paragraphs 333-338 of the Amended Complaint.  The motion

to dismiss says not a single word about Mr. Doe's complaint or its resolution by GW.

Although GW will doubtless realize its error and try its best to remedy that error in its

reply brief (or, more likely, claim that it did not err because its other arguments somehow

subsumed the two it missed), this Court should not allow that.  *See Demery v. Montgomery*

*C'nty, Md.*, 602 F. Supp. 2d 206, 212 (D.D.C. 2009) ("Because this argument [in support of

motion to dismiss] was raised for the first time in their reply brief, it will not be considered.");

*Grant v. U.S. Air Force*, 197 F.3d 539, 542 n. 6 (D.C. Cir. 1999) ("our caselaw makes clear that

an argument first made in a reply brief comes too late").

>        **B.**     **The Hearing Panel Arbitrarily and Without Rational Basis Concluded That**
>                 **a Preponderance of Evidence Showed That Ms. Roe Was Incapacitated and**
>                 **Mr. Doe Should Reasonably Have Known That.**

GW cannot simply put words on a piece of paper, label it a rationale, and pretend it has

complied with its contract.  The hearing panel's finding that Ms. Roe was incapacitated and that

Mr. Doe should have known that is completely without rational support.  As much as GW wants

to convince this Court that it can't take an independent look at that decision, that is simply not

the law.  In *Paulin*, for example, the court denied GW's motion to dismiss an expelled medical

student's claims for breach of contract and breach of the implied covenant.  *Paulin*, 878 F. Supp.

2d 841, 248 (D.D.C. 2012).  It did so not by concluding that GW had denied some procedural

protection to the plaintiff, but by *examining the merits of GW's actual rationale* for the plaintiff's

academic dismissal and concluding that it was arbitrary and capricious—that "'there was no

rational basis for the decision or that it was motivated by bad faith or ill will.'"  *Id.* at 247

(quoting *Alden v. Georgetown Univ.*, 734 A.2d 1103, 1109 (D.C. 1999).  It refuted GW's

finding, for instance, that the plaintiff's work represented "a declining trend inconsistent with

advancing expectations" by examining her recent grades. *Id.* It rejected GW's finding that her

work in a clinical rotation was substandard, by noting the grade she received there, too. *Id.* And

it rejected GW's finding regarding the plaintiff's "fund of medical knowledge" by noting that a

professor had recently said that the plaintiff "has a very strong, solid fund of medical

knowledge." *Id.* The court, in short, *looked behind GW's own decision*, evaluating its reasoning,

and concluded that it lacked any rational basis as pled, meaning that the complaint stated claims

for breach of contract and the implied covenant even under the deferential "arbitrary and

capricious" standard that applied there.

Similarly, in *Kumar*, the court denied a motion to dismiss the plaintiff's claims for breach

of contract and breach of the implied covenant against GW, including a contract claim alleging

that the preponderance of the evidence standard had not been satisfied. *Kumar*, 174 F. Supp. 3d

at 187. The court found that the complaint adequately alleged that GW's finding that the

plaintiff had engaged in research misconduct was "not supported by a 'preponderance of the

evidence,'" *even without* examining the specific ways in which the plaintiff alleged that the

standard had not been met. *Id.* It was sufficient that the complaint "call[ed] into question the

fundamental fairness of [GW's] investigation." *Id.*

Mr. Doe states a claim for breach of contract for those same reasons. He has adequately

and exhaustively pled that the hearing panel was biased, *see* Am. Compl. ¶¶ 280, 318-19, 320-

23, that it ignored evidence, *id.* ¶ 143, and most importantly that its ultimate finding was without

rational basis, *id.* ¶¶ 169-72. Briefly, Mr. Doe has alleged that:

- Not a single witness saw Ms. Roe appear incapacitated at the party. *Id.* ¶ 170.

- Three out of four witnesses who did see her there noticed no signs of intoxication
  whatsoever. *Id.* ¶ 97.

- One of those witnesses saw her cross the street to leave the party without incident. *Id.*

- The only witness to testify that Ms. Roe looked intoxicated refused to say to what degree. *Id.* ¶ 146.

- E.E.'s testimony about the phone call changed so many times, in such fundamental and contradictory ways, as to have been inherently unreliable. *Id.* ¶ 149.

- That phone call, which documentary evidence has proven *never happened*, was the hearing panel's reason for believing that Mr. Doe should have known Ms. Roe allegedly was incapacitated. *Id.* ¶ 170. *See Univ. of Notre Dame*, 2017 WL 1836939, at *9 (text message evidence obtained during litigation showed that school's investigation "might have been arbitrary and capricious").[6]

- Ms. Roe's testimony about her actions, including running down eight flights of stairs and back to her dorm just minutes after supposedly being unconscious, was inherently incredible. *See, e.g.*, Am. Compl. ¶¶ 11, 81.

Concluding that Mr. Doe should have known Ms. Roe was incapacitated, when the evidence available *to him* showed at most that she was intoxicated, is arbitrary and capricious. *King v. DePauw Univ.*, No. 2:14-cv-70, 2014 WL 419750, at *12 (S.D. Ind. Aug. 22, 2014), (it was "illegal, arbitrary or capricious" for hearing panel to conclude that student knew complainant was incapacitated where there was no testimony that the outward signs of her incapacity occurred in the plaintiff's presence.)  Not only is the same true here, but multiple witnesses who observed Ms. Roe at the party—including right before she left—noticed no signs of incapacity. Am. Compl. ¶ 97.  It was arbitrary and capricious for the hearing board to conclude that a preponderance of evidence showed otherwise.

GW offers little by way of response, and almost nothing as to the merits.  It asserts that Mr. Doe is upset because the panel simply found Ms. Roe more credible than he.  ECF No. 46-1 at 10.  But the panel made no credibility findings as to either of them, and that certainly is not

---

[6] For a fuller treatment of the problems with the panel's bias and rationale, see the Memorandum in Support of Mr. Doe's Motion for a Preliminary Injunction (ECF No. 6-1) at 21-27.

alleged in the Amended Complaint.  Instead, the panel chose to credit some parts of Ms. Roe's

testimony but not others (including her claim that Mr. Doe used force).  *See* Am. Compl. ¶¶ 168-

69.  The panel reduced its rationale to writing, and that rationale did not include a blanket

statement about Roe's believability.  Instead, as to the critical finding—whether Mr. Doe

reasonably should have known that Ms. Roe was incapacitated—it relied on the purported phone

call between Ms. Roe and E.E., a call that the Amended Complaint alleges, *with ironclad*

*support*, never happened.  *Id.* ¶ 170.

GW simply asks the Court to adopt GW's desired inferences from Mr. Doe's allegations,

but the question on a motion to dismiss, before any discovery has been conducted, is not whether

a defendant can draw plausible counter-inferences from the allegations, but only whether

plausible inferences *in favor* of the sufficiency of the complaint can be drawn.  The Amended

Complaint has done that in spades.

### C.    Biased Hearing Panels Do Not Comply With the Contract.

GW breached its contract with Mr. Doe, and the covenant inherent in it, by providing him

with a biased hearing panel.  Am. Compl. ¶¶ 147, 166.  GW's only argument in response is an

erroneous assertion that the claim is based on "a single stray remark regarding the traumatic

nature of the underlying events."  ECF No. 46-1 at 11.  John Doe has alleged not only that the

Chair presumed Ms. Roe had undergone trauma, Am. Compl. ¶ 144, but also that he grasped for

reasons to doubt Mr. Doe, *see id.* ¶ 166 ("So [Ms. Roe] has presented a couple witnesses, . . . .  Is

there any reason why you haven't presented any witnesses to us today?") and that he refused to

let Mr. Doe establish the bias of R.M., the only witness to testify to seeing Ms. Roe intoxicated

to any degree at the party, *see id.* ¶ 147.  That single stray remark, furthermore, cannot be

characterized as acknowledging potential trauma on the part of *Mr. Doe*, for the reasons

explained in the Amended Complaint. *See id.* ¶ 280. GW, in any event, is not entitled to draw inferences in its favor before discovery; it is reasonable to infer from these allegations that the panel was biased, and that suffices to state a claim.

> **D.     Mr. Doe's Hearing Appeals Panel Handed Down a Patently Ridiculous Rationale and is Plausibly Alleged to Have Been Biased Against Him.**

The Amended Complaint states a claim for breach of contract, and the covenant inherent in it, based on GW's denial of Mr. Doe's second appeal. As articulated in the Amended Complaint and summarized above, it is plausible to infer that Mr. Doe's panel was biased and not appropriately trained, *see, e.g.*, Am. Compl. ¶¶ 35, 147, 166, 349, 352, and it is indisputable that its actual rationale was arbitrary, capricious, and without any rational basis. The covenant of good faith required GW to give Mr. Doe a panel that would fairly apply the appellate procedures it promised him, and the panel's decision to deny him a new hearing when the evidence overwhelmingly altered the finding of fact denied him his contractual rights under the Code.

As to the first of these, Mr. Doe alleges that one of the panelists in his initial pool was openly and obviously unfit to serve on a sexual misconduct appeals panel. Am. Compl. ¶ 199. Worse still, one of his eventual panelists denied explicit instructions not to do outside research on the case, *id.* ¶ 206, then openly asked how resolution of the appeal "could affect any future or current understanding of the University in court against the respondent," *id.* ¶ 207. This may be why the university's own president encouraged GW's faculty earlier this year to adopt a new Sexual Misconduct Policy precisely because they currently had "no decent appeal right to an outside entity *who's actually trained in this*." *Id.* ¶ 210. When two members of GW's appellate so readily show themselves unfit to participate on a sexual misconduct appeals panel, and the university's president laments the pool members' lack of training, it is plausible to infer that bias and lack of fitness infect the entire process.

As to the merits of the panel's rationale, there is no defending it, and GW barely tries to do so. Ms. Roe and E.E. had testified that they talked to each other, and no one else, while Ms. Roe was in the Uber and E.E. was at the party. The phone records showed that Ms. Roe had called only her roommate, A.C. (*not E.E.*), any time close to her ride in the Uber. A.C. also told GW, and her contemporaneous text messages showed, that she was already home when Ms. Roe left the party, *and therefore indisputably not with E.E.* Yet the appeal panel still managed to conclude, impossibly, that Ms. Roe's call to A.C. at home bolstered the testimony that she called E.E. at the party. Am. Compl. ¶¶ 218-24. That is, in fact, as crazy as it sounds. It is also arbitrary, capricious, and without rational basis, and thus belongs in the same company as GW's decisions in *Paulin* and *Kumar*.

 The rest of the panel's reasoning was equally irrational. Dr. Milman concluded that even at a BAC of 0.26, Ms. Roe's actions and her purported alcohol consumption could not be reconciled. Ms. Roe concluded, based on her actual weight (which was different than what Dr. Milman used), that her BAC would have been almost identical to that—0.24 or 0.25. Yet the appeals panel decided to disregard Dr. Milman's report based simply on the weight discrepancy, even though it did not result in a material BAC discrepancy. *Id.* ¶¶ 225-29. That, too, was arbitrary and without rational basis.

Finally, the appeals panel *discounted* the testimony of Q.W., Mr. Doe's friend who had a lucid conversation with Ms. Roe near the end of the party, because it was offered subsequent to the hearing. Yet it *credited* testimony by A.C. that it deemed helpful to Ms. Roe even though it, too, was first offered long after the hearing. Am. Compl. ¶¶ 230-32, 246.

GW spends just a single paragraph in response to all of this, and it says three things. First, it argues that Mr. Doe's assertion that the second appeals panel's rationale "'was frivolous

and without basis and in violation of the Code'" is "conclusory" and cites to a single paragraph in the Amended Complaint to give the allegation that appearance. ECF No. 46-1 at 11 (quoting Am. Comp. ¶ 332, misciting it as Am. Compl. ¶ 331). But that's just silly. The Amended Complaint spends *29 paragraphs* articulating each piece of the panel's rationale and asserting facts demonstrating why it is completely without basis. Am. Compl. ¶¶ 218-46. "Conclusory" may be a nice brief-writing epithet, but it doesn't apply here.

Second, GW says that Mr. Doe is simply "wrong" that the panel's rationale is without basis. ECF No. 46-1 at 11. But *say* that is all GW does; it makes no effort, *at all*, to defend the panel's rationale. As a litigation strategy, that actually makes sense, because it is indefensible—and responding on the merits would only highlight that for the Court.

Third, GW says that this contract claim is not adequately alleged because the Amended Complaint does not identify any contract provisions breached by that denial. *Id.* at 12. That is a curious argument, given that the parties spent 63 pages briefing the Code's four appellate articles, which span less than half a page of its Code. *See* ECF Nos. 27, 32, 36. Moreover, the Amended Complaint actually attaches the Code and expressly alleged that the Code "required that appeals panels consist of panelists capable of, and adequately trained to, review and decide sexual misconduct appeals according to the requirements articulated in the Code." Am. Compl. ¶ 333. And if that were not enough, the Amended Complaint specifically says that the Code required "a duly appointed appeals panel order a new hearing when qualifying evidence presented on appeal significantly altered the finding of fact," Am. Compl. ¶ 328, tracking Article 33's language about the standard that governs appeals (whether the evidence "significantly alters the finding of fact") and Article 35's language about the remedy (remand "for a new hearing"

when the evidence succeeds in significantly altering the finding).  Mr. Doe has thus plausibly stated a breach of contract claim based on the denial of his second appeal.

## II.     THE AMENDED COMPLAINT OVERWHELMINGLY STATES A TITLE IX ERRONEOUS OUTCOME CLAIM.

GW's flight from the three most significant Title IX decisions in the country won't help it much.  Courts have repeatedly recognized the "erroneous outcome" theory of Title IX liability set out by the Second Circuit in *Yusuf v. Vassar College*, 35 F.3d 709 (2d Cir. 1994), *see, e.g.*, *Doe v. Miami Univ.*, 882 F.3d 579, 592 (6th Cir. 2018), and Mr. Doe has facts to spare in pleading it.  "To plead an erroneous-outcome claim, a plaintiff must allege: (1) facts sufficient to cast some articulable doubt on the accuracy of the outcome of the disciplinary proceeding and (2) a particularized . . . causal connection between the flawed outcome and gender bias."  *Miami Univ.*, 882 F.3d at 592 (citing *Yusuf*, 35 F.3d at 715).  Allegations of gender bias "might include, inter alia, statements by members of the disciplinary tribunal, statements by pertinent university officials, or patterns of decision-making that also tend to show the influence of gender." *Miami Univ.*, 882 F.3d at 593 (citing *Yusuf*, 35 F.3d at 715).  As explained below, they take other forms as well.  Courts are increasingly denying motions to dismiss such claims;[7] GW's motion should be denied as well.[8]

---

[7] *See, e.g.*, *Doe v. Baum*, 903 F.3d 575 (6th Cir. 2018); *Doe v. Univ. of Mississippi*, 2018 WL 3570229 at *6 (S.D. Miss. July 24, 2018); *Doe v. Miami Univ.*, 882 F.3d 579, 594 (6th Cir. 2018); *Doe v. Marymount Univ.*, 297 F. Supp. 3d 573 (E.D. Va. 2018); *Schaumleffel v. Muskingum Univ.*, No. 2:17-cv-463, 2018 WL 1173043 at *16 (S.D. Oh. March 6, 2018); *Gischel v. Univ. of Cincinnati*, No. 1:17-cv-475, 2018 WL 705886 at *9 (S.D. Oh. February 5, 2018); *Doe v. The Trustees of the University of Pennsylvania*, No. 2:16-cv-05088-JP, 2017 WL 4049033 (E.D. Pa. Sept. 13, 2017); *Doe v. Case Western Reserve Univ.*, No. 1:17-cv-414, 2017 WL 3840418 at **6-7 (N.D. Ohio Sept. 1, 2017); *Doe v. Ohio State Univ.*, 239 F. Supp. 3d 1048, 1073 (S.D. Ohio 2017); *Doe v. Lynn Univ., Inc.*, 235 F. Supp. 3d 1336, 1340-41 (S.D. Fla. 2017); *Doe v. Amherst College*, 238 F. Supp. 3d 195, 223 (D. Mass. 2017);  *Neal v. Colorado State Univ.-Pueblo*, 2017 WL 633045 at *14 (D. Colo. Feb. 16, 2017);  *Collick v. William Patterson*

**A.      John Doe Has Cast Substantial Doubt on the Accuracy of the Outcome.**

GW limply asserts, but does not actually try to argue, that the Amended Complaint fails

to satisfy the first prong of analysis.  ECF No. 46-1 at 17.  As the Second Circuit explained in

*Yusuf*, "the pleading burden" with respect to this first element of an erroneous outcome claim "is

not heavy." 35 F.3d at 716.  It may be satisfied by "alleg[ing] particular evidentiary weaknesses

behind the finding of an offense such as a motive to lie on the part of a complainant or witnesses,

particularized strengths of the defense, or other reason to doubt the veracity of the charge. A

[student-plaintiff's] complaint may also allege particular procedural flaws affecting the proof."

*Id.*  The Amended Complaint sails over this low bar.  *See, e.g.*, *Doe v. Brown Univ.*, 166 F. Supp.

3d 177, 187 (D.R.I. 2016).

**B.      John Doe Has Pled Facts That Amply Support an Inference of Gender Bias.**

The Amended Complaint also overwhelmingly supports a plausible inference of gender

bias.  Although one wouldn't know it from reading GW's motion to dismiss, three federal Courts

of Appeals decisions have analyzed the gender-bias prong of an "erroneous outcome" claim.

And all three have reversed district court decisions finding insufficient evidence of gender bias.

Under the standards these cases articulate, Mr. Doe easily satisfies this second prong of an

erroneous outcome claim.

**1.      Existing Appellate Authority Shows Clearly That Mr. Doe States a
Claim for Gender Bias**

In the first such case, *Doe v. Columbia University*, the plaintiff alleged just one source of

gender bias: local public pressure exerted upon the school, and upon its Title IX investigator, to

---

*Univ.*, 2016 WL 6824374 at **11-12 (D.N.J. Nov. 17, 2016); *Doe v. Columbia Univ.*, 831 F.3d
46, 59 (2d Cir. 2016).

[8] The Amended Complaint does not allege a selective enforcement claim.  *See* ECF No. 46-1 at
20-22.

respond aggressively to claims of sexual assault made by females against males in the time period preceding the plaintiff's hearing. *Columbia Univ.*, 831 F.3d at 58. The district court found that to be insufficient evidence of gender bias for a Title IX claim, but the Second Circuit reversed. "*Iqbal*," the Second Circuit emphasized, "does not require that the inference of discriminatory intent supported by the pleaded facts be *the most plausible* explanation of the defendant's conduct. It is sufficient if the inference of discriminatory intent is plausible." *Doe v. Columbia Univ.*, 831 F.3d at 57. "There is nothing implausible or unreasonable," the court concluded, "about the Complaint's suggested inference that the panel adopted a biased stance in favor of the accusing female and against the defending male varsity athlete in order to avoid further fanning the criticisms that Columbia turned a blind eye to such assaults." *Id.*

In the second decision, *Doe v. Miami University,* the Sixth Circuit concluded that two things together—"statistical evidence that ostensibly shows a pattern of gender-based decision-making" and nationwide "external pressure from the federal government"—"support[ed] at the motion-to-dismiss stage a reasonable inference of gender discrimination." *Miami Univ.*, 882 F.3d at 593. The statistical evidence consisted in the allegation that every male accused of sexual misconduct during one academic year was found responsible and that 90% of those found responsible in a three-year period were male. *Id.*

Finally, in *Doe v. Baum*, the University of Michigan was under pressure from the public and the federal government (in the form of an active OCR investigation) "to prove that it took complaints of sexual misconduct seriously." *Baum*, 903 F.3d at 586. That "external pressure alone," the court held, "is not enough to state a claim that the university acted with bias in this particular case," but it "provides a backdrop that, when combined with other circumstantial evidence of bias in Doe's specific proceeding, gives rise to a plausible claim." *Id.* The "other

circumstantial evidence" needed in light of that targeted pressure was minimal—it consisted *solely* of the adjudicator's decision to "credit[] exclusively female testimony (from Roe and her witnesses) and reject[] all of the male testimony (from Doe and his witnesses)."  *Id.  Twombly* and *Iqbal*, the *Baum* court emphasized, do not require complaints to show that gender discrimination is the *most* plausible explanation for a defendant's actions in order to survive dismissal; they need only show it to be *one* plausible explanation among many.  *Baum*, 903 F.3d at 587 ("[A]lternative explanations are not fatal to Doe's ability to survive a Rule 12(b)(6) motion to dismiss. . . .  Doe's allegations do not have to give rise to the *most* plausible explanation—they just have to give rise to one of them.").

GW completely ignores these cases and instead seeks shelter from an earlier, *unpublished* decision of the Sixth Circuit, *Doe v. Cummins*, 662 Fed. App'x 437 (6th Cir. 2016), in arguing that the Title IX claim should be dismissed.  That tack towards the older and unpublished case speaks volumes.  It is a tacit admission that Mr. Doe states a claim under the two published decisions that followed it, *Miami Univ.* and *Baum*.  It also makes no sense on the merits, because *Cummins* actually held that *targeted* pressure upon a school, such as an active OCR investigation or public criticism of the school's handling of a prior Title IX proceeding, *would* support an inference of gender bias.  *Cummins*, 662 Fed. App'x at 453 (active OCR investigation and public criticism the kinds of "supporting facts" that would allow for a plausible inference of gender bias, but which the plaintiffs in *Cummins* simply "d[id] not allege").  *Id.*  And GW, as noted in the Amended Complaint, was experiencing both of those things in spades at the time Ms. Roe filed her complaint, as explained more below.

### 2.      Mr. Doe Pleads Overwhelming Evidence of Gender Bias.

The Amended Complaint also alleges ample facts that state a claim for gender bias under *Columbia University*, *Miami University*, *Baum* or *Cummins*.

First, GW was under an unprecedented amount of pressure—from the federal government, its student body, and proceedings in the courts—to appear tough on claims of sexual assault brought by women against men.  *See, e.g.*, Am. Compl. ¶¶ 14, 15, 16, 55, 60.  It had come under active OCR investigation just three months before Ms. Roe filed her complaint, and remained under investigation until long after Mr. Doe's hearing,[9] *see id.* ¶¶ 14-15, 58, a fact that by itself is almost dispositive.[10]  At the same time, it was experiencing intense campus-wide fallout from Aniqa Raihan's complaint that her own proceeding had been mishandled, *id.* ¶¶ 16-17, fallout that so affected the school that it held special meetings with her, publicly touted its 100% conviction rate, revamped its procedures, and hired a victims' advocate to serve as a Title IX investigator, *id.* ¶¶ 53-54, 56-57.  And Ms. Roe's complaint, which was filed just days after students continued to protest on Ms. Raihan's behalf, mirrored her allegations.  *Id.* ¶ 16.  That, too, is practically dispositive of the question whether Mr. Doe has stated a claim.[11]  Yet that is not all, because GW was also in the midst of defending itself against a highly publicized lawsuit

---

[9] GW tries desperately to blunt the significance of this fact by noting that this investigation closed before Mr. Doe's *second* appeal was decided.  ECF No. 46-1 at 19.

[10] *Cummins*, 662 Fed. App'x at 453 (targeted public pressure or OCR investigation supports claim of gender bias); *Columbia Univ.*, 831 F.3d at 57 (targeted pressure sufficed to establish gender bias); *Wells v. Xavier*, 7 F. Supp. 3d 746, 747, 751 (S.D. Oh. 2014) (fact that school was brought under OCR investigation six months before plaintiff was charged supported inference of gender bias).

[11] *Amherst College*, 238 F. Supp. 3d at 223 (allegation that school punished plaintiff to appease student movement pushing "to change the way it handled sexual assault allegations" sufficient to establish inference of gender bias); *Columbia Univ.*, 831 F.3d at 57 (targeted school pressure upon administrators sufficed to establish gender bias); *Cummins*, 662 Fed. App'x at 453.

by a former female student, *id.* ¶ 50—another fact supporting an inference of bias.[12]  And its

Title IX regime had been the focus of local media coverage, yet another source of pressure that

supports an inference of gender bias.[13]

No case that counsel for Mr. Doe is aware of involved anywhere near that much pressure

on a university.  And in no case has the connection between that pressure and a school's

willingness to act been as clear as it is here.

Second, as just noted, there is "statistical evidence that ostensibly shows a pattern of

gender-based decision-making," and it comes from *GW itself*.  GW admits that 100% of the

respondents put through its formal process in the two most recent academic years were found

responsible.  *Id.* ¶¶ 53-54.  That necessarily means that 100% of the men put through that process

were found responsible, and upon information and belief, all ten of those respondents were in

fact male.  That is independent evidence of gender bias.  *See Miami Univ.*, 882 F.3d at 593

(allegations that 100% of males in the academic year in which plaintiff was accused of

misconduct were found responsible, and that 90% of students found responsible in a three-year

period were male, showed pattern of decision-making informed by gender bias).

Third, "statements by university officials" make clear that gender plays a role in GW's

adjudication of these cases, including its adjudication of Mr. Doe's.  Its Title IX office, which

implements the Policy, offers training to *male students in particular* on how to prevent sexual

assaults.  Am. Compl. ¶ 62.  Implementing the policy under the assumption that men are the

---

[12] *Miami Univ.*, 882 F.3d at 594; *Ohio State Univ.*, 239 F. Supp. 3d at 1073 (pressure and publicity from lawsuit filed two months before investigation supported inference of gender bias).

[13] *The Trustees of the University of Pennsylvania*, 2017 WL 4049033 at *16 (two newspaper articles highlighting school's handling of assault allegations supported inference of gender bias); *Lynn Univ., Inc.*, 235 F. Supp. 3d at 1340-41 (media attention from school security's decision not to charge different student with misconduct in February 2015 supported inference of gender bias against plaintiff seven months later).

sexual aggressors and women the ones enduring the risk of their aggression is evidence of impermissible gender bias.  *Case Western Reserve Univ.*, 2017 WL 3840418, at *6 (administrator's statements that college students, and "in particular women," were engaging in sexual risk taking was evidence of gender bias).  Worse still, that same office refers GW students to the work of Laci Green to further understand the Policy's meaning of consent, and Ms. Green teaches that one of the "most pervasive reasons why people don't believe survivors is that most survivors are women" and that "[s]exual assault accounts are nearly always true."[14]  *Id.* ¶ 64. And finally, in denying Mr. Doe's second appeal, GW credited the late-received testimony of a female witness that it believed supported Ms. Roe yet simultaneously discredited, *because* it was late-received, the testimony of a male student that supported Mr. Doe—precisely the type of circumstantial evidence of gender bias that pushed the claim across the plausibility line in *Baum*. Am. Compl. ¶¶ 231, 246. GW's gendered enforcement of Title IX may be well-intentioned, but it is gender bias all the same.[15]  These statements support an inference of gender bias.[16]

    In the light of those facts, it is clear Mr. Doe states a plausible claim of gender bias.  He alleges extreme targeted public pressure upon the school extremely close in time to his proceeding, which carried the day in *Columbia University*—yet also alleges an active OCR investigation, a highly contentious lawsuit by a female student, university statements evidencing

---

[14] *See* nn.1-3, *supra.*

[15] *See Columbia Univ.*, 831 F.3d at 58 n. 11 ("A defendant is not excused from liability for discrimination because the discriminatory motivation does not result from a discriminatory heart . . . .  A covered university that adopts, even temporarily, a policy of bias favoring one sex over the other in a disciplinary dispute . . . has practiced sex discrimination[.]").

[16] *See Marymount Univ.*, 297 F. Supp. 3d at 584 (single statement by adjudicator in subsequent proceeding showing he held gendered views of men was enough to support inference of gender bias); *Doe v. Washington & Lee Univ.*, No. 6:14-CV-00052, 2015 WL 4647996, at *10 (W.D. Va. Aug. 5, 2015) (investigator's statements about "grey rape" sufficed to establish gender bias in case where complainant alleged she was intoxicated).

gender bias, and the fact that his own case mirrored the case generating the public pressure.  He alleges strong generic pressure upon the school and statistical evidence of bias, which sufficed to prove gender bias in *Miami University*—yet, again, is able to plead so much more, including the extremely intense targeted pressure GW was under and express statements of gender bias.  And finally, he alleges almost precisely what the court found sufficient in *Baum*—that, against the backdrop of targeted public and government pressure, his male witness was treated differently than Ms. Roe's similarly situated female witness.

### C.   GW's Efforts to Rebut This Evidence Lack All Merit.

#### 1.   GW's Arguments Regarding External Pressure Are Uniformly Without Support.

GW's primary response to Mr. Doe's evidence of gender bias is its assertion that external pressure, whether from OCR or the public, "must be directly connected to the underlying decision in the plaintiff's case" in order to state a claim for gender bias.  ECF No. 46-1 at 18-20.  That argument flies in the face of the three published appellate decisions on the matter, a host of other decisions from around the country, and—ironically enough—most of the cases GW cites for this proposition.

First, *Columbia University*, *Miami University*, *Baum*, and a host of similar cases all hold that external pressure—particularly when it's targeted at the school—supports an inference of gender bias, *whether or not it can be expressly connected to the underlying proceeding*.  In *Columbia University*, targeted external pressure upon the school to take female assault claims more seriously was enough, *by itself*, to support an inference of gender bias against the plaintiff, even though the pressure was not said to have concerned his proceeding in any way.  *Columbia*

*Univ.*, 831 F.3d at 58.  Other courts have held similarly.[17]  The *Baum* court held that targeted

pressure upon the school was not enough by itself to support an inference of gender bias, but

required only the slightest additional circumstantial evidence of bias to make the claim plausible.

Many other courts have likewise held that targeted pressure supports an inference of gender bias

in conjunction with other evidence.[18]  And in *Miami University*, the court likewise held that

external pressure—this time purely nationwide pressure from OCR—supported an inference of

gender bias together with other (there, statistical) evidence.  *Miami Univ.*, 882 F.3d at 593.

Other courts have agreed that even generic nationwide pressure supports an inference of gender

bias in conjunction with other circumstantial evidence.[19]  The intuition behind all of these cases

is straightforward: when a school feels pressure, it is reasonable to infer that it will respond to

that pressure in subsequent proceedings.  And the greater, more targeted, and closer in time the

pressure is to the plaintiff's proceeding, the less need there is for corroborating circumstantial

evidence at the pleading stage.

     Second, almost none of the cases that GW cites actually say that pressure must be alleged

to have reached the plaintiff's specific proceeding.  *Doe v. Colorado* says nothing about whether

pressure must touch the proceeding or merely the school; it simply says that external pressure,

---

[17] *See, e.g.*, *Cummins*, 662 Fed. App'x at 453; *Wells*, 7 F. Supp. 3d at 751.

[18] *See, e.g.*, *The Trustees of the University of Pennsylvania*, 2017 WL 4049033 at *16 (E.D. Pa. Sept. 13, 2017); *Ohio State Univ.*, 239 F. Supp. 3d at 1073; *Lynn Univ., Inc.*, 235 F. Supp. 3d at 1340-4; *Amherst College*, 238 F. Supp. 3d at 223.

[19] *See, e.g.*, *Neal v. Colorado State Univ.-Pueblo*, No. 1:16-cv-873, 2017 WL 633045 at *14 (D. Colo. Feb. 16, 2017) (refraining from deciding whether OCR pressure or procedural deficiencies alone could support inference of gender bias because "all of Plaintiff's allegations together," including "pressure to avoid DOE investigation and . . . procedural shortcomings" sufficed to support plausible inference of gender bias); *Collick v. William Patterson Univ.*, 2016 WL 6824374 at **11-12 (Nov. 17, 2016) (allegations that female complainant's claims "were accepted as true without any investigation," that the plaintiffs were "not afforded a thorough and impartial investigation," and that OCR exerted national pressure on universities together supported plausible inference of gender bias).

whether generic or specific, is not evidence of *gender* bias.  255 F. Supp. 3d 1064, 1078 (D.

Colo. 2017).  The unpublished and superseded-by-two-published-cases *Doe v. Cummins*, on

which GW leans most heavily, *see* ECF 46-1 at 18, holds that targeted public or governmental

pressure *upon the school—*which Mr. Doe has amply alleged here—suffices to support an

inference of gender bias.  662 Fed App'x at 453.  *Doe v. Purdue Univ.* cites *Cummins* and

likewise finds no gender bias because it was not alleged that "*Purdue or* any decision makers"

experienced targeted public or governmental pressure.  281 F. Supp. 3d 754, 780 (N.D. Ind.

2017) (emphasis added).  *Ruff v. Bd. of Regents of Univ. of New Mexico* also held that to state a

claim, the plaintiff had to allege that "some fact or facts demonstrating that outside pressure

actually influenced *UNM*," the school.  272 F. Supp. 3d 1289, 1302 (D.N.M. 2017) (emphasis

added).  *Doe v. St. Thomas Univ.* similarly found no gender bias because the plaintiff alleged

only "general federal pressure" as opposed to "targeted stress . . . from government institutions

or the public" as alleged in *Columbia University.*  240 F. Supp. 3d 984, 992 (D. Minn. 2017).

And *Doe v. Lynn Univ.* likewise found no evidence of gender bias because the alleged pressure

was "general" and not "focused on" the school.  224 F. Supp. 3d 1288, 1294 (S.D. Fla. 2016).

Only one of GW's cases even arguably supports its position: *Doe v. Univ. of Cincinnati*,

which does state that in cases where public pressure "was found to support" a claim, it "targeted

the *specific disciplinary action being challenged.*"  No. 16-987, 2018 WL 1521631, at *5 (S.D.

Ohio Mar. 28, 2018).  But as all of the cases cited above demonstrate, that just is not true.  And

after *Miami University* and *Baum*, that statement in *University of Cincinnati* is no longer good

law.  The motion to dismiss quite literally has no case law support for this, its primary argument

as to why Mr. Doe has failed to state a Title IX claim.

### 2. GW Cannot Dodge the Significance of Aniqa Raihan's Campus Pressure.

GW's only other argument in support of dismissal is that Aniqa Raihan's lawsuit against the university has been dismissed, ECF No. 46-1 at 20, as though that lawsuit were her primary significance to the Amended Complaint. GW's desire to blunt her significance is telling. The obvious importance of her saga is the intense pressure she exerted on GW in the months leading up to Ms. Roe's complaint, a complaint that mirrored Ms. Raihan's own allegations and was filed while that pressure was still fresh. Am. Compl. ¶¶ 16-17, 51-58; *see DAmherst College*, 238 F. Supp. 3d at 223 (allegation that school punished plaintiff to appease recent student movement pushing "to change the way it handled sexual assault allegations" sufficient to establish inference of gender bias). The more significant lawsuit discussed in the Amended Complaint, which had already succeeded in subjecting GW to discovery, is that of Ricca Prasad. *See* Am. Compl. ¶ 51; *Ohio State Univ.*, 239 F. Supp. 3d at 1073 (pressure and publicity from lawsuit filed two months before investigation supported inference of gender bias). That lawsuit remains active.

### III. MR. DOE PLAINLY STATES CLAIMS OF BOTH DISPARATE TREATMENT AND DISPARATE IMPACT UNDER THE D.C. HUMAN RIGHTS ACT.

GW is so worried about the DCHRA that it invokes the Supremacy Clause in the hopes that this Court won't actually apply the Act as written. Section 2-1402.41 of the D.C. Human Rights Act makes it "an unlawful discriminatory practice, subject to the exemptions in § 2-1401.03(b), for an educational institution" to "deny, restrict, or to abridge or condition the use of, or access to, any of its facilities, services, programs, or benefits of any program or activity to any person otherwise qualified, *wholly or partially*, for a discriminatory reason," including "based

upon the actual or perceived . . . sex . . . of any individual." (emphasis added).  John Doe will

succeed in showing both disparate treatment and disparate impact under the Act.

> **A.      Mr. Doe States a Claim for Disparate Treatment.**

For the same reasons stated in Section I.B., Mr. Doe will succeed in showing disparate

treatment under the Act.  That is especially true given that the Act is violated when denial of an

educational benefit is based "wholly *or partially*" on a discriminatory motivation.

> **B.      Mr. Doe Also States a Claim for Disparate Impact.**

Mr. Doe will also succeed in showing disparate impact under the Act.  The Act contains

an "effects clause" which states that "[a]ny practice which has the effect or consequence of

violating any of the provisions of this chapter shall be deemed to be an unlawful discriminatory

practice."  D.C. Code § 2-1402.68; *Smith v. Henderson*, 982 F. Supp. 2d 32, 52 (D.D.C. 2013)

(holding a disparate impact claim under D.C. Human Rights Act actionable where school closing

procedures disproportionately affected a particular racial group).  "Under that section, despite the

absence of any intention to discriminate, practices are unlawful if they bear disproportionately on

a protected class and are not independently justified for some nondiscriminatory reason." *Gay*

*Rights Coal. of Georgetown Univ. Law Ctr. v. Georgetown Univ.*, 536 A.2d 1, 29 (D.C. 1987);

*Davis v. District of Columbia*, 949 F. Supp. 2d 1, 11 (D.D.C. 2013).  That is not only the

inescapable meaning of the statutory language, it was the acknowledged reason that the drafters

included that language in the statute.  "As the legislative history demonstrates, the Council

imported into the Human Rights Act, by way of the effects clause, the concept of disparate

impact discrimination developed by the Supreme Court in *Griggs v. Duke Power Co.,* 401 U.S.

424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971)."  *Gay Rights Coal. Of Georgetown Univ. Law Ctr.*,

536 A.2d at 29.  *Griggs* "was expressly relied upon by the drafters of the Human Rights Act

when the original regulation was adopted," *id.*, and the effects clause was retained "[d]uring the passage of the bill . . . despite opposition from local employers." *Id.*

The statute's language and its legislative history leave no room to limit the reach of the Act to claims of intentional discrimination.  On the contrary, the Act is "a broad remedial statute and it is to be generously construed." *George Washington Univ. v. D.C. Bd. of Zoning Adjustment,* 831 A.2d 921, 939 (D.C. 2003).  That means that courts "must read the words of the DCHRA liberally consistent with the Act's sweeping statement of intent," *Estenos v. PAHO/WHO Federal Credit Union*, 952 A.2d 878, 887 (D.C. 2008), which, as explained above, was to reach both intentional and unintentional discrimination.

The Act permits practices that have a disparate impact based on sex only when required by "business necessity," which the Act defines as a "case where it can be proved by a respondent that, without such exception, such business *cannot be conducted*."  D.C. Code § 2-1401.03 (emphasis added).  That is the *only* permissible justification for unintentional discrimination, *Estenos*, 952 A.2d at 888, and that exception "should be interpreted narrowly and with the greatest of caution," *id.*, which is precisely what courts do.  *See, e.g., Mitchell v. DCX, Inc.*, 274 F. Supp. 3d 33, (D.D.C. 2003); *Natural Motion by Sandra v. D.C. Comm'n on Human Rights,* 687 A.2d 215, 218 (D.C. 1997) (absences due to employee's physical handicap that "caused an unspecified increase in inefficiency in the operation of [a] salon" did not satisfy business necessity exception) (quotation marks and citation omitted).  The Act furthermore "places the burden of proving the exception of 'business necessity' squarely on the employer, who must meet that burden "'in each individual case.'"  *Estenos*, 952 A.2d at 888 (quoting § 2-1401.03).

As alleged in the Amended Complaint, the university's Title IX enforcement regime has a disparate impact on its male students.  The University has chosen to resolve sexual misconduct

complaints through a regime unique to those claims.  *See, e.g.*, Am. Compl. ¶¶ 35, 57.  And that

regime contains an unmistakably pro-complainant, anti-respondent bias that makes it more likely

to result in findings of responsibility than would otherwise occur.  University personnel are

trained to investigative and adjudicate those claims, and no others, "*in a manner that protects the

safety of victims and promotes accountability.*"  *Id.* ¶ 35.  Consistent with that policy, students

and faculty are instructed by the Title IX office to believe that sexual misconduct claims are

"nearly always true," *id.* ¶ 64, and sexual misconduct investigations are overseen by a Title IX

investigator who has spent her entire professional career advocating for sexual assault claimants,

*id.* ¶ 57.  The chair of Mr. Doe's hearing provided powerful evidence of that bias, immediately

acknowledging the "trauma" Ms. Doe was experiencing in "reliving" the encounter before even

hearing from any witnesses.  *Id.* ¶ 144.  Not surprisingly, respondents put through this process

were convicted 100% of the time in a two-year period, a fact that GW's highest administrators

publicly cited as evidence that the system was working.  *Id.* ¶ 53-54.  And upon information and

belief, all or the vast majority of those convicted respondents were men.  *Id.* ¶ 13.[20]

Men do not commit 100% of sexual assaults.  Men, presumably, are not found

responsible 100% of the time in GW's non-sexual misconduct hearings.  Nor, quite obviously,

are all men accused of sexual misconduct guilty of sexual misconduct.  The facts alleged in the

Amended Complaint make it at least plausible to infer that GW's sexual misconduct disciplinary

---

[20] That Mr. Doe alleges this "upon information and belief" is of no moment at the motion to dismiss stage.  *Evangelou v. D.C.*, 901 F. Supp. 2d 159, 170 (D.D.C. 2012) (*Twombly/Iqbal* plausibility standard "does not prevent a plaintiff from pleading facts alleged 'upon information and belief' where the facts are peculiarly within the possession and control of the defendant, or where the belief is based on factual information that makes the inference of culpability plausible") (citing *Arista Records LLC v. Doe 3,* 604 F.3d 110, 120 (2d Cir.2010) (internal quotation marks omitted).  Tellingly, GW refused, in its preliminary injunction briefing, to deny that 100% of its convicted respondents from 2015-17 were male, or that its conviction rate in non-sexual misconduct hearings was 100%, even though it could have done so.

regime had a disparate impact upon men, in violation of the Act. *See Mitchell*, 274 F. Supp. 2d at 48-49 (taxi company's pick-up rates had disparate impact based on race because "pick-up rate" for a disproportionately African-American section of the District was lower than the rate in the rest of the District).

GW tries to avoid that conclusion on three grounds, two of which are just weird, and none of which are persuasive.

First, GW argues that the Act should be read to conform to Title IX, which supports a private right of action only for claims of intentional discrimination. It argues that this Court should follow the lead of a federal trial court in California that "construe[d]" a similar California statute "consistently with Title IX." ECF No. 46-1 at 23-24, citing *Zuccaro v. Martinez Unified Sch. Dist.*, No. 16-02709, 2016 WL 10807692, at *13 (N.D. Cal. Sept. 27, 2016). But the state statute in *Zuccaro*, Cal. Educ. § 220, contained no "effects" language whatsoever, and—more importantly—contained express statutory language *requiring* that it be construed consistently with Title IX. *See* Cal. Educ. § 201(g). Section 201(g), in fact, lists several federal statutes according to which section 220 is to be interpreted, and none of them is Title VII. *Zuccaro* does not "construe" an ambiguous state statute (let alone a state statute with an explicit effects clause) in a manner consistent with Title IX; it faithfully applying section 201(g)'s plain statutory language. GW's insistence that California's application of *its* plain statutory language is reason for DC to disregard its even *plainer* statutory language is schizophrenic. *Zuccaro* provides no basis for reading statutory language, backed by unambiguous legislative history, out of the D.C. Code, if that were even possible.

That is not GW's only argument as to why the reach of the Act should be limited. It also argues that doing so is necessary to avoid a conflict with federal law. ECF No. 46-1 at 24-25.

The argument has two premises.  The first is that Title IX requires it to enact sexual misconduct procedures.  *Id.* at 24.  The second, which GW cannot actually say because it is not alleged in the pleadings, is that more men than women engage in campus sexual assault, and therefore that it cannot enact sexual misconduct procedures without having a disparate impact on men and running afoul of the Act.[21]  Absent that unstated factual premise, there is no inherent conflict between Title IX and the Act.

GW's reliance on this unpled factual premise is sufficient to reject this argument at the pleading stage.  That impropriety notwithstanding, Mr. Doe will address it, because it misses the key point of his disparate impact claim entirely.  The problem with the argument is not its second premise, but its first.  GW is liable under the Act not because of what federal law *makes* GW do, but because of what GW has *chosen* to do.  No one told GW to use a separate training regime for sexual misconduct cases.  (OCR, in fact, expressly allowed universities to use the same disciplinary system to resolve claims of sexual and nonsexual misconduct.)[22]  No one told it to teach its sexual misconduct hearing administrators, and no others, to "protect the safety of victims and promote responsibility."  Am. Compl. ¶ 35.  No one told GW to train people to believe that sexual assault claims are "nearly always true."  *Id.* ¶ 64. No one told GW to hire a career victims' rights advocate to oversee all of its Title IX investigations.  *Id.* ¶ 57.  GW *chose* to do those things; those things are plausibly alleged to have resulted in a 100% conviction rate

---

[21] GW dances around this premise by trying to put it in Mr. Doe's mouth as much as possible. The result is that GW has Mr. Doe saying things he neither alleges nor argues, like, "If plaintiff is correct, and compliance with Title IX results in a disparate impact on men in violation of the D.C. Human Rights Act, then there is an unavoidable conflict of state and federal law."  ECF No. 46-1 at 25.  Mr. Doe actually argues that GW's *specific manner* of complying with Title IX has resulted in disparate impact, not that Title IX compliance *in general* inevitably does so.

[22] *See* Russlynn Ali, Office for Civil Rights, Department of Education, *Dear Colleague Letter* (April 4, 2011) at 8 ("Title IX does not require a recipient to provide separate grievance procedures for sexual harassment and sexual violence complaints.") (available at https://www2.ed.gov/about/offices/list/ocr/letters/colleague-201104.pdf).

entirely of men; and it is plausible to infer that the 100% conviction rate exceeds what might otherwise be expected.  That is enough to state a disparate impact claim; the Court need not resolve the broader question whether GW's 100% conviction rate would plausibly state that claim were all of GW's actions mandated by federal law.

Third and finally, GW strangely argues that Mr. Doe alleges that "the Policy or the Code are facially discriminatory" and that facial discrimination is inconsistent with a disparate impact claim.  ECF No. 46-1 at 26-27.  But Mr. Doe doesn't actually allege that the Policy or Code were facially discriminatory based on sex, and that is the only kind of facial neutrality that matters for a disparate impact claimed based on *sex*.  Discrimination tends not to be facial in some form; more often than not, a wrongdoer selects a proxy for the protected class and claims only to be biased for or against the proxy, not the protected class.  *See, e.g.*, *U.S. v. Wynn*, 20 F. Supp. 2d 7, 14-15 (D.C. Cir. 1997) (noting concern that "residence or employment in a certain location of Washington D.C." was being used as "a proxy for race" and was having "a disparate impact"). Facially neutral policies, in other words, are often used to intentionally discriminate based on a protected class, and that is precisely what Mr. Doe alleges here.  And it is well-settled that intentional and disparate impact discrimination claims may be simultaneously asserted, and even that they may be proven by the same evidence.  *See, e.g.*, *Anderson v. Zubieta*, 180 F.3d 329, 339-40 (D.C. Cir 1999) (reversing district court's dismissal on summary judgment of plaintiff's disparate treatment and disparate impact claims and stating that "[u]nder our case law, this level of statistical significance is sufficient to establish a prima facie case of both disparate treatment and disparate impact.").

C.      **The Business Necessity Exception Cannot Save GW.**

GW argues that it qualifies for the business necessity exception because federal law requires that it adopt sexual misconduct procedures.  ECF No. 46-1 at 27.  As explained above, Mr. Doe's disparate impact claim is based on actions GW *chose* to take, as opposed to actions federal law *required* of it.  GW does not qualify for the exception.

D.      **GW Remaining Objections Fail.**

GW offers a few other futile objections to Mr. Doe's disparate impact claim.  *See* ECF No. 46-1 at 27-29.  It first contends that not every allegation of sexual misconduct in 2015-17 proceeded to a formal hearing, and those that did simply "tended to result in a finding of misconduct."  ECF No. 46-1 at 22.  Sexual misconduct hearings "tended" to result in convictions the way water "tends" to be wet and the sun "tends" to rise in the east—inevitably.

More fundamentally, GW's response ignores two things.  First, it ignores the allegations that disparate impact occurred *at the hearing stage*.  Mr. Doe alleges 100% of sexual misconduct *hearings* result in convictions, Am. Compl. ¶ 53-54, and that a smaller percentage of nonsexual misconduct *hearings* do so, *id.* ¶ 298.  And he alleges a plausible reason why: GW's decision to train its *hearing* officers in a pro-complainant, anti-respondent manner (to "protect victims" and "promote responsibility") in these types of hearings *and no others*.  *See, e.g., id.* ¶ 35.  In other words, even if GW had no role in determining which cases proceeded to formal hearings (it does, as explained below), it would still be responsible for the disparate impact that occurs there.

But second, it is not true that GW had no role in shaping the gender makeup of its formal hearings.  GW had a pivotal role in determining who proceeded through its formal disciplinary process, as spelled out in its Policy.  *See id.* ¶¶ 29-32.  After a complaint is filed, GW must then conduct its "adequate, reliable and impartial investigation."  *Id.* ¶ 29.  That investigation, like its

formal hearings, is conducted by people trained to "protect victims" and "promote responsibility." *Id.* ¶ 35.  Based on *that* investigation, *GW* decides whether the complaint can be resolved informally, *id.* ¶ 30, and if not, "whether to charge the Respondent,'" *id.* ¶ 32 (quoting Policy at 17).  Only if *GW* decides not to pursue informal resolution, *and* decides to charge someone, do they proceed to a formal hearing at the election of either party.  *Id.* ¶ 33.  GW had a direct hand in determining who was eligible for a formal hearing, and the data it relies on in making those determinations is the pro-complainant, anti-respondent training its administrators are told to employ in judging these cases, and no others.  GW cannot wash its hands of the gender makeup of its formal hearings, let alone the 100% conviction that occurred there.

*       *       *

Mr. Doe does not deny that GW must adjudicate claims of sexual misconduct.  Nor would he deny that most of the respondents in those proceedings are likely to be male.  What is not permissible under the D.C. Human Rights Act is to choose to resolve this one category of claims through a unique system where complainants are viewed as more likely to be victims.  If that were done in a category of claims with predominantly African-American respondents, the process would rightly be characterized as having an impermissible disparate impact based on race.  GW's system just as clearly has an impermissible disparate impact based on sex.

## IV.   GW'S ADMINISTRATION OF A NAKEDLY BIASED DISCIPLINARY REGIME CONSTITUTES NEGLIGENCE.

Count V alleges that GW breached a "duty to Doe to exercise reasonable care, with due regard for the truth, an evenhanded application of procedure, and the important and irreversible consequences of its actions."  Am. Compl. ¶ 346  To prove negligence in the District of Columbia, as in other jurisdictions, a plaintiff must show "(1) that the defendant owed a duty to the plaintiff, (2) breach of that duty, and (3) injury to the plaintiff that was proximately caused by

41

the breach." *Hedgepeth v. Whitman Walker Clinic*, 22 A.3d 789, 793 (D.C. 2011).  "In general, courts rely on the concept of 'foreseeability' to determine whether the defendant owed a duty to the claimant in a negligence action and examine whether the risk to the claimant was 'reasonably foreseeable' to the defendant."  *Id.* (citing *District of Columbia v. Shannon,* 696 A.2d 1359, 1366 (D.C.1997); *Haynesworth v. D.H. Stevens Co.,* 645 A.2d 1095, 1098 (D.C.1994)).  "If the injury that befell the plaintiff was 'reasonably foreseeable' to the defendant, then courts will usually conclude that the defendant owed the plaintiff a duty to avoid causing that injury; if the injury was not 'reasonably foreseeable,' then there was no duty."  *Id.*

Whether a risk is foreseeable "is determined, in large part, by the nature of the relationship between the parties."  *Id.* at 794.  When a defendant "enters into a relationship with a plaintiff, . . . a corresponding duty of care arises," and "'the scope of the defendant's undertaking determines the scope of its duty.'"  *Id.*  The "foreseeable risks" for which the defendant is liable are the ones "associated with the defendant's failure" adequately to complete the given undertaking.  *Id.* (quoting *Haynesworth,* 645 A.2d at 1098).

In the light of these principles, private universities owe a clear duty to their students to exercise reasonable care when disciplining them.  It is readily foreseeable that private universities, which bring together thousands of people, will have to maintain order on campus and discipline students—that is why codes of conduct exist.  It also is readily foreseeable that wrongful discipline, particularly for something as "stigmatizing" as sexual assault, *see Starishevsky v. Hofstra Univ.*, 612 N.Y.S.2d 794, 796 (Sup. Ct. 1994), carries serious injury and "important and irreversible consequences" for the accused, Am. Compl. ¶ 346.  Courts across the country therefore hold that students disciplined by private universities, particularly for something as serious as sexual misconduct, are owed a duty of care in that process.  *See, e.g.*, *St. Thomas*

*Univ.*, 240 F. Supp. 3d at 995 (denying motion to dismiss negligence claim brought by student disciplined for sexual misconduct); *Case Western Reserve Univ.*, 2017 WL 3840418 at *12 (denying motion to dismiss portion of negligence claim not based on duties created by contract); *Tsuruta v. Augustana Univ.*, No. 4:16-cv-4107, Docket No. 13 (D.S.D. June 16, 2016) (denying university's motion to dismiss negligence and breach of contract claims by student disciplined for sexual misconduct); *Papelino v. Albany Coll. of Pharmacy of Union Univ.*, 633 F.3d 81, 93 (2d Cir. 2011) (denying college's summary judgment motion as to negligence and breach of contract claims because college "had a duty to administer the Honor Code proceedings in a fair and impartial manner" and reasonable jury "could conclude . . . that the College was negligent in its handling of the proceedings"); *Doe v. Univ. of the South*, No. 4:09-cv-62, 2011 WL 1258104 at *21 (E.D. Tenn. March 31, 2011) (denying motion to dismiss negligence and breach of contract claims, holding that university owed common law duty to student disciplined for sexual misconduct "especially" because "the harm was severe: a wrongful conviction by a disciplinary committee"); *Rollins v. Cardinal Stritch Univ.*, 626 N.W.2d 464, 470 (Minn. Ct. App. 1981) ("common law imposes a duty on the part of private universities not to expel students in an arbitrary manner").  That duty exists prior to, and independent of, any particular contractual promises a university might later make about the manner in which discipline will be imposed.

GW, not surprisingly, says nothing about these negligence principles.  Instead it asserts that the Court of Appeals' decisions in *Choharis v. State Farm Fire & Cas. Co.*, 961 A.2d 1080 (D.C. 2008) and *EDCare Mgmt., Inc. v. DeLisi*, 50 A.3d 448 (D.C. 2012), mandate dismissal of Mr. Doe's negligence claim, because they hold that when a duty to act is *created by* contract, no tort claim based on breach of the contract will lie.  ECF No. 46-1 at 29-30.  But *Choharis* is explicit that where, as here, a tort "exist[s] in its own right independent of the contract," and the

duty upon which it is based "flows from considerations other than the contractual relationship," a contract claim does not subsume a simultaneous negligence claim. *Choharis*, 961 A.2d at 1089.

So GW additionally argues that, as a matter of pleading, Mr. Doe has not actually alleged that his negligence claim is based on any facts other than the breach of contractual duties. *See* ECF No. 46-1 at 31. But that simply is not true. The Amended Complaint alleges that GW was negligent in performing a series of acts that are not the subject of express promises in the Policy or the Code. It alleges, for example, that GW negligently trained the individuals who investigate and adjudicate sexual misconduct claims to combat something called "rape culture," to believe that only 2-8% of campus sexual misconduct claims are false, and to otherwise credit allegations of sexual assault when doing so is not warranted (Am. Compl. ¶¶ 62-64, 350). It further alleges that GW was negligent in hiring an investigator with a background in victims' rights advocacy to oversee what should be a neutral proceeding (*id.* ¶ 351). It also alleges additional facts establishing that GW negligently trained Mr. Doe's appeals panelists in his second appeal (*id.* ¶ 353). None of that violates a contract term in either the Policy or Code, yet all of it served to deny Mr. Doe a fair proceeding and punish him arbitrarily. *See Tsuruta v. Augustana Univ.*, No. 4:16-cv-4107, Docket No. 13, at 7 (D.S.D. June 16, 2016) (denying motion to dismiss negligence claim based on inadequate training of Title IX proceeding participants).

GW has a duty to discipline students fairly no matter what procedures it promises them. It cannot extinguish its common law duties by contractually promising its students an elaborate kangaroo court. It cannot promise them a certain set of procedures, adhere to them, yet take steps outside of them that have the foreseeable effect of denying students a fair hearing. That is what John Doe has alleged—that the pro-complainant, anti-respondent bias GW identifies in its

Code, and provides evidence of on its Title IX website, resulted in a 100% conviction rate at the time of his investigation.

Because GW owed Doe a duty of care when disciplining him, the only remaining question is whether Mr. Doe has plausibly pled that its failure to exercise reasonable care in investigating and adjudicating Ms. Roe's claims proximately caused his expulsion.  GW's Motion to Dismiss makes no argument regarding proximate cause, and GW should not be heard to do so for the first time in reply.  *Demery*, 602 F. Supp. 2d at 212; *Grant*, 197 F.3d at 542 n. 6.

The Amended Complaint, in any event, sufficiently alleges that GW's negligence proximately caused his injuries.  "Proximate cause is . . . a test of whether the injury is the natural and probable consequence of the negligence of wrongful act and ought to be foressen in light of the circumstances."  *Ceco Corp. v. Coleman*, 441 A.2d 940, 944 (D.C. 1982) (citing *Spar v. Obwoya,* 369 A.2d 173, 178 (D.C. 1977)).  Mr. Doe's discipline was not just the "natural and probable consequence" of the biased system that GW ran from 2015 to 2017; it was their inevitable consequence.  Am. Compl. ¶¶ 13, 53-54.

## CONCLUSION

As we have stated earlier in the case, at some point, the truth has to matter.  At every stage in this proceeding, new evidence has emerged that dramatically undermines Ms. Roe's story and shows Mr. Doe's actual innocence.  GW's indefensible handling of that evidence has added still more plausibility to his claims against it.  He is entitled to the full range of discovery against GW, which discovery will undoubtedly vindicate him all the more.  He thus asks this Court to deny GW's motion to dismiss.

Respectfully submitted,

DATED:  November 2, 2018

/s/ Christopher C. Muha
Justin Dillon (D.C. Bar No. 502322)
Christopher C. Muha (D.C. Bar No. 987116)
KAISERDILLON PLLC
1401 K Street NW, Suite 600
Washington, DC 20005
T: (202) 640-2850
F: (202) 280-1034
jdillon@kaiserdillon.com
cmuha@kaiserdillon.com

*Attorneys for Plaintiff John Doe*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 2nd day of November, 2018, a copy of the foregoing

Opposition to George Washington University's Motion to Dismiss Amended Complaint was

served by ECF and by email upon the following counsel who have been retained to represent The

George Washington University in this matter:


Joshua W. B. Richards
James A. Keller
Saul Ewing Arnstein & Lehr LLP
Centre Square West
1500 Market Street, 38th Floor
Philadelphia, PA 19102
Joshua.Richards@saul.com
James.Keller@saulcom

Jason A. Ross
Saul Ewing Arnstein & Lehr LLP
1919 Pennsylvania Ave. NW
Suite 550
Washington, DC 20006
(202) 295-6655
Jason.Ross@saul.com


/s/ Christopher C. Muha
Christopher C. Muha