| | |
|---|---|
| **JOHN DOE,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **Civil Action No. 18-553 (RMC)** |
| ) | |
| **THE GEORGE WASHINGTON** ) | |
| **UNIVERSITY,** ) | |
| ) | |
| **Defendant.** ) | |
| ) | |

## MEMORANDUM OPINION

As a sophomore at the George Washington University (GW), John Doe met a young woman, Jane Roe, at a party who said that she wanted to have sex. They did. Two years later, Jane Roe complained to GW that she had been sexually assaulted because she had obviously been too drunk to consent. After a hearing before a panel convened by GW, Mr. Doe was found responsible for sexual assault and suspended for one year. Mr. Doe appealed and was rebuffed. He then sued GW in this Court for gender-based discrimination in violation of Title IX and the D.C. Human Rights Act, as well as for breach of contract and negligence. The parties have already navigated motions for preliminary injunction and partial summary judgment, as well as a Court-mandated appeal before a GW appeals panel. The appeals panel having affirmed the hearing panel's decision, Mr. Doe has now filed an amended complaint. GW moves to dismiss all claims. That motion will be granted in part and denied in part.

## I. BACKGROUND

Twice now, the Court has stated the facts of this case. *See Doe v. George Washington Univ.*, 321 F. Supp. 3d 118 (D.D.C. 2018) (*Doe II*); *Doe v. George Washington*

*Univ.*, 305 F. Supp. 3d 126 (D.D.C. 2018) (*Doe I*). However, because new evidence has come to light since the last round of proceedings, an additional restatement is necessary.

### A. GW and Title IX

First, some context. In the wake of the Department of Education's 2011 "Dear Colleague" letter, GW, like many other colleges and universities, has been working to address sexual assaults on campus and comply with its obligations under Title IX, 20 U.S.C. § 1681 *et seq*. Second Am. Compl. (SAC) [Dkt. 51] ¶ 44. To describe just some of its struggles: In 2011, the Department of Education's Office of Civil Rights (OCR) opened an investigation into GW's handling of sexual assault claims after a female student filed a complaint, which investigation was only closed after GW agreed to monitoring by OCR through the 2012-2013 and 2013-2014 school years. *Id.* ¶¶ 48-49. In October 2015, however, another female student filed her own complaint, this time in federal court. *Id.* ¶ 50. That case received public attention and is ongoing. *Id*.

In April 2017, yet another female student, Aniqa Raihan, complained that GW had mishandled her case and started a change.org petition for stricter disciplinary punishment of students found responsible for sexual assault. *Id.* ¶ 52. In response, GW issued a statement wherein it acknowledged that the "narrative emerging from the petition and related activities suggests that GW has been reluctant or even unwilling to hold individuals accountable for acts of sexual violence." *Id.* ¶ 53; *Message from University Administrators*, GW Today (Apr. 21, 2017) https://gwtoday.gwu.edu/message-university-administrators. GW insisted, however, that "the narrative is not borne out by our record" and cited statistics from the 2015-2017 school years to prove its point: of 16 formal complaints, 10 went before a hearing panel, and in all 10 cases the accused student was found responsible and disciplined. SAC ¶ 53. This statement did not placate Ms. Raihan; in dramatic fashion at graduation, she displayed a five-by-twelve-foot sign

that read "#GWProtectsRapists," while the graduating class of the Women's, Gender, and Sexuality Studies Program held a banner with "IX" on it. *Id.* ¶ 55. This too received public attention. *Id.*

In August 2017, OCR opened another investigation into GW's Title IX practices, based on a third student's complaint. *Id.* ¶ 58. That investigation was completed in July 2018. *Id.* However, Ms. Raihan filed her own complaint with OCR in September 2018, and GW continues to receive negative Title IX publicity. *Id.* ¶¶ 59-60.

**B.  The Incident Between Mr. Doe and Ms. Roe**

On the night of September 12, 2015, Mr. Doe, a sophomore at George Washington University and a member of the school's rugby team, attended a party at the rugby house. *Id.* ¶ 65. At the time, Mr. Doe was a virgin and did not drink alcohol for religious reasons. *Id.* As Mr. Doe recalls and alleges, he overheard Ms. Roe tell a friend at the party that she wanted to have sex. *Id.* ¶ 67. He introduced himself to her; they talked; they kissed; and Ms. Roe, after confirming with her roommate that their room was not available, asked if they could have sex in Mr. Doe's room. *Id.* ¶ 71. She then called an Uber for them and a third student who needed a ride. *Id.* They did not speak during the Uber ride—Mr. Doe says that he was nervous and that Ms. Roe was "quietly doing things on her phone" (not talking to anyone)—but when they arrived at Mr. Doe's place they reciprocated oral sex and had consensual intercourse. *Id.* ¶¶ 73, 75. After they finished, they exchanged a few more words, then Ms. Roe left Mr. Doe's room. *Id.* ¶¶ 75-76. At no point in their interaction did Ms. Roe show signs of severe intoxication, including slurring or stumbling. *Id.* ¶ 70.

Ms. Roe, who was a freshman in September 2015, recalls differently,[1] and on October 30, 2017, she filed a formal complaint with GW alleging that she had been too drunk to consent to sex and that Mr. Doe should have known it. *Id.* ¶ 77. Ms. Roe told GW that she attended a pre-game party with friends, where she took multiple shots. *Id.* ¶ 137. The group then took an Uber to the rugby house, where Ms. Roe drank more. *Id.* ¶¶ 94-95. Ms. Roe only vaguely remembered speaking with Mr. Doe and did not remember calling or getting into an Uber with him. *Id.* ¶ 78. Instead, she remembered waking up a short while later to Mr. Doe having sexual intercourse with her, that she verbalized "no," and that she tried to push him away but was unable to. *Id.* ¶ 80. After Mr. Doe finished, Ms. Roe rushed out of bed and into her clothes and ran down eight flights of stairs and one block back to her dorm. *Id.* ¶ 81. There she found her roommate, A.C., and, going into the bathroom, "explained to her the details of what had happened." *Id.*

GW initiated an investigation through which it conducted interviews and held a hearing before a panel composed of another GW undergraduate student, a GW law student, and a GW administrator whose title is "Director of Greek Life" (collectively, the Hearing Panel). *Id.* ¶ 134. These proceedings were conducted pursuant to GW's Sexual Harassment and Sexual Violence Policy (the Policy) and its Code of Student Conduct (the Code) that were in effect at the time.[2] Three witnesses appeared before the Hearing Panel on behalf of Ms. Roe. *Id.* ¶ 130.

---

[1] According to the complaint, Ms. Roe recounts the night's events inconsistently across several statements and testimony. Because at this stage of litigation the Court must take Mr. Doe's allegations as true, *see* Section II, *infra*, his account of the night, not hers, is relied upon. The critical facts of Ms. Roe's story are inconsistent with Mr. Doe's and credibility is not judged in this decision, so the details can be skipped.

[2] Both documents are appended to Mr. Doe's complaint. *See* Ex.1, First Am. Compl. (FAC), Sexual Harassment and Sexual Violence [Dkt. 45-1]; Ex.2, FAC, Code of Student Conduct [Dkt.

J.E. was the first witness and he testified both that he had been with Ms. Roe at the pre-game party where he had seen her take a number of shots, and that she was slurring her words and stumbling before the group left for the rugby house.  *Id.* ¶ 145.  The second witness, R.M., testified that Ms. Roe had appeared drunk at the rugby house, although he did not describe what he meant.  *Id.* ¶ 146.  The third witness, E.E., testified that Ms. Roe had called her when she was in the Uber with Mr. Doe, during which call Ms. Roe sounded "extremely intoxicated . . . and . . . barely conscious."[3]  *Id.* ¶ 148.  Mr. Doe was his own and only witness.  He denied that Ms. Roe was obviously drunk and reported that his potential witness, Q.W., had spoken with Ms. Roe and observed nothing out of the ordinary.  *Id.* ¶ 166.  However, Q.W. was studying abroad in 2017 and did not provide a statement to the Hearing Panel.  *Id.*

On January 23, 2018, GW informed Mr. Doe that the Hearing Panel had found him responsible for sexually assaulting Ms. Roe.  *Id.* ¶ 167.  Specifically, it found that Ms. Roe had been intoxicated to the point of incapacitation based on:  (1) Ms. Roe's own testimony regarding her level of intoxication and lack of memory; (2) E.E.'s testimony that Ms. Roe sounded incoherent and barely conscious on the phone; (3) the fact that Mr. Doe and Ms. Roe had exchanged few words during their Uber ride together; (4) the fact that the rugby team had encouraged women at the party to drink heavily; and (5) Mr. Doe's predatory behavior, *i.e.*, approaching Ms. Roe after overhearing her tell her friend that she wanted to have sex.  *Id.* ¶ 168; Ex. 12, Mot. for Summ. J., University Hearing Board Adjudication Report (hereinafter Hearing

<hr />

45-2].  The Court understands that the Sexual Harassment and Sexual Violence Policy has since been updated.

[3] Again, Mr. Doe's complaint notes several inconsistencies in E.E.'s statements.  Those inconsistencies are irrelevant at this time and do not warrant further detail.

Decision) [Dkt. 27-15] at 5-6.[4] The Hearing Panel also found that Mr. Doe should have known that Ms. Roe was too incapacitated to consent based on testimony that she had been stumbling and slurring words before the rugby party, been drunk at the rugby party, been slurring her words on the phone during the Uber ride, and had otherwise spoken very little with Mr. Doe during the Uber ride. *Id.* at 6. Mr. Doe was suspended for one year, delaying conferral of his undergraduate degree from spring 2018 until January 2019 even though all of his course work was completed. SAC ¶¶ 167, 284.

Since the decision of the Hearing Panel, additional evidence has become available to Mr. Doe. First, Mr. Doe subpoenaed E.E.'s phone records in this litigation; they show that she received no calls from Ms. Roe on the night of the incident. *Id.* ¶ 106. Mr. Doe also subpoenaed Ms. Roe's phone records; they show that the only call Ms. Roe made during the Uber ride was a one-minute call to her roommate A.C. *Id.* ¶ 107. Second, Mr. Doe submitted a report from toxicologist Harry Milman, Ph.D., estimating that, in his opinion, Ms. Roe would have had a blood alcohol content (BAC) between 0.26 and 0.37, based on varying accounts of the number of drinks she had. *Id.* ¶ 174. Dr. Milman stated that "even at the low end of the range" it was "extremely unlikely that she could have dressed herself, run down eight flights of stairs, run one block to her home, and was able to explain to her roommate that she had allegedly been assaulted." Harry A. Milman, Intoxication Opinion [Dkt. 28-4] at 5. Third, Q.W. submitted a statement indicating that he had a "normal, lucid conversation" with Ms. Roe and her friends at the rugby party in the presence of Mr. Doe, approximately thirty minutes before the Mr. Doe and Ms. Roe left in the Uber together. SAC ¶ 69. Fourth, Mr. Doe obtained texts between A.C. and

---

[4] Decisions by GW's disciplinary panels, as well as other evidentiary documents, are incorporated by reference into the Second Amended Complaint. *Cf. Abhe & Svodboda, Inc., v. Chao*, 508 F.3d 1052, 1059 (D.C. Cir. 2007).

Ms. Roe indicating that A.C. had no memory of calling Ms. Roe or hearing her describe her assault on the night of the incident. *Id.* ¶ 153. Mr. Doe appealed the Hearing Panel's decision with this new evidence.

A GW Appeals Panel considered Mr. Doe's appeal in September 2018.[5] After considering the new evidence provided by Mr. Doe, the Hearing Panel's decision and the record before it, and additional statements from Ms. Roe responding to Mr. Doe's appeal, the Appeals Panel issued a terse, two-page letter rejecting Mr. Doe's appeal. SAC ¶¶ 213-15; Ex. C, Mot. to Dismiss Pl.'s Am. Compl. (Mot. to Dismiss) [Dkt. 46], Letter from Christy Anthony, Director, Office of Student Rights and Responsibilities, to John Doe (Sept. 18, 2018) (hereinafter Appeals Decision) [Dkt. 46-5]. For the third time, Mr. Doe turned to this Court, claiming breach of contract, breach of the duty of good faith and fair dealing, disparate treatment under Title IX, disparate impact and disparate treatment under the D.C. Human Rights Act (DCHRA), and negligence.[6] *See generally* SAC. GW moves to dismiss. The Court heard oral arguments. The matter is now ripe.[7]

---

[5] The appeal before GW had some complications. First, it was ordered by the Court. *See Doe II*, 321 F. Supp. 3d 118. Second, one trained panelist was challenged for bias and removed. SAC ¶¶ 199-201. Third, another trained panelist performed impermissible outside research then emailed the entire panel requesting information from GW on the impact of the appeals decision on this litigation. *Id.* ¶ 206-07. That entire panel had to be replaced. *Id.* ¶ 211.

[6] This court has federal jurisdiction arising out of Mr. Doe's Title IX claim, as well as diversity jurisdiction—Mr. Doe is a citizen of the State of Washington and GW is incorporated in D.C. SAC ¶¶ 1-2. Venue properly lies in this Court because a substantial part of the events underlying Mr. Doe's claims occurred in D.C.

[7] *See* Mot. to Dismiss.; Mem. of Law in Supp. of Def.'s Mot. to Dismiss Am. Compl. (Mem.) [Dkt. 46-1]; Opp'n to George Washington Univ.'s Mot. to Dismiss Am. Compl. (Opp'n) [Dkt. 47]; Reply in Supp. of Def.'s Mot to Dismiss Am. Compl. (Reply) [Dkt. 48].

## II.    LEGAL STANDARD

Federal Rule of Civil Procedure 12(b)(6) requires a complaint to be sufficient "to give the defendant fair notice of what the claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal citations omitted).  Although a complaint does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.*  The facts alleged "must be enough to raise a right to relief above the speculative level." *Id.*  A complaint must contain sufficient factual matter to state a claim for relief that is "plausible on its face." *Id.* at 570.  When a plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged, then the claim has facial plausibility. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  "The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.*  A court must treat the complaint's factual allegations as true, "even if doubtful in fact." *Twombly*, 550 U.S. at 555.  But a court need not accept as true legal conclusions set forth in a complaint. *See Iqbal*, 556 U.S. at 678.

## III.    ANALYSIS

### A.  Breach of Contract

To state a claim for breach of contract under D.C. law, a plaintiff must allege: "(1) a valid contract between the parties; (2) an obligation or duty arising out of the contract; (3) a breach of that duty; and (4) damages caused by that breach." *Tsintolas Realty Col. v. Mendez*, 984 A.2d 181 (D.C. 2009).  This Court has ruled that GW's codes and policies form a contract that Mr. Doe can seek to enforce. *See Doe I*, 305 F. Supp. 3d at 131 (citing *Chenari v. George Washington Univ.*, 847 F.3d 740, 744 (D.C. Cir. 2017)).  Because both parties agree that GW has

now completed the formal procedures described in its codes and policies, the question is whether those procedures were carried out fairly and in good faith.

> As described by another court in this district, under D.C. law

> [a]ll contracts contain an implied duty of good faith and fair dealing, which means that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract. A party breaches this duty by evading the spirit of the contract, willfully rendering imperfect performance, or interfering with performance by the other party. The test for determining whether a Defendant's actions breached the covenant of good faith and fair dealing is a reasonableness inquiry.

*Paulin v. George Washington Univ. Sch. of Med. And Health Scis.*, 878 F. Supp. 2d 241, 247-48 (D.D.C. 2012) (internal quotes and citations omitted) (citing *Allsworth v. Howard Univ.*, 890 A.2d 194 (D.C. 2006)). Conduct is unfair and not in good faith if it is arbitrary and capricious.[8] *Kumar v. George Washington Univ.*, 174 F. Supp. 3d 172, 189 (D.D.C. 2016) (citing *Wright v. Howard Univ.*, 60 A.3d 749, 754 (D.C. 2013)). Notably, the duty of good faith and fair dealing "cannot contradict, modify, negate, or override the express terms of a contract." *Billups v. Lab. Corp. of America*, 233 F. Supp. 3d 20, 26 (D.D.C. 2017) (citing 17A C.J.S. *Contracts* § 437 (2016)). Rather, the duty of good faith and fair dealing is an interpretive lens through which courts evaluate the parties' reasonable expectations for the fulfillment of the terms of the

---

[8] GW also argues "a judgment by school officials that a student has not performed adequately to meet the school's academic standard is a determination that usually calls for judicial deference." *Alden v. Georgetown Univ.*, 734 A.2d 1103, 1108 (D.C. 1999). The Court agrees, although there is no issue about the University's academic standards in this case. GW cites no persuasive case law indicating that a university is entitled to similar deference on *non-academic* matters. *Cf. Doherty v. S. Coll. of Optometry*, 862 F.2d 570, 577 (6th Cir. 1988) ("[C]ourts have adopted different standards of review when educators' decisions are based upon disciplinary versus academic criteria—applying a more intrusive analysis of the former and a far more deferential examination of the latter."). Notwithstanding, GW's argument overlaps with the standard applicable to good faith and fair dealing. *Cf. Chenari*, 847 F.3d at 745 (considering breach of contract and implied covenant claims together because the standards "overlap").

contract.  In this situation, because the count for breach of the duty of good faith and fair dealing is duplicative of the count for breach of contract, the issues will be consolidated and addressed together; the independent claim for breach of the duty of good faith and fair dealing will be dismissed.  *See WMATA v. Quik Serve Foods, Inc.*, Nos. 04-cv-687 and 04-cv-838 2006 WL 1147933, at *5 (D.D.C. Apr. 28, 2006).

For the purposes of GW's motion to dismiss, the Court does not need to address whether GW's initial investigation of Ms. Roe's complaint was adequate or whether the decision of the Hearing Panel was correct, since on appeal any defects could have been addressed and remedied.  Instead, the question now is whether the decision by GW's Appeals Panel, which considered the new evidence and decided that a new hearing was not appropriate, was arbitrary and capricious.

Complicating this analysis is the ambiguous standard of review applied by the Appeals Panel.  GW exhorts the Court to defer to the factual findings of the Appeals Panel, but the Hearing Panel was the factfinder in this case, not the Appeals Panel.  *See* Mem. at 10 n.3 (arguing that "credibility determin[ations] are left solely to the discretion of the finder of fact, which in this case was the hearing panel").  Indeed, that the Appeals Panel was not itself a factfinder is emphasized by the limited remedies available to it:  even with new evidence, it could not make a factual finding *contrary* to the Hearing Panel but could only remand to the Hearing Panel or a new panel for further proceedings.  *See* Code ¶ 35.  While the Appeals Panel did receive written statements from both Mr. Doe and Ms. Roe concerning the new evidence, the Appeals Panel did not itself hear directly from any witness, new or otherwise; it could not properly make credibility determinations as between or among witnesses.  The Code does state that "[a]ppeals must be based on new information that . . . significantly alters the finding of fact."

*Id.* ¶ 34.  But without a factfinding function, or insight into credibility, the Appeals Panel could not be tasked to decide whether the new evidence did, in fact, significantly alter the finding of fact (that would be the role of a hearing panel on remand), and reading the Code in this way would seem to frustrate the entire appeals process and deny appellants meaningful review. Rather, this standard can only be reconciled with the authority and practice of the Appeals Panel if the Appeals Panel was actually tasked with determining whether the new evidence *could* significantly alter the facts, given the totality of the cold evidence under review.

       Mr. Doe describes his count for breach of contract as six different claims.  Three of the claims, related to incapacity (Count III.A), SAC ¶¶ 309-13, the preponderance standard (Count III.B), *id.* ¶¶ 314-18, and the adequacy of the investigation (Count III.D), *id.* ¶¶ 323-26, deal with infirmities in the investigative and hearing panel process which have been mooted by the Appeals Panel's superseding decision, and so will be dismissed.  Mr. Doe's retaliation claim (Count. III.F), *id.* ¶¶ 333-38, argues that GW failed to punish Ms. Roe for statements she made related to the case.  This claim is sparsely pled, however, and Mr. Doe does not allege that he has a contractual right to have GW enforce the confidentiality provisions of the Code against Ms. Roe.  It, too, will be dismissed.  However, to the extent these claims overlap with Mr. Doe's claim that the Appeals Panel's ultimate decision was improper (Count III.E), *id.* 327-32, they are consolidated and addressed with that claim below.

       Mr. Doe also claims that he had insufficient opportunity to challenge Hearing Panel member Ms. Witkowicki, the Director of Greek Life, for bias (Count III.C).  *Id.* ¶¶ 319-22. The Code states that "[a]ny party may challenge a Board member on the grounds of personal bias before the hearing commences."  Code ¶ 27.g.  Mr. Doe alleges that Ms. Witkowicki has a background which evidences biased thinking and would have objected to her presence on the

panel.  SAC ¶ 134.  Mr. Doe further alleges that he was only told the identities of the members of the Hearing Panel when he arrived for the hearing itself and that he had no meaningful opportunity to review their backgrounds or object.  *Id.* ¶ 133.  This Court does not infer that Ms. Witkowicki's background showed any bias or whether she should have been disqualified as panelist.  It is sufficient that Mr. Doe alleges that the University failed to give him a meaningful opportunity to challenge the members of the panel, contrary to the Code.  GW's motion to dismiss this claim will be denied.[9]

Only Count III.E—Mr. Doe's claim that the Appeals Panel improperly denied his appeal—remains to be addressed.  Giving Mr. Doe, as plaintiff, the benefit of his factual allegations and all reasonable inferences therefrom, the Court cannot reconcile the facts of this case with the Appeals Panel's decision.

First, the Appeals Panel considered the phone records belonging to Ms. Roe and her friend E.E. and determined that they "did not significantly alter the finding of fact because the phone records supported [E.E.]'s statement that a phone call occurred in the Uber ride."  Appeals Decision at 1.  However, the phone records showed that Ms. Roe had neither called nor received a call from E.E.  SAC ¶ 219.  Ms. Roe may have called her roommate A.C., but, as alleged, A.C. had already left the party for their dorm and was not with E.E. at the time.  *Id*.  Therefore, E.E. could not possibly have known whether any phone call occurred during the Uber ride, much less actually had a conversation with Ms. Roe during that ride.

---

[9] Unlike Counts III.A, B, and D, Count III.C is not mooted by the Appeals Panel's decision because the Appeals Panel gave significant weight to the Hearing Panel's credibility determinations.

Ms. Roe may have placed a call to A.C. during the Uber ride, which the Appeals Panel believed "directly contradicted [Mr. Doe's] testimony that no phone call occurred during the Uber ride." Appeals Decision at 1. But as described by Mr. Doe,

> [w]hen a Verizon subscriber's call goes unanswered for under a minute before hanging up, it is recorded on the subscriber's bill as a one-minute outgoing call. The 12:06 a.m. call to A.C. would thus be recorded on Ms. Roe's records in exactly the same way whether or not A.C. ever answered, and therefore whether or not Ms. Roe ever said a word.

SAC ¶ 119. At the point of a motion to dismiss, Mr. Doe is also entitled to all reasonable inferences that may be drawn from his factual allegations. Together with Mr. Doe's allegation that Ms. Roe did not speak with anyone during the Uber ride, *see id.* ¶ 73, the Court gives him the benefit of the reasonable inference that Ms. Roe's call to A.C. went unanswered and that no conversation took place.

The Hearing Panel's decision gave significant credit to E.E.'s testimony regarding Ms. Roe's state of notable intoxication during the Uber ride. The totality of the evidence before the Appeals Panel indicates that E.E. never spoke to Ms. Doe; certainly, a one-minute or unanswered call to A.C. does not corroborate E.E.'s testimony. The Appeals Panel excused the failure of evidence as a mere memory lapse by Ms. Roe, who, it concluded (contrary to the Hearing Panel), may have been confused about whom she called from the Uber. However, there is no evidence that Ms. Roe had any recollection of talking to anyone during the Uber ride, at least not prior to the hearing when she heard E.E.'s statements asserting that E.E. had talked with Ms. Roe. *Id.* ¶ 143. If there were other bases for the Appeals Panel to dismiss the potential impact of E.E.'s erroneous testimony, it did not state them. GW's motion to dismiss fails to explain how the Appeals Panel could reasonably scramble the facts and ignore the errors in E.E.'s testimony.

Second, the Appeals Panel reviewed Dr. Milman's expert toxicology report. Advised by Mr. Doe that Ms. Roe was approximately 65 inches tall and weighed somewhere between 140-150 pounds, Dr. Milman estimated that Ms. Roe's BAC would have been between 0.26 and 0.37. He opined that at the midpoint BAC of 0.32, she would have had total memory loss and substantial motor impairment. The Appeals Panel discounted Dr. Milman's opinion, however, because he received the wrong height and weight for Ms. Roe—she is actually 70 inches tall and estimates she weighed around 170 pounds at the time of the alleged assault. *Id.* ¶ 226.

After finding that Dr. Milman's calculations were based on incorrect assumptions, the Appeals Panel was not required to calculate a new BAC based on its own lay knowledge. That said, the Appeals Panel only decided that Dr. Milman's assumptions were incorrect because Ms. Roe was permitted to submit supplemental statements in response to Mr. Doe's appeal. GW argues that no provision of the Code was violated when it invited Ms. Roe to file supplemental statements. The Code states, however, that the "decision to grant or deny the appeal will be based on information supplied in the written appeal and, when necessary, the record of the original proceedings." Code ¶ 34; s*ee also* SAC ¶¶ 189, 192-97. Ms. Roe's actual height and weight were not in the record prior to the appeal or supplied in Mr. Doe's written appeal. Further, the pleadings do not state that GW provided Mr. Doe with a chance to respond to Ms. Roe's supplemental statements.[10] Without more information on how appeals are normally conducted, this apparent irregularity is glaring.

---

[10] Even if the Appeals Panel were not required to calculate a new BAC, Mr. Doe may have been interested in presenting a revised calculation from Dr. Milman.

Third, the Appeals Panel discounted the statement of Mr. Roe's witness, Q.W., because the statement was submitted after the hearing and "did not outweigh other evidence offered by the parties." Appeals Decision at 1. By definition, some evidence before an appeals panel will always be new and thus "late." Further, Q.W. had a reason for submitting his statement late: he was studying abroad when the Hearing Panel convened. In any event, it is not the place of either this Court or the Appeals Panel to weigh the Q.W.'s credibility relative to the other witnesses on a cold record. That factfinding is reserved for a hearings panel. GW does not address the roles of the Hearing and Appeals Panels in this context.

Fourth and finally, the Appeals Panel addressed newly-discovered text messages between Ms. Roe and A.C.[11] According to the texts, A.C. had no recollection of talking to Ms. Roe either during the Uber ride or in the bathroom of the dorm after Ms. Roe returned. Without explanation, the Appeals Panel found that this evidence "generally corroborate[d]" Ms. Roe's statements that she had spoken with someone on the phone during the Uber ride and that she had spoken to A.C. about the assault when she got back to the dorm. *Id.* at 2. This conclusion is divorced from the evidence and not explained by GW.

To put a finer point on the matter, the Code required two determinations: (1) Ms. Roe did not have the capacity to consent; and (2) Mr. Doe should reasonably have known that she was incapacitated. The Appeals Panel was presented with direct contradictions in the evidence and appears to have strained to overlook such contradictions, leaving no trail of reasoning.

---

[11] Although E.E.'s phone records were available before *Doe II*, A.C.'s formal statement and text messages only became available to Mr. Doe after he filed a retaliation claim against Ms. Roe. SAC ¶ 127.

Of course, members of the Appeals Panel are neither lawyers nor judges, and their decisions may not require much explanation. Nonetheless, to warrant deference, such a decision must provide enough reasoning to avoid being arbitrary and capricious. The bar Mr. Doe must clear on a motion to dismiss is low. The motion to dismiss will be denied on the breach of contract claim to the extent it relates to the denial of his appeal.

### B. Title IX

Title IX provides, in pertinent part, that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subject to discrimination under any education program or activity" that receives federal funding. 29 U.S.C. § 1681(a). Courts in other circuits have recognized an "erroneous outcome" theory of Title IX liability, under which a student may prevail upon a showing that they were improperly disciplined due to gender bias. *See Yusuf v. Vassar Coll.*, 35 F.3d 709, 715 (2d Cir. 1994); *Doe v. Miami Univ.*, 882 F.3d 579, 589 (6th Cir. 2018) (recognizing Title IX defenses of "(1) erroneous outcome, (2) selective enforcement, (3) deliberate indifference, and (4) archaic assumptions") (internal marks and citations omitted). To succeed, a plaintiff must show "particular facts sufficient to cast some articulable doubt on the outcome of the disciplinary proceeding" and circumstances showing "that gender bias was a motivating factor behind the erroneous finding." *Yusuf*, 35 F.3d at 715. As discussed above, Mr. Doe has cast "articulable doubt" on the outcome of disciplinary proceeding; the remaining question is whether there was a relationship between that outcome and gender bias.

The Second and Sixth Circuits have identified possible indicia of gender bias that may affect the outcome of a disciplinary proceeding. In *Doe v. Columbia University*, the Second Circuit found that local criticism of the school's prior tolerance of sexual assaults against female students, combined with an alleged motivation to demonstrate that the school was "serious about

protecting female students from sexual assault by male students," was sufficient to support an inference of discriminatory intent. 831 F.3d 46, 57 (2d Cir. 2016). By comparison, in *Doe v. Baum* the Sixth Circuit found that alleged public attention and an ongoing federal investigation that "put pressure on the university to prove that it took complaints of sexual misconduct seriously" provided only background context for a Title IX claim. 903 F.3d 575, 586 (6th Cir. 2018). However, because that context included an additional allegation—that the university's hearing panel had credited all testimony by women and no testimony by men—the Sixth Circuit found sufficient basis to support an inference of discriminatory intent. *Id.* at 587. Similarly, in *Doe v. Miami University*, the Sixth Circuit found that public pressure created a backdrop against which another lawyer's affidavit and loose statistical evidence were sufficient to allege a Title IX claim. 882 F.3d 579, 593 (6th Cir. 2018). Both the Second and Sixth Circuits agree that other relevant allegations "might include, inter alia, statements by members of the disciplinary tribunal, statements by pertinent university officials, or patterns of decision-making that also tend to show the influence of gender." *Yusuf*, 35 F.3d at 715; *see also Miami Univ.*, 882 F.3d at 593 (citing *Yusuf*, 35 F.3d at 715).

Differing precedents in the Second and Sixth Circuits regarding Title VII pleading standards (which have been cross-applied to Title IX) explain the different requirements for Title IX cases. *Compare Littlejohn v. City of New York*, 795 F.3d 297, 310 (2d Cir. 2015) (finding Title VII discrimination can be plead under a minimal plausible inference standard), *with Keys v. Humana, Inc.*, 684 F.3d 605, 608 (6th Cir. 2012) (finding Title VII discrimination claims must be pled under *Twombly* and *Iqbal* standards)*. But see Doe v. Univ. of Colorado, Boulder through Bd. of Regents of Univ. of Colorado*, 255 F. Supp. 3d 1064, 1076 (D. Colo. 2017) (finding that the Second Circuit's interpretation does not weaken the standard required under *Twombly* and

*Iqbal*).  The D.C. Circuit has yet to speak to the underlying issue and the parties disagree about which standard should be applied, but the Court will not belabor the distinction because Mr. Doe pleads enough to satisfy the Sixth Circuit's higher pleading requirements.

Specifically, Mr. Doe alleges two OCR investigation targeting GW's disciplinary practices, and a third one potentially pending.  *See* SAC ¶¶ 48-50, 59.  Mr. Doe also alleges other prongs of unwanted public attention, including two other ongoing federal lawsuits, brought by female students against GW for its recent handling of their sexual assault claims, and public protests.  *Id.* ¶¶ 15-18, 50-55.  Ms. Roe herself is also alleged to have publicly pressured GW for stronger Title IX enforcement.  *Id.* ¶ 61.

Further, in response to these protests and complaints that GW was "reluctant or even unwilling to hold individuals accountable for acts of sexual violence," GW issued a statement noting that of 16 cases reported between 2015 and 2017, 10 went before a hearing board and all 10 resulted in a finding of violation.  *Message from University Administrators*, *supra.*  Without context, the Court would read little into these numbers.  *Cf. Univ. of Colorado*, 255 F. Supp. 3d at 1078 (finding that the school was "not responsible for the gender makeup of those are accused by other students of sexual misconduct") (internal cites and marks omitted)*.* However, Mr. Doe alleges that by putting forward these numbers in response to student protests and as proof of its commitment to combatting sexual assault, GW has "demonstrated a concrete link between public criticism of its Title IX enforcement regime and the results of individual Title IX cases."  SAC ¶ 54.  The significance of the GW statement is contested—GW provided some clarification in the next paragraph of its statement, *Message from University Administrators*, *supra* ("[N]ot every case will result in a finding of violation.")—but the

combination of OCR investigations, publicized demonstrations, and the GW statement are sufficient to avoid dismissal at this point in the litigation.

GW's motion to dismiss Mr. Doe's claim under Title IX will be denied.

## C.  D.C. Human Rights Act

Under the DCHRA, it is "an unlawful discriminatory practice . . . for an educational institution" to "deny, restrict, or to abridge or condition the use of, or access to, any of its facilities, services, programs, or benefits of any program or activity to any person otherwise qualified, wholly or partially, for a discriminatory reason," including a student's sex.  D.C. Code § 2-1402.41(1).  The DCHRA also provides that "[a]ny practice which has a discriminatory effect . . . shall not be deemed unlawful if it can be established that such practice is not intentionally devised or operated to contravene the prohibitions of this chapter and can be justified by business necessity."  D.C. Code § 2-1401.03(a).  Because Mr. Doe has stated a claim for disparate treatment due to his gender under Title IX, he has also stated a claim for such disparate treatment under the DCHRA.

That said, Mr. Doe further argues that GW's facially neutral procedures for investigating and adjudicating sexual assault cases have a disparate impact on men.  He cites the fact that GW hearing panels from 2015 through 2017 found responsible all accused persons—all men, upon information and belief—brought before it.  The parties agree that private-action disparate impact claims are not permitted under Title IX, *cf. Alexander v. Sandoval*, 532 U.S. 275 (2001) (noting that Title VI "prohibits only intentional discrimination" and that Title IX "was patterned after Title VI"), but they disagree as to whether such claims are permitted under the DCHRA.

GW argues that the Court should refuse to recognize a disparate impact theory of liability under the DCHRA.  However, the D.C. Court of Appeals has already spoken directly on

this issue and found that D.C. "imported into the Human Rights Act, by way of the effects clause, the concept of disparate impact discrimination developed by the Supreme Court in *Griggs v. Duke Power Co.*, 401 U.S. 424, 91 S. Ct. 849, 28 L. Ed. 2d 158 (1971)." *Gay Rights Coal. of Georgetown Univ. Law Ctr. v. Georgetown Univ.*, 536 A.2d 1, 29 (D.C. 1987) (*en banc*); *see also Smith v. Henderson*, 54 F. Supp. 3d 58, 74 (D.D.C. 2014) (citing *Gay Rights Coal.*, 536 A.2d at 29). Indeed, the plaintiff in *Gay Rights Coalition* was a private party, and GW cites no D.C. case law supporting a different interpretation of the DCHRA.

Notwithstanding D.C. law, Mr. Doe has not actually stated a claim for disparate impact. He pleads that from 2015 through 2017 "all of the respondents" in GW's sexual assault hearings were men. SAC ¶ 277. This allegation is fatal to his claim because without showing that women go through the same disciplinary process and receive disproportionately different outcomes, there is no showing of disparate impact; there is no comparator group. Although Mr. Doe argues that GW is responsible for choosing which cases go to hearing and is responsible for sending only men to hearings, this is an inevitable result of the pool of respondents; no inference can be drawn from it.

The fact that only men may have been accused of sexual assault at GW does not change this conclusion. GW is not responsible for selecting the parties who are the subjects of its proceedings—that happens through complaints by alleged victims. *See* Code ¶ 16; *cf. Univ. of Colorado*, 255 F. Supp. 3d at 1078. And GW cannot be said to have created a separate training program to address disproportionately-male misconduct since "it is not alleged in the pleadings . . . that more men than women engage in sexual assault," and Mr. Doe asks the Court not to rely on such an "unstated factual premise." Opp'n at 38.

GW's motion to dismiss the disparate impact claim under the DCHRA will be granted.[12]  It's motion to dismiss the claim of disparate treatment based on gender under the DCHRA will be denied.

### D. Negligence

To state a claim for negligence, a plaintiff must allege "(1) that the defendant owed a duty to the plaintiff, (2) breach of that duty, and (3) injury to the plaintiff that was proximately caused by the breach." *Hedgepeth v. Whitman Walker Clinic*, 22 A.3d 789, 793 (D.C. 2011).  When a tort parallels a claimed breach of contract, "the tort must exist in its own right independent of the contract, and any duty upon which the tort is based must flow from considerations other than the contractual relationship." *Choharis v. State Farm Fire and Cas. Co.*, 961 A.2d 1080, 1089 (D.C. 2008).  Thus, a "negligence claim based solely on a breach of the duty to fulfill one's obligations under a contract . . . is duplicative and unsustainable." *Himmelstein v. Comcast of the Dist. LLC*, 908 F. Supp. 2d 49, 55 (D.D.C. 2012) (citing *Choharis*, 961 A.2d at 1089).

GW argues that it owes no duty to Mr. Doe outside of those created by its policies, and Mr. Doe makes only a nominal defense of his negligence allegations, citing a series of cases outside this Court's jurisdiction.  Contrary to his attempt, *Choharis* represents the law of the District of Columbia.  Further, while Mr. Doe accurately states that torts that exist independent of a contract are not duplicative, he alleges no such independent torts.  *Compare* SAC ¶¶ 309-42 (listing claims under breach of contract), *with id.* ¶¶ 346-53 (listing the same claims under negligence).  The claim of negligence will be dismissed.

---

[12] Accordingly, the Court need not address whether a disparate impact claim under the DCHRA would conflict with GW's obligations under Title IX.

## IV.    CONCLUSION

GW's Motion to Dismiss, Dkt. 46, will be granted in part and denied in part.  Mr. Doe's claims for disparate treatment under Title IX (Count I) and the DCHRA (Count II.A) and his claim for breach of contract due to denial of his appeal (Count III.E) will be allowed to proceed to discovery.  All other claims will be dismissed.  A memorializing Order accompanies this Memorandum Opinion.

Date: December 20, 2018

_____
ROSEMARY M. COLLYER
United States District Judge